# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

COMMONWEALTH OF VIRGINIA, et al.,

*Plaintiff-Appellants*,

v.

DAVID FERRIERO,
in his official capacity as Archivist of the United States,

*Defendant-Appellee*,

STATE OF ALABAMA, et al.,

*Intervenor-Defendant-Appellees*.

On Appeal from the United States District Court for
the District of Columbia

## BRIEF OF APPELLANTS

KWAME RAOUL
Attorney General of Illinois
JANE ELINOR NOTZ
ALEX HEMMER
PRIYANKA GUPTA
KATHRYN HUNT MUSE
ELIZABETH ROBERSON-YOUNG
Office of the Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3312 – Telephone
(312) 814-5024 – Facsimile
Jane.Notz@ilag.gov

Attorneys for Appellant
State of Illinois

MARK R. HERRING
Attorney General of Virginia
ERIN B. ASHWELL
MICHELLE S. KALLEN
A. ANNE LLOYD
BRITTANY M. JONES
ROHINIYURIE TASHIMA
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile
mkallen@oag.state.va.us

Attorneys for Appellant
Commonwealth of Virginia

AARON D. FORD
Attorney General of Nevada
HEIDI PARRY STERN
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

Attorneys for Appellant
State of Nevada

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

A.     Parties and Amici—Plaintiffs before the district court, and appellants here, are the Commonwealth of Virginia and the States of Illinois and Nevada.  Defendant before the district court, and appellee here, is David Ferriero, in his official capacity as the Archivist of the United States.  The intervenor-defendants before the district court, and appellees, are the States of Alabama, Louisiana, Nebraska, South Dakota, and Tennessee.  The State of Michigan has filed a notice of intent to file an amicus brief in support of the plaintiff-appellants.

Amici before the district court were: 38 Agree for Georgia, 98 Point6 Inc., 1010Data, Inc., AAUW of Illinois, AAUW of Nevada, AAUW of Richmond, AAUW of Virginia, Adapt of America, Inc., Advance Local Media LLC, Advance Magazine Publishers Inc., Advance Publications, Inc., American Association of University Women, Airbnb, Inc., Alice Paul Institute, Amalgamated Bank, American City Business Journals, Inc., American Express Company, American International Group, Inc., Apollo Global Management, Inc., Apple, Arab Women Organization, Asana, Inc.,

ASG, LLC, ASG II, LLC, Association of Flight Attendants-CWA, Arizona NOW, Atakama Inc., Barbara Hadley Smith, Baron Capital Group, Inc., Benco Dental Supply Co., Biogen Inc., Black Women's Roundtable, Bloomberg L.P., Blue Apron Holdings, Inc., Bowery Farming Inc., BNY Mellon, Braze, Inc., Brighthouse Financial, Inc., Build America Mutual Assurance Company, California Constitutional Rights Foundation, CapeSpace, LLC, Capri Holdings Limited, CAULIPOWER, LLC, Center for Common Ground, Chicago Bar Association, Chicago Foundation for Women, Chobani, LLC, Citigroup Inc., Clare Boothe Luce Center for Conservative Women, Commonwealth of Massachusetts, Commonwealth of Pennsylvania, Concerned Women for America, Concord Worldwide, Inc., Conservative Legal Defense and Education Fund, Cota, Inc., CVS Health Corporation, David Karem, Dayforward Inc., Deloitte LLP, Diageo North America, Inc., the District of Columbia, Dolores Delahanty, Dolores Huerta Foundation, Domestic Violence Legal Empowerment and Appeals Project, Dow, Inc., Downtown Women for Change, Eagle Forum, Eagle Forum Foundation, Ellig Group LLC, Equal Means ERA, Equal Rights Amendment North Carolina Alliance, Equal Rights Trust, Equality Now, Equality Utah, Equitable, ERA Coalition, ERA

Minnesota, ERA Task Force AZ, Erwin Chemerinsky, Estee Lauder Companies Inc., Etsy, Inc., European Women's Lobby, Everything is Everything, Feminist Majority Foundation, FEMNET, Fund for Women's Equality, General Federation of Women's Clubs, Gender Justice, General Assembly Space, Inc., Generation Ratify, Generation Upwards, Gilead Sciences, Inc., Godiva Chocolatier, Inc., Goldman Sachs Group, Inc., Google LLC, Governor of Kansas, Greenhouse Software, Inc., Guardian Life Insurance Company of America, Hadassah, the Women's Zionist Organization of America, Inc., Hershey Company, Homegirl Project, IBM, Illinois Federation of Business Women's Clubs, Inc., Illinois NOW, Illinois State Bar Association, Independent Women's Law Center, Industrious, International Women's Rights Action Watch Asia Pacific, Julie C. Suk, JPMorgan Chase & Co., Justice Revival, Kimberly-Clark Corporation, Kind LLC, LAratifyERA, Larock David, Latin American and Caribbean Committee for the Defense of Women's Rights, Leaders Group Holdings LLC, League of Women Voters of Virginia, League of Women Voters of the United States, Leanne Littrell DiLorenzo, Legal Momentum, Levi Strauss & Co., Livari Clothing, LVMH Moet Hennessy Louis Vuitton Inc., Lyft, Inc., Marie Abrams, Mastercard Incorporated,

McIntosh Foundation, McKesson Corporation, Michigan ERAmerica, Michigan Federation of Business and Professional Women's Clubs, Inc., Microsoft, Morgan Stanley, Mormons for ERA, Motus LLC, Nardello & Co., National Alliance to End Sexual Violence, National Association of Commission for Women, National Association of Social Workers, National Association of Women Lawyers, National Congress of Black Women, Inc., National Council of Jewish Women, Inc., National Federation of Business and Professional Women's Clubs, National Football League, National Immigrant Women's Advocacy Project, Inc., National Organization for Women, National Women's Political Caucus, National Women's Political Caucus Foundation, National Women's Political Caucus of Virginia, National Women's Soccer League, LLC, Neuberger Berman, Nevadans for the ERA, Nevada NOW, New York Life Insurance Company, Noah Feldman, Oklahoma Women's Coalition, Oscar Health, PepsiCo, Inc., Pfizer Inc., Planet Labs Inc., Platform, Policy Analysis Center, Pride in Running, Procore Technologies, Inc., Project 28 MO, Prosperity Life Insurance Group, LLC, Prudential Financial, Inc., Public Advocate of the United States, Puppet, Inc., Quotient Technology Inc., Rachel's Network, Rebelle Media, REI Co–Op,

Restoring Liberty Action Committee, Rethinking Eve LLC, Reva Siegel, Robert G. Marshall, Rodan & Fields, LLC, Salesforce.com, Inc., Seed&Spark, Inc., Sending Her Essentials, Service Women's Action Network, ShelterPoint Life Insurance Company, Shiseido Americas Corporation, Shutterstock, Inc., Sisterhood Is Global institute, Sisters of Loretto – Loretto Community, Sisters of St. Joseph of Carondelet Area, Softbank Investment Advisers, Spotify USA, Inc., State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin, Steve Bullock, Strava, SurveyMonkey Inc., Susan B. Anthony List, Tapestry, Inc., Thinx, Tiffany & Co., Time's Up Foundation, Tory Burch LLC, TransUnion, Turnitin, LLC, Turo Inc., Twitter, Inc., Uber, Union Theological Seminary in the City of New York, United 4 Equality, LLC, United States Conference of Mayors, United States Soccer Federation, Inc., Univision Communications Inc., U.S. Constitutional Rights Legal Defense Fund, Utah ERA Coalition, VAratifyERA, VF Corporation, Vice Media LLC, Virginia NOW, Virginia

Poor People's Campaign, Virginia Woodward, VoteERA.org, Voto Latino, WeWork, Women Matter, Women's Bar Association of Illinois, Women's Equality Coalition, Women's Health and Reproductive Rights, Women's Law Project, Women's Lawyers on Guard Inc., Women's Media Center, World Policy Analysis Center, Workday, Inc., YWCA Metropolitan Chicago, and YWCA USA.

B.    Rulings Under Review—Plaintiff-appellants have appealed from the district court's order dismissing their case for lack of jurisdiction, entered by U.S. District Judge Rudolph Contreras on March 5, 2021.  The district court's order can be found at pages 309–10 of the Joint Appendix and the court's memorandum opinion at pages 311–347.  The court's opinion is also available at 525 F. Supp. 3d 36 (D.D.C. 2021).

C.    Related Cases—This case has not been before this Court or any other court except the district court.  Undersigned counsel is unaware of any related cases pending in this Court or any other court.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .i

TABLE OF CONTENTS .......................................................................vii

TABLE OF AUTHORITIES.................................................................ix

INTRODUCTION................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 2

STATEMENT OF THE ISSUES........................................................... 3

PERTINENT STATUTES AND CONSTITUTIONAL PROVISIONS..... 4

STATEMENT ...................................................................................... 6

    A.    The Article V amendment process........................................ 6

    B.    The Equal Rights Amendment ........................................... 10

    C.    This lawsuit......................................................................... 13

SUMMARY OF ARGUMENT ............................................................. 16

STANDARD OF REVIEW................................................................... 17

ARGUMENT ...................................................................................... 19

I.    Plaintiff-States have standing to vindicate their ratifications
of the Equal Rights Amendment ................................................. 20

    A.    Plaintiff-States have standing to vindicate the harm to
their sovereign interests caused by the Archivist's
refusal to publish and certify the Equal Rights
Amendment ........................................................................ 21

    B.    The district court held that Plaintiff-States lacked
standing only by improperly adding a "legal effect"
requirement to the standing analysis................................. 30

II.   The district court erred in holding that the Archivist had the power to discard Plaintiff-States' ratifications of the Equal Rights Amendment ........................................................................ 37

     A.   The Archivist was required under Section 106b to publish and certify the Equal Rights Amendment after receiving Plaintiff-States' ratifications ................................. 39

     B.   The deadline Congress included in the proposing clause of the Equal Rights Amendment does not invalidate subsequent State ratifications ............................................. 50

     C.   There is no other adequate remedy to redress Plaintiff-States' injuries caused by the Archivist's refusal to publish and certify the Equal Rights Amendment ............... 63

CONCLUSION ......................................................................... 64

CERTIFICATE OF COMPLIANCE ....................................... 66

CERTIFICATE OF SERVICE ............................................... 67

# TABLE OF AUTHORITIES*

Page

## CASES

*13th Reg'l Corp. v. U.S. Dep't of Interior,*
654 F.2d 758 (D.C. Cir. 1980) ...........................................38

*Air All. Hous. v. EPA,*
906 F.3d 1049 (D.C. Cir. 2018) ......................................22

*Alaska Legis. Council v. Babbitt,*
181 F.3d 1333 (D.C. Cir. 1999) ......................................30

*Alaska v. U.S. Dep't of Transp.,*
868 F.2d 441 (D.C. Cir. 1989) .......................................23

*Alden v. Maine,*
527 U.S. 706 (1999) ..........................................21, 23, 24

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ......................................20, 22, 27

*American Hosp. Ass'n v. Burwell,*
812 F.3d 183 (D.C. Cir. 2016) ....................................18, 63

*Arizona State Legislature v. Arizona Indep.
Redistricting Comm'n,*
576 U.S. 787 (2015) ......................................20, 28, 29

*Association of Civilian Technicians v. Fed. Lab. Rels. Auth.,*
22 F.3d 1150 (D.C. Cir. 1994) .......................................40

*Baker v. Carr,*
369 U.S. 186 (1962) .................................................18, 20

*Bauer v. Marmara,*
774 F.3d 1026 (D.C. Cir. 2014) .......................................58

*Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,*
477 U.S. 41 (1986) ..............................................22, 25, 27

*Carello v. Aurora Policemen Credit Union,*
930 F.3d 830 (7th Cir. 2019) .........................................33

---

* Authorities upon which we chiefly rely are marked with asterisks.

*City of Waukesha v. EPA,*
320 F.3d 228 (D.C. Cir. 2003) ........................................................25

*Clinton v. City of N.Y.,*
524 U.S. 417 (1998) ........................................................................52

\*Coleman v. Miller*,
307 U.S. 433 (1939) ............................................. 28, 29, 30, 57, 59, 60

*Copeman v. Gallant,*
24 Eng. Rep. 404 (1716) ................................................................59

*Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n,*
788 F.3d 312 (D.C. Cir. 2015) ........................................................36

*Dillon v. Gloss,*
256 U.S. 368 (1921) ........................................................55, 56, 58

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................................59

*Fairchild v. Hughes,*
258 U.S. 126 (1922) ........................................................................49

*Flast v. Cohen,*
392 U.S. 83 (1968) ..........................................................................18

*Foretich v. United States,*
351 F.3d 1198 (D.C. Cir. 2003) ......................................................33

*Frontiero v. Richardson,*
411 U.S. 677 (1973) ........................................................................11

*Ganem v. Heckler,*
746 F.2d 844 (D.C. Cir. 1984) ........................................................42

*Hollingsworth v. Virginia,*
3 U.S. 378 (1798) ............................................................................47

*I.N.S. v. Chadha,*
462 U.S. 919 (1983) ..................................................................9, 24

*Idaho v. Freeman,*
529 F. Supp. 1107 (D. Idaho 1981) ................................................60

*In re Al-Nashiri,*
921 F.3d 224 (D.C. Cir. 2019) ........................................................63

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905) ............................................................. 59

*Jeffries v. Volume Servs. Am., Inc.*,
928 F.3d 1059 (D.C. Cir. 2019) ..................................... 17

*Landstar Express Am., Inc. v. Fed. Mar. Comm'n*,
569 F.3d 493 (D.C. Cir. 2009 ........................................ 46

*Lewis v. Continental Bank Corp.*,
494 U.S. 472 (1990) .................................................. 61, 62

*Lovitky v. Trump*,
949 F.3d 753 (D.C. Cir. 2020) ....................................... 38

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......................................................... 17

*Maloney v. Murphy*,
984 F.3d 50 (D.C. Cir. 2020) ...................................... 30, 33

*Marbury v. Madison*,
5 U.S. 137 (1803) ................................................. 31, 32, 34

*Marshall Dental Mfg. v. Iowa*,
226 U.S. 460 (1913) ........................................................ 23

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .................................. 18, 20, 22, 23

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ........................................................ 20

*Missouri v. Illinois*,
180 U.S. 208 (1901) ........................................................ 34

*Monmouth Med. Ctr. v. Thompson*,
257 F.3d 807 (D.C. Cir. 2001) ................................... 38, 40

*Moss v. Spartanburg Cnty. Sch. Dist. Seven*,
683 F.3d 599 (4th Cir. 2012) ......................................... 34

*National Org. for Women, Inc. v. Idaho*,
459 U.S. 809 (1982) ................................................. 60, 61

*National Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ....................................... 45

*New Jersey v. EPA*,
  989 F.3d 1038 (D.C. Cir. 2021) ....................................................... 25

*New York v. United States*,
  505 U.S. 144 (1992) ...................................................................... 21

*North Carolina v. Rice*,
  404 U.S. 244 (1971) ................................................................ 61, 62

*Old Dominion Elec. Coop. v. FERC*,
  892 F.3d 1223 (D.C. Cir. 2018) ................................................ 14, 36

*Parsons v. U.S. Dep't of Just.*,
  801 F.3d 701 (6th Cir. 2015) ............................................................ 33

*Printz v. United States*,
  521 U.S. 898 (1997) ........................................................................ 24

*Public Agencies Opposed to Soc. Sec. Entrapment v. Heckler*,
  613 F. Supp. 558 (E.D. Cal. 1985) ....................................... 22, 25, 27

*Public Citizen, Inc. v. National Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) ......................................................... 22

*Raines v. Byrd*,
  521 U.S. 811 (1997) ............................................................. 28, 29, 30

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ........................................................................ 47

*SAS Inst. v. Iancu*,
  138 S. Ct. 1348 (2018) .............................................................. 40, 41

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  140 S. Ct. 2183 (2020) .............................................................. 32, 33

*Sierra v. City of Hallandale Beach*,
  996 F.3d 1110 (11th Cir. 2021) ....................................................... 33

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................ 17

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ......................................................... 49

*United States ex rel. McLennan v. Wilbur*,
  283 U.S. 414 (1931) ........................................................................ 38

*United States ex rel. Widenmann v. Colby,
    265 F. 998 (D.C. Cir. 1920) ........................31, 35, 41, 42, 43, 44, 45, 46
United States v. Chambers,
    291 U.S. 217 (1934) .................................................................. 62
United States v. Moy,
    241 U.S. 394 (1916) .................................................................. 47
United States v. Munsingwear, Inc.,
    340 U.S. 36 (1950) .................................................................... 60
*United States v. Sprague,
    282 U.S. 716 (1931) ................................................ 9, 52, 53, 57, 58
Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.,
    505 U.S. 214 (1992) .................................................................. 61
Yazoo & M.V.R. Co. v. Thomas,
    132 U.S. 174 (1889) .................................................................. 59

## STATUTES

*1 U.S.C. § 106b…….........................................3, 5, 10, 13, 15, 19, 39,
                                                                                                40, 43, 63
28 U.S.C. § 1291 ............................................................................ 2
28 U.S.C. § 1331 ............................................................................ 2
28 U.S.C. § 1361 ....................................................................... 2, 18
28 U.S.C. § 2107(b) ....................................................................... 3
Act of Apr. 20, 1818, ch. 80,
    § 2, 3 Stat. 439 .................................................................. 39, 41

## CONSTITUTIONAL PROVISIONS

Articles of Confederation of 1781, art. XIII ..............................................9
Ill. Const. art. XIV, § 4 ...................................................................55
Mass. Const. of 1780,
    pt. 2, ch. 6, art. X...................................................................52
Md. Const. of 1776, LIX.....................................................................52

N.H. Const. of 1784, pt. 2 ...................................................52

Penn. Const. of 1776, § 47 .................................................52

S.C. Const. of 1778, XLIV..................................................52

U.S. Const. amend. XVIII .............................................51, 54

U.S. Const. amend. XX....................................................51

U.S. Const. amend. XXI ...................................................51

U.S. Const. amend. XXII ..................................................51

U.S. Const. amend. XXVII ................................................55

*U.S. Const. amend. XXVIII ........................................1, 4, 11

*U.S. Const. art. V.............................4, 6, 7, 8, 9, 10, 19, 20, 24,
39, 43, 48, 52, 57

U.S. Const. Preamble .......................................................6

Vt. Const. of 1777, ch. 2, XLIV............................................52

Vt. Const. of 1786, ch. 2, XL...............................................52

## OTHER AUTHORITIES

1 *The Records of the Federal Convention of 1787*,
(Max Farrand ed., 1911) ...............................................8

13B Wright & Miller, Fed. Prac. & Proc. § 3531.11.1 ...........................23

96 Cong. Rec. 3250 (1950) .................................................48

124 Cong. Rec. 26,264 (1978) ..............................................12

*Congressional Pay Amendment*,
16 Op. O.L.C. 87 (Nov. 2, 1992) ...............................7, 10, 48

The Constitution, The White House .......................................26

*The Constitution: Amendments 11–27*, Nat'l Archives.........................55

*The Constitution of the United States*, Nat'l Archives ..........................26

*Constitutional Amendment Process*, Nat'l Archives.................26, 27, 49

*The Federalist* No. 39 (James Madison) ................................7, 21, 24, 47

*The Federalist* No. 43 (James Madison) ..................................6

*The Federalist* No. 45 (James Madison) ..........................................21, 53

*The Federalist* No. 51 (James Madison) ...............................................22

*The Federalist* No. 85 (Alexander Hamilton).................. 9, 24, 48, 54, 55

*Founders Online*, Nat'l Archives..............................................................6

H.J. Res. 17, 117th Cong. (2021).............................................................45

H.J. Res. 79, 116th Cong. (2020).............................................................45

H.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978) ....................................12

James Madison, Sovereignty (1835), in 9 *The Writings of James*
    *Madison* 572 (Gaillard Hunt, ed. 1900)............................................21

John F. Manning, *The Absurdity Doctrine*,
    116 Harv. L. Rev. 2387 (2003) .........................................................46

Letter from Thomas Jefferson to Wilson Cary Nicholas, (Sept. 7,
    1803) in *Founders Online*, Nat'l Archives .........................................6

"Mode," Merriam-Webster Dictionary ....................................................57

President George Washington,
    *Inaugural Address of 1789* (Apr. 30, 1789) ........................................8

*Ratification of the Equal Rights Amendment*,
    44 Op. O.L.C. 1 (Jan. 6, 2020) ............................................... 30, 48, 61

R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart &
    Wechsler's The Federal Courts and the Federal System (6th
    ed. 2009) ............................................................................................21

Saikrishna Bangalore Prakash, *The Appointment and Removal of*
    *William J. Marbury and When an Office Vests*,
    89 Notre Dame L. Rev. 199 (2013) ....................................................32

State Ratification Documents, in 1 *Elliot's Debates*, 325
    (Jonathan Elliot, ed. 1836) ...............................................................53

## RULES

Fed. R. App. P. 4(a)(1)(B) .........................................................................3

## INTRODUCTION

Throughout the Nation's history, American women have sought recognition as equal participants in the duties and privileges conferred by the Constitution. It was not until 1920, 132 years after the Constitution was ratified, that the Nineteenth Amendment finally extended women the right to vote. But the fight for gender parity persisted: the Constitution did not expressly enshrine women's equality under law.

As of January 2020, however, the requisite thirty-eight States had ratified the Equal Rights Amendment. The Equal Rights Amendment provides: "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." U.S. Const. amend. XXVIII. More than two centuries after ratification, the Constitution was finally amended to expressly protect women as equals.

Although the Article V amendment process is complete, the Archivist of the United States refuses to perform his statutory duty to publish and certify the Equal Rights Amendment as part of the Constitution. He admits that his duty is ministerial, yet he refuses to act based on his view that ratifications by Virginia, Illinois, and Nevada

(Plaintiff-States) were not valid. The Archivist insists he will not publish and certify the amendment absent a court order forcing him to do so.

Plaintiff-States sued seeking that very judicial direction. But the district court erroneously concluded it lacked jurisdiction to issue any such order. Allowing this decision to stand would do much more than allow an unelected executive branch official to disregard his statutory duty. It would obstruct Plaintiff-States' sovereign prerogative to ratify amendments that bring our foundational document in line with our Nation's values. And it would tell the women of America that, after 234 years, they must wait even longer for equal treatment under the Constitution. The district court's decision should be reversed.

## JURISDICTIONAL STATEMENT

Because this action sought mandamus relief against a federal official pursuant to 28 U.S.C. § 1361, the district court had original jurisdiction under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court entered its final order dismissing Plaintiff-States' complaint for lack of jurisdiction on March 5, 2021, JA 309–10, and Plaintiff-States filed a timely notice of appeal on

May 3, 2021, JA 348–50.  See 28 U.S.C. § 2107(b); Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.    Whether Plaintiff-States have standing to vindicate their legislatures' ratifications of the Equal Rights Amendment when the Archivist refuses to publish and certify the amendment as Congress directed in 1 U.S.C. § 106b.

2.    Whether the Archivist was required to publish and certify the Equal Rights Amendment upon receiving Plaintiff-States' ratifications, notwithstanding Congress's attempt to limit the timeframe for ratification in the prefatory clause to the amendment.

# PERTINENT STATUTES AND CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XXVIII states:

SECTION 1.  Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

SECTION 2.  The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

SECTION 3.  This amendment shall take effect two years after the date of ratification.


Article V of the Constitution provides that:

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

1 U.S.C. § 106b states:

Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

## STATEMENT

### A. The Article V amendment process

1. The Framers of the Constitution did not describe the document as entirely perfect; rather it was "more perfect." U.S. Const. Preamble. Recognizing their fallibility, the Framers set forth a mechanism for amending the document; this process plays a foundational role in the Nation's constitutional scheme. See *The Federalist* No. 43 (James Madison)[1] (amendment procedure "guards equally against that extreme facility, which would render the Constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults").[2]

Article V of the Constitution states that "[t]he Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention

---

[1] All cited Federalist Papers are available at The Avalon Project, https://avalon.law.yale.edu/subject_menus/fed.asp.

[2] Accord Letter from Thomas Jefferson to Wilson Cary Nicholas, (Sept. 7, 1803) in *Founders Online*, Nat'l Archives, https://founders.arch ives.gov/documents/Jefferson/01-41-02-0255 ("nothing is more likely than that their enumeration of powers is defective. this is the ordinary case of all human works. let us go on then perfecting it, by adding by way of amendment to the constitution, those powers which time & trial shew are still wanting").

for proposing Amendments[.]" U.S. Const. art. V.  An amendment "*shall be valid* to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress." *Id.* (emphasis added).[3]

The Framers carefully crafted the Article V amendment process to balance state and federal power.  As James Madison explained—and the Department of Justice has long recognized—the structure of Article V is "neither wholly federal nor wholly national." *The Federalist* No. 39 (James Madison); accord *Congressional Pay Amendment*, 16 Op. O.L.C. 87, 103 (Nov. 2, 1992).  "[B]oth Congress and the states play[] important roles" in the amendment process. *Congressional Pay Amendment*, 16 Op. O.L.C. at 103.  Congress may "propose Amendments" and choose from one of two specifically designated "Mode[s] of Ratification." U.S. Const. art. V.  In turn, the States are empowered to determine whether to

---

[3] Article V sets forth two additional qualifications not relevant here: (1) "no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article;" and (2) "no State, without its Consent, shall be deprived of its equal Suffrage in the Senate." U.S. Const. art. V.

"ratif[y]" those proposals.  *Id.*  And nothing in Article V expressly gives Congress the ability to impose additional ratification requirements on the States.[4]

This balance between Congress and the States grew out of the Framers' concern that federal actors would have too much control over changes to the Constitution.  Indeed, an early proposal at the convention would have permitted States to directly amend the Constitution without requiring Congress (or any federal official) to participate at all.  See 1 *The Records of the Federal Convention of 1787*, at 121 (Max Farrand ed., 1911) ("[P]rovision ought to be made for . . . amending the system now to be established, without requiring the assent of the Nat[ional] Legislature").  George Mason supported this proposal, arguing that "[i]t would be improper to require the consent of the Nat[ional] Legislature, because they may abuse their power, and refuse their consent on that very account."  *Id.* at 203.

---

[4] Likewise, nothing in Article V gives the federal executive branch a role in the amendment process.  During his First Inaugural Address, George Washington confirmed that the President has no role under Article V, declining to make any "particular recommendations" about potential amendments because he had no "official opportunities" to weigh in.  President George Washington, *Inaugural Address of 1789* (Apr. 30, 1789).

Although Article V ultimately included a role for Congress, the Framers designed the amendment process to ensure that federal power had limits. In urging support for the Constitution during the ratification debates, Alexander Hamilton explained that, under Article V's structure, "[w]e may safely rely on the disposition of the State legislatures to erect barriers against the encroachments of the national authority." *The Federalist* No. 85 (Alexander Hamilton); see also *I.N.S. v. Chadha*, 462 U.S. 919, 955 n.21 (1983) (describing Article V's requirement that amendments be approved by three-fourths of the States as a "check[]" on federal legislative authority).[5] In the end, the Framers determined that once a proposed amendment had been "ratified by the legislatures of three fourths of the several states" (or by three-fourths of state conventions, if that is the mode chosen by Congress), it "*shall be valid* to

---

[5] By design, the States may even override Congress's proposing power with a vote of two-thirds of State legislatures. U.S. Const. art. V; see also *United States v. Sprague*, 282 U.S. 716, 730 (1931) ("[O]n the application of the legislatures of two-thirds of the States, [Congress] must call a [proposing] convention . . . ."). This was a marked change from the Articles of Confederation, which required any "alteration" to "be agreed to in a Congress of the United States." Articles of Confederation of 1781, art. XIII, ¶ 1.

all Intents and Purposes, as Part of th[e] Constitution." U.S. Const. art. V (emphasis added).

2. The Article V amendment process also triggers certain statutory requirements, which ensure that fully ratified amendments receive appropriate legal recognition and publication. Upon receiving "official notice" that a proposed amendment "has been adopted, according to the provisions of the Constitution," the Archivist of the United States has a statutory obligation to promptly "cause the amendment to be published" and "certif[y]" that the amendment "has become valid, to all intents and purposes, as a part of the Constitution of the United States." 1 U.S.C. § 106b. As the Archivist acknowledges, this provision imposes upon him a "ministerial, record-keeping duty" with respect to certifying constitutional amendments. Mem. in Supp. of Def.'s Mot. to Dismiss Pls.' Compl. at 5, *Virginia v. Ferriero*, No. 1:20-cv-242 (D.D.C. May 7, 2020), ECF No. 29-1 (quoting *Congressional Pay Amendment*, 16 Op. O.L.C. at 98) (internal quotation marks omitted).

B. **The Equal Rights Amendment**

1. The effort to add a constitutional amendment specifically recognizing sex equality began in the 1920s soon after the Nineteenth

Amendment guaranteed women the right to vote.  See JA 76, 80.  The first proposed equal rights amendment came to Congress in 1923.  JA 80.  Although this initial effort failed to win congressional support, nearly fifty years later, Congress proposed the modern Equal Rights Amendment and submitted it to the States for consideration.  JA 81–82; *Frontiero v. Richardson*, 411 U.S. 677, 687 (1973).

The Equal Rights Amendment declares, in relevant part: "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex."  JA 82.  In an introduction to the proposed text of the amendment, Congress stated that the amendment "shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress."  *Id.*  As the seven-year mark approached, thirty-five States had ratified the Equal Rights Amendment—three short of the thirty-eight needed to turn the proposed amendment into law.  JA 82–83; see U.S. Const. art. V.  Before the seven-year timeframe elapsed, both houses of Congress passed joint resolutions to extend the ratification period to

June 30, 1982.  H.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978); 124 Cong. Rec. 26,264, 34,314 (1978).

In 2017, Nevada ratified the Equal Rights Amendment, increasing the total number of State ratifications to thirty-six.  JA 83.  The following year, Illinois became the thirty-seventh State to ratify.  JA 84–85.  And on January 27, 2020, Virginia became the thirty-eighth State to ratify the Equal Rights Amendment.  JA 85–86.  With Nevada, Illinois, and Virginia's ratifications, the Equal Rights Amendment had the final three State ratifications needed to amend the Constitution.

2.    Since Virginia's ratification, the National Archives and Records Administration—under the direction of the Archivist—has acknowledged receipt of official notice of "state ratification actions" by thirty-eight States.  JA 172.  Despite his statutory duty to publish and certify amendments, however, the Archivist declined to publish and certify the Equal Rights Amendment as adopted and refuses to do so until ordered by a court.  JA 174; see also Joint Stipulation & Pls.' Notice of Voluntary Dismissal at ¶¶ 2–3, *Alabama v. Ferriero*, No. 7:19-cv-02032 (N.D. Ala. Feb. 27, 2020), ECF No. 23 (Archivist stipulating that "he will not certify the adoption of the Equal Rights Amendment" unless "directed

by a final court order" or the Department of Justice changes its current position (internal citation omitted)).

## C.  This lawsuit

Plaintiff-States filed this lawsuit in January 2020, shortly after Virginia's ratification, to ensure that the Equal Rights Amendment was published and certified as part of the Constitution. JA 91–92. Because the Archivist expressly refused to carry out his statutory duty absent a court order, Plaintiff-States sought mandamus relief to compel the Archivist to "publish[]" and "certif[y]" that the Equal Rights Amendment is "valid" and "part of the Constitution of the United States." 1 U.S.C. § 106b; JA 92. Plaintiff-States also sought a declaration stating that the Archivist's failure to carry out his statutory duty violates federal constitutional and statutory law, and that the Equal Rights Amendment is valid and part of the Constitution. JA 92. Nineteen States and the District of Columbia supported Plaintiff-States as amici. Br. for the [Amici] States and the District of Columbia as *Amici Curiae* in Supp. of Pls., *Virginia v. Ferriero*, No. 1:20-cv-242 (D.D.C. June 29, 2020), ECF No. 67; Amicus Br. of Michigan Supporting Pl. States, *Virginia v. Ferriero*, No. 1:20-cv-242 (D.D.C. July 2, 2020), ECF No. 71. And five

States—Alabama, Louisiana, Nebraska, South Dakota, and Tennessee (Intervenors)—moved to intervene as defendants in support of the Archivist. JA 56.

While the motion to intervene was pending, the Archivist moved to dismiss the case. JA 58. The following month, the district court granted the intervention motion as to all five States who sought intervention, including two States that never ratified the Equal Rights Amendment. JA 95. In granting the intervention motion, the district court reasoned that States "have a constitutionally-assigned role in the amendment process" and that this role was "a legally protected interest sufficient to confer Article III standing." JA 102 (quoting *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1233 (D.C. Cir. 2018)) (internal quotation marks omitted). Both Intervenors and Plaintiff-States moved for summary judgment. JA 69, 73.[6]

The district court dismissed the case for lack of jurisdiction. JA 309. It first held that Plaintiff-States lacked standing. JA 320–26. In the court's view, the Archivist's failure to follow his statutory obligation

_____

[6] At Intervenors' request, the district court construed their motion for summary judgment as one to dismiss the action. JA 317.

to publish and certify the Equal Rights Amendment could not injure Plaintiff-States because if all Article V requirements were met, then the amendment became a part of the "true" Constitution (even if not the official document) upon Plaintiff-States' ratifications. JA 323–24. Because the Archivist's publication of the Equal Rights Amendment would have "no legal effect," the district court reasoned, Plaintiff-States lacked standing to challenge the failure to publish and certify the amendment. JA 320, 322–24.

The district court alternately held that it lacked jurisdiction over Plaintiff-States' mandamus action because the Archivist did not have a "clear duty" to publish and certify the Equal Rights Amendment upon receipt of Virginia's ratification and, likewise, Plaintiff-States did not have a "clear right" to this relief. JA 334–45. This holding came in two parts: *First*, the district court concluded that the Archivist's statutory duty to publish and certify an amendment upon receiving "official notice" of ratification, 1 U.S.C. § 106b, included an "implied" duty to determine whether that ratification complied with congressional requirements beyond those enumerated in Article V. JA 337–38. *Second*, the district court concluded that the deadline in the prefatory language to the Equal

Rights Amendment qualified the States' ability to ratify that amendment and therefore invalidated Plaintiff-States' ratifications.  JA 338–45.[7]

Plaintiff-States timely appealed.  JA 348–49.

## SUMMARY OF ARGUMENT

As sovereigns and equal participants in the Article V amendment process, Plaintiff-States have standing to vindicate their ratifications of the Equal Rights Amendment.  The Archivist's refusal to perform his statutory duty to publish and certify the amendment has injured Plaintiff-States' sovereign interests in preserving their equal role in the Article V process and in ensuring that the ratifications by their legislatures are given effect.  That the Archivist's statutory duty is purely ministerial (and thus has no "legal effect" on the Equal Rights Amendment's status) is immaterial to the standing analysis.

Federal courts likewise have jurisdiction to entertain Plaintiff-States' mandamus claim.  The Archivist is violating his statutory obligation to publish and certify a constitutional amendment that has been ratified by the requisite number of States.  Nothing in Article V or

---

[7] The court did not address whether States could rescind prior ratifications or whether Congress could extend a ratification deadline after its expiration.  JA 326.

Section 106b empowers the Archivist to discard State ratifications he deems insufficient. Likewise, the timeframe Congress placed in the proposing clause of the Equal Rights Amendment does not invalidate Plaintiff-States' ratifications, because Congress lacks authority to impose a timeline for ratification in this manner.

The district court thus erred in concluding that it lacked jurisdiction to hear this case, and this Court should reverse.

## STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal of a complaint for lack of standing. *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1063 (D.C. Cir. 2019). To establish standing at the pleading stage, the plaintiff must plausibly allege that it has "suffered an injury in fact," which is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The plaintiff must also plausibly allege that the injury is "fairly traceable to the challenged conduct of the defendant" and "is likely to be redressed by a favorable judicial decision." *Id.* (quoting *Spokeo*, 578 U.S. at 338). The "gist of the question of

standing is whether" the plaintiff has alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)) (internal quotation marks omitted); accord *Flast v. Cohen*, 392 U.S. 83, 99 (1968).

This Court also reviews de novo whether a district court correctly dismissed a mandamus action for lack of jurisdiction. *American Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016). The Mandamus Act grants district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. A court has jurisdiction to grant mandamus relief where (1) the plaintiff has a "clear and indisputable right to relief," (2) "the government agency or official is violating a clear duty to act," and (3) "no adequate alternative remedy exists." *American Hosp. Ass'n*, 812 F.3d at 189.[8]

_____

[8] Mandamus also includes the non-jurisdictional requirement that the equities merit relief. *American Hosp. Ass'n*, 812 F.3d at 189–90.

# ARGUMENT

With Virginia's ratification in 2020, the Article V requirements to amend the Constitution were satisfied, and the Equal Rights Amendment became "valid to all Intents and Purposes, as Part of th[e] Constitution." U.S. Const. art. V; JA 86, 91. Upon receiving "official notice" that the amendment "ha[d] been adopted, according to the provisions of the Constitution," the Archivist was statutorily required to promptly "cause the amendment to be published" and "certif[y]" that the amendment "has become valid, to all intents and purposes, as a part of the Constitution of the United States." 1 U.S.C. § 106b; JA 87–88. The Archivist, however, has refused to carry out his statutory duty, and Plaintiff-States properly stated a mandamus claim to compel him to perform that duty.

The district court erred in concluding otherwise. First, it incorrectly held that Plaintiff-States lack standing to challenge the Archivist's refusal to publish and certify the Equal Rights Amendment, disregarding the harm to Plaintiff-States' sovereign interests. Second, the district court erroneously held that the Archivist could refuse to carry out his statutory duty because he has the authority to assess the validity

19

of State ratifications and because Plaintiff-States' ratifications occurred after Congress's purported deadline for ratification. The district court's decision is wrong in both respects.

## I. Plaintiff-States have standing to vindicate their ratifications of the Equal Rights Amendment

"States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). And Article V—which provides States with a specific and exclusive role in the amendment process—is not a normal basis for invoking judicial review. Here, Plaintiff-States assert that a federal official is harming their sovereign interests in (1) performing their role in the Article V amendment process and (2) ensuring that the ratifications by their legislatures are given effect. Plaintiff-States thus have a "personal stake" in the outcome of this litigation sufficient for standing. *Id.* at 517 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).[9]

_____

[9] Although such a claim appears foreclosed by precedent binding on this Court, see *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923), Plaintiff-States preserve for possible future proceedings the argument that they have *parens patriae* standing to "secur[e] [their] residents from the harmful effects of discrimination," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982); see *Arizona State Leg. v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10

A. Plaintiff-States have standing to vindicate the harm to their sovereign interests caused by the Archivist's refusal to publish and certify the Equal Rights Amendment

The Framers set up a federalist system of government, with the power "divided between two distinct governments": the States and the national government. *The Federalist* No. 51 (James Madison). This system "reserves to [the States] a substantial portion of the Nation's primary sovereignty." *Alden v. Maine*, 527 U.S. 706, 714 (1999).[10] In fact, the States' sovereignty "is equal to that of the" federal government. James Madison, Sovereignty (1835), in 9 *The Writings of James Madison* 572 (Gaillard Hunt, ed. 1900).[11]

---

(2015) ("The cases on the standing of states to sue the federal government seem to depend on the kind of claim that the state advances . . . [and] are hard to reconcile." (quoting R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 263–66 (6th ed. 2009)).

[10] See *The Federalist* No. 45 (James Madison) ("[T]he States w[ould] retain, under the proposed Constitution, a very extensive portion of active sovereignty."); *New York v. United States*, 505 U.S. 144, 188 (1992) (explaining that States' sovereignty is "'residuary and inviolable'" (quoting *The Federalist* No. 39 (James Madison))).

[11] *Available at* https://oll-resources.s3.us-east-2.amazonaws.com/oll3/store/titles/1940/1356.09_Bk.pdf.

Given their sovereign status, "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 518; *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 612 (1982) (Brennan, J., concurring) ("[A] State is no ordinary litigant"). Rather, States "receive 'special solicitude' in standing analysis." *Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 n.2 (D.C. Cir. 2007) (quoting *Massachusetts*, 549 U.S. at 520). States are also special litigants for the separate reason that they hold interests unique to their identities as sovereigns. *Snapp*, 458 U.S. at 601 (identifying "sovereign interests" such as "power to create and enforce a legal code"). As the Supreme Court and this Court have long recognized, States have standing to challenge an intrusion on such interests, including by bringing an action against the federal government. See, *e.g.*, *Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 n.17 (1986) (agreeing with district court that State had standing because it alleged a "diminishment of [its] sovereignty" (quoting *Public Agencies Opposed to Soc. Sec. Entrapment v. Heckler*, 613 F. Supp. 558, 567 (E.D. Cal. 1985))); *Air All. Hous. v. EPA*, 906 F.3d 1049, 1059 (D.C. Cir. 2018) ("There is no difficulty in recognizing

a state's standing to protect . . . sovereign interests." (quoting 13B Wright & Miller, Fed. Prac. & Proc. § 3531.11.1) (alterations omitted)); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443, 443 n.1 (D.C. Cir. 1989) (concluding that States had standing to litigate "injury to their sovereign power to enforce state law"); see also *Marshall Dental Mfg. v. Iowa*, 226 U.S. 460, 462 (1913) ("[B]y virtue of its sovereignty[,] the state of Iowa has an interest in the condition of the lake sufficient to entitle it to maintain this suit").

The Archivist's refusal to publish and certify the Equal Rights Amendment harms two of Plaintiff-States' sovereign interests: (1) their interest in performing the constitutional role assigned to them by Article V, and (2) their interest in ensuring their legislatures' ratifications of the Equal Rights Amendment are given effect. Plaintiff-States thus have standing to bring this action, especially given the special solicitude to which they are entitled.

1. The Constitution "limit[s] and enumerate[s] powers granted to . . . the National Government" and "underscore[s] the vital role reserved to the States" as "sovereign entities." *Alden*, 527 U.S. at 713. This constitutional design is especially important to Article V. See *id.*

The amendment process arose out of the Framers' concern that the federal government would have too much control over changes to the Constitution.  See supra pp. 7–10.  Article V thus "assume[s] the States' continued existence and active participation in the fundamental processes of governance."  *Alden*, 527 U.S. at 713; see *I.N.S. v. Chadha*, 462 U.S. 919, 955 n.21 (1983) (describing State ratification authority under Article V as "check" on Congress); *The Federalist* No. 85 (Alexander Hamilton) (Under Article V's structure, "[w]e may safely rely on the disposition of the State legislatures to erect barriers against the encroachments of the national authority.").

Article V assigns distinct but equal roles in the amendment process to Congress and the States: (i) Congress may "propose Amendments" and choose between two enumerated "Mode[s] of Ratification," and (ii) the States, in turn, are empowered to "ratif[y]" those proposals via the designated mode.  U.S. Const. art. V.  The article therefore confers upon the States a unique and sovereign power to ratify amendments.  See *Printz v. United States*, 521 U.S. 898, 919 (1997) (explaining that Article V reflects States' retention of "a residuary and inviolable sovereignty" (quoting *The Federalist* No. 39 (James Madison)); *The Federalist* No. 85

(Alexander Hamilton) (writing that whenever three-fourths of States are "united in the desire of a particular amendment, that amendment must infallibly take place"). States therefore have a "judicially cognizable interest in the preservation of" their sovereign power. See *Bowen*, 477 U.S. at 50 n.17 (quoting *Heckler*, 613 F. Supp. at 567).

The Archivist's refusal to publish and certify the Equal Rights Amendment obstructs Plaintiff-States' constitutionally assigned role under Article V and diminishes their sovereign prerogative to exercise this role. [12] "In reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *New Jersey v. EPA*, 989 F.3d 1038, 1045 (D.C. Cir. 2021) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)) (alteration omitted). For purposes of the standing analysis in this case, therefore, one must accept that all requirements of Article V have been properly met: Plaintiff-States exercised their sovereign

---

[12] Indeed, this was the district court's conclusion as to the Intervenors when it held they had standing because their "constitutionally-assigned role in the amendment process" was "a legally protected interest sufficient to confer Article III standing." JA 102.

authority under Article V by ratifying the Equal Rights Amendment, bringing the total number of State ratifications to the requisite thirty-eight needed to add the amendment to the Constitution. JA 76–77, 86. The Archivist, however, has refused to perform his duty under Section 106b to publish and certify the Equal Rights Amendment as part of the Constitution. JA 88. This refusal carries important practical consequences.

For one, the Equal Rights Amendment has not been included in the official version of the U.S. Constitution disseminated by the National Archives and Records Administration.[13] The Archivist has also withheld certification, the "formal proclamation" stating that the "amendment is valid and has become part of the Constitution."[14] The Archivist's certification would be published in the Federal Register and the United States Statutes at Large, and would "serve[] as official notice to the

---

[13] See *The Constitution of the United States*, Nat'l Archives, https://www.archives.gov/founding-docs/constitution (updated Oct. 7, 2021); see also The Constitution, The White House, https://www.whitehouse.gov/about-the-white-house/our-government/the-constitution/ (citing to National Archives' electronic version of Constitution).

[14] *Constitutional Amendment Process*, Nat'l Archives, https://www.archives.gov/federal-register/constitution (updated Aug. 15, 2016).

Congress and to the Nation that the amendment process has been completed."[15]  "In recent history, the signing of the certification has become a ceremonial function attended by various dignitaries," including the President.[16]

By withholding publication and certification of the Equal Rights Amendment, the Archivist has prevented the amendment from becoming a formal and officially recognized part of the Constitution.  He has thus "interfer[ed]" with Plaintiff-States' exercise of their sovereign authority to add this amendment to the Constitution, harming their "judicially cognizable interest" in "preserv[ing]" this sovereign authority.  See *Bowen*, 477 U.S. at 50 n.17 (quoting *Heckler*, 613 F. Supp. at 567); see *Snapp*, 458 U.S. at 607–08 ("[T]he State has an interest in securing observance of the terms under which it participates in the federal system.").

2.    The Archivist's refusal to publish and certify the Equal Rights Amendment also harms Plaintiff-States by obstructing the resolutions passed by their legislatures.  Plaintiff-States have an interest in ensuring

---

[15] *Id.*

[16] *Id.*

that their legislatures' ratifications of the Equal Rights Amendment are given effect.

The Supreme Court has recognized, in the context of Article V, a state legislative actor's standing to ensure that its acts are effectuated. In *Coleman v. Miller*, 307 U.S. 433 (1939), several Kansas state senators who had voted against ratification of a proposed amendment challenged the Lieutenant Governor's authority to cast the deciding vote in favor of ratification as impermissible under Article V. *Id.* at 436. A plurality of the Supreme Court concluded the senators had standing because they had a "plain, direct, and adequate interest in maintaining the effectiveness of their votes" against ratification, which had "been overridden and virtually held for naught." *Id.* at 438; see *Raines v. Byrd*, 521 U.S. 811, 823 (1997) ("*Coleman* stands . . . for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.").

The Supreme Court applied this principle to an entire legislative body in *Arizona State Legislature v. Arizona Independent Redistricting*

*Commission*, 576 U.S. 787 (2015). Arizona's legislature claimed that a voter initiative transferring redistricting authority from the legislature to an independent commission "strip[ped]" the legislature of its federal constitutional "prerogative to initiate redistricting." *Id.* at 800. The Court held that the legislature had standing because it asserted an injury similar to the one presented by the senators in *Coleman*: the initiative "would completely nullify any vote by the Legislature . . . purporting to adopt a redistricting plan." *Id.* at 804 (quoting *Raines*, 521 U.S. at 823–24) (internal quotation marks and alteration omitted).

Just like the legislators in *Coleman*, or the legislative body in *Arizona*, Plaintiff-States have a "plain, direct, and adequate interest" in maintaining the effectiveness of their legislative acts. *Coleman*, 307 U.S. at 438. The Archivist is effectively "overrid[ing]" Plaintiff-States' legislatures' ratifications of the Equal Rights Amendment by refusing to credit those ratifications toward the number needed to trigger his statutory duty to publish and certify an amendment. *Id.* That is, the amendment that Plaintiff-States ratified would have become a formal part of the Constitution's text if their ratifications had not been "virtually

held for naught" by the Archivist. *Id.*[17] Plaintiff-States have thus suffered a legally cognizable invasion of their sovereign interest in ensuring that their legislative acts are given effect.

## B. The district court held that Plaintiff-States lacked standing only by improperly adding a "legal effect" requirement to the standing analysis

The district court's contrary conclusion rested on its view that "the Archivist's proclamation has no legal effect." JA 322. The court reasoned that "an amendment becomes law when it secures ratifications from three-fourths of the states," not when it is published and certified. JA 322. And, in the court's view, because the Archivist's publication and certification of the Equal Rights Amendment were purely ministerial, they would not determine, as a legal matter, whether the amendment

---

[17] Plaintiff-States are further injured because their legislatures' "votes" for ratification are being "denied [their] full validity in relation to the votes of" other States. *Alaska Legis. Council v. Babbitt*, 181 F.3d 1333, 1338 n.3 (D.C. Cir. 1999) (quoting *Raines*, 521 U.S. at 824 n.7) (internal quotation marks omitted); see also *Maloney v. Murphy*, 984 F.3d 50, 66 (D.C. Cir. 2020). Unlike other States' pre-deadline ratifications, Plaintiff-States' ratifications are not being counted as valid ratifications that would trigger the Archivist's statutory duty. See JA 172, 174 (in declining to publish and certify Equal Rights Amendment, relying on Office of Legal Counsel opinion crediting pre-deadline ratifications but not post-deadline ratifications); *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C. 1 (Jan. 6, 2020).

was a part of the Constitution, so Plaintiff-States could not be injured by the Archivist's inaction and compelling him to act "would avail them nothing." JA 323 (quoting *United States ex rel. Widenmann v. Colby*, 265 F. 998, 1000 (D.C. Cir. 1920), *aff'd sub nom. United States ex rel. Widenmann v. Hughes*, 257 U.S. 619 (1921) (per curiam)) (alternation omitted). That is, according to the district court, because the Archivist's role under Section 106b is purely ministerial (a requirement for a mandamus action) and has no "legal effect" on the status of the Equal Rights Amendment, Plaintiff-States have no standing. JA 322. This self-defeating theory of mandamus is wrong.

1. A "legal effect" is not required to establish standing. To the contrary, the Supreme Court has repeatedly held that a plaintiff has standing even though the requested relief would not have a legal impact on the plaintiff's rights. This principle dates back to *Marbury v. Madison*, 5 U.S. 137 (1803).

There, the Court held that William Marbury could bring a mandamus action challenging the Secretary of State's failure to deliver a commission showing his judicial appointment—notwithstanding that "[d]elivery [was] not necessary to the validity of" the appointment and

instead was merely "evidence" of that appointment. *Id.* at 138 (emphasis omitted); see *id.* at 158–59 ("[W]hen the seal is affixed, the appointment is made, and the commission is valid."). Marbury was "fighting for the 'principle.'" Saikrishna Bangalore Prakash, *The Appointment and Removal of William J. Marbury and When an Office Vests*, 89 Notre Dame L. Rev. 199, 250 (2013) (explaining that the commission that Marbury sought "would not have helped him assume office").

Even though the delivery of the commission would have no "legal effect," JA 322, the Supreme Court held that because Marbury had a legal right to his judicial appointment, he had a "consequent right to the commission" that served as evidence of that appointment, *Marbury*, 5 U.S. at 168. And because that right was "violat[ed]" by the "refusal to deliver" the commission, Marbury was entitled to seek "a remedy" in federal court. *Id.* If the district court's theory of standing—that a plaintiff seeking mandamus relief must identify a ministerial act with a "legal effect" on the plaintiff's rights—was correct, then *Marbury* was wrongly decided.

Likewise, just last year, in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), the Supreme Court held that

a law firm had standing on appeal to challenge the constitutionality of the for-cause removal protection for the Consumer Financial Protection Bureau's Director, even though resolution of that question would not affect the enforceability of the civil investigative demand that the Director had issued against the law firm and that the firm sought to invalidate. *Id.* at 2195–96. That is, the fact the Court's decision on the question presented would carry no consequences for the law firm's legal rights did not "deprive [the Court] of jurisdiction." *Id.* at 2195.

*Marbury* and *Seila* are just two examples demonstrating that a plaintiff need not allege that the requested relief "does anything legally significant" to establish standing. JA 323.[18] Plaintiff-States have

---

[18] The courts of appeals similarly do not require a "legal effect" to establish standing. Courts have held, for example, that "reputational injury that derives directly from government action will support Article III standing to challenge that action." *Foretich v. United States*, 351 F.3d 1198, 1214 (D.C. Cir. 2003). Likewise, "informational injury" can confer standing. *Maloney*, 984 F.3d at 64 (FOIA requester denied information "has suffered a cognizable informational injury that can be enforced in federal court"). "Dignitary harms" or "stigmatic injuries" may also be sufficient. See, *e.g.*, *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833 (7th Cir. 2019) ("There is no doubt that dignitary harm is cognizable."); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1114 (11th Cir. 2021) (plaintiff alleging "stigmatic injury" had standing to bring Title II claim); *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 712 (6th Cir. 2015) ("Stigmatization also constitutes an injury in fact for standing

standing to protect their sovereign interests harmed by the Archivist's failure to publish and certify the Equal Rights Amendment, even if those actions do not affect the legal "validity" of that amendment. *Marbury*, 5 U.S. at 138.

This result makes sense. Under the district court's theory of standing, Plaintiff-States could never obtain judicial relief for the Archivist's failure to adhere to his statutory duty under Section 106b. For instance, if instead of refusing to *add* an amendment to the text of the Constitution, the Archivist decided to *erase* an amendment from the Constitution's text, the States would lack standing to sue because the Archivist's action would have no "legal effect"; that amendment, having been ratified by three-fourths of the States, would still remain a legal part of the Constitution despite being omitted from its text. This result would leave the States without legal recourse to vindicate their ratifications. See *Missouri v. Illinois*, 180 U.S. 208, 241 (1901) (State could bring federal action where "nature of the injury complained of [was]

---

purposes."); see also *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) ("Feelings of marginalization and exclusion are cognizable forms of injury[.]").

such that an adequate remedy [could] only be found in this court at the suit of the state[s]").

2.     The district court likewise erroneously relied on *Colby*, 265 F. at 998, to justify its conclusion that Plaintiff-States lacked standing.  See JA 323.  There, the petitioner sought a writ of mandamus directing the Secretary of State to cancel the proclamation certifying the Eighteenth Amendment as valid because, in his view, the amendment was not validly adopted.   265 F. at 999.   This Court concluded that granting the petitioner this relief would "avail him nothing," because cancelling the proclamation "would not affect the validity of the amendment."  *Id.* at 1000.  Unlike *Colby*, where the petitioner challenged the legal validity of the amendment (which publication and certification do not affect), Plaintiff-States here challenge the omission of the amendment from the Constitution's text (which publication and certification do affect).  It was therefore proper for the Court in *Colby* (unlike here) to consider the "legal effect" on the amendment's validity.

3.     Finally, the district court's holding that Plaintiff-States lack standing cannot be reconciled with the court's holding that Intervenors have standing.  An intervening-defendant must have Article III standing,

and "[t]he standing inquiry for an intervening-defendant is the same as for a plaintiff." *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 316 (D.C. Cir. 2015). In granting the motion to intervene, the district court recognized that the States "have a constitutionally-assigned role in the amendment process," and concluded that Intervenors' interest in that role constituted "a legally protected interest sufficient to confer Article III standing." JA 102 (quoting *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1233 (D.C. Cir. 2018)) (internal quotations marks omitted).

Plaintiff-States have standing for the same reason. See U.S. Const. art. V. There is no principled basis for concluding that Intervenors—two of whom never even exercised their Article V authority to ratify the Equal Rights Amendment—have a cognizable interest in whether the Archivist publishes and certifies the amendment, but Plaintiff-States—which exercised this authority but whose ratifications are not being counted—do not.

*     *     *

The district court incorrectly held that Plaintiff-States lack standing to bring this action. In doing so, the court left Plaintiff-States

without a judicial avenue to redress the harm caused to their sovereign interests by the Archivist's refusal to publish and certify the Equal Rights Amendment, even though the Archivist has stated that he will not perform those actions without a court order. JA 174.[19] This Court should reverse the district court's dismissal for lack of standing.

## II. The district court erred in holding that the Archivist had the power to discard Plaintiff-States' ratifications of the Equal Rights Amendment

The district court set forth an alternative basis for dismissal under the Mandamus Act. JA 334–45. It held that the first two requirements of mandamus relief—a plaintiff's right to relief and a federal official's duty to act—were not satisfied because the Archivist has an "implied" power to assess the validity of State ratifications, and, in addition, Plaintiff-States' ratifications should not be counted because of the timeframe set by Congress. JA 337. But the Archivist has no such power, and, even if he did, he should not have discarded Plaintiff-States'

---

[19] For these reasons, it is disingenuous that the Archivist contends in litigation that the court lacks jurisdiction to enter the very order he contemplated. Mem. in Supp. of Def.'s Mot. to Dismiss Pls.' Compl. at 8–12, *Virginia v. Ferriero*, No. 1:20-cv-242 (D.D.C. May 7, 2020), ECF No. 29-1.

ratifications.  This Court should reverse the district court's decision on this ground, too.

As the district court recognized, this Court often discusses the first two elements of a mandamus claim "'concurrently.'"  JA 335 (quoting *Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020)).  To show that these two requirements are met, Plaintiff-States must plausibly allege that "the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined."  *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)).  That is, the defendant official must have a "clear non-discretionary duty" that he is required to discharge.  *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001).  Here, Section 106b imposes on the Archivist a clear, non-discretionary duty to publish and certify constitutional amendments. Plaintiff-States therefore have a clear right to relief, and, likewise, the Archivist has a clear duty to act.

**A.** **The Archivist was required under Section 106b to publish and certify the Equal Rights Amendment after receiving Plaintiff-States' ratifications**

Nothing in Article V sets forth a role for the Archivist in the amendment process. Rather, Article V provides in relevant part that a constitutional amendment "shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress." U.S. Const. art. V. Federal statutes, however, have designated to federal officials the administrative task of accepting State ratifications and eventually certifying and publishing amendments after the Article V amendment process has been completed. At one point, the role belonged to the Secretary of State. See Act of Apr. 20, 1818, ch. 80, § 2, 3 Stat. 439. Today, that role lies with the Archivist. The operative statute states:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States *shall* forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same

has become valid, to all intents and purposes, as a part of the Constitution of the United States.

1 U.S.C. § 106b (emphasis added).

Here, the "provisions of the Constitution" were satisfied. Congress specified State legislatures as the mode of ratification for the Equal Rights Amendment, JA 145, and the Archivist has recorded receiving "official notice" of ratification by State legislatures from thirty-eight, or three-fourths, of the States, JA 172. The only remaining question, then, is whether Section 106b required the Archivist to publish and certify the Equal Rights Amendment upon receipt of this notice. See *Monmouth Med. Ctr.*, 257 F.3d at 813.

1. The plain text of Section 106b answers this question. "The word 'shall' generally imposes a non-discretionary duty" and a statute's use of "shall" renders its directive "mandatory." *SAS Inst. v. Iancu*, 138 S. Ct. 1348, 1354 (2018); see *Association of Civilian Technicians v. Fed. Lab. Rels. Auth.*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive."). Because Section 106b directs that the Archivist "shall" publish and certify an amendment upon receipt of official notice of ratification, the statute's plain terms

"impose[] a non-discretionary duty" on the Archivist to publish and certify the Equal Rights Amendment upon receipt of such notice. *SAS Inst.*, 138 S. Ct. at 1354.

This plain-text interpretation is confirmed by this Court's decision in *Colby*. That case addressed Section 106b's substantively identical predecessor statute, which tasked the Secretary of State with publishing and certifying amendments. Act of Apr. 20, 1818, ch. 80, § 2, 3 Stat. 439. The petitioner there claimed that the Acting Secretary of State should not have published and certified the Eighteenth Amendment because that amendment was not validly adopted. *Colby*, 265 F. at 999. Specifically, he contended that several States should not have sent official notice of ratification. *Id.* This Court concluded that, under the statute, the Acting Secretary was "obliged" to publish and certify an amendment "upon receiving official notice from three-fourths of the several states that the proposed amendment had been adopted." *Id.* (internal citation omitted). This duty was "purely ministerial" because the statute afforded the Acting Secretary "[n]o discretion" to determine "whether or not the notices stated the truth" or "look behind the notices" to determine whether the States should have issued them. *Id.* at 999–

1000.  And because there was no dispute that the Acting Secretary had received official notice of ratification from three-fourths of the States, he was required to publish and certify the Eighteenth Amendment.  *Id.*

Likewise, here, the Archivist was required to publish and certify the Equal Rights Amendment upon receipt of official notice of ratification from three-fourths of the States, without assessing for himself the ratifications' validity.  Because the Archivist "refuses to perform [his] statutory dut[y], mandamus is an appropriate remedy to force [him] to do so."  *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984).

2.  The district court's decision to the contrary relied on a misreading of Section 106b and *Colby*.  It determined that the Archivist did not have a clear duty to publish and certify the Equal Rights Amendment because Section 106b confers on the Archivist an "implied" power to ensure that any amendment complies with "Article V's requirements," which the court believed included "any time limit that Congress put on the ratification process."  JA 336–37.  Put differently, in the district court's view, Section 106b authorizes the Archivist not only to confirm that the conditions enumerated in Article V are satisfied, but also to interpret and enforce any additional terms that Congress claims

it has imposed pursuant to Article V.  That conclusion finds support neither in Section 106b nor in *Colby*.

To start, Section 106b does not expressly confer interpretive authority upon the Archivist.  Instead, it directs that the Archivist "shall" publish a constitutional amendment upon receipt of "official notice" that the "amendment . . . has been adopted, according to the provisions of the Constitution."  1 U.S.C. § 106b.  As this Court explained in *Colby*, that language commands the Archivist to publish the amendment "upon receiving official notice from three-fourths of the several states," without conducting a further inquiry.  265 F. at 999.  That is, the Archivist may ensure that the textually enumerated provisions of Article V— ratification by three-fourths of the States, and by State legislature or convention as chosen by Congress—have been met.  But he is then "obliged" to publish and certify the amendment without "examin[ing] into [the] matter" any further.  *Id.* at 999–1000.

The district court cast *Colby* aside as "inapplicable" because the Archivist "did not look behind [Plaintiff-States'] ratification notices to second-guess the proceedings that generated them" but rather determined whether the notices "on their face" did not meet Congress's

timeframe. JA 336–37 (internal quotation marks omitted). This distinction is hollow for at least two reasons.

First, this Court's analysis of Section 106b's predecessor statute in *Colby* did not turn on why the ratifications were allegedly invalid or how closely the executive official would need to examine the notices. Rather, the Court's conclusion that the official had a "purely ministerial" duty to publish and certify the amendment upon receipt of official notice rested on the fact that "[n]o discretion was lodged in him" by the statute to do otherwise. 265 F. at 999. This meant that he was "obliged, under the statute, to put forth his proclamation" publishing and certifying the amendment "[a]s soon as he had received the notices from [three-fourths] of the states that the amendment had been adopted." *Id.*

Second, the district court's conclusion—that the Archivist can assess the facial validity of a State's notice of ratification but not undertake a more searching inquiry—cannot be squared with *Colby*'s determination that the Archivist's duty is "purely ministerial." 265 F. at 999. Under the district court's view, the Archivist would decide which questions require only a facial inquiry (i.e., questions he may answer), and which require further analysis (i.e., questions he lacks authority to

answer). But this case illustrates that conducting this determination is not straightforward.

The district court believed that the Archivist could resolve the validity of Plaintiff-States' ratifications based solely on the "face" of their notices, which would answer whether they met Congress's deadline. JA 337. That is not correct because, before conducting such a facial analysis, the Archivist would need to determine whether the deadline Congress placed in the prefatory clause to the proposed amendment was binding. And, depending on the circumstances, the Archivist might also need to evaluate the effect of subsequent congressional action on that deadline.[20] Answering these questions requires significant judgment on the Archivist's part, contrary to this Court's determination that the operative statute affords him "[n]o discretion." *Colby*, 265 F. at 999; see *National Treasury Emps. Union v. Nixon*, 492 F.2d 587, 608 (D.C. Cir. 1974) (explaining that a ministerial task is a "simple, definite duty").

---

[20] Congress, for instance, extended the Equal Rights Amendment's deadline by three years, and the House of Representatives has twice passed a joint resolution to rescind the deadline. H.J. Res. 17, 117th Cong. (2021); H.J. Res. 79, 116th Cong. (2020).

*Colby* thus forecloses the conclusion that the Archivist may evaluate the States' compliance with any ratification conditions beyond those expressly stated in Article V. Nevertheless, the district court adopted a contrary view of Section 106b out of apparent concern that adhering to *Colby* could require the Archivist to publish and certify an amendment that "clearly violates a condition of Article V," such as if Congress specified State legislatures as the mode of ratification yet the States ratified via conventions. JA 337–38. The district court viewed such a result as absurd. JA 337. But following *Colby* would not lead to this result. That decision permits the Archivist to assess an amendment's compliance with the textually enumerated provisions of Article V, which include Congress's choice of State legislatures or conventions as the mode of ratification. See *Colby*, 265 F. at 999.

In any event, the absurdity canon poses a high threshold: a statutory construction is absurd if it "defies rationality" or is "so contrary to perceived social values that Congress could not have intended it." *Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498–99 (D.C. Cir. 2009) (quoting John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2390 (2003)) (internal quotation marks omitted).

That the Archivist lacks authority to evaluate whether a State's ratification satisfies additional terms of ratification (such as congressional deadlines) does not defy rationality given that Article V provides no role in the amendment process for the executive branch. See U.S. Const. art. V; see also *Hollingsworth v. Virginia*, 3 U.S. 378, 381 n.2 (1798) ("[The president] has nothing to do with the proposition, or adoption, of amendments to the Constitution.").

3.    Finally, although the district court expressed concern about the Archivist publishing and certifying an amendment that violates Article V, JA 337–38, it is the district court's reading that creates constitutional concerns. A "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (quoting *United States v. Moy*, 241 U.S. 394, 401 (1916)). Here, the district court's construction of Section 106b created such "grave doubts" by disrupting the balance of state and federal power struck in Article V.

In response to concerns that Congress would abuse its power, the Framers designed the amendment process to be "neither wholly federal nor wholly national." *The Federalist* No. 39 (James Madison); see supra

pp. 7–10.  Specifically, they allocated some authority in the amendment process (such as proposing amendments) to Congress, while reserving other authority (such as ratifying amendments) to the States.  U.S. Const. art. V.  This division of authority ensured that the States could "erect barriers against the encroachment of the national authority."  *The Federalist* No. 85 (Alexander Hamilton).

Notably, Article V does not mention the executive branch at all, let alone prescribe a role for that branch to referee the amendment process.  Consistent with this constitutional design, the executive branch has long recognized that its statutory duty to publish and certify amendments is "a ministerial, 'record-keeping' duty," *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C. 1, 6 n.5 (Jan. 6, 2020) (quoting *Congressional Pay Amendment*, 16 Op. O.L.C. 87, 98 (Nov. 2, 1992)); see 96 Cong. Rec. 3250 (1950) (message from President Truman accompanying Reorganization Plan No. 20) (describing process of publishing and certifying amendments as "record keeping"), and that the federal official tasked with certifying and publishing amendments "is without power to

examine into the validity of alleged acts of ratification," *Fairchild v. Hughes*, 258 U.S. 126, 127–28 (1922) (Secretary of State's position).[21]

Under the district court's reading of Section 106b, however, the executive branch would play a substantive—and, indeed, a powerful—role in the amendment process because the Archivist would determine which ratification conditions are permitted by Article V and then judge the validity of amendments based on those conditions. See *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (explaining that duties involving judgment are not ministerial). Reading such a role into Article V would inject the executive branch into the amendment process and enlarge the national government's overall authority by including an additional federal actor with additional substantive responsibility—giving that actor a role to play *after* the States have completed the ratification process—thus upending the careful balance of power struck by the Framers.

---

[21] In fact, despite the Archivist's refusal to credit Plaintiff-States' ratifications of the Equal Rights Amendment, the National Archives and Records Administration maintains that "[t]he Archivist does not make any substantive determinations as to the validity of State ratification actions." *Constitutional Amendment Process*, supra note 14.

The district court therefore erred in disregarding both Section 106b's text and this Court's decision in *Colby*, under which the Archivist has a clear non-discretionary duty to publish and certify the Equal Rights Amendment and Plaintiff-States correspondingly have a clear and indisputable right to that relief.

### B. The deadline Congress included in the proposing clause of the Equal Rights Amendment does not invalidate subsequent State ratifications

The district court's conclusions that Plaintiff-States had no right to relief and the Archivist likewise had no duty to act should be reversed for a separate reason: the court erroneously held that Plaintiff-States' ratifications were invalidated by Congress's seven-year timeframe on the Equal Rights Amendment's ratification. JA 338–45.[22] When proposing the Equal Rights Amendment, Congress asserted that the amendment would become "part of the Constitution when ratified by the legislatures

_____

[22] Because the district court made two independent errors in analyzing the merits, this Court need not address both issues to reverse. If this Court agrees that the Archivist lacks the authority to determine whether a State's ratification complies with any additional terms beyond those explicitly set out in Article V, see supra Section II.A, it need not resolve whether Congress had authority to set the type of deadline imposed here. And if it concludes that Congress cannot set such deadlines, then it need not resolve whether the Archivist can assess compliance with Congressional deadlines as a general matter.

of three-fourths of the several States within seven years from the date of its submission by the Congress."  JA 145.  Unlike its previous practice of placing time restraints in the text of the amendments proposed to the States (i.e., text the States would actually ratify),[23] Congress here chose to include this timeframe in the introduction of the joint resolution proposing the amendment (i.e., text the States had no power to accept or reject through ratification).

The district court described the question of whether such a prefatory timeframe can bind the States as one of "first impression," and held that Plaintiff-States' ratifications were invalid because they occurred after the seven-year period.  JA 339, 345.  This conclusion was wrong.

1.    At the threshold, and as the district court acknowledged, Article V does not explicitly authorize Congress to set deadlines on State ratification in any manner.  See JA 339 (recognizing "Constitution's text provides no guidance" in resolving this question).  Rather, the article

---

[23] See U.S. Const. amend. XVIII, § 3 (text of amendment stating it "shall be inoperative unless it shall have been ratified . . . within seven years from the date of the submission); U.S. Const. amend. XX, § 6 (same); U.S. Const. amend. XXI, § 3 (same); U.S. Const. amend. XXII, § 2 (same).

confers three specific powers on Congress: (1) to "propose Amendments;" (2) to "call a Convention for proposing Amendments" upon the request of two-thirds of the States; and (3) to "propose" ratification by State legislatures or conventions as "one or the other Mode of Ratification." U.S. Const. art. V. Article V simply spells out an order of process between the States and Congress. Nowhere does Article V empower Congress to impose deadlines or other constraints.[24]

This "[c]onstitutional silence" on Congress's authority to impose additional constraints should be read as "equivalent to an express prohibition" on Congress setting deadlines for State ratification. *Clinton v. City of N.Y.*, 524 U.S. 417, 439 (1998). The Supreme Court has explained that Article V is "clear in statement and in meaning, contains no ambiguity, and calls for no resort to rules of construction." *United States v. Sprague*, 282 U.S. 716, 730 (1931). And where the Constitution is "clear[,] there is no room for construction and no excuse for

---

[24] This omission lies in stark contrast to the constitutions of six of the original States, which imposed specific timelines on aspects of the amendment process. Penn. Const. of 1776, § 47; Md. Const. of 1776, LIX; Vt. Const. of 1777, ch. 2, XLIV; Vt. Const. of 1786, ch. 2, XL; Mass. Const. of 1780, pt. 2, ch. 6, art. X; N.H. Const. of 1784, pt. 2; S.C. Const. of 1778, XLIV.

interpolation or addition." *Id.* at 731–32 (explaining that Article V did not contain provision was "persuasive evidence" that no such provision "was intended"). Article V is thus best read to confer on Congress only the authority expressly set out in its text, which does not include the authority to set deadlines on the amendment process.[25]

2. To be clear, this Court need not resolve any broader question of congressional authority to impose deadlines on State ratification because, at minimum, Congress lacks the authority to set deadlines outside the text of proposed amendments—as it sought to do here. Congress's decision to place its deadline in language *separate* from the proposed amendment, rather than including it *within* the text of a proposed amendment (consistent with its previous practice), is constitutionally significant.

---

[25] Indeed, early American historians and the Framers cautioned against construing the Constitution to confer unspecified powers on the federal government. See, *e.g.*, State Ratification Documents, in 1 *Elliot's Debates*, 325 (Jonathan Elliot, ed. 1836) ("This Convention doth also declare, that no section or paragraph of the said Constitution warrants a construction that the states do not retain every power not expressly relinquished by them, and vested in the general government of the Union.") (South Carolina); *The Federalist* No. 45 (James Madison) ("The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.").

Placing a deadline *within* the proposed amendment's text at least arguably respects the careful balance struck in Article V between Congress and the States.  When Congress drafts an amendment to be inoperative if it is not ratified within a certain period, the States can exercise their constitutional prerogative to ratify an amendment at any time, but the amendment, once ratified, may be inoperative.[26]  By contrast, when Congress imposes a deadline *separate* from the text of a proposed amendment, that deadline limits the period in which States may exercise their ratification authority altogether.  Such deadlines alter the compromise struck in Article V by interfering with the ratification authority reserved solely for the States.  See *The Federalist* No. 85 (Alexander Hamilton) (writing that roles prescribed in amendment process ensure States can protect against "encroachments" by Congress).[27]

---

[26] See U.S. Const. amend. XVIII, § 3 ("This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress.").

[27] Concluding that Congress has the authority to set such deadlines also carries serious practical repercussions.  As one example, congressional deadlines may not account for the time required by state

3.    The district court nonetheless determined that Congress has the power to limit the States' authority to ratify amendments by means of a deadline outside the text of a proposed amendment.    JA 339. Acknowledging that the "Supreme Court has not spoken directly on the issue," the district court relied on the Supreme Court's decision in *Dillon v. Gloss*, 256 U.S. 368 (1921), "hints" offered by the Supreme Court in other cases, and past congressional practice.    JA 339.    None of these indicia supports, let alone permits, the expansion of Congress's constitutional authority under Article V.

a.    The district court relied principally on *Dillon*, which it characterized as holding that "Congress can attach a deadline to a proposed amendment."    JA 338.    But *Dillon*'s holding was not so broad. *Dillon* concerned the validity of the Eighteenth Amendment, which, like

---

procedures for ratification.    In Illinois, for instance, the State legislature cannot hold a ratification vote unless a majority of its members has been elected *after* the amendment's proposal.    Ill. Const. art. XIV, § 4. Relatedly, such deadlines may prevent States from undertaking the "mature consideration" necessary for ratifying amendments, *The Federalist* No. 85 (Alexander Hamilton), as it may take more than seven years (or whatever deadline Congress chooses) for States to fully consider an amendment.    Notably, the 27th Amendment was ratified more than 200 years after its proposal.    *The Constitution: Amendments 11–27*, Nat'l Archives, https://www.archives.gov/founding-docs/amendments-11-27.

multiple other amendments, stated in its text that it would be inoperative if not ratified within seven years. 256 U.S. at 371–72. The petitioner there was a federal defendant charged with transporting liquor in violation of a statute enacted pursuant to the Eighteenth Amendment; he argued that that the existence of the deadline meant the entire Eighteenth Amendment was invalid. *Id.* at 370–71. The Supreme Court rejected his argument, reasoning that Congress could set a deadline "as an incident of its power to designate the mode of ratification." *Id.* at 376. *Dillon*, however, cannot sustain the weight the district court placed on it for three reasons.

*First*, the language from *Dillon* on which the district court relied— that Congress could set a deadline "as an incident of its power to designate the mode of ratification," 256 U.S. at 376—is dictum. The constitutional question was not concretely presented in *Dillon* because the Eighteenth Amendment had been validly ratified before the seven-year deadline elapsed, even assuming the deadline's propriety. See *id.* In fact, the Supreme Court later explained that the language it used in *Dillon* regarding Congress's authority to choose a mode of ratification "was not in the strict sense necessary to [its] decision," although its

language was "not idly or lightly made." *Sprague*, 282 U.S. at 732–33. The Court also cautioned against reading *Dillon* broadly, emphasizing that *Dillon* "must be read in the light of the point decided," *Coleman*, 307 U.S. at 453, and the "point decided" in *Dillon* was whether the mere existence of a deadline in the text of an amendment invalidates the entirety of the amendment.

*Second*, *Dillon*'s dictum should not be stretched to govern here. The plain meaning of "mode of ratification" does not support the conclusion that this phrase includes the authority to set the timing of ratification. See *Sprague*, 282 U.S. at 731–32 (explaining that Article V should be given plain meaning). According to Merriam-Webster, "mode" means the "particular form or variety of something," and the form ratification takes (i.e., legislature or convention) is distinct from when it occurs.[28] Congress's power to designate the "Mode of Ratification," U.S. Const. art. V, thus should not be read as including the power to set the timing of ratification.

---

[28] "Mode," Merriam-Webster Dictionary, https://www.merriam-web ster.com/dictionary/mode.

The Supreme Court appears to have recognized as much. After *Dillon*, the Court characterized Article V's use of the phrase "mode of ratification" as "conferring upon the Congress the choice of *method* of ratification, as between action by legislatures and by conventions." *Sprague*, 282 U.S. at 729, 732 (emphasis added). The *Dillon* Court provided no reason to depart from this "normal and ordinary" meaning of the phrase "mode of ratification," *id.* at 731, and this Court need not give contrary dictum persuasive effect where it is conclusory, see *Bauer v. Marmara*, 774 F.3d 1026, 1035 (D.C. Cir. 2014).

*Finally*, even if *Dillon* could be viewed as determining Congress's power to set deadlines for State ratification, that holding would not apply here because the deadline Congress included for the Eighteenth Amendment was within that amendment's text, 265 U.S. at 371, and not in a proposing clause outside of the constitutional text proposed to the States. The placement of a putative deadline matters, because if a deadline is placed within the text of an amendment, the States may still exercise their constitutional prerogative to ratify that amendment at any

time even if the amendment is ultimately inoperative.  See supra pp. 53–54.[29]

b.    The remaining "clues" relied upon by the district court, JA 341, likewise cannot bear the weight the court placed on them.  To start, the district court read an observation made by the plurality opinion in *Coleman* that "'[n]o limitation of time for ratification is provided in the instant case either in the proposed amendment or *in the resolution of submission*'" as suggesting that the location of a ratification deadline is immaterial to its effect.  JA 341 (quoting *Coleman*, 307 U.S. at 452).  But that case never raised the issue of a prefatory time limit.  The plurality was simply noting that because Congress had set no timeframe *at all* for

---

[29] This distinction between the text of a proposed amendment and introductory language in the proposing resolution is consistent with similar contexts where the Supreme Court has made clear that "a prefatory clause does not limit or expand the scope of the operative clause."  *District of Columbia v. Heller*, 554 U.S. 570, 578 (2008); *id.* at 578 n.3 ("[T]he key 18th-century English case on the effect of preambles . . . stated that 'the preamble could not be used to restrict the effect of the words used in the purview.'" (quoting *Copeman v. Gallant*, 24 Eng. Rep. 404 (1716))); see also *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889) ("[T]he preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act."); *Jacobson v. Massachusetts*, 197 U.S. 11, 22 (1905) ("[The preamble to the Constitution] has never been regarded as the source of any substantive power conferred on the government of the United States . . . .").

ratification of the proposed amendment in that case, the question was whether the Court, as opposed to Congress, could impose a reasonable time period for ratification. *Coleman*, 307 U.S. at 452. The plurality did not decide whether, if Congress had set a timeframe in an amendment's prefatory material, that restriction would bind the States.

The district court next looked to the Supreme Court's vacatur of the district court's decision in *Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981). JA 342. The *Freeman* district court held, among other things, that Congress's three-year extension of the deadline for ratifying the Equal Rights Amendment was unconstitutional. 529 F. Supp. at 1153. The Supreme Court granted certiorari, but before it heard argument, the extended deadline elapsed without additional ratifications. JA 342. The Court summarily dismissed the action as moot and vacated the district court's decision under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). *National Org. for Women, Inc. v. Idaho*, 459 U.S. 809, 809 (1982) ("*NOW*"). The district court here read the Supreme Court's one-sentence summary disposition as "tacitly acknowledg[ing] that the [Equal Rights Amendment's] ratification deadline was effective" because otherwise

additional States could still ratify the Equal Rights Amendment and there remained a live controversy. JA 342. That cannot be correct.

The Supreme Court was not required (or even permitted) to opine on whether the deadline would bar any hypothetical future ratifications of the Equal Rights Amendment. See *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (explaining that courts lack authority to "advis[e] what the law would be upon a hypothetical state of facts" (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). In any event, the Court did not explain why the case was moot, and such summary decisions should not be afforded precedential value. See *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 221 (1992) (noting that decision to dismiss appeal as moot "did not . . . have any legal significance").[30]

---

[30] The district court emphasized that the federal government moved to dismiss the case as moot on the basis that the Equal Rights Amendment had "failed of adoption no matter what the resolution of the legal issues presented," and that the Supreme Court had referenced this briefing. JA 342 (quoting 44 Op. O.L.C. at 23). The Court, however, merely said that it had "consider[ed]" the parties' filings, *NOW*, 459 U.S. at 809, not that it agreed with any particular arguments therein. And there were other reasons for finding the case moot, including that deciding whether the deadline was constitutionally extended would not affect the litigants' rights because no State had availed itself of the

Finally, the district court relied on the fact that "Congress . . . believes" it can limit state authority to ratify amendments through deadlines outside proposed amendments. JA 340. No other constitutional amendment accompanied by a similar prefatory deadline has been challenged because it received the requisite number of State ratifications only after the deadline lapsed, so Congress's past practice on this issue is of no probative value. Congress, moreover, may think that placing deadlines outside the text of proposed amendments will avoid "cluttering up the Constitution," *id.* (internal quotation marks omitted), but "Congress . . . is powerless to expand or extend its constitutional authority," *United States v. Chambers*, 291 U.S. 217, 224 (1934), regardless of its reasons for doing so.

4.     All told, the Framers intentionally designed the amendment process to balance the authority of Congress and the States, and in doing so did not confer on Congress the power to limit the States' authority to ratify amendments—at least not by setting constraints outside the text

_____

extended deadline before it expired. See *Lewis*, 494 U.S. at 477 ("Article III denies federal courts the power to decide questions that cannot affect the rights of litigants in the case before them." (quoting *Rice*, 404 U.S. at 246) (internal quotation marks omitted)).

of proposed amendments. Congress's purported deadline for the Equal Rights Amendment, therefore, does not invalidate Plaintiff-States' ratifications.

### C. There is no other adequate remedy to redress Plaintiff-States' injuries caused by the Archivist's refusal to publish and certify the Equal Rights Amendment

The district court did not reach the third jurisdictional element of mandamus relief—whether Plaintiff-States have an adequate alternative remedy to redress their injuries. See *American Hosp. Ass'n*, 812 F.3d at 189. Plaintiff-States have no adequate alternative remedy here, making this case appropriate for mandamus relief.

Section 106b vests sole responsibility for publishing and certifying an amendment with the Archivist. 1 U.S.C § 106b. The Archivist is thus the only individual authorized to perform the action sought here, but he has refused to do so "unless otherwise directed by a final court order." JA 129. The statute itself, moreover, provides no means for challenging the Archivist's refusal to discharge this duty. See *American Hosp. Ass'n*, 812 F.3d at 191 (examining whether statutory scheme provides adequate alternative remedy). Thus, Plaintiff-States' "sole means for adequate relief lies with this mandamus petition," *In re Al-Nashiri*, 921 F.3d 224,

239 (D.C. Cir. 2019), and they have satisfied the third element of mandamus relief.

*   *   *

This appeal is not merely about State standing or the meaning of Article V. It is about who we are as a Nation. Thirty-eight States have voted to make the Constitution "more perfect" with an express recognition of sex equality. Those votes should be respected.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

COMMONWEALTH OF
VIRGINIA, STATE OF ILLINOIS,
and STATE OF NEVADA

MARK R. HERRING
Attorney General of Virginia

By: */s/ Michelle S. Kallen*
MICHELLE S. KALLEN [1030497]
*Solicitor General*
ERIN B. ASHWELL
A. ANNE LLOYD
BRITTANY M. JONES
ROHINIYURIE TASHIMA
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone

(804) 371-0200 – Facsimile
mkallen@oag.state.va.us

*Attorneys for Appellant*
*Commonwealth of Virginia*

KWAME RAOUL
Attorney General of Illinois

By: */s/ Jane Elinor Notz*
JANE ELINOR NOTZ
*Solicitor General*
ALEX HEMMER
PRIYANKA GUPTA
KATHRYN HUNT MUSE
ELIZABETH ROBERSON-
YOUNG
Office of the Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3312 – Telephone
(312) 814-5024 – Facsimile
Jane.Notz@ilag.gov

*Attorneys for Appellant*
*State of Illinois*

AARON D. FORD
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
HEIDI PARRY STERN
*Solicitor General*
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

*Attorneys for Appellant*
*State of Nevada*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 12,760 words, excluding the parts exempted by Rule 32(f), according to the count of Microsoft Word.

By: _/s/ Michelle S. Kallen_
Michelle S. Kallen

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2022, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

By: */s/ Michelle S. Kallen*
Michelle S. Kallen