No. 21-5096

---

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**COMMONWEALTH OF VIRGINIA, et al.,**
*Plaintiff s-Appellants*

v.

**DAVID FERRIERO,** in his individual capacity
as Archivist of the United States,
*Defendant-Appellee,*

**STATE OF ALABAMA, et al.,**
*Intervenors for Defendants-Appellees.*

---

Appeal from the United States District Court
for the District of Columbia

---

## JOINT APPENDIX

---

| | |
|---|---|
| KWAME RAOUL | MARK R. HERRING |
| Attorney General of Illinois | Attorney General of Virginia |
| JANE ELINOR NOTZ | ERIN B. ASHWELL |
| ALEX HEMMER | MICHELLE S. KALLEN |
| PRIYANKA GUPTA | A. ANNE LLOYD |
| KATHRYN HUNT MUSE | BRITTANY M. JONES |
| ELIZABETH ROBERSON-YOUNG | ROHINIYURIE TASHIMA |

| | |
|---|---|
| Office of the Attorney General | Office of the Attorney General |
| 100 West Randolph Street | 202 North Ninth Street |
| Chicago, Illinois 60601 | Richmond, Virginia 23219 |
| (312) 814-3312 – Telephone | (804) 786-7704 – Telephone |
| (312) 814-5024 – Facsimile | (804) 371-0200 – Facsimile |
| Jane.Notz@ilag.gov | eashwell@oag.state.va.us |
| Alex.Hemmer@ilag.gov | mkallen@oag.state.va.us |
| Priyanka.Gupta@ilag.gov | alloyd@oag.state.va.us |
| Kathryn.Muse@illinois.gov | brecord@oag.state.va.us |
| Elizabeth.Roberson-Young@illinois.gov | rtashima@oag.state.va.us |

| | |
|---|---|
| *Attorneys for Appellant State of Illinois* | *Attorneys for Appellant Commonwealth of Virginia* |

AARON D. FORD
Attorney General of Nevada
HEIDI PARRY STERN
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

*Attorneys for Appellant
State of Nevada*

# TABLE OF CONTENTS

District Court Docket Report ............................................................... 001

Complaint (Docket No. 5) ................................................................ 076

Order – Granting Movants' Motion to Intervene (Docket No. 33) ....... 095

Memorandum Opinion (Docket No. 34) ............................................. 096

Answer of Intervenor-Defendants (Docket No. 35) ............................ 106

Plaintiffs' Response to Intervenors' Statement of Material Facts
(Docket No. 99-1) ........................................................................... 116

Plaintiffs' Statement of Undisputed and Material Facts in
Support of Motion for Summary Judgment (Docket No. 100-1) ......... 134

Michelle S. Kallen Declaration (Docket No. 100-2) ............................ 139

Exhibits to Kallen Declaration (Docket No. 100-3):
    Exhibit 1 – Joint Resolution dated 1-18-92 .................................... 144
    Exhibit 2 – Letter from Nevada to Ferriero dated
            3/22/17 .................................................................... 147
    Exhibit 3 – Letter from Secretary of State to
            Ferriero w/attachments dated 6/15/18 ...................... 153
    Exhibit 4 – Letter from General Assembly to
            Ferriero w/attachments dated 1/27/20 ...................... 167
    Exhibit 5 – List of State Ratification Actions ................................ 171
    Exhibit 6 – NARA Press Statement .............................................. 173
    Exhibit 7 – Pass of the resolution to amend the
            Constitution dated 5/18/92 ........................................ 175
    Exhibit 8 – Newspaper Article ...................................................... 179
    Exhibit 9 – Letter from National Archived to Steven
            A. Engel w/attachments dated 12/12/18 .................... 181

Cameron T. Norris Declaration (Docket No. 113) ................................ 220

Exhibits to Norris Declaration:
    Exhibit A – H.R.J. Res. 208 ............................................................ 223
    Exhibit B – CRS Report 97-22 (Sept. 30, 1997) ............................. 225
    Exhibit C – *Equal Rights Amendment Extension:*
         *Hearings on S.J. Res. 134* ...................................... 231
    Exhibit D – H.R. Rep. 95-1405 (1978) ............................................ 234
    Exhibit E – List of State Ratification Actions ................................ 236
    Exhibit F – Joint Resolution ........................................................... 238
    Exhibit G – *Nat'l Org. for Women, Inc. v. Idaho*,
         Nos. 81-1281, 81-1283, 81-1312, 81-1313
         (U.S. July 1982) .................................................... 241
    Exhibit H – *Nat'l Org. for Women, Inc. v. Idaho*,
         Nos. 81-1281, 81-1283, 81-1312,
         81-1313 (U.S. Aug. 1982) ..................................... 247
    Exhibit I – *Leaders Concede Loss on Equal Rights*,
         N.Y. Times (June 25, 1982) .................................. 262
    Exhibit J – *The Day the ERA Dies*, UPI (June 30, 1982) .............. 267
    Exhibit K – *U.S. Equal Rights Measure Is*
         *Re-introduced in Congress*,
         N.Y. Times (July 15, 1982) .................................. 277
    Exhibit L – 128 Cong. Rec. 14,913-14, 14,925, 15,149,
         15,195, 15,158-60, 15,586 .................................... 281
    Exhibit M – *Two Modes of Ratification*, Alice Paul Inst. .............. 292
    Exhibit N. – *Median Age of the Resident Population*
         *of the United States from 1960 to 2018*,
         Statista taken on September 21, 2020 .................... 299
    Exhibit O – *Statement on Equal Rights Amendment Debate*,
         Nat'l Archives (Dec. 19, 2019) .................................... 302
    Exhibit P – *NARA Press Statement on the Equal Rights*
         *Amendment*, Nat'l Archives (Jan. 8, 2020) ................. 304
    Exhibit Q – *Supreme Court Closes Lid on 10-Year-Old*
         *ERA Issues*, The Press-Tribune (Oct. 4, 1982) ........... 307

Order – Granting Defendant's Motion to Dismiss; Granting
        Intervenor-Defendants'    Motion    for    Summary
        Judgment; Denying Plaintiffs' Motion for Summary
        Judgment (Docket No. 116) .................................................. 309

Memorandum Opinion (Docket No. 117) ............................................. 311

Notice of Appeal (Docket No. 119) ....................................................... 348

Query     Reports     Utilities     Help     Log Out

APPEAL,CLOSED,MANDAMUS,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00242-RC

COMMONWEALTH OF VIRGINIA et al v. FERRIERO
Assigned to: Judge Rudolph Contreras
Case in other court: USDC for the DC Circuit, 21-05096
Cause: 28:1361 Petition for Writ of Mandamus

Date Filed: 01/30/2020
Date Terminated: 03/12/2021
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**COMMONWEALTH OF VIRGINIA**

represented by **Jessica Merry Samuels**
OFFICE OF THE ATTORNEY
GENERAL/VA
202 North 9th Street
Richmond, VA 23219
804-786-6835
Email: jsamuels@oag.state.va.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martine Elizabeth Cicconi**
OFFICE OF THE ATTORNEY
GENERAL/VA
202 North Ninth Street
Richmond, VA 23219
202-786-7773
Fax: 804-371-0200
Email: mcicconi@oag.state.va.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle S. Kallen**
OFFICE OF THE ATTORNEY
GENERAL/VA
202 North 9th Street
Richmond, VA 23219
804-786-7704
Fax: 804-371-0200
Email: mkallen@oag.state.va.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Toby Jay Heytens**
OFFICE OF THE ATTORNEY
GENERAL/VA
Solicitor General

JA 001

202 North Ninth Street
Richmond, VA 23219
804-786-7240
Fax: 804-371-0200
Email: theytens@oag.state.va.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**STATE OF ILLINOIS**                    represented by **Christopher Graham Wells**
ILLINOIS ATTORNEY GENERAL'S
OFFICE
100 W. Randolph St.
Chicago, IL 60601
312-814-1134
Email: cwells@atg.state.il.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Roberson-Young**
OFFICE OF THE ATTORNEY
GENERAL/IL
Public Interest Division
100 W. Randolph Street, 11th Floor
Chicago, IL 60601
312-814-5028
Email: erobersonyoung@atg.state.il.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathryn Hunt Muse**
ILLINOIS ATTORNEY GENERAL'S
OFFICE
100 W. Randolph St.
Chicago, IL 60601
312-814-3000
Fax: 312-814-5024
Email: Kathryn.Muse@ilag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle S. Kallen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**STATE OF NEVADA**                    represented by **Heidi Parry Stern**
OFFICE OF THE ATTORNEY
GENERAL/NV
555 E. Washington Ave
Suite 3900
Las Vegas, NV 89101
(702) 486-3594

Email: hstern@ag.nv.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle S. Kallen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**2255**

**Leanne Littrell DiLorenzo**                  represented by  **Charles Morton English , Jr.**
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washingon, DC 20005
202-973-4272
Email: chipenglish@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID S. FERRIERO**                  represented by  **Liam Holland**
*in his official capacity as Archivist of the*                  U.S. DEPARTMENT OF JUSTICE
*United States*                  Civil Division, Federal Programs Branch
1100 L Street NW
Room 11318
Washington, DC 20530
202-514-4964
Email: liam.c.holland@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vinita B. Andrapalliyal**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 305-0845
Fax: (202) 616-8470
Email: vinita.b.andrapalliyal@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**ALABAMA**                  represented by  **Cameron Thomas Norris**
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd.
Suite 700
Arlington, VA 22209

(703) 243-9423
Email: cam@consovoymccarthy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edmund G. LaCour , Jr**
OFFICE OF THE ATTORNEY
GENERAL/AL
PO BOX 300152
501 Washington Ave
Montgomery, AL 36130-0152
334-353-2196
Email: edmund.lacour@alabamaag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick Neilson Strawbridge**
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617-227-0548
Email: patrick@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alexander Barrett Bowdre**
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
PO Box 300152
Montgomery, AL 36130-0152
334-353-8892
Email: barrett.bowdre@alabamaag.gov
*ATTORNEY TO BE NOTICED*

**James William Davis**
STATE OF ALABAMA OFFICE OF
ATTORNEY GENERAL
P.O. Box 300152
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 353-1356
Fax: (334) 353-8440
Email: Jim.Davis@AlabamaAG.gov
*ATTORNEY TO BE NOTICED*

**Kelsey Curtis**
OFFICE OF THE ATTORNEY GENERAL
FOR ALABAMA
501 Washington Avenue
Montgomery, AL 36104
334-353-8891

JA 004

Fax: 334-353-8400
Email: kelsey.curtis@alabamaag.gov
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**LOUISIANA**                    represented by **Cameron Thomas Norris**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baker Murrill**
OFFICE OF THE ATTORNEY
GENERAL/LA
P.O. Box 94005
Baton Rouge, LA 70804
225-326-6766
Email: murrille@ag.louisiana.gov
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**NEBRASKA**                    represented by **Cameron Thomas Norris**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James A. Campbell**
OFFICE OF THE ATTORNEY
GENERAL/NE
2115 State Capitol
Lincoln, NE 68509
402-471-2682
Email: jim.campbell@nebraska.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**SOUTH DAKOTA**                    represented by **Cameron Thomas Norris**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**TENNESSEE**                    represented by **Andree Sophia Blumstein**
ATTORNEY GENERAL'S OFFICE/TN
Office of the Solicitor General
PO Box 20207
Nashville, TN 37202-0207
615-741-3492
Email: andree.blumstein@ag.tn.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cameron Thomas Norris**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**EAGLE FORUM**                           represented by  **William Jeffrey Olson**
                                          WILLIAM J. OLSON, P.C.
                                          370 Maple Avenue West
                                          Suite 4
                                          Vienna, VA 22180
                                          (703) 356-5070
                                          Fax: (703) 356-5085
                                          Email: wjo@mindspring.com
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Movant**

**EAGLE FORUM FOUNDATION**                represented by  **William Jeffrey Olson**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Movant**

**PUBLIC ADVOCATE OF THE UNITED**         represented by  **William Jeffrey Olson**
**STATES**                                (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Movant**

**CONSERVATIVE LEGAL DEFENSE**            represented by  **William Jeffrey Olson**
**AND EDUCATION FUND**                    (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Movant**

**CALIFORNIA CONSTITUTIONAL**             represented by  **William Jeffrey Olson**
**RIGHTS FOUNDATION**                     (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Movant**

**U.S. CONSTITUTIONAL RIGHTS**            represented by  **William Jeffrey Olson**
**LEGAL DEFENSE FUND**                    (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Movant**

**CLARE BOOTHE LUCE CENTER**              represented by  **William Jeffrey Olson**
**FOR CONSERVATIVE WOMEN**                (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Movant**

JA 006

**POLICY ANALYSIS CENTER**    represented by **William Jeffrey Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**RESTORING LIBERTY ACTION**    represented by **William Jeffrey Olson**
**COMMITTEE**    (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**LAROCK DAVID**    represented by **William Jeffrey Olson**
*Virginia Delegate*    (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**ROBERT G. MARSHALL**    represented by **William Jeffrey Olson**
*Former Virginia Delegate*    (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**AAUW OF RICHMOND**    represented by **Dorothy Wallace**
OFFICE OF THE ATTORNEY
GENERAL/VA
202 North 9th Street
Richmond, VA 23219
804-786-2912
Email: pwallace@oag.state.va.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
2727 Nw 58th Blvd
Gainesville, FL 32606
352-538-0380
Email: jmills@bsfllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
BOIES, SCHILLER & FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 274-1146
Fax: (202) 237-6131
Email: jriley@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
954-356-0011
Email: ssinger@bsfllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
954-356-0011
Email: avarela@bsfllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
954-356-0011
Email: vtussey@bsfllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**AAUW OF ILLINOIS**                    represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**AAUW OF NEVADA**                    represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**AAUW OF VIRGINIA**                    represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**CENTER FOR COMMON GROUND**          represented by   **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA 010

**Movant**

**CHICAGO BAR ASSOCIATION**                    represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**CHICAGO FOUNDATION FOR**                    represented by **Dorothy Wallace**
**WOMEN**                                       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*

JA 011

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**ILLINOIS STATE BAR ASSOCIATION**            represented by   **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**ILLINOIS FEDERATION OF
WOMENS BUSINESS CLUBS, INC.**            represented by   **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)

JA 012

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**ILLINOIS NOW**                                    represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**LEAGUE OF WOMEN VOTERS OF VIRGINIA**   represented by   **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**MCINTOSH FOUNDATION**   represented by   **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA 014

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL WOMENS POLITICAL CAUCUS OF VIRGINIA**          represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**NEVADANS FOR THE ERA**          represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA 015

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**NEVADA NOW**                    represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**RACHELS NETWORK**                     represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**VARATIFYERA**                     represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)

JA 017

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**VIRGINIA NOW**                          represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**VIRGINIA POOR PEOPLES**                 represented by **Dorothy Wallace**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**WOMENS BAR ASSOCIATION OF ILLINOIS**     represented by **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**WOMEN MATTER**                    represented by  **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**YWCA METROPOLITAN CHICAGO**           represented by  **Dorothy Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Lester Mills**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA 020

**Joshua P. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Harold Singer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ana Carolina Varela**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Tussey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**1010DATA, INC.**                    represented by **Jeannie Sclafani Rhee**
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street NW
Washington, DC 20006
202-223-7300
Email: JRhee@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**98POINT6 INC.**                    represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**ADVANCE LOCAL MEDIA LLC**          represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**ADVANCE MAGAZINE PUBLISHERS**      represented by **Jeannie Sclafani Rhee**
**INC.**                             (See above for address)
*AKA CONDE NAST*                     *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**ADVANCE PUBLICATIONS, INC.**       represented by **Jeannie Sclafani Rhee**

JA 021

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**AIRBNB, INC.**                          represented by  **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**AMERICAN CITY BUSINESS**                represented by  **Jeannie Sclafani Rhee**
**JOURNALS, INC.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**AMERICAN INTERNATIONAL**                represented by  **Jeannie Sclafani Rhee**
**GROUP, INC.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**APOLLO GLOBAL MANAGEMENT,**             represented by  **Jeannie Sclafani Rhee**
**INC.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**APPLE**                                 represented by  **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**ASANA, INC.**                           represented by  **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**ATAKAMA INC.**                          represented by  **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**BARON CAPITAL GROUP, INC.**             represented by  **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

JA 022

**BENCO DENTAL SUPPLY CO.**                    represented by **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*


<u>Movant</u>

**BIOGEN INC.**                                represented by **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*


<u>Movant</u>

**BLOOMBERG L.P.**                             represented by **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*


<u>Movant</u>

**BLUE APRON HOLDINGS, INC.**                  represented by **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*


<u>Movant</u>

**BOWERY FARMING INC.**                        represented by **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*


<u>Movant</u>

**BRAZE, INC.**                                represented by **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*


<u>Movant</u>

**BRIGHTHOUSE FINANCIAL, INC.**                represented by **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*


<u>Movant</u>

**BUILD AMERICA MUTUAL**                       represented by **Jeannie Sclafani Rhee**
**ASSURANCE COMPANY**                                           (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*


<u>Movant</u>

**CAPESPACE, LLC**                             represented by **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Movant**

**CAPRI HOLDINGS LIMITED**                    represented by    **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Movant**

**CHOBANI, LLC**                              represented by    **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Movant**

**CITIGROUP INC.**                            represented by    **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Movant**

**COTA, INC.**                                represented by    **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Movant**

**DAYFORWARD INC.**                           represented by    **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Movant**

**DIAGEO NORTH AMERICA, INC.**                represented by    **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Movant**

**ELLIG GROUP LLC**                           represented by    **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Movant**

**EQUITABLE**                                 represented by    **Jeannie Sclafani Rhee**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Movant**

**ESTEE LAUDER COMPANIES INC.**               represented by    **Jeannie Sclafani Rhee**
                                                                (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**ETSY, INC.**                                    represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**EVERYTHING IS EVERYTHING**                     represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**GENERAL ASSEMBLY SPACE, INC.**                 represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**GOLDMAN SACHS GROUP, INC.**                    represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**GUARDIAN LIFE INSURANCE**                      represented by **Jeannie Sclafani Rhee**
**COMPANY OF AMERICA**                           (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**HERSHEY COMPANY**                              represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**INDUSTRIOUS**                                  represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**KIMBERLY-CLARK CORPORATION**                   represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**KIND LLC**                          represented by **Jeannie Sclafani Rhee**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**LEADERS GROUP HOLDINGS LLC**         represented by **Jeannie Sclafani Rhee**
*SPORTS BUSINESS JOURNAL*                             (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**LEVI STRAUSS & CO.**                 represented by **Jeannie Sclafani Rhee**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**LIVARI CLOTHING**                    represented by **Jeannie Sclafani Rhee**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**LVMH MOET HENNESSY LOUIS**           represented by **Jeannie Sclafani Rhee**
**VUITTON INC.**                                      (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**LYFT, INC.**                         represented by **Jeannie Sclafani Rhee**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**MASTERCARD INCORPORATED**            represented by **Jeannie Sclafani Rhee**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**MICROSOFT**                          represented by **Jeannie Sclafani Rhee**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**MORGAN STANLEY**                     represented by **Jeannie Sclafani Rhee**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

JA 026

**Movant**

**MOTUS LLC**
represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**NARDELLO & CO.**
represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL FOOTBALL LEAGUE**
represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL WOMEN'S SOCCER LEAGUE, LLC**
represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**NEUBERGER BERMAN**
represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**NEW YORK LIFE INSURANCE COMPANY**
represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**OSCAR HEALTH**
represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**PEPSICO, INC.**
represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**PFIZER INC.**
represented by **Jeannie Sclafani Rhee**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**PLANET LABS INC.**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**PROCORE TECHNOLOGIES, INC.**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**PROSPERITY LIFE INSURANCE GROUP, LLC**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**PRUDENTIAL FINANCIAL, INC.**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**PUPPET, INC.**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**QUOTIENT TECHNOLOGY INC.**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**REBELLE MEDIA**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**RODAN & FIELDS, LLC**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**SALESFORCE.COM, INC.**                    represented by **Jeannie Sclafani Rhee**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**SEED&SPARK, INC.**                        represented by **Jeannie Sclafani Rhee**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**SHELTERPOINT LIFE INSURANCE**             represented by **Jeannie Sclafani Rhee**
**COMPANY**                                 (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**SHISEIDO AMERICAS**                       represented by **Jeannie Sclafani Rhee**
**CORPORATION**                             (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**SHUTTERSTOCK, INC.**                      represented by **Jeannie Sclafani Rhee**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**SOFTBANK INVESTMENT ADVISERS**            represented by **Jeannie Sclafani Rhee**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**SPOTIFY USA, INC.**                       represented by **Jeannie Sclafani Rhee**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**STRAVA**                                  represented by **Jeannie Sclafani Rhee**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

<u>Movant</u>

**SURVEYMONKEY INC.**                       represented by **Jeannie Sclafani Rhee**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

JA 029

**Movant**

**THINX**                                        represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**TIFFANY & CO.**                                represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**TORY BURCH LLC**                               represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**TRANSUNION**                                   represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**TURNITIN, LLC**                                represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**TURO INC.**                                    represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**TWITTER, INC.**                                represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**UBER**                                         represented by **Jeannie Sclafani Rhee**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**UNITED STATES SOCCER**                         represented by **Jeannie Sclafani Rhee**
**FEDERATION, INC.**                             (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**UNIVISION COMMUNICATIONS INC.**                  represented by    **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**VF CORPORATION**                  represented by    **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**VICE MEDIA LLC**                  represented by    **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**WEWORK**                  represented by    **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**WORKDAY, INC.**                  represented by    **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**CVS HEALTH CORPORATION**                  represented by    **Rebecca S. LeGrand**
LEGRAND LAW PLLC
1100 H Street NW
Suite 1220
Washington, DC 20005
202-587-5725
Email: rebecca@legrandpllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**MCKESSON CORPORATION**                  represented by    **Rebecca S. LeGrand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**NOAH FELDMAN**                  represented by    **Jessica Lynn Ellsworth**
HOGAN LOVELLS US LLP

555 13th St, NW
Washington, DC 20004
(202) 637-5886
Fax: (202) 637-5910
Email: jessica.ellsworth@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**REVA SIEGEL**

**Movant**

**UNITED STATES CONFERENCE OF**          represented by **J. David Folds**
**MAYORS**                                                    BAKER DONELSON BEARMAN
                                                              CALDWELL & BERKOWITZ, PC
                                                              901 K Street, NW
                                                              Suite 900
                                                              Washington, DC 20001
                                                              (202) 508-3441
                                                              Fax: (202) 220-2241
                                                              Email: dfolds@bakerdonelson.com
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Jade E. Sipes ,**
                                                              BAKER DONELSON

                                                              420 North 20th Street
                                                              Suite 1400
                                                              Birmingham, AL 35203
                                                              205-328-0480
                                                              Email: jsipes@bakerdonelson.com
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Elizabeth J. Cappiello**
                                                              BAKER DONELSON BEARMAN
                                                              CALDWELL & BERKOWITZ PC
                                                              901 K Street NW
                                                              Ste 900
                                                              Washington, DC 20001
                                                              202-326-5026
                                                              Email: ecappiello@bakerdonelson.com
                                                              *TERMINATED: 10/21/2020*

                                                              **Jessica B. Spade**
                                                              BAKER DONELSON
                                                              420 North 20th Street
                                                              Suite 1400
                                                              Birmingham, AL 35203
                                                              205-244-3845
                                                              Email: jspade@bakerdonelson.com
                                                              *ATTORNEY TO BE NOTICED*

JA 032

Madeline E Hughes
BAKER DONELSON
420 20th St. North
Ste 1400
Birmingham, AL 35203-5202
205-250-8325
Fax: 205-488-3846
Email: mhughes@bakerdonelson.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Xeris Gregory
BAKER DONELSON
420 20th Street N
Suite 1600
Birmingham, AL 35203
205-250-8319
Email: xgregory@bakerdonelson.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**EQUAL MEANS ERA**                    represented by **J. David Folds**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jade E. Sipes ,**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth J. Cappiello**
(See above for address)
*TERMINATED: 10/21/2020*

**Jessica B. Spade**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Xeris Gregory**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**38 AGREE FOR GEORGIA**                represented by **J. David Folds**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jade E. Sipes**

JA 033

BAKER DONELSON
420 North 20th Street
Suite 1400
Birmingham, AL 35203
205-328-0480
Email: jsipes@bakerdonelson.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth J. Cappiello**
(See above for address)
*TERMINATED: 10/21/2020*

**Jessica B. Spade**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Xeris Gregory**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**LARATIFYERA**                              represented by  **J. David Folds**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jade E. Sipes ,**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth J. Cappiello**
(See above for address)
*TERMINATED: 10/21/2020*

**Jessica B. Spade**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Xeris Gregory**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**EQUALITY NOW**                            represented by  **Stefani Johnson Myrick**
DAVIS POLK & WARDWELL LLP
901 15th Street, NW
Suite 1200
Washington, DC 20005

JA 034

202-962-7165
Email: stefani.myrick@davispolk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**WORLD POLICY ANALYSIS CENTER**               represented by   **Stefani Johnson Myrick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**LATIN AMERICAN AND CARIBBEAN**               represented by   **Stefani Johnson Myrick**
**COMMITTEE FOR THE DEFENSE OF**               (See above for address)
**WOMEN'S RIGHTS**                             *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**EQUAL RIGHTS TRUST**                         represented by   **Stefani Johnson Myrick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**EUROPEAN WOMEN'S LOBBY**                      represented by   **Stefani Johnson Myrick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**FEMNET**                                     represented by   **Stefani Johnson Myrick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**ARAB WOMEN ORGANIZATION**                    represented by   **Stefani Johnson Myrick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**INTERNATIONAL WOMEN'S RIGHTS**               represented by   **Stefani Johnson Myrick**
**ACTION WATCH ASIA PACIFIC**                  (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**SISTERHOOD IS GLOBAL**                        represented by   **Stefani Johnson Myrick**
**INSTITUTE**                                  (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**GENERATION UPWARDS**

<u>Movant</u>

**PLATFORM**

<u>Movant</u>

**PRIDE IN RUNNING**

<u>Movant</u>

**HOMEGIRL PROJECT**

<u>Movant</u>

**SENDING HER ESSENTIALS**

<u>Movant</u>

**ALICE PAUL INSTITUTE**          represented by  **Christopher D. Man**
WINSTON & STRAWN LLP
1901 L Street NW
Washington, DC 20036
202-282-5000
Fax: 202-282-5100
Email: CMan@winston.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
312-558-8768
Email: lcoberly@winston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**AMERICAN ASSOCIATION OF**          represented by  **Christopher D. Man**
**UNIVERSITY WOMEN**          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Movant</u>

**ASSOCIATION OF FLIGHT**          represented by  **Christopher D. Man**
**ATTENDANTS-CWA**          (See above for address)
*LEAD ATTORNEY*

JA 036

*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**ARIZONA NOW**                     represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**BLACK WOMENS ROUNDTABLE**         represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**DOLORES HUERTA FOUNDATION**       represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**DOMESTIC VIOLENCE LEGAL**         represented by **Christopher D. Man**
**EMPOWERMENT AND APPEALS**         (See above for address)
**PROJECT**                         *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**DOWNTOWN WOMEN FOR CHANGE**          represented by   **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**EQUAL RIGHTS AMENDMENT**          represented by   **Christopher D. Man**
**NORTH CAROLINA ALLIANCE**                         (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**EQUALITY UTAH**          represented by   **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**ERA COALITION**          represented by   **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**ERA MINNESOTA**          represented by   **Christopher D. Man**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**ERA TASK FORCE AZ**                    represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**FEMINIST MAJORITY FOUNDATION**         represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**FUND FOR WOMEN'S EQUALITY**            represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**GENDER JUSTICE**                       represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**

*(See above for address)*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**GENERAL FEDERATION OF**          represented by   **Christopher D. Man**
**WOMEN'S CLUBS**                                    (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Linda T Coberly**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

**Movant**

**HADASSAH, THE WOMEN'S ZIONIST**   represented by   **Christopher D. Man**
**ORGANIZATION OF AMERICA, INC.**                    (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Linda T Coberly**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

**Movant**

**JUSTICE REVIVAL**                 represented by   **Christopher D. Man**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Linda T Coberly**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

**Movant**

**LEAGUE OF WOMEN VOTERS OF**       represented by   **Christopher D. Man**
**THE UNITED STATES**                                (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Linda T Coberly**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

**Movant**

**LEGAL MOMENTUM**                          represented by **Christopher D. Man**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Linda T Coberly**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

**Movant**

**MICHIGAN FEDERATION OF**                  represented by **Christopher D. Man**
**BUSINESS AND PROFESSIONAL**                               (See above for address)
**WOMEN'S CLUBS, INC.**                                     *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Linda T Coberly**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

**Movant**

**MICHIGAN ERAMERICA**                      represented by **Christopher D. Man**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Linda T Coberly**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

**Movant**

**MORMONS FOR ERA**                         represented by **Christopher D. Man**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Linda T Coberly**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL ALLIANCE TO END**                represented by **Christopher D. Man**
**SEXUAL VIOLENCE**                                         (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

JA 041

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL ASSOCIATION OF**          represented by    **Christopher D. Man**
**COMMISSIONS FOR WOMEN**                             (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Linda T Coberly**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL ASSOCIATION OF**          represented by    **Christopher D. Man**
**SOCIAL WORKERS**                                    (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Linda T Coberly**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL ASSOCIATION OF**          represented by    **Christopher D. Man**
**WOMEN LAWYERS**                                     (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Linda T Coberly**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL CONGRESS OF BLACK**       represented by    **Christopher D. Man**
**WOMEN, INC.**                                       (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Linda T Coberly**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL COUNCIL OF JEWISH WOMEN, INC.**          represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL FEDERATION OF BUSINESS AND PROFESSIONAL WOMEN'S CLUBS**          represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT, INC.**          represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL ORGANIZATION FOR WOMEN**          represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**NATIONAL WOMEN'S POLITICAL**          represented by **Christopher D. Man**

**CAUCUS**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Movant
**NATIONAL WOMEN'S POLITICAL**     represented by   **Christopher D. Man**
**CAUCUS FOUNDATION**                               (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Linda T Coberly**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

Movant
**OKLAHOMA WOMEN'S COALITION**     represented by   **Christopher D. Man**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Linda T Coberly**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

Movant
**PROJECT 28 MO**                  represented by   **Christopher D. Man**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Linda T Coberly**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

Movant
**RETHINKING EVE LLC**             represented by   **Christopher D. Man**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Linda T Coberly**

JA 044

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**SERVICE WOMEN'S ACTION**                    represented by  **Christopher D. Man**
**NETWORK**                                                   (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Linda T Coberly**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Movant**

**SISTERS OF LORETTO - LORETTO**               represented by  **Christopher D. Man**
**COMMUNITY**                                                 (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Linda T Coberly**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Movant**

**SISTERS OF ST. JOSEPH OF**                   represented by  **Christopher D. Man**
**CARONDELET AREA**                                           (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Linda T Coberly**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Movant**

**TIME'S UP FOUNDATION**                       represented by  **Christopher D. Man**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Linda T Coberly**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Movant**

**UNION THEOLOGICAL SEMINARY**
**IN THE CITY OF NEW YORK**

represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**UNITED 4 EQUALITY, LLC**

represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**UTAH ERA COALITION**

represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**VOTO LATINO**

represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**WOMEN'S EQUALITY COALITION**

represented by **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**WOMEN'S HEALTH AND
REPRODUCTIVE RIGHTS**          represented by   **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**WOMEN'S LAW PROJECT**          represented by   **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**WOMEN LAWYERS ON GUARD INC.**          represented by   **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**WOMEN'S MEDIA CENTER**          represented by   **Christopher D. Man**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda T Coberly**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**YWCA USA**                                    represented by   **Christopher D. Man**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Linda T Coberly**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**ARIZONA NOW**                                 represented by   **Christopher D. Man**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**VOTEERA.ORG**                                 represented by   **Charles Morton English , Jr.**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**LEANNE LITTRELL DILORENZO**                   represented by   **Charles Morton English , Jr.**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Movant**

**INDEPENDENT WOMEN'S LAW
CENTER**

**Movant**

**CONCERNED WOMEN FOR
AMERICA**                                       represented by   **Denise Mayo Harle**
                                                                 ALLIANCE DEFENDING FREEDOM
                                                                 1000 Hurricane Shoals Rd., NE
                                                                 1000 Hurricane Shoals Rd
                                                                 Suite D1100
                                                                 Lawrenceville, GA 30043
                                                                 770-339-0774
                                                                 Fax: 770-339-6744
                                                                 Email: dharle@adflegal.org
                                                                 *LEAD ATTORNEY*
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Jordan Woodard Lorence**
                                                                 ALLIANCE DEFENDING FREEDOM

JA 048

440 First Street NW
Suite 600
Washington, DC 20001
202-393-8690
Fax: 202-347-3622
Email: jlorence@adflegal.org
*ATTORNEY TO BE NOTICED*

**Movant**

**SUSAN B. ANTHONY LIST**                    represented by     **Denise Mayo Harle**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jordan Woodard Lorence**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMALGAMATED BANK**                    represented by     **Rebecca S. LeGrand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**GILEAD SCIENCES, INC.**                    represented by     **Rebecca S. LeGrand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**GOOGLE LLC**                    represented by     **Rebecca S. LeGrand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ERWIN CHEMERINSKY**                    represented by     **Jessica Lynn Ellsworth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**REVA SIEGEL**                    represented by     **Jessica Lynn Ellsworth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JULIE C. SUK**                    represented by     **Jessica Lynn Ellsworth**
(See above for address)

JA 049

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**GENERATION RATIFY**                    represented by **Lauren Moxley**
                                                        COVINGTON & BURLING LLP
                                                        One City Center
                                                        850 Tenth Street, NW
                                                        Suite 326N
                                                        Washington, DC 20001
                                                        813-789-6129
                                                        Email: lmoxley@cov.com
                                                        *TERMINATED: 07/29/2020*

**Amicus**

**STATE OF NEW YORK**                    represented by **Joseph Spadola**
                                                        NEW YORK STATE OFFICE OF THE
                                                        ATTORNEY GENERAL
                                                        The Capitol
                                                        Albany, NY 12224
                                                        518-776-2043
                                                        Fax: 518-915-7725
                                                        Email: joseph.spadola@ag.ny.gov
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF COLORADO**                    represented by **Joseph Spadola**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF CONNECTICUT**                 represented by **Joseph Spadola**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF DELAWARE**                    represented by **Joseph Spadola**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF HAWAII**                      represented by **Joseph Spadola**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF MAINE**                       represented by **Joseph Spadola**
                                                        (See above for address)

JA 050

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF MARYLAND**                    represented by   **Joseph Spadola**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**COMMONWEALTH OF**                      represented by   **Joseph Spadola**
**MASSACHUSETTS**                                         (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF MINNESOTA**                   represented by   **Joseph Spadola**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NEW JERSEY**                  represented by   **Joseph Spadola**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NEW MEXICO**                  represented by   **Joseph Spadola**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NORTH CAROLINA**              represented by   **Joseph Spadola**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF OREGON**                      represented by   **Joseph Spadola**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**COMMONWEALTH OF**                      represented by   **Joseph Spadola**
**PENNSYLVANIA**                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF RHODE ISLAND**                                      represented by **Joseph Spadola**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**STATE OF VERMONT**                        represented by **Joseph Spadola**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**STATE OF WASHINGTON**                     represented by **Joseph Spadola**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**STATE OF WISCONSIN**                      represented by **Joseph Spadola**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**DISTRICT OF COLUMBIA**                    represented by **Joseph Spadola**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**GOVERNOR OF KANSAS**                      represented by **Joseph Spadola**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**STATE OF MICHIGAN**                       represented by **Ann M Sherman**
                                                              MICHIGAN DEPARTMENT OF
                                                              ATTORNEY GENERAL
                                                              Solicitor General Division
                                                              P.O. Box 30212
                                                              Lansing, MI 48909
                                                              517-335-7628
                                                              Email: shermana@michigan.gov
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**STEVE BULLOCK**                           represented by **Rylee K Sommers-Flanagan**
*Governor of Montana*                                          UPPER SEVEN LAW
                                                              P.O. Box 31
                                                              Helena, MT 59624
                                                              406-396-3373

Email: rylee@upperstevenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ADAPT OF AMERICA, INC.**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN EXPRESS COMPANY**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ASG, LLC**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ASG II, LLC**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**BNY MELLON**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CAULIPOWER, LLC**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CONCORD WORLDWIDE, INC.**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**DELOITTE LLP**

represented by **Jeannie Sclafani Rhee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**DOW, INC.**                                   represented by **Jeannie Sclafani Rhee**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*


<u>Amicus</u>

**GODIVA CHOCOLATIER, INC.**                    represented by **Jeannie Sclafani Rhee**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*


<u>Amicus</u>

**GREENHOUSE SOFTWARE, INC.**                   represented by **Jeannie Sclafani Rhee**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*


<u>Amicus</u>

**IBM**                                         represented by **Jeannie Sclafani Rhee**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*


<u>Amicus</u>

**JPMORGAN CHASE & CO.**                        represented by **Jeannie Sclafani Rhee**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*


<u>Amicus</u>

**REI CO-OP**                                   represented by **Jeannie Sclafani Rhee**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*


<u>Amicus</u>

**TAPESTRY, INC.**                              represented by **Jeannie Sclafani Rhee**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*


<u>Amicus</u>

**Marie Abrams**                                represented by **Linda H. Martin**
                                                **FRESHFIELDS BRUCKHAUS**
                                                **DERINGER US LLP**
                                                601 Lexington Avenue
                                                31st Floor
                                                New York, NY 10022
                                                (212) 277-4017
                                                Fax: (646) 521-5617
                                                Email: linda.martin@freshfields.com
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

JA 054

Scott A. Eisman
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
31st Floor
New York, NY 10022
212-277-4000
Email: scott.eisman@freshfields.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Dolores Delahanty**                    represented by **Linda H. Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott A. Eisman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Barbara Hadley Smith**                    represented by **Linda H. Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott A. Eisman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**David Karem**                    represented by **Linda H. Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott A. Eisman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**VIRGINIA WOODWARD**                    represented by **Linda H. Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott A. Eisman**
(See above for address)

JA 055

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/30/2020 | 1 | COMPLAINT against DAVID S. FERRIERO (Fee Status:Filing Fee Waived) filed by COMMONWEALTH OF VIRGINIA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Kallen, Michelle) (Entered: 01/30/2020) |
| 01/30/2020 | 2 | NOTICE of Appearance by Kathryn Hunt Muse on behalf of STATE OF ILLINOIS (Muse, Kathryn) (Entered: 01/30/2020) |
| 01/30/2020 | 3 | NOTICE of Appearance by Christopher Graham Wells on behalf of STATE OF ILLINOIS (Wells, Christopher) (Entered: 01/30/2020) |
| 01/30/2020 | 4 | NOTICE of Appearance by Elizabeth Roberson-Young on behalf of STATE OF ILLINOIS (Roberson-Young, Elizabeth) (Entered: 01/30/2020) |
| 01/30/2020 | 5 | ERRATA by COMMONWEALTH OF VIRGINIA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Kallen, Michelle) (Entered: 01/30/2020) |
| 01/30/2020 | 6 | NOTICE of Appearance by Martine Elizabeth Cicconi on behalf of COMMONWEALTH OF VIRGINIA (Cicconi, Martine) (Entered: 01/30/2020) |
| 01/30/2020 |   | Case Assigned to Judge Rudolph Contreras. (adh, ) (Entered: 01/30/2020) |
| 01/30/2020 | 7 | SUMMONS (1) Issued Electronically as to DAVID S. FERRIERO. (Attachment: # 1 Notice and Consent)(adh, ) (Entered: 01/30/2020) |
| 01/30/2020 | 8 | NOTICE of Appearance by Jessica Merry Samuels on behalf of COMMONWEALTH OF VIRGINIA (Samuels, Jessica) (Entered: 01/30/2020) |
| 02/07/2020 | 9 | NOTICE of Appearance by Toby Jay Heytens on behalf of COMMONWEALTH OF VIRGINIA (Heytens, Toby) (Entered: 02/07/2020) |
| 02/19/2020 | 10 | MOTION to Intervene by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE (Attachments: # 1 Proposed Answer, # 2 Text of Proposed Order)(Norris, Cameron) (Entered: 02/19/2020) |
| 02/20/2020 | 11 | NOTICE of Appearance by Edmund G. LaCour, Jr on behalf of ALABAMA (LaCour, Edmund) (Entered: 02/20/2020) |
| 02/21/2020 | 12 | NOTICE of Appearance by James William Davis on behalf of ALABAMA (Davis, James) (Entered: 02/21/2020) |
| 02/25/2020 | 13 | NOTICE of Appearance by James Campbell on behalf of NEBRASKA (Campbell, James) (Entered: 02/25/2020) |
| 02/27/2020 | 14 | Unopposed MOTION for Extension of Time to File Response/Reply as to 10 MOTION to Intervene by COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, STATE OF NEVADA (Attachments: # 1 Text of Proposed Order)(Kallen, Michelle) (Entered: 02/27/2020) |
| 02/27/2020 |   | MINUTE ORDER granting 14 Plaintiffs' Unopposed Motion for Extension of Time to File Response/Reply to 10 Motion to Intervene: It is hereby ORDERED that Plaintiffs shall have until and including March 11, 2020, to respond to 10 Movants' Motion to Intervene. SO ORDERED. Signed by Judge Rudolph Contreras on 2/27/2020. (lcrc1) (Entered: 02/27/2020) |

| 02/28/2020 | 15 | NOTICE of Appearance by Andree Sophia Blumstein on behalf of TENNESSEE (Blumstein, Andree) (Entered: 02/28/2020) |
|---|---|---|
| 02/28/2020 | 16 | NOTICE of Appearance by Alexander Barrett Bowdre on behalf of ALABAMA (Bowdre, Alexander) (Entered: 02/28/2020) |
| 02/28/2020 | 17 | NOTICE of Appearance by Kelsey Curtis on behalf of ALABAMA (Curtis, Kelsey) (Entered: 02/28/2020) |
| 03/04/2020 | 18 | NOTICE of Appearance by Patrick Neilson Strawbridge on behalf of ALABAMA (Strawbridge, Patrick) (Entered: 03/04/2020) |
| 03/04/2020 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DAVID S. FERRIERO served on 2/18/2020 (Attachments: # 1 Exhibit A)(Kallen, Michelle); Modified date of service on 3/5/2020 (ztth). (Entered: 03/04/2020) |
| 03/04/2020 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 2/18/2020. RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/20/2020. (Answer due for ALL FEDERAL DEFENDANTS by 4/20/2020.) (See Docket Entry 19 to view document) (ztth) (Entered: 03/05/2020) |
| 03/10/2020 | 21 | Memorandum in opposition to re 10 MOTION to Intervene filed by COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, STATE OF NEVADA. (Attachments: # 1 Text of Proposed Order)(Kallen, Michelle) (Entered: 03/10/2020) |
| 03/13/2020 | 22 | Unopposed MOTION for Extension of Time to File Response/Reply as to 10 MOTION to Intervene by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE (Attachments: # 1 Text of Proposed Order)(Norris, Cameron) (Entered: 03/13/2020) |
| 03/13/2020 | | MINUTE ORDER granting 22 Movants' Unopposed Motion for Extension of Time to File Response/Reply: It is hereby ORDERED that Movants shall have until and including March 24, 2020, to file their reply in support of their motion to intervene. SO ORDERED. Signed by Judge Rudolph Contreras on 03/13/2020. (lcrc1) (Entered: 03/13/2020) |
| 03/18/2020 | | Set/Reset Deadlines: Replies due by 3/24/2020. (tj) (Entered: 03/18/2020) |
| 03/24/2020 | 23 | REPLY to opposition to motion re 10 MOTION to Intervene filed by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE. (Norris, Cameron) (Entered: 03/24/2020) |
| 03/24/2020 | 24 | NOTICE of Appearance by Elizabeth Baker Murrill on behalf of LOUISIANA (Murrill, Elizabeth) (Main Document 24 replaced on 3/25/2020) (ztth). (Entered: 03/24/2020) |
| 04/16/2020 | 25 | NOTICE of Appearance by Vinita B. Andrapalliyal on behalf of DAVID S. FERRIERO (Andrapalliyal, Vinita) (Entered: 04/16/2020) |
| 04/16/2020 | 26 | Consent MOTION for Extension of Time to *Respond to Complaint* by DAVID S. FERRIERO (Attachments: # 1 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 04/16/2020) |
| 04/16/2020 | | MINUTE ORDER granting 26 Defendant's Consent Motion for Extension of Time to Respond to Complaint: It is hereby ORDERED that the following schedule shall govern briefing on the Defendant's forthcoming motion to dismiss: Defendant shall file his motion to dismiss on or before May 7, 2020; Plaintiffs shall file their opposition to the motion to dismiss on or before June 8, 2020; Defendant shall file his reply in further |

JA 057

| | | |
|---|---|---|
| | | support of the motion to dismiss on or before June 29, 2020. SO ORDERED. Signed by Judge Rudolph Contreras on 4/16/2020. (lcrc1) (Entered: 04/16/2020) |
| 04/17/2020 | | Set/Reset Deadlines: Motions due by 5/7/2020; Responses due by 6/8/2020; Replies due by 6/29/2020. (tj) (Entered: 04/17/2020) |
| 04/17/2020 | 27 | ENTERED IN ERROR.....NOTICE OF SUPPLEMENTAL AUTHORITY by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE (Norris, Cameron); Modified on 4/20/2020 (ztth). (Entered: 04/17/2020) |
| 04/20/2020 | | NOTICE OF ERROR re 27 NOTICE OF SUPPLEMENTAL AUTHORITY; emailed to cam@consovoymccarthy.com, cc'd 22 associated attorneys -- The PDF file you docketed contained errors: 1. Please refile document, 2. Document 27 was entered in error. Please refile in pleading format. See LCvR 5.1 (a). (ztth, ) (Entered: 04/20/2020) |
| 04/23/2020 | 28 | NOTICE OF SUPPLEMENTAL AUTHORITY by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE (Attachments: # 1 Exhibit)(Norris, Cameron) (Entered: 04/23/2020) |
| 05/07/2020 | 29 | MOTION to Dismiss *for Failure to State a Claim* by DAVID S. FERRIERO (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Andrapalliyal, Vinita); Modified text and to deleted selected docket information on 5/8/2020 (ztth). (Entered: 05/07/2020) |
| 05/14/2020 | 30 | NOTICE of Appearance by William Jeffrey Olson on behalf of EAGLE FORUM (Olson, William) (Entered: 05/14/2020) |
| 05/14/2020 | 31 | Consent MOTION for Leave to File *Brief Amicus Curiae* by EAGLE FORUM (Attachments: # 1 Exhibit Proposed Amicus Curiae Brief, # 2 Text of Proposed Order, # 3 LCvR 26.1 Certificate)(Olson, William) (Entered: 05/14/2020) |
| 05/22/2020 | 32 | Consent MOTION for Extension of Time to File Response/Reply as to 29 MOTION to Dismiss *for Failure to State a Claim* by COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, STATE OF NEVADA (Attachments: # 1 Text of Proposed Order)(Kallen, Michelle) (Entered: 05/22/2020) |
| 05/22/2020 | | MINUTE ORDER granting 32 Plaintiffs' Consent Motion for Extension of Time to File Response/Reply: It is hereby ORDERED that the following schedule shall govern the remaining briefing on 29 Defendant's motion to dismiss: Plaintiffs shall file their opposition to the motion to dismiss on or before June 29, 2020; Defendant shall file his reply in further support of the motion to dismiss on or before August 10, 2020. SO ORDERED. Signed by Judge Rudolph Contreras on 5/22/2020. (lcrc1) (Entered: 05/22/2020) |
| 05/26/2020 | | Set/Reset Deadlines: Responses due by 6/29/2020; Replies due by 8/10/2020. (tj) (Entered: 05/26/2020) |
| 06/12/2020 | 33 | ORDER granting 10 Movants' Motion to Intervene. See document for details. Signed by Judge Rudolph Contreras on 6/12/2020. (lcrc1) (Entered: 06/12/2020) |
| 06/12/2020 | 34 | MEMORANDUM OPINION granting 10 Movants' Motion to Intervene. See document for details. Signed by Judge Rudolph Contreras on 6/12/2020. (lcrc1) (Entered: 06/12/2020) |
| 06/12/2020 | 35 | ANSWER to Complaint by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE. (ztth) (Entered: 06/16/2020) |
| 06/29/2020 | 36 | NOTICE of Appearance by Dorothy Wallace on behalf of AAUW of Greater Richmond, AAUW of Illinois, AAUW of Nevada, AAUW of Virginia, Center for Common Ground, |

| | | |
|---|---|---|
| | | CHICAGO BAR ASSOCIATION, Chicago Foundation for Women, ILLINOIS STATE BAR ASSOCIATION, Illinois Federation of Womens Business Clubs, Inc., Illinois NOW, League of Women Voters of Virginia, The McIntosh Foundation, National Womens Political Caucus of Virginia, Nevadans for the ERA, Nevada NOW, Rachels Network, VAratifyERA, Virginia NOW, Virginia Poor Peoples Campaign, Womens Bar Association of Illinois, Women Matter, YWCA Metropolitan Chicago (Wallace, Dorothy) (Main Document 36 replaced on 6/29/2020) (ztth). (Entered: 06/29/2020) |
| 06/29/2020 | 37 | Memorandum in opposition to re 29 MOTION to Dismiss *for Failure to State a Claim* filed by COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, STATE OF NEVADA. (Attachments: # 1 Text of Proposed Order)(Kallen, Michelle) (Entered: 06/29/2020) |
| 06/29/2020 | 38 | NOTICE of Appearance by Jeannie Sclafani Rhee on behalf of 1010DATA, INC., 98POINT6 INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ATAKAMA INC., BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CHOBANI, LLC, CITIGROUP INC., COTA, INC., DAYFORWARD INC., DIAGEO NORTH AMERICA, INC., ELLIG GROUP LLC, EQUITABLE, THE ESTEE LAUDER COMPANIES INC., ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., THE GOLDMAN SACHS GROUP, INC., GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, THE HERSHEY COMPANY, INDUSTRIOUS, KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC. (Rhee, Jeannie) (Entered: 06/29/2020) |
| 06/29/2020 | 39 | NOTICE of Appearance by Rebecca S. LeGrand on behalf of Amalgamated Bank, CVS HEALTH CORPORATION, GILEAD SCIENCES, INC., GOOGLE LLC, MCKESSON CORPORATION (LeGrand, Rebecca) (Entered: 06/29/2020) |
| 06/29/2020 | 40 | Consent MOTION for Leave to File *Amicus Curiae Brief* by 1010DATA, INC., 98POINT6 INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ATAKAMA INC., Amalgamated Bank, BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY |

CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CHOBANI, LLC, CITIGROUP INC., COTA, INC., CVS HEALTH CORPORATION, DAYFORWARD INC., DIAGEO NORTH AMERICA, INC., ELLIG GROUP LLC, EQUITABLE, ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., GILEAD SCIENCES, INC., GOOGLE LLC, GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, INDUSTRIOUS, KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, MCKESSON CORPORATION, MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., THE ESTEE LAUDER COMPANIES INC., THE GOLDMAN SACHS GROUP, INC., THE HERSHEY COMPANY, THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC. (Attachments: # 1 Appendix A - Brief of Business and Corporate Entities as Amici Curiae in Support of Plaintiff States, # 2 Appendix B - LCvR 26.1 Certificate of Corporate Disclosure, # 3 Text of Proposed Order)(Rhee, Jeannie) (Entered: 06/29/2020)

| | | |
|---|---|---|
| 06/29/2020 | 41 | NOTICE of Appearance by Jessica Lynn Ellsworth on behalf of ERWIN CHEMERINSKY, NOAH FELDMAN, REVA SIEGEL, JULIE C. SUK (Ellsworth, Jessica) (Main Document 41 replaced on 6/30/2020) (ztth). (Entered: 06/29/2020) |
| 06/29/2020 | 42 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Loretta E. Lynch, Filing fee $ 100, receipt number ADCDC-7280150. Fee Status: Fee Paid. by 1010DATA, INC., 98POINT6 INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ATAKAMA INC., BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CHOBANI, LLC, CITIGROUP INC., COTA, INC., DAYFORWARD INC., DIAGEO NORTH AMERICA, INC., ELLIG GROUP LLC, EQUITABLE, ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, INDUSTRIOUS, KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR |

| | | |
|---|---|---|
| | | HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., THE ESTEE LAUDER COMPANIES INC., THE GOLDMAN SACHS GROUP, INC., THE HERSHEY COMPANY, THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC. (Attachments: # 1 Declaration of Loretta E. Lynch, # 2 Text of Proposed Order)(Rhee, Jeannie) (Entered: 06/29/2020) |
| 06/29/2020 | 43 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Liza M. Velazquez, Filing fee $ 100, receipt number ADCDC-7280294. Fee Status: Fee Paid. by 1010DATA, INC., 98POINT6 INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ATAKAMA INC., BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CHOBANI, LLC, CITIGROUP INC., COTA, INC., DAYFORWARD INC., DIAGEO NORTH AMERICA, INC., ELLIG GROUP LLC, EQUITABLE, ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, INDUSTRIOUS, KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., THE ESTEE LAUDER COMPANIES INC., THE GOLDMAN SACHS GROUP, INC., THE HERSHEY COMPANY, THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC. (Attachments: # 1 Declaration of Liza M. Velazquez, # 2 Text of Proposed Order)(Rhee, Jeannie) (Entered: 06/29/2020) |
| 06/29/2020 | 44 | Consent MOTION for Leave to File *Brief of Amici Curiae in Support of Plaintiffs* by Generation Ratify (Attachments: # 1 Proposed Amicus Brief, # 2 LCvR 26 Corporate Disclosure Statement, # 3 Proposed Order)(Moxley, Lauren) (Entered: 06/29/2020) |
| 06/29/2020 | 45 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Andrew G. Gordon, Filing |

JA 061

fee $ 100, receipt number ADCDC-7280354. Fee Status: Fee Paid. by 1010DATA, INC., 98POINT6 INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ATAKAMA INC., BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CHOBANI, LLC, CITIGROUP INC., COTA, INC., DAYFORWARD INC., DIAGEO NORTH AMERICA, INC., ELLIG GROUP LLC, EQUITABLE, ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, INDUSTRIOUS, KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., THE ESTEE LAUDER COMPANIES INC., THE GOLDMAN SACHS GROUP, INC., THE HERSHEY COMPANY, THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC. (Attachments: # 1 Declaration of Andrew G. Gordon, # 2 Text of Proposed Order)(Rhee, Jeannie) (Entered: 06/29/2020)

| 06/29/2020 | 46 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Tamar Holoshitz, Filing fee $ 100, receipt number ADCDC-7280459. Fee Status: Fee Paid. by 1010DATA, INC., 98POINT6 INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ATAKAMA INC., BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CHOBANI, LLC, CITIGROUP INC., COTA, INC., DAYFORWARD INC., DIAGEO NORTH AMERICA, INC., ELLIG GROUP LLC, EQUITABLE, ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, INDUSTRIOUS, KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR |

HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., THE ESTEE LAUDER COMPANIES INC., THE GOLDMAN SACHS GROUP, INC., THE HERSHEY COMPANY, THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC. (Attachments: # 1 Declaration of Tamar Holoshitz, # 2 Text of Proposed Order)(Rhee, Jeannie) (Entered: 06/29/2020)

| 06/29/2020 | 47 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Benjamin Z. Bergmann, Filing fee $ 100, receipt number ADCDC-7280521. Fee Status: Fee Paid. by 1010DATA, INC., 98POINT6 INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ATAKAMA INC., BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CHOBANI, LLC, CITIGROUP INC., COTA, INC., DAYFORWARD INC., DIAGEO NORTH AMERICA, INC., ELLIG GROUP LLC, EQUITABLE, ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, INDUSTRIOUS, KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., THE ESTEE LAUDER COMPANIES INC., THE GOLDMAN SACHS GROUP, INC., THE HERSHEY COMPANY, THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC. (Attachments: # 1 Declaration of Benjamin Z. Bergmann, # 2 Text of Proposed Order)(Rhee, Jeannie) (Entered: 06/29/2020) |
| 06/29/2020 | 48 | Consent MOTION for Leave to File *Brief of Amici Curiae* by ERWIN CHEMERINSKY, NOAH FELDMAN, REVA SIEGEL, JULIE C. SUK (Attachments: # 1 Exhibit Proposed Brief of Amici Curiae Constitutional Law Professors Erwin Chemerinsky, Noah Feldman, Reva Siegel, and Julie C. Suk, in Support of Neither Party, # 2 Text of Proposed Order)(Ellsworth, Jessica) (Entered: 06/29/2020) |

| | | |
|---|---|---|
| 06/29/2020 | 49 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Maria T. Vullo, Filing fee $ 100, receipt number ADCDC-7280582. Fee Status: Fee Paid. by 1010DATA, INC., 98POINT6 INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ATAKAMA INC., Amalgamated Bank, BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CHOBANI, LLC, CITIGROUP INC., COTA, INC., CVS HEALTH CORPORATION, DAYFORWARD INC., DIAGEO NORTH AMERICA, INC., ELLIG GROUP LLC, EQUITABLE, ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., GILEAD SCIENCES, INC., GOOGLE LLC, GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, INDUSTRIOUS, KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, MCKESSON CORPORATION, MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., THE ESTEE LAUDER COMPANIES INC., THE GOLDMAN SACHS GROUP, INC., THE HERSHEY COMPANY, THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC. (Attachments: # 1 Declaration of Maria T. Vullo, # 2 Text of Proposed Order)(LeGrand, Rebecca) (Entered: 06/29/2020) |
| 06/29/2020 | 50 | NOTICE of Appearance by Joseph Spadola on behalf of STATE OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAII, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, STATE OF WISCONSIN, DISTRICT OF COLUMBIA, GOVERNOR OF KANSAS (Spadola, Joseph) (Entered: 06/29/2020) |
| 06/29/2020 | 51 | Consent MOTION for Leave to File *Brief Amicus Curiae* by THE UNITED STATES CONFERENCE OF MAYORS, EQUAL MEANS ERA, 38 AGREE FOR GEORGIA, LARATIFYERA (Attachments: # 1 Exhibit Amicus Curiae Brief, # 2 Text of Proposed Order)(Cappiello, Elizabeth) (Entered: 06/29/2020) |
| 06/29/2020 | 52 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jodi Siegel, Filing fee $ 100, receipt number BDCDC-7281144. Fee Status: Fee Paid. by 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, THE UNITED STATES |

| | | |
|---|---|---|
| | | CONFERENCE OF MAYORS (Attachments: # 1 Exhibit Declaration of Jodi Siegel, # 2 Text of Proposed Order)(Cappiello, Elizabeth) (Entered: 06/29/2020) |
| 06/29/2020 | 53 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Xeris Gregory, Filing fee $ 100, receipt number ADCDC-7281278. Fee Status: Fee Paid. by 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, THE UNITED STATES CONFERENCE OF MAYORS (Attachments: # 1 Exhibit Declaration of Xeris Gregory, # 2 Text of Proposed Order)(Cappiello, Elizabeth) (Entered: 06/29/2020) |
| 06/29/2020 | 54 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jessica B. Spade, Filing fee $ 100, receipt number ADCDC-7281341. Fee Status: Fee Paid. by 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, THE UNITED STATES CONFERENCE OF MAYORS (Attachments: # 1 Exhibit Declaration of Jessica B. Spade, # 2 Text of Proposed Order)(Cappiello, Elizabeth) (Entered: 06/29/2020) |
| 06/29/2020 | 55 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Ana Carolina Varela, Filing fee $ 100, receipt number ADCDC-7281350. Fee Status: Fee Paid. by AAUW of Greater Richmond, AAUW of Illinois, AAUW of Nevada, AAUW of Virginia, CHICAGO BAR ASSOCIATION, Center for Common Ground, Chicago Foundation for Women, ILLINOIS STATE BAR ASSOCIATION, Illinois Federation of Womens Business Clubs, Inc., Illinois NOW, League of Women Voters of Virginia, National Womens Political Caucus of Virginia, Nevada NOW, Nevadans for the ERA, Rachels Network, The McIntosh Foundation, VAratifyERA, Virginia NOW, Virginia Poor Peoples Campaign, Women Matter, Womens Bar Association of Illinois, YWCA Metropolitan Chicago (Riley, Joshua) (Entered: 06/29/2020) |
| 06/29/2020 | 56 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jon L. Mills, Filing fee $ 100, receipt number ADCDC-7281382. Fee Status: Fee Paid. by AAUW of Greater Richmond, AAUW of Illinois, AAUW of Nevada, AAUW of Virginia, Center for Common Ground, ILLINOIS STATE BAR ASSOCIATION, Illinois Federation of Womens Business Clubs, Inc., Illinois NOW, League of Women Voters of Virginia, National Womens Political Caucus of Virginia, Nevada NOW, Nevadans for the ERA, Rachels Network, The McIntosh Foundation, VAratifyERA, Virginia NOW, Virginia Poor Peoples Campaign, Women Matter, Womens Bar Association of Illinois, YWCA Metropolitan Chicago (Riley, Joshua) (Entered: 06/29/2020) |
| 06/29/2020 | 57 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jade E. Sipes, Filing fee $ 100, receipt number ADCDC-7281398. Fee Status: Fee Paid. by 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, THE UNITED STATES CONFERENCE OF MAYORS (Attachments: # 1 Exhibit Declaration of Jade E. Sipes, # 2 Text of Proposed Order)(Cappiello, Elizabeth) (Entered: 06/29/2020) |
| 06/29/2020 | 58 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- STUART H. SINGER, Filing fee $ 100, receipt number ADCDC-7281421. Fee Status: Fee Paid. by AAUW of Greater Richmond, AAUW of Illinois, AAUW of Nevada, AAUW of Virginia, CHICAGO BAR ASSOCIATION, Center for Common Ground, Chicago Foundation for Women, ILLINOIS STATE BAR ASSOCIATION, Illinois Federation of Womens Business Clubs, Inc., Illinois NOW, League of Women Voters of Virginia, National Womens Political Caucus of Virginia, Nevada NOW, Nevadans for the ERA, Rachels Network, The McIntosh Foundation, VAratifyERA, Virginia NOW, Virginia Poor Peoples Campaign, Women Matter, Womens Bar Association of Illinois, YWCA Metropolitan Chicago (Riley, Joshua) (Entered: 06/29/2020) |
| 06/29/2020 | 59 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Vanessa B. Tussey, Filing fee $ 100, receipt number ADCDC-7281443. Fee Status: Fee Paid. by AAUW of Greater Richmond, AAUW of Illinois, AAUW of Nevada, AAUW of Virginia, Center for Common Ground, Chicago Foundation for Women, ILLINOIS STATE BAR |

| | | |
|---|---|---|
| | | ASSOCIATION, Illinois Federation of Womens Business Clubs, Inc., Illinois NOW, League of Women Voters of Virginia, National Womens Political Caucus of Virginia, Nevada NOW, Nevadans for the ERA, Rachels Network, The McIntosh Foundation, VAratifyERA, Virginia NOW, Virginia Poor Peoples Campaign, Women Matter, Womens Bar Association of Illinois, YWCA Metropolitan Chicago (Riley, Joshua) (Entered: 06/29/2020) |
| 06/29/2020 | 60 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Sharonda Childs Fancher, Filing fee $ 100, receipt number ADCDC-7281432. Fee Status: Fee Paid. by 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, THE UNITED STATES CONFERENCE OF MAYORS (Attachments: # 1 Exhibit Declaration of Sharonda Childs Fancher, # 2 Text of Proposed Order)(Cappiello, Elizabeth) (Entered: 06/29/2020) |
| 06/29/2020 | 61 | Unopposed MOTION for Leave to File *Brief of Amicus Curiae* by Equality Now, The World Policy Analysis Center, The Latin American and Caribbean Committee for the Defense of Women's Rights, The Equal Rights Trust, The European Women's Lobby, FEMNET, The Arab Women Organization, International Women's Rights Action Watch Asia Pacific, The Sisterhood is Global Institute (Attachments: # 1 Exhibit Proposed Brief, # 2 Exhibit Corporate Disclosure Statement, # 3 Text of Proposed Order)(Myrick, Stefani) (Entered: 06/29/2020) |
| 06/29/2020 | 62 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Madeline E. Hughes, Filing fee $ 100, receipt number ADCDC-7281466. Fee Status: Fee Paid. by 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, THE UNITED STATES CONFERENCE OF MAYORS (Attachments: # 1 Exhibit Declaration of Madeline E. Hughes, # 2 Text of Proposed Order)(Cappiello, Elizabeth) (Entered: 06/29/2020) |
| 06/29/2020 | 63 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Chelsea Dunn, Filing fee $ 100, receipt number ADCDC-7281487. Fee Status: Fee Paid. by 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, THE UNITED STATES CONFERENCE OF MAYORS (Attachments: # 1 Exhibit Declaration of Chelsea Dunn, # 2 Text of Proposed Order)(Cappiello, Elizabeth) (Entered: 06/29/2020) |
| 06/29/2020 | 64 | ERRATA re 44 Motion *and Amended Motion and Proposed Brief* by Generation Ratify. (Attachments: # 1 Amended Consent Motion for Leave to Participate as Amici Curiae, # 2 Amended Proposed Brief of Amici Curiae)(Moxley, Lauren); Modified to add docket entry relationship on 6/30/2020 (ztth). (Entered: 06/29/2020) |
| 06/29/2020 | 65 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Kathleen Kelly, *D.C. Bar No. 1014921*. Filing fee $ 100, receipt number ADCDC-7281511. Fee Status: Fee Paid. by Generation Ratify (Attachments: # 1 Declaration Declaration of Kathleen Kelly, # 2 Text of Proposed Order Proposed Order)(Moxley, Lauren) (Entered: 06/29/2020) |
| 06/29/2020 | 66 | Unopposed MOTION for Leave to File *Amicus Brief in Support of State Plaintiffs* by AAUW of Greater Richmond, AAUW of Illinois, AAUW of Nevada, AAUW of Virginia, CHICAGO BAR ASSOCIATION, Center for Common Ground, Chicago Foundation for Women, ILLINOIS STATE BAR ASSOCIATION, Illinois Federation of Womens Business Clubs, Inc., Illinois NOW, League of Women Voters of Virginia, National Womens Political Caucus of Virginia, Nevada NOW, Nevadans for the ERA, Rachels Network, The McIntosh Foundation, VAratifyERA, Virginia NOW, Virginia Poor Peoples Campaign, Women Matter, Womens Bar Association of Illinois, YWCA Metropolitan Chicago (Attachments: # 1 Exhibit Proposed Amicus Brief in Support f the State Plaintiffs, # 2 Exhibit B Local Rule 26.1 Certificate, # 3 Exhibit C Proposed Order Granting Leave to File Amicus Brief)(Wallace, Dorothy) (Entered: 06/29/2020) |
| 06/29/2020 | 67 | AMICUS BRIEF by COMMONWEALTH OF MASSACHUSETTS, COMMONWEALTH OF PENNSYLVANIA, DISTRICT OF COLUMBIA, |

| | | |
|---|---|---|
| | | GOVERNOR OF KANSAS, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAII, STATE OF MAINE, STATE OF MARYLAND, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, STATE OF WISCONSIN. (Spadola, Joseph); Modified event and text on 6/30/2020 (ztth). (Entered: 06/29/2020) |
| 07/01/2020 | 68 | Consent MOTION for Leave to File Brief Amici Curiae in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss by ALICE PAUL INSTITUTE, AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, ARIZONA NOW, ASSOCIATION OF FLIGHT ATTENDANTS-CWA, BLACK WOMENS ROUNDTABLE, DOLORES HUERTA FOUNDATION, DOMESTIC VIOLENCE LEGAL EMPOWERMENT AND APPEALS PROJECT, DOWNTOWN WOMEN FOR CHANGE, EQUAL RIGHTS AMENDMENT NORTH CAROLINA ALLIANCE, EQUALITY UTAH, ERA COALITION, ERA MINNESOTA, ERA TASK FORCE AZ, FEMINIST MAJORITY FOUNDATION, FUND FOR WOMEN'S EQUALITY, GENDER JUSTICE, GENERAL FEDERATION OF WOMEN'S CLUBS, HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC., JUSTICE REVIVAL, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEGAL MOMENTUM, MICHIGAN ERAMERICA, MICHIGAN FEDERATION OF BUSINESS AND PROFESSIONAL WOMEN'S CLUBS, INC., MORMONS FOR ERA, NATIONAL ALLIANCE TO END SEXUAL VIOLENCE, NATIONAL ASSOCIATION OF COMMISSIONS FOR WOMEN, NATIONAL ASSOCIATION OF SOCIAL WORKERS, NATIONAL ASSOCIATION OF WOMEN LAWYERS, NATIONAL CONGRESS OF BLACK WOMEN, INC., NATIONAL COUNCIL OF JEWISH WOMEN, INC., NATIONAL FEDERATION OF BUSINESS AND PROFESSIONAL WOMEN'S CLUBS, NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT, INC., NATIONAL ORGANIZATION FOR WOMEN, NATIONAL WOMEN'S POLITICAL CAUCUS, NATIONAL WOMEN'S POLITICAL CAUCUS FOUNDATION, OKLAHOMA WOMEN'S COALITION, PROJECT 28 MO, RETHINKING EVE LLC, SERVICE WOMEN'S ACTION NETWORK, SISTERS OF LORETTO - LORETTO COMMUNITY, SISTERS OF ST. JOSEPH OF CARONDELET AREA, TIME'S UP FOUNDATION, UNION THEOLOGICAL SEMINARY IN THE CITY OF NEW YORK, UNITED 4 EQUALITY, LLC, UTAH ERA COALITION, VOTO LATINO, WOMEN LAWYERS ON GUARD INC., WOMEN'S EQUALITY COALITION, WOMEN'S HEALTH AND REPRODUCTIVE RIGHTS, WOMEN'S LAW PROJECT, WOMEN'S MEDIA CENTER, and YWCA USA. (Attachments: # 1 Proposed Amicus Brief, # 2 Corporate Disclosure, # 3 Notice of Appearance, # 4 Text of Proposed Order)(ztnr) (Entered: 07/01/2020) |
| 07/01/2020 | 69 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Linda T. Coberly, Filing fee $ 100, receipt number ADCDC-7290084. Fee Status: Fee Paid. by ALICE PAUL INSTITUTE, AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, ARIZONA NOW, ASSOCIATION OF FLIGHT ATTENDANTS-CWA, BLACK WOMENS ROUNDTABLE, DOLORES HUERTA FOUNDATION, DOMESTIC VIOLENCE LEGAL EMPOWERMENT AND APPEALS PROJECT, DOWNTOWN WOMEN FOR CHANGE, EQUAL RIGHTS AMENDMENT NORTH CAROLINA ALLIANCE, EQUALITY UTAH, ERA COALITION, ERA MINNESOTA, ERA TASK FORCE AZ, FEMINIST MAJORITY FOUNDATION, FUND FOR WOMEN'S EQUALITY, GENDER JUSTICE, GENERAL FEDERATION OF WOMEN'S CLUBS, HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC., JUSTICE REVIVAL, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEGAL MOMENTUM, MICHIGAN ERAMERICA, MICHIGAN FEDERATION OF BUSINESS AND PROFESSIONAL WOMEN'S CLUBS, INC., MORMONS FOR ERA, |

JA 067

| | | |
|---|---|---|
| | | NATIONAL ALLIANCE TO END SEXUAL VIOLENCE, NATIONAL ASSOCIATION OF COMMISSIONS FOR WOMEN, NATIONAL ASSOCIATION OF SOCIAL WORKERS, NATIONAL ASSOCIATION OF WOMEN LAWYERS, NATIONAL CONGRESS OF BLACK WOMEN, INC., NATIONAL COUNCIL OF JEWISH WOMEN, INC., NATIONAL FEDERATION OF BUSINESS AND PROFESSIONAL WOMEN'S CLUBS, NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT, INC., NATIONAL ORGANIZATION FOR WOMEN, NATIONAL WOMEN'S POLITICAL CAUCUS, NATIONAL WOMEN'S POLITICAL CAUCUS FOUNDATION, OKLAHOMA WOMEN'S COALITION, PROJECT 28 MO, RETHINKING EVE LLC, SERVICE WOMEN'S ACTION NETWORK, SISTERS OF LORETTO - LORETTO COMMUNITY, SISTERS OF ST. JOSEPH OF CARONDELET AREA, TIME'S UP FOUNDATION, UNION THEOLOGICAL SEMINARY IN THE CITY OF NEW YORK, UNITED 4 EQUALITY, LLC, UTAH ERA COALITION, VOTO LATINO, WOMEN LAWYERS ON GUARD INC., WOMEN'S EQUALITY COALITION, WOMEN'S HEALTH AND REPRODUCTIVE RIGHTS, WOMEN'S LAW PROJECT, WOMEN'S MEDIA CENTER, YWCA USA (Attachments: # 1 Exhibit A - Declaration of Linda T. Coberly, # 2 Text of Proposed Order)(Man, Christopher) (Entered: 07/01/2020) |
| 07/01/2020 | | MINUTE ORDER granting 42 , 43 , 45 , 46 , 47 , 49 , 52 , 53 , 54 , 55 , 56 , 57 , 58 , 59 , 60 , 62 , 63 , 65 , 69 motions for leave to appear *pro hac vice*: Pursuant to Local Civil Rule 83.2(d), it is hereby ORDERED that Loretta E. Lynch, Liza M. Velazquez, Andrew G. Gordon, Tamar Holoshitz, Benjamin Z. Bergmann, Maria T. Vullo, Jodi Siegel, Xeris Gregory, Jessica B. Spade, Jade E. Sipes, Sharonda Childs Fancher, Madeline E. Hughes, Chelsea Dunn, Ana Carolina Varela, Jon L. Mills, Stuart H. Singer, Vanessa B. Tussey, Kathleen Kelly, and Linda T. Coberly are admitted to represent their respective clients as proposed *amici curiae* in this case *pro hac vice*. SO ORDERED. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions.** Signed by Judge Rudolph Contreras on 7/1/2020. (lcrc1) (Entered: 07/01/2020) |
| 07/02/2020 | 70 | NOTICE of Appearance by Ann M Sherman on behalf of State of Michigan (Sherman, Ann) (Entered: 07/02/2020) |
| 07/02/2020 | 71 | AMICUS BRIEF *SUPPORTING PLAINTIFF STATES IN REQUESTING A DECLARATION* by State of Michigan. (Sherman, Ann) (Entered: 07/02/2020) |
| 07/02/2020 | 72 | NOTICE of Appearance by Linda T Coberly on behalf of ALICE PAUL INSTITUTE, AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, ARIZONA NOW, ASSOCIATION OF FLIGHT ATTENDANTS-CWA, BLACK WOMENS ROUNDTABLE, DOLORES HUERTA FOUNDATION, DOMESTIC VIOLENCE LEGAL EMPOWERMENT AND APPEALS PROJECT, DOWNTOWN WOMEN FOR CHANGE, EQUAL RIGHTS AMENDMENT NORTH CAROLINA ALLIANCE, EQUALITY UTAH, ERA COALITION, ERA MINNESOTA, ERA TASK FORCE AZ, FEMINIST MAJORITY FOUNDATION, FUND FOR WOMEN'S EQUALITY, GENDER JUSTICE, GENERAL FEDERATION OF WOMEN'S CLUBS, HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC., JUSTICE REVIVAL, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEGAL MOMENTUM, MICHIGAN ERAMERICA, MICHIGAN FEDERATION OF BUSINESS AND PROFESSIONAL WOMEN'S CLUBS, INC., MORMONS FOR ERA, NATIONAL ALLIANCE TO END SEXUAL VIOLENCE, NATIONAL ASSOCIATION OF COMMISSIONS FOR WOMEN, NATIONAL ASSOCIATION OF SOCIAL WORKERS, NATIONAL ASSOCIATION OF WOMEN LAWYERS, NATIONAL CONGRESS OF BLACK WOMEN, INC., NATIONAL COUNCIL OF JEWISH WOMEN, INC., NATIONAL FEDERATION OF BUSINESS AND PROFESSIONAL |

JA 068

| | | |
|---|---|---|
| | | WOMEN'S CLUBS, NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT, INC., NATIONAL ORGANIZATION FOR WOMEN, NATIONAL WOMEN'S POLITICAL CAUCUS, NATIONAL WOMEN'S POLITICAL CAUCUS FOUNDATION, OKLAHOMA WOMEN'S COALITION, PROJECT 28 MO, RETHINKING EVE LLC, SERVICE WOMEN'S ACTION NETWORK, SISTERS OF LORETTO - LORETTO COMMUNITY, SISTERS OF ST. JOSEPH OF CARONDELET AREA, TIME'S UP FOUNDATION, UNION THEOLOGICAL SEMINARY IN THE CITY OF NEW YORK, UNITED 4 EQUALITY, LLC, UTAH ERA COALITION, VOTO LATINO, WOMEN LAWYERS ON GUARD INC., WOMEN'S EQUALITY COALITION, WOMEN'S HEALTH AND REPRODUCTIVE RIGHTS, WOMEN'S LAW PROJECT, WOMEN'S MEDIA CENTER, YWCA USA (Coberly, Linda) (Entered: 07/02/2020) |
| 07/02/2020 | 80 | ENTERED IN ERROR.....ANSWER to Interrogatories on Writ of Attachment from King & Spalding LLP. (ztth); Modified on 7/10/2020 (ztth). (Entered: 07/10/2020) |
| 07/06/2020 | 73 | Consent MOTION for Leave to File *Brief Amicus Curiae in Support of Plaintiff States* by VOTEERA.ORG, LEANNE LITTRELL DILORENZO (Attachments: # 1 Proposed Brief Amicus Curiae, # 2 LCvR 26 Corporate Disclosure, # 3 Proposed Order on Consent Motion)(English, Charles) (Entered: 07/06/2020) |
| 07/06/2020 | 74 | MOTION for Summary Judgment by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Norris, Cameron) (Entered: 07/06/2020) |
| 07/08/2020 | 75 | NOTICE of Appearance by Rylee K Sommers-Flanagan on behalf of Governor of Montana (Sommers-Flanagan, Rylee) (Entered: 07/08/2020) |
| 07/08/2020 | 76 | AMICUS BRIEF by Governor of Montana. (Sommers-Flanagan, Rylee) (Entered: 07/08/2020) |
| 07/08/2020 | 77 | NOTICE of Appearance by Jade E. Sipes on behalf of 38 AGREE FOR GEORGIA, UNITED STATES CONFERENCE OF MAYORS, EQUAL MEANS ERA, LARATIFYERA. (Sipes, Jade); Modified text at the request of counsel on 7/9/2020 (ztth). (Entered: 07/08/2020) |
| 07/09/2020 | 78 | Consent MOTION for Extension of Time to File Response/Reply as to 74 MOTION for Summary Judgment by COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, STATE OF NEVADA (Attachments: # 1 Text of Proposed Order)(Kallen, Michelle) (Entered: 07/09/2020) |
| 07/09/2020 | 79 | NOTICE of Appearance by Xeris Gregory on behalf of 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, UNITED STATES CONFERENCE OF MAYORS (Gregory, Xeris) (Main Document 79 replaced on 7/10/2020) (ztth). (Entered: 07/09/2020) |
| 07/09/2020 | | MINUTE ORDER granting 78 Plaintiffs' Consent Motion for Extension of Time: It is hereby ORDERED that Plaintiffs shall have until and including August 19, 2020 to respond to 74 Intervenor-Defendants' Motion for Summary Judgment. SO ORDERED. Signed by Judge Rudolph Contreras on 7/9/2020. (lcrc1) (Entered: 07/09/2020) |
| 07/10/2020 | | NOTICE OF CORRECTED DOCKET ENTRY: re 80 Answer to Interrogatories on Writ of Attachment was entered in the incorrect case. (ztth) (Entered: 07/10/2020) |
| 07/10/2020 | | Set/Reset Deadlines: Responses due by 8/19/2020 (tj) (Entered: 07/10/2020) |
| 07/10/2020 | 81 | NOTICE of Appearance by Heidi Parry Stern on behalf of STATE OF NEVADA (Stern, Heidi) (Entered: 07/10/2020) |

| 07/10/2020 | 82 | NOTICE of Appearance by Stuart Harold Singer on behalf of AAUW OF ILLINOIS, AAUW OF NEVADA, AAUW OF RICHMOND, AAUW OF VIRGINIA, CENTER FOR COMMON GROUND, CHICAGO BAR ASSOCIATION, CHICAGO FOUNDATION FOR WOMEN, ILLINOIS FEDERATION OF WOMENS BUSINESS CLUBS, INC., ILLINOIS NOW, ILLINOIS STATE BAR ASSOCIATION, LEAGUE OF WOMEN VOTERS OF VIRGINIA, MCINTOSH FOUNDATION, NATIONAL WOMENS POLITICAL CAUCUS OF VIRGINIA, NEVADA NOW, NEVADANS FOR THE ERA, RACHELS NETWORK, VARATIFYERA, VIRGINIA NOW, VIRGINIA POOR PEOPLES CAMPAIGN, WOMEN MATTER, WOMENS BAR ASSOCIATION OF ILLINOIS, YWCA METROPOLITAN CHICAGO (Singer, Stuart) (Entered: 07/10/2020) |
|---|---|---|
| 07/10/2020 | 83 | NOTICE of Appearance by Jon Lester Mills on behalf of AAUW OF ILLINOIS, AAUW OF NEVADA, AAUW OF RICHMOND, AAUW OF VIRGINIA, CENTER FOR COMMON GROUND, CHICAGO BAR ASSOCIATION, CHICAGO FOUNDATION FOR WOMEN, ILLINOIS FEDERATION OF WOMENS BUSINESS CLUBS, INC., ILLINOIS NOW, ILLINOIS STATE BAR ASSOCIATION, LEAGUE OF WOMEN VOTERS OF VIRGINIA, MCINTOSH FOUNDATION, NATIONAL WOMENS POLITICAL CAUCUS OF VIRGINIA, NEVADA NOW, NEVADANS FOR THE ERA, RACHELS NETWORK, VARATIFYERA, VIRGINIA NOW, VIRGINIA POOR PEOPLES CAMPAIGN, WOMEN MATTER, WOMENS BAR ASSOCIATION OF ILLINOIS, YWCA METROPOLITAN CHICAGO (Mills, Jon) (Entered: 07/10/2020) |
| 07/10/2020 | 84 | NOTICE of Appearance by Ana Carolina Varela on behalf of AAUW OF ILLINOIS, AAUW OF NEVADA, AAUW OF RICHMOND, AAUW OF VIRGINIA, CENTER FOR COMMON GROUND, CHICAGO BAR ASSOCIATION, CHICAGO FOUNDATION FOR WOMEN, ILLINOIS FEDERATION OF WOMENS BUSINESS CLUBS, INC., ILLINOIS NOW, ILLINOIS STATE BAR ASSOCIATION, LEAGUE OF WOMEN VOTERS OF VIRGINIA, MCINTOSH FOUNDATION, NATIONAL WOMENS POLITICAL CAUCUS OF VIRGINIA, NEVADA NOW, NEVADANS FOR THE ERA, RACHELS NETWORK, VARATIFYERA, VIRGINIA NOW, VIRGINIA POOR PEOPLES CAMPAIGN, WOMEN MATTER, WOMENS BAR ASSOCIATION OF ILLINOIS, YWCA METROPOLITAN CHICAGO (Varela, Ana) (Entered: 07/10/2020) |
| 07/10/2020 | 85 | NOTICE of Appearance by Vanessa Tussey on behalf of AAUW OF ILLINOIS, AAUW OF NEVADA, AAUW OF RICHMOND, AAUW OF VIRGINIA, CENTER FOR COMMON GROUND, CHICAGO BAR ASSOCIATION, CHICAGO FOUNDATION FOR WOMEN, ILLINOIS FEDERATION OF WOMENS BUSINESS CLUBS, INC., ILLINOIS NOW, ILLINOIS STATE BAR ASSOCIATION, LEAGUE OF WOMEN VOTERS OF VIRGINIA, MCINTOSH FOUNDATION, NATIONAL WOMENS POLITICAL CAUCUS OF VIRGINIA, NEVADA NOW, NEVADANS FOR THE ERA, RACHELS NETWORK, VARATIFYERA, VIRGINIA NOW, VIRGINIA POOR PEOPLES CAMPAIGN, WOMEN MATTER, WOMENS BAR ASSOCIATION OF ILLINOIS, YWCA METROPOLITAN CHICAGO (Tussey, Vanessa) (Entered: 07/10/2020) |
| 07/13/2020 | 86 | NOTICE of Appearance by Madeline E Hughes on behalf of UNITED STATES CONFERENCE OF MAYORS (Hughes, Madeline) (Entered: 07/13/2020) |
| 07/13/2020 | 87 | Consent MOTION for Extension of Time to File Response/Reply as to 29 MOTION to Dismiss *for Failure to State a Claim* by DAVID S. FERRIERO (Attachments: # 1 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 07/13/2020) |
| 07/13/2020 |  | MINUTE ORDER granting 87 Defendant David S. Ferriero's Consent Motion for Extension of Time: It is hereby ORDERED that Defendant David S. Ferriero shall have |

| | | |
|---|---|---|
| | | until and including August 20, 2020 to file a reply in support of 29 his motion to dismiss. SO ORDERED. Signed by Judge Rudolph Contreras on 7/13/2020. (lcrc1) (Entered: 07/13/2020) |
| 07/13/2020 | | Set/Reset Deadlines: Replies due by 8/20/2020. (tj) (Entered: 07/13/2020) |
| 07/14/2020 | 88 | Unopposed MOTION to Consolidate Hearings re 29 MOTION to Dismiss *for Failure to State a Claim*, 74 MOTION for Summary Judgment by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE (Attachments: # 1 Text of Proposed Order)(Norris, Cameron) (Entered: 07/14/2020) |
| 07/14/2020 | 89 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Raphael Graybill, Filing fee $ 100, receipt number ADCDC-7337401. Fee Status: Fee Paid. by STEVE BULLOCK (Attachments: # 1 Declaration of Raphael Graybill, # 2 Text of Proposed Order)(Sommers-Flanagan, Rylee) (Entered: 07/14/2020) |
| 07/14/2020 | | MINUTE ORDER granting 89 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2(d), it is hereby ORDERED that Raphael Graybill is admitted to represent the Governor of Montana as *amicus curiae* in this case *pro hac vice*. SO ORDERED. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Ju dge Rudolph Contreras on 7/14/2020. (lcrc1) (Entered: 07/14/2020) |
| 07/15/2020 | 90 | MOTION for Leave to File *Amicus Brief* by INDEPENDENT WOMEN'S LAW CENTER (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Milanovich, Anita) (Entered: 07/15/2020) |
| 07/15/2020 | 91 | MOTION for Leave to File *Amici Curiae Brief in Support of Defendants' Motion for Summary Judgment* by CONCERNED WOMEN FOR AMERICA, Susan B. Anthony List (Attachments: # 1 Text of Proposed Order)(Lorence, Jordan) (Entered: 07/15/2020) |
| 07/15/2020 | 92 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Denise M. Harle, Filing fee $ 100, receipt number ADCDC-7344567. Fee Status: Fee Paid. by CONCERNED WOMEN FOR AMERICA, Susan B. Anthony List (Attachments: # 1 Declaration Denise M. Harle, # 2 Text of Proposed Order)(Lorence, Jordan) (Entered: 07/15/2020) |
| 07/16/2020 | | MINUTE ORDER: To aid the Court in considering 91 their Motion for Leave to File Amici Curiae Brief, proposed amici Concerned Women for America and Susan B. Anthony List are directed to file a copy of their proposed brief. SO ORDERED. Signed by Judge Rudolph Contreras on 7/16/2020. (lcrc1) (Entered: 07/16/2020) |
| 07/16/2020 | | MINUTE ORDER granting 92 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2(d), it is hereby ORDERED that Denise M. Harle is admitted to represent Concerned Women for America and Susan B. Anthony List as proposed *amici curiae* in this case *pro hac vice*. SO ORDERED. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for ins tructions**. Signed by Judge Rudolph Contreras on 7/16/2020. (lcrc1) (Entered: 07/16/2020) |
| 07/17/2020 | 93 | NOTICE of Appearance by Denise Mayo Harle on behalf of CONCERNED WOMEN FOR AMERICA, SUSAN B. ANTHONY LIST (Harle, Denise ) (Entered: 07/17/2020) |
| 07/24/2020 | 94 | Unopposed MOTION for Leave to File *Amici Curiae Brief in Support of Defendant-Intervenors States* by CONCERNED WOMEN FOR AMERICA, SUSAN B. ANTHONY LIST (Attachments: # 1 Exhibit Amicus Brief in Support of Defendant-Intervenors States, # 2 Text of Proposed Order)(Harle, Denise ) (Entered: 07/24/2020) |
| 07/28/2020 | 95 | NOTICE of Appearance by Jeannie Sclafani Rhee on behalf of ADAPT OF AMERICA, INC., AMERICAN EXPRESS COMPANY, ASG, LLC, ASG II, LLC, BNY MELLON, |

| | | |
|---|---|---|
| | | CAULIPOWER, LLC, CONCORD WORLDWIDE, INC., DELOITTE LLP, DOW, INC., GODIVA CHOCOLATIER, INC., GREENHOUSE SOFTWARE, INC., IBM, JPMORGAN CHASE & CO., REI CO-OP, TAPESTRY, INC. (Rhee, Jeannie) (Entered: 07/28/2020) |
| 07/28/2020 | 96 | Unopposed MOTION to Amend/Correct 40 Consent MOTION for Leave to File *Amicus Curiae Brief* by 1010DATA, INC., 98POINT6 INC., ADAPT OF AMERICA, INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMALGAMATED BANK, AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN EXPRESS COMPANY, AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ASG II, LLC, ASG, LLC, ATAKAMA INC., BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BNY MELLON, BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CAULIPOWER, LLC, CHOBANI, LLC, CITIGROUP INC., CONCORD WORLDWIDE, INC., COTA, INC., CVS HEALTH CORPORATION, DAYFORWARD INC., DELOITTE LLP, DIAGEO NORTH AMERICA, INC., DOW, INC., ELLIG GROUP LLC, EQUITABLE, ESTEE LAUDER COMPANIES INC., ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., GILEAD SCIENCES, INC., GODIVA CHOCOLATIER, INC., GOLDMAN SACHS GROUP, INC., GOOGLE LLC, GREENHOUSE SOFTWARE, INC., GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, HERSHEY COMPANY, IBM, INDUSTRIOUS, JPMORGAN CHASE & CO., KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, MCKESSON CORPORATION, MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, REI CO-OP, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., TAPESTRY, INC., THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC. (Attachments: # 1 Revised Appendix A-[Proposed] Amicus Brief, # 2 Appendix B-Redline, # 3 Additional LCvR 26.1 Certificate of Corporate Disclosure, # 4 Text of Proposed Order)(Rhee, Jeannie) (Entered: 07/28/2020) |
| 07/29/2020 | 97 | NOTICE OF WITHDRAWAL OF APPEARANCE as to GENERATION RATIFY. Attorney Lauren Moxley terminated. (Moxley, Lauren) (Entered: 07/29/2020) |
| 08/12/2020 | 98 | NOTICE of Appearance by Charles Morton English, Jr on behalf of VOTEERA.ORG, Leanne Littrell DiLorenzo (English, Charles) (Entered: 08/12/2020) |
| 08/19/2020 | 99 | Memorandum in opposition to re 74 MOTION for Summary Judgment filed by COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, STATE OF NEVADA. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Statement of Facts - Plaintiffs' Response, # 2 Text of Proposed Order) (Kallen, Michelle) (Entered: 08/19/2020) |
| 08/19/2020 | 100 | MOTION for Summary Judgment by COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, STATE OF NEVADA (Attachments: # 1 Statement of Facts, # 2 Declaration of Michelle S. Kallen, # 3 Exhibit - Exhibits to Kallen Declaration, # 4 Text of Proposed Order)(Kallen, Michelle) (Entered: 08/19/2020) |
| 08/20/2020 | 101 | REPLY to opposition to motion re 29 MOTION to Dismiss *for Failure to State a Claim* filed by DAVID S. FERRIERO. (Andrapalliyal, Vinita) (Entered: 08/20/2020) |
| 08/22/2020 | 102 | Consent MOTION for Extension of Time to File Response/Reply as to 74 MOTION for Summary Judgment by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE (Norris, Cameron) (Entered: 08/22/2020) |
| 08/24/2020 | 103 | NOTICE of Appearance by Liam Holland on behalf of All Defendants (Holland, Liam) (Entered: 08/24/2020) |
| 08/24/2020 | 104 | MOTION to Stay *Summary-Judgment Briefing*, or MOTION for Extension of Time to File Response by DAVID S. FERRIERO (Holland, Liam). Added MOTION for Extension of Time to File Response/Reply on 8/25/2020 (eg). (Entered: 08/24/2020) |
| 08/25/2020 | 105 | Memorandum in opposition to re 104 MOTION to Stay *Summary-Judgment Briefing* MOTION for Extension of Time to File Response/Reply filed by COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, STATE OF NEVADA. (Attachments: # 1 Text of Proposed Order)(Kallen, Michelle) (Entered: 08/25/2020) |
| 08/26/2020 | | MINUTE ORDER granting 102 Intervenors' Consent Motion for Extension of Time: Intervenors shall file their reply in support of their motion for summary judgment on or before September 9, 2020. SO ORDERED. Signed by Judge Rudolph Contreras on 8/26/2020. (lcrc1) (Entered: 08/26/2020) |
| 08/26/2020 | | Set/Reset Deadlines: Replies due by 9/9/2020. (tj) (Entered: 08/26/2020) |
| 08/26/2020 | 106 | NOTICE of Appearance by Scott A. Eisman on behalf of Marie Abrams, Dolores Delahanty, Barbara Hadley Smith, David Karem, Virginia Woodward (Eisman, Scott) (Entered: 08/26/2020) |
| 08/26/2020 | 107 | NOTICE of Appearance by Linda H. Martin on behalf of Marie Abrams, Dolores Delahanty, David Karem, Barbara Hadley Smith, Virginia Woodward (Martin, Linda) (Entered: 08/26/2020) |
| 08/26/2020 | 108 | Consent MOTION for Leave to File *Brief on Behalf of Amici Curiae in Support of Plaintiffs* by Marie Abrams, Dolores Delahanty, David Karem, Barbara Hadley Smith, Virginia Woodward (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Martin, Linda) (Entered: 08/26/2020) |
| 08/28/2020 | 109 | REPLY to opposition to motion re 104 MOTION to Stay *Summary-Judgment Briefing* MOTION for Extension of Time to File Response/Reply filed by DAVID S. FERRIERO. (Holland, Liam) (Entered: 08/28/2020) |
| 09/01/2020 | 110 | NOTICE of Appearance by Jessica B. Spade on behalf of 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, UNITED STATES CONFERENCE OF MAYORS (Spade, Jessica) (Entered: 09/01/2020) |
| 09/02/2020 | 111 | Consent MOTION for Extension of Time to File Response/Reply as to 74 MOTION for Summary Judgment by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE (Norris, Cameron) (Entered: 09/02/2020) |
| 09/03/2020 | | MINUTE ORDER granting 111 Intervenors' Consent Motion for Extension of Time: |

| | | |
|---|---|---|
| | | Intervenors shall file their reply in support of their motion for summary judgment on or before September 23, 2020. SO ORDERED. Signed by Judge Rudolph Contreras on 9/3/2020. (lcrc1) (Entered: 09/03/2020) |
| 09/04/2020 | | Set/Reset Deadlines: Reply in support of its motion for summary judgment on or before September 23, 2020. (hs) (Entered: 09/04/2020) |
| 09/23/2020 | 112 | REPLY to opposition to motion re 74 MOTION for Summary Judgment filed by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE. (Norris, Cameron) (Entered: 09/23/2020) |
| 09/23/2020 | 113 | AFFIDAVIT re 74 MOTION for Summary Judgment by ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, TENNESSEE. (Norris, Cameron) (Entered: 09/23/2020) |
| 10/21/2020 | 114 | NOTICE of Appearance by J. David Folds on behalf of 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, UNITED STATES CONFERENCE OF MAYORS (Folds, J.) (Entered: 10/21/2020) |
| 10/21/2020 | 115 | NOTICE OF WITHDRAWAL OF APPEARANCE as to 38 AGREE FOR GEORGIA, EQUAL MEANS ERA, LARATIFYERA, UNITED STATES CONFERENCE OF MAYORS. Attorney Elizabeth J. Cappiello terminated. (Cappiello, Elizabeth) (Entered: 10/21/2020) |
| 03/05/2021 | 116 | ORDER granting 29 the Archivist's motion to dismiss; granting 74 Intervenors' motion for summary judgment construed as a motion to dismiss; denying 100 Plaintiffs' motion for summary judgment; denying 88 Intervenors' unopposed motion to consolidate hearings; denying 104 the Archivist's motion to stay summary-judgment briefing; and granting 31 , 40 , 44 , 48 , 51 , 61 , 66 , 68 , 73 , 90 , 91 , 94 , 96 , 108 amici's motions for leave to file amicus briefs. See document for details. Signed by Judge Rudolph Contreras on 3/5/2021. (lcrc1) (Entered: 03/05/2021) |
| 03/05/2021 | 117 | MEMORANDUM OPINION granting 29 the Archivist's motion to dismiss; granting 74 Intervenors' motion for summary judgment construed as a motion to dismiss; denying 100 Plaintiffs' motion for summary judgment; denying 88 Intervenors' unopposed motion to consolidate hearings; denying 104 the Archivist's motion to stay summary-judgment briefing; and granting 31 , 40 , 44 , 48 , 51 , 61 , 66 , 68 , 73 , 90 , 91 , 94 , 96 , 108 amici's motions for leave to file amicus briefs. See document for details. Signed by Judge Rudolph Contreras on 3/5/2021. (lcrc1) (Entered: 03/05/2021) |
| 04/16/2021 | 118 | NOTICE OF WITHDRAWAL OF APPEARANCE as to 1010DATA, INC., 98POINT6 INC., ADVANCE LOCAL MEDIA LLC, ADVANCE MAGAZINE PUBLISHERS INC., ADVANCE PUBLICATIONS, INC., AIRBNB, INC., AMERICAN CITY BUSINESS JOURNALS, INC., AMERICAN INTERNATIONAL GROUP, INC., APOLLO GLOBAL MANAGEMENT, INC., APPLE, ASANA, INC., ATAKAMA INC., BARON CAPITAL GROUP, INC., BENCO DENTAL SUPPLY CO., BIOGEN INC., BLOOMBERG L.P., BLUE APRON HOLDINGS, INC., BOWERY FARMING INC., BRAZE, INC., BRIGHTHOUSE FINANCIAL, INC., BUILD AMERICA MUTUAL ASSURANCE COMPANY, CAPESPACE, LLC, CAPRI HOLDINGS LIMITED, CHOBANI, LLC, CITIGROUP INC., COTA, INC., DAYFORWARD INC., DIAGEO NORTH AMERICA, INC., ELLIG GROUP LLC, EQUITABLE, ESTEE LAUDER COMPANIES INC., ETSY, INC., EVERYTHING IS EVERYTHING, GENERAL ASSEMBLY SPACE, INC., GOLDMAN SACHS GROUP, INC., GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, HERSHEY COMPANY, INDUSTRIOUS, KIMBERLY-CLARK CORPORATION, KIND LLC, LEADERS GROUP HOLDINGS LLC, LEVI STRAUSS & CO., LIVARI CLOTHING, LVMH MOET HENNESSY LOUIS VUITTON INC., LYFT, INC., MASTERCARD INCORPORATED, |

MICROSOFT, MORGAN STANLEY, MOTUS LLC, NARDELLO & CO., NATIONAL FOOTBALL LEAGUE, NATIONAL WOMEN'S SOCCER LEAGUE, LLC, NEUBERGER BERMAN, NEW YORK LIFE INSURANCE COMPANY, OSCAR HEALTH, PEPSICO, INC., PFIZER INC., PLANET LABS INC., PROCORE TECHNOLOGIES, INC., PROSPERITY LIFE INSURANCE GROUP, LLC, PRUDENTIAL FINANCIAL, INC., PUPPET, INC., QUOTIENT TECHNOLOGY INC., REBELLE MEDIA, RODAN & FIELDS, LLC, SALESFORCE.COM, INC., SEED&SPARK, INC., SHELTERPOINT LIFE INSURANCE COMPANY, SHISEIDO AMERICAS CORPORATION, SHUTTERSTOCK, INC., SOFTBANK INVESTMENT ADVISERS, SPOTIFY USA, INC., STRAVA, SURVEYMONKEY INC., THINX, TIFFANY & CO., TORY BURCH LLC, TRANSUNION, TURNITIN, LLC, TURO INC., TWITTER, INC., UBER, UNITED STATES SOCCER FEDERATION, INC., UNIVISION COMMUNICATIONS INC., VF CORPORATION, VICE MEDIA LLC, WEWORK, WORKDAY, INC.. (Bergmann, Benjamin) (Entered: 04/16/2021)

| 05/03/2021 | 119 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 116 Order on Motion for Leave to File, Order on Motion to Dismiss, Order on Motion for Summary Judgment, Order on Motion for Miscellaneous Relief, Order on Motion to Amend/Correct, Order on Motion to Stay, Order on Motion for Extension of Time to File Response/Reply, 117 Memorandum & Opinion, by COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, STATE OF NEVADA. Filing fee $ 505, receipt number ADCDC-8417214. Fee Status: Fee Paid. Parties have been notified. (Kallen, Michelle) Modified on 5/7/2021 (znmw). (Entered: 05/03/2021) |
| 05/04/2021 | 120 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 119 Notice of Appeal to DC Circuit Court. (ztth) (Entered: 05/04/2021) |
| 05/07/2021 | | USCA Case Number 21-5096 for 119 Notice of Appeal to DC Circuit Court, filed by STATE OF NEVADA, COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS. (ztth) (Entered: 05/12/2021) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA,<br>202 North Ninth Street<br>Richmond, VA 23219, | ) )<br>)<br>) | **COMPLAINT** |
| | ) | |
| STATE OF ILLINOIS,<br>100 West Randolph Street<br>Chicago, IL 60601, and | )<br>)<br>)<br>) | |
| STATE OF NEVADA,<br>100 North Carson Street<br>Carson City, NV 89701, | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>)<br>) | |
| v. | )<br>) | Case No. _____ |
| DAVID S. FERRIERO, in his official capacity<br>as Archivist of the United States,<br>700 Pennsylvania Avenue NW<br>Washington, DC 20408, | )<br>)<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

The United States Constitution now declares, once and for all, that equality of rights under the law shall not be denied or abridged on account of sex. For nearly 150 years, our Nation's foundational document did not acknowledge the existence of women. In 1920, the concept of equality among the sexes appeared in the Constitution for the first time, but was limited to the right to vote. Now—after 231 years and on the centennial of the 19th Amendment—the American people have committed to equality regardless of sex by adopting the Equal Rights Amendment as the 28th Amendment to the U.S. Constitution.

On January 27, 2020, the Commonwealth of Virginia became the 38th State to ratify the Equal Rights Amendment. At that moment, the process set forth in Article V of the U.S. Constitution was complete. Plaintiff States Nevada, Illinois, and Virginia—the three States to

1

most recently ratify—ask this Court for an order: (1) directing the Archivist of the United States to perform his purely ministerial duty under 1 U.S.C. § 106b to "cause the amendment to be published, with his certificate, specifying . . . that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States," and (2) declaring that the Equal Rights Amendment has become the 28th Amendment to the U.S. Constitution.

After generations of effort, the women of this country are entitled to their rightful place in the Constitution. This Court should compel the Archivist to carry out his statutory duty of recognizing the complete and final adoption of the Equal Rights Amendment.

## PARTIES

1.      Plaintiff Commonwealth of Virginia is a State of the United States of America.

2.      Plaintiff State of Illinois is a State of the United States of America.

3.      Plaintiff State of Nevada is a State of the United States of America.

4.      Defendant David S. Ferriero is the Archivist of the United States. In that role, he oversees the operations of the National Archives and Records Administration. The Archivist is sued in his official capacity.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this suit arises under the Constitution and laws of the United States. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1361 because this is an "action in the nature of mandamus to compel" a federal officer "to perform a duty owed to the plaintiff."

6.      Venue is proper under 28 U.S.C. § 1391(e) because the Archivist is sued in his official capacity and, for purposes of that capacity, the Archivist resides in this District.

2

JA 077

## THE PROCESS FOR AMENDING THE CONSTITUTION

7.      Article V of the United States Constitution establishes the process for adopting constitutional amendments. As relevant here, it provides:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress.

8.      The Constitution assigns particular tasks to Congress and the States in the amendment process that reflect a careful balance between state and federal power. Congress is given the powers to "propose Amendments to this Constitution" and to select between one of two "Mode[s] of Ratification"—ratification by state legislatures or via state "Conventions." States, in turn, are given the power to "ratif[y]" the amendments proposed by Congress. In the words of James Madison in *The Federalist* No. 39, the amendment process set forth in the Constitution is "neither wholly federal nor wholly national."

9.      Article V was not merely an afterthought in the creation of the American constitutional scheme. To the contrary, the amendment process generated significant debate among the Framers and was carefully designed to balance the need for stability in our governing document with flexibility to adapt that document as needed. As James Madison explained in *The Federalist* No. 43, Article V's procedure for making "useful alterations" to the Constitution "guards equally against that extreme facility, which would render the Constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults."

3

JA 078

## HISTORY OF THE EQUAL RIGHTS AMENDMENT

10.    Women have been fighting for equality in the United States since the Founding generation. In 1776, Abigail Adams famously told her husband, John, to "Remember the Ladies" when drafting "the new Code of Laws."

11.    The original text of the United States Constitution did not include—or even refer to—women. In fact, the only known use of the pronoun "she" in the Framers' deliberations appeared in an ultimately rejected clause referring to fugitive slaves.

12.    The first women's rights convention was held in Seneca Falls, New York, in 1848.

13.    It was not until 1868 that the first federal legislation was introduced proposing equal suffrage for men and women on the basis of citizenship. The resolution was not even debated.

14.    After the Civil War, suffragists advocated for universal suffrage and hoped the Reconstruction Amendments would protect women and grant them the right to vote.

15.    In March 1913, thousands of women marched in favor of women's suffrage in Washington, D.C., where they were met with bitter resistance and could proceed only with the assistance of the U.S. Army.

16.    The House of Representatives eventually passed a resolution guaranteeing women the right to vote in 1918, and President Woodrow Wilson supported the amendment in a presidential address that he delivered on the Senate floor. The resolution, however, failed in the Senate twice. Finally, in 1919, the resolution passed both chambers of Congress, and the proposed women's suffrage amendment was sent to the States for ratification.

JA 079

17.     The 19th Amendment was formally adopted as part of the U.S. Constitution in 1920, upon ratification by the requisite number of States. Even so, some States ratified the amendment decades later. Virginia did not ratify until 1952. Alabama waited until 1953. Louisiana only ratified in 1970. And Mississippi did not ratify the 19th Amendment until 1984.

18.     Over time, a patchwork of constitutional and statutory provisions has been found to prohibit discrimination on the basis of sex in certain circumstances. The relevant standards typically call for only intermediate scrutiny of sex-based distinctions. Many of the statutory provisions have been changed, undermined, and even repealed. Until the Equal Rights Amendment was ratified in 2020, American law did not include a broad and definite prohibition on sex discrimination.

19.     The first proposal for an equal rights amendment was drafted by Alice Paul and introduced in Congress in 1923. Initially known as the "Lucretia Mott Amendment," that proposal was introduced in the House by Representative Daniel Read Anthony of Kansas, a nephew of Susan B. Anthony.

20.     Between 1923 and 1946, proposals to amend the Constitution to prohibit discrimination on the basis of sex were taken up by congressional committees more than 30 times.

21.     In 1946, an equal rights amendment proposal came to the Senate floor for the first time. Although that proposed amendment received majority support, it failed to achieve the necessary two-thirds majority, by a vote of 39-35.

22.     The Senate passed versions of a proposed equal rights amendment in 1950 and 1953, but the House took no action. Although equal rights amendment proposals continued to be

5

JA 080

introduced in every Congress, none of these proposals received floor consideration in either chamber for more than 15 years.

23.     Support for an equal rights amendment was a bipartisan cause. For many years, it was endorsed by both major political parties. In September 1960, then-Vice-President Nixon issued a statement encouraging "widespread support for our [party's] platform declaration in behalf of an equal rights amendment to our Constitution which would add equality between the sexes to the freedoms and liberties guaranteed to all Americans."

24.     Throughout this period, the precise terms of the proposed amendment continued to evolve. Changes were made to both the language prohibiting discrimination and the enforcement provision, and amendments were introduced, debated, adopted, and removed as Congress considered different iterations of the proposed amendment.

25.     The House first passed an equal rights amendment in 1970. In January 1969, Representative Martha Griffiths of Michigan introduced H.J. Res. 264. After that resolution was referred to the Judiciary Committee, Representative Griffiths filed a discharge petition to bring the proposed amendment to the House floor. On August 10, 1970, the House approved the motion to discharge, and proceeded to adopt the proposed amendment by a vote of 334-26.

26.     Although the proposed equal rights amendment passed the House in 1970, the Senate did not follow suit. The amendment was considered on the Senate floor in the fall of 1970, but the Senate adjourned without voting on the resolution and failed to bring it to the floor in the following session.

**A.     Congress Proposes the Equal Rights Amendment to the States in 1972**

27.     When the 92nd Congress convened, Representative Griffiths began the constitutional amendment process again. In 1971, she introduced H.J. Res. 208, which would

JA 081

ultimately become the Equal Rights Amendment proposed by Congress. The full text of the

resolution (as adopted) states:

JOINT RESOLUTION

Proposing an amendment to the Constitution of the United States relative
to equal rights for men and women.

> *Resolved by the Senate and House of Representatives of the United
> States of America in Congress assembled* (*two-thirds of each House
> concurring therein*), That the following article is proposed as an
> amendment to the Constitution of the United States, which shall be valid
> to all intents and purposes as part of the Constitution when ratified by the
> legislatures of three-fourths of the several States within seven years from
> the date of its submission by the Congress:

"ARTICLE —

> "SECTION 1. Equality of rights under the law shall not be denied or
> abridged by the United States or by any State on account of sex.
> "SECTION 2. The Congress shall have the power to enforce, by
> appropriate legislation, the provisions of this article.
> "SECTION 3. This amendment shall take effect two years after the date
> of ratification."

28.     Both the House and the Senate approved H.J. Res. 208 by far more than the

required two-thirds majority. The House adopted the resolution in October 1971 by a vote of

354-24, and the Senate adopted the resolution in March 1972 by a vote of 84-8. In both

chambers, the Equal Rights Amendment passed with strong bipartisan support.

29.     While Congress was considering the Equal Rights Amendment, President Richard

Nixon endorsed it, noting in a letter to Senate Republican leadership that he had co-sponsored

the equal rights amendment as a Senator in 1951 and remained committed to its adoption.

30.     Once approved by two-thirds of each chamber, the Equal Rights Amendment was

formally proposed to the States as provided in Article V.

31.     By the end of 1972, 22 States had ratified the Equal Rights Amendment: Hawaii,

New Hampshire, Delaware, Iowa, Kansas, Idaho, Nebraska, Texas, Tennessee, Alaska, Rhode

7

JA 082

Island, New Jersey, Colorado, West Virginia, Wisconsin, New York, Michigan, Maryland, Massachusetts, Kentucky, Pennsylvania, and California. The total number of ratifications reached 35 by the end of 1977, as Wyoming, South Dakota, Oregon, Minnesota, New Mexico, Vermont, Connecticut, Washington, Maine, Montana, Ohio, North Dakota, and Indiana each ratified the amendment.

**B.**    **Recent Ratifications by Nevada, Illinois, and Virginia Bring the Total Number of Ratifying States to 38**

32.    In recent years, three more States have ratified the Equal Rights Amendment.

      **i.**    **Nevada**

33.    Nevada ratified the Equal Rights Amendment in 2017.

34.    The Equal Rights Amendment was introduced in the 79th Nevada legislature on February 13, 2017. The Nevada Senate's joint resolution stated that the Equal Rights Amendment "is meaningful and needed as part of the Constitution of the United States and that the present political, social and economic conditions demonstrate that constitutional equality for women and men continues to be a timely issue in the United States."

35.    The Nevada Senate ratified the Equal Rights Amendment on March 1, 2017 with bipartisan support.

36.    On March 20, 2017, the Nevada Assembly ratified the Equal Rights Amendment, after amending the joint resolution to specify delivery of the ratification to the Archivist of the United States in accordance with federal statute. Again, the Nevada Assembly did so with bipartisan support.

37.    On March 22, 2017, the Nevada Senate completed the ratification process by passing the amended joint resolution in bipartisan fashion. As stated by then-Senator Ford on the

JA 083

Nevada Senate floor: "This is long overdue. The fact that we are still having this conversation is very perturbing. We should all be clapping about equality, and I am happy to be doing so now."

38.     The joint resolution was subsequently enrolled and delivered to the Nevada Secretary of State, who transmitted the ratification to the Archivist in accordance with federal statute.

39.     Nevada thus became the 36th State to ratify the Equal Rights Amendment.

40.     The National Archives and Records Administration has recorded Nevada as ratifying the Equal Rights Amendment.

     **ii.     Illinois**

41.     Illinois ratified the Equal Rights Amendment in 2018.

42.     The Equal Rights Amendment was introduced in the 100th Illinois General Assembly on February 7, 2017. The Illinois Senate's proposing resolution stated that "[c]onstitutional equality for women and men continues to be timely in the United States and worldwide, and a number of other nations have achieved constitutional equality for their women and men[.]" On April 11, 2018, the Senate ratified the Equal Rights Amendment by the three-fifths majority required under the Illinois Constitution and with bipartisan support.

43.     The bill arrived in the Illinois House of Representatives that same day. On May 30, 2018, the Illinois House voted to ratify the Equal Rights Amendment by the required constitutional three-fifths majority and with bipartisan support. Recognizing the historic gravity of the issue, one representative observed: "I don't think that I will have debated a more important Bill than this Bill. This is about who we are as a people. This is about who we believe the State of Illinois is and should be going forward. But it's more than just the State of Illinois; it's about the United States of America[.]"

JA 084

44. On May 30, 2018, the Illinois Secretary of the Senate recorded the Equal Rights Amendment as officially adopted in both chambers of the Illinois General Assembly. Ratification by the State of Illinois was complete.

45. On June 15, 2018, the Illinois Secretary of State certified in writing that the Equal Rights Amendment had been ratified by the State of Illinois and mailed official certification to the Archivist.

46. Illinois thus became the 37th State to ratify the Equal Rights Amendment.

47. The National Archives and Records Administration has recorded Illinois as ratifying the Equal Rights Amendment.

### iii. Virginia

48. Virginia ratified the Equal Rights Amendment in 2020.

49. Ratification of the Equal Rights Amendment was one of the first measures introduced in the 2020 Session of the Virginia General Assembly. The ratification resolutions, Senate Joint Resolution 1 and House Joint Resolution 1, noted that "over 80 percent of Virginians approve the ratification of the Equal Rights Amendment by the Virginia General Assembly." The resolutions also explained that the Equal Rights Amendment had already been "ratified by 37 state legislatures," acknowledging Virginia's role as "pivotal to incorporating fundamental rights into the Constitution of the United States" throughout American history— both today, as to the Equal Rights Amendment, as well as during the Founding era, when "Virginia's ratification of 10 amendments in 1791 established the Bill of Rights."

50. In floor remarks in support of House Joint Resolution 1, the chief patron in the Virginia House of Delegates acknowledged the significance of Virginia's action as the 38th State to ratify: "Very rarely the votes we take matter to people around the nation and the world, but I

JA 085

want to be unequivocally clear that this is a vote of a lifetime. Never again will you be able to affect the United States Constitution and solidify and enshrine women's equality into our founding document."

51.     A chief patron of Senate Joint Resolution 1 has described why ratification is an important turning point for our nation, stating: "By adding the Equal Rights Amendment to the Constitution, we have taken an imperfect document and made it closer to perfect. We can tell our children that they are all equally represented in the Constitution and that we are one step closer to achieving liberty and justice for all." Demonstrating the bipartisan support in favor of ratification, another supporter stated on the Senate floor that ratification of the Equal Rights Amendment "is an issue that we all agree on," and the "principle . . . that women and men are equal . . . is worthy of being elevated to a constitutional priority."

52.     On January 27, 2020, the Virginia House of Delegates and the Senate of Virginia adopted the ratification resolutions. The House adopted the resolution by a vote of 58 to 40, and the Senate adopted the resolution by a vote of 27 to 12. In both chambers, the Equal Rights Amendment was ratified with bipartisan support.

53.     Also on January 27, 2020, the Clerk of the Virginia House of Delegates and the Clerk of the Senate of Virginia transmitted certified copies of Virginia's ratification resolutions to the Archivist. Virginia's ratification of the Equal Rights Amendment was complete.

54.     Virginia thus became the 38th State to ratify the Equal Rights Amendment.

*     *     *

55.     The recent ratifications by Nevada, Illinois, and Virginia bring the total number of ratifying States to 38, satisfying Article V's requirement of ratification by "three fourths" of all States.

11

JA 086

56.     Public support for the Equal Rights Amendment remains consistently strong. A survey conducted by CBS News in 1999 showed that 74% of respondents supported the Equal Rights Amendment, while only 10% were opposed. In recent years, support for the amendment has become nearly universal. A 2016 poll found that 94% of respondents were in favor of a constitutional amendment guaranteeing equal rights for men and women.[1]

### THE DUTIES OF THE ARCHIVIST

57.     Under Article V, a proposed constitutional amendment automatically becomes "valid to all Intents and Purposes, as Part of th[e] Constitution" as soon as it is "ratified by the Legislatures of three fourths of the several States." For that reason, the Equal Rights Amendment became part of the U.S. Constitution immediately upon Virginia's ratification.

58.     Congress has enacted legislation that imposes ministerial duties on the Archivist involving the publication of duly enacted constitutional amendments. That statute, 1 U.S.C. § 106b, reads:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

59.     That statute does not grant the Archivist any discretion in deciding whether to publish and certify a newly adopted amendment. Instead, the duties imposed upon the Archivist are mandatory and purely ministerial.

---

[1] That same poll found that 80% of respondents mistakenly believed that men and women are *already* explicitly guaranteed equal rights in the U.S. Constitution.

60.    In 1992, then-Archivist Don Wilson published and certified the 27th Amendment shortly after Michigan ratified the proposal. As Mr. Wilson noted, the votes by three-fourths of the States—not the Archivist's signature or any action by his office—formally added the amendment to the Constitution.

61.    Virginia transmitted a certified copy of its ratification of the Equal Rights Amendment to the National Archives and Records Administration on January 27, 2020. Because the National Archives and Records Administration has received "official notice" that the Equal Rights Amendment has been adopted pursuant to Article V, the Archivist is required to publish the amendment and certify its validity.

62.    As of the date of this filing, the Archivist has neither published nor certified the Equal Rights Amendment. On January 8, 2020, the National Archives and Records Administration announced that the Archivist will refuse to do so "unless otherwise directed by a final court order." Following Virginia's ratification, the Archivist confirmed that he will take no action to certify the adoption of the Equal Rights Amendment. The Archivist has therefore failed to execute the obligations imposed on him by federal law.

### ARGUMENTS DISPUTING THE VALIDITY OF THE EQUAL RIGHTS AMENDMENT HAVE NO MERIT

**A.    No Binding Ratification Deadline Has Lapsed**

63.    The preamble of H.J. Res. 208 (1972) states that the proposed amendment "shall be valid . . . as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of it submission by the Congress." This language did not strip the Plaintiff States of their power to ratify the Equal Rights Amendment.

64.    *First*, the purported limitations period on the time for ratification was not part of the actual "Article" that was "proposed" to the States. The text of that article—which is set out in

13

JA 088

full above—neither includes a deadline for ratification nor provides consequences if ratification occurs after a particular time. Because no timeframe was part of the "amendment[]" that Congress "propose[d]" to the States for ratification under Article V, it does not limit a State's discretion about whether—or when—to ratify Congress's proposal.

65.     *Second*, Article V does not empower Congress to dictate when a State may consider—much less ultimately ratify—a proposed amendment. The Constitution grants Congress two specific powers regarding amendment: (1) to "propose Amendments to this Constitution"; and (2) to designate whether the "Mode of Ratification" will be through state legislatures or via conventions.

66.     Because Article V carefully sets out the balance between Congress and the States in the amendment process, congressional authority to limit the States' role in ratification should not be presumed where the Constitution is silent. And given the Framers' concern for protecting state prerogatives against federal intrusion, any doubts about the scope of congressional authority should be resolved in favor of the States. Indeed, pursuant to the Tenth Amendment to the United States Constitution, any "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

**B.      There Is No Implied Time Limit on Ratification**

67.     Under Article V, there is no time limit for how long Congress may deliberate before proposing an amendment to the States. The same is true of a State's decision about whether or when to ratify a proposed amendment.

68.     Nothing in Article V suggests—much less clearly requires—that States take action on proposed constitutional amendments within any particular amount of time. Reading

additional requirements into Article V that appear nowhere in its text would upset the important balance the Framers struck between congressional and state authority.

69.     The ratification process for the 27th Amendment confirms the point. Congress originally proposed that amendment—which prohibits pay changes for members of Congress from taking effect until after the next set of congressional elections—along with the Bill of Rights in 1789. Ratification of the 27th Amendment stalled after 1792, and the requisite three-fourths of state legislatures did not ratify it until 1992. Despite the passage of *more than 200 years* between Congress's proposal and the final State's ratification, the Archivist published and certified the 27th Amendment in May 1992.

**C.     A State's Ratification Is a One-Time Event**

70.     The recent ratifications of the Equal Rights Amendment by Nevada, Illinois, and Virginia bring the total number of ratifying States to 38. Although a small number of States have, at various times and in various ways, purported to "rescind" their earlier ratifications, these efforts are constitutionally unauthorized and without legal effect.

71.     Article V grants States the authority to "ratif[y]" amendments proposed by Congress, and nothing in Article V suggests that a State may definitively reject a proposed amendment or rescind a previous ratification. To the contrary, Article V specifically provides that a proposed amendment "shall be valid . . . , as Part of this Constitution, when ratified by . . . three fourths of the several States" through whichever mode of ratification (state legislatures or convention) selected by Congress. According to that mandatory language, once a State has ratified a proposed amendment, that State has had its final say on the question.

72.     Any other interpretation would read additional state authority into Article V where none exists. Allowing States to offer a non-final, or conditional, ratification contradicts the

15

## JA 090

clear language of Article V, which specifically provides that proposed amendments shall be finally adopted upon ratification by the requisite number of States—with no mention of a State's authority to withdraw or otherwise modify its ratification once given. It would also be contrary to the Framers' intent that constitutional provisions be adopted "*in toto*, and *for ever*," as described in a letter from James Madison to Alexander Hamilton on July 20, 1788.

73.     Historical practice confirms that States have no power to rescind prior ratifications. On the few occasions where States have attempted to withdraw ratification with respect to other constitutional amendments, those purported rescissions had no effect. For example, the 14th Amendment was adopted despite two States' attempts to rescind their ratifications.

74.     Because 38 States have performed the ratification role assigned to them by Article V, the Equal Rights Amendment has become the 28th Amendment to the United States Constitution.

## THE PLAINTIFF STATES ARE ENTITLED TO MANDAMUS RELIEF

75.     The previous allegations are repeated and realleged herein.

76.     Under 28 U.S.C. § 1361, this Court has jurisdiction over "any action in the nature of mandamus to compel an officer . . . of the United States or any agency thereof to perform a duty owed to the plaintiff."

77.     The Archivist has a clear and indisputable duty to publish and certify the Equal Rights Amendment as part of the U.S. Constitution.

78.     The Archivist has failed to execute those duties and has made clear that he will not publish and certify the Equal Rights Amendment unless ordered to do so by a court.

79.     The Plaintiff States have no adequate alternative remedy. Under Article V, the

JA 091

Equal Rights Amendment has been added to the U.S. Constitution. The Plaintiff States have already fulfilled their constitutional role in the amendment process—ratifying an amendment that has been proposed by Congress. But the Archivist refuses to carry out the ministerial duties required by statute to publish and certify the amendment.

80.    The duty is owed "to the [Plaintiff States]" within the meaning of 28 U.S.C. § 1361. As separate sovereigns, the States are full and necessary partners in the constitutional amendment process. The Plaintiff States have fulfilled their assigned role by ratifying an amendment that has been proposed by Congress. The Archivist's failure to carry out his ministerial duties to acknowledge the adoption of the amendment harms the Plaintiff States by creating widespread confusion regarding the effect of their ratifications.

81.    The Plaintiff States also have a significant interest in this case because the Archivist's delay continues to thwart the will of the people, as expressed by the lawful and valid adoption of the Equal Rights Amendment. As States that have ratified the Equal Rights Amendment, the Plaintiff States have a particularly acute interest in ensuring that the amendment is properly recognized as the law of the land.

**DEMAND FOR RELIEF**

The Plaintiff States request that the Court enter judgment against the Archivist and award the following relief:

a)    Declare that the Equal Rights Amendment is "valid" and "part of th[e] Constitution" within the meaning of Article V;

b)    Declare that the Archivist's refusal to publish and certify the Equal Rights Amendment violates federal constitutional and statutory law;

17

JA 092

c)        Order the Archivist to execute his statutory duties under 1 U.S.C. § 106b as soon as practicable, by instructing him to "cause the [Equal Rights Amendment] to be published, with his certificate" stating that the Plaintiff States are among those that have ratified and that the amendment "has become valid, to all intents and purposes, as a part of the Constitution of the United States";

d)        Grant Plaintiffs reasonable costs and attorney fees, including those costs and fees allowable under 28 U.S.C. § 2412; and

e)        Grant additional relief at law and in equity as the interests of justice may require.

18

JA 093

Dated: January 30, 2020                          Respectfully submitted,

*Mark R. Herring*                                *Kwame Raoul*

MARK R. HERRING                                  KWAME RAOUL
*Attorney General of Virginia*                   *Attorney General of Illinois*

  By:  */s/ Michelle S. Kallen*                    By:  */s/ Kathryn Hunt Muse*
MICHELLE S. KALLEN [1030497]                     KATHRYN HUNT MUSE
TOBY J. HEYTENS [490314]                         CHRISTOPHER WELLS
MARTINE E. CICCONI [219373]                      ELIZABETH ROBERSON-YOUNG
JESSICA MERRY SAMUELS [1552258]                  Office of the Attorney General
ZACHARY R. GLUBIAK                               100 West Randolph Street
Office of the Attorney General                   Chicago, Illinois 60601
202 North Ninth Street                           (312) 814-3000 – Telephone
Richmond, Virginia 23219                         (312) 814-5024 – Facsimile
(804) 786-7240 – Telephone                       kmuse@atg.state.il.us
(804) 371-0200 – Facsimile                       cwells@atg.state.il.us
mkallen@oag.state.va.us                          erobersonyoung@atg.state.il.us

*Attorneys for Plaintiff*                        *Attorneys for Plaintiff*
*Commonwealth of Virginia*                       *State of Illinois*


AARON D. FORD
*Attorney General of Nevada*

  By:  */s/ Heidi Parry Stern*
HEIDI PARRY STERN
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

*Attorneys for Plaintiff*
*State of Nevada*

19

JA 094

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| COMMONWEALTH OF VIRGINIA, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 20-242 (RC) |
| | : | | |
| v. | : | Re Document No.: | 10 |
| | : | | |
| DAVID S. FERRIERO, *in his official capacity* | : | | |
| *as Archivist of the United States*, | : | | |
| | : | | |
| Defendant. | : | | |

**ORDER**

GRANTING MOVANTS' MOTION TO INTERVENE

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, the motion to intervene by Movants Alabama, Louisiana, Nebraska, South Dakota, and Tennessee (ECF No. 10) is **GRANTED**. It is hereby:

**ORDERED** that the caption in this case is amended to reflect the same; and it is

**FURTHER ORDERED** that Movants' proposed answer attached to their motion to intervene (ECF No. 10-1) is hereby accepted as filed.

**SO ORDERED**.

Dated:  June 12, 2020                                     RUDOLPH CONTRERAS
                                                          United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMONWEALTH OF VIRGINIA, *et al.*,   :
                                       :
            Plaintiffs,                :        Civil Action No.:      20-242 (RC)
                                       :
      v.                               :        Re Document No.:       10
                                       :
DAVID S. FERRIERO, *in his official capacity*   :
      *as Archivist of the United States*,   :
                                       :
            Defendant.                 :

**MEMORANDUM OPINION**

**GRANTING MOVANTS' MOTION TO INTERVENE**

## I.  INTRODUCTION

In this case, a group of plaintiff states contend that a long-pending constitutional

amendment has been ratified by the required number of states and is now part of the

Constitution.  They have sued the Archivist of the United States, seeking a declaration that the

amendment is now the law, as well as an order directing the Archivist to carry out his statutory

duty to publish and certify an approved amendment.  Another group of states, contending that the

proposed amendment has not been validly approved, moves to intervene in the suit on behalf of

the Archivist.  For the reasons explained below, the Court will grant the motion to intervene.

## II.  BACKGROUND[1]

On January 27, 2020, the legislature of the Commonwealth of Virginia voted to ratify the

Equal Rights Amendment (ERA), a proposed constitutional amendment declaring that the

---

[1] The Court's summary and choice of language here should not be read as implying any
view on the current status of the ERA.  "For purposes of resolving the motion[] to intervene
presently before the Court, the well-pleaded allegations in the Complaint are assumed to be
true."  *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 9 (D.D.C. 2010) (citations omitted); *see*

equality of rights under the law should not be denied or abridged by the United States or by any

state on account of sex.  *See* Compl. ¶¶ 27, 52, ECF No. 1.  By its reckoning, Virginia's vote

made it the thirty-eighth state to ratify the amendment, meaning that the ERA had been approved

by three-quarters of the states (as required for an amendment under Article V of the Constitution)

and that it is now the Twenty-Eighth Amendment to the Constitution of the United States.  *Id.* ¶¶

54–55.  Despite Virginia's vote, the Archivist of the United States declined to publish or certify

the ERA, as he is arguably required to do under statute.  *Id.*  ¶¶ 58 (citing 1 U.S.C. § 106b), 62.

Virginia, along with Nevada and Illinois (the two other states to have most recently voted to

ratify the amendment), subsequently brought this suit against the Archivist.

Before the Archivist filed an appearance, another group of states (Alabama, Louisiana,

Nebraska, South Dakota, and Tennessee) moved to intervene in this case as Defendants, both as

a matter of right and as a matter of this Court's permissive discretion.  *See* Mot. to Intervene,

ECF No. 10.  These Movants contend that the ERA was not properly ratified by the plaintiff

states and reject the idea that it is now part of the Constitution.  *Id.* at 3.  Their basic arguments

are: (1) a Congressionally-imposed deadline for ratification of the ERA is valid and has long-

since passed; (2) the Constitution itself implicitly limits the time available for state ratification,

and that tacit deadline has also passed; and (3) five states (including Movants Nebraska, South

Dakota, and Tennessee) that originally ratified the ERA have since rescinded their ratifications,

meaning that the ERA still lacks the required support.  *Id.* at 3–5.  Plaintiffs, it should be noted,

anticipated each of these defenses and offered preemptive counter-arguments in their complaint.

Compl. ¶¶ 63–74.  The Archivist does not oppose Movants' intervention, but Plaintiffs do.  *See*

---

*also Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) ("[M]otions to intervene are usually
evaluated on the basis of well pleaded matters in the motion, the complaint, and any responses of
opponents to intervention.").

Pls.' Mem. in Opp'n to Mot. to Intervene ("Pls.' Opp'n"), ECF No. 21.  The motion is fully briefed and ripe for the Court's consideration.  Since the completion of briefing, the Archivist has appeared in the case and filed a motion to dismiss.  Mot. to Dismiss, ECF No. 29.

### III.  LEGAL STANDARD

Under the federal rules, an outside party can intervene in an existing lawsuit under certain circumstances.  *See* Fed. R. Civ. P. 24 (providing for both "intervention of right" and "permissive intervention").  A court must allow an applicant to intervene when, (1) "[o]n timely motion," it (2) "claims an interest relating to the property or transaction that is the subject of the action" and (3) "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," (4) "unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a); *see also Jones v. Prince George's Cty., Maryland*, 348 F.3d 1014, 1017 (D.C. Cir. 2003) (summarizing Rule 24(a) as requiring "four elements—timeliness, interest, impairment of interest, and adequacy of representation").  Alternatively, a court may allow an applicant to intervene when it demonstrates (1) again, "on timely motion" that it (2) "has a claim or defense that share with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1).  When exercising its discretion to allow permissive intervention, the Court also "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  Whether under Rule 24(a) or 24(b), "where a party tries to intervene as another defendant," our Circuit has also "required it to demonstrate Article III standing."  *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 316 (D.C. Cir. 2015).

## IV.  ANALYSIS

### A.  The Movants Are Entitled to Intervene as a Matter of Right

As explained below, the Court agrees with Movants that they meet each of the requirements of Rule 24(a) and have demonstrated standing, at least at this preliminary stage. Because the Court finds that intervention as a matter of right is therefore appropriate, it does not discuss whether Movants are also entitled to permissive intervention under Rule 24(b).

### 1.  Timeliness

This element merits little discussion.  Movants moved to intervene approximately three weeks after the complaint was filed and prior to any meaningful developments in the case (indeed, before the Archivist had even entered an appearance).  Such a prompt motion is timely under any reasonable measure, and Plaintiffs make no argument to the contrary.  *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 734–35 (D.C. Cir. 2003) (finding it "not difficult at all" to find timely a motion to intervene filed "less than two months after the plaintiffs filed their complaint and before the defendants filed an answer").

### 2.  Interest and Impairment of Interest

Of the five Movants, two (Alabama and Louisiana) never ratified the ERA, while three (Nebraska, South Dakota, and Tennessee) first ratified it but have since purported to rescind their ratifications.  Mot. to Intervene at 2.  Despite this difference, all five Movants claim a "legally protected interest in this action."  *Id.* at 7 (quoting *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008)).  They portray the issue as one of fairness: "If Plaintiffs have standing to ensure their 'yes' votes are counted and the ERA is added to the Constitution, then Movants have standing to ensure their 'no' votes are counted and the ERA is not added to the Constitution."  *Id.* at 8.  They submit that each "State has an interest in securing observance of the terms under which it

participates in the federal system," including the rules governing the amendment process. *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607–08 (1982)). More concretely, they argue that the Archivist's publication of the ERA will require them to review their existing laws for compliance with the new amendment and will expose those laws to potential legal challenges. *Id.* at 9–10. Finally, Movants claim, the three rescinding states have an additional interest in their prior ratifications not being incorrectly construed and wrongly treated as "live legal documents" by the Archivist. *Id.* at 8–9.

For their part, Plaintiffs seem to concede that the states that purported to rescind their ratifications of the ERA have a sufficient interest in the lawsuit. But they claim that Louisiana and Alabama—the two Movants who undisputedly never ratified the ERA—"cannot identify a legally protected interest threatened by the discrete procedural questions before the Court in *this* action." Pls.' Opp'n at 8. Because there is no risk that their vote will be miscounted, Plaintiffs maintain, they "do not have an interest in this litigation beyond a generalized disdain for the Equal Rights Amendment." Pls.' Opp'n at 3–4. Plaintiffs argue that any concerns about how the ERA will be interpreted and enforced are speculative and not relevant to this proceeding. *See id.* at 9 (noting that how the ratified ERA "will interact with the 50 states' laws, regulations, and programs" is not at issue in this case).

Plaintiffs are correct to point out this case is not directly related to the content and potential impact of the amendment. But the Court is not convinced that this provides grounds to exclude Louisiana and Alabama. There is, as Plaintiffs implicitly acknowledge, at least some uncertainty about the impact of a ratified ERA on current constitutional doctrine.[2] At a

---

[2] *See* Lisa Baldez et al., <u>Does the U.S. Constitution Need an Equal Rights Amendment?</u>, 35 J. Legal Stud. 243, 244–45 (2006) (describing a debate in which some "argue that ratification of the ERA will clarify a particularly murky area of the law and, in the process, generate a nearly

minimum, all five Movants—and indeed all 50 states—will be operating under a binding but novel regime if the Archivist confirms and publishes the amendment. All states face a form of threatened "injury": they will have to review their laws, consider whether they comply with the amendment, and decide whether to maintain certain policies and programs in the face of new litigation risks. Additionally, and perhaps more importantly, all states would seem to have a more general procedural interest in participating in the federal system under a validly adopted (or rejected) superior rule.

The overall interest analysis becomes slightly more complicated, however, when viewed through the lens of Article III's standing requirements, as our Circuit has held it must. *See Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1233 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 794 (2019) (explaining that Rule 24(a)'s "legally protected interest" must be "sufficient to confer Article III standing"); *see also Crossroads Grassroots Policy Strategies*, 788 F.3d at 316 ("The standing inquiry for an intervening-defendant is the same as for a plaintiff: the intervenor must show injury in fact, causation, and redressability."). The Movants do not analyze their interests in these exact terms, seeming instead to rely on older Circuit precedent that spoke somewhat less precisely about the relationship between Rule 24(a) and Article III standing. *See* Mot. to Intervene at 7 ("Any movant 'who satisfies Rule 24(a) will also meet Article III's standing requirement.'") (quoting *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003)).[3] And for their part, Plaintiffs do not broadly challenge Movants' standing, possibly because they do not want to argue themselves out of court.

---

irreversible sea change in sex discrimination jurisprudence" while others "remain doubtful that the amendment could produce any effect," in part "because decisions of the U.S. Supreme Court have largely fulfilled the amendment's chief objectives").

[3] *Cf. Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 13 n.5 (D.D.C. 2010) ("In most instances, the standing inquiry will fold into the underlying inquiry under Rule 24(a): generally

Ultimately, in this preliminary posture (and aware that it lacks fully adversarial briefing on the issue), the Court concludes that all five Movants have identified a legally protected interest "sufficient to confer Article III standing." *Old Dominion Elec. Coop.*, 892 F.3d at 1233, All five Movants have a constitutionally-assigned role in the amendment process. *See Alden v. Maine*, 527 U.S. 706, 713 (1999) ("Various textual provisions of the Constitution [including Art. V] assume the States' continued existence and active participation in the fundamental processes of governance."). And all five have a related interest in their regulatory powers not being constrained or preempted by a procedurally invalid constitutional rule. *See Snapp*, 458 U.S. at 601 (identifying as a sovereign interest "the power to create and enforce a legal code, both civil and criminal"); *Maine v. Taylor*, 477 U.S. 131, 137 (1986) (stating, in recognizing standing, that "a State clearly has a legitimate interest in the continued enforceability of its own statutes"); *cf.* S*tate of Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 444 (D.C. Cir. 1989) (explaining that when the "preemptive effect [of federal law] is the injury of which petitioners complain, we are satisfied that the States meet the standing requirements of Article III"). At the same time, the Court is mindful that the Archivist has offered a standing argument in support of his motion to dismiss. *See* Mem. in Supp. of Mot. to Dismiss at 8–11, ECF No. 29-1. By recognizing Movants' interests here, the Court does not mean to prejudge the issue of Plaintiffs' standing and related justiciability questions—it simply seeks to facilitate the efficient presentation of arguments from apparently concerned parties. *See Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967) ("[T]he 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.").

---

speaking, when a putative intervenor has a 'legally protected' interest under Rule 24(a), it will also meet constitutional standing requirements, and *vice versa*.").

Building on this analysis, it is not difficult to conclude that Movants' interests will be impaired if Plaintiffs are successful in this case. Movants' regulatory and procedural interests would be affected if the Archivist were ordered to publish the amendment. And it is unclear whether Movants would be able to bring a subsequent lawsuit to "un-publish" or "de-ratify" the amendment. *See United States v. Stahl*, 792 F.2d 1438, 1439 (9th Cir. 1986) (indicating that "certification of the adoption of [a constitutional amendment by the statutorily-designated federal official] is conclusive upon the courts") (citing *Leser v. Garnett*, 258 U.S. 130, 137 (1922)). In any case, "[r]egardless of whether the [Movants] could reverse an unfavorable ruling by bringing a separate lawsuit, there is no question that the task of reestablishing the status quo if the [Plaintiffs] succeed[] in this case will be difficult and burdensome." *Fund for Animals*, 322 F.3d at 735.

### 3.  Adequacy of Representation

In their motion, Movants argued that the Archivist, as a representative of the federal government, would not necessarily adequately defend their state-specific interests. *See* Mot. to Intervene at 13 ("As a federal official, the Archivist has no interest in the validity of Movants' laws or what happens to their ratification documents."). Movants predicted that the Archivist would not raise all of their anticipated defenses and reasoned that "[b]ecause his only interest is following the procedures imposed on him by federal law, the Archivist 'merely seeks to defend the present suit and would accept a procedural victory.'" *Id.* (quoting *Wal–Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016)). In opposing, Plaintiffs primarily argued that, prior to the Archivist actually appearing in the case, it was impossible to know whether or not he would not adequately represent Movants' interests. *See* Pls.' Opp'n at 5

("Movants' speculation about the positions the Archivist might take is simply insufficient to support intervention as of right.").

Regardless of its merits, the parties' debate has been overtaken by events.  As mentioned above, the Archivist has since appeared and filed a motion to dismiss, and his arguments appear to vindicate some of Movants' concerns.  He does appear to be content with a "procedural victory," insofar as he raises a variety of justiciability concerns, and he does not raise all of Defendants' proposed defenses.  *See generally* Mem. in Supp. of Def.'s Mot. to Dismiss.  More generally, this Circuit has "often concluded that [federal] governmental entities do not adequately represent the interests of aspiring intervenors" because the federal government's obligation "is to represent the interests of the American people" as expressed in federal law, not the interests of other entities or governments.  *Fund for Animals*, 322 F.3d at 736; *see also WildEarth Guardians v. Jewell*, 320 F.R.D. 1, 5 (D.D.C. 2017) ("While the Federal Defendants' duty runs to the interests of the American people as a whole, the state-intervenors will primarily consider the interests of their own citizens."); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 7 (D.D.C. 2008) (reasoning that "the existing defendants, the DOI and the Secretary, have no clear interest in protecting Alaska's sovereignty or Alaska's interest").  Additionally, our Circuit has noted that an applicant's burden in this context is minimal, requiring it to show a mere possibility that its interests may not be adequately represented absent intervention.  *See Fund for Animals*, 322 F.3d at 735.  Here, it is not difficult to see that the interests of Movants and the federal government "might diverge during the course of the litigation," *id.* at 736, particularly since the federal government "remains free to change its strategy" as the case proceeds, *100Reporters LLC v. United States Dep't of Justice*, 307 F.R.D. 269, 280 (D.D.C. 2014).

## V.  CONCLUSION

For the foregoing reasons, Movants' motion to intervene is **GRANTED**.  Consistent with

their motion, Movants shall "voice their collective views in one consolidated brief . . . [and]

focus their briefs and arguments on their own unique defenses, rather than duplicating defenses

and arguments that the Archivist raise[d] himself."  Mot. to Intervene at 15.  An order consistent

with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  June 12, 2020                                     RUDOLPH CONTRERAS
                                                         United States District Judge

JA 105

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VIRGINIA, ILLINOIS, and NEVADA,<br>*Plaintiffs*,<br><br>v.<br><br>DAVID S. FERRIERO, in his official capacity<br>as Archivist of the United States,<br>*Defendant*,<br><br>ALABAMA, LOUISIANA, NEBRASKA,<br>SOUTH DAKOTA, and TENNESSEE,<br>[*Proposed*] *Intervenor-Defendants*, | Case No. 1:20-cv-242-RC |

**[PROPOSED] ANSWER OF [PROPOSED] INTERVENOR-DEFENDANTS
ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, AND TENNESSEE**

Intervenor-Defendants Alabama, Louisiana, Nebraska, South Dakota, and Tennessee file this answer in response to Plaintiffs' complaint. Unless expressly admitted below, Intervenors deny everything in the complaint. Intervenors respond to the numbered allegations in the complaint as follows:

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Paragraph 5 contains legal conclusions that require no response. Intervenors admit, however, that this Court has jurisdiction over the subject matter of the complaint.

6.      Paragraph 6 contains legal conclusions that require no response. Intervenors admit, however, that this Court is one where venue is proper.

7.      The cited provisions of the Constitution speak for themselves. Paragraph 7 otherwise contains legal conclusions that require no response.

1

JA 106

8.      The cited documents speak for themselves. Paragraph 8 otherwise contains legal conclusions that require no response.

9.      The cited documents speak for themselves. Paragraph 9 otherwise contains legal conclusions that require no response.

10.      Abigail Adams' letter speaks for itself. Intervenors otherwise lack knowledge or information to form a belief about the allegations in paragraph 10.

11.      The Framers' deliberations speak for themselves. Paragraph 11 is otherwise denied. The Constitution includes women. It uses sex-inclusive terms like "people" and "person." It neither specifically refers to "women" nor explicitly refers to "men." Though the Constitution sometimes uses seemingly masculine pronouns ("he," "him," "his"), at the Founding and throughout most of American history those pronouns referred to both men and women.

12.      Intervenors admit that the Woman's Rights Convention was held in Seneca Falls, New York in 1848.

13.      Intervenors admit that a proposed constitutional amendment concerning women's suffrage was introduced in Congress in 1868. Any debates over that proposal speak for themselves. Intervenors otherwise lack knowledge or information to form a belief about the allegations in paragraph 13.

14.      Intervenors admit that suffragists advocated for women's suffrage after the Civil War. Intervenors otherwise lack knowledge or information to form a belief about the allegations in paragraph 14.

15.      Intervenors admit that the Women's Suffrage Parade was held in Washington, D.C. in 1913. Intervenors otherwise lack knowledge or information to form a belief about the allegations in paragraph 15.

16.     Intervenors admit that Congress proposed the 19th Amendment to the States in 1919. The legislative documents and President Wilson's address speak for themselves.

17.     Intervenors admit that the 19th Amendment was ratified by Tennessee, the final State, in 1920. Other documents speak for themselves.

18.     Paragraph 18 contains legal conclusions that require no response. Intervenors agree, however, that current federal constitutional law generally applies intermediate scrutiny to laws that draw sex-based distinctions. Intervenors deny that the Equal Rights Amendment was ratified in 2020 or any other year.

19.     Admitted.

20.     Any proposals to amend the Constitution to prohibit discrimination on the basis of sex speak for themselves. Intervenors otherwise lack knowledge or information to form a belief about the allegations in paragraph 20.

21.     Intervenors admit that the Senate did not approve an equal rights amendment by the requisite two-thirds vote in 1946.

22.     The proposals speak for themselves. Intervenors admit that Congress did not propose an equal rights amendment to the States before 1972.

23.     Intervenors admit that the idea of an equal rights amendment, as that concept was understood in the 1960s, was supported by individuals in both the Democratic and Republican parties. Then-Vice President Nixon's statement speaks for itself.

24.     The text of the proposed amendment and any suggested changes speak for themselves. Notably, proponents of the Equal Rights Amendments have consistently refused to change the amendment to make it abortion neutral.

25.     The legislative documents speak for themselves.

26.     Intervenors admit that Congress did not propose an equal rights amendment to the States before 1972.

27.     H.J. Res. 208 speaks for itself.

28.     Intervenors admit that, in 1972, Congress approved the Equal Rights Amendment by a two-thirds majority vote. Intervenors admit that the amendment was supported by Representatives and Senators from the Democratic and Republican parties.

29.     President Nixon's letter speaks for itself.

30.     Admitted.

31.     Denied. While 22 States had ratified the Equal Rights Amendment by the end of 1972, four of those States (Idaho, Kentucky, Nebraska, and Tennessee) had validly rescinded their ratifications by the end of 1978. And while 31 States had ratified the Equal Rights Amendment as of 1978, one of those States (South Dakota) validly rescinded its ratification in 1979.

32.     Denied. No State could have "ratified" the Equal Rights Amendment in recent years because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

33.     Denied. Nevada could not have "ratified" the Equal Rights Amendment in 2017 because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

34.     The legislative documents speak for themselves.

35.     Denied. The Nevada Senate could not have "ratified" the Equal Rights Amendment on March 1, 2017 because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

36.     Denied. The Nevada Assembly could not have "ratified" the Equal Rights Amendment on March 20, 2017 because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

4

JA 109

37.     Denied. The Nevada Senate could not have "completed the ratification process" on March 22, 2017 because the congressional and constitutional deadlines for ratifying the Equal Rights Amendment expired long ago. Senator Ford's statement speaks for itself.

38.     Denied. The joint resolution had no legal effect.

39.     Denied. Nevada did not become the 36th State to "ratify" the Equal Rights Amendment because the congressional and constitutional deadlines for ratifying that amendment expired long ago. Even if those deadlines had not expired, Nevada would be only the 31st State to ratify the Equal Rights Amendment because Idaho, Kentucky, Nebraska, South Dakota, and Tennessee validly rescinded their prior ratifications.

40.     Denied. While the records of the National Archives and Records Administration speak for themselves, the official position of the executive branch, including the Archivist and the National Archives and Records Administration, is that the Equal Rights Amendment expired in 1979 without the sufficient votes for ratification.

41.     Denied. Illinois could not have "ratified" the Equal Rights Amendment in 2018 because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

42.     Denied. While the legislative documents speak for themselves, the Illinois Senate could not have "ratified" the Equal Rights Amendment because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

43.     Denied. While the legislative documents speak for themselves, the Illinois House of Representatives did not "ratify" the Equal Rights Amendment because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

44.     Denied. Illinois' bill had no legal effect.

45.     Denied. While the Illinois Secretary of State's writings speak for themselves, his "certification" had no legal effect.

5

JA 110

46.     Denied. Illinois did not become the 37th State to "ratify" the Equal Rights Amendment because the congressional and constitutional deadlines for ratifying that amendment expired long ago. Even if those deadlines had not expired, Illinois would be only the 32nd State to ratify the Equal Rights Amendment because Idaho, Kentucky, Nebraska, South Dakota, and Tennessee validly rescinded their prior ratifications.

47.     Denied. While the records of the National Archives and Records Administration speak for themselves, the official position of the executive branch, including the Archivist and the National Archives and Records Administration, is that the Equal Rights Amendment expired in 1979 without sufficient votes for ratification.

48.     Denied. Virginia could not have "ratified" the Equal Rights Amendment in 2020 because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

49.     Denied. While the legislative documents speak for themselves, the Virginia legislature could not legitimately consider a "ratification" resolution because the congressional and constitutional deadlines for ratifying the Equal Rights Amendment expired long ago.

50.     The floor remarks speak for themselves.

51.     The statements speak for themselves.

52.     Denied. While the legislative documents speak for themselves, the Virginia legislature could not have "ratified" the Equal Rights Amendment because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

53.     Denied. While the votes and copies speak for themselves, Virginia could not have "ratified" the Equal Rights Amendment because the congressional and constitutional deadlines for ratifying that amendment expired long ago.

54.     Denied. Virginia did not become the 38th State to "ratify" the Equal Rights Amendment because the congressional and constitutional deadlines for ratifying that amendment

expired long ago. Even if those deadlines had not expired, Virginia would be only the 33rd State to ratify the Equal Rights Amendment because Idaho, Kentucky, Nebraska, South Dakota, and Tennessee validly rescinded their prior ratifications.

55.     Denied. The "ratifications" of Nevada, Illinois, and Virginia were ineffective because the congressional and constitutional deadlines for ratifying the Equal Rights Amendment expired long ago. Even if they were effective, those ratifications did not bring the total number of ratifying States to 38 because Idaho, Kentucky, Nebraska, South Dakota, and Tennessee validly rescinded their ratifications of the Equal Rights Amendment.

56.     Denied. The Fourteenth Amendment to the Constitution, according to controlling Supreme Court precedent, already guarantees equal rights for men and women. Any surveys about the Equal Rights Amendment speak for themselves. But public support for a ban on sex discrimination, which the Fourteenth Amendment already accomplishes, does not equal public support for the broader goals of the Equal Rights Amendment's modern proponents. Strong majorities of Americans oppose, for example, using their tax dollars to fund abortion and allowing biological men to compete in women's athletics. Intervenors otherwise lack knowledge or information to form a belief about the allegations in paragraph 56.

57.     The Constitution speaks for itself. Paragraph 57 otherwise contains legal conclusions that require no response.

58.     The cited statute speaks for itself. Paragraph 58 otherwise contains legal conclusions that require no response.

59.     Paragraph 59 contains legal conclusions that require no response.

60.     Mr. Wilson's publications and certifications speak for themselves. Paragraph 60 otherwise contains legal conclusions that require no response.

61.     Intervenors admit that Virginia transmitted a certified copy of what it (incorrectly) characterized as a ratification of the Equal Rights Amendment to the National Archives and Records Administration on January 27, 2020. Paragraph 61 otherwise contains legal conclusions that require no response.

62.     Admitted, except for the last sentence of Paragraph 62 which contains legal conclusions that require no response.

63.     H.J. Res. 208 speaks for itself. Paragraph 63 otherwise contains legal conclusions that require no response.

64.     Paragraph 64 contains legal conclusions that require no response.

65.     Paragraph 65 contains legal conclusions that require no response.

66.     Paragraph 66 contains legal conclusions that require no response.

67.     Paragraph 67 contains legal conclusions that require no response.

68.     Paragraph 68 contains legal conclusions that require no response.

69.     Paragraph 69 contains legal conclusions that require no response.

70.     Paragraph 70 contains legal conclusions that require no response.

71.     Paragraph 71 contains legal conclusions that require no response.

72.     Paragraph 72 contains legal conclusions that require no response.

73.     Paragraph 73 contains legal conclusions that require no response.

74.     Paragraph 74 contains legal conclusions that require no response.

75.     Intervenors incorporate their responses to paragraphs 1-74 of the complaint.

76.     Paragraph 76 contains legal conclusions that require no response.

77.     Paragraph 77 contains legal conclusions that require no response.

78.     The Archivist's statements speak for themselves. Paragraph 78 otherwise contains legal conclusions that require no response.

79.     Paragraph 79 contains legal conclusions that require no response.

80.     Paragraph 80 contains legal conclusions that require no response.

81.     Paragraph 81 contains legal conclusions that require no response.

### RESPONSE TO PLAINTIFFS' DEMAND FOR RELIEF

Plaintiffs are not entitled to relief.

### AFFIRMATIVE DEFENSES

#### FIRST DEFENSE

The complaint fails to state a claim upon which relief can be granted because Plaintiffs' purported ratifications occurred after the expiration of the seven-year deadline that Congress imposed on the Equal Rights Amendment. That deadline is valid and enforceable, cannot be extended, and has not even arguably been extended past 1982.

#### SECOND DEFENSE

The complaint fails to state a claim upon which relief can be granted because Article V of the Constitution requires constitutional amendments to be ratified within a reasonable time after their proposal. By any measure, the almost half-century that passed between the Equal Rights Amendment's proposal by Congress and purported ratification by Virginia is not reasonable.

#### THIRD DEFENSE

The complaint fails to state a claim upon which relief can be granted because Idaho, Kentucky, Nebraska, South Dakota, and Tennessee validly rescinded their ratifications of the Equal Rights Amendment. Even counting Plaintiffs' "ratifications," then, only 33 States have ratified the Equal Rights Amendment—short of the three-fourths support that Article V requires.

**WHEREFORE**, Intervenors respectfully ask this Court to enter judgment against Plaintiffs.

Dated: February 19, 2020

Respectfully submitted,

STEVE MARSHALL
*Attorney General of Alabama*

 */s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
*Solicitor General*
James W. Davis
*Deputy Attorney General*
A. Barrett Bowdre
*Deputy Solicitor General*
Kelsey J. Curtis
*Assistant Solicitor General*
OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
(334) 353-2196
(334) 353-8400 (fax)
edmund.lacour@AlabamaAG.gov
jim.davis@AlabamaAG.gov
barrett.bowdre@AlabamaAG.gov
kelsey.curtis@AlabamaAG.gov

 */s/ Cameron T. Norris*
Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

Cameron T. Norris
Alexa R. Baltes
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
lexi@consovoymccarthy.com
tiffany@consovoymccarthy.com

JEFF LANDRY
*Attorney General of Louisiana*

 */s/ Elizabeth B. Murrill*
Elizabeth B. Murrill
*Solicitor General of Louisiana*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov

JASON RAVNSBORG
*Attorney General of South Dakota*

 */s/ Paul S. Swedlund*
Paul S. Swedlund
*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
605-773-3215
paul.swedlund@state.sd.us

DOUGLAS J. PETERSON
*Attorney General of Nebraska*

 */s/ James A. Campbell*
James A. Campbell
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF
NEBRASKA
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

HERBERT H. SLATERY III
*Attorney General and Reporter of Tennessee*

 */s/ Andrée S. Blumstein*
Andrée S. Blumstein
*Solicitor General*
OFFICE OF THE TENNESSEE ATTORNEY
GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 741-3492
andree.blumstein@ag.tn.gov

JA 115

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-00242 |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, | ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, and TENNESSEE, | ) ) ) | |
| Intervenor-Defendants. | ) | |

**PLAINTIFF STATES' RESPONSE TO INTERVENORS'
STATEMENT OF MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h), Plaintiff States submit the following response to Intervenors' Statement of Material Facts (Dkt. 74-1).

**PLAINTIFF STATES' RESPONSES**

As to all of Intervenors' assertions, Plaintiff States object that Intervenors failed to attach any materials to support the factual positions in their motion and thus have not carried their burden under Federal Rule of Civil Procedure 56 to "cit[e] to particular parts of materials in the record" to show "that a fact cannot be . . . genuinely disputed." Fed. R. Civ. P. 56(c). Because Intervenors did not submit any documents or other materials for the Court's consideration, the Court does not have a record to review in connection with the Intervenors' Motion for Summary Judgment.

As to Intervenors' individual factual positions, Plaintiff States further object and respond below. Intervenors' assertions are reproduced below, with Plaintiff States' response directly after.

1.     On March 22, 1972, Congress passed a joint resolution "[p]roposing an amendment to the Constitution of the United States relative to equal rights for men and women." H.R.J. Res. 208, 92d Cong., 1st Sess., 86 Stat. 1523 (1972).

**Response:** ADMIT.

2.     The 1972 amendment is more commonly known as the Equal Rights Amendment, or ERA.

**Response:**  ADMIT.

3.     The joint resolution proposing the ERA stated:

> That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:
>
> "ARTICLE —
>
> "SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
> "SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.
> "SEC. 3. This amendment shall take effect two years after the date of ratification."
>
> 86 Stat. 1523.

**Response:**  ADMIT.

4.     The "within seven years" language was added to the ERA because "several influential Members of both Houses objected to its absence."

**Response:**  Paragraph 4 is not relevant to the claim at issue, nor is it necessary to resolve Plaintiff States' entitlement to relief. Subject to that objection, Plaintiff States DENY that "the 'within seven years' language" appears in the Equal Rights Amendment. Further, the cited document, H.R. Rep. 95-1405 (1978), does not support Intervenors' conclusion regarding

JA 117

legislative history, and the document speaks for itself.

5.    Excluding the Twenty-Seventh Amendment, no constitutional amendment has been ratified more than four years after its proposal.

**Response:**  Paragraph 5 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States do not dispute paragraph 5.

6.    Excluding the Twenty-Seventh Amendment, the average time between the proposal and ratification of successful constitutional amendments has been one year, eight months, and seven days.

**Response:**  Paragraph 6 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States do not dispute paragraph 6.

7.    Starting with the Eighteenth Amendment, every congressional proposal for a new constitutional amendment (except the Nineteenth Amendment and the proposed Child Labor Amendment) has included a seven-year ratification deadline.

**Response:**  Paragraph 7 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States DENY paragraph 7. The Twenty-Seventh Amendment did not include a ratification deadline.

8.    The seven-year ratification deadlines for the Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth Amendments appeared in the proposing resolutions but not the text of the proposed amendments themselves.

**Response:**  Paragraph 8 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that

objection, Plaintiff States partially ADMIT paragraph 8. Plaintiff States agree that, like the Equal

Rights Amendment, the Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth

Amendments do not include text regarding a timeframe for their ratification.

9.    Thirty States referenced the ERA's seven-year ratification deadline in their ratification

documents.

**Response:**  Paragraph 9 is not relevant to the claim at issue and has no bearing on whether

Article V's requirements have been satisfied as to the Equal Rights Amendment. Because

Intervenors have not provided Plaintiff States or the Court with copies of these 30 States'

ratification documents, Plaintiff States can neither admit nor deny the asserted fact. Plaintiff States

note that Article V does not authorize States to impose conditions on their ratification of a federal

constitutional amendment.

10.   Seven years from March 22, 1972 is March 22, 1979.

**Response:**  Paragraph 10 is not relevant to the claim at issue and has no bearing on whether

Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that

objection, Plaintiff States do not dispute paragraph 10.

11.   Three-fourths of the States (38 States) did not ratify the ERA before March 22, 1979.

**Response:**  Paragraph 11 is not relevant to the claim at issue and has no bearing on whether

Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to those

objections, Plaintiff States ADMIT in part and DENY in part that paragraph 11 is accurate because

it is imprecise. See Decl. of Michelle S. Kallen (attached to Plaintiff States' Motion for Summary

Judgment) (Kallen Decl.) Ex. 5 (explaining when each of the 38 States ratified the Equal Rights

Amendment, many but not all of which occurred before March 22, 1979).

12.   By March 22, 1979, thirty States had enacted measures to ratify the ERA and had not

enacted measures to rescind their prior ratifications: Alaska, California, Colorado, Connecticut,

Delaware, Hawaii, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota,

Montana, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oregon

Pennsylvania, Rhode Island, Texas, Vermont, Washington, West Virginia, Wisconsin, and

Wyoming.

**Response:**  Paragraph 12 is only partially relevant to the claim at issue, as purported

"measures to rescind" States' "prior ratifications" have no bearing on whether Article V's

requirements have been satisfied as to the Equal Rights Amendment. Subject to those objections,

Plaintiff States partially ADMIT paragraph 12. Plaintiff States agree that, as of March 22, 1979, at

least 30 States had ratified the Equal Rights Amendment because a total of 35 States had ratified at

that time. See Kallen Decl. Ex. 5.

13.   By March 22, 1979, five States had enacted measures to rescind their prior ratifications

of the ERA: Idaho, Kentucky, Nebraska, South Dakota, and Tennessee.

**Response:**  Paragraph 13 is not relevant to the claim at issue and has no bearing on whether

Article V's requirements have been satisfied as to the Equal Rights Amendment. Intervenors have

not provided Plaintiff States or the Court with any materials—let alone admissible evidence—to

support paragraph 13. Subject to those objections, Plaintiff States respond as follows:  Plaintiff

States agree that Idaho, Kentucky, Nebraska, South Dakota, and Tennessee ratified the Equal

Rights Amendment, see Kallen Decl. Ex. 5. Plaintiff States also agree that, after each State's

ratification, some legislative officials in each of these five states took actions to signal

disagreement with their State's prior ratification. The legal and factual circumstances in which

these measures were considered and/or adopted have not been described or proven, and if this

Court deems States' post-ratification actions relevant, Plaintiff States request the opportunity to

pursue discovery on that issue. See Kallen Decl. ¶ 12; see also Fed. R. Civ. P. 56(d).

14.   By March 22, 1979, fifteen States had not enacted measures to ratify the ERA:

Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Louisiana, Mississippi, Missouri, Nevada, North Carolina, Oklahoma, South Carolina, Utah, and Virginia.

**Response:** Paragraph 14 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States ADMIT paragraph 14. After March 22, 1979, however, three additional States (Nevada, Illinois, and Virginia) ratified the Equal Rights Amendment. See Kallen Decl. Ex. 2, 3, 4.

15.  In October 1978, Congress enacted a joint resolution, stating that the ERA "shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States not later than June 30, 1982." H.R.J. Res. 638, 95th Cong., 2d Sess., 92 Stat. 3799 (1978).

**Response:** Paragraph 15 is not relevant to the question of whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States ADMIT paragraph 15. Plaintiff States note that the quoted language in a congressional resolution is inconsistent with the U.S. Constitution, which states that an amendment "shall be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three-fourths of the several States." U.S. Const. art. V.

16.  The 1978 resolution was approved by simple majorities of the House and Senate; it did not obtain two-thirds support in either House.

**Response:** Paragraph 16 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States do not dispute paragraph 16.

17.  In December 1981, a federal district court declared that "Congress' attempted extension of the time for the ratification of the [ERA] was null and void." *Idaho v. Freeman*, 529 F.

Supp. 1107, 1155 (D. Idaho 1981).

**Response:**  Paragraph 17 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Plaintiff States do not dispute that paragraph 17 accurately quotes from the cited decision. But the truth of the statement is a legal conclusion, not a material fact, and the cited decision speaks for itself.

18.   The U.S. Supreme Court agreed to review the district court's judgment in *Freeman*. *See Nat'l Org. for Women, Inc. v. Idaho*, 455 U.S. 918 (1982).

**Response:**  Plaintiff States ADMIT that the Supreme Court of the United States stayed the judgment of the district court in the Idaho litigation pending Supreme Court review.

19.   On June 30, 1982, the Supreme Court had not yet issued a decision in the *Freeman* litigation.

**Response:**  Plaintiff States do not dispute paragraph 19 but object that it is not material to their claim for relief here.

20.   Between March 22, 1979 and June 30, 1982, no additional States ratified the ERA.

**Response:**  Paragraph 20 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States do not dispute paragraph 20.

21.   On July 9, 1982, the government submitted a memorandum suggesting mootness in the *Freeman* litigation, urging the Supreme Court to order the case dismissed because "the extended period for ratifying the [Equal Rights] Amendment expired" and so "the Amendment has failed of adoption."

**Response:**  Paragraph 21 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. The evidence on which Intervenors rely to support paragraph 21 has not been provided to the Court or made part of

the record. If this assertion is properly supported, then the document may speak for itself.

22.    Other parties objected to the suggestion of mootness, stressing that a mootness ruling "would effectively decide the 'antecedent' issue of whether Congress has plenary power and control over the amending process under Article V and thereby determine many of the other issues and policies presented by this case."

**Response:**  Paragraph 22 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. The evidence on which Intervenors rely to support paragraph 22 has not been provided to the Court or made part of the record. If this assertion is properly supported, then the document may speak for itself.

23.    "Upon consideration of the memorandum for the Administrator of General Services suggesting mootness, filed July 9, 1982, and the responses thereto," the Supreme Court "vacated" the district court's judgment and "remanded to that Court with instructions to dismiss the complaints as moot." *Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)).

**Response:**  Paragraph 23 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. The cited decision speaks for itself. Subject to those objections, Plaintiff States partially ADMIT paragraph 23. Plaintiff States agree that the Supreme Court of the United States vacated the judgment of the district court.

24.    Reporting on the Supreme Court's decision, a story by United Press International stated that "[t]he Supreme Court today closed the coffin lid on the 10-year-old Equal Rights Amendment, declaring it legally dead."

**Response:**  Paragraph 24 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. The evidence on

which Intervenors rely to support paragraph 24 has not been provided to the Court or made part of

the record. Plaintiff States DENY that the Supreme Court has ever declared the Equal Rights

Amendment "legally dead." Intervenors' assertion to the contrary is inadmissible hearsay.

25.    When it became clear that the ERA would not be ratified by June 30, 1982, "[l]eaders

of the fight … officially conceded defeat."

    **Response:**  Paragraph 25 is not relevant to the claim at issue and has no bearing on

whether Article V's requirements have been satisfied as to the Equal Rights Amendment. The

evidence on which Intervenors rely to support paragraph 25 has not been provided to the Court or

made part of the record. Intervenors' description of the document suggests it is inadmissible

hearsay. If the cited news stories in paragraph 25 are considered by the Court, then the Court

should also consider other historical sources that dispute this factual assertion.[1] Plaintiff States also

note that, even though advocates and activists have continued their efforts to promote sex equality

in the United States, there is still much work to be done. See, *e.g.*, Paula England et al., *Progress

Toward Gender Equality Has Slowed or Stalled*, 117 Proceedings of the Nat'l Acad. of Sci. 6955,

6990 (2020) ("[T]here has been dramatic progress in movement toward gender equality, but, in

recent decades, change has slowed and on some indicators stalled entirely.").

26.    ERA proponents announced on July 14, 1982 that they would be reintroducing the

ERA in Congress.

    **Response:**  Paragraph 26 is not relevant to the claim at issue and has no bearing on whether

---

    [1] See, *e.g.*, Megan Taylor Shockley, *Creating a Progressive Commonwealth: Women
Activists, Feminism, and the Politics of Social Change in Virginia, 1970s–2000s* 91 (La. St. U.
Press, 2018) (advocates in Virginia waved banners in the 1980s proclaiming "ERA Is Not Dead");
see also Flora Crater, Putting Women in the Constitution, Panel at the National Women's
Conference Committee (Nov. 20, 1987) at 31:00, https://www.c-span.org/video/?523-1/putting-
women-constitution (urging fellow advocates in 1987 to "continue the fight for the Equal Rights
Amendment"); "Laura Carter Callow," Equal Means Equal (last visited Aug. 19, 2020)
https://equalmeansequal.org/laura-carter-callow-bio/.

JA 124

Article V's requirements have been satisfied as to the Equal Rights Amendment. The evidence on which Intervenors rely to support paragraph 26 has not been provided to the Court or made part of the record. If this assertion is properly supported, then the cited document may speak for itself.

27.   ERA proponents assumed they had to "reintroduce [the ERA] fresh and begin from square 1 … go[ing] through the different legislatures all over again." 128 Cong. Rec. 14,925 (1982) (Rep. Schroeder); *see id.* at 14,913 (Rep. Frank: "Should the Congress approve the reintroduced ERA, we will have 7 years to win ratification."); *id.* at 15,558 (Sen. Packwood: "Yesterday, the ratification deadline for the equal rights amendment expired. It is unfortunate, indeed tragic, that the deadline passed with us still three States short of the 38 needed to put the equal rights amendment into our Constitution."); *id.* at 14,913-14 (Rep. Ferraro: "July 14 marks the day of the beginning of a new battle for equal rights."); *accord id.* at 15,559-60 (Sen. Tsongas); *id.* at 15,149 (Rep. Lehman); *id.* at 15,195 (Rep. Kastenmeier); *id.* at 15,560 (Sen. Cranston); *id.* at 15,570 (Sen. Kennedy); *id.* at 15,586 (Sen. Biden).

**Response:**  Paragraph 27 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. The evidence on which Intervenors rely to support paragraph 27 has not been provided to the Court or made part of the record. The cited documents speak for themselves and are not sufficient under Rule 56(c) to "establish the absence . . . of a genuine dispute" as to the truth of the factual assertion in paragraph 27, particularly in light of other historical sources to the contrary. See note 1, *supra*.

28.   Other than the 1972 proposal, Congress never again proposed the ERA to the States.

**Response:**  Paragraph 28 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States do not dispute paragraph 28.

29.   In 1986, in response to a question about the status of the ERA, prominent ERA

supporter Gloria Steinem stated, "Because it was not ratified in the nine years allotted to it, it now has to start the process over again and … be passed by the House and the Senate and go through … all the States' ratification process…. [P]robably something like eight or ten years…."

**Response:**  Paragraph 29 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. The evidence on which Intervenors rely to support paragraph 29 has not been provided to the Court or made part of the record. Intervenors' description of the statement suggests it is inadmissible hearsay.

30.  "[F]ollowing the 1992 ratification of the … 27th Amendment to the Constitution," however, "[t]he three-state strategy for ERA ratification was developed."

**Response:**  Paragraph 30 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. The evidence on which Intervenors rely to support paragraph 30 has not been provided to the Court or made part of the record. Intervenors' description of the statement suggests it is inadmissible hearsay.

31.   The three-state strategy argued that the ERA proposed by Congress in 1972 could still be added to the Constitution if three more States ratified it.

**Response:**  Paragraph 31 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Intervenors cite no evidence to support paragraph 31.

32. On March 22, 2017, the Nevada legislature enacted Senate Joint Resolution 2, titled "Ratifying the proposed amendment to the Constitution of the United States providing that equality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex."

**Response:**  ADMIT.

33.   Nevada enacted Senate Joint Resolution 2 forty-five years after Congress proposed

11

JA 126

the ERA to the States.

**Response:** Paragraph 33 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States do not dispute paragraph 33.

34. On May 30, 2018, the Illinois legislature enacted Senate Joint Resolution Constitutional Amendment No. 4, stating that "the proposed amendment to the Constitution set forth in [H.R.J. Res. 208] is ratified."

**Response:** ADMIT.

35. Illinois enacted Joint Resolution Constitutional Amendment No. 4 more than forty-six years after Congress proposed the ERA to the States.

**Response:** Paragraph 35 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States do not dispute paragraph 35.

36. On January 27, 2020, the Virginia legislature enacted House Joint Resolution 1, titled "Ratifying the Equal Rights Amendment to the Constitution of the United States."

**Response:** ADMIT.

37. Virginia enacted House Resolution 1 nearly forty-eight years after Congress proposed the ERA to the States.

**Response:** Paragraph 37 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that objection, Plaintiff States do not dispute paragraph 37.

38. From 1972 to 2017, the population of the United States grew by more than 100 million people.

**Response:** Paragraph 38 is not relevant to the claim at issue and has no bearing on whether

Article V's requirements have been satisfied as to the Equal Rights Amendment. The evidence on which Intervenors rely to support paragraph 38 has not been provided to the Court or made part of the record. Subject to those objections, Plaintiffs States do not dispute paragraph 38 for the purpose of this motion.

39.   More than half of the Americans alive in 2017 were not alive in 1972.

**Response:**  Paragraph 39 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. The evidence on which Intervenors rely to support paragraph 39 has not been provided to the Court or made part of the record. If this assertion is properly supported, then the cited document may speak for itself.

40.   In anticipation of Virginia's purported ratification, Alabama, Louisiana, and South Dakota sued the Archivist in the U.S. District Court for the Northern District of Alabama on December 16, 2019. *See Alabama v. Ferriero*, Doc. 1, No. 7:19-cv-2032-LSC (N.D. Ala. Dec. 16, 2019).

**Response:**  Paragraph 40 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Because this action has not yet proceeded to discovery, Plaintiff States presently are unable to respond to the characterization in paragraph 40 of the motivations of Alabama, Louisiana, and/or South Dakota for initiating a separate action against the Archivist.

41.   Days later, the Archivist "requested guidance from the Department of Justice's Office of Legal Counsel on legal issues regarding ratification of the ERA." *Statement on Equal Rights Amendment Debate*, Nat'l Archives (Dec. 19, 2019), bit.ly/3iwxu6t.

**Response:**  Paragraph 41 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. If the Court were to deem it relevant, Plaintiff States request discovery from the Archivist before being required to

respond to the timeframe incorporated into paragraph 41. Subject to those objections, Plaintiff

States partially ADMIT paragraph 41. Plaintiff States agree that the Archivist has publicly stated

that he requested guidance from OLC with respect to the Equal Rights Amendment. However, the

Archivist did so as early as December 2018 (not "[d]ays" after Alabama sued in December 2019, as

paragraph 41 asserts). See Kallen Decl. Ex. 9.

42. On January 6, 2020, the Office of Legal Counsel published a formal opinion titled

"Ratification of the Equal Rights Amendment," concluding (among other things) that the ERA

could not be ratified because its congressional deadline had expired. *Ratification of the Equal

Rights Amendment*, 44 Op. OLC (Jan. 6, 2020).

**Response:**  Paragraph 42 is not relevant to the claim at issue and has no bearing on whether

Article V's requirements have been satisfied as to the Equal Rights Amendment. Subject to that

objection, Plaintiff States do not dispute paragraph 42.

43. On January 8, 2020, the Archivist released a statement that he "defers to DOJ on this

issue and will abide by the OLC opinion."

**Response:**  ADMIT. See Kallen Decl. Ex. 6. Plaintiff States also note that the quotation in

paragraph 43 is incomplete. The full sentence reads: "NARA defers to DOJ on this issue and will

abide by the OLC opinion, unless otherwise directed by a final court order." *Id.*

44. Alabama, Louisiana, South Dakota, and the Archivist entered a joint stipulation with

the federal district court in Alabama, where the States agreed to dismiss their case without

prejudice and the Archivist agreed that, "[i]n the event that the Department of Justice ever

concludes that the 1972 ERA Resolution is still pending and that the Archivist therefore has

authority to certify the ERA's adoption under 1 U.S.C. § 106b, the Archivist will make no

certification concerning ratification of the ERA until at least 45 days following the announcement

of the Department of Justice's conclusion, absent a court order compelling him to do so sooner."

*Alabama v. Ferriero*, Doc. 23, No. 7:19-cv-2032- LSC (N.D. Ala. Feb. 27, 2020).

**Response:**  Paragraph 44 is not relevant to the claim at issue and has no bearing on whether Article V's requirements have been satisfied as to the Equal Rights Amendment. Plaintiff States note that the stipulation referenced in paragraph 44 was objected to in the Alabama litigation, and the Court "d[id] not necessarily join or adopt any such stipulations." Order (Dkt. 27) at 2, *Alabama v. Ferriero*, No. 7:19-cv-02032 (N.D. Ala. Mar. 2, 2020).

45.   On March 24, 2020, the Archivist published an updated list of the States' ratification actions on the ERA, representing that the ratifications of Illinois, Nevada, and Virginia are invalid because they "occurred after Congress's deadline expired." *Archivist's List* (citing *Ratification of the Equal Rights Amendment*, 44 Op. OLC (Jan. 6, 2020)).

**Response:**  Plaintiff States ADMIT that the Archivist published a list of State's ratifications on the ERA in March 2020, but DENY the remainder of paragraph 45 including Intervenors' characterization of the list and any conclusion that the Plaintiff States' ratifications were invalid. The seven-year timeframe is not included in the operative text of the Equal Rights Amendment and thus does not nullify the Plaintiff States' ratifications. The cited document speaks for itself. See Kallen Decl. Ex. 5.

### PLAINTIFF STATES' STATEMENT OF DISPUTED MATERIAL FACTS

In addition to the disputes noted above, Plaintiff States further contend that the following disputed issues of fact preclude summary judgment in favor of Intervenors.[2]

---

[2] As Plaintiff States explain in their own motion for summary judgment, also filed today, they are entitled to judgment as a matter of law because (among other reasons) Article V does not permit "rescission" of a State's ratification. Accordingly, the Court need not reach Intervenors' motion or the question of what discovery is necessary. To the extent the Court disagrees and holds that States *do* have federal constitutional authority to rescind, Plaintiff States respectfully request an opportunity to conduct discovery, including but not limited to discovery with respect to Intervenor States and non-party States as to the procedures relevant to each State's purported rescission process and the circumstances surrounding each purported rescission of the ERA.

1.      The purported rescissions of ratifications of the Equal Rights Amendment were not "validly" adopted. Compare Intervenors' SMF ¶ 13 (citing no evidence regarding the purported rescissions or the circumstances in which they were adopted), with U.S. Const. art. V (describing an amendment as valid "when ratified" by State legislatures, and not considering post-ratification actions).

2.      Procedural irregularities with respect to the purported rescissions call the validity of States' measures into question, demonstrating the need for further factual development on this question should the Court reach the issue. See, *e.g.*, Pls.' Mem. in Opp. to Intervenors' Mot. for Summ. J. at 24–25 (describing purported veto of Kentucky's rescission resolution and questionable sunset provision in South Dakota); Kallen Decl. Ex. 8.

3.      None of the circumstances surrounding any of the purported rescissions have been described—much less proven—and to the extent relevant under the Court's rulings in this matter, Plaintiff States request the opportunity to pursue discovery as appropriate. See Kallen Decl. ¶ 12; see also Pls.' Resp. ¶ 13; Fed. R. Civ. P. 56(d).

Dated: August 19, 2020

Respectfully submitted,

COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA

KWAME RAOUL
Attorney General of Illinois

By: */s/ Kathryn Hunt Muse*
KATHRYN HUNT MUSE
CHRISTOPHER WELLS
ELIZABETH ROBERSON-YOUNG
Office of the Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3000 – Telephone
(312) 814-5024 – Facsimile
kmuse@atg.state.il.us
cwells@atg.state.il.us
erobersonyoung@atg.state.il.us

*Attorneys for Plaintiff*
*State of Illinois*

MARK R. HERRING
Attorney General of Virginia

By: */s/ Michelle S. Kallen*
MICHELLE S. KALLEN [1030497]
TOBY J. HEYTENS [490314]
MARTINE E. CICCONI [219373]
JESSICA MERRY SAMUELS [1552258]
ZACHARY R. GLUBIAK
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
mkallen@oag.state.va.us

*Attorneys for Plaintiff*
*Commonwealth of Virginia*

AARON D. FORD
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
HEIDI PARRY STERN
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

*Attorneys for Plaintiff*
*State of Nevada*

17

JA 132

## CERTIFICATE OF SERVICE

Pursuant to Local Civil Rule 5.4(d), I hereby certify that on August 19, 2020 I will file this document electronically through the Court's CM/ECF system, which will effect service on all counsel who have appeared.


_/s/ Michelle S. Kallen_
Michelle S. Kallen

*Counsel for Plaintiff*
*Commonwealth of Virginia*

JA 133

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:20-cv-00242 |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, | ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, and TENNESSEE, | ) ) ) | |
| Intervenor-Defendants. | ) ) | |

**PLAINTIFF STATES' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h), Plaintiff States submit the following statement of

material facts as to which there is no genuine dispute. On the basis of these facts, Plaintiff States

are entitled to judgment as a matter of law under Federal Rule of Procedure 56.

1.     In 1972, Congress proposed adding the following language—known as the Equal

Rights Amendment—to the United States Constitution:

"SECTION 1. Equality of rights under the law shall not be denied or
abridged by the United States or by any State on account of sex.
"SEC. 2. The Congress shall have the power to enforce, by appropriate
legislation, the provisions of this article.
"SEC. 3. This amendment shall take effect two years after the date of
ratification."

Once Congress voted to propose the Equal Rights Amendment, it was submitted to the States for

ratification pursuant to Article V. See Decl. of Michelle S. Kallen (attached to Plaintiff States' Mot.

for Summ. J.) (Kallen Decl.) Ex. 1; see also Answer of Intervenor-Defendants (Dkt. 35) ¶¶ 27–30.

1

JA 134

2.      Since before 1972, there have been fifty States. Article V's description of "three-fourths of the several States" therefore has meant 38 States.

3.      By the end of 1977, 35 States had ratified the Equal Rights Amendment as proposed by Congress: Hawai'i, New Hampshire, Delaware, Iowa, Idaho, Kansas, Nebraska, Texas, Tennessee, Alaska, Rhode Island, New Jersey, Colorado, West Virginia, Wisconsin, New York, Michigan, Maryland, Massachusetts, Kentucky, Pennsylvania, California, Wyoming, South Dakota, Oregon, Minnesota, New Mexico, Vermont, Connecticut, Washington, Maine, Montana, Ohio, North Dakota, and Indiana. See Kallen Decl. Ex. 5 (listing dates of State ratifications); see also Answer of Intervenor-Defendants (Dkt. 35) ¶ 31 (admitting that 35 states had ratified the Equal Rights Amendment by 1978, including Idaho, Kentucky, Nebraska, Tennessee, and South Dakota).

4.      In or before 1978, the National Archives and Records Administration received official notice from each of the 35 States that had ratified the Equal Rights Amendment of their State legislature's ratification of the amendment. See Kallen Decl. Ex. 5.

5.      In 2017, Nevada ratified the Equal Rights Amendment. See Kallen Decl. Ex. 2.

6.      In 2017, the National Archives and Records Administration received official notice of the Nevada legislature's ratification. See Kallen Decl. Ex. 2, 5.

7.      In 2018, Illinois ratified the Equal Rights Amendment. See Kallen Decl. Ex. 3.

8.      In 2018, the National Archives and Records Administration received official notice of the Illinois legislature's ratification. See Kallen Decl. Ex. 3, 5.

9.      On January 8, 2020, the National Archives and Records Administration announced that the Archivist will refuse to publish the Equal Rights Amendment absent a final court order. See Kallen Decl. Ex. 6.

10.     On January 27, 2020, Virginia ratified the Equal Rights Amendment. See Kallen Decl. Ex. 4.

11.     On or around January 28, 2020, the National Archives and Records Administration received official notice of the Virginia legislature's ratification. See Kallen Decl. Ex. 4, 5.

12.     For the only amendment that was adopted between 1985 and 2019, the Archivist caused the amendment to be published (with his certificate) after he received official notice that the proposed amendment had been adopted according to the provisions of the Constitution. In so doing, the Archivist specified that the amendment had become valid as part of the Constitution of the United States. See Kallen Decl. Ex. 7.

13.     When Plaintiff States filed their Complaint on January 30, 2020, the Archivist had not published or certified the Equal Rights Amendment. See Kallen Decl. Ex. 5; Answer of Intervenor-Defendants (Dkt. 35) ¶ 62.

14.     As of August 19, 2020, the Archivist has not published or certified the Equal Rights Amendment as part of the U.S. Constitution, and he continues to refuse to do so unless directed by a final court order. See Kallen Decl. Ex. 5, 6.

JA 136

Dated: August 19, 2020                    Respectfully submitted,


                                          COMMONWEALTH OF VIRGINIA, STATE OF
                                          ILLINOIS, and STATE OF NEVADA


KWAME RAOUL                               MARK R. HERRING
Attorney General of Illinois              Attorney General of Virginia


  By:  */s/ Kathryn Hunt Muse*_____        By:  */s/ Michelle S. Kallen*_____
KATHRYN HUNT MUSE                         MICHELLE S. KALLEN [1030497]
CHRISTOPHER WELLS                         TOBY J. HEYTENS [490314]
ELIZABETH ROBERSON-YOUNG                  MARTINE E. CICCONI [219373]
Office of the Attorney General            JESSICA MERRY SAMUELS [1552258]
100 West Randolph Street                  ZACHARY R. GLUBIAK
Chicago, Illinois 60601                   Office of the Attorney General
(312) 814-3000 – Telephone                202 North Ninth Street
(312) 814-5024 – Facsimile                Richmond, Virginia 23219
kmuse@atg.state.il.us                     (804) 786-7240 – Telephone
cwells@atg.state.il.us                    (804) 371-0200 – Facsimile
erobersonyoung@atg.state.il.us            mkallen@oag.state.va.us


*Attorneys for Plaintiff*                   *Attorneys for Plaintiff*
*State of Illinois*                         *Commonwealth of Virginia*


AARON D. FORD
Attorney General of Nevada


  By:  */s/ Heidi Parry Stern*_____
HEIDI PARRY STERN
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov


*Attorneys for Plaintiff*
*State of Nevada*

JA 137

## **CERTIFICATE OF SERVICE**

Pursuant to Local Civil Rule 5.4(d), I hereby certify that on August 19, 2020 I will file this document electronically through the Court's CM/ECF system, which will effect service on all counsel who have appeared.


$\qquad$ */s/ Michelle S. Kallen* $\qquad$
Michelle S. Kallen

*Counsel for Plaintiff*
*Commonwealth of Virginia*

5

JA 138

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-00242 |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States, | ) ) ) | |
| Defendant, and | ) ) ) | |
| ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, and TENNESSEE, | ) ) ) | |
| Intervenor-Defendants. | ) | |

**DECLARATION OF MICHELLE S. KALLEN**

I, Michelle S. Kallen, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am Deputy Solicitor General in the Office of the Virginia Attorney General. I am a member in good standing of the bars of Virginia, the District of Columbia, and California. I am admitted to practice in this Court.

2.      I have compiled the information set forth below as well as the attached exhibits through personal knowledge and legislative and executive personnel who have assisted me in gathering this information and these materials. I make this declaration to place certain information and documents before in the Court in connection with the parties' cross-motions for summary judgment.

3.      Attached as Exhibit 1 is a copy of House Joint Resolution 208 from the Second Session of the 92nd Congress of the United States of America, obtained online from the National Archives Catalog on August 5, 2020 at https://catalog.archives.gov/id/7455549. The title of the

document in the Catalog is: "Joint Resolution of March 22, 1972, 86 STAT 1523, Proposing an Amendment to the Constitution of the United States Relative to Equal Rights for Men and Women." The PDF version of the attached document is available (as of August 5, 2020) at https://catalog.archives.gov/OpaAPI/media/7455549/content/arcmedia/rediscovery/04841-2013.pdf.

4.      Attached as Exhibit 2 is a copy of the letter (and enclosure) transmitted to David Ferriero, Archivist of the United States of America, from Claire J. Clift, Secretary of the Senate of the Legislature of the State of Nevada, dated March 22, 2017, providing "official notice that the Legislature of the State of Nevada . . . ratified the proposed amendment to the Constitution of the United States of America which was proposed by . . . House Joint Resolution No. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972), and which is more commonly known as the federal Equal Rights Amendment." The letter "enclosed a certified and duly authenticated copy of "Senate Joint Resolution No. 2 of the 79th Session of the Legislature of the State of Nevada." Certified copies of the documents in Exhibit 2 were obtained from the Nevada Legislature through its Legislative Counsel Bureau's Research Division, which is tasked with maintaining a research library. NEV. R. STAT. § 218F.810(7).

5.      Attached as Exhibit 3 is a copy of the letter (and enclosure) transmitted to David Ferriero, Archivist of the United States, from Jesse White, Secretary of State of the State of Illinois, dated June 15, 2018, "forwarding herewith a copy of the Senate Joint Resolution Constitutional Amendment No. 4, which was passed by the Illinois General Assembly on May 30, 2018." The letter noted that the enclosed document "represents ratification by the State of Illinois of the Equal Rights Amendment as passed by both houses of the 92nd Congress of the United States of America at its Second Session." The documents in Exhibit 3 were obtained from the Index Department of the Illinois Secretary of State on January 13, 2020.

6.      Attached as Exhibit 4 is a copy of the letter (and enclosures) transmitted to David

Ferriero, National Archivist, from Susan Clarke Schaar, Clerk of the Senate of Virginia, and

Suzette Denslow, Clerk of the Virginia House of Delegates, dated January 27, 2020, noting

"Virginia's ratification of the Equal Rights Amendment to the Constitution of the United States"

and "includ[ing] . . . a copy of" Virginia's ratification documents: House Joint Resolution No. 1

and Senate Joint Resolution No. 1, which were both passed by the Virginia General Assembly on

January 27, 2020. The documents in Exhibit 4 were obtained from the Clerk of the Virginia House

of Delegates by email on January 27, 2020.

7.      Attached as Exhibit 5 is copy of a document entitled "Equal Rights Amendment –

Proposed March 22, 1972: List of State Ratification Actions" dated March 24, 2020, obtained

online from the U.S. National Archives and Records Administration on August 5, 2020 at

https://www.archives.gov/foia/records-related-equal-rights-amendment. According to the National

Archives website, the attached document is "an updated list of state ratification actions with respect

to the Equal Rights Amendment, which was proposed by Congress in 1972." The PDF version of

the attached document is available (as of August 5, 2020) at https://www.archives.gov/files/foia/

pdf/era-list-of-state-ratification-actions-03-24-2020.pdf.

8.      Attached as Exhibit 6 is a copy of "NARA Press Statement on the Equal Rights

Amendment," dated January 8, 2020, obtained online from the U.S. National Archives and Records

Administration on August 6, 2020 at https://www.archives.gov/press/press-releases-4.

9.      Attached as Exhibit 7 is a copy of the Archivist's Certification of the 27th

Amendment, dated May 18, 1992, obtained online from the National Archives Catalog on August

5, 2020 at https://catalog.archives.gov/id/1512313. The PDF version of the attached document is

available (as of August 5, 2020) at https://catalog.archives.gov/OpaAPI/media/1512313/content/

arcmedia/Public_Vaults/09616.pdf.

JA 141

10.     Attached as Exhibit 8 is a copy of a news article from The New York Times published March 21, 1978, entitled "Acting Governor Vetoes Kentucky Rights Reversal." This document was obtained online from The New York Times on August 5, 2020 at https://www.nytimes.com/1978/03/21/archives/around-the-nation-acting-governor-vetoes-kentucky-rights-reversal.html. The PDF version of the attached document is available (as of August 5, 2020) at https://timesmachine.nytimes.com/timesmachine/1978/03/21/110810420.pdf?pdf_redirect=true&ip=0.

11.     Attached as Exhibit 9 is a copy of a letter from Gary M. Stern, General Counsel of the National Archives, to Steven A. Engel, Assistant Attorney General at the United States Department of Justice, dated December 12, 2018. This document was obtained online from the U.S. National Archives and Records Administration on August 6, 2020 at https://www.archives.gov/press/press-releases-4. The PDF version of the attached document is available (as of August 6, 2020) at https://www.archives.gov/files/press/press-releases/2020/olc-letter-re-era-ratification-12-12-2018.pdf.

12.     Should the Court conclude that, as a matter of law, States may be able to validly rescind prior ratifications of federal constitutional amendments—and Plaintiff States set forth in their pleading and briefs why the Court should conclude that they cannot, see Pls.' Mem. in Opp. to Intervenors' Mot. for Summ. J. (Dkt. 99) at 16–27—Plaintiff States request discovery regarding the circumstances surrounding the purported rescissions relied upon by Intervenors. The record includes no evidence that would permit the Court to evaluate, much less conclusively determine, whether any of the legislatures of the 38 ratifying States properly rescinded their prior ratification in compliance with state and federal law. Accordingly, pursuant to Federal Rule of Civil Procedure 56(d), Plaintiff States request the opportunity to conduct discovery as necessary and appropriate before summary judgment is granted in favor of Intervenors on that basis. Plaintiff States note that

4

JA 142

this Court need not answer the question of whether the purported rescissions are valid to rule in favor of the Plaintiff States because, as Plaintiff States argue, the United States Constitution does not permit rescissions of prior ratifications.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on August 19, 2020 in Richmond, Virginia.

_____
Michelle S. Kallen

# Exhibit 1

H. J. Res. 208

# Ninety-second Congress of the United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Tuesday, the eighteenth day of January,
one thousand nine hundred and seventy-two*

## Joint Resolution

Proposing an amendment to the Constitution of the United States relative to
equal rights for men and women.

*Resolved by the Senate and House of Representatives of the United
States of America in Congress assembled* (*two-thirds of each House
concurring therein*), That the following article is proposed as an
amendment to the Constitution of the United States, which shall be
valid to all intents and purposes as part of the Constitution when rati-
fied by the legislatures of three-fourths of the several States within
seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1. Equality of rights under the law shall not be denied or
abridged by the United States or by any State on account of sex.
"SEC. 2. The Congress shall have the power to enforce, by appropri-
ate legislation, the provisions of this article.
"SEC. 3. This amendment shall take effect two years after the date
of ratification."

*Carl Albert*

*Speaker of the House of Representatives.*

*Vice President of the United States and
President of the Senate pro Tempore.*

JA 145

I certify that this Joint Resolution originated in the House of Representatives.

W. Pat Jennings

*Clerk.*

By W. Raymond Colley

# Exhibit 2



# Nevada State Senate

March 22, 2017

David S. Ferriero
Archivist of the United States of America
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Ferriero:

Pursuant to Article V of the Constitution of the United States of America and the laws of the United States enacted thereto, 1 U.S.C. §§ 106b and 112, I have enclosed a certified and duly authenticated copy of Senate Joint Resolution No. 2 of the 79th Session of the Legislature of the State of Nevada, which serves as official notice that the Legislature of the State of Nevada, lawfully convened in its 79th Session which commenced on February 6, 2017, pursuant to Article 4, Section 2 of the Constitution of the State of Nevada, and acting through its Senate and Assembly, ratified the proposed amendment to the Constitution of the United States of America which was proposed by both houses of the 92nd Congress of the United States of America, by a constitutional majority of two-thirds, House Joint Resolution No. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972), and which is more commonly known as the federal Equal Rights Amendment.

Sincerely,

Claire J. Clift
Secretary of the Senate of the
Legislature of the State of Nevada

Encl.
Senate Joint Resolution No. 2 of the 79th Session of the
Legislature of the State of Nevada

**LEGISLATIVE COUNSEL BUREAU
RESEARCH LIBRARY**

As the designated custodian of various records of the Nevada Legislature, I hereby certify that this is a true and correct copy of the document maintained in the Research Library.

Dated this _____ day of _____, 20___

TERESA WILT, Legislative Librarian

By. _____

JA 148

File Number _____

## SENATE JOINT RESOLUTION NO. 2

_____
*President of the Senate*

_____
*Secretary of the Senate*

_____
*Speaker of the Assembly*

_____
*Chief Clerk of the Assembly*

STATE OF NEVADA

*OFFICE OF SECRETARY OF STATE*

## RECEIVED AND FILED

Date _____

Hour _____

_____
*Secretary of State*

By _____
*Receiving Clerk*

(NSPO t 09)

Senate Joint Resolution No. 2–Senators Spearman, Cancela, Cannizzaro, Ratti, Woodhouse; Atkinson, Denis, Farley, Ford, Manendo, Parks and Segerblom

Joint Sponsors: Assemblymen Araujo, Bilbray-Axelrod, Brooks, Bustamante Adams, Carlton, Carrillo, Cohen, Diaz, Frierson, Jauregui, Joiner, Miller, Monroe-Moreno, Ohrenschall, Spiegel, Sprinkle and Yeager

FILE NUMBER..........

SENATE JOINT RESOLUTION—Ratifying the proposed amendment to the Constitution of the United States providing that equality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex.

**Legislative Counsel's Digest:**
    Under Article V of the United States Constitution, Congress has the power to propose an amendment to the federal Constitution and to determine the mode of ratification. (U.S. Const. Art. V) In 1972, Congress passed the Equal Rights Amendment and sent it to the states for ratification, imposing a 7-year time limit for ratification in the resolving clause of the Amendment, but later extended this time limit to June 30, 1982. The Equal Rights Amendment was ratified by 35 states before the deadline. Under *Coleman v. Miller*, 307 U.S. 433, 450, 456 (1939), the United States Supreme Court held that, as a political question, Congress may determine whether an amendment is valid because ratifications of the amendment are made within a reasonable period of time, even after the deadline. This resolution ratifies the Equal Rights Amendment, which provides for equality of rights under the law regardless of sex.

WHEREAS, Both houses of the 92nd Congress of the United States of America, by a constitutional majority of two-thirds, adopted the following resolution proposing to amend the United States Constitution:

RESOLVED BY THE SENATE AND HOUSE OF REPRESENTATIVES OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED (TWO-THIRDS OF EACH HOUSE CONCURRING THEREIN), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:



79th Session (2017)

– 2 –

ARTICLE.......

Section 1.   Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

Section 2.   The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

Section 3.   This amendment shall take effect two years after the date of ratification; and

WHEREAS, The 95th Congress of the United States amended the resolution of the 92nd Congress to extend the time for ratification to June 30, 1982, thereby indicating its continued support of the amendment; and

WHEREAS, The Congress of the United States adopted the 27th Amendment to the Constitution of the United States, which was proposed in 1789 by our First Congress but not ratified by three-fourths of the States until May 7, 1992, and, on May 18, 1992, certified as the 27th Amendment; and

WHEREAS, The restricting time limit for ratification of the Equal Rights Amendment is in the resolving clause and is not part of the amendment which was proposed by Congress and which has already been ratified by 35 states; and

WHEREAS, Having passed a time extension for the Equal Rights Amendment on October 20, 1978, Congress demonstrated that a time limit in a resolving clause may be disregarded if it is not part of the proposed amendment; and

WHEREAS, The United States Supreme Court in *Coleman v. Miller*, 307 U.S. 433 (1939), recognized that Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social and economic factors affecting the nation and to be aware of the importance to the nation of the proposed amendment; and

WHEREAS, If an amendment to the Constitution of the United States has been proposed by two-thirds of both houses of Congress and ratified by three-fourths of the state legislatures, it is for Congress, under the principles of *Coleman v. Miller*, to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself; and

WHEREAS, The Legislature of the State of Nevada finds that the proposed amendment is meaningful and needed as part of the Constitution of the United States and that the present political, social and economic conditions demonstrate that constitutional equality for



79th Session (2017)

JA 151

– 3 –

women and men continues to be a timely issue in the United States; now, therefore, be it

RESOLVED BY THE SENATE AND ASSEMBLY OF THE STATE OF NEVADA, JOINTLY, That the proposed amendment to the Constitution of the United States of America is hereby ratified by the Legislature of the State of Nevada; and be it further

RESOLVED, That the Secretary of the Senate shall prepare and transmit a copy of this resolution to the Secretary of State who shall keep it as a true record of the official acts of the Legislative Department of the State Government pursuant to Section 20 of Article 5 of the Nevada Constitution; and be it further

RESOLVED, That the Secretary of the Senate shall prepare and transmit a certified copy of this resolution, duly authenticated, to the Archivist of the United States at the National Archives and Records Administration pursuant to 1 U.S.C. §§ 106b and 112, which shall serve as official notice that the proposed amendment to the Constitution of the United States of America is hereby ratified by the Legislature of the State of Nevada; and be it further

RESOLVED, That the Secretary of the Senate shall prepare and transmit a copy of this resolution to the Vice President of the United States as the presiding officer of the United States Senate, the Speaker of the House of Representatives and each member of the Nevada Congressional Delegation; and be it further

RESOLVED, That this resolution becomes effective upon passage.

20  17



79th Session (2017)

JA 152

# Exhibit 3



# OFFICE OF THE SECRETARY OF STATE

**JESSE WHITE** • Secretary of State

June 15, 2018

David S. Ferriero
Archivist of the United States
National Archives and Records Administration
8601 Adelphi Road
College Park, MD  20740-6001

Dear Mr. Ferriero:

This office is forwarding herewith a copy of the **Senate Joint Resolution Constitutional Amendment No.** 4, which was passed by the Illinois General Assembly on May 30, 2018.   Said Amendment represents ratification by the State of Illinois of the Equal Rights Amendment as passed by both houses of the 92nd Congress of the United States of America at its Second Session.

Yours truly,

JESSE WHITE
Secretary of State

Index Department, Secretary of State
111 East Monroe, Springfield, Illinois 62756
(217) 782-7017



**State of Illinois**
**Executive Department**

# CERTIFICATE

## To All To Whom These Presents Shall Come, Greeting:

I, JESSE WHITE, Secretary of State of the State of Illinois, do hereby certify that the attached is a true copy of **Senate Joint Resolution Constitutional Amendment No. 4**, which was passed by the Illinois General Assembly on May 30, 2018. Said amendment represents ratification by the State of Illinois of the Equal Rights Amendment as passed by both houses of the 92nd Congress of the United States of America at its Second Session.

IN TESTIMONY WHEREOF, I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois. Done at the City of Springfield,

**June 15, 2018.**





SECRETARY OF STATE

JA 155

10000SC0004ENR                           LRB100 08663 HEP 18798 e


*STATE OF ILLINOIS*
*ONE HUNDREDTH GENERAL ASSEMBLY*
*SENATE*

*Senate Joint Resolution*
*Constitutional Amendment No. 4*

*Offered by Senators Steans, Martinez, Bennett, Lightford,*
*Biss, Murphy, Castro, Bush, Manar, Holmes, Hutchinson,*
*Morrison and Harmon; Senator J. Cullerton, President of the*
*Senate; and Senators Van Pelt, Aquino, Raoul, Collins,*
*Bertino-Tarrant, T. Cullerton, Koehler, Harris, Hunter, Sims,*
*Landek, Stadelman, Sandoval, Hastings and Muñoz*


*WHEREAS, The Ninety-second Congress of the United States of*
*America, at its Second Session, in both houses, by a*
*constitutional majority of two-thirds, adopted the following*
*proposition to amend the Constitution of the United States of*
*America:*

*"JOINT RESOLUTION*

*RESOLVED BY THE HOUSE OF REPRESENTATIVES AND SENATE OF THE*
*UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED (TWO-THIRDS OF*
*EACH HOUSE CONCURRING THEREIN), That the following article is*
*proposed as an amendment to the Constitution of the United*
*States, which shall be valid to all intents and purposes as a*
*part of the Constitution when ratified by the legislatures of*
*three-fourths of the several States within seven years from the*
*date of its submission by the Congress:*

*"ARTICLE _____*

*10000SC0004ENR*        *-2-*        *LRB100 08663 HEP 18798 e*

*Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.*

*Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.*

*Section 3. This amendment shall take effect two years after the date of ratification.""; and*

*WHEREAS, A Joint Resolution is a resolution adopted by both houses of the General Assembly and does not require the signature of the Governor; a Joint Resolution is sufficient for Illinois' ratification of an amendment to the United States Constitution; and*

*WHEREAS, The United States Congress has recently adopted the 27th Amendment to the Constitution of the United States, the so-called Madison Amendment, relating to Compensation of Members of Congress; this amendment was proposed 203 years earlier by our First Congress and only recently ratified by three-fourths of the States; the United States Archivist certified the 27th Amendment on May 18, 1992; and*

*WHEREAS, The founders of our nation, James Madison included, did not favor further restrictions to Article V of the Constitution of the United States, the amending procedure; the United States Constitution is harder to amend than any other constitution in history; and*

*WHEREAS, The restricting time limit for the Equal Rights Amendment ratification is in the resolving clause and is not a part of the amendment proposed by Congress and already ratified by 35 states; and*

JA 157

10000SC0004ENR            -3-            LRB100 08663 HEP 18798 e

WHEREAS, Having passed a time extension for the Equal Rights Amendment on October 20, 1978, Congress has demonstrated that a time limit in a resolving clause can be disregarded if it is not a part of the proposed amendment; and

WHEREAS, The United States Supreme Court in _Coleman v. Miller_, 307 U.S. 433, at 456 (1939), recognized that Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social, and economic factors affecting the nation, and to be aware of the importance to the nation of the proposed amendment; and

WHEREAS, If an amendment to the Constitution of the United States has been proposed by two-thirds of both houses of Congress and ratified by three-fourths of the state legislatures, it is for Congress under the principles of _Coleman v. Miller_ to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself; and

WHEREAS, Constitutional equality for women and men continues to be timely in the United States and worldwide, and a number of other nations have achieved constitutional equality for their women and men; therefore, be it

RESOLVED, BY THE SENATE OF THE ONE HUNDREDTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, THE HOUSE OF REPRESENTATIVES CONCURRING HEREIN, that the proposed amendment to the Constitution of the United States of America set forth in this resolution is ratified; and be it further

RESOLVED, That a certified copy of this resolution be forwarded to the Archivist of the United States, the President

JA 158

10000SC0004ENR            -4-            LRB100 08663 HEP 18798 e

pro tempore of the Senate and the Speaker of the House of
Representatives of the Congress of the United States, and each
member of the Illinois congressional delegation.

    Adopted by the Senate, April 11, 2018.


                                    _John J. Cullerton_
                                    President of the Senate


_Th_
Secretary of the Senate




    Concurred in by the House of Representatives, May 30,
2018.


                                    _Michael J. Madigan_
                                    Speaker of the House of
                                    Representatives


_Bradley J. Bolin_
Assistant Clerk of the
House of Representatives

                                    FILED
                                    INDEX DEPARTMENT
                                    JUN 1 4 2018
                                    IN THE OFFICE OF
                                    SECRETARY OF STATE

JA 159

MH0719

A message from the House by
Mr. Mapes, Clerk:
Mr. President  --  I am directed to inform the Senate that
the House of Representatives has concurred with the Senate in the
adoption of the following joint resolution constitutional
amendment, to-wit:

SENATE JOINT RESOLUTION
CONSTITUTIONAL AMENDMENT 4

10000SC0004 Engrossed

WHEREAS, The Ninety-second Congress of the United States of America,
at its Second Session, in both houses, by a constitutional majority of
two-thirds, adopted the following proposition to amend the Constitution of
the United States of America:

"JOINT RESOLUTION
RESOLVED BY THE HOUSE OF REPRESENTATIVES AND SENATE OF THE UNITED
STATES OF AMERICA IN CONGRESS ASSEMBLED (TWO-THIRDS OF EACH HOUSE
CONCURRING THEREIN), That the following article is proposed as an
amendment to the Constitution of the United States, which shall be valid
to all intents and purposes as a part of the Constitution when ratified by
the legislatures of three-fourths of the several States within seven years
from the date of its submission by the Congress:

"ARTICLE _____
Section 1. Equality of rights under the law shall not be denied or
abridged by the United States or by any State on account of sex.
Section 2. The Congress shall have the power to enforce, by
appropriate legislation, the provisions of this article.
Section 3. This amendment shall take effect two years after the date
of ratification.""; and

WHEREAS, A Joint Resolution is a resolution adopted by both houses of
the General Assembly and does not require the signature of the Governor; a
Joint Resolution is sufficient for Illinois' ratification of an amendment
to the United States Constitution; and

WHEREAS, The United States Congress has recently adopted the 27th
Amendment to the Constitution of the United States, the so-called Madison
Amendment, relating to Compensation of Members of Congress; this amendment
was proposed 203 years earlier by our First Congress and only recently
ratified by three-fourths of the States; the United States Archivist
certified the 27th Amendment on May 18, 1992; and

WHEREAS, The founders of our nation, James Madison included, did not
favor further restrictions to Article V of the Constitution of the United
States, the amending procedure; the United States Constitution is harder
to amend than any other constitution in history; and

JA 160

WHEREAS, The restricting time limit for the Equal Rights Amendment ratification is in the resolving clause and is not a part of the amendment proposed by Congress and already ratified by 35 states; and

WHEREAS, Having passed a time extension for the Equal Rights Amendment on October 20, 1978, Congress has demonstrated that a time limit in a resolving clause can be disregarded if it is not a part of the proposed amendment; and

WHEREAS, The United States Supreme Court in Coleman v. Miller, 307 U.S. 433, at 456 (1939), recognized that Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social, and economic factors affecting the nation, and to be aware of the importance to the nation of the proposed amendment; and

WHEREAS, If an amendment to the Constitution of the United States has been proposed by two-thirds of both houses of Congress and ratified by three-fourths of the state legislatures, it is for Congress under the principles of Coleman v. Miller to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself; and

WHEREAS, Constitutional equality for women and men continues to be timely in the United States and worldwide, and a number of other nations have achieved constitutional equality for their women and men; therefore, be it

RESOLVED, BY THE SENATE OF THE ONE HUNDREDTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, THE HOUSE OF REPRESENTATIVES CONCURRING HEREIN, that the proposed amendment to the Constitution of the United States of America set forth in this resolution is ratified; and be it further

RESOLVED, That a certified copy of this resolution be forwarded to the Archivist of the United States, the President pro tempore of the Senate and the Speaker of the House of Representatives of the Congress of the United States, and each member of the Illinois congressional delegation.

Concurred in by the House, May 30, 2018.

TIMOTHY D. MAPES, Clerk of the House

JA 161

10000SC0004ENR                           LRB100 08663 HEP 18798 e

STATE OF ILLINOIS
ONE HUNDREDTH GENERAL ASSEMBLY
SENATE

Senate Joint Resolution
Constitutional Amendment No. 4

Offered by Senators Steans, Martinez, Bennett, Lightford,
Biss, Murphy, Castro, Bush, Manar, Holmes, Hutchinson,
Morrison and Harmon; Senator J. Cullerton, President of the
Senate; and Senators Van Pelt, Aquino, Raoul, Collins,
Bertino-Tarrant, T. Cullerton, Koehler, Harris, Hunter, Sims,
Landek, Stadelman, Sandoval, Hastings and Muñoz

WHEREAS, The Ninety-second Congress of the United States of
America, at its Second Session, in both houses, by a
constitutional majority of two-thirds, adopted the following
proposition to amend the Constitution of the United States of
America:

"JOINT RESOLUTION

RESOLVED BY THE HOUSE OF REPRESENTATIVES AND SENATE OF THE
UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED (TWO-THIRDS OF
EACH HOUSE CONCURRING THEREIN), That the following article is
proposed as an amendment to the Constitution of the United
States, which shall be valid to all intents and purposes as a
part of the Constitution when ratified by the legislatures of
three-fourths of the several States within seven years from the
date of its submission by the Congress:

"ARTICLE _____

JA 162

*10000SC0004ENR*      *-2-*      *LRB100 08663 HEP 18798 e*

*Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.*
*Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.*
*Section 3. This amendment shall take effect two years after the date of ratification.""; and*

*WHEREAS, A Joint Resolution is a resolution adopted by both houses of the General Assembly and does not require the signature of the Governor; a Joint Resolution is sufficient for Illinois' ratification of an amendment to the United States Constitution; and*

*WHEREAS, The United States Congress has recently adopted the 27th Amendment to the Constitution of the United States, the so-called Madison Amendment, relating to Compensation of Members of Congress; this amendment was proposed 203 years earlier by our First Congress and only recently ratified by three-fourths of the States; the United States Archivist certified the 27th Amendment on May 18, 1992; and*

*WHEREAS, The founders of our nation, James Madison included, did not favor further restrictions to Article V of the Constitution of the United States, the amending procedure; the United States Constitution is harder to amend than any other constitution in history; and*

*WHEREAS, The restricting time limit for the Equal Rights Amendment ratification is in the resolving clause and is not a part of the amendment proposed by Congress and already ratified by 35 states; and*

*10000SC0004ENR          -3-          LRB100 08663 HEP 18798 e*

*WHEREAS, Having passed a time extension for the Equal Rights Amendment on October 20, 1978, Congress has demonstrated that a time limit in a resolving clause can be disregarded if it is not a part of the proposed amendment; and*

*WHEREAS, The United States Supreme Court in <u>Coleman v. Miller</u>, 307 U.S. 433, at 456 (1939), recognized that Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social, and economic factors affecting the nation, and to be aware of the importance to the nation of the proposed amendment; and*

*WHEREAS, If an amendment to the Constitution of the United States has been proposed by two-thirds of both houses of Congress and ratified by three-fourths of the state legislatures, it is for Congress under the principles of <u>Coleman v. Miller</u> to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself; and*

*WHEREAS, Constitutional equality for women and men continues to be timely in the United States and worldwide, and a number of other nations have achieved constitutional equality for their women and men; therefore, be it*

*RESOLVED, BY THE SENATE OF THE ONE HUNDREDTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, THE HOUSE OF REPRESENTATIVES CONCURRING HEREIN, that the proposed amendment to the Constitution of the United States of America set forth in this resolution is ratified; and be it further*

*RESOLVED, That a certified copy of this resolution be forwarded to the Archivist of the United States, the President*

JA 164

10000SC0004ENR              -4-              LRB100 08663 HEP 18798 e

pro tempore of the Senate and the Speaker of the House of
Representatives of the Congress of the United States, and each
member of the Illinois congressional delegation.

    Adopted by the Senate, April 11, 2018.


                                    _John J. Cullerton_
                                    President of the Senate


_Th_
_____
Secretary of the Senate


    Concurred in by the House of Representatives, May 30,
2018.


                                    _Michael J. Madigan_
                                    Speaker of the House of
                                        Representatives


_Bradley J. Bolin_
_____
Assistant Clerk of the
House of Representatives


JA 165

MS0461

A message from the Senate by
Mr. Anderson, Secretary:
Mr. Speaker   --   I am directed to inform the House of
Representatives that the Senate has adopted the following Senate
Joint Resolution Constitutional Amendment, in the adoption of
which I am instructed to ask the concurrence of the House of
Representatives, to-wit:

SENATE JOINT RESOLUTION CONSTITUTIONAL AMENDMENT 4

Adopted by the Senate, April 11, 2018, by a three-fifths vote.

Tim Anderson, Secretary of the Senate

# Exhibit 4



# Commonwealth of Virginia

## GENERAL ASSEMBLY

RICHMOND

January 27, 2020

David Ferriero
National Archivist
3301 Metzerott Road
College Park, Maryland  20740-6001

Dear Mr. Ferriero:

On January 27, 2020, the Virginia General Assembly passed both House Joint Resolution No. 1 and Senate Joint Resolution No. 1.  Both HJR 1 and SJR 1 are Virginia's ratification of the Equal Rights Amendment to the Constitution of the United States.

Pursuant to this legislation, we have been directed to transmit a copy of HJR No. 1 and SJR No. 1 to the President of the United States, the Speaker of the United States House of Representatives, the President of the United States Senate, the members of the Virginia Congressional Delegation, and the Archivist of the United States at the National Archives and Records Administration of the United States.

So you may take note of this recent legislative action, we have included for your convenience a copy of HJR No. 1 and SJR No. 1.  We also are asking that you share this information with others who you believe may benefit from knowing the action of the General Assembly on this matter.

Sincerely,

Susan Clarke Schaar
Clerk, Senate of Virginia

Suzette Denslow
Clerk, Virginia House of Delegates

JA 168



# SENATE OF VIRGINIA

*SENATE JOINT RESOLUTION NO. 1*

*Ratifying the Equal Rights Amendment to the Constitution of the United States.*

*Patrons—McClellan, Locke, Hanger, Howell, Surovell, Saslaw, Barker, Bell, Boysko, Deeds, Ebbin, Edwards, Favola, Hashmi, Lewis, Lucas, Marsden, Mason, McPike, Morrissey, Petersen and Spruill; Delegate: Samirah*

*Agreed to by the Senate, January 15, 2020*
*Agreed to by the House of Delegates, January 27, 2020*

*WHEREAS, a concurrent or joint resolution is a resolution adopted by both houses of a bicameral legislature, which does not require the signature of the chief executive, and a concurrent or joint resolution is sufficient for a state's ratification of an amendment to the Constitution of the United States; and*

*WHEREAS, Article V of the Constitution of the United States provides that amendments "shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states"; and*

*WHEREAS, over 80 percent of Virginians approve the ratification of the Equal Rights Amendment by the Virginia General Assembly; and*

*WHEREAS, Virginia has been pivotal to incorporating fundamental rights into the Constitution of the United States, as when Virginia's ratification of 10 amendments in 1791 established the Bill of Rights; now, therefore, be it*

*RESOLVED by the Senate, the House of Delegates concurring, That the General Assembly of the Commonwealth of Virginia hereby ratify and affirm the Equal Rights Amendment to the Constitution of the United States proposed by the United States Congress on March 22, 1972, and ratified by 37 state legislatures. The complete text of House Joint Resolution 208 proposing the Equal Rights Amendment follows:*

*HOUSE JOINT RESOLUTION 208*

*Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.*

*RESOLVED by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:*

*"Article—*

*"Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.*

*"Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.*

*"Section 3. This amendment shall take effect two years after the date of ratification."; and, be it*

*RESOLVED FURTHER, That the Clerk of the Senate transmit certified copies of this joint resolution to the President of the United States, the Speaker of the United States House of Representatives, the President of the United States Senate, the members of the Virginia Congressional Delegation, and the Archivist of the United States at the National Archives and Records Administration of the United States.*

*A True Copy, Teste:*

*Susan Clarke Schaar*
*Clerk of the Senate*

*L. Louise Lucas*
*President Pro Tempore of the Senate*

*Eileen Filler-Corn*
*Speaker of the House of Delegates*



# COMMONWEALTH OF VIRGINIA
# GENERAL ASSEMBLY

HOUSE JOINT RESOLUTION NO. 1

## Ratifying the Equal Rights Amendment to the Constitution of the United States.

Agreed to by the House of Delegates, January 15, 2020
Agreed to by the Senate, January 27, 2020

WHEREAS, a concurrent or joint resolution is a resolution adopted by both houses of a bicameral legislature, which does not require the signature of the chief executive, and a concurrent or joint resolution is sufficient for a state's ratification of an amendment to the Constitution of the United States; and

WHEREAS, Article V of the Constitution of the United States provides that amendments "shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states"; and

WHEREAS, over 80 percent of Virginians approve the ratification of the Equal Rights Amendment by the Virginia General Assembly; and

WHEREAS, Virginia has been pivotal to incorporating fundamental rights into the Constitution of the United States, as when Virginia's ratification of 10 amendments in 1791 established the Bill of Rights; now, therefore, be it

RESOLVED by the House of Delegates, the Senate concurring, That the General Assembly of the Commonwealth of Virginia hereby ratify and affirm the Equal Rights Amendment to the Constitution of the United States proposed by the United States Congress on March 22, 1972, and ratified by 37 state legislatures. The complete text of House Joint Resolution 208 proposing the Equal Rights Amendment follows:

HOUSE JOINT RESOLUTION 208

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"Article—

"Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"Section 3. This amendment shall take effect two years after the date of ratification."; and, be it

RESOLVED FURTHER, That the Clerk of the House of Delegates transmit certified copies of this joint resolution to the President of the United States, the Speaker of the United States House of Representatives, the President of the United States Senate, the members of the Virginia Congressional Delegation, and the Archivist of the United States at the National Archives and Records Administration of the United States.

House Patrons: Carroll Foy, Ayala, Ward, Kory, Watts, Roem, Herring, Adams, D.M., Aird, Askew, Bagby, Bourne, Bulova, Carr, Carter, Cole, J.G., Convirs-Fowler, Delaney, Filler-Corn, Gooditis, Guy, Guzman, Hayes, Helmer, Heretick, Hope, Hudson, Hurst, Jenkins, Jones, Keam, Krizek, Levine, Lindsey, Lopez, McQuinn, Mugler, Mullin, Murphy, Plum, Price, Rasoul, Reid, Samirah, Scott, Sickles, Simon, Simonds, Subramanyam, Sullivan, Torian, Tran, Tyler, VanValkenburg and Willett

A True Copy, Teste:

Suzette Denslow
Clerk of the House of Delegates
And
Keeper of the Rolls of the Commonwealth

Eileen Filler-Corn
Speaker of the House of Delegates

L. Louise Lucas
President Pro Tempore of the Senate

JA 170

# Exhibit 5

# EQUAL RIGHTS AMENDMENT, PROPOSED MARCH 22, 1972
## LIST OF STATE RATIFICATION ACTIONS

The following dates reflect the date of the state legislature's passage, the date of filing with the Governor or Secretary of State, or the date of certification by the Governor or Secretary of State, whichever is the earliest date included in the official documents sent to the NARA, Office of the Federal Register. (Updated as of: 03/24/2020)

| STATE | RATIFICATION | STATE | RATIFICATION |
|---|---|---|---|
| Alabama | not ratified | Montana | Jan. 25, 1974 |
| Alaska | April 5, 1972 | Nebraska* | March 29, 1972 |
| Arizona | not ratified | Nevada** | March 22, 2017 |
| Arkansas | not ratified | New Hampshire | March 23, 1972 |
| California | Nov. 13, 1972 | New Jersey | April 17, 1972 |
| Colorado | April 21, 1972 | New Mexico | Feb. 28, 1973 |
| Connecticut | March 15, 1973 | New York | May 18, 1972 |
| Delaware | March 23, 1972 | North Carolina | not ratified |
| Florida | not ratified | North Dakota | Feb. 3, 1975 |
| Georgia | not ratified | Ohio | Feb. 7, 1974 |
| Hawaii | March 22, 1972 | Oklahoma | not ratified |
| Idaho* | March 24, 1972 | Oregon | Feb. 8, 1973 |
| Illinois** | May 30, 2018 | Pennsylvania | Sept. 26, 1972 |
| Indiana | Jan. 24, 1977 | Rhode Island | April 14, 1972 |
| Iowa | March 24, 1972 | South Carolina | not ratified |
| Kansas | March 28, 1972 | South Dakota* | Feb. 5, 1973 |
| Kentucky* | June 27, 1972 | Tennessee* | April 4, 1972 |
| Louisiana | not ratified | Texas | March 30, 1972 |
| Maine | Jan 18, 1974 | Utah | not ratified |
| Maryland | May 26, 1972 | Vermont | March 1, 1973 |
| Massachusetts | June 21, 1972 | Virginia** | January 27, 2020 |
| Michigan | May 22, 1972 | Washington | March 22, 1973 |
| Minnesota | Feb. 8, 1973 | West Virginia | April 22, 1972 |
| Mississippi | not ratified | Wisconsin | April 26, 1972 |
| Missouri | not ratified | Wyoming | Jan. 26, 1973 |

| * Purported Rescission | | ** Ratification actions occurred after |
|---|---|---|
| Nebraska | March 15, 1973 | Congress's deadline expired. *See* U.S. |
| Tennessee | April 23, 1974 | Dep't of Justice, Office of Legal Counsel, |
| Idaho | Feb. 8, 1977 | *Ratification of the Equal Rights* |
| Kentucky | March 20, 1978 | *Amendment*, 44 Op. O.L.C. __, Slip Op. |
| South Dakota | March 5, 1979 | at 6, 2020). |

# Exhibit 6



# NARA Press Statement on the Equal Rights Amendment

**Press Release ·**
**Wednesday, January 8, 2020**

**Washington, DC**

At the request of the National Archives and Records Administration　(NARA), the Department of Justice (DOJ) has issued an <u>opinion on the Ratification of the Equal Rights Amendment</u> (ERA) and the statutory role of the Archivist of the United States.

Under 1 U.S.C. § 106b, the Archivist performs a ministerial role with respect to certifying the ratification of amendments to the U.S. Constitution, as follows:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

In its January 6, 2020, opinion, the Office of Legal Counsel (OLC) has concluded "that Congress had the constitutional authority to impose a deadline on the ratification of the ERA and, because that deadline has expired, the ERA Resolution is no longer pending before the States." (OLC Opinion, at p.2.) Accordingly, the OLC opinion goes on to state that "the ERA's adoption could not be certified under 1 U.S.C. § 106b." (OLC Opinion, at p.37.)

These issues are currently presented in two federal lawsuits against the Archivist of the United States, one filed in the U.S. District Court for the Northern District of Alabama　by the states of Alabama, Louisiana, and South Dakota and the other filed in the U.S. District Court for the District of Massachusetts　by Equal Means Equal, The Yellow Roses, and Katherine Weitbrecht.

NARA defers to DOJ on this issue and will abide by the OLC opinion, unless otherwise directed by a final court order.

### ###

For press information contact the National Archives Public and Media Communications Staff at 202-357-5300.

> *Connect with the National Archives on:*
> **Twitter:** @USNatArchives
> **Facebook:** USNationalArchives
> **Tumblr:** usnatarchives
> **Instagram:** usnatarchives

# Exhibit 7

## ARCHIVIST OF THE UNITED STATES
## UNITED STATES OF AMERICA

*TO ALL TO WHOM THESE PRESENTS SHALL COME,*

*GREETING:*

*KNOW YE, That the first Congress of the United States, at its first session, held in New York, New York, on the twenty–fifth day of September, in the year one thousand seven hundred and eighty–nine, passed the following resolution to amend the Constitution of the United States of America, in the following words and figures in part, to wit:*

> *The Conventions of a number of the States having at the time of their adopting the Constitution, expressed a desire, in order to prevent misconstruction or abuse of its powers, that further declaratory and restrictive clauses should be added: And as extending the ground of public confidence in the Government will best ensure the benificent ends of its institution;*

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, two thirds of both Houses concurring, that the following Articles be proposed to the Legislatures of the several States, as Amendments to the Constitution of the United States, all or any of which Articles, when ratified by three fourths of the said Legislatures, to be valid to all intents and purposes, as part of the said Constitution, viz.:*

JA 176

*Articles in addition to, and amendment of, the
Constitution of the United States of America,
proposed by Congress and ratified by the
Legislatures of the several States, pursuant to the
fifth Article of the original Constitution.*

\*     \*     \*     \*     \*     \*     \*

*Article the Second...No law, varying the
compensation for the services of the Senators and
Representatives, shall take effect, until an
election of Representatives shall have intervened.*

\*     \*     \*     \*     \*     \*     \*

*And, further, that Section 106b, Title 1 of the United States Code provides
that whenever official notice is received at the National Archives and
Records Administration that any amendment proposed to the
Constitution of the United States has been adopted, according to the
provisions of the Constitution, the Archivist of the United States shall
forthwith cause the amendment to be published, with his certificate,
specifying the States by which the same may have been adopted, and that
the same has become valid, to all intents and purposes, as a part of the
Constitution of the United States.*

*And, further, that it appears from official documents on file in the
National Archives of the United States that the Amendment to the
Constitution of the United States proposed as aforesaid has been ratified
by the Legislatures of the States of Alabama, Alaska, Arizona, Arkansas,
Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois,
Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan,
Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey,
New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon,
South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia,
West Virginia, Wisconsin, and Wyoming.*

JA 177

And, further, that the States whose Legislatures have so ratified the said proposed Amendment constitute the requisite three fourths of the whole number of States in the United States.

NOW, Therefore, be it known that I, Don W. Wilson, Archivist of the United States, by virtue and in pursuance of Section 106b, Title 1 of the United States Code, do hereby certify that the aforesaid Amendment has been valid, to all intents and purposes, as a part of the Constitution of the United States.

IN TESTIMONY WHEREOF,
I have hereunto set my hand and caused the seal of the National Archives and Records Administration to be affixed.

DONE at the City of Washington this 18th day of May in the year of our Lord one thousand nine hundred and ninety-two.

DON W. WILSON

foregoing was signed in my presence on this 18 day of No..., 1992.

Martha L. Gu...

JA 178

# Exhibit 8

# Around the Nation

## Acting Governor Vetoes Kentucky Rights Reversal

FRANKFORT, Ky., March 20 (AP)—Lieut. Gov. Thelma Stovall of Kentucky today vetoed a resolution rescinding the State Legislature's ratification in 1972 of the proposed equal rights amendment.

Mrs. Stovall was serving as Acting-Governor in the absence from the state of Gov. Julian Carroll, who was on vacation in South Carolina.

Mrs. Stovall, a strong backer of the proposed amendment to the Constitution that would ban discrimination because of sex, fought the rescission move in the legislative session that ended early yesterday.

The General Assembly, she said this morning, "wasted valuable time and energy in using many tactics, within or without the boundaries of the rules adopted by the Legislature, to pass a measure which in itself amounts to legislative folly."

Last week, Kentucky became the fourth state to vote to reverse its vote on the proposal. The amendment is three short of the 38 states needed for ratification by next year. Four states have voted to rescind their approval, but the legality of such a move is not clear.

## Ex-Mississippi Governor Seeks Eastland's Seat

Special to The New York Times

JACKSON, Miss., March 20—William L. Waller, the former Governor of Mississippi who is regarded as a strong racial moderate, announced today that he would oppose Senator James O. Eastland for the Democratic senatorial nomination in June.

The move by the 51-year-old Mr. Waller, now a practicing attorney here, to unseat the 73-year-old Senator is considered a major political surprise because of supposed political ties between the two in the past.

It would mark the first time in 24 years that Senator Eastland has faced a strong Democratic challenger. Six years ago the senior Mississippi Senator had turned back a formidable challenge from Gil Carmichael, a Republican.

## Stressful Events Found To Precede Acts of Crime

CHICAGO, March 20 (UPI)—A study of prison inmates shows that a significant number underwent major events that changed their lives in the year before they were imprisoned.

The events included the death of a spouse, loss of a job, breakup of a marriage, trouble on the job, financial difficulties, arguments within the family, personal injuries and illness.

The researchers questioned 176 male inmates of McNeil Island Federal prison in Washington and a state penitentiary at Walla Walla, Wash., about events that occurred in the year before they were jailed.

They concluded that too many stressful life events could drive a person to crime.

The study, published in the current edition of Archives of General Psychiatry, found that prisoners were less stable and more mobile than a control group.

## Possible Ford Flaw Hinted In 6 Deaths, 39 Injuries

DETROIT, March 20 (AP)—The Federal Government said today that it was investigating a possible transmission defect that might have caused the deaths of six persons and injuries to 39 others.

The investigation by the National Highway Traffic Safety Administration indicates that some 1973 to 1978 Ford Motor Company vehicles have defects that cause the automatic transmissions to slip from park into reverse.

Such transmission failures have resulted in cars running over their owners, crushing them against buildings or dragging them along the pavement as a person tries to stop the runaway vehicle, the agency said.

Ford had no comment except that it was cooperating with the investigation. The auto maker said that it had no specific advice to motorists as no defect has yet been identified.

The inquiry involves Ford Torinos, Elites, LTD II's, and Thunderbirds; Mercury Montegos, Cougars and Lincolns; and F-100, F-150, F-250, F-350, Econoline and Bronco light trucks.

JA 180

The New York Times
Published: March 21, 1978
Copyright © The New York Times

# Exhibit 9



NATIONAL
ARCHIVES

December 12, 2018

Steven A. Engel
Assistant Attorney General
Office of Legal Counsel
United States Department of Justice
Washington, DC  20530
BY EMAIL

Dear Mr. Engel:

The Archivist of the United States has been asked by Members of Congress to inform them as to what actions he would take in the event that a 38th state ratifies the Equal Rights Amendment to the United States Constitution (ERA).  The Archivist indicated that under 1 U.S.C. § 106b, he would be expected to publish the amendment to the Constitution when the requisite number of states have ratified it, but noted that he would first need to seek counsel from the Office of Legal Counsel (OLC).

The ERA was approved by Congress for ratification in 1972, with a seven-year deadline for ratification.  In 1978, Congress extended the deadline to 1982.  By 1973, 35 states had ratified the ERA.  Between 1973 and 1979, five of those states purported to rescind their ratifications.  In 2017, a 36th state ratified the ERA, and in May 2018, a 37th state did so (see attached list of state actions).  It is our understanding that several other states are considering ratification of the ERA, which could lead to 38 or more states having ratified it.  (See attached June 18, 2018, Congressional Research Service Report on "The Proposed Equal Rights Amendment: Contemporary Ratification Issues.")

Section 106b of Title I, United States Code, establishes certain responsibilities of the Archivist of the United States with respect to the publication and certification of amendments to the Constitution, as follows:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

NATIONAL ARCHIVES and
RECORDS ADMINISTRATION

8601 ADELPHI ROAD
COLLEGE PARK. MD 20740-6001
www.archives.gov

GARY M. STERN
GENERAL COUNSEL
Suite 3110
t. 301.837.3026
garym.stern@nara.gov

JA 182

In 1991, when it appeared that a 38th state could ratify the Congressional Pay Amendment, NARA contacted OLC with respect to the Archivist's role under 1 U.S.C. § 106b, and in 1992, the Office of Legal Counsel issued an opinion on what became the 27th Amendment to the Constitution.  We now request that OLC provide the Archivist with guidance on his role under 1 U.S.C. § 106b in the event that 38 or more states ratify the Equal Rights Amendment.

Please feel free to contact me to discuss further.

Sincerely,

GARY M. STERN
General Counsel

Enc.

2

JA 183

# EQUAL RIGHTS AMENDMENT - PROPOSED MARCH 22, 1972
## LIST OF STATE RATIFICATION ACTIONS

The following dates reflect the date of the state legislature's passage, the date of filing with the Governor or Secretary of State, or the date of certification by the Governor or Secretary of State, whichever is the earliest date included in the official documents sent to the NARA, Office of the Federal Register.

| STATE | RATIFICATION | STATE | RATIFICATION |
|---|---|---|---|
| Alabama | not ratified | Montana | Jan. 25, 1974 |
| Alaska | April 5, 1972 | Nebraska* | March 29, 1972 |
| Arizona | not ratified | Nevada | March 22, 2017 |
| Arkansas | not ratified | New Hampshire | March 23, 1972 |
| California | Nov. 13, 1972 | New Jersey | April 17, 1972 |
| Colorado | April 21, 1972 | New Mexico | Feb. 28, 1973 |
| Connecticut | March 15, 1973 | New York | May 18, 1972 |
| Delaware | March 23, 1972 | North Carolina | not ratified |
| Florida | not ratified | North Dakota | Feb. 3, 1975 |
| Georgia | not ratified | Ohio | Feb. 7, 1974 |
| Hawaii | March 22, 1972 | Oklahoma | not ratified |
| Idaho* | March 24, 1972 | Oregon | Feb. 8, 1973 |
| Illinois | May 30, 2018 | Pennsylvania | Sept. 26, 1972 |
| Indiana | Jan. 24, 1977 | Rhode Island | April 14, 1972 |
| Iowa | March 24, 1972 | South Carolina | not ratified |
| Kansas | March 28, 1972 | South Dakota* | Feb. 5, 1973 |
| Kentucky* | June 27, 1972 | Tennessee* | April 4, 1972 |
| Louisiana | not ratified | Texas | March 30, 1972 |
| Maine | Jan 18, 1974 | Utah | not ratified |
| Maryland | May 26, 1972 | Vermont | March 1, 1973 |
| Massachusetts | June 21, 1972 | Virginia | not ratified |
| Michigan | May 22, 1972 | Washington | March 22, 1973 |
| Minnesota | Feb. 8, 1973 | West Virginia | April 22, 1972 |
| Mississippi | not ratified | Wisconsin | April 26, 1972 |
| Missouri | not ratified | Wyoming | Jan. 26, 1973 |

* Purported Rescission

| | |
|---|---|
| Nebraska | March 15, 1973 |
| Tennessee | April 23, 1974 |
| Idaho | Feb. 8, 1977 |
| Kentucky | March 20, 1978 |
| South Dakota | March 5, 1979 |

JA 184



# The Proposed Equal Rights Amendment: Contemporary Ratification Issues

**Thomas H. Neale**
Specialist in American National Government

July 18, 2018

**Congressional Research Service**

7-5700

www.crs.gov

R42979

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

The proposed Equal Rights Amendment to the U.S. Constitution (ERA), which declares that "equality of rights under the law shall not be denied or abridged by the United States or any State on account of sex," was approved by Congress for ratification by the states in 1972. The proposal included a seven-year deadline for ratification. Between 1972 and 1977, 35 state legislatures, of the 38 required by the Constitution, voted to ratify the ERA. Despite a congressional extension of the deadline from 1979 to 1982, no additional states approved the amendment during the extended period, at which time the amendment was widely considered to have expired.

Since 1982, Senators and Representatives who support the amendment have continued to introduce new versions of the ERA, generally referred to as "fresh start" amendments. In addition, some Members of Congress have also introduced resolutions designed to reopen ratification for the ERA as proposed in 1972, restarting the process where it ended in 1982. This was known as the "three-state strategy," for the number of additional ratifications then needed to complete the process, until Nevada and Illinois ratified the amendment in March 2017 and May 2018, respectively, becoming the 36th and 37th states to do so. The ERA supporters' intention here is to repeal or remove the deadlines set for the proposed ERA, reactivate support for the amendment, and complete the ratification process by gaining approval from the one additional state needed to meet the constitutional requirement, assuming the Nevada and Illinois ratifications are valid.

As the 115th Congress convened, resolutions were introduced in the House of Representatives and the Senate that embraced both approaches. H.J.Res. 33, introduced by Representative Carolyn Maloney, and S.J.Res. 6, introduced by Senator Robert Menendez, propose "fresh start" equal rights amendments. H.J.Res. 53, introduced by Representative Jackie Speier, and S.J.Res. 5, introduced by Senator Benjamin Cardin, would remove the deadline for ratification of the ERA proposed by Congress in 1972.

First introduced in Congress in 1923, the ERA proposed to the states in 1972 by the 92nd Congress included the customary seven-year ratification time limit. Although through 1977 the ERA was approved by 35 states, various controversies brought the ratification process to a halt as the deadline approached. In 1978, Congress extended the deadline through 1982. Opponents claimed this violated the spirit, if not the letter of the amendment process; supporters insisted the amendment needed more time for state consideration. Further, they justified extension because the deadline was placed not in the amendment, but in its preamble. Despite the extension, no further states ratified during the extension period, and the amendment was presumed to have expired in 1982. During this period, the ratification question was further complicated when five state legislatures passed resolutions rescinding their earlier ratifications. The Supreme Court agreed to hear cases on the rescission question, but the ERA's ratification time limit expired before they could be argued, and the Court dismissed the cases as moot.

Many ERA proponents claim that because the amendment did not include a ratification deadline *within the amendment text*, it remains potentially viable and eligible for ratification indefinitely. They maintain that Congress possesses the authority both to repeal the original 1979 ratification deadline and its 1982 extension, and to restart the ratification clock at the current 37-state level—including the Nevada and Illinois ratifications—with or without a future ratification deadline. In support, they assert that Article V of the Constitution gives Congress broad authority over the amendment process. They further cite the Supreme Court's decisions in *Dillon v. Gloss* and *Coleman v. Miller* in support of their position. They also note the precedent of the Twenty-Seventh "Madison" Amendment, which was ratified in 1992, 203 years after Congress proposed it to the states.

JA 186

Opponents of reopening the amendment process may argue that attempting to revive the ERA would be politically divisive, and that providing it with a "third bite of the apple" would be contrary to the spirit and perhaps the letter of Article V and Congress's earlier intentions. They might also reject the example of the Twenty-Seventh Amendment, which, unlike the proposed ERA, never had a ratification time limit. Further, they might claim that efforts to revive the ERA ignore the possibility that state ratifications may have expired with the 1982 deadline, and that amendment proponents fail to consider the issue of state rescission, which has never been specifically decided in any U.S. court.

The "fresh start" approach provides an alternative means to revive the ERA. It consists of starting over by introducing a new amendment, similar or identical to, but distinct from, the original. A fresh start would avoid potential controversies associated with reopening the ratification process, but would face the stringent constitutional requirements of two-thirds support in both chambers of Congress and ratification by three-fourths of the states.

JA 187

# Contents

Introduction ........................................................................................................................... 1

Most Recent Developments.................................................................................................... 2

115th Congress Proposals .................................................................................................. 2

Fresh Start Proposals.................................................................................................... 2

Discussion .................................................................................................................... 3

Removing the ERA Ratification Deadline: The "Three-State Strategy" ..................... 4

Discussion .................................................................................................................... 5

Recent Activity in the State Legislatures: Nevada and Illinois ....................................... 5

Contemporary Public Attitudes toward the Equal Rights Amendment ........................... 6

An Equal Rights Amendment: Legislative and Ratification History, 1923-1972............................ 7

Five Decades of Effort: Building Support for an Equal Rights Amendment in
Congress, 1923-1970 .................................................................................................. 7

Congress Approves and Proposes the Equal Rights Amendment, 1970-1972 ..................... 10

First Vote in the House, 91st Congress—1970 ........................................................... 11

Passage and Proposal by Congress, 92nd Congress—1971-1972..................................... 12

Congress Sets a Seven-Year Ratification Deadline...................................................... 13

Ratification Efforts in the States ..................................................................................... 14

Ratification Is Extended in 1978, but Expires in 1982..................................................... 15

Rescission: A Legal Challenge to the Ratification Process ............................................... 16

Renewed Legislative and Constitutional Proposals, 1982 to the Present ................................ 16

"Fresh Start" Proposals .................................................................................................. 17

"Three-State" Proposals ................................................................................................. 17

Contemporary Viability of the Equal Rights Amendment .................................................... 18

Article V: Congressional Authority over the Amendment Process ........................................ 18

The Madison Amendment (the Twenty-Seventh Amendment): A Dormant Proposal
Revived and Ratified.................................................................................................... 20

Ratification of the Madison Amendment: A Model for the Proposed Equal Rights
Amendment? .............................................................................................................. 22

The Role of the Supreme Court Decisions in *Dillon v. Gloss* and *Coleman v. Miller* ........... 24

Ancillary Issues ............................................................................................................. 26

Origins of the Seven-Year Ratification Deadline............................................................. 26

Rescission .................................................................................................................... 26

Congressional Promulgation of Amendments............................................................... 27

The Proposed District of Columbia Voting Rights (Congressional Representation)
Amendment—Congress Places a Ratification Deadline in the Body of the
Amendment.............................................................................................................. 28

Concluding Observations ...................................................................................................... 30

## Contacts

Author Contact Information ...................................................................................................... 31

JA 188

# Introduction

On July 20, 1923, the National Woman's Party (NWP) met in Seneca Falls, New York, to commemorate the 75th anniversary of the historic Seneca Falls Convention and celebrate the 1920 ratification of the Nineteenth Amendment, by which women won the right to vote. At the meeting, NWP leader Alice Paul announced her next project would be to develop and promote a new constitutional amendment, guaranteeing equal rights and equality under the law in the United States to women and men. Paul, a prominent suffragist, noted the recent ratification of the Nineteenth Amendment, which established the right of women to vote. She characterized an "equal rights" amendment as the next logical step for the women's movement.[1] The proposed amendment was first introduced six months later, in December 1923, in the 68th Congress.[2] Originally named "the Lucretia Mott Amendment," in honor of the prominent 19th century abolitionist, women's rights activist, and social reformer, the draft amendment stated that, "men and women shall have equal rights throughout the United States and every place subject to its jurisdiction."

Nearly half a century passed before the Mott Amendment, as amended and ultimately renamed the Alice Paul Amendment, was approved by Congress and proposed to the states for ratification in 1972.[3] In common with the Eighteenth and Twentieth through Twenty-Sixth Amendments, the proposed ERA included a seven-year deadline for ratification; in this case the deadline was included in the proposing clause, or preamble, that preceded the text of the amendment. After considerable early progress in the states, ratifications slowed, and the process ultimately stalled at 35 states in 1977, 3 short of the 38 approvals (three-fourths of the states) required by the Constitution. As the 1979 deadline approached, however, ERA supporters capitalized on the fact that the seven-year time limit was incorporated in the amendment's proposing clause, rather than in the body of the amendment. Concluding that the amendment itself was, therefore, not time-limited, Congress extended the ratification period by 38 months, through 1982. No further states added their approval during the extension, however, and the proposed ERA appeared to expire in 1982.

Since the proposed ERA's extended ratification period expired in 1982, Senators and Representatives have continued to introduce new versions of the amendment, beginning in the 97th Congress.[4] More recently, new analyses emerged that led ERA supporters to assert that the amendment remains viable, and that the period for its ratification could be extended indefinitely by congressional action. Resolutions embracing this thesis have been introduced beginning in the 112th Congress.[5] Their stated purpose is that of "[r]emoving the deadline for ratification of the Equal Rights Amendment." If enacted, these measures would eliminate the 1979 and 1982 deadlines; reopen the proposed ERA for state ratification at the present count of 37 states;[6] and extend the period for state ratification indefinitely.

This report examines the legislative history of the various proposals that ultimately emerged as the proposed Equal Rights Amendment. It identifies and provides an analysis of current

---

[1] "Alice Paul, Feminist, Suffragist, and Political Strategist," The Alice Paul Institute, at http://www.alicepaul.org/alicepaul.htm.

[2] S.J. Res 21 and H.J. Res. 75, 68th Congress, 1st session.

[3] The amendment is referred to hereinafter as "the proposed Equal Rights Amendment," or "the proposed ERA."

[4] See H.J. Res. 192 et al. and S.J. Res. 213, 92nd Congress.

[5] See H.J.Res. 47 and S.J.Res. 39, 112th Congress.

[6] Nevada became the 36th state to ratify the ERA when its legislature voted to ratify the amendment on March 22, 2017, and Illinois became the 37th, when its legislature ratified on May 30, 2018.

JA 189

legislative proposals and reviews contemporary factors that may bear on its present and future viability.

# Most Recent Developments

## 115th Congress Proposals

As the 115th Congress convened, resolutions were introduced in both the House and Senate that embraced two approaches to the Equal Rights Amendment. These include "fresh start" proposals that proposed a new constitutional amendment, separate from the amendment proposed by Congress in 1972 (H.J. Res. 208, 92nd Congress), and proposals designed to reopen the ratification process by removing the deadline included in the resolution proposing the original ERA.

### Fresh Start Proposals

Perhaps the most basic means of restarting an equal rights amendment would be by introduction of a new joint resolution, a "fresh start." In 1982, even as the extended ratification deadline for the proposed ERA approached, resolutions proposing a new equal rights amendment were introduced in the 97th Congress. New versions of the ERA have continued to be introduced in the House and Senate in each succeeding Congress. All have shared language identical or similar to the original proposed by Congress in 1982. Two fresh start amendments have been introduced to date in the 115th Congress, as detailed below.

### *S.J.Res. 6*

The first fresh start ERA proposal to be offered in the 115th Congress was S.J.Res. 6, introduced by Senator Bob Menendez of New Jersey on January 20, 2017. To date, Senator Menendez has been joined by 15 cosponsors.[7] Senator Menendez's proposal incorporates the language of the original ERA, as proposed in the 92nd Congress:

> Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
>
> Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.
>
> Section 3. This article shall take effect 2 years after the date of ratification.

S.J.Res. 6 has been referred to the Senate Committee on the Judiciary.

### *H.J.Res. 33*

H.J.Res. 33 was introduced in the House of Representatives by Representative Carolyn Maloney of New York on January 24, 2017. To date, Representative Maloney has been joined by 169 cosponsors.[8] This measure is also a fresh start resolution, proposing a new ERA:

---

[7] A list of cosponsors for S.J. Res. 6 is available from Congress.gov at https://www.congress.gov/bill/115th-congress/senate-joint-resolution/6/cosponsors?r=1.

[8] A list of cosponsors for H.J. Res. 33 is available from Congress.gov at https://www.congress.gov/bill/115th-congress/house-joint-resolution/33/cosponsors?r=1.

Section 1. Women shall have equal rights in the United States and every place subject to its jurisdiction. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

Section 2. Congress and the several States shall have the power to enforce, by appropriate legislation, the provisions of this article.

Section 3. This amendment shall take effect two years after the date of ratification.

This version of the amendment includes Section 1 language that differs from the version of the ERA proposed by Congress in 1972. The new wording appeared initially in H.J.Res. 56 in the 113th Congress. Specifically, Section 1 was amended by the addition of the following clause at its beginning: "Women shall have equal rights in the United States and every place subject to its jurisdiction." In a press release issued at the time, Representative Maloney described this as a

> ... new and improved Equal Rights Amendment.... Today's ERA would prohibit gender discrimination and for the first time, would explicitly mandate equal rights for women.... This ERA is different ... it's designed for the 21st Century. This ERA expressly puts women in the Constitution for the first time.[9]

It may also be noted that this language recalls the wording of the first version of the ERA, as drafted by suffragist Alice Paul in 1923 and introduced in the 68th Congress in 1923:

> Men and women shall have equal rights throughout the United States and every place subject to its jurisdiction.
>
> Congress shall have power to enforce this article by appropriate legislation.[10]

Further, the resolution expands enforcement authority for the amendment "by appropriate legislation," extending it from Congress to include "the several States."

H.J.Res. 33 has been referred to the Subcommittee on the Constitution and Civil Justice of the House Committee on the Judiciary.

## Discussion

As joint resolutions proposing an amendment to the Constitution, S.J.Res. 6 and H.J.Res. 33 would require approval in identical form by two-thirds of the Members present and voting in both chambers of Congress. Unlike a standard joint resolution that has the force of law, the President's approval is not necessary for joint resolutions that propose amendments.[11] Both resolutions prescribe that the proposed amendment would be submitted to the legislatures of the states for ratification.[12]

Neither S.J.Res. 6 nor H.J.Res. 33 includes a time limit for ratification, either in their preambles, or in the body of the amendment. While a ratification deadline has been included in either the

---

[9] Rep. Carolyn B. Maloney, Press Release, "Rep. Maloney, Speaker Quinn, and Council Members Lappin, Brewer, James, and Chin Join Women Leaders to Announce New, Improved Equal Rights Amendment," August 13, 2013, at https://maloney.house.gov/media-center/press-releases/rep-maloney-speaker-quinn-and-council-members-lappin-brewer-james-and-chin-join-women.

[10] S.J. Res. 21, 68th Congress, 1st session, introduced on December 10, 1923, by Senator Charles Curtis of Kansas, and H.J. Res. 75, introduced on December 13 by Representative Daniel Read Anthony, also of Kansas. Representative Anthony was a nephew of women's rights pioneer Susan B. Anthony.

[11] U.S. Senate website, "Legislation, Laws, and Acts," at https://www.senate.gov/legislative/common/briefing/leg_laws_acts.htm#2

[12] Article V of the Constitution authorizes Congress to choose the mode of ratification, by either the legislatures of the several states, or by conventions called for the purpose of considering the proposed amendment.

JA 191

preamble or the text of the 18th and 20th through 26th Amendments, it is a tradition dating to the early 20th century, rather than a constitutional requirement. If Congress were to propose either of these resolutions to the states as a constitutional amendment, they would arguably be eligible for ratification indefinitely. In not setting a ratification deadline, these measures thus avoid the expiration issues associated with the original proposed Equal Rights Amendment. They also arguably embrace the assumption under which the 27th Amendment was ratified in 1992, some 203 years after Congress sent it to the states for approval: proposed amendments remain constitutionally valid and eligible for ratification unless a deadline is specifically prescribed when the amendment is proposed.[13] Opponents, however, might argue that the seven-year ratification deadline first included in the 18th Amendment should not be lightly discarded. The inclusion of a "sunset" provision on proposed amendments, they might argue, is necessary to ensure that a contemporaneous majority of the people, and through them the state legislatures, favors the measure. This issue is examined at greater length later in this report.

### Removing the ERA Ratification Deadline: The "Three-State Strategy"

Two resolutions introduced in the 115th Congress, one each in the House and Senate, are designed to reopen the ratification process for H.J. Res. 208, the Equal Rights Amendment proposed by the 92nd Congress in 1972, and extend it indefinitely by removing the deadline set in the preamble to the proposed ERA. Both these measures are based on the "three-state" argument[14] that (1) Congress has the constitutional authority to propose, alter, or terminate any limits on the ratification of amendments pending before the states; (2) all existing ratifications remain in effect and viable; and (3) rescissions of ratification passed by some states are invalid. The three-state argument is examined in detail later in this report.[15]

### *S.J.Res. 5*

This resolution, designed to reopen the ERA ratification process, was introduced by Senator Ben Cardin of Maryland on January 17, 2017. To date, Senator Cardin has been joined by 36 cosponsors.[16] The purpose of the resolution, as stated in its title is "[r]emoving the deadline for ratification of the equal rights amendment." The text of the resolution states:

> [t]hat notwithstanding any time limit contained in House Joint Resolution 208, 92d Congress, as agreed to in the Senate on March 22, 1972, the article of amendment proposed to the States in that joint resolution shall be valid to all intents and purposes as part of the Constitution whenever ratified by the legislatures of three-fourths of the several States.

S.J.Res. 5 has been referred to the Senate Judiciary Committee.

---

[13] The 27th Amendment (the Madison Amendment) is examined later in this report.

[14] Although the Equal Rights Amendment has now been ratified by 37 states, this report will generally refer to proposals to repeal the ERA ratification deadline by its original name, the "three state" process or solution.

[15] See under "Three-State Proposals."

[16] A list of cosponsors for S.J.Res. 5 is available at Congress.gov at https://www.congress.gov/bill/115th-congress/senate-joint-resolution/5/cosponsors?r=1.

JA 192

*H.J.Res. 53*

This resolution was introduced by Representative Jackie Speier of California on January 31, 2017. To date, Representative Speier has been joined by 166 co-sponsors.[17] The text of H.J.Res. 53 is identical to that of S.J.Res. 5.

H.J.Res. 53 has been referred to the Subcommittee on the Constitution and Civil Justice of the House Committee on the Judiciary.

## Discussion

Many ERA proponents claim that because the amendment as originally proposed by Congress in 1972 did not include a ratification deadline *within the amendment text*, it remains potentially viable and eligible for ratification indefinitely. They maintain that Congress possesses the authority both to remove the original 1979 ratification deadline and its 1982 extension, and to restart the ratification clock at the then-current 36-state level, with or without a future ratification deadline. In support, they assert that Article V of the Constitution gives Congress uniquely broad authority over the amendment process. They further cite the Supreme Court's decisions in *Dillon v. Gloss* and *Coleman v. Miller* in support of their position. They also note the precedent of the Twenty-Seventh "Madison" Amendment, which was ratified in 1992, 203 years after Congress proposed it to the states. These issues are examined more fully later in this report.

# Recent Activity in the State Legislatures: Nevada and Illinois

Although the ratification deadline for the proposed ERA expired in 1982, its proponents have continued to press for action in the legislatures of states that either failed to ratify it, or had previously rejected the amendment. Recent notable developments in the states include action by Nevada in 2017 and Illinois in 2018 to ratify the amendment. Also in 2018, however, proposals to ratify the ERA failed to reach the floor of state legislatures in both Arizona[18] and Virginia,[19] although supporters in the North Carolina Legislature assert the amendment may come to a vote in that state's legislature during the current session.[20]

## Nevada and Illinois Ratify the Equal Rights Amendment

The most widely-publicized recent ERA developments in the states occurred in March 2017, and May 2018, when Nevada and Illinois ratified the proposed amendment. Their actions raised the number of state ratifications to 37.

On March 22, 2017, the Nevada Legislature completed action on a resolution approving the ERA as proposed by H.J.Res. 208 in the 92nd Congress. With this action, Nevada became the 36th state to ratify the ERA, and the first state to do so since 1977. The ratification measure, introduced on

---

[17] A list of cosponsors for H.J.Res. 53 is available at Congress.gov at https://www.congress.gov/bill/115th-congress/house-joint-resolution/53/cosponsors?r=1.

[18] Dustin Gardiner, "On Equal Pay Day Arizona Republicans Block Vote on Equal Rights Amendment," *The Republic/AZCentral.com*, April 10, 2018, at https://www.azcentral.com/story/news/politics/arizona/2018/04/10/equal-rights-amendment-vote-fails-arizona-legislature/504763002/.

[19] Patricia Sullivan, "Virginia's Hopes of ERA Ratification Go Down in Flames This Year," *Washington Post*, February 9, 2018, at https://www.washingtonpost.com/local/virginia-politics/virginias-hopes-of-era-ratification-go-down-in-flames-this-year/2018/02/09/7acfbf80-0dab-11e8-8890-372e2047c935_story.html?utm_term=.c4e112eebca7.

[20] "NC Could Be Deciding State in Push for Constitutional Amendment," WETC6 Wilmington, June 6, 2018, at http://m.wect.com/story/38362420/nc-could-be-deciding-state-in-push-for-constitutional-amendment.

JA 193

February 17 as Senate Joint Resolution 2, (SJR2), passed the Nevada Senate on March 1 and the Nevada House of Representatives on March 20. The Senate's concurrence with a House amendment on March 22 completed the ratification process.[21] The choice of dates had historical significance: H.J.Res. 208 was proposed by Congress on March 22, 1972, exactly 45 years earlier.[22] Press accounts of the action noted that the ratification marked a reversal of earlier actions in Nevada. Efforts to secure ERA ratification in the legislature failed three times in the 1970s and failed once when placed on the ballot as an advisory ballot issue in 1978.[23] With Nevada's ratification, the three-state strategy arguably changed to a "two-state strategy," and the legislature's action was reported as "being read by [ERA] supporters as an encouraging sign,"[24] while the Eagle Forum, an advocacy group historically opposed to ERA,[25] restated its criticism of the amendment, noting the deadline for ratification had been passed in 1982.[26]

On May 30, 2018, the Illinois legislature completed action on a resolution approving the ERA as proposed by H.J.Res. 208 in the 92nd Congress. With this action Illinois became the 37th state to ratify the amendment. The ratification measure, introduced as SJRCA (Senate Joint Resolution Constitutional Amendment 0004) on February 7, 2018, was adopted by the Senate as originally introduced on April 11 and in its final form by the Senate and House of Representatives on May 30.[27] The governor's approval was not required.[28]

## Contemporary Public Attitudes toward the Equal Rights Amendment

Public opinion polls showed support through the 1990s for an equal rights amendment. The first recorded survey on support for the proposal was a CBS News telephone poll conducted in September 1970, in which 56% of respondents approved of an equal rights amendment.[29] Favorable attitudes remained steady in the 1970s and throughout the subsequent ratification period, during which time levels of support as reported by the Gallup Poll never dropped below

---

[21] Nevada Legislature website, SJR 2, at https://www.leg.state.nv.us/Session/79th2017/Reports/history.cfm?ID=319. The governor's approval is not required for ratification of a constitutional amendment. The vote in favor of ratification was 13-8 in the Senate and 28-14 in the Assembly, at https://www.leg.state.nv.us/Session/79th2017/Reports/history.cfm?DocumentType=8&BillNo=2.

[22] Sandra Cherb, "Nevada Ratifies Equal Rights Amendment on 45th Anniversary of Passage by Congress," *Las Vegas Review Journal*, March 22, 2017, at https://www.reviewjournal.com/news/politics-and-government/nevada/nevada-ratifies-equal-rights-amendment-on-45th-anniversary-of-passage-by-congress//.

[23] Ibid.

[24] "Pumping Life into the Equal Rights Amendment," *New York Times*, March 25, 2017, at https://www.nytimes.com/2017/03/25/opinion/sunday/pumping-life-into-the-equal-rights-amendment.html?_r=0.

[25] The Eagle Forum was an early opponent of ERA. Its self-described mission is "to enable conservative and pro-family men and women to participate in the process of self-government and public policy making...." Eagle Forum, "Our Mission," at http://eagleforum.org/misc/descript.html.

[26] "Nevada's Assembly Passed the So-Called Equal Rights Amendment for Final Passage Today," Eagle Forum, March 20, 2017, at http://eagleforum.org/state-news/nevada/nevada-passed-era.html.

[27] Illinois General Assembly website, 100th General Assembly, Bill Status of SJRCA0004, http://www.ilga.gov/legislation/billstatus.asp?DocNum=4&GAID=14&GA=100&DocTypeID=SJRCA&LegID=99262&SessionID=91.

[28] Rick Pearson and Bill Lukitch, "Illinois Approves Equal Rights Amendment 36 Years after Deadline," *Chicago Tribune*, May 31, 2018, at http://www.chicagotribune.com/news/local/politics/ct-met-equal-rights-amendment-illinois-20180530-story.html.

[29] *CBS News Survey*, September 8-10, 1970. Source: Jane J. Mansbridge, *Why We Lost the ERA* (Chicago: U. of Chicago Press, 1986), pp. 206-209.

JA 194

57%. A later ERA-specific survey conducted by CBS News in 1999 reported that 74% of respondents supported the proposed ERA, while 10% were opposed.[30]

The ERA's expiration as a pending constitutional amendment was eventually followed by corresponding fall-off in related polling; there is little evidence of related activity by major survey research organizations after 1999, a development that is arguably due to the fact that the ERA was presumed to be a closed issue.

More recently, in 2017, the Harris Survey conducted a poll on women's status in American society. While it did not include a specific question concerning the ERA, the Harris Survey included the following query: "There has been much talk recently about changing women's status in society today. On the whole, do you favor or oppose most of the efforts to strengthen and change women's status in society?" Sixty-six percent of respondents favored strengthening and changing women's status in society, 7% were opposed, and 27% were not sure.[31]

# An Equal Rights Amendment: Legislative and Ratification History, 1923-1972

Despite the efforts of women's rights advocates in every Congress, nearly 50 years passed between the time when the Mott Amendment was first introduced in 1923 and the Equal Rights Amendment was approved by Congress and proposed to the states in 1972.

## Five Decades of Effort: Building Support for an Equal Rights Amendment in Congress, 1923-1970

The first proposal for an equal rights amendment, drafted by Alice Paul, was introduced in the 68th Congress in 1923.[32] In its original form, the text of the amendment read as follows:

> Men and women shall have equal rights throughout the United States and every place subject to its jurisdiction.
>
> Congress shall have power to enforce this article by appropriate legislation.[33]

Although Alice Paul characterized the then-Lucretia Mott Amendment as a logical and necessary next step in the campaign for women's rights following the Nineteenth Amendment, the proposal made little progress in Congress over the course of more than two decades. During the years

---

[30] Major survey research firms regularly conducted surveys of public attitudes toward the Equal Rights Amendment between the 1970s and the 1990s. Their findings reflected consistent support for the proposed amendment throughout the ratification period. For instance, an early Gallup Poll, conducted in March 1975, showed 58% of respondents favored the proposed ERA, while 24% opposed it, and 18% expressed no opinion. These levels of support changed little during the when the ERA was pending before the states, never dropping below a 57% approval rate. Source: *The Gallup Poll, Public Opinion, 1982* (Wilmington, DE: Scholarly Resources Inc., 1982), p. 140. In ensuing years, public support rose. One later survey, conducted by the CBS News Poll in 1999, reported that 74% of respondents supported the proposed ERA, while 10% were opposed. Source: *CBS News Poll*, "Slow Progress for Women," conducted December 13-16, 1999, at http://www.cbsnews.com/news/poll-slow-progress-for-women/.

[31] "Two in Three Americans Favor Enhancing Women's Status in Society," The Harris Survey, March 10, 2017, at http://www.theharrispoll.com/politics/enhancing-womens-status-society.html.

[32] S.J. Res. 21, 68th Congress, 1st session, introduced on December 10, 1923, by Senator Charles Curtis of Kansas, and H.J. Res. 75, introduced on December 13 by Representative Daniel Read Anthony, also of Kansas. Representative Anthony was a nephew of women's rights pioneer Susan B. Anthony.

[33] Ibid.

JA 195

following its first introduction, an equal rights amendment was the subject of hearings in either the House or Senate in almost every Congress. According to one study, the proposal was the subject of committee action, primarily hearings, on 32 occasions between 1923 and 1946, but it came to the floor for the first time—in the Senate—only in the latter year.[34] During this period, however, the proposal continued to evolve. In 1943, for instance, the Senate Judiciary Committee reported a version of an equal rights amendment incorporating revised language that remained unchanged until 1971:

> Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

> Congress and the several states shall have power, within their respective jurisdictions, to enforce this article by appropriate legislation.[35]

Throughout this period, amendment proponents faced opposition from traditionalists, organized labor, and some leaders of the women's movement. According to one study of the amendment's long pendency in Congress, "[t]he most persistent and most compelling trouble that crippled prospects for an ERA from its introduction in 1923 until a year after Congress initially passed it on to the states was opposition from most of organized labor during a period of ascending labor strength."[36] A principal objection raised by organized labor and women's organizations that opposed the amendment was concern that the ERA might lead to the loss of protective legislation for women, particularly with respect to wages, hours, and working conditions.[37] One historian notes that:

> Through the years of the New Deal and the Truman administration, however, protective legislation for women held a firm place in organized labor's list of policy favorites. Since an ERA threatened protective laws, it and its supporters qualified as the enemy.[38]

The nature of opposition from women's groups was illustrated by a 1946 statement issued by 10 prominent figures, including former Secretary of Labor Frances Perkins and former First Lady Eleanor Roosevelt, which asserted that an equal rights amendment would "make it possible to wipe out the legislation which has been enacted in many states for the special needs of women in industry."[39]

These attitudes toward the proposal persisted, even as women in great numbers entered the civilian workforce and the uniformed services during the four years of U.S. involvement in World War II (1941-1945), taking jobs in government, industry, and the service sector that had previously been filled largely by men. Congressional support for an equal rights amendment grew slowly in the late 1940s, but a proposal eventually came to the Senate floor, where it was the subject of debate and a vote in July 1946. Although the 39-35 vote to approve fell short of the

---

[34] Amelia Fry, "Alice Paul and the ERA," in Joan Hoff Wilson, ed., *Rights of Passage, The Past and Future of the ERA* (Bloomington, IN: Indiana U. Press, 1986), pp. 13-16.

[35] S.J. Res. 25, 78th Congress, introduced by Senator Guy Gillette of Iowa.

[36] Gilbert Y. Steiner, *Constitutional Inequality: The Political Fortunes of the Equal Rights Amendment* (Washington, DC: Brookings Institution, 1985), p. 7.

[37] Kathryn Kish Sklar, "Why Were Most Politically Active Women Opposed to the ERA in the 1920s?" in *Rights of Passage*, pp. 25-28. Opponents included the League of Women Voters and the General Federation of Women's Clubs. Steiner, *Constitutional Inequality*, pp. 7-10.

[38] Steiner, *Constitutional Inequality*, p 10

[39] Ibid., p. 52.

JA 196

Case 1:20-cv-00242-RC   Document 100-3   Filed 08/19/20   Page 54 of 76
USCA Case #21-5096   Document #1928907   Filed: 01/03/2022   Page 202 of 355

*The Proposed Equal Rights Amendment: Contemporary Ratification Issues*

two-thirds of Senators present and voting required by the Constitution, it was a symbolic first step.[40]

The so-called Hayden rider, named for its author, Senator Carl Hayden of Arizona, was perhaps emblematic of the arguments ERA advocates faced during the early post-war era. First introduced during the Senate's 1950 debate, this proposal stated that:

> The provisions of this article shall not be construed to impair any rights, benefits, or exemptions conferred by law upon persons of the female sex.[41]

Although the rider's ostensible purpose was to safeguard protective legislation, one source suggested an ulterior motive: "Hayden deliberately added the riders in order to divide the amendment's supporters, and these tactics delayed serious consideration of the unamended version of the Equal Rights Amendment."[42] Whatever the rider's intent, it was not welcomed by ERA supporters,[43] and was opposed on the floor by Senator Margaret Chase Smith of Maine, at that time the only woman Senator.[44]

The Senate ultimately passed an equal rights amendment resolution that included the Hayden rider twice in the 1950s. In the 81st Congress, S.J. Res. 25, introduced by Senator Guy Gillette of Iowa and numerous co-sponsors, was approved by a vote of 63-19 on January 25, 1950, a margin that comfortably surpassed the two-thirds of Members present and voting required by the Constitution.[45] An amendment came before the Senate again in the 83rd Congress, when Senator John M. Butler of Maryland and co-sponsors introduced S.J. Res. 49. The resolution, as amended by the Hayden rider, passed by a vote of 73-11 on July 16, 1953.[46] Over the next 16 years, the Senate considered various equal rights amendment resolutions in committee in almost every session, but no proposal was considered on the floor during this period. By 1964, however, the Hayden rider had lost support in the Senate as perceptions of the equal rights amendment concept continued to evolve. In the 88th Congress, the Senate Judiciary Committee effectively removed it from future consideration when it stated in its report:

> Your committee has considered carefully the amendment which was added to this proposal on the floor of the Senate.... Its effect was to preserve "rights, benefits, or exemptions" conferred by law upon persons of the female sex. This qualification is not acceptable to women who want equal rights under the law. It is under the guise of so-called "rights" or

---

[40] "Equal Rights Amendment," *Congressional Quarterly Almanac, 81st Congress, Second Session, 1950*, vol. V (Washington, DC: Congressional Quarterly News Features, 1951), p. 419.

[41] See S.J. Res. 25, as amended, 81st Congress.

[42] Mary Frances Berry, *Why ERA Failed, Politics, Women's Rights, and the Amending Process of the Constitution* (Bloomington, IN: Indiana U. Press, 1986), p. 60.

[43] In oral history interviews conducted between November 1972 and March 1973, Alice Paul recalled that Senator Hayden's intentions in introducing the rider were sincere, and that he was dismayed when she told him it made the amendment unacceptable to many ERA activists. See "Conversations with Alice Paul: Women's Suffrage and the Equal Rights Amendment," Suffragists Oral History Project, U. of California, Calisphere, c. 1976, at http://content.cdlib.org/view?docId=kt6f59n89c&brand=calisphere&doc.view=entire_text.

[44] While she voted against the rider, Senator Smith voted yes on final passage of the resolution as amended, which included the rider. Senate debate, *Congressional Record*, vol. 96, pt. 1 (January 25, 1950), p. 870. See also, *Congressional Quarterly Almanac, 1950*, p. 420.

[45] Senate debate, *Congressional Record*, vol. 96, pt. 1 (January 25, 1950), pp. 870-873. For an analysis of the vote, see *Congressional Quarterly Almanac, 1950*, pp. 419-422.

[46] As with her vote in 1950, Senator Smith opposed the rider, but voted yes on final passage of the resolution in 1953. Senate debate, *Congressional Record*, vol. 99, pt. 7 (July 16, 1953), p. 8974.

JA 197

"benefits" that women have been treated unequally and denied opportunities which are available to men.[47]

Between 1948 and 1970, however, the House of Representatives took no action on an equal rights amendment. Throughout this period, Representative Emanuel Celler of New York had blocked consideration of the amendment in the Judiciary Committee, which he chaired from 1949 to 1953 and again from 1955 to 1973. A Member of the House since 1923, Chairman Celler had been a champion of New Deal social legislation, immigration reform, civil rights legislation, and related measures throughout his career, but his strong connections with organized labor, which, as noted earlier, opposed an equal rights amendment during this period, may have influenced his attitudes toward the proposal.[48]

## Congress Approves and Proposes the Equal Rights Amendment, 1970-1972

Although proposals for an equal rights constitutional amendment continued to be introduced in every Congress, there was no floor consideration of any proposal by either chamber for almost two decades following the Senate's 1953 action. By the early 1970s, however, the concept had gained increasing visibility as one of the signature issues of the emerging women's movement in the United States. As one eyewitness participant later recounted:

> The 1960s brought a revival of the women's rights movement and more insistence on changed social and legal rights and responsibilities. The fact of women's involvement in the civil rights movement and the anti-war movement and their changed role in the economy created a social context in which many women became active supporters of enhanced legislation for themselves.[49]

By the time the concept of an equal rights amendment emerged as a national issue, it had also won popular support, as measured by public opinion polling. As noted earlier in this report, the first recorded survey on support for the proposal was a CBS News telephone poll conducted in September 1970, in which 56% of respondents favored an equal rights amendment.[50] Favorable attitudes remained consistent during the 1970s and throughout the subsequent ratification period.[51] Labor opposition also began to fade, and in April 1970, one of the nation's largest and most influential unions, the United Auto Workers, voted to endorse the concept of an equal rights amendment.[52]

In actions that perhaps reflected changing public attitudes, Congress had also moved during the 1960s on several related fronts to address women's equality issues. The Equal Pay Act of 1963 "prohibited discrimination on account of sex in payment of wages,"[53] while the Civil Rights Act of 1964 banned discrimination in employment on the basis of race, color, religion, *sex*, or national

---

[47] U.S. Congress, Senate, Committee on the Judiciary, *Equal Rights for Men and Women*, report to accompany S.J. Res. 45, S. Rept. 1558, 88th Congress, 2nd session (Washington, DC: GPO, 1964), p. 2.

[48] Steiner, *Constitutional Inequality*, pp. 14-15.

[49] Berry, *Why ERA Failed, Politics, Women's Rights, and the Amending Process of the Constitution*, p. 60.

[50] *CBS News Survey*, September 8-10, 1970. Source: Jane J. Mansbridge, *Why We Lost the ERA* (Chicago: U. of Chicago Press, 1986), pp. 206-209.

[51] See above at footnote 30.

[52] Mansbridge, *Why We Lost the ERA*, p. 12.

[53] Equal Pay Act of 1963, 77 Stat. 56.

JA 198

origin [emphasis added].[54] Although it remained pending, but unacted upon in Congress, proposals for an equal rights amendment had gained support in other areas. The Republican Party had endorsed an earlier version of the amendment in its presidential platform as early as 1940, followed by the Democratic Party in 1944.[55] Both parties continued to include endorsements in their subsequent quadrennial platforms, and, by 1970, Presidents Eisenhower, Kennedy, Lyndon Johnson, and Nixon were all on record as having endorsed an equal rights amendment.[56]

### First Vote in the House, 91st Congress—1970

Representative Martha Griffiths of Michigan is widely credited with breaking the legislative stalemate that had blocked congressional action on a series of equal rights amendment proposals for more than two decades.[57] Against the background of incremental change outside Congress, Representative Griffiths moved to end the impasse in House consideration of the amendment. On January 16, 1969, she introduced H.J. Res. 264, proposing an equal rights amendment, in the House of Representatives. The resolution was referred to the Judiciary Committee where, as had been expected, no further action was taken.[58] On June 11, 1970, however, Representative Griffiths took the unusual step of filing a discharge petition to bring the proposed amendment to the floor. A discharge petition "allows a measure to come to the floor for consideration, even if the committee of referral does not report it and the leadership does not schedule it."[59] In order for a House committee to be discharged from further consideration of a measure, a majority of Representatives (218, if there are no vacancies) must sign the petition. As reported at the time, the use of the discharge petition had seldom been invoked successfully, having gained the necessary support only 24 times since the procedure had been established by the House of Representatives in 1910, and Representative Griffiths' filing in 1970.[60] By June 20, Representative Griffiths announced that she had obtained the necessary 218 Member signatures for the petition.[61] Although the Judiciary Committee had neither scheduled hearings nor issued a report, the resolution was brought to the House floor on August 10. The House approved the motion to discharge by a vote of 332 to 22, and approved the amendment itself by a vote of 334 to 26.[62]

The Senate had begun to act on a resolution proposing an equal rights amendment in the 91st Congress in 1970, before the amendment came to the House floor. In May, the Judiciary Committee's Subcommittee on Constitutional Amendments held hearings on S.J.Res. 61, the Senate version of an amendment. These hearings were followed by hearings in the full committee in September, and consideration on the Senate floor in early October. Floor debate was dominated by consideration and adoption of two amendments that would have (1) exempted women from

---

[54] Title VII, Civil Rights Act of 1964, 78 Stat. 241.

[55] Donald Bruce Johnson, comp., *National Party Platforms*, vol. I, 1840-1956 (Urbana, IL: U. of Illinois Press, 1978), pp. 393, 403.

[56] U.S. President's Task Force on Women's Rights and Responsibilities, *A Matter of Simple Justice* (Washington, DC: GPO, 1970), p. 5.

[57] "Martha Griffiths and the Equal Rights Amendment," National Archives, Center for Legislative Archives, at http://www.archives.gov/legislative/features/griffiths.

[58] *Congressional Record*, vol. 115, pt. 1 (January 16, 1969), p. 1144.

[59] CRS Report 97-552, *The Discharge Rule in the House: Principal Features and Uses*, by Richard S. Beth, p. 3.

[60] "Equal Rights for Women Dropped in Senate," *Congressional Quarterly Almanac, 91st Congress, 2nd Session—1970, vol. XXVI* (26) (Washington, DC: Congressional Quarterly, Inc., 1970), p. 707.

[61] Ibid.

[62] For debate and vote on the amendment, see *Congressional Record*, vol. 116, pt. 21 (August 10, 1970), pp. 28004-28037.

JA 199

compulsory military service, and (2) permitted non-denominational prayer in public schools; and a final amendment that provided alternative language for the resolution. Thus encumbered, the Senate resolution was unacceptable to ERA supporters, but, in any event, the Senate adjourned on October 14 without a vote on the resolution as amended, and failed to bring it to the floor for final action in the subsequent lame-duck session.[63]

## Passage and Proposal by Congress, 92nd Congress—1971-1972

In the 92nd Congress, Representative Griffiths began the process anew in the House of Representatives when she introduced H.J.Res. 208, proposing an equal rights amendment. Chairman Celler continued to oppose it, but no longer blocked committee action. After subcommittee and full committee hearings, the House Judiciary Committee reported an amendment on July 14, but the resolution as reported included amendments concerning citizenship, labor standards, and the exemption of women from selective service that were unacceptable to ERA supporters. When H.J.Res. 208 came to the floor in early October, however, the House stripped out the committee amendments, and, on October 12, it approved the resolution by a bipartisan vote of 354 to 24.[64]

The Senate took up the House-passed amendment during the second session of the 92nd Congress, in March 1972. On March 14, the Judiciary Committee reported a clean version of H.J. Res. 208 after rejecting several amendments, including one adopted by the Subcommittee on the Constitution, and several others offered in the full committee. The resolution was called up on March 15, and immediately set aside. The Senate began debate on the amendment on March 17, with Senator Birch Bayh of Indiana, a longtime ERA supporter, as floor manager. On the same day, President Richard Nixon released a letter to Senate Republican Leader Hugh Scott of Pennsylvania reaffirming his endorsement of the Equal Rights Amendment.[65] After two days in which the Members debated the proposal, Senator Sam Ervin of North Carolina offered a series of amendments that, among other things, would have exempted women from compulsory military service and service in combat units in the U.S. Armed Forces, and preserved existing gender-specific state and federal legislation that extended special exemptions or protections to women. Over the course of two days, Senator Ervin's amendments were serially considered and rejected, generally by wide margins. On March 22, the Senate approved the House version of the amendment, H.J. Res. 208, by a vote of 84 to 8, with strong bipartisan support.[66]

The text of H.J. Res. 208—the Equal Rights Amendment as proposed by the 92nd Congress—follows:

House Joint Resolution 208

---

[63] "Equal Rights for Women Dropped in Senate," *Congressional Quarterly Almanac, 1970*, pp. 708-709.

[64] The vote in the House was 217 Democrats and 137 Republicans in favor, 12 Democrats and 12 Republicans opposed. *Congressional Record*, vol. 117, pt. 27 (October 12, 1971), p. 35815. See also "House Passes Equal Rights Constitutional Amendment," *Congressional Quarterly Almanac, 92nd Congress, 1st Session, 1971, vol. XXVII* (27) (Washington, DC: Congressional Quarterly Inc. 1972), pp. 656-658.

[65] In his letter, President Nixon noted that he had co-sponsored the ERA as a freshman Senator in 1951, and that he remained committed to the amendment. "Letter to the Senate Minority Leader About the Proposed Constitutional Amendment on Equal Rights for Men and Women," U.S. President, *Public Papers of the Presidents of the United States, Richard Nixon, 1972* (Washington, DC: GPO, 1972), p. 444.

[66] The Senate vote was 47 Democrats and 37 Republicans in favor; two Democrats and six Republicans opposed. *Congressional Record*, vol. 118, pt. 8 (March 22, 1972), p. 9598. See also "Equal Rights: Amendment Passed over Ervin Opposition," *Congressional Quarterly Almanac, 92nd Congress, 2nd session, 1972, vol. XVIII* (18) (Washington, DC: Congressional Quarterly Inc. 1973), pp. 199-204.

JA 200

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each house concurring therein), That

The following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years of its submission by the Congress:

"Section 1. Equality of rights under the law shall not be denied or abridged by the United States or any State on account of sex.

"Section 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"Section 3. This amendment shall take effect two years after the date of ratification."

The action of the two chambers in approving H.J. Res. 208 by two-thirds majorities of Members present and voting (91.3% in the Senate and 93.4% in the House) had the effect of formally proposing the amendment to the states for ratification.

## Congress Sets a Seven-Year Ratification Deadline

When it proposed the Equal Rights Amendment, Congress stipulated in the preamble of the joint resolution that the ERA was to be ratified by the constitutionally requisite number of state legislatures (38 then as now) within seven years of the time it was proposed, in order to become a valid part of the Constitution. A time limit for ratification was first instituted with the Eighteenth Amendment,[67] proposed in 1917, and, with the exception of the Nineteenth Amendment and the Child Labor Amendment, all subsequent proposed amendments have included a ratification deadline of seven years.

With respect to the Child Labor Amendment, Congress did not incorporate a ratification deadline when it proposed the amendment in 1924. It was ultimately ratified by 28 states through 1937, 8 short of the 36 required by the Constitution at that time, the Union then comprising 48 states. Although the amendment arguably remains technically viable because it lacked a deadline when proposed, the Supreme Court in 1941 upheld federal authority to regulate child labor as incorporated in the Fair Labor Standards Act of 1938 (52 Stat. 1060) in the case of *United States v. Darby Lumber Company* (312 U.S. 100 (1941)). In this case, the Court reversed its earlier decision in *Hammer v. Dagenhart* (24 U.S. 251 (1918)), which ruled that the Keating-Owen Child Labor Act of 1916 (39 Stat. 675) was unconstitutional. The amendment is thus widely regarded as having been rendered moot by the Court's 1941 decision.[68]

In the case of the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments, the "sunset" ratification provision was incorporated *in the body of the amendment itself*. For subsequent amendments, however, Congress determined that inclusion of the time limit within its body "cluttered up" the proposal. Consequently, all but one of the subsequently proposed amendments[69]—the Twenty-Third, Twenty-Fourth, Twenty-Fifth and Twenty-Sixth, and the

---

[67] The origins of and rationale for the seven-year ratification deadline are examined in greater detail later in this report.

[68] John R. Vile, "Child Labor Amendment," in *Encyclopedia of Constitutional Amendments, Proposed Amendments, and Amending Issues, 1789-2010*, 3rd edition (Santa Barbara, CA: ABC-CLIO, 2010), vol. 2, p. 65.

[69] Only the proposed District of Columbia Voting Rights (Congressional Representation) Amendment included a ratification deadline within the body of the amendment. This exception is examined later in this report.

JA 201

ERA—placed the limit *in the preamble or authorizing resolution, rather than in the body of the amendment itself.*[70] This decision, seemingly uncontroversial at the time, was later to have profound implications for the question of extending the ratification window for the ERA.

## Ratification Efforts in the States

States initially responded quickly once Congress proposed the Equal Rights Amendment for their consideration. Hawaii was the first state to ratify, on March 22, 1972, the same day the Senate completed action on H.J. Res. 208. By the end of 1972, 22 states had ratified the amendment, and it seemed well on its way to adoption. Opposition to the amendment, however, began to coalesce around organizations like "STOP ERA," which revived many of the arguments addressed during congressional debate.[71] Opponents also broadly asserted that ratification of the amendment would set aside existing state and local laws providing workplace and other protections for women and would lead to other, unanticipated negative social and economic effects.[72] In 1976, ERA supporters established a counter-organization, "ERAmerica," as an umbrella association to coordinate the efforts of pro-amendment groups and serve as a high-profile national advocate for the amendment.[73]

Opposition to the proposed Equal Rights Amendment continued to gain strength, although, as noted earlier in this report, public approval of the amendment never dropped below 54% during the ratification period.[74] Following the first 22 state approvals, 8 additional states ratified in 1973, 3 more in 1974, and 1 each in 1975 and 1977, for an ultimate total of 35, 3 short of the constitutional requirement of 38 state ratifications.[75] At the same time, however, ERA opponents in the states promoted measures in a number of legislatures to repeal or rescind their previous ratifications. Although the constitutionality of such actions has long been questioned, by 1979, five states had passed rescission measures.[76] The question of rescission will be addressed in detail later in this report.

---

[70] U.S. Congress, *The Constitution of the United States of America, Analysis and Interpretation*, "Article V, Mode of Amendment," online edition available to Members of Congress and their staff at http://www.crs.gov/conan/default.aspx?doc=Article05.xml&mode=topic&t=1|2|3; hereinafter, *The Constitution Annotated*.

[71] Founded by political activist Phyllis Schlafly, STOP ERA, which was renamed "Eagle Forum" in 1975, continues, among other issues, to oppose the ERA in 2017. See Douglas Martin, "Phyllis Schlafly, 'First Lady' of a March to the Political Right, Dies at 92," *New York Times*, September 5, 2016, at https://www.nytimes.com/2016/09/06/obituaries/phyllis-schlafly-conservative-leader-and-foe-of-era-dies-at-92.html.

[72] David E. Kyvig, *Explicit and Authentic Acts: Amending the U.S. Constitution, 1776-1995* (Lawrence, KS: University of Kansas Press, 1996), pp. 409-412.

[73] Ibid., pp. 412-413. Berry, *Why ERA Failed*, p. 69. ERAmerica drew support from such organizations as the League of Women Voters, American Association of University Women, Federation of Business and Professional Women's Clubs, and other pro-ERA organizations.

[74] Mansbridge, *Why We Lost the ERA*, pp. 206-209.

[75] Ratifications by year and order of approval: 1972: Hawaii, New Hampshire, Delaware, Iowa, Kansas, Idaho, Nebraska, Texas, Tennessee, Alaska, Rhode Island, New Jersey, Colorado, West Virginia, Wisconsin, New York, Michigan, Maryland, Massachusetts, Kentucky, Pennsylvania, and California; 1973: Wyoming, South Dakota, Oregon, Minnesota, New Mexico, Vermont, Connecticut, and Washington; 1974: Maine, Montana, and Ohio; 1975: North Dakota; 1977: Indiana. (The Equal Rights Amendment/equalrightsamendment.org), "State Ratifications of the ERA," at http://www.equalrightsamendment.org/ratification.htm. This list has not been updated to include Nevada and Illinois.

[76] State rescissions by year: 1973: Nebraska; 1974: Tennessee; 1977: Idaho; 1978: Kentucky; 1979: South Dakota. Source, Congressional Research Service Memorandum, *Questions Pertaining to the Equal Rights Amendment*, by David C. Huckabee, August 19, 2004, p. 2. Available to Members of Congress and staff from CRS.

JA 202

## Ratification Is Extended in 1978, but Expires in 1982

By the late 1970s, the ratification process had clearly stalled, and the deadline for ratification as specified in the preamble to H.J. Res. 208 was approaching. Reacting to the impending "sunset" date of March 22, 1979, ERA supporters developed a novel strategy to extend the deadline by congressional resolution. The vehicle chosen by congressional supporters was a House joint resolution, H.J.Res. 638, introduced in the 95th Congress on October 26, 1977, by Representative Elizabeth Holtzman[77] of New York and others. In its original form, the resolution proposed to extend the deadline an additional seven years, thus doubling the original ratification period.

During hearings in the House Judiciary Committee's Subcommittee on Civil and Constitutional Rights, legal scholars debated questions on the authority of Congress to extend the deadline; whether an extension vote should be by a simple majority or a supermajority of two-thirds of the Members present and voting; and if state rescissions of their ratifications were lawful. The full Judiciary Committee also addressed these issues during its deliberations in 1978.[78] Continuing controversy in the committee and opposition to extending the ratification period a full seven years led to a compromise amendment to the resolution that reduced the proposed extension to three years, three months, and eight days. ERA supporters accepted the shorter period as necessary to assure committee approval of the extension. Two other changes, one that would have recognized the right of states to rescind their ratifications, and a second requiring passage of the extension in the full House by a two-thirds super majority, were both rejected by the committee when it reported the resolution to the House on July 30.[79]

The full House debated the resolution during summer 1978, rejecting an amendment that proposed to recognize states' efforts to rescind their instruments of ratification. Another amendment rejected on the floor would have required votes on the ERA deadline extension to pass by the same two-thirds vote necessary for original actions proposing constitutional amendments. The House adopted the resolution by a vote of 233 to 189 on August 15, 1978.[80] The Senate took up H.J.Res. 638 in October; during its deliberations it rejected amendments similar to those offered in the House and joined the House in adopting the resolution, in this case by a vote of 60 to 36 on October 6.[81] In an unusual expression of support, President Jimmy Carter signed the joint resolution on October 20, even though the procedure of proposing an amendment to the states is solely a congressional prerogative under the Constitution.[82]

During the extended ratification period, ERA supporters sought unsuccessfully to secure the three necessary ratifications for the amendment, while opponents pursued rescission in the states with similarly unsuccessful results. A Gallup Poll reported in August 1981 that 63% of respondents supported the amendment, a higher percentage than in any previous survey, but, as one observer noted, "The positive poll results were really negative, because additional ratifications needed to

---

[77] Representative Holtzman had defeated Representative Emanuel Celler (q.v.) for renomination in the Democratic primary in 1992.

[78] "ERA Deadline Extended," *Congressional Quarterly Almanac, 95th Congress, 2nd Session, 1978, vol. XXIV* (34) (Washington, DC: Congressional Quarterly Inc., 1979), pp. 773-775.

[79] Ibid.

[80] Ibid., pp. 775-776.

[81] Ibid., p. 773.

[82] "ERA Deadline Extension," *Congress and the Nation, vol. V, 1977-1980* (Washington, DC: Congressional Quarterly Inc., 1981), pp. 798-800. For President Carter's explanation of his signing of the extension joint resolution, see "Equal Rights Amendment, Remarks on Signing H.J.Res. 638," in U.S. President, *Public Papers of the Presidents of the United States, Jimmy Carter, 1978* (Washington, DC: GPO, 1979), pp. 1800-1801.

JA 203

come from the states in which support was identified as weakest."[83] On June 30, 1982, the Equal Rights Amendment deadline expired with the number of state ratifications at 35, not counting rescissions.

## Rescission: A Legal Challenge to the Ratification Process

As noted earlier, while ratification of the proposed Equal Rights Amendment was pending, a number of states passed resolutions that sought to rescind their earlier ratifications. By the time the amendment's extended ratification deadline passed in 1982, the legislatures of more than 17 states had considered rescission, and 5 passed these resolutions.[84] Throughout the period, however, legal opinion as to the constitutionality of rescission remained divided.

On May 9, 1979, the state of Idaho, joined by the state of Arizona and individual members of the Washington legislature, brought legal action in the U.S. District Court for the District of Idaho, asserting that states did have the right to rescind their instruments of ratification.[85] The plaintiffs further asked that the extension enacted by Congress be declared null and void.[86]

On December 23, 1981, District Court Judge Marion Callister ruled (1) that Congress had exceeded its power by extending the deadline from March 22, 1979, to June 30, 1982; and (2) that states had the authority to rescind their instruments of ratification, provided they took this action *before* an amendment was declared to be an operative part of the Constitution.[87] The National Organization for Women (NOW), the largest ERA advocacy organization, and the General Services Administration (GSA)[88] appealed this decision directly to the Supreme Court, which, on January 25, 1982, consolidated four appeals and agreed to hear the cases. In its order, the High Court also stayed the judgment of the Idaho District Court. On June 30, as noted earlier, the extended ratification deadline expired, so that when the Supreme Court convened for its term on October 4, it dismissed the appeals as moot, and vacated the district court decision.[89]

# Renewed Legislative and Constitutional Proposals, 1982 to the Present

Interest in the proposed Equal Rights Amendment did not end when its extended ratification deadline expired on June 30, 1982. Since that time, there have been regular efforts to introduce the concept as a "fresh start" in Congress, while additional approaches have emerged that would revive H.J. Res. 208, the amendment as originally proposed by the 92nd Congress.

---

[83] Berry, *Why ERA Failed*, p. 79.

[84] Kyvig, *Explicit and Authentic Acts*, p. 415. For state rescissions, see above at footnote 75.

[85] However, neither the Idaho nor the Arizona legislature had passed a resolution of rescission.

[86] *State of Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho, 1981).

[87] John F. Carroll, "Constitutional Law: Constitutional Amendment, Rescission of Ratification, Extension of Ratification Period, State of Idaho v. Freeman," *Akron Law Review*, vol. 16, no. 1 (summer 1982), pp. 151-161.

[88] GSA became involved in 1982 because it was at that time the parent agency of the National Archives and Records Service, now the National Archives and Records Administration, which, then, as now, received and recorded state ratifications for proposed constitutional amendments.

[89] *Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho, 1981), *prob. juris. noted*, 455 U.S. 918 (1982), *vacated and remanded to dismiss*, 459 U.S. 809 (1982).

JA 204

## "Fresh Start" Proposals

One potential means of restarting an equal rights amendment would be by introduction of a new joint resolution, a "fresh start." Even as the June 30, 1982, extended ratification deadline approached, resolutions proposing an equal rights amendment were introduced in the 97th Congress. New versions of an ERA have continued to be introduced in the House and Senate in each succeeding Congress. For many years, Senator Edward Kennedy of Massachusetts customarily introduced an equal rights amendment early in the first session of a newly convened Congress; since the 111th Congress, Senator Robert Menendez of New Jersey has introduced Senate fresh start proposals. In the House of Representatives, Representative Carolyn Maloney of New York introduced a fresh start equal rights amendment in the 105th and all succeeding Congresses. Fresh start amendments introduced in the 115th Congress, S.J.Res. 6 and H.J.Res. 33, were discussed earlier in this report, under "Most Recent Developments."

## "Three-State" Proposals

In addition to "fresh start" proposals, alternative approaches to the ratification question have also emerged over the years. In 1994, Representative Robert E. Andrews of New Jersey introduced H.Res. 432 in the 103rd Congress. His proposal sought to require the House of Representatives to "take any legislative action necessary to verify the ratification of the Equal Rights Amendment as part of the Constitution when the legislatures of an additional 3 states ratify the Equal Rights Amendment." This resolution was a response to the three-state strategy[90] proposed by a pro-ERA volunteer organization "ERA Summit" in the 1990s,[91] which was called following adoption of the Twenty-Seventh Amendment, the Madison Amendment, in 1992. The rationale for H.Res. 432, and a succession of identical resolutions offered by Representative Andrews in subsequent Congresses,[92] was that, following the precedent of the Madison Amendment, the ERA remained a valid proposal and the ratification process was still open. Representative Andrews further asserted that the action of Congress in extending the ERA deadline in 1978 provided a precedent by which "subsequent sessions of Congress may adjust time limits placed in proposing clauses by their predecessors. These adjustments may include extensions of time, reductions, or elimination of the deadline altogether."[93] The influence of the Madison Amendment is examined at greater length later in this report.

The year 2012 marked the 30th anniversary of the expiration of the proposed Equal Rights Amendment's extended ratification deadline. During that period, new analyses emerged that examined the question of whether the amendment proposed in 1972 remains constitutionally viable. As noted later in this report, one of the most influential developments opening new lines of analysis occurred when the Twenty-Seventh Amendment, originally proposed in 1789 as part of a package that included the Bill of Rights, was taken up in the states after more than two centuries and ultimately ratified in 1992. This action, and Congress's subsequent

---

[90] As noted elsewhere in this report, the "three-state" argument maintains that (1) Congress has the constitutional authority to propose, alter, or terminate any limits on the ratification of amendments pending before the states; (2) all existing ratifications remain in effect and viable; and (3) rescissions of ratification passed by some states are invalid.

[91] The Equal Rights Amendment website, a project of the Alice Paul Institute, in collaboration with the ERA Task Force of the National Council of Women's Organizations, at http://www.equalrightsamendment.org.

[92] Most recently, H.Res. 794 in the 112th Congress.

[93] Rep. Robert E. Andrews, "Applauding the Recent Actions Taken by the Illinois State Legislature Regarding the Equal Rights Amendment," Extension of Remarks in the House, *Congressional Record*, vol. 149, pt. 10 (June 5, 2003), pp. 14039-14040.

JA 205

acknowledgment of the amendment's viability, bear directly on the issue of the current status of the proposed Equal Rights Amendment, and are examined later in this report.

In the 112th Congress, for the first time since the proposed ERA's deadline expired, resolutions were introduced in both the House and Senate[94] that sought specifically to (1) repeal, or eliminate entirely, the deadlines set in 1972 and 1978; (2) reopen the proposed ERA for state ratification at the then-current count of 35 states; and (3) extend the period for state ratification indefinitely. Current legislation proposing the three state/two state strategy in the 115th Congress, S.J.Res. 5 and H.J.Res. 53 were discussed earlier in this report, under "Most Recent Developments."

# Contemporary Viability of the Equal Rights Amendment

Supporters of the ERA, and particularly the three-state strategy—now, arguably, the one-state strategy, assuming the validity of ratifications by Nevada and Illinois—identify a number of sources that they claim support their contention that the proposed Equal Rights Amendment remains constitutionally viable. Other scholars and observers, however, have raised concerns about, or objections to, these assertions.

## Article V: Congressional Authority over the Amendment Process

Proponents of the proposed Equal Rights Amendment cite the exceptionally broad authority over the constitutional amendment process granted to Congress by Article V of the Constitution as a principal argument for their case. The article's language states that "[t]he Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution ... which ... shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States or by Conventions in three fourths thereof...." While the Constitution is economical with words when spelling out the authority extended to the three branches of the federal government, it does speak specifically when it places limits on these powers. In this instance, the founders placed no time limits or other conditions on congressional authority to propose amendments, so long as they are approved by the requisite two-thirds majority of Senators and Representatives present and voting.

In a 1992 opinion for the Counsel to the President concerning ratification of the Twenty-Seventh Amendment, Acting Assistant Attorney General Timothy Flanigan took note of the absence of time limits in Article V, and drew a comparison with their presence in other parts of the Constitution:

> ... [t]he rest of the Constitution strengthens the presumption that when time periods are part of a constitutional rule, they are specified. For example, Representatives are elected every second year ... and a census must be taken within every ten year period following the first census, which was required to be taken within three years of the first meeting of Congress..... Neither House of Congress may adjourn for more than three days without the consent of the other ... and the President has ten days (Sundays excepted) within which to sign or veto a bill that has been presented to him.... The Twentieth Amendment refers to certain specific dates, January 3rd and 20th. Again, if the Framers had intended there to be

---

[94] H.J.Res. 47, Representative Baldwin and others; S.J.Res. 38l, Senator Cardin and others. Aside from routine committee referral, no action was taken on these resolutions.

JA 206

a time limit for the ratification process, we would expect that they would have so provided in Article V.[95]

Further, Article V empowers Congress to specify either of two modes of ratification: by the state legislatures, or by ad hoc state conventions. Neither the President nor the federal judiciary is allocated any obvious constitutional role in the amendment process. To those who might suggest the Constitutional Convention did not intend to grant such wide authority to Congress, ERA supporters can counter by noting that the founders provided a second mode of amendment, through a convention summoned by Congress at the request of the legislatures of two-thirds of the states.[96] The suggestion here is that the founders deliberately provided Congress with plenary authority over the amendment process, while simultaneously checking it through the super-majority requirement, and balancing it with the Article V Convention alternative.[97] In the case of the proposed Equal Rights Amendment, it has been inferred by ERA supporters that since neither ratification deadlines nor contemporaneity requirements for amendments appear anywhere in Article V, Congress is free to propose, alter, or terminate such ratification provisions at its discretion.[98]

Advocates of congressional authority over the amendment process might also note the fact that Congress has acted on several occasions in the course of, or after, the ratification process by the states to assert its preeminent authority under Article V in determining ratification procedures.[99] For instance, on July 21, 1868, Congress passed a resolution that declared the Fourteenth Amendment to have been duly ratified and directed Secretary of State William Seward to promulgate it as such. Congress had previously received a message from the Secretary reporting that 28 of 37 states then in the Union had ratified the amendment, but that 2 of the 28 ratifying states had subsequently passed resolutions purporting to rescind their ratifications, and the legislatures of 3 others had approved the amendment only after previously rejecting earlier ratification resolutions. Congress considered these issues but proceeded to declare the ratification

---

[95] U.S. Department of Justice, Office of Legal Counsel, *Congressional Pay Amendment, Memorandum Opinion for the Counsel to the President*, by Timothy E. Flanigan, Acting Assistant Attorney General, Washington, November 2, 1992, Medical and Public Health Law Site, LSU Law Center, Louisiana State University, at https://biotech.law.lsu.edu/blaw/ olc/congress.17.htm.

[96] The founders were concerned that Congress might resist the proposal of necessary amendments. As a result, they included the Article V Convention process as an alternative to congressional proposal of amendments. Alexander Hamilton explained the origins of the Article V Convention process in *The Federalist*: "The intrinsic difficulty of governing thirteen states ... will, in my opinion, constantly impose on the national rulers the necessity of a spirit of accommodation to the reasonable expectations of their constituents. But there is yet a further consideration.... It is this, that the national rulers, whenever nine States concur, will have no option on the subject. By the first article of the plan, the Congress will be obliged to call a convention for proposing amendments.... The words of this article are peremptory. The Congress 'shall call a convention.' Nothing in this particular is left to the discretion of that body." See Alexander Hamilton, "Conclusion," in *The Federalist*, Number 85 (Cambridge, MA: The Belknap Press of the Harvard University Press, 1961), p. 546.

[97] For further information on the "Article V Convention" alternative method for the proposal of constitutional amendments, see CRS Report R42589, *The Article V Convention to Propose Constitutional Amendments: Contemporary Issues for Congress*, by Thomas H. Neale; and CRS Report R42592, *The Article V Convention for Proposing Constitutional Amendments: Historical Perspectives for Congress*, by Thomas H. Neale.

[98] Mason Kalfus, "Why Time Limits on the Ratification of Constitutional Amendments Violate Article V," *University of Chicago Law Review*, vol. 66, no. 2 (spring, 1999), pp. 451-453.

[99] While these are precedents that Congress could follow, or at least look to for guidance, it should be recalled that one Congress may not bind succeeding Congresses in expression of their decision making. See, for example, William Holmes Brown, Charles W. Johnson, and John V. Sullivan, *House Practice: A Guide to the Rules, Precedents, and Procedures of the House* (Washington, DC: GPO, 2011), p. 158: "The Constitution gives each House the power to determine the rules of its proceedings.... This power cannot be restricted by the rules or statutory enactments of a preceding House."

JA 207

process complete.[100] Congress similarly exercised its authority over the process less than two years later when it confirmed the ratification of the Fifteenth Amendment by resolution passed on March 30, 1870.[101] Congress exercised its authority over the amendment process again in 1992 when it declared the Twenty-Seventh Amendment, the so-called "Madison Amendment," to have been ratified, an event examined in the next section of this report.

Opponents of ERA extension, while not questioning the plenary authority of Congress over the amending process, raise questions on general grounds of constitutional restraint and fair play. Some reject it on fundamental principle; Grover Rees III, writing in *The Texas Law Review*, asserted that

> ... extension is unconstitutional insofar as it rests on the unsubstantiated assumption that states which ratified the ERA with a seven-year time limit also would have ratified with a longer time limit, and insofar as it attempts to force those states into an artificial consensus regardless of their actual intentions.[102]

ERA supporter Mary Frances Berry noted a similar argument raised by the amendment's opponents:

> ... some scholars pointed out that legally an offer and agreed-upon terms is required before any contract is valid. ERA ratification, according to this view, was a contract. Therefore, states could not be regarded as contracting not in the agreed upon terms. The agreed upon terms included a seven-year time limit. When seven years passed, all pre-existing ratifications expired.[103]

Writing in *Constitutional Commentary*, authors Brannon P. Denning and John R. Vile offered additional criticisms of efforts to revive the proposed Equal Rights Amendment, noting that ample time had been provided for ratification between 1972 and 1982. They further suggested that elimination of ratification deadlines would reopen the question of purported state rescissions of acts of ratification; that progress in women's equality in law and society may have "seemed to render ERA superfluous"; and that allowing the proposed amendment "a third bite at the apple would suggest that no amendment to the U.S. Constitution ever proposed ... could ever be regarded as rejected."[104]

## The Madison Amendment (the Twenty-Seventh Amendment): A Dormant Proposal Revived and Ratified

Supporters of the proposed Equal Rights Amendment cite another source in support of their argument for the proposed amendment's viability: the Twenty-Seventh Amendment to the Constitution, also known as the Madison Amendment, which originated during the first year of government under the Constitution, but fell into obscurity, and became the object of renewed

---

[100] 15 Stat. 709. The reconstructed legislatures of North Carolina, South Carolina, and Georgia reversed rejections by earlier unreconstructed state legislatures. Ohio and New Jersey had passed resolutions purporting to rescind their earlier ratifications of the amendment. For further information, see *The Constitution Annotated*, "Article V, Ratification."

[101] 16 Stat. 1131. Here again, Congress refused to acknowledge the act of the New York legislature purporting to rescind its previous instrument of ratification.

[102] Grover Rees III, "Throwing Away the Key: The Unconstitutionality of the Equal Rights Amendment Extension," *Texas Law Review*, vol. 58, no. 5, (May 1980), p. 930.

[103] Berry, *Why ERA Failed*, p. 71.

[104] Brannon P. Denning and John R. Vile, "Necromancing the Equal Rights Amendment," *Constitutional Commentary* (University of Minnesota), vol. 17, winter, 2000, issue 3, p. 598. See also the discussion of the unique circumstances of the 27th Amendment in *The Constitution Annotated*, "Article V, Ratification."

JA 208

public interest only in the late 20th century. In 1789, Congress proposed a group of 12 amendments to the states for ratification. Articles III through XII of the proposals became the Bill of Rights, the first 10 amendments to the Constitution. They were ratified quickly, and were declared adopted on December 15, 1791. Articles I and II, however, were not ratified along with the Bill of Rights; Article II, which required that no change in Members' pay could take effect until after an election for the House of Representatives had taken place, was ratified by six states between 1789 and 1791 (the ratification threshold was 10 states in 1789), after which it was largely forgotten.[105]

After nearly two centuries, the Madison Amendment was rediscovered in 1978, when the Wyoming legislature was informed that as no deadline for ratification had been established, the measure was arguably still viable. Seizing on the opportunity to signal its disapproval of a March 3, 1978, vote by Congress to increase compensation for Representatives and Senators, the legislature passed a resolution approving the proposed amendment. In its resolution of ratification, the legislature cited the congressional vote to increase Member compensation, noting that:

> ... the percentage increase in direct compensation and benefits [to Members of Congress] was at such a high level, as to set a bad example to the general population at a time when there is a prospect of a renewal of double-digit inflation; and ... increases in compensation and benefits to most citizens of the United States are far behind these increases to their elected Representatives.... "[106]

The Wyoming legislature's action went almost unreported, however, until 1983, when Gregory D. Watson, a University of Texas undergraduate student, studied the amendment and concluded that it was still viable and eligible for ratification. Watson began a one-person campaign, circulating letters that drew attention to the proposal to state legislatures across the country.[107] This grassroots effort developed into a nationwide movement, leading ultimately to 31 additional state ratifications of the amendment between 1983 and 1992.

In 1991, as the number of state ratifications of the Madison Amendment neared the requisite threshold of 38, Representative John Boehner of Ohio introduced H.Con.Res. 194 in the 102nd Congress. The resolution noted that, "this amendment to the Constitution was proposed without a deadline for ratification and is therefore still pending before the States." The resolution went on to state "the sense of the Congress that at least 3 of the remaining 15 States should ratify the proposed 2nd amendment to the Constitution, which would delay the effect of any law which varies the compensation of Members of Congress until after the next election of Representatives."[108] Although no further action was taken on the resolution, its findings anticipated Congress's response to the amendment.

On May 7, 1992, the Michigan and New Jersey legislatures both voted to ratify the "Madison Amendment," becoming the 38th and 39th states to approve it. As required by law,[109] the Archivist

---

[105] In 1873, Ohio provided the only additional ratification to the pay amendment. For the record, Article I proposed regulating the size of the House of Representatives so that it eventually would include "not less than two hundred Representatives, nor more than one Representative for every fifty thousand persons."

[106] Wyoming legislature, H.J. Res. 6 (March 3, 1978), quoted in Richard B. Bernstein, "The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment," *Fordham Law Review*, vol. 61, issue 3, (December 1992), p. 537.

[107] Ibid.; Kyvig, *Explicit and Authentic Acts*, p. 465.

[108] H.Con.Res. 194, 102nd Congress, introduced August 1, 1991.

[109] 1 U.S.C. §106.

JA 209

of the United States certified the ratification on May 18, and the following day an announcement that the amendment had become part of the Constitution was published in the *Federal Register*.[110] Although the Archivist was specifically authorized by the U.S. Code to publish the act of adoption and issue a certificate declaring the amendment to be adopted, many in Congress believed that, in light of the unusual circumstances surrounding the ratification, positive action by both houses was necessary to confirm the Madison Amendment's legitimacy.[111] In response, the House adopted H.Con.Res. 320[112] on May 20, and the Senate adopted S.Con.Res. 120[113] and S.Res. 298[114] on the same day. All three resolutions declared the amendment to be duly ratified and part of the Constitution.[115]

By providing a recent example of a proposed amendment that had been inactive for more than a century, the Twenty-Seventh Amendment suggests to ERA supporters an attainable model for renewed consideration of the proposed Equal Rights Amendment.

## Ratification of the Madison Amendment: A Model for the Proposed Equal Rights Amendment?

The example of the Madison Amendment contributed to the emergence of a body of advocacy scholarship that asserts the proposed Equal Rights Amendment has never lost its constitutional viability. One of the earliest expressions of this viewpoint was offered in an article that appeared in the *William and Mary Journal of Women and the Law* in 1997. The authors reasoned that adoption of the Twenty-Seventh Amendment challenged many of the assumptions about ratification generated during the 20th century. Acceptance of the Madison Amendment by the Archivist and the Administrator of General Services, as advised by the Justice Department[116] and ultimately validated by Congress, was said to confirm that there is no requirement that ratifications of proposed amendments *must* be roughly contemporaneous.[117] The authors went on to examine the history of the seven-year time limit, concluding after a review of legal scholarship on the subject that this device was a matter of procedure, rather than of substance (i.e., part of the body of the amendment itself). As such it was "separate from the amendment itself, and therefore,

---

[110] Archivist of the U.S., "U.S. Constitution, Amendment 27," *Federal Register*, vol. 567, no. 97, (May 19, 1992), pp. 21187-21188.

[111] "Madison Amendment," *Congress and the Nation, vol. VII, 1989-1992* (Washington, DC: Congressional Quarterly Inc., 1993), p. 972. For additional examination of the role and authority of the Archivist, see Bernstein, "The Sleeper Awakes: The History and Legacy of the Twenty-Seventh Amendment," pp. 540-542.

[112] H.Con.Res. 320, 102nd Congress, sponsored by Representative Jack Brooks.

[113] S.Con.Res. 120, 102nd Congress, sponsored by Senator Robert Byrd and others.

[114] S.Res. 298, 102nd Congress, sponsored by Senator Robert Byrd and others.

[115] S.Con.Res. 120 and S.Res. 298, *Congressional Record*, vol. 138, pt. 9 (May 20, 1992), p. 11869; H.Con.Res. 320, *Congressional Record*, vol. 138, pt. 9 (May 20, 1992), p. 12051. Senator Robert Byrd of West Virginia also introduced S.Con.Res. 121 on May 19, 1992, to declare that the ratification periods for four other pending amendments had lapsed, and that they were no longer viable. He did not, however, include the Equal Rights Amendment among them. The resolution was referred to the Senate Judiciary Committee, but no further action was taken.

[116] Office of Legal Counsel, U.S. Department of Justice, "Congressional Pay Amendment," *Memorandum Opinion for the Counsel to the President*, May 13, 1992, and November 2, 1992, at http://justice.gov/olc/congress/17.htm. See also Michael Stokes Paulsen, "A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment," *Yale Law Journal*, vol. 103, no. 3 (December 1992), p. 680, at footnote 7.

[117] Allison L. Held, Sheryl L. Herndon, and Danielle M. Stager, "The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States," *William and Mary Journal of Women and the Law*, vol. 3, (no issue number), 1997, p. 121.

JA 210

it can be treated as flexible." By extending the original ERA deadline, Congress based its action on the broad authority over the amendment process conferred on it by Article V.[118]

Finally, the authors asserted, relying on the precedent of the Twenty-Seventh Amendment, that "even if the seven-year limit was a reasonable legislative procedure, a ratification after the time limit expired can still be reviewed and accepted by the current Congress.... "[119] In their view, even if one Congress failed to extend or remove the ratification deadline, states could still ratify, and a later Congress could ultimately validate their ratifications.[120]

Other observers question the value of the Madison Amendment as precedent. Writing in *Constitutional Commentary*, Denning and Vile asserted that the Twenty-Seventh Amendment presented a poor model for ERA supporters. Examining the amendment's origins, they suggested that "the courts and most members of Congress have tended to treat the 27th as a 'demi-amendment,' lacking the full authority of the 26 that preceded it."[121] Reviewing what they characterized as unfavorable interpretations of the Madison Amendment in various legal cases, the authors asked whether what they referred to as the "jury rigged ratification of the ERA might result in its similar evisceration by the judiciary that will be called upon to interpret it."[122] Similarly, a commentary in *National Law Journal* asserted that, by blocking its own cost of living salary increases, Congress itself has also persistently failed to observe the Madison Amendment's requirements that "[n]o law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened."[123]

On the other hand, supporters of the proposed ERA might claim that such criticism of the Twenty-Seventh Amendment refers more to what they might characterize as the flawed application of the amendment, rather than the intrinsic integrity of the amendment itself.

Constitutional scholar Michael Stokes Paulsen further questioned use of the Twenty-Seventh Amendment as an example in the case of the proposed Equal Rights Amendment. He returned to the contemporaneity issue, suggesting that the amending process

> ... should be *occasions*, not long, drawn-out processes. To permit ratification over a period of two centuries is to erode, if not erase the ideal of overwhelming popular agreement.... There is no assurance that the Twenty-seventh Amendment ever commanded, at *any one time*, popular assent corresponding to the support of two-thirds of the members of both houses of Congress and three-fourths of the state legislatures.[124] (Emphases in the original.)

It could be further argued by opponents of proposed Equal Rights Amendment extension that, whatever the precedent set by Congress in declaring the Twenty-Seventh Amendment to have been regularly adopted, there is no precedent for Congress promulgating an amendment based on state ratifications adopted after two ratification deadlines have expired.

---

[118] Ibid., pp. 129-130.

[119] Ibid., p. 131.

[120] This would arguably apply to Nevada's 2017 ratification of ERA.

[121] Denning and Vile, "Necromancing the Equal Rights Amendment," p. 598. See also the discussion of the unique circumstances of the 27th Amendment in *The Constitution Annotated*, "Article V, Amendment."

[122] Ibid., p. 599.

[123] Eric Fish and Daniel Hemel, "Congress's Unconstitutional Pay Freeze," *National Law Journal*, January 30, 2012, at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202540170443&slreturn=1.

[124] Paulsen, "A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment," p. 692.

JA 211

## The Role of the Supreme Court Decisions in *Dillon v. Gloss* and *Coleman v. Miller*

By some measures, the action of the Archivist of the United States in announcing ratification of the Twenty-Seventh Amendment, followed by congressional confirmation of its viability, superseded a body of constitutional principle that had prevailed since the 1920s and 1930s. This body of theory and political consideration arguably originated with the Supreme Court's 1921 decision in *Dillon v. Gloss*, the case in which the Court first enunciated the principle that conditions of ratification for proposed constitutional amendments could be determined by Congress, and that the conditions should be roughly contemporaneous.[125] The Court concluded that, relying on the broad grant of authority contained in Article V, Congress had the power, "keeping within reasonable limits, to fix a definite period for the ratification.... "[126]

At the same time, the Court noted that nothing in the nation's founding documents touched on the question of time limits for ratification of a duly proposed constitutional amendment, and asked whether ratification would be valid at any time

> ... within a few years, a century or even a longer period, or that it must be had within some reasonable period which Congress is left free to define? Neither the debates in the federal convention which framed the Constitution nor those in the state conventions which ratified it shed any light on the questions.[127]

Ultimately, however, the Court concluded that proposal of an amendment by Congress and ratification in the states are both steps in a single process, and that amendments

> ... are to be considered and disposed of presently.... [A] ratification is but the expression of the approbation of the people and is to be effective when had in three-fourths of the states, there is a fair implication that it must be sufficiently contemporaneous in that number of states to reflect the will of the people in all sections at relatively the same period, which of course ratification scattered through a long series of years would not do.[128]

The need for contemporaneity was also discussed by the Court with regard to the congressional apportionment amendment and the Madison Amendment, both of which were pending in 1921. The Court maintained that the ratification of these amendments so long after they were first proposed would be "untenable."[129] Some scholars dispute the Court's position in *Dillon*, however; Mason Kalfus, writing in *The University of Chicago Law Review*, claimed that

---

[125] *Dillon v. Gloss*, 256 U.S. 368 (1921). Dillon, arrested on a violation of the Volstead Act, asserted, among other things, that the 18th Amendment was unconstitutional because Congress had included a ratification deadline in the body of the amendment, an action for which no authority appeared in the Constitution.

[126] Ibid.

[127] Ibid.

[128] Ibid.

[129] Ibid. Justice Van Devanter, delivering the majority opinion, asserted: "That this is the better conclusion [constitutional amendments lacking contemporaneousness ought to be considered waived] becomes even more manifest when what is comprehended in the other view is considered; for, according to it, four amendments proposed long ago—two in 1789, one in 1810 and one in 1861—are still pending and in a situation where their ratification in some of the States many years since by representatives of generations now largely forgotten may be effectively supplemented in enough more States to make three-fourths by representatives of the present or some future generation. To that view few would be able to subscribe, and in our opinion it is quite untenable."

JA 212

reference to the contemporaneity doctrine is to be found neither in the text of Article V nor in the deliberations of the Philadelphia Convention.[130]

In *Coleman v. Miller*,[131] the Supreme Court explicitly held that Congress had the sole power to determine whether an amendment is sufficiently contemporaneous, and thus valid, or whether, "the amendment ha[s] lost its vitality through the lapse of time."[132] In *Coleman*, the High Court refined its holdings in *Dillon*, ruling that when it proposes a constitutional amendment:

- Congress may fix a reasonable time for ratification;

- there was no provision in Article V that suggested a proposed amendment would be open for ratification forever;

- since constitutional amendments were deemed to be prompted by some type of necessity, they should be dealt with "presently";

- it could be reasonably implied that ratification by the states under Article V should be sufficiently contemporaneous so as to reflect a nationwide consensus of public approval in relatively the same period of time; and

- ratification of a proposed amendment must occur within some reasonable time after proposal.[133]

The Court additionally ruled, however, that if Congress were not to specify a reasonable time period for ratification of a proposed amendment, it would not be the responsibility of the Court to decide what constitutes such a period. The Court viewed such questions as essentially political and, hence, nonjusticiable, believing that the questions were committed to, and must be decided by, Congress in exercise of its constitutional authority to propose an amendment or to specify the ratification procedures for an amendment.[134]

This "political question" interpretation of the contemporaneity issue is arguably an additional element supporting the fundamental constitutional doctrine of continued viability claimed by ERA advocates.

Another observer suggests, however, that the constitutional foundation of the Supreme Court's ruling in *Coleman v. Miller*, and hence the political question doctrine, may have been affected by the contemporary political situation. According to this theory, the Court in 1939 may have been influenced by, and overreacted to, the negative opinion generated by its political struggles with President Franklin Roosevelt over the constitutionality of New Deal legislation: "A later court, bruised by its politically unpopular New Deal rulings, retreated somewhat from a dogmatic defense of ratification time limits (as enunciated in *Dillon v. Gloss*)."[135] Michael Stokes Paulsen also questioned the Supreme Court's decision in *Coleman v. Miller*, suggesting that the "political

---

[130] Kalfus, "Why Time Limits on the Ratification of Constitutional Amendments Violate Article V," pp. 451-453.

[131] *Coleman v. Miller*, 307 U.S. 433 (1939). This case concerned the Child Labor Amendment, and arose from a dispute in the Kansas Senate over ratification procedure. This amendment was examined at greater length earlier in this report, under "Congress Sets a Seven-Year Ratification Deadline."

[132] Ibid.

[133] Ibid.

[134] Ibid. Note, however, that in advising the Archivist on certifying ratification of the 27th Amendment, the Office of Legal Counsel took the view that there was no role for Congress in promulgation of an amendment. See "Congressional Pay Amendment," *Memorandum Opinion for the Counsel to the President*.

[135] Kyvig, *Explicit and Authentic Acts*, p. 468.

JA 213

question" doctrine could be interpreted to assert a degree of unchecked congressional authority over the ratification process that is arguably anti-constitutional.[136]

# Ancillary Issues

A range of subsidiary issues could also come under Congress's purview should it consider revival of the proposed Equal Rights Amendment or a signal to the states that it would consider additional ratifications beyond the expired ratification deadline in the congressional resolutions.

## Origins of the Seven-Year Ratification Deadline

One historical issue related to consideration of the proposed Equal Rights Amendment concerns the background of the seven-year deadline for ratification that originated with the Eighteenth Amendment (Prohibition). The amendment was proposed in 1917, proceeded rapidly through the state ratification process, and was declared to be adopted in 1919. During Senate consideration of the proposal, Senator and, later, President Warren Harding of Ohio is claimed to have originated the idea of a ratification deadline for the amendment as a political expedient, one that would "permit him and others to vote for the amendment, thus avoiding the wrath of the 'Drys' (prohibition advocates), yet ensure that it would fail of ratification."[137] As it happened, the law of unintended consequences intervened, as "[s]tate ratification proceeded at a pace that surprised even the Anti-Saloon League, not to mention the calculating Warren Harding."[138] Proposed on December 18, 1917, the amendment was declared to have been adopted just 13 months later, on January 29, 1919.

ERA supporters might cite this explanation of the origins of the seven-year ratification deadline in addition to their central assertions of the amendment's viability. They could claim that, far from being an immutable historical element in the amendment process, bearing with it the wisdom of the founders, the ratification time limit is actually the product of a failed political maneuver, and is, moreover, of comparatively recent origin.

Opponents of extension might argue, however, that, whatever its origins, the seven-year ratification deadline has become a standard element of nearly all subsequent proposed amendments.[139] They might further note that if ratification deadlines were purely political, Congress would not have continued to incorporate them in nine subsequent proposed amendments.[140] In their judgment, these time limits not only ensure that proposed constitutional amendments enjoy both broad and contemporaneous support in the states, but they also arguably constitute an important element in the checks and balances attendant to the amendment process.

## Rescission

In addition to this question, the constitutional issue of rescission would almost certainly recur in a contemporary revival of the proposed Equal Rights Amendment. As noted earlier in this report,

---

[136] Paulsen, "A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment," pp. 706-707, 718-721. See also the discussion of congressional authority in *The Constitution Annotated*, Article V.

[137] Kyvig, *Explicit and Authentic Acts*, p. 225.

[138] Ibid., p. 224.

[139] The 19th Amendment, providing for women's suffrage, and the unratified Child Labor Amendment, were the last to be proposed by Congress without a ratification deadline.

[140] The nine proposals are the 20th, 21st, 22nd, 23rd, 24th, 25th, and 26th Amendments, and the proposed Equal Rights and District of Columbia Voting Rights (Congressional Representation) Amendments.

JA 214

five states enacted resolutions purporting to rescind their previously adopted ratifications of the proposed amendment. The U.S. District Court for the District of Idaho ruled in 1981 that states had the option to rescind their instruments of ratification any time in the process *prior to* the promulgation or certification of the proposed amendment, a decision that was controversial at the time.[141] The Supreme Court agreed to hear appeals from the decision, but after the extended ERA ratification deadline expired on June 30, 1982, the High Court in its autumn term vacated the lower court decision and remanded the decision to the District Court with instructions to dismiss the case.[142]

It may be noted by ERA supporters, however, that since the Supreme Court ruled in *Coleman v. Miller* that Congress has plenary power in providing for the ratification process, it may be inferred from this holding that Congress also possesses dispositive authority over the question as to the validity of rescission. Moreover, they might also note that its 1868 action directing Secretary of State William Seward to declare the Fourteenth Amendment to be ratified, notwithstanding two state rescissions, further confirms Congress's broad authority over the amendment process.[143]

Speculation on potential future court action on this question is beyond the scope of this report, but rescission arguably remains a potentially viable constitutional issue that could arise in response to a revival of the proposed Equal Rights Amendment.

## Congressional Promulgation of Amendments

Some observers have noted that, while Congress passed resolutions declaring the Fourteenth, Fifteenth, and Twenty-Seventh Amendments to be valid, congressional promulgation of amendments that have been duly ratified is not necessary, and has no specific constitutional foundation. In his 1992 Memorandum for the Counsel to the President concerning the Twenty-Seventh Amendment, Acting Assistant Attorney General Timothy Flanigan, wrote that

> Article V clearly delimits Congress's role in the amendment process. It authorizes Congress to propose amendments and specify their mode of ratification, and requires Congress, on the application of the legislatures of two-thirds of the States, to call a convention for the proposing of amendments. Nothing in Article V suggests that Congress has any further role. Indeed, the language of Article V strongly suggests the opposite: it provides that, once proposed, amendments "<u>shall be valid</u> to all Intents and Purposes, as Part of this Constitution, when ratified by" three-fourths of the States.[144] (Emphasis original in the memorandum, but not in Article V.)

The same viewpoint has been advanced by constitutional scholar Walter Dellinger. Addressing the question shortly after the Twenty-Seventh Amendment was declared to have been ratified, he noted

> An amendment is valid when ratified. There is no further step. The text requires no additional action by Congress or anyone else after ratification by the final state. The

---

[141] Kyvig, *Explicit and Authentic* Acts, pp. 451-416.

[142] *Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho, 1981), *prob. juris. noted*, 455 U.S. 918 (1982), *vacated and remanded to dismiss*, 459 U.S. 809 (1982). See also "ERA Dies Three States Short of Ratification," *Congressional Quarterly Almanac, 97th Congress, 2nd Session, 1992*, pp. 377-378.

[143] See earlier in this report under "Article V: Congressional Authority over the Amendment Process."

[144] "Congressional Pay Amendment," *Memorandum Opinion for the Counsel to the President*, November 2, 1992, p.102, at https://www.justice.gov/file/20561/download.

creation of a "third step"—promulgation by Congress—has no foundation in the text of the Constitution.[145]

Supporters of the proposed Equal Rights Amendment, however, might refer again to the Supreme Court's ruling in *Coleman v. Miller*. If plenary authority over the amendment process rests with Congress, advocates might ask, does it also presumably extend to other issues that arise, including provision for such routine procedures as promulgation of an amendment?

## The Proposed District of Columbia Voting Rights (Congressional Representation) Amendment—Congress Places a Ratification Deadline in the Body of the Amendment

Congress has proposed one constitutional amendment to the states since the proposed Equal Rights Amendment began the ratification process in 1972, the District of Columbia Voting Rights (Congressional Representation) Amendment. For this amendment, Congress returned to the earlier practice of placing a deadline for ratification directly in the body of the proposal itself. According to contemporary accounts, this decision was influenced by the nearly concurrent congressional debate over the ERA deadline extension.[146]

The District of Columbia is a unique jurisdiction, part of the Union, but not a state, and subject to "exclusive Legislation in all Cases whatsoever ... by Congress."[147] Congress has exercised its authority over the nation's capital with varying degrees of attention and control, and through a succession of different governing bodies, beginning in 1800. By the 1950s, the long-disenfranchised citizens of Washington, DC, began to acquire certain rights. The Twenty-Third Amendment, ratified in 1961, established their right to vote in presidential elections. In 1967, President Lyndon Johnson used his reorganization authority to establish an appointed mayor and a city council, also presidentially appointed.[148] In 1970, Congress provided by law for a non-voting District of Columbia Delegate to Congress, who was seated in the House of Representatives.[149] In 1973, President Richard Nixon signed legislation that established an elected mayor and council, while reserving ultimate authority over legislation to Congress.[150]

After more than a decade of change, proponents asserted that voting representation in Congress proportionate to that of a state would be an important step in the progress toward full self-government by the District of Columbia. In 1977, Representative Don Edwards of California, chairman of the House Judiciary Committee's Subcommittee on Civil and Constitutional Rights, introduced H.J.Res. 554 (95th Congress). The resolution, as introduced, comprised the following text:

> Resolved by the Senate and the House of Representatives of the United States of America in Congress assembled (two thirds of each House concurring therein), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the

---

[145] Walter Dellinger, "Legitimacy of Constitutional Change: Rethinking the Amendment Process," *Harvard Law Review*, vol. 97, issue 2 (December 1983), p. 398.

[146] Orrin G. Hatch, "Should the Capital Vote in Congress? A Critical Analysis of the Proposed D.C. Congressional Representation Amendment," *Fordham Urban Law Journal,* vol. 7 (issue 3), 1978, p. 483.

[147] U.S. Constitution, Article I, Section 8, clause 17.

[148] U.S. President, Lyndon B. Johnson, Reorganization Plan Number 3 of 1967, 81 Stat. 948.

[149] The District of Columbia Delegate Act, 84 Stat. 845.

[150] The District of Columbia Self Government and Government Reorganization Act, 87 Stat. 774.

JA 216

legislatures of three fourths of the several states within seven years of the date of its submission by the Congress:

Article—

Section 1. For purpose of representation in the Congress, election of the President, and Article V of this Constitution, the District constituting the seat of government of the United States shall be treated as though it were a state.

Section 2. The exercise of the rights and powers conferred under this article shall be by the people of the District constituting the seat of government, and as shall be provided by the Congress.

Section 3. The twenty-third article of amendment to the Constitution of the United States is hereby repealed.

Extensive hearings were held in the subcommittee in 1977, and on February 15, 1978, the full Judiciary Committee reported the measure to the House. The committee, however, adopted an amendment offered by Representative M. Caldwell Butler of Virginia that incorporated the seven-year ratification deadline directly in the body of the resolution, rather than in the preamble. *Congressional Quarterly* reported that this provision

> ... was intended to ensure that the deadline could not be extended by a simple majority vote of Congress. The Justice Department has said in the case of the Equal Rights Amendment that Congress could extend the deadline for ratification by a simple majority vote because the time limit was contained in the resolving clause rather than in the body of that amendment.[151]

Similarly, writing in *Fordham Urban Law Journal* during the same period, Senator Orrin Hatch of Utah noted that:

> Section 4 of the D.C. Amendment requires that ratification of the necessary three-fourths of the states must occur within seven years of the date of its submission to the states. The inclusion of this provision within the body of the resolution will avoid a similar controversy to that which has arisen with respect to the time limit for ratification of the proposed "Equal Rights Amendment."[152]

During consideration of H.J.Res. 554 in the full House, language setting the ratification deadline was deleted from the authorizing resolution, and the Butler amendment was incorporated in the body of the proposal by voice vote as a new section:

> Section 4. This article shall be inoperative, unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the States within seven years from the date of its submission.[153]

The amendment passed the House on March 2, 1978, by a margin of 289 to 127, 11 votes more than the two-thirds constitutional requirement.[154] The Senate took up the House-passed resolution on August 16, 1978. During four days of debate, it rejected a wide range of amendments, voting

---

[151] "D.C. Representation," *Congressional Quarterly Almanac, 95th Congress, 2nd Session, 1978, vol. XXXIV* (34) (Washington: Congressional Quarterly Inc., 1979), p. 793.

[152] Hatch, "Should the Capital Vote in Congress? A Critical Analysis of the Proposed D.C. Congressional Representation Amendment," p. 483.

[153] "District of Columbia Representation in Congress," *Congressional Record*, vol. 124, part 4 (March 2, 1978), p. 5263.

[154] Ibid., pp. 5272-5273.

JA 217

to adopt H.J.Res. 554 on August 22 by a margin of 67 to 32, one vote more than the constitutional requirement.[155]

The District of Columbia Congressional Representation Amendment expired on August 2, 1985, seven years after it was proposed by Congress. It was ultimately ratified by 16 states,[156] 22 short of the constitutionally mandated requirement that it be approved by three-fourths, or 38, of the states.

# Concluding Observations

The arguments and constitutional principles relied on by ERA supporters to justify the revival of the proposed Equal Rights Amendment include, but may not be limited to, the following:

- Article V, they assert, grants exceptionally broad discretion and authority over the constitutional amendment process to Congress.

- In their interpretation, the example of the Twenty-Seventh Amendment suggests that there is no requirement of contemporaneity in the ratification process for proposed constitutional changes.

- ERA proponents claim that the Supreme Court's decision in *Coleman v. Miller* gives Congress wide discretion in setting conditions for the ratification process.

- Far from being sacrosanct and an element in the founders' "original intent," the seven-year deadline for amendments has its origins in a political maneuver by opponents of the Eighteenth Amendment authorizing Prohibition.

- The decision of one Congress in setting a deadline for ratification of an amendment does not constrain a later Congress from rescinding the deadline and reviving or acceding to the ratification of a proposed amendment.

Against these statements of support may be weighed the cautions of other observers who may argue as follows:

- The Twenty-Seventh Amendment is a questionable model for efforts to revive the proposed Equal Rights Amendment; unlike the proposed amendment, it was not encumbered by two expired ratification deadlines. Moreover, it is argued that Congress has generally ignored its provisions since ratification.[157]

- Even though the proposed Equal Rights Amendment received an extension, supporters were unable to gain approval by three-fourths of the states. Opponents suggest that a "third bite of the apple" is arguably unfair and, if not unconstitutional, at least contrary to the founders' intentions.

- Revivification opponents caution ERA supporters against an overly broad interpretation of *Coleman v. Miller*, which, they argue, may have been be a politically influenced decision.

---

[155] "District of Columbia Representation in Congress," *Congressional Record*, vol. 124, part 20 (August 22, 1978), p. 27260.

[156] Ratifications by year: 1978: Michigan, New Jersey, Ohio; 1979: Connecticut, Massachusetts, Minnesota, Wisconsin; 1980: Hawaii, Maryland; 1989: Maine, Oregon, Rhode Island, West Virginia; 1984: Delaware, Louisiana, Iowa.

[157] Eric Fish and Daniel Hemel, "Congress' Unconstitutional Pay Freeze," *National Law Journal*/law.com, January 30, 2012, at https://www.law.com/nationallawjournal/almID/1202540170443&Congress_unconstitutional_pay_freeze&slreturn=20130022145518/?slreturn=20180602182349.

JA 218

- Congress implicitly recognized its misjudgment on the ratification deadline for the proposed Equal Rights Amendment when it incorporated such a requirement in the text of the proposed District of Columbia Voting Rights (Congressional Representation) Amendment.
- The rescission issue was not conclusively decided in the 1980s and remains potentially open to congressional or judicial action if the proposed Equal Rights Amendment is reopened for further ratifications.

Congress could revisit the contending points raised by different analysts if it gives active consideration to legislation that would seek specifically to revive the proposed Equal Rights Amendment, or to accept the additional state ratifications.

In recent years, some supporters of the proposed ERA have embraced the three-state strategy, which maintains that Congress has the authority to effectively repeal the ratification deadlines provided in H.J. Res. 208, 92nd Congress and H.J.Res. 638, 95th Congress. In the 115th Congress, S.J.Res. 5 and H.J.Res. 53 incorporate this approach, which could be more accurately described as a "one-state strategy" following ratification by Nevada in 2017 and Illinois in 2018. Alternatively, Congress could propose a "fresh start" equal rights amendment; such proposals have been introduced regularly since the original ERA time limit expired in 1982. This approach might avoid the controversies that have been associated with repeal of the deadlines for the 1972 ERA, but starting over would present a fresh constitutional amendment with the stringent requirements provided in Article V: approval by two-thirds majorities in both houses of Congress, and ratification by three-fourths of the states. It would, however, be possible to draft the proposal without a time limit, as is the case with S.J.Res. 6 and H.J.Res. 33 in the 115th Congress. If approved by Congress in this form, the proposed amendment would, as was the case with the Madison Amendment, remain current, viable, and thus eligible for ratification, for an indefinite period.

## Author Contact Information

Thomas H. Neale
Specialist in American National Government
tneale@crs.loc.gov, 7-7883

JA 219

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

VIRGINIA, ILLINOIS, and NEVADA,

*Plaintiffs*,

v.

DAVID S. FERRIERO, in his official capacity        Case No. 1:20-cv-242-RC
as Archivist of the United States,

*Defendant*,

ALABAMA, LOUISIANA, NEBRASKA,
SOUTH DAKOTA, and TENNESSEE,

*Intervenor-Defendants.*

**DECLARATION OF CAMERON T. NORRIS**

1.     I am an attorney at the law firm Consovoy McCarthy PLLC and counsel for
Intervenor-Defendant Alabama.

2.     I am over the age of eighteen and under no mental disability or impairment. I have
personal knowledge of the following facts and, if called as a witness, would competently testify to
them.

3.     Exhibit A is a true and accurate copy of H.R.J. Res. 208 that was downloaded on June
28, 2020.

4.     Exhibit B is a true and accurate copy of CRS Report 97-922 (Sept. 30, 1997) that was
downloaded on June 28, 2020.

5.     Exhibit C is a true and accurate copy of *Equal Rights Amendment Extension: Hearings on
S.J. Res. 134 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 95th Cong. 739-40 (1978)
that was downloaded on September 22, 2020.

6.     Exhibit D is a true and accurate copy of H.R. Rep. 95-1405, at 4 (1978) that was
downloaded on September 23, 2020.

JA 220

7.      Exhibit E is a true and accurate copy of *Equal Rights Amendment – Proposed March 22, 1972, List of State Ratification Actions*, Nat'l Archives (Mar. 24, 2020) that was downloaded on September 22, 2020.

8.      Exhibit F is a true and accurate copy of H.R. J. Res. 638, 95th Cong., 2d Sess., 92 Stat. 3799 (1978) that was downloaded on January 18, 2020.

9.      Exhibit G is a scan of Memo. for the Admin. of Gen. Servs. Suggesting Mootness, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1281, 81-1283, 81-1312, 81-1313 (U.S. July 1982) taken on December 26, 2018.

10.     Exhibit H is a scan of Response of Idaho and Arizona, et al., in Opposition to the Administrator's Suggestion of Mootness, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1281, 81-1283, 81-1312, 81-1313 (U.S. Aug. 1982) taken on December 26, 2018.

11.     Exhibit I is a true and accurate copy of *Leaders Concede Loss on Equal Rights*, N.Y. Times (June 25, 1982) that was downloaded on June 29, 2020.

12.     Exhibit J is a true and accurate copy of June *30, 1982: The Day the ERA Dies*, UPI (June 30, 1982) that was downloaded on July 5, 2020.

13.     Exhibit K is a true and accurate copy of *U.S. Equal Rights Measure Is Re-introduced in Congress*, N.Y. Times (July 15, 1982) that was downloaded on June 29, 2020.

14.     Exhibit L is a true and accurate copy of 128 Cong. Rec. 14,913-14, 14,925, 15,149, 15,195, 15,158-60, 15,586 that was downloaded from Govinfo.gov on September 21, 2020.

15.     Exhibit M is a true and accurate copy of *Two Modes of Ratification*, Alice Paul Inst. downloaded on June 29, 2020.

16.     Exhibit N is a screenshot of *Median Age of the Resident Population of the United States from 1960 to 2018*, Statista taken on September 21, 2020.

17.    Exhibit O is a true and accurate copy of *Statement on Equal Rights Amendment Debate*, Nat'l Archives (Dec. 19, 2019) that was downloaded on September 21, 2020.

18.    Exhibit P is a true and accurate copy of *NARA Press Statement on the Equal Rights Amendment*, Nat'l Archives (Jan. 8, 2020) that was downloaded on September 21, 2020.

19.    Exhibit Q is a true and accurate copy of *Supreme Court Closes Lid on 10-Year-Old ERA Issues*, The Press-Tribune (Oct. 4, 1982) that was downloaded on July 5, 2020.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 23, 2020.

 /s/ Cameron T. Norris

3

# Exhibit A

# PROPOSED AMENDMENT

## TO THE

## CONSTITUTION OF THE UNITED STATES

### SECOND SESSION, NINETY-SECOND CONGRESS

JOINT RESOLUTION

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

[H. J. Res. 208]

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"SEC. 3. This amendment shall take effect two years after the date of ratification."

CARL ALBERT

*Speaker of the House of Representatives.*

ALLEN J. ELLENDER

*President of the Senate pro Tempore.*

I certify that this Joint Resolution originated in the House of Representatives.

W. PAT JENNINGS

*Clerk.*

BY   W. RAYMOND COLLEY

1523

JA 224

# Exhibit B

Case 1:20-cv-00242-RC    Document 113    Filed 09/23/20    Page 7 of 89
USCA Case #21-5096    Document #1928907    Filed: 01/03/2022    Page 231 of 355

97-922 GOV
September 30, 1997

# CRS Report for Congress

## Received through the CRS Web

# Ratification of Amendments to the U.S. Constitution

David C. Huckabee
Specialist in American National Government
Government Division

## Summary

Article V of the U.S. Constitution provides two ways to propose amendments to the document and two ways to ratify them.  Amendments may be proposed either by the Congress, by two-thirds votes of the House and the Senate (of those present and voting, provided a quorum is present), or by a convention called by Congress in response to applications from the legislatures of two-thirds (34) or more of the states.

Amendments must be ratified by three-quarters (38) or more of the states.  The Congress can choose to refer proposed amendments either to state legislatures, or to special conventions called in the states to consider ratification.  Only the 21st Amendment (repeal of Prohibition) has been ratified by conventions held in the states.

In the period beginning with the First Congress, through September 30, 1997 (105th Congress, 1st Session), a total of 10,980 proposals had been introduced to amend the Constitution.  Thirty-three of these were proposed by Congress to the states, and 27 have been ratified.  Excluding the 27th Amendment (Congressional Pay), which took more than 202 years, the longest pending proposed amendment that was successfully ratified was the 22nd Amendment (Presidential Tenure), which took three years, nine months, and four days.  The 26th Amendment (18-year-old vote) was ratified in the shortest time:  three months and 10 days.  The average ratification time was one year, eight months, and seven days.

## Ratification Deadlines

The practice of limiting the time available to the states to ratify proposed amendments began in 1917 with the 18th Amendment (Prohibition).  All amendments proposed since then, with the exception of the 19th (Women's Suffrage) and the proposed child labor amendment, have included a deadline either in the body of the amendment proposed to the states, or in the joint resolution transmitting the amendment to the states to be ratified.

The 20th through 22nd Amendments incorporated the ratification deadline in the body of the amendment, so these amendments' deadlines are now part of the Constitution. Beginning with the 23rd Amendment, Congress began imposing the seven-year deadline in the joint resolutions transmitting the amendments to the state legislatures in order to avoid including extraneous language in the Constitution.[1]

The ratification deadline "clock" begins running on the day final action is completed in Congress (presidential approval of proposed amendments is not necessary). The amendment may be ratified at any time after final congressional action, even though the states have not been officially notified. The Archivist of the United States officially notifies the states (by registered letters to the governors) that an amendment has been proposed. The Archivist also keeps track of state ratifications and issues a proclamation when ratification is completed.[2]

The rules governing the consideration of proposed amendments vary among the states. Many legislatures require proposed amendments to be approved by "constitutional majorities"—a majority of the membership of the legislature (rather than a quorum for doing other legislative business). Some states require amendments to be ratified by the same margin as a proposed amendment to their state constitutions; others only require a majority of the legislators present and voting (provided a quorum is present). At least seven states require a "supermajority"[3] vote in one or more "chamber, either by rule, statute, or state constitution."[4]

The unprecedented time period of the 27th Amendment's successful ratification, and the decision by the 95th Congress to extend the seven-year deadline for the proposed Equal Rights Amendment (ERA) for an additional two years, 10 months, and 16 days,[5] has prompted speculation that Congress might have the power to revive other amendments proposed without ratification deadlines (in the body of the amendment) by enacting new ratification deadlines. At this writing, this matter is unresolved, but constitutional scholars

---

[1] See: Walter Dellinger, "The Legitimacy of Constitutional Change: Rethinking the Amendment Process," *Harvard Law Review*, vol. 97, Dec. 1983, p. 408. Two exceptions to this practice were the 27th Amendment, because it was proposed in 1789, and the proposed District of Columbia voting representation amendment, where a seven-year time limit was included in the body of it.

[2] Pursuant to 1 U.S.C. 106b.

[3] A "supermajority" requires more than a simple majority (one half, plus one). A supermajority ratification requirement for proposed amendments has been recognized by a federal District Court. In *Dyer* v. *Blair*, 390 F. Supp. 1291 (N.D. Ill. 1975), a federal District Court upheld an Illinois supermajority requirement for ratification of a proposed amendment to the U.S. Constitution.

[4] The seven States requiring "supermajority" votes to ratify amendments are Alabama, Colorado, Delaware, Georgia, Idaho, Illinois, and Kansas. See Scott Mackey and Brenda Erickson, *The Balanced Budget Amendment: The Road to Ratification: A Preliminary Report*, (Washington: National Conference of State Legislatures, 1995), p. 4.

[5] The Equal Rights Amendment was proposed on March 22, 1972. The original ratification deadline of March 21, 1979 was extended until January 30, 1982, with the adoption of H.J. Res. 638 on October 11, 1978.

distinguish the Equal Rights Amendment extension from efforts to revive amendments whose deadlines have expired because the ERA deadline was extended before the original deadline had expired.

The following tables list information about amendments that were proposed by Congress. Table 1 lists the dates of proposal and ratification, and the number of days each successful amendment was pending before the states before ratification. Table 2 provides summary statistics about amendments, and Table 3 lists the amendments Congress proposed that were not ratified by the states. Table 3 provides the date the amendment was proposed, its ratification deadline (if it had any) and the number of states that ratified it.

### Table 1.  Time Required to Ratify Constitutional Amendments

| Amendment | Date Proposed | Date Ratified | No. of days |
|---|---|---|---|
| 1—Religion, speech, assembly | 25-Sep 1789 | 15-Dec-1791 | 811 |
| 2—Bear arms | " | " | 811 |
| 3—Quartering soldiers | " | " | 811 |
| 4—Searches and seizures | " | " | 811 |
| 5—Rights of persons | " | " | 811 |
| 6—Rights of accused | " | " | 811 |
| 7—Civil trials | " | " | 811 |
| 8—Punishment for crime | " | " | 811 |
| 9—Unenumerated rights | " | " | 811 |
| 10—Reserved powers | " | " | 811 |
| 11—Suits against states | 04-Mar-1794 | 07-Feb-1795 | 340 |
| 12—Election of Pres. & Vice Pres. | 09-Dec-1803 | 15-Jun-1804 | 189 |
| 13—Slavery | 31-Jan-1865 | 06-Dec-1865 | 309 |
| 14—Rights guaranteed | 13-Jun-1866 | 09-Jul-1868 | 757 |
| 15—Right to vote | 26-Feb-1869 | 03-Feb-1870 | 342 |
| 16—Income tax | 12-Jul-1909 | 03-Feb-1913 | 1,302 |
| 17—Pop. election of Senators | 13-May-1912 | 08-Apr-1913 | 330 |
| 18—Prohibition | 18-Dec-1917 | 16-Jan-1919 | 394 |
| 19—Women's suffrage | 04-Jun-1919 | 18-Aug-1920 | 441 |
| 20—Commencement of terms | 02-Mar-1932 | 23-Jan-1933 | 327 |
| 21—Repeal of prohibition | 20-Feb-1933 | 05-Dec-1933 | 288 |
| 22—Presidential tenure | 21-Mar-1947 | 27-Feb-1951 | 1,439 |
| 23—Pres. electors for D.C. | 17-Jun-1960 | 29-Mar-1961 | 285 |
| 24—Abolition of poll taxes | 27-Aug-1962 | 23-Jan-1964 | 514 |
| 25—Pres. vacancy, disability | 06-Jul-1965 | 10-Feb-1967 | 584 |
| 26—18-year-old vote | 23-Mar-1971 | 01-Jul-1971 | 100 |
| 27—Congressional salaries | 25-Sep-1789 | 07-May-1992 | 74,003 |

Source:  For dates proposed and ratified:  U.S. Congress,  House. *The Constitution of the United States of America, As Amended*,  H. Doc. 102-188,  102nd Cong., 2nd sess., (Washington: GPO, 1992).  Time to ratify calculated by CRS.

**Table 2.  Range, Mean, and Median Values for Ratifying
Ratifying Constitutional Amendments**
(Excluding 27th Amendment)

| | | |
|---|---|---|
| Maximum time to ratify | 22nd amend. | 1,439 days |
| Minimum time to ratify | 26th amend. | 100 days |
| Mean and median times to ratify | Median | Mean |
| 18th & 19th centuries | 811 days | 670 days |
| 20th century | 394 days | 546 days |
| 18th - 20th centuries | 670 days | 617 days |

**Table 3.  Unratified Amendments**

| Subject | Date proposed | Ratification deadline | No. of states ratifying |
|---|---|---|---|
| APPORTIONMENT—Regulates the apportionment of Representatives among the states. | 25-Sep-1789 | None | 10 |
| TITLES OF NOBILITY—Revokes citizenship of people accepting titles of nobility or "any present, pension, office or emolument of any kind whatever, from any emperor, king, prince or foreign power." | 1-May-1810 | None | 12 |
| SLAVERY—Prohibits constitutional amendments that will authorize Congress to "abolish or interfere, within any State, with the domestic institutions thereof, including that of persons held to labor or service by the laws of said State." | 2-Mar-1861 | None | 2 |
| CHILD LABOR—Gives Congress the "power to limit, regulate, and prohibit the labor of persons under 18 years of age." | 2-Jun-1924 | None | 28 |
| EQUAL RIGHTS—"Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." | 22-Mar-1972 (proposed) 11-Oct-1978 (extended) | 21-Mar-1979 (original) 30-Jan-82 (extension) | 35 |
| D.C. REPRESENTATION—Treats the District of Columbia "as a State ... for the purposes of representation in the Congress, election of the President and Vice President, and article V of this Constitution." | 22-Aug-1978 | 21-Aug-1985 | 16 |

Sources:  U.S. Congress, House, *The Constitution of the United States of America As Amended,* H. Doc. No. 102-188, 102nd Cong., 2nd sess, (Washington: GPO, 1992);  U.S. Library of Congress, Congressional Research Service, *Proposed Amendments to the Constitution of United States of America Introduced in Congress from the 91st Congress, 1st Session, Through the 98th Congress, 2nd Session, January 1969-December 1984,* by Richard A. Davis, CRS Report 85-36 GOV, (Washington: Feb . 1, 1985.)

JA 230

# Exhibit C

PART 4—GOVERNMENT SERVICES ADMINISTRATION DOCUMENTS

(To be found in the files of the subcommittee)

PART 5.—LIBRARY OF CONGRESS WORDING AND TYPE OF LEGISLATIVE ACTION ON STATE RATIFICATION OF THE PROPOSED EQUAL RIGHTS AMENDMENT

(By Karen R. Keesling, Analyst in American National Government, Government Division, July 14, 1978)

STATE RATIFICATION OF THE PROPOSED EQUAL RIGHTS AMENDMENT

(Wording and type of legislative action)

This report presents a summary of the wording and the type of legislative action taken by the 35 States which have ratified the proposed Equal Rights Amendment to the United States Constitution. The proposed Amendment, H.J. Res. 208, was passed by the Congress on March 22, 1972 and submitted to the States for their consideration. The following is the text of H.J. Res. 208:

H.J. RES. 208

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"SEC. 3. *This amendment shall take effect two years after the date of* ratification."

WORDING OF STATE RATIFICATION RESOLUTION

*State ratifications that quoted H.J. Res. 208 in its entirety*

Twenty-five State ratifications quoted H.J. Res. 208 in its entirety, including the language referring to the seven year ratification period. These are: California, Colorado, Connecticut, Hawaii, Idaho, Indiana, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, Ohio, South Dakota, Tennessee, Texas, Washington, West Virginia, Wisconsin and Wyoming. The ratification resolutions are reproduced in the Appendix.

*State ratifications not quoting H.J. Res. 208 in its entirety, but referring to the seven year ratification period*

Five State ratifications did not quote H.J. Res. 208 in its entirety, but during the ratification process included reference to the seven year time limit for rati-

(739)

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

fication. These States are: Delaware, Kentucky,[1] New York, Oregon, and Vermont. The ratification resolutions are reproduced in the Appendix.

*State ratifications not referring to the seven year ratification period*

Five States did not quote H.J. Res. 208 in its entirety nor did they include any mention of the seven year ratification period during their ratification process. These States are: Alaska,[2] Maryland, New Jersey, Pennsylvania, and Rhode Island. The ratification resolutions are reproduced in the Appendix.

### TYPE OF LEGISLATIVE ACTION

*Concurrent resolution*

The following nine States ratified the proposed ERA by concurrent resolution: Colorado, Delaware, Hawaii, Kansas, New Hampshire, New Jersey, New York, North Dakota, and Texas.

*Joint resolution*

The following twenty-two States ratified the proposed ERA by joint resolution: Alaska, California, Connecticut, Idaho, Indiana, Iowa, Kentucky, Maine, Maryland, Michigan, Montana, New Mexico, Ohio, Oregon, Pennsylvania, South Dakota, Tennessee, Vermont, Washington, West Virginia, Wisconsin, and Wyoming.

*Resolution*

The following four States ratified the proposed ERA by resolution: Massachusetts, Minnesota, Nebraska, and Rhode Island.

## STATE RATIFICATION DOCUMENTATION

### ALASKA STATE LEGISLATURE—1972

#### HOUSE JOINT RESOLUTION NO. 128

Relating to the ratification of the 27th Amendment to the Constitution of the United States.

*Be it resolved by the Legislature of the State of Alaska:*

Whereas the Congress of the United States has approved a proposed amendment to the United States Constitution that stipulates "Equality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex"; and

Whereas this proposal has been sent to the states for ratification; be it

*Resolved,* That the Seventh Alaska Legislature hereby ratifies the proposed 27th Amendment to the Constitution of the United States prohibiting the denial or abridgment of equality of rights under the law by the United States or by any state on account of sex.

———

#### CALIFORNIA

##### RESOLUTION CHAPTER —

Senate Joint Resolution No. 80—Relative to ratification of an amendment to the Constitution of the United States, proposed by the Congress of the United States, relating to equal rights for men and women.

###### LEGISLATIVE COUNSEL'S DIGEST

S.JR 80. Drmally. Equal rights.

Ratifies proposed amendment to United States Constitution relating to equality of rights for men and women.

———

[1] The wording of the Kentucky resolution omitted two words and one comma in the Article At the request of the Director of the Federal Register, Kentucky submitted a new certificate containing reference to H.J. Res. 208, which was accepted as ratification of the proposed ERA by the State of Kentucky.
[2] The State of Alaska included only Section 1 of the Article in its ratification resolution. The Director of the Federal Register requested that the certification of ratification include a reference to H.J. Res. 208, which was completed by Alaska and subsequently accepted by the Director as ratification of the proposed ERA by the State of Alaska.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2020-09-22 04:17 GMT / https://hdl.handle.net/2027/mdp.39015026756664
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

# Exhibit D

Ervin and others adding a 7-year deadline for ratification. In propos-
ing the deadline, Senator Ervin stated that:

> My other proposed alteration of the original purpose of the
> resolution would require, that this resolution be ratified by
> three-fourths of the States within 7 years after submission by
> Congress to them for consideration. This is necessary because
> we still have floating around some unratified amendments
> that were submitted at the time of the original submission of
> the Bill of Rights. We have some other amendments that have
> been floating around since about 1860. There is no date for
> their expiration, no time limit for their ratification, and they
> could be ratified at any time. I do not think it is wise for
> Congress to submit a proposed constitutional amendment to
> the States without a time limit for its ratification. [116 Cong.
> Rec. 36302.]

However, despite the attempts to compromise, no final vote on the
resolution was taken by the Senate during the 91st Congress.

In the 92d Congress, the House passed House Joint Resolution 208,
containing a 7-year ratification period in the proposing clause. No
discussion of the inclusion of this provision appears in the floor de-
bates on the date of passage, October 12, 1971, 117 Congressional Rec-
ord 35782–35815, but it appears that the provision was added to meet
the arguments of the amendment's critics in both the House and the
Senate. On March 22, 1978, the Senate passed House Joint Resolution
208 with no further discussion of the time limit. See generally 117
Congressional Record 9517–9598.

Although there was very little discussion on the addition of a dead-
line for ratification of the amendment on the floor of either House,
apart from the few instances mentioned above, there were some refer-
ences to the issue during the hearings on House Joint Resolution 208
held by the Subcommittee on Civil and Constitutional Rights of this
committee in March and April of 1971. These references indicate that
the amendment's sponsor, Representative Martha Griffiths, had no
objection to a time limit, although she believed none was necessary.

The legislative history reveals no reason for inclusion of the dead-
line provision other than that such a provision had become customary
and several influential Members of both Houses objected to its ab-
sence strongly enough that it was eventually added. In addition, the
7-year limitation had received a stamp of approval from the Supreme
Court in *Dillon v. Gloss*, 256 U.S. 368 (1921). In that case the Court
had held that with regard to the deadline in the 18th amendment,
Congress had the authority under article V to fix a reasonable time for
ratification after the proposal of an amendment. This authority was
found to be incident of congressional power to designate the mode of
ratification. With regard to the specific 7-year time period involved,
the Court simply stated that "it is not questioned that 7 years * * *
was reasonable. * * *" 256 U.S., at 376.

## AUTHORITY OF CONGRESS TO EXTEND

*Introduction*

The question whether Congress has the authority to extend the
time for ratification in the manner proposed, is one of first impres-

# Exhibit E

**EQUAL RIGHTS AMENDMENT, PROPOSED MARCH 22, 1972**
**LIST OF STATE RATIFICATION ACTIONS**

The following dates reflect the date of the state legislature's passage, the date of filing with the Governor or Secretary of State, or the date of certification by the Governor or Secretary of State, whichever is the earliest date included in the official documents sent to the NARA, Office of the Federal Register. (Updated as of: 03/24/2020)

| STATE | RATIFICATION | STATE | RATIFICATION |
|---|---|---|---|
| Alabama | not ratified | Montana | Jan. 25, 1974 |
| Alaska | April 5, 1972 | Nebraska* | March 29, 1972 |
| Arizona | not ratified | Nevada** | March 22, 2017 |
| Arkansas | not ratified | New Hampshire | March 23, 1972 |
| California | Nov. 13, 1972 | New Jersey | April 17, 1972 |
| Colorado | April 21, 1972 | New Mexico | Feb. 28, 1973 |
| Connecticut | March 15, 1973 | New York | May 18, 1972 |
| Delaware | March 23, 1972 | North Carolina | not ratified |
| Florida | not ratified | North Dakota | Feb. 3, 1975 |
| Georgia | not ratified | Ohio | Feb. 7, 1974 |
| Hawaii | March 22, 1972 | Oklahoma | not ratified |
| Idaho* | March 24, 1972 | Oregon | Feb. 8, 1973 |
| Illinois** | May 30, 2018 | Pennsylvania | Sept. 26, 1972 |
| Indiana | Jan. 24, 1977 | Rhode Island | April 14, 1972 |
| Iowa | March 24, 1972 | South Carolina | not ratified |
| Kansas | March 28, 1972 | South Dakota* | Feb. 5, 1973 |
| Kentucky* | June 27, 1972 | Tennessee* | April 4, 1972 |
| Louisiana | not ratified | Texas | March 30, 1972 |
| Maine | Jan 18, 1974 | Utah | not ratified |
| Maryland | May 26, 1972 | Vermont | March 1, 1973 |
| Massachusetts | June 21, 1972 | Virginia** | January 27, 2020 |
| Michigan | May 22, 1972 | Washington | March 22, 1973 |
| Minnesota | Feb. 8, 1973 | West Virginia | April 22, 1972 |
| Mississippi | not ratified | Wisconsin | April 26, 1972 |
| Missouri | not ratified | Wyoming | Jan. 26, 1973 |

| * Purported Rescission | | ** Ratification actions occurred after |
|---|---|---|
| Nebraska | March 15, 1973 | Congress's deadline expired. *See* U.S. |
| Tennessee | April 23, 1974 | Dep't of Justice, Office of Legal Counsel, |
| Idaho | Feb. 8, 1977 | *Ratification of the Equal Rights* |
| Kentucky | March 20, 1978 | *Amendment*, 44 Op. O.L.C. __, Slip Op. |
| South Dakota | March 5, 1979 | (Jan. 6, 2020). |

# Exhibit F

# JOINT RESOLUTION

# SECOND SESSION, NINETY-FIFTH CONGRESS

## Joint Resolution

Extending the deadline for the ratification of the equal rights amendment.    [H.J. Res. 638]

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That notwithstanding any provision of House Joint Resolution 208 of the Ninety-second Congress, second session, to the contrary, the article of amendment proposed to the States in such joint resolution shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States not later than June 30, 1982.

86 Stat. 1523.

Thomas P. O'Neill, Jr.,
*Speaker of the House of Representatives.*

James O. Eastland,
*President of the Senate pro Tempore.*

Jimmy Carter,
*October 20, 1978.*


I certify that this Joint Resolution originated in the House of Representatives.

Edmund L. Henshaw, Jr.,
*Clerk.*


[Received by the Office of the Federal Register, National Archives and Records Service, General Services Administration, October 20, 1978.]

---

LEGISLATIVE HISTORY:

HOUSE REPORT No. 95–1405 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 124 (1978):
    Aug. 15, considered and passed House.
    Sept. 28, Oct. 3, 4, 6, considered and passed Senate.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 14, No. 42:
    Oct. 20, Presidential statement.

# Exhibit G

Nos. 81-1282, 81-1283, 81-1312, and 81-1313

Office - Supreme Court, U
F I L E D

JUL   9   1982

ALEXANDER L. STEV,
CLERK

# In the Supreme Court of the United States

## OCTOBER TERM, 1982

---

NATIONAL ORGANIZATION FOR WOMEN, INC., ET AL.,
APPELLANTS AND PETITIONERS

*v.*

STATE OF IDAHO, ET AL.

---

GERALD P. CARMEN, ADMINISTRATOR OF GENERAL
SERVICES, APPELLANT AND PETITIONER

*v.*

STATE OF IDAHO, ET AL.

---

*ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO IN NOS. 81-1282 AND 81-1312
AND ON WRITS OF CERTIORARI BEFORE JUDGMENT TO
THE UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT IN NOS. 81-1283 AND 81-1313*

---

### MEMORANDUM FOR THE ADMINISTRATOR
### OF GENERAL SERVICES SUGGESTING MOOTNESS

---

LAWRENCE G. WALLACE
*Acting Solicitor General
Department of Justice
Washington, D.C. 20530
(202) 633-2217*

Library of Congress

TABLE OF AUTHORITIES

Page

Cases:

DeFunis v. Odegaard, 416 U.S. 312 ............ 4

Great Western Sugar Co. v. Nelson, 442
U.S. 92 ................................... 4

North Carolina v. Rice, 404 U.S. 244 ......... 4

United States v. Alaska Steamship Co.,
253 U.S. 113 ............................. 4

United States v. Munsingwear, Inc., 340
U.S. 36 .................................. 4

Statute:

1 U.S.C. 106b ............................... 2

Miscellaneous:

H.R.J. Res. 208, 92d Cong., 1st Sess.
(1972), 86 Stat. 1523 .................... 2

H.R.J. Res. 638, 95th Cong., 2d Sess.
(1978), 92 Stat. 3799 .................... 2

(I)

# In the Supreme Court of the United States

OCTOBER TERM, 1982

———

Nos. 81-1282 and 81-1283

NATIONAL ORGANIZATION FOR WOMEN, INC., ET AL.,
APPELLANTS AND PETITIONERS

*v.*

STATE OF IDAHO, ET AL.

———

Nos. 81-1312 and 81-1313

GERALD P. CARMEN, ADMINISTRATOR OF GENERAL
SERVICES, APPELLANT AND PETITIONER

*v.*

STATE OF IDAHO, ET AL.

———

*ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO IN NOS. 81-1282 AND 81-1312
AND ON WRITS OF CERTIORARI BEFORE JUDGMENT TO
THE UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT IN NOS. 81-1283 AND 81-1313*

———

**MEMORANDUM FOR THE ADMINISTRATOR
OF GENERAL SERVICES SUGGESTING MOOTNESS**

———

1. These cases present several questions concerning the ratification by the states of the proposed Equal Rights Amendment to the Constitution. Congress passed a resolution proposing that Amendment in March 1972. The preamble of the resolution specified that the Amendment

1

2

"shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress." H.R.J. Res. 208, 92d Cong., 1st Sess. (1972), 86 Stat. 1523 (81-1282 J.S. App. 154a).

During the seven years after the Amendment was proposed, 35 of the necessary 38 states ratified it and, pursuant to 1 U.S.C. 106b, transmitted official ratification documents to the Administrator of General Services (81-1282 J.S. App. 4a). Five of the ratifying states, including appellee-respondent Idaho, also passed resolutions purporting to withdraw their ratifications (*id.* at 4a & n.2) Idaho notified the Administrator of its rescission resolution (*id.* at 8a).

In August and October 1978, each House of Congress passed, by a majority (but less than two-thirds) vote, a resolution extending the expiration date of the proposed Amendment by 39 months, until June 30, 1982. H.R.J. Res. 638, 95th Cong., 2d Sess. (1978), 92 Stat. 3799 (81-1282 J.S. App. 155a). The President signed the resolution on October 20, 1978 (*ibid.*).

2. Appellee-respondents--Idaho and Arizona, a state that has not ratified the Amendment (81-1282 J.S. App. 8a-9a), and legislators from those two states—brought this suit in the United States District Court for the District of Idaho against the Administrator of General Services in May 1979. The National Organization for Women (NOW) intervened in the suit as a defendant.[1] Plaintiffs sought a declaration that Idaho's rescission was valid and nullified its prior ratification; an injunction requiring the

---

[1] Legislators from the State of Washington intervened as plaintiffs 81-1282 J.S. App. 2a.

3

Administrator not to list Idaho as a ratifying state; and an injunction restraining the Administrator from taking account of any ratification that occurred after the expiration of the original seven-year period (*id.* at 2a).

The district court ruled in favor of plaintiffs. It held that plaintiffs had standing to sue and that their claims were ripe and did not present a political question (81-1282 J.S. App. 13a-76a). The district court then declared that the state rescissions nullified the prior ratifications, that Congress could establish the period in which ratifications would be valid only by a two-thirds vote, and that in any case Congress lacked the power to extend the ratification period for a proposed amendment once that period had been established (*id.* at 76a-93a).

The Administrator and NOW appealed to the United States Court of Appeals for the Ninth Circuit, filed petitions for a writ of certiorari before judgment to that court, and docketed appeals in this Court. On January 25, 1982, the Court granted the petitions for a writ of certiorari, postponed further consideration of the question of jurisdiction on appeal to the hearing of the cases on the merits, consolidated the cases, and stayed the judgment of the district court.

3. On June 30, 1982, the extended period for ratifying the Amendment expired. The Administrator informs us that no state transmitted a ratification of the Amendment during the period after the original expiration date of March 22, 1979. Congress has not passed any additional extension.

Consequently, the Amendment has failed of adoption no matter what the resolution of the legal issues presented here, and the Administrator informs us that he will not certify to Congress that the Amendment has been adopted. Even if all the ratifications remain valid, the rescissions are disregarded, and Congress is conceded the power to extend the

4

ratification period as it did here, only 35 of the necessary 38 states can be regarded as having ratified the Amendment. If appellee-respondents were to prevail on all issues, fewer than 35 states would be counted as having ratified the Amendment, and the Amendment would be regarded as having failed of adoption in March 1979. But the date on which the proposed Amendment failed of adoption, and the extent to which it fell short of the necessary three-fourths of the states, do not affect the legally cognizable interests of any party.

Because these cases accordingly present only " 'questions that cannot affect the rights of litigants in the case before' " the Court (*DeFunis* v. *Odegaard*, 416 U.S. 312, 316 (1974), quoting *North Carolina* v. *Rice*, 404 U.S. 244, 246 (1971)), they are moot. See *United States* v. *Alaska Steamship Co.*, 253 U.S. 113, 116 (1920). It is therefore respectfully submitted that the judgment of the district court should be vacated and the cases remanded with instructions to dismiss the complaint as moot. See, *e.g.*, *Great Western Sugar Co.* v. *Nelson*, 442 U.S. 92 (1979); *United States* v. *Munsingwear, Inc.*, 340 U.S. 36, 39-41 (1950).

LAWRENCE G. WALLACE
*Acting Solicitor General**

JULY 1982

---

*The Solicitor General is disqualified in these cases.

JA 246

# Exhibit H

Nos. 81-1282, 81-1283, 81-1312 and 81-1313

FILED

AUG 6 1982

ALEXANDER L. STEVAS
CLERK

In The

# Supreme Court of the United States

OCTOBER TERM, 1981

———

NATIONAL ORGANIZATION FOR WOMEN, INC., *et al.*,
*Appellants and Petitioners,*

v.

STATE OF IDAHO, *et al,*
*Appellees and Respondents.*

———

GERALD P. CARMEN, ADMINISTRATOR OF
GENERAL SERVICES,
*Appellant and Petitioner,*

v.

STATE OF IDAHO, *et al,*
*Appellees and Respondents.*

———

ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO IN NOS. 81-1282 AND 81-1312
ON PETITIONS FOR WRIT OF CERTIORARI BEFORE
JUDGMENT TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT IN NOS. 81-1283 AND 81-1313

———

RESPONSE OF THE STATES OF IDAHO AND ARIZONA, *ET AL,*
IN OPPOSITION TO THE ADMINISTRATOR'S
SUGGESTION OF MOOTNESS

———

DAVID H. LEROY, Esq.
Idaho Attorney General
(Counsel of Record)
LARRY K. HARVEY, Esq.
Chief Deputy
Statehouse
Boise, Idaho 83720
(208) 334-2400

[List of Counsel continued on inside cover]

MAXWELL A. MILLER, Esq.
Mountain States Legal
Foundation
   1200 Lincoln St., Suite 600
   Denver, Colorado 80203
   (303) 861-0244

JOHN L. RUNFT, Esq.
TERRY E. COFFIN, Esq.
Runft, Stecher & Coffin, Ctd.
   420 West Bannock Street
   Boise, Idaho 83702
   (208) 345-6521

ROBERT K. CORBIN, Esq.
Arizona Attorney General
ANTHONY CHING, Esq.
Arizona Solicitor General
   1275 W. Washington Street
   Phoenix, Arizona 85007
   (602) 255-5025

DAVID WM. WEST, Esq.
West and Bliss, P.A.
   4154 North 12th Street
   Phoenix, Arizona 85104
   (602) 263-7891

Counsel for Appellees/Respondents

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| INTRODUCTION AND SUMMARY OF ARGUMENT | | 2 |
| I. | THIS APPEAL RAISES TRANSCENDENT LEGAL QUESTIONS CONCERNING THE AMENDMENT PROCESS THAT ARE NOT MOOT BECAUSE THEY ARE NOT DEPENDENT UPON THE POLITICAL FATE OF THE PROPOSED TWENTY-SEVENTH AMENDMENT | 5 |
| II. | THIS CONTROVERSY IS NOT MOOT BECAUSE THE ACTS COMPLAINED OF HAVE CONTINUING, PERVASIVE AND ADVERSE EFFECTS IN NEED OF JUDICIAL REMEDY | 7 |
| | A. The expiration of the extension period on June 30, 1982, has not eradicated the harm to the states and the amendment process caused by passage of the extension | 7 |
| | B. The expiration of the extension period on June 30, 1982, has not eradicated the harm to the amendment process as occasioned by the refusal to honor rescissions | 10 |
| III. | THE VITAL PUBLIC INTEREST ISSUES RAISED BY THIS APPEAL ARE NOT MOOT BECAUSE THEY ARE CAPABLE OF REPETITION YET EVADING REVIEW | 12 |
| | A. Congressional manipulation of the amendment process is capable of repetition, yet evading review | 12 |
| | B. The rescission issue is capable of repetition, yet evading review | 16 |
| IV. | THE PRESENT APPEAL IS STRONGLY ANALOGOUS TO THE ELECTION CASES THIS COURT HAS DECIDED DESPITE MOOTNESS CHALLENGES | 17 |
| CONCLUSION | | 19 |

# TABLE OF CITATIONS

*Cases:*                                                                                    Page

Baker v. Carr, 369 U.S. 186 (1962) . . . . . . . . . . . . . . . . .                          9,10
Bus Employees v. Missouri, 374 U.S. 74 (1963) . . . . . . . .                                  8
Carroll v. Princess Anne, 393 U.S. 175 (1963) . . . . . . . . .                                8
Coleman v. Miller, 307 U.S. 433 (1939) . . . . . . . . . . . . . .                            8,15
County of Los Angeles v. Davis, 440 U.S. 625 (1978) . . . .                                    7
Dillon v. Gloss, 256 U.S. 368 (1921) . . . . . . . . . . . . . . .                             9
Dunn v. Blumstein, 405 U.S. 330 (1972) . . . . . . . . . . . . .                              19
Dyer v. Blair, 390 F.Supp. 1291 (N.D. Ill. 1975) . . . . . . .                             8-9,11,17
Gerstein v. Pugh, 420 U.S. 103 (1975) . . . . . . . . . . . . . .                             13
Goldwater v. Carter, 444 U.S. 996 (1979) . . . . . . . . . . . .                             9,20
MacDougall v. Green, 335 U.S. 281 (1948) . . . . . . . . . . .                                18
Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803) . . . . .                                    10
Maryland Casualty Co. v. Pac. Coal & Oil Co., 312 U.S.
  270 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                13
Moore v. Ogilvie, 394 U.S. 814 (1969) . . . . . . . . . . . . . .                           12,17,19
Murphy v. Hunt, 50 U.S.L.W. 4264 (1982) . . . . . . . . . . .                                 13
Powell v. McCormack, 395 U.S. 486 (1969) . . . . . . . . . . .                                10
Preiser v. Newkirk, 422 U.S. 395 (1975) . . . . . . . . . . . . .                             13
Roe v. Wade, 410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . .                          12
Rosario v. Rockefeller, 410 U.S. 752 (1973) . . . . . . . . . . .                             19
So. Pac. Terminal Co. v. I.C.C., 219 U.S. 433 (1911) . . . .                                  12
So. Pac. Terminal Co. v. I.C.C., 219 U.S. 498 (1911) . . . .                               12,13,19
Storer v. Brown, 415 U.S. 724 (1974) . . . . . . . . . . . . . . .                           12,18
Super Tire Engineering Co. v. McCorkle, 416 U.S. 115
  (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
U.S. v. Munsingwear, Inc., 340 U.S. 36, 39-40 (1950) . . .                                     7
U.S. v. W.T. Grant Co., 345 U.S. 629 (1953) . . . . . . . . . .                               7,8
Weinstein v. Bradford, 423 U.S. 147, 149 (1975) . . . . . . . .                               13


*Other Authorities:*

United States Constitution, Article III . . . . . . . . . . . . . . .                         7
United States Constitution, Article V . . . . . . . . . . . . . . . .                      *passim*
1 U.S.C. § 106(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                  6
H.J. Res. 208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                5
H.J. Res. 638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                5

**TABLE OF CITATIONS — Continued**

S. 2307, 90th Cong., 1st Sess. (1967) . . . . . . . . . . . . . . . . . .   16
S. 623, 91st Cong., 1st Sess. (1969) . . . . . . . . . . . . . . . . . .   16
S. 215, 92nd Cong., 1st Sess. (1971) . . . . . . . . . . . . . . . . .   16
S. 1271, 93rd Cong., 1st Sess. (1973) . . . . . . . . . . . . . . . . .   16
Cong. Globe, 41st Cong., 2nd Sess., 28 (1869) . . . . . . . . .   16
Cong. Globe, 41st Cong., 2nd Sess., 5356 (1870) . . . . .   16
Cong. Globe, 41st Cong., 3rd Sess., 1381 (1871) . . . . . . .   16

*Joint Resolution Extending the Deadline for the Ratifica-
tion of the Equal Rights Amendment, 1978: Hearings on
S.J. Res. 134 Before the Subcommittee on the Constitution,
95th Cong., 1st Sess. 105 (1978)* . . . . . . . . . . . . . . . . . .   6

IN THE

# Supreme Court of the United States

OCTOBER TERM, 1981

———

NATIONAL ORGANIZATION FOR WOMEN, INC., *et al.,*
*Appellants and Petitioners,*

v.

STATE OF IDAHO, *et al.,*
*Appellees and Respondents.*

———

GERALD P. CARMEN, ADMINISTRATOR OF
GENERAL SERVICES,
*Appellant and Petitioner,*

v.

STATE OF IDAHO, *et al.,*
*Appellees and Respondents.*

———

ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO IN NOS. 81-1282 AND 81-1312
ON PETITIONS FOR WRIT OF CERTIORARI BEFORE
JUDGMENT TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT IN NOS. 81-1283 AND 81-1313

———

RESPONSE OF THE STATES OF IDAHO AND ARIZONA, *ET AL,*
IN OPPOSITION TO THE ADMINISTRATOR'S
SUGGESTION OF MOOTNESS

———

2

3

## INTRODUCTION AND SUMMARY OF ARGUMENT

This response is made to the suggestion by Gerald P. Carmen, Administrator of General Services (hereafter "Administrator"), that the Court vacate the district court's judgment on the ground of mootness, without further briefing or oral argument. State-appellees respectfully submit that the Administrator's advice to this Court that this case now presents only questions that cannot affect the rights of litigants as a result of the expiration of the extension resolution (H.J. Res. 638) is erroneous and misguided.

State-appellees submit that a summary vacation on the issue of mootness would not be the simple, elegant solution to the issues of this case as envisioned by the Administrator. Rather, vacation of the judgment on grounds of mootness in this case would effectively decide, without the benefit of briefing, argument and reflection, many of those very issues of fundamental constitutional significance, consideration of which the Administrator seeks to avoid. Specifically, such a ruling would effectively decide the "antecedent" issue of whether Congress has plenary power and control over the amending process under Article V and thereby determine many of the other issues and policies presented by this case.

A summary ruling as suggested by the Administrator would effectively permit unprincipled political expediency to determine the *process* for amending the Constitution. Such a result was neither intended by the framers of the Constitution nor embraced in Article V. In rejecting that result-oriented outcome, the district court ruled that the "contemporaneous consensus" required by Article V in order for an amendment to become part of the Constitution means an actual consensus reflecting a state legislature's express consent. Consensus cannot mean that Congress has power to manipulate the process to effect the end it favors. The process instead must be independent of politics, consistent with Article V's consensus requirement, and constant for every amendment Congress may propose. In this respect, the district court opinion protects the amendment process.

The Administrator and the National Organization for Women (NOW) have repeatedly claimed that the case involves

little more than judicial intervention in politics, and that the interests Arizona and Idaho seek to protect are somehow tied to the life or death of the proposed Twenty-Seventh Amendment (the amendment). That is an erroneous view of this case.[1]

Arizona and Idaho have consistently maintained that their interest is in protecting the integrity of the amendment process and ensuring their constitutional right to full participation in that process. These states seek to repair the damage done to their roles in the amendatory process and to clarify Article V's meaning notwithstanding the amendment's political fate.

Arizona's and Idaho's interests are similar to that of a voter who has been wrongfully denied the right to cast his ballot. If a person wanting to vote for Candidate X had been told at the polls that he could only vote for Candidate Y or that the polls would be open three hours beyond the time they were supposed to be closed to ensure Candidate Y's election, he would have a cause of action against the state official who so corrupted the election process. To sustain the claim, the person would not, in theory, have to await the election's outcome in favor of Candidate Y. In fact, he would find it difficult, if not impossible, to vindicate his right to vote before the election was over. After the election, the effects of the corrupt practice will continue and the likelihood that future elections will be similarly corrupted is real. For that reason the courts have consistently held that challenges to election procedures should not be dismissed for mootness. Likewise, the effects of the corruption of the amendment process in this case persist after June 30, 1982. Congress'

---

[1] The Court's attention is directed to the Administrator's suggestion that this Court consider vacating the judgment of the district court on ripeness grounds set forth in his jurisdictional statement in Case No. 81-1312 at p. 18, fn. 10, *and* the appellees' response.

The Administrator first argued a lack of ripeness and, by virtue of the passage of time only, now argues that the case is moot. The two suggestions share the same theoretical underpinning — the issues presented are political questions left to Congress for decision to the exclusion of this Court. The suggestion of mootness, as was the suggestion of ripeness, is so intertwined with the merits of this case that mootness should be resolved only after plenary consideration based on briefing and oral argument on

4

extension and the Administrator's rejection of rescissions are notorious precedent for future amendments unless this Court affirms the judgment of the district court. In particular, the effects of the corruption on the balance of the respective state and congressional roles in the amendment process will remain if the Court vacates for mootness.

Aside from the residual injury to the amendment process, there are compelling reasons for deciding the merits of this case. Since the Ninety-Seventh Congress convened in January, 1981, over one hundred amendments to the Constitution have been introduced.[2] Some of these deal with significant social problems, such as busing and abortion, while others attempt to regulate the nation's financial affairs. On July 14, 1982, the proposed Twenty-Seventh Amendment was reintroduced in Congress.

The obvious conclusion to be drawn from these increasing efforts to amend the Constitution is that troublesome questions concerning the amendment process will frequently recur. If, as the Administrator has consistently maintained, the Congress has plenary power to deal with these questions as they arise, the answers are as likely to be as politically motivated and lacking in principled clarity as is the congressional extension of the time period in which states could have ratified the amendment.

The appeal's present posture, without the amendment's political outcome hanging in the balance, presents the best possible setting for the Court to articulate principled rules governing the amendment process. Not only does this Court have continuing power to resolve potentially recurring challenges to the amendment process, but it can forthrightly announce enduring rules, consistent with Article V, absent any pressure to formulate rules that accomplish the politically expedient. In light of the fundamental importance the amendment process has to our constitutional system of government, this Court should give this case plenary review.

---

[2] Of the amendments introduced, forty-six concern the budget process; fifteen deal with the terms of Congress; fifteen involve the election of the President and Vice President; fourteen concern abortion; four concern the tenure of federal judges; nine involve discrimination issues; six deal with prayer in the public schools; one concerns English as the official language; and one involves the death penalty.

5

## I.

### THIS APPEAL RAISES TRANSCENDENT LEGAL QUESTIONS CONCERNING THE AMENDMENT PROCESS THAT ARE NOT MOOT BECAUSE THEY ARE NOT DEPENDENT UPON THE POLITICAL FATE OF THE PROPOSED TWENTY-SEVENTH AMENDMENT.

On March 22, 1972, the Ninety-Second Congress, by the requisite two-thirds vote, passed H.J. Res. 208 proposing "An Amendment to the Constitution of the United States Relative to Equal Rights for Men and Women." As embodied in that proposal, the amendment was to become part of the Constitution "when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by Congress." By October of 1978, only thirty-five of the thirty-eight state needed had approved the amendment. The thirty-five state tally was reduced to thirty since five legislatures voted to rescind their previous approvals before the seven-year period had expired. Nebraska rescinded first, on March 15, 1973. Tennessee followed in 1974, Idaho in 1977, Kentucky in 1978 and South Dakota in effect in 1979.

The seven-year time limit set in the proposal sent to the states expired on March 22, 1979. Of the thirty-five states which had approved the proposal as of that date, twenty-four states expressly included the time limitation in their ratifying resolutions, and one of five rescinding states, South Dakota, expressly stated in its rescission that its approval had been intended for seven years only and that Congress had no power to extend the approval beyond the period to which it has initially consented.

To save the proposal from political defeat, the Ninety-Fifth Congress, on October 6, 1978, took the unprecedented step of extending the deadline by which it could be ratified by three-fourths of the states to June 30, 1982. The extension resolution, H.J. Res. 638, by its terms and the statements of its sponsors, was passed upon the presumption that all thirty-five approvals remained valid, notwithstanding the five rescissions or the express expiration dates in twenty-four approvals.

Though a majority in both houses favored the extension, there was insufficient support to pass the proposal by a two-

JA 253

6

thirds vote. Congress instead passed the resolution by a simple majority, the House by a vote of 253 to 189 and the Senate by a vote of 60 to 36.

In August of 1978, the Archivist of the United States, acting on behalf of the appellant-administrator, presented testimony at the Senate extension hearings.[3] The Administrator explained that his duty under 1 U.S.C. Section 106(b) was to tabulate the state approvals for the proposal and to publish the amendment once three-fourths of the states had ratified it, "along with a certificate proclaiming that the amendment has become valid as part of the Constitution of the United States and specifying the states which have ratified."[4] In deciding what states have or have not ratified, the Administrator explained that he followed "precedents and customs" and, apparently on that basis, declared that the legislatures of thirty-five states had adopted the proposal, thus ignoring all the rescissions.

In ruling on cross-motions for summary judgment, the district court on December 23, 1981, declared the extension unconstitutional and the rescissions valid. The court's ruling was premised, in part, upon a finding that:

> [B]oth the questions of the efficacy of a rescission and the proper procedure for establishing a time period for ratification are the kind of questions that must be interpreted with the kind of consistency that is characteristic of judicial rather than political decision making. Whatever the outcome of these questions as they relate to the powers vested by Article V, they must be interpreted consistently for each amendment that may be proposed.

J.S. App. 76a

---

[3] *Joint Resolution Extending the Deadline for the Ratification of the Equal Rights Amendment, 1978: Hearings on S.J. Res. 134 Before the Subcommittee on the Constitution, 95th Cong., 1st Sess. 105 (1978)* statement of James E. O'Neal, Deputy Archivist, U.S. National Archives and Records Service.

[4] *Id.* 1 U.S.C. § 106(b) is the *sole* statute which serves to guide the amendment process under Article V.

7

The foregoing demonstrates that at the heart of this lawsuit are questions of constitutional procedure and power. Does Congress have the power to extend the time limit of a proposed amendment? May it do so by a simple majority? May it extend the time despite incorporation of the original time limit in state approvals? Do states have the power to rescind a prior approval before ratification by three-fourths of the states? Underlying these issues is the antecedent and even more important issue, whether this Court or the Congress is the final arbiter of questions arising under Article V. The dispute over, and the need for answers to, these questions are independent of the amendment's political fate.

## II.

### THIS CONTROVERSY IS NOT MOOT BECAUSE THE ACTS COMPLAINED OF HAVE CONTINUING, PERVASIVE AND ADVERSE EFFECTS IN NEED OF JUDICIAL REMEDY.

A. *The expiration of the extension period on June 30, 1982, has not eradicated the harm to the states and the amendment process caused by passage of the extension.*

The mootness doctrine is premised on the constitutional requirement that jurisdiction to resolve issues be limited to actual "cases or controversies." U.S. Const., Art. III. Dismissal of a case for mootness is thus warranted where the issues are no longer sufficiently "alive" to necessitate a judicial remedy. It consequently follows that dismissal of a moot case does not injure the parties' interests, *U.S.* v. *Munsingwear, Inc.*, 340 U.S. 36, 39-40 (1950).

The tests this Court has fashioned for determining mootness are explained in *County of Los Angeles* v. *Davis*, 440 U.S. 625 (1978). Emphasizing that parties claiming mootness have a "heavy" burden of proof (*U.S.* v. *W.T. Grant Co.*, 345 U.S. 629, 632-633 (1953)), the *Davis* Court then stated that a case may become moot when:

> 1. it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, *and*,

JA 254

8

9

2. interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

440 U.S. at 631 (emphasis added).

> To apply this cumulative test, the Court directed:

> *When both conditions are satisfied*, it may be said that the case is moot because neither party has a legally cognizable interest in the underlying questions of fact and law.

*Id.* (emphasis added)

If either condition continues, the case is accordingly not moot and should be adjudicated because *both* conditions must be met before the case can be dismissed as moot. Both conditions remain unsatisfied in this case. With respect to the second condition, examples of ongoing controversies the Court has adjudicated despite mootness claims include *Bus Employees v. Missouri*, 374 U.S. 74 (1963); *Carroll* v. *Princess Anne*, 393 U.S. 175 (1968). In *Bus Employees*, the Court passed upon the merits of a Missouri statute authorizing the governor to seize a strike-bound transit company, even though the governor had rescinded his order. Justice Stewart, speaking for a unanimous Court, held that the merits of the case must be decided because the underlying labor dispute was unresolved. 374 U.S. at 78. The Court in *Carroll* decided the merits of a constitutional challenge to an *ex parte* restraint on free speech notwithstanding expiration of the relevant order. Eight members of the Court in *Carroll* held that the case was not moot because the Maryland Court of Appeals "continues to play a substantial role in the response of officials to their activities." 393 U.S. at 178.

The primary residual, on-going and adverse effect of the extension resolution is the unconstitutional enlargement of congressional power. To bolster the rationale for the extension, the government has adopted the view of the dissenting justices in *Coleman v. Miller*, 307 U.S. 433 (1939), that Congress has "plenary authority over the process of amending the Constitution." This dissenting view of congressional power has never been the law and in fact was expressly rejected not only by *Coleman*'s majority but by Judge (now Justice) Stevens in *Dyer v.*

*Blair*, 390 F. Supp. 1291, 1300 (N.D. Ill. 1975). When passing the extension, Congress thus usurped unto itself powers it does not have. It effectively embraced the rejected view of the dissenting justices in *Coleman*.

Congress has also enlarged its powers by fabricating authority to extend the time period for ratification where no such power exists. The very rationale in *Dillon* v. *Gloss*, 256 U.S. 368 (1921), upon which Congress' power to set a time period initially is based — i.e., *providing certainty* — is thwarted by an extension.

One of the continuing effects of Congress' unconstitutional expansion of its Article V role is the erosion of the states' role in the amendment process. Under Article V, it is Congress' function to propose amendments and set the conditions for their ratification. The states, through their legislatures, decide whether they will agree with any such proposal. The states' constitutional function in the process of determining a sufficiently "contemporaneous consensus" of the people (*Dillon* v. *Gloss, supra*) is severely hampered if the precedent of the extension resolution is allowed to stand. Not only is the certainty of the process of ratification by the states destroyed by the continuing possibility of congressional extension, but also the states find their authority diminished by the prospect of extension. The possibility of a state's consent to a proposed amendment being extended by Congress might cause such legislatures to be even more guarded in giving such consent. There can be no question that the uncertainty of the contemporaneousness of any such consensus caused by the continued existence of an extension doctrine or precedent will have a deleterious effect on the amendatory process.

Another continuing, adverse effect of extension is unconstitutionally replacing this Court with Congress as the final arbiter of the Constitution. In *Goldwater* v. *Carter*, 444 U.S. 996 (1979), Justice Brennan wrote that the "political question" doctrine restrains courts from reviewing an exercise of decisionmaking by a:

> coordinate political branch to which authority to do make that judgment has been "constitutional[ly] committed]." *Baker* v. *Carr*, 369 U.S.

10

186, 211-213, 217 (1962). But that doctrine does not pertain when a court is faced with the *antecedent* question whether a particular branch has been constitutionally designated as the repository of political decision-making power. C.F. *Powell* v. *McCormack*, 395 U.S. 486, 519-521 (1969). The issue of decision-making authority must be resolved as a matter of constitutional law, not political discretion; accordingly it falls within the competence of the Courts.

440 U.S. at 1006-1007. Justice Brennan made the same observation in *Baker* v. *Carr*: "[D]eciding whether a matter has in any measure been committed by the Constitution to another branch of government . . . is itself a delicate exercise in constitutional interpretation and the responsibility of the Court as ultimate interpreter of the Constitution." 369 U.S. at 211. The "antecedent question" principle is ultimately grounded upon a correct understanding of the separation of powers doctrine and Chief Justice Marshall's famous recognition that "[I]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). As in *Powell* v. *McCormack*, this appeal squarely raises the antecedent question. If this Court dismisses the case as moot, it will be making, *sub silentio*, a decision that the passage of an extension period for ratification of a constitutional amendment by less than the majority required for proposing the amendment is not subject to review because Congress has constitutionally been given that decision-making power. The rules for the amendment process in the future will be set by political whim rather than reasoned application of principle. Protection of the states' Article V role similarly will be dependent upon congressional whim. This antecedent question remains "live" and "legally cognizable" despite the expiration of the June 30, 1982, deadline.

> B. *The expiration of the extension period on June 30, 1982, has not eradicated the harm to the amendment process as occasioned by the refusal to honor rescissions.*

11

By refusing to recognize Idaho's rescission resolution and by refusing to make any official announcement honoring the rescinding resolutions of other states, the Administrator has damaged the sovereign power and authority of the states well beyond the expiration of the extension. As alleged in the complaint and recognized by the district court, the states have a right, inherent in the amendment process, to rescind their previous approval of a proposed amendment prior to its final ratification by a contemporaneous consensus of the states. The Administrator violated the inherent power of the Legislature of the State of Idaho to decide its own will, and procedure for expressing consensus, with respect to constitutional amendments. The Administrator's acts also deprived members of the Idaho Legislature of the effectiveness of their votes and interfered with the rightful prosecution of their legislative duties on behalf of their constituents.

This injury to Idaho has relegated all states to a second-class role in the amendment process without redress for all future constitutional amendment proposals in the event this Court accepts the Administrator's suggestion of mootness. To argue that the "effect" of the refusal to recognize a sovereign state's valid rescission under Article V is "completely and irrevocably eradicated" by the expiration of the extension on June 30th is a fantasy. Unless this Court affirms the judgment of the district court, the state's role in the amendment process will have been irrevocably altered.

This Court's decision in *Super Tire Engineering Co.* v. *McCorkle*, 416 U.S. 115 (1974), supports a conclusion that the case is not moot. In *McCorkle*, this Court held that the case before it was not moot because the policy there challenged "has not ceased" and that it was "fixed and definite." 416 U.S. at 123. Similar to *McCorkle*, the policy challenged here is "fixed and definite." The government's policy on rescissions should not be anything but constant. As noted by Justice (then Judge) Stevens in *Dyer* v. *Blair*, the interpretation of the word "ratification" "must be constant for each amendment that a Congress may propose." 390 F. Supp. at 1303. Consequently, the Administrator's position on what constitutes a binding "ratification" (and the effect of the state's vote to rescind its approval) has continued without modification after the subject expiration

12

of the extension period and will continue regardless of the substantive content of any particular amendment being considered or the political philosophy of the particular administration then in power. This policy of refusing to recognize a state's rescission during the period allowed for ratification of a constitutional amendment thus raises an on-going case or controversy and is not moot.

The rescission issue also raises the "antecedent question" of who is to be the final arbiter of Article V. For rescission, the question in this case principally is whether the decision on the effect of a state's rescission has been committed to the Administrator's discretion. Though administrative officials are ordinarily entitled to judicial deference in interpreting their duties, in this instance the Court must act as the "ultimate interpreter of the Constitution" if an administrative official is not to have powers no one intended him to have. Ruling the present appeal moot is tantamount to saying that a state's role in, and procedures for, reflecting the "contemporaneous consensus" for an amendment is not committed to elected state legislatures, but is rather in the hands of the Administrator.

III.

THE VITAL PUBLIC INTEREST ISSUES RAISED BY THIS APPEAL ARE NOT MOOT BECAUSE THEY ARE CAPABLE OF REPETITION YET EVADING REVIEW.

A. *Congressional manipulation of the amendment process is capable of repetition, yet evading review.*

As an independent test for mootness, this Court has consistently maintained that an action will not be dismissed if the issue is "capable of repetition, yet evading review." Under this prudential doctrine, a case or an issue complained of is "capable of repetition, yet evading review." *So. Pac. Terminal Co.* v. *I.C.C.*, 219 U.S. 433 (1911); *So. Pac. Terminal Co.* v. *I.C.C.*, 219 U.S. 498 (1911); *Moore* v. *Ogilvie*, 394 U.S. 814 (1969); *Roe* v. *Wade*, 410 U.S. 113 (1973); *Storer* v. *Brown*, 415 U.S. 724 (1974); *Super*

13

*Tire Engineering Co.* v. *McCorkle*, 416 U.S. 115 (1974); *Gerstein* v. *Pugh*, 420 U.S. 103 (1975); and *Murphy* v. *Hunt*, 50 U.S.L.W. 4264 (March 2, 1982).

This Court's most recent pronouncement on mootness, *Murphy* v. *Hunt*, explained that the "capable of repetition, yet evading review" doctrine was limited to cases where two elements are present: (1) the challenged action was too short in its duration to be fully litigated prior to its succession or expiration; and (2) there is reasonable expectation that the same complaining party would be subject to the same action again. In expanding upon the second element of this test, *Murphy* emphasized that the reasonable expectation must be a "' demonstrated probability' that the same controversy will recur involving the same complaining party." *Id.*, at 4265, quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149, (1975).

Two additional cases clarify the "capable of repetition, yet evading review" doctrine in declaratory judgment cases: *Maryland Casualty Co.* v. *Pac. Coal & Oil Co.*, 312 U.S. 270 (1941), as explained by *Preiser* v. *Newkirk*, 422 U.S. 395 (1975), and *Super Tire Engineering Co.* v. *McCorkle*. The *Preiser* Court, relying on *Maryland Casualty* language, held that the basic question in determining mootness in a declaratory judgment action is whether the facts alleged under all the circumstances show that there is a substantial controversy between parties having an adverse legal interest of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

In *McCorkle*, after citing with approval the *Maryland Casualty* test, the Court added:

> [A]nd since this case *involves governmental action*, we must ponder the broader consideration whether the short term nature of that action makes the issues here "capable of repetition, yet evading review," so that petitioners are adversely affected by government "without a chance of redress." *So. Pac. Terminal Co.* v. *I.C.C.*, 219 U.S. 498, 515 (1911).

416 U.S. at 122 (emphasis added). *McCorkle* further emphasized that "the challenged government action has not ceased" and the policy challenged is "fixed and definite" and not "con-

14

tingent upon executive discretion," 416 U.S. at 123. In conclusion, the Court stated:

> It is sufficient, therefore, that the litigant show the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest.

416 U.S. at 125-126.

Notwithstanding the expiration of the extension, the issues raised in the present appeal meet the foregoing tests of "capable of repetition, yet evading review." First, the very nature of the extension period granted by Congress is one of relatively short duration, only three years. This action was filed in the district court on May 9, 1979, within two months of the extension's passage. Thereafter, the Justice Department, followed by the National Organization for Women, sought to disqualify Judge Callister on religious grounds. This "case within a case" took years to resolve and was ultimately decided in Judge Callister's favor by the United States Court of Appeals for the Ninth Circuit.

The merits of the case also took years to resolve. Because of the significance and complexity of the issues involved, both sides did extensive briefing on the merits after having taken many months to agree upon a stipulation of facts. After argument in May of 1981, Judge Callister took fully six months to render his thorough decision. The case was promptly before this Court on a petition for certiorari *before* judgment to the Ninth Circuit. NOW filed its motion to expedite this matter on January 8 and 9, 1982. On January 25, 1982, the motion to expedite consideration of the jurisdictional statement was granted, but expedition of plenary consideration was denied. Further consideration of the question of jurisdiction was postponed to the hearing of the case on the merits. Since the Court called for hearing the case on the merits, repeated extensions of time for filing of the joint appendix and briefs have been granted to the Administrator. As of this writing no joint appendix or briefs on the merits have yet been filed. The Administrator has failed to proceed to argument on the merits of the case but rather continues to argue issues piecemeal before this Court. It has been pending for over six months without a decision.

15

Obviously, the three-year extension was too short in its duration to be fully litigated prior to its expiration. The first component of the "capable of repetition, yet evading review" doctrine is thus satisfied.

Second, the state-appellees can reasonably expect to be subjected to the same illegal action by Congress again. Idaho and Arizona now seek to protect the integrity of their role in the federalist scheme embodied in Article V. It is probable that Congress will again propose a constitutional amendment and likewise probable that these states will be again subjected to unlawful manipulation of the amendment process. Since the Administrator and congressional leaders have themselves defended the extension under a theory of plenary power, it is reasonable to assume that having established the precedent, Congress will again assume the power.

Even if Congress does not have plenary power, the legal extent of its powers remains unclear. In *Coleman* v. *Miller*, 307 U.S. 433 (1939), the majority, explaining what is a reasonable time after a proposal of an amendment for ratification by a state, declared:

> The question of reasonable time in many cases would involve . . . an appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in courts of justice . . . On the other hand, these conditions are appropriate for the consideration of the political departments of government.

307 U.S. at 453-54. Because *the initial setting* of a reasonable time has been deemed a "political question" committed to the Congress, the argument has been made that Congress can reset or alter the time and impose any condition it wishes. Accepting that rationale leaves nothing to prevent Congress from extending the time limit of future amendments, passing an extension retroactively to revive the amendment, shortening the time period for other proposed amendments, or ignoring state approvals as untimely. Multiple variations of this nightmare are possible. But it is clear that states can reasonably expect that the extension resolution will become a prece-

16

dent in determining the scope of congressional powers in the amendment process.

B. *The rescission issue is capable of repetition, yet evading review.*

As with the extension, it is reasonable to expect that the rescission issue will recur. The rescission problem has repeatedly frustrated a consistent and principled operation of the amendment process beginning with the Fourteenth and recurring with the Fifteenth and proposed Twenty-Seventh Amendments. Relating to the Fourteenth and Fifteenth Amendments, Congress avoided making a decision on the rescission issue because the amendments had been ratified by a sufficient number of the states without counting the rescissions. In both instances, the Secretary of State (predecessor to the Administrator in the amendatory process) did not issue a proclamation unconditionally promulgating the amendments until the necessary number of states excluding rescinding states had ratified.

Contrary to the assumption and action of the Administrator, congressional precedent concerning rescission remains inconsistent or at least ambiguous. This is further demonstrated by Congress' legislative actions subsequent to ratification of the Fourteenth Amendment. Following ratification, a bill was introduced that would have made rescissions null and void. Cong. Globe, 41st Cong., 2nd Sess. 28 (1869). The measure passed the House but not the Senate. Cong. Globe, 41st Cong., 2nd Sess., 5356 (1870); Cong. Globe, 41st Cong., 3d Sess., 1361 (1871). More recently, the following bills have been initiated in Congress: S. 2307, 90th Cong., 1st Sess. (1967); S. 623, 91st Cong., 1st Sess. (1969); S. 215, 92nd Cong., 1st Sess. (1971); S. 1271, 93rd Cong., 1st Sess. (1973). Most of the recent bills would have confirmed the states' right to rescind. None passed both Houses but the 1973 Senate version confirming the power to rescind passed 84-0.

There are two relevant conclusions to be emphasized from this brief sketch of rescission history and a survey of related legal literature. One is the obvious point that rescissions occur, questions concerning their validity have frequently occurred, and can be expected to recur. The second and less obvious point is that there is no principled guidance on the rescission question

17

tion. Thus, the need for a judicial determination is compelling. Since the question of the validity of rescissions is inextricably intertwined with the Article V "ratification" process and since the validity of rescissions "must be constant for each amendment that Congress may propose," *Dyer* v. *Blair*, 390 F. Supp. at 1303, such questions must be determined by the Court, not by Congress or the Administrator on a case-by-case basis.

Article V embodies a careful balancing of Congress' power to propose, and the states' power both to initiate (by convention) and ratify, changes to the Constitution. The Administrator's determination that a state may not withdraw its earlier approval prior to ratification upsets this constitutional balance by divesting states, including Arizona and Idaho, of their exclusive right ultimately to determine the fate of each proposed amendment. Not only do the effects of this deprivation continue, but there is strong likelihood that, given the ambiguity of congressional precedent, states will attempt rescissions in the future only to find such actions questioned by the Administrator or Congress.

IV.

THE PRESENT APPEAL IS STRONGLY ANALOGOUS TO THE ELECTION CASES THIS COURT HAS DECIDED DESPITE MOOTNESS CHALLENGES.

Although this Court has not set up a separate test to evaluate mootness problems in cases challenging election procedures, it has recognized the impossibility of resolving legal challenges to election procedures before the election is held. For that reason, the Court has consistently adjudicated such challenges after the conclusion of the relevant election, recognizing a need to resolve cases involving "a continuing controversy in the federal state area." *Moore* v. *Ogilvie*, 394 U.S. 814 (1969). Since the amendment process is strongly analogous to an election, the rationale of the election cases merits serious consideration in the determination of the issue of mootness in the present appeal.

*Moore* v. *Ogilvie* was a suit for declaratory and injunctive relief brought by individuals who were independent candidates

for the offices of electors of the President and Vice President of the United States from Illinois. The defendants were members of the Illinois Electoral Board that had refused to certify the plaintiffs on the November, 1968, election ballot. A three-judge district court dismissed the plaintiff's complaint for failure to state a cause of action, and the case was appealed directly to the United States Supreme Court. On appeal, the appellants filed a motion to expedite the hearing and disposition of the cause (similar to this case) before the election, which the Court denied. After the election, the Illinois Electoral Board urged the Court to dismiss the action as moot since, it was claimed, there was no possibility of granting any relief to appellants. The *Moore* Court, however, declared that the problem posed was one "capable of repetition, yet evading review" even though the election was over. Citing *So. Pac. Terminal Co.*, the Court held that because its decision in *MacDougall* v. *Green*, 335 U.S. 281 (1948), mandated the election procedure used, the case was not moot. The Court expressly recognized that the need for resolution of the case reflected "a continuing controversy in the federal state area." 394 U.S. at 816.

*Storer* v. *Brown*, 415 U.S 724 (1974), involved a similar conclusion and reasoning. As Justice White, speaking for the six members of the Court, explained:

> The 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot since the issues properly presented, and their effects on independent candidacies, will persist as California statutes are applied in future elections. This is, therefore, a case where the controversy is "capable of repetition, yet evading review." [Citations omitted] The "capable of repetition, yet evading review" doctrine *in the context of election cases,* is appropriate where there are "as applied" challenges as well as in the more typical case involving only facial attacks. The construction of the statute, and understanding of its operation, and possible constitutional limits on its application will have the effect of simplifying future challenges, *thus increasing the likelihood*

> *that timely filed cases can be adjudicated before an election.*

415 U.S. at 737, n. 8 (emphasis added).

Similarly, in *Dunn* v. *Blumstein*, 405 U.S. 330 (1972), this Court stated:

> Although appellee can now vote, the problem to voters posed by the Tennessee residency requirement is "capable of repetition, yet evading review," *Moore* v. *Ogilvie . . . So. Pac. Terminal Co.* v. *I.C.C. . . .* In this case, . . . the laws in question remain on the books, and Blumstein has standing to challenge them as a member of the class of people affected by the present written statute.

405 U.S. at 333, n. 2.

The Court followed the *Dunn* result in *Rosario* v. *Rockefeller*, 410 U.S. 752 (1973), and stated:

> Although the June primary election has been completed and the petitioners will be eligible to vote in the next scheduled New York primary, this case is not moot, since the question petitioners raise is "capable of repetition, yet evading review."

410 U.S. at 756, n. 5.

These cases are strongly analogous to the present appeal. The Administrator has declared a policy of dishonoring rescissions and recognizing Congress' alleged plenary power over the amendment process. Neither of these policies will evaporate simply because the amendment has not been ratified. Instead, they will be the standard by which the process will be guided in the future. Appellees, as participants in that process, thus remain affected by such policies and the controversy is truly one "capable of repetition, yet evading review."

## CONCLUSION

The issues of this appeal have enormous significance and transcend the immediate controversy that brings them to this

20

Court's attention. The parties continue to maintain interests adverse to one another. None of the parties, notwithstanding the passage of the June 30, 1982, deadline for ratification of the amendment, has changed its position on the substantive issues which were raised below and are now squarely before this Court. The requisite "constitutional impasse" (*Goldwater* v. *Carter*, *supra*, at 997-98) has occurred and maintains.

The Administrator's position on mootness is inherently based on the concept that the amendatory process under Article V is wholly political and entirely within the control of Congress. Therefore, according to the Administrator, when the political process ends with the failure of a proposed amendment to achieve ratification, there remain no justiciable issues for review by the Court. However, the Administrator's casting of the issues is erroneous. This case remains justiciable, *inter alia*, for the very reason that state-appellees challenge the congressional plenary power premise upon which the Administrator's theory of mootness is founded. The merits of rescission and extension are thus sub-issues to what Justice Brennan might term "the antecedent question." *Goldwater* v. *Carter*, *supra*, at 1006-07. State-appellees submit that their challenge to the theory of Congress' plenary power over the amendatory process and, hence, the ensuing issues of this case, are properly joined and are not affected by the failure of the proposed Twenty-Seventh Amendment to achieve ratification.

Whatever the outcome, the core meaning of the amendatory procedures under Article V of the Constitution is at stake. Interwoven as a common feature to both the rescission and extension issues is the concept that the "united desire" necessary for constitutional change should reflect the actual "contemporaneous consensus" of the state legislatures rather than a contrivance to ensure the amendment's passage. Further refinement of these concepts will not only determine the difficulty or ease in passing an amendment, but also fundamental matters of allocation of power between the states and the federal government as well as issues concerning the proper role of the judiciary in interpreting the Constitution.

This Court should decide these issues by its traditional deliberative process. To short-circuit that process by a vacation of

21

the judgment below on mootness grounds would be to decide these important questions by default to the concept that Congress has plenary control of the amendatory process and to the continuing injury of the state-appellees' interests. For these reasons, it is respectfully suggested that this Court should proceed to a briefing and hearing of the case on its merits.

Respectfully submitted.
DATED: August 5, 1982.

APPELLEES-RESPONDENTS:

DAVID H. LEROY
Attorney General of Idaho
Counsel of Record

Larry K. Harvey
Chief Deputy
IDAHO ATTORNEY GENERAL

Maxwell A. Miller
MOUNTAIN STATES LEGAL FOUNDATION

Terry E. Coffin
John. L. Runft
RUNFT, STECHER & COFFIN, CTD.

Attorneys for Idaho
Appellees-Respondents

Robert K. Corbin
ATTORNEY GENERAL OF THE
STATE OF ARIZONA
By Anthony B. Ching
SOLICITOR GENERAL OF THE
STATE OF ARIZONA
David Wm. West
WEST AND BLISS, P.A.

Attorneys for Arizona
Appellees-Respondents

JA 261

# Exhibit I

**The New York Times** | https://nyti.ms/29QIyMN

# LEADERS CONCEDE LOSS ON EQUAL RIGHTS

**By Marjorie Hunter, Special To the New York Times**

June 25, 1982



See the article in its original context from
June 25, 1982, Section A, Page 1    Buy Reprints

New York Times subscribers* enjoy full access to
TimesMachine—view over 150 years of New
York Times journalism, as it originally appeared.

SUBSCRIBE

*Does not include Crossword-only or
Cooking-only subscribers.

*About the Archive*
*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

---

Leaders of the fight for an equal rights amendment officially conceded defeat today. But they vowed to continue the struggle for equality of women by electing their backers to state legislatures and by suing corporations that practice sexual discrimination.

''We've just begun to fight,'' said Eleanor Smeal, the president of the National Organization for Women, the group that spearheaded the Equal Rights Amendment Countdown Campaign, which has now ended in defeat.

In the 10 years since Congress passed the proposed constitutional amendment to forbid discrimination on the basis of sex, it has been ratified by 35 states, three short of the three-fourths it needed to become part of the Constitution.

Hopes for ratification before the deadline next Wednesday were dashed this week when the amendment was rejected by the Illinois House and the Florida Senate, two states in which supporters felt they had a fighting chance. Hope for One of Two Others

Had Illinois and Florida ratified the amendment, there was at least some chance that either Oklahoma or North Carolina would have provided the final needed vote.

Prospects were far slimmer in the other nonratifying states: Alabama, Arizona, Arkansas, Georgia, Louisiana, Mississippi, Missouri, Nevada, South Carolina, Utah and Virginia.

Phyllis Schlafly, a leader of a group called Stop-ERA, hailed the defeat of the amendment tonight, saying: ''They realized E.R.A. is dead and I think that that is an admission they have lost the battle. My feeling is that E.R.A. will take its place with the prohibition and the child labor amendments as ones which did not have enough support of the American people to be in the Constitution.''

A bipartisan group of at least 38 senators, led by Bob Packwood of Oregon, a Republican, and Paul E. Tsongas of Massachusetts, a Democrat, will introduce new legislation in Congress on July 14, calling again for a constitutional amendment that would have to be ratified by three-fourths of the state legislatures.

But at her crowded news conference today in the organization's storefront headquarters on Pennsylvania Avenue, between the Capitol and the White House, Mrs. Smeal said her organization would ''not again seriously pursue the E.R.A. until we've made a major dent'' in the memberships of Congress and state legislatures by electing more women and ''men who are genuinely feminists.''

She said that NOW, with a membership of 200,000 and a goal of at least a million members, intended to create ''an independent political force'' to unseat legislators who opposed equal rights and recruit and elect those pledged to support the amendment. Says G.O.P. 'Led the Attack'

While she said the new movement would work in both major political parties, she was critical of the Republican Party, saying that it ''actually led the attack'' against the amendment. Although she was less critical of the Democrats, she said that ''women's rights were not high on their agenda and there was significant defection in their ranks.''

To carry on the fight ahead, Mrs. Smeal said, the organizations have a large war chest. She said that donations had averaged $1 million a month in recent months and were still pouring in.

''We're now raising more money than the Democratic Party,'' she said. ''If our opponents think it's all over, someone should tell them we've just begun to fight.''

While critical of state legislators who voted against the proposed amendment, Mrs. Smeal said: ''The real opposition, behind the visible political opposition, has been the special corporate interests that profit from sex discrimination.'' She Accuses Corporaations

Major corporate interests, she said, made heavy contributions to the opposition to the equal rights amendment. In the months and years to come, she said, she expects to see big corporations and other special interests ''fighting us as we work to ban discrimination in insurance or to win better wages for women.'' She said that the National Organization for Women would spearhead efforts to boycott, and in some cases to sue, businesses that practiced sex discrimination. She did not cite any specific corporations.

While the battle over the equal rights amendment has been waged more intensely in the last few years, the effort to achieve such an amendment dates from 1923, when legislation was first introduced in Congress. It Passed in 1972

In 1972, the proposed amendment passed the House by the wide margin of 354 to 24, and the Senate by an equally top-heavy vote, 84 to 8. It was a one-sentence amendment: ''Equality of rights under the law shall not be abridged or denied by the United States or any state on account of sex.''

In two hours after it cleared Congress, the amendment had been ratified by Hawaii. And in the months that followed, it handily won approval in a number of other state legislatures.

But by the spring of 1973, opponents had mounted a strong campaign, arguing that it would result in forced military service for women; a dilution of existing laws protecting women in the workplace; homosexual marriages, and unisex public toilets. Furthermore, they argued

that existing laws provided equality for women. Proponents of the measure rebutted or minimized allegations of such consequences.

The bill had stipulated that the states had five years in which to ratify. As the deadline in the spring 1979 approached, the amendment was still three states short. Over the objections of forces opposed to it, Congress in the fall of 1978 granted a 36-month extension, which ends next Wednesday.

A version of this article appears in print on June 25, 1982, Section A, Page 1 of the National edition with the headline: LEADERS CONCEDE LOSS ON EQUAL RIGHTS

# Exhibit J

USCA Case #21-5096        Document #1928907        Filed: 01/03/2022        Page 273 of 355

 

UPI ARCHIVES        JUNE 30, 1982

# June 30, 1982: The Day the ERA Dies

By PATRICIA McCORMMCK, United Press International

Celebration and mourning both mark June 30, 1982, the day the Equal Rights
Amendment dies.

In both cases, the sentiment is heartfelt. The mourning losers are those who campaigned
nearly 10 years for ratification of the proposed amendment to the Constitution. The
winners are those who fought to keep the proposal from being approved by the required
38 states.

A D V E R T I S E M E N T

Autopsies of the ERA -- and there will be many -- undoubtedly will show no one thing or person killed it.

The actual agents who killed it were the deeply divided state legislators in states that did not ratify the amendment, even though polls in some of those states -- whose accuracy themselves was controversial -- showed more than half the voters favored ERA.

Both celebrations and wakes are planned in the nation's capital.

In a Washington hotel Phyllis Schlafly, the Rev. Jerry Falwell and others who fought ERA for a decade will join in an 'Over the Rainbow' celebration. Mrs. Schlafly said the victors will cheer the beginning of a new era of harmony between women and men.

In Lafayette Park, across from the White House, the losers, led by Eleanor Smeal, president of the National Organization for Women, will rally in mourning. Ms. Smeal said the rally also will mark the start of a new campaign called 'Until Justice is Ours' which she said is shaping up as Round Two of the ERA battle.

Smeal discounts the suggestion fear of unisex toilets and a draft for women beat ERA. She blames big business and said the new campaign will include boycotts of firms that discriminate against women -- plus court action, against discrimination.

A D V E R T I S E M E N T

USCA Case #21-5096      Document #1928907          Filed: 01/03/2022      Page 275 of 355

Charging women earn 59 cents on the dollar to what men are paid for similar work, Smeal says boycotts would supply incentive for equality by making discriminating firms feel it in the cash register.

Birth of the new ERA 'crusade' is expected soon after Congress returns from its Fourth of July holiday and certain congressmen re-introduce an ERA amendment to start the ratification process back at square one.

No one knows as yet if the language will be the same as that of the ERA that died.

That language:

Section 1: 'Equality of Rights under the law shall not be denied or abridged by the United States or by any state on account of sex.'

Section 2: 'The Congress shall have the power to enforce by appropriate legislation the provisions of this article.'

Section 3: 'This amendment shall take effect two years after the date of ratification.'

The ERA officially dies at midnight, June 30, when it falls three states shorts of the required 38 for ratification. Death was sealed last week when Florida and then Illinois legislatures rejected ratification.

The death of ERA has been called a tragedy, a great accomplishment, a disgrace, a vindication for right, depending, of course, on which side of the ERA fence one stood.

'I think it is a disgrace, an outrage against the will of men and women,' said Betty Friedan, founder of the National Organization for Women and author of 'The Feminine Mystique,' the book that started the women's liberation movement, a crusade that helped make the ERA sprout in Congress.

ADVERTISEMENT

USCA Case #21-5096    Document #1928907    Filed: 01/03/2022    Page 276 of 355

'We will get it before his century is over, maybe in the '80s.

'We will get it because women are outraged and will turn the country around.'

'The basic thrust of the women's movement cannot be reversed,' Ms. Friedan said from her summer home in Sag Harbor, N.Y.

In Salt Lake City, Utah, Barbara Smith, president of the Relief Society of the Church of Jesus Christ of the Latter-day Saints, the 1.6 million member Mormon women's organization, said:

'We hope the divisive struggle that has encompassed the ERA will end and that some very positive things might begin to emerge -- such as we hope both men and women will use their energies cooperatively to create a finer society than we have yet known.

'And we hope efforts of individuals will be expended in sharing a loving concern for the well being of each individual to unite our nation under God.'

In New York City, Muriel Fox, president of the National Organization for Women Legal Defense and Education Fund, said:

'I think the death of the ERA is a tragedy.

'Even though time is not on our side for the deadline time will be on our side for the ultimate passage of an ERA. I see more and more women and men understanding our goals more fully, especially as their daughters enter the job market and as more wives turn to work outside the home to make ends meet.'

In Las Vegas, Nev., Jacqui Davison, founder of Happiness of Womanhood, an anti-ERA organization dating from 1973, said:

ADVERTISEMENT

'The defeat of the ERA is just wonderful. It is good newsfor the family and for the happiness of womanhood.'

In Alton, Ill., Mrs. Schlafly echoed the sentiments.

'I think the defeat of the ERA is a tremendous victory for women and for families.'

Where did the ERA crusaders go wrong?

'They didn't have a product to sell,' Mrs. Schlaflyy said. 'And I think a grievous tactical error was made when they got President Carter to come out in favor of drafting women.'

What will happen to Mrs. Schlafly's 'STOP ERA' organization, now that the ERA has been stopped?

USCA Case #21-5096        Document #1928907        Filed: 01/03/2022        Page 278 of 355

'It will fold into the Eagle Forum,' she said. That Forum, 50,000 members, was set up to help crusades for strong families -- a type Mrs. Schlafly describes as the husband out earning the living, the mother home keeping the homefront and taking care of the children.

Sarah Alice Wright, executive director of the National Board of the YWCA, said members at the annual meeting in Washington mourned ERA June 6 at a prayer vigil on the steps of the National Cathedral.

It was led by YMCA President Mrs. Jewel Graham, Antioch College, Yellow Springs, Ohio.

'The spirit of that vigil,' said Mrs. Wright, 'was that we are not going to view what happened to the ERA as defeat. We will continue the crusade.'

Mrs. Wright said many women apparently did not understand what the language of the amendment meant.

'Many women did not recognize that there are gaps in the laws, gaps that would have been bridged by the ERA.'

A D V E R T I S E M E N T

At headquarters of the National Council of Churches, New York City, Dr. Claire Randall, general secretary of the Council which includes 30 Protestant, Orthodox and Anglican Communions, said:

JA 273

'One can only be sad that the fear of a minority has tarnished our national proclamation that freedom and equality are the right of all people because we are all made in God's image. Until women are included in the constitution -- and they will be one day -- that promise cannot be fulfilled.'

In Washington, D.C., Sister Lora Ann Quinonez, executive director of the Leadership Conference on Women Religious, which comprises heads of 370 women's Catholic religious communities in America, said the LCWR has been participating in the Religious Committee for the ERA, a coalition of different denominations trying to explain 'the religious and moral values that undergird the ERA, to state to religious people that there can and should be justice for women before the law.'

'We have for years made systematic efforts to educate members of the church (on the ERA),' she said. 'It's a justice question, a moral question.'

What does the defeat mean for women religious -- nuns?

'I think it means the same as to other women who are concerned about justice for women,' Sister Quinonez sais. 'One thing it shouldn't mean is that we should examine 'everything that went wrong.' I feel the burden for someone who didn't act justly is on that someone, not the person who has suffered the injustice.

'We should also continue a serious discussion that, from a religious point of view, there's an absolute mandate for justice and justice should not exclude any one or any group.

A D V E R T I S E M E N T

JA 274

'...we need to keep asking persistently why there has been such a deafening silence of the official Catholic Church of the United States. Some individual bishops have spoken out, but the official structure of the U.S. Catholic Church has been very loudly silent (on the ERA).

'And since the church has various statements about justice and rights for women, I think we have to keep raising persistently the question, 'Why?''

The National Conference of Catholic Bishops, also based in Washington, D.C., didn't support or didn't fight the ERA. Bill Ryan, spokesman, said there would be no comment on the death of the ERA.

Dorothy Ridings, president of the League of Women Voters, said:

'We have learned so much in 10 years that simply is never going to be lost, which is going to be translated into a lot of other issues as well as ERA. It has taught women how to play political hardball.'

Bella Abzug, former congresswoman who was among those introducing the ERA in the House of Representatives, said:

'There is anger over the death of the ERA. But out of anger comes energy. What we need is non-stop action to take out all the obstructionists, from Reagan on down.'

Patricia Carbine, publisher of Ms. Magazine, the publication that sprouted from the women's movement, said, 'Remember it took 72 years for women to get the vote in this country.'

She was confident that the ERA will be ratified eventually.

The same sentiments came from Gloria Steinem, editor of Ms. and a leading women's movement figure. Steinem interprets the defeat of the ERA movement at the hands of male legislators at the state legislature level as a mandate to elect more women to those assemblies.

JA 275

ADVERTISEMENT

The National Organization for Women claimed the life insurance industry benefits from the death of the ERA.

In a statement, the American Council of Life Insurance reacted to that charge.

'The American Council of Life Insurance, which represents insurance companies accounting for 95 percent of life insurance in force, does not oppose the Equal Rights Amendment,' the statement said.

'NOW's claim that the life insurance business somehow profits by using sex-distinct rates is totally false. Sex-distinct pricing allows companies to set fair prices for groups of people.

'If the rates were merged, so that men and women paid equal rates regardless of their risk of death or sickness at different ages, some people would pay more for insurance than they do now, and some would pay less.

'The extra cost of converting to that system would be paid by everyone.'

'It is unfortunate that NOW has distorted the facts...'

**(0) Leave a comment**

JA 276

# Exhibit K

6/29/2020

*The New York Times* | https://nyti.ms/29KwREb

# U.S. EQUAL RIGHTS MEASURE IS RE-INTRODUCED IN CONGRESS

**By Lynn Rosellini, Special To the New York Times**

July 15, 1982



See the article in its original context from
July 15, 1982, Section B, Page 13     Buy Reprints

New York Times subscribers* enjoy full access to
TimesMachine—view over 150 years of New
York Times journalism, as it originally appeared.

**SUBSCRIBE**

*Does not include Crossword-only or
Cooking-only subscribers.

*About the Archive*

*This is a digitized version of an article from The Times's print archive, before the start of online
publication in 1996. To preserve these articles as they originally appeared, The Times does not alter,*

Case 1:20-cv-00242-RC Document 13 Filed 09/23/20 Page 60 of 89

USCA Case #21-5096     Document #1928907      Filed: 01/03/2022     Page 284 of 355

*edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

---

With a flurry of press releases, more than 200 senators and representatives re-introduced the proposed equal rights amendment to the Constitution today and then posed for pictures behind a green-and-white banner on the Capitol steps.

Some of the stars of the Democratic Party, and a sizable contingent of Republicans, took turns addressing a crowd of several hundred people at the Capitol's West Front. If anyone was skeptical about the task of starting work on the amendment all over again, 14 days after expiration of the ratification deadline and 10 years after the ratification task began, nobody let on.

''I know that success is out there,'' said the Speaker of the House, Thomas P. O'Neill Jr., Democrat of Massachusetts. ''The temporary defeat of E.R.A. is a national disgrace,'' said Senator Edward M. Kennedy, Democrat of Massachussetts. Packwood Predicts Success

''If you look at the history of the advocacy of civil liberties,'' said Senator Bob Packwood, Republican of Oregon, ''it is never fast, but it is always sure.''

A bipartisan group of 51 senators and 201 representatives cosponsored the measure. Many showed up for the rally wearing greenand-white ''E.R.A. Now'' buttons.

National opinion polls have shown that a majority of Americans continue to support the amendment, which has long been pushed by the Democratic Party but was rejected by the Republicans in their 1980 convention.

At the same time, President Reagan, an opponent of the proposal, has slipped dramatically in his poll ratings among women. Some Republicans fear this reaction will also affect Republican congressional candidates in November. A Warning by Packwood

''If we are going to write off 90 percent of minorities and 50 percent of women, our party is going to go out of existence,'' Senator Packwood, head of the Senate Republican Campaign Committee, said in an interview. ''It's the worst mistake the party has made morally and politically since its founding.''

He predicted that women's issues would be felt less in statewide Senate races than in the more limited House races, where women's political groups can mobilize more effectively. ''We will lose five or six more seats than we thought we would, just on those issues,'' Mr. Packwood said.

Case 1:20-cv-00242-RC Document 113 Filed 09/23/20 Page 61 of 89
USCA Case #21-5096 Document #1928907 Filed: 01/03/2022 Page 285 of 355

Announcements about the rally went out weeks ago. Reporters arriving today found dozens of stacks of news releases covering three conference tables. The releases had such headlines as ''Moffett Aids Resumption of Fight for E.R.A'' (Representative Toby Moffett, Democrat of Connecticut) and ''McHugh Cosponsors E.R.A. Reintroduction in Capitol Ceremony'' (Representative Matthew F. McHugh, Democrat of upstate New York).

Members of Congress met on the Capitol steps with representatives of women's groups. Some made pointed comments about Phyllis Schlafly, a principal architect of the defeat of the earlier rights amendment.

A version of this article appears in print on July 15, 1982, Section B, Page 13 of the National edition with the headline: U.S. EQUAL RIGHTS MEASURE IS RE-INTRODUCED IN CONGRESS

# Exhibit L

Case 1:20-cv-00242-RC   Document 113   Filed 09/23/20   Page 63 of 89
USCA Case #21-5096    Document #1928907    Filed: 01/03/2022    Page 287 of 355

have worked a full basic workweek, and for other purposes.

The message also announced that the Senate had passed a bill of the following title, in which the concurrence of the House is requested:

S. 2457. An act to amend the District of Columbia Self-Government and Governmental Reorganization Act to increase the amount authorized to be appropriated as the annual Federal payment to the District of Columbia.

---

## PERMISSION FOR COMMITEE ON BANKING, FINANCE AND URBAN AFFAIRS TO HAVE UNTIL 5 P.M., JULY 1, 1982, TO FILE REPORT ON H.R. 6016, BANK EXPORT SERVICES ACT

Mr. ST GERMAIN. Mr. Speaker, I ask unanimous consent that the Committee on Banking, Finance and Urban Affairs may have until 5 p.m. on July 1, 1982, to file its report on the bill, H.R. 6016, the Bank Export Services Act.

The SPEAKER. Is there objection to the request of the gentleman from Rhode Island?

There was no objection.

---

## PERMISSION FOR SUBCOMMITTEE ON MERCHANT MARINE OF COMMITTEE ON MERCHANT MARINE AND FISHERIES TO SIT DURING 5-MINUTE RULE ON TOMORROW, THURSDAY, JUNE 24, 1982

Mr. BIAGGI. Mr. Speaker, I ask unanimous consent that the Subcommittee on Merchant Marine of the Committee on Merchant Marine and Fisheries be permitted to sit on tomorrow, Thursday, June 24, 1982, during the 5-minute rule for the purpose of marking up four bills.

The SPEAKER. Is there objection to the request of the gentleman from New York?

Mr. DUNN. Mr. Speaker, reserving the right to object, could the gentleman tell me whether this has been cleared with the ranking minority member?

Mr. BIAGGI. Mr. Speaker, if the gentleman will yield, yes, it has. The gentleman from California (Mr. McCLOSKEY) has been apprised of it.

The SPEAKER. All Members will be seated.

Mr. DUNN. Mr. Speaker, I object.

The SPEAKER. The Chair hears an objection. The required 10 Members not having stood, the Chair hears no objection.

---

## THE WOMEN OF AMERICA WILL NOT LET ERA DIE

(Mrs. SCHROEDER asked and was given permission to address the House for 1 minute and to revise and extend her remarks.)

Mrs. SCHROEDER. Mr. Speaker, this week is a grim one for ERA supporters. The Florida State Legislature voted on Monday against ratifying the equal rights amendment. Polls have shown that the majority of Floridians support the ERA. This defeat brings home the jolting reality that the democratic process is not working.

That the debate on the ERA has been so lively down to the wire proves that the amendment and the issue are far from its deathbed.

Millions of women and men have worked for the ERA since Alice Paul first introduced it in 1923. It is an issue that touches men and women in all walks of life and in every State of the Union. The amendment guarantees equal rights for men and women.

It has been argued that ratification of the ERA would loosen the moral fabric of America. That it would change lifestyles overnight.

It is 10 years later. Lifestyles have changed and we do not even have an ERA.

Lifestyles change because the country changes. It is precisely because our lifestyles are constantly in flux that we need a constant that will withstand these changes. That is what the ERA is. It is an immovable constant around which our laws must revolve. Unless women are specifically in the Constitution, our status is as stable as the 1929 stock market.

The ERA is an issue that will not die. The women of America will not let it.

---

## ERA MUST BE REINTRODUCED

(Mr. FRANK asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. FRANK. Mr. Speaker, I want to join the gentlewoman from Colorado (Mrs. SCHROEDER) in her expression of anger and dismay that the ERA has run into political obstacles that have apparently stopped its ratification temporarily. I join her in expressing our determination to reintroduce the equal rights amendment and to continue the fight until we put the principle of equality for women into the Constitution. This is a fight supported by the large majority of the American people who want the ERA passed.

Mr. Speaker, in the State of Massachusetts we have operated under an equal rights amendment since 1977. None of the horror stories conjured up by the opponents have come true. There has been none of the erosion of family life or moral standards that have been inaccurately imputed to ERA, and, in fact, it has had positive effects. For example, it has led to significant changes in our State's property laws which give greater protections to women.

The principle of equality between men and women is one that we still

must go a long way to reach. It is essential that we put that principle into our Constitution, and I want to join with the gentlewoman from Colorado, and I hope a large majority of this House, in reintroducing the equal rights amendment. We can and we must continue the fight for equality in the American Constitution and my determination to see that principle established has not diminished.

The ERA has, to be sure, important symbolic value but it really means much more than that. Individual laws deal with specific and often narrow situations. No one statue can deal effectively with the widespread discrimination which still persists against women. Even a bill as comprehensive as the Economic Equity Act, of which I am a cosponsor, cannot serve as a replacement for passage of an amendment to the Constitution.

Mr. Speaker, despite this temporary setback, I am confident that the march for equal rights will continue and will succeed. Should the Congress approve the reintroduced ERA, we will have 7 years to win ratification. We will have time to expose the myths and scare tactics employed by some opponents of the ERA and persuade State legislators that equality for women is a fundamental right which must be recognized in our Constitution.

Progress in equal rights for women has been made. But as long as women earn, on the average, only 59 percent of men's earnings, we cannot say that the progress has been complete. As long as equality for women is not part of the Constitution, we cannot say "equal justice under law," the phrase that appears over the entrance to the Supreme Court, is really true when it comes to women's rights.

---

## ERA IS NOT DEAD

(Ms. FERRARO asked and was given permission to address the House for 1 minute and to revise and extend her remarks.)

Ms. FERRARO. Mr. Speaker, here we stand, a week left from the end of the ratification period for the equal rights amendment, still battling the forces of reaction against women. It is a fight that our grandmothers thought they had won when women in America got the right to vote 62 years ago, after a 72-year struggle.

Why are we fighting now? Women are the majority of our people, yet we are treated like a minority. We are, on the average, paid 59 cents for each $1 earned by a man—a gap that has actually widened in the last 20 years.

Women are discriminated against in insurance, pensions, and social security; victimized by sexual harassment and spousal violence. Those of us who choose the life of a homemaker re-

ceive hollow praise but inadequate financial protection from our society.

□ 1230

Every poll ever taken affirms support for the ERA by the vast majority of Americans. The foes of ERA are a minority. If they think that ERA will soon be dead, they are dead wrong.

Mr. Speaker, July 14 marks the day of the beginning of a new battle for equal rights. I ask my colleagues to join me in cosponsoring the reintroduction of that amendment.

---

## DISCHARGE PETITION FILED ON ADMINISTRATIVE RULEMAKING REFORM ACT

(Mr. LEVITAS asked and was given permission to address the House for 1 minute, and to revise and extend his remarks.)

Mr. LEVITAS. Mr. Speaker, it is with a sense of regret but out of great frustration that I announce this morning that I have filed at the Clerk's desk discharge petition No. 17 for the discharge of H.R. 1776, the Administrative Rulemaking Reform Act, which will provide among other things, for a legislative veto over rules and regulations issued by government agencies.

This bill has over 250 bipartisan cosponsors. More than a majority of the Members of this House had cosponsored this bill by May 27, 1981, over a year ago. The time has come for this House to deal with the entire question of regulatory reform, and it would by my purpose, if we discharge H.R. 1776, to provide that the substance of the comprehensive regulatory reform legislation, H.R. 746, be offered as amendments to H.R. 1776.

Mr. Speaker, the time to act is now. I urge my colleagues to join with me in signing this discharge petition, discharge petition No. 17. It is at the Clerk's desk for Members to sign. The American people will be watching to see who is really interested in controlling the bureaucrats, cutting redtape and reforming the regulatory process.

---

## URGENT SUPPLEMENTAL CONTAINS FUNDS FOR GUARANTEED STUDENT LOANS

(Mr. PEYSER asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. PEYSER. Mr. Speaker, today we are going to be taking up the urgent supplemental. One of the major items in the urgent supplemental that will continue beyond the July 20 date is the guranteed student loan moneys.

Mr. Speaker, we have students all over the country today who are waiting to get forms so they can actually go ahead and apply for these loans. If we do not act in a positive sense today,

we will just about have run out of time for these young people who are planning to go to college in September. So I urge the support of this bill and moving ahead with it.

The guaranteed student loan provision will continue throughout the year, and at least we will have launched thousands and thousands of our students on the road to a college education that they are entitled to have and that we in Congress intend for them to have.

Mr. Speaker, I urge the Members to vote "yes" on this urgent supplemental today.

---

## SHARP CRITICISM OF ISRAEL'S INVASION OF LEBANON

(Mr. RAHALL asked and was given permission to address the House for 1 minute, and to revise and extend his remarks.)

Mr. RAHALL. Mr. Speaker, with each day the death toll mounts. The threat of serious disease and the stench of dead bodies have reached epidemic proportions. In the Middle East the question of Israel's invasion of Lebanon can no longer be shunned by this country's policymakers.

Mr. Begin has just visited the President, and we are told that there were no serious reprimands taken by our President to oppose Prime Minister Begin's policies in the Middle East.

Mr. Speaker, there is no question that the Israeli invasion of Lebanon is just that—an invasion. This country's policymakers and those of us throughout this country and in this Congress should begin questioning whether the policies of Menachem Begin are indeed leading to peace in the Middle East and whether they are in the best interests of America's foreign policy concerns.

Mr. Speaker, none of us question the right of every country to defend its territorial boundaries and its sovereignty. Each country has that right, but it is time that we question what is in the best interests of American foreign policy, if we are to continue to send massive amounts of arms to that country.

---

## LEBANON DEVASTATED, WHITE HOUSE DOES NOTHING

(Ms. OAKAR asked and was given permission to address the House for 1 minute.)

Ms. OAKAR. Mr. Speaker, there is a dramatic void of leadership on the part of the President of the United States. The world is witnessing the destruction of a country and its people, the devastation of Lebanon, and the President does nothing. American taxpayers have paid for the equipment used to destroy this country and the President expresses no remorse—no leadership. One expects Secretary

Haig to act in the manner he does. He looks for military solutions, not diplomatic solutions.

But, Mr. Speaker, are we not a civilized country which values life? One Israeli life lost, one Palestinian life lost, one Lebanese life lost is one loss too many. But more than 10,000 have died and thousands left homeless. And the President does nothing.

---

## INDUSTRIAL ESPIONAGE IS NOT FAIR TRADE

(Mr. SCHULZE asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. SCHULZE. Mr. Speaker, the FBI is to be commended for uncovering what is reported to be the biggest industrial espionage case ever. Yesterday, the Bureau charged 18 men, including a number of high-ranking executives of Hitachi, Ltd. with paying an undercover agent $648,000 to steal technical data on new generation American computers.

The Japanese are fierce competitors and we do not fear competition if it is fair. But industrial espionage is never fair. It belies the Japanese statements in recent months that they are doing all that they can to engage in "fair trade."

Since when is it fair to steal the work product of the American people? Since when is it fair to profit from criminal acts?

I think there is a message here, Mr. Speaker. When it comes to innovation, our honorable trading partners in the Far East will steal everything we have that is not nailed down.

---

## ANNOUNCEMENT OF SPECIAL ORDERS ON ABC'S REPORT ON JOHN EDGAR HOOVER AND THE FBI

(Mr. RUDD asked and was given permission to address the House for 1 minute, and to revise and extend his remarks.)

Mr. RUDD. Mr. Speaker, on June 3 last, the American Broadcasting Co. provided an hour-long program purporting to report on the life and times of John Edgar Hoover and the FBI. This afternoon, after legislative business, the gentleman from Virginia (Mr. DAN DANIEL) and I will address the House on special orders we have taken to clarify the distortions, half-truths, and other inaccuracies in that report.

---

## HINCKLEY VERDICT POINTS UP DEFICIENCIES IN INSANITY DEFENSE STATUTES

(Mr. PARRIS asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

*June 23, 1982*   CONGRESSIONAL RECORD—HOUSE   **14925**

The SPEAKER pro tempore. Pursuant to the order of the House of June 22, 1982, the previous question is considered as having been ordered without intervening motion to final passage.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

□ 1130

### A NEW EQUAL RIGHTS AMENDMENT

(Mr. CONTE asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. CONTE. Mr. Speaker, may I have the attention of the gentlewoman from Colorado (Mrs. SCHROEDER).

The gentlewoman is going to file the extension of the equal rights amendment on July 15, is that right?

Mrs. SCHROEDER. If the gentleman will yield, the equal rights amendment will be reintroduced July 14, 1982.

Mr. CONTE. July 14?

Mrs. SCHROEDER. That is right.

Mr. CONTE. I would like to be included in that.

The gentlewoman knows that I have been with her right from the beginning on this crusade.

Mrs. SCHROEDER. I thank the gentleman from Massachusetts. I know the gentleman has. He has been valiant in the effort to grant women equal rights.

My hope is that we finally get the ERA passed. I keep having a nightmare I am in a nursing home still writing letters to my Congressman about passing the ERA, but I am hoping that this time we really finally get the amendment ratified. It has been a long and hard road and we really appreciate good supporters, such as the gentleman from Massachusetts, who has been so helpful. I am delighted he is not a quitter.

Mr. CONTE. Is this a simple extension? Can the gentlewomen tell us something about it?

Mrs. SCHROEDER. If the gentleman will yield further, what we are going to do is totally reintroduce the ERA. We have decided that it is improper to do another extension at this point. We will have to reintroduce it fresh and begin from square 1. We will then have to go through the different legislatures all over again; but we anticipate States, such as mine which passed it before, will ratify it very rapidly, so we will have a full 7 years to focus on the few States that in prior years did not approve the ERA.

I think that those holdout legislatures are going to change very radically and, hopefully, they will be joining us.

Mr. CONTE. So the gentlewoman will introduce on July 14, 1982, and then there will be 7 years from that date to accomplish it.

Mrs. SCHROEDER. That is exactly right. It will be 7 years from the date that the ERA passes out of the House and the Senate, so we are encouraging Members of the House and the Senate to cosponsor, so we have as many cosponsors as possible.

The gentleman knows that we need two-thirds on both sides to get the ERA passed, but our hope is that we can get that as rapidly as possible and then begin the ratification process once again.

Mr. CONTE. That is two-thirds of the legislatures?

Mrs. SCHROEDER. That is two-thirds House and Senate and then two-thirds of the State legislatures; so I am very pleased that the gentleman from Massachusetts brought this up. We are looking for cosponsors and I know the gentleman has been so good on this. We hope the gentleman can help us on that side of the aisle in getting cosponsors for the reintroduction of the ERA.

We want to do a massive press conference with both the Senate and the House Members reintroducing it on July 14.

Mr. CONTE. Well, if I am invited, certainly I will be there to join with the gentlewomen, if they will have me.

Mrs. SCHROEDER. If the gentleman will yield further, I am sure his mother will be very proud. She raised him properly.

Mr. CONTE. Well, I thank the gentlewoman very much.

Mr. ROSTENKOWSKI. Mr. Speaker, will the gentleman yield?

Mr. CONTE. I yield to my friend, the gentleman from Illinois (Mr. ROSTENKOWSKI).

Mr. ROSTENKOWSKI. Mr. Speaker, I want to commend the gentleman on his courageous commitment. The gentleman is always in the forefront of these very difficult decisions.

Mr. CONTE. Mr. Speaker, on that note, I yield back the balance of my time.

### SMALL BUSINESS INNOVATION DEVELOPMENT ACT OF 1981

Mr. LaFALCE. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H.R. 4326) to amend the Small Business Act to strengthen the role of the small, innovative firms in federally funded research and development, and to utilize Federal research and development as a base for technological innovation to meet agency needs and to contribute to the growth and strength of the Nation's economy.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from New York (Mr. LaFALCE).

The question was taken; and the Speaker pro tempore announced that the ayes appeared to have it.

Mr. WALKER. Mr. Speaker, I object to the vote on the ground that a quorum is not present and make the point of order that a quorum is not present.

The SPEAKER pro tempore. Evidently a quorum is not present.

The Sergeant at Arms will notify absent Members.

The vote was taken by electronic device, and there were—yeas 389, nays 2, answered "present" 1, not voting 40, as follows:

[Roll No. 166]

YEAS—389

| | | |
|---|---|---|
| Addabbo | Crane, Daniel | Gonzalez |
| Akaka | Crane, Philip | Goodling |
| Albosta | Crockett | Gore |
| Alexander | D'Amours | Gradison |
| Anderson | Daniel, R. W. | Gramm |
| Andrews | Dannemeyer | Gray |
| Annunzio | Daschle | Green |
| Applegate | Daub | Gregg |
| Archer | Davis | Grisham |
| Aspin | de la Garza | Guarini |
| Atkinson | Deckard | Gunderson |
| AuCoin | Dellums | Hagedorn |
| Badham | Derrick | Hall (OH) |
| Bailey (MO) | Derwinski | Hall, Ralph |
| Bailey (PA) | Dickinson | Hall, Sam |
| Barnard | Dicks | Hamilton |
| Barnes | Dixon | Hammerschmidt |
| Beard | Donnelly | Hance |
| Bedell | Dorgan | Hansen (ID) |
| Beilenson | Dornan | Hansen (UT) |
| Benedict | Dougherty | Harkin |
| Benjamin | Dowdy | Hatcher |
| Bennett | Downey | Hawkins |
| Bereuter | Dreier | Heckler |
| Bethune | Duncan | Hefner |
| Bevill | Dunn | Heftel |
| Biaggi | Dwyer | Hendon |
| Bingham | Dymally | Hertel |
| Bliley | Early | Hightower |
| Boggs | Eckart | Hiler |
| Boner | Edgar | Hillis |
| Bonior | Edwards (AL) | Hollenbeck |
| Bonker | Edwards (CA) | Holt |
| Bouquard | Edwards (OK) | Hopkins |
| Bowen | Emerson | Horton |
| Breaux | Emery | Howard |
| Brinkley | English | Hoyer |
| Brodhead | Erdahl | Hubbard |
| Brooks | Erlenborn | Huckaby |
| Broomfield | Evans (DE) | Hughes |
| Brown (CA) | Evans (GA) | Hunter |
| Brown (CO) | Evans (IA) | Hutto |
| Broyhill | Evans (IN) | Hyde |
| Burton, John | Fary | Ireland |
| Burton, Phillip | Fascell | Jacobs |
| Butler | Fazio | Jeffords |
| Byron | Fenwick | Jeffries |
| Campbell | Ferraro | Jenkins |
| Carman | Fiedler | Johnston |
| Carney | Fields | Jones (NC) |
| Chappell | Findley | Jones (OK) |
| Chappie | Fish | Jones (TN) |
| Cheney | Flippo | Kastenmeier |
| Clausen | Foglietta | Kazen |
| Clinger | Foley | Kemp |
| Coats | Ford (TN) | Kennelly |
| Coelho | Forsythe | Kildee |
| Coleman | Fountain | Kindness |
| Collins (IL) | Fowler | Kogovsek |
| Collins (TX) | Frank | Kramer |
| Conable | Frost | LaFalce |
| Conte | Fuqua | Lagomarsino |
| Conyers | Gaydos | Lantos |
| Corcoran | Gejdenson | Latta |
| Coughlin | Gephardt | Leach |
| Courter | Gilman | Leath |
| Coyne, James | Gingrich | LeBoutillier |
| Coyne, William | Glickman | Lee |
| Craig | Goldwater | Lehman |

JA 284

S. 2494. An act to authorize support for an ongoing program of water resources research; and

S Con. Res. 100. Concurrent resolution expressing the sense of the Congress that pending steel unfair trade practice cases be vigorously pursued and promptly concluded.

## ANNOUNCEMENT BY THE SPEAKER

The SPEAKER. The Chair desires to announce that pursuant to clause 4 of rule I, the Speaker signed the following enrolled bill earlier today:

H.R. 5922. Making urgent supplemental appropriations for the fiscal year ending September 30, 1982, and for other purposes.

## RABBI EUGENE LEVY

(Mr. FROST asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

The SPEAKER. The Chair wishes to inform the Members that our visiting Chaplain this morning is the cousin of the distinguished gentleman from Texas (Mr. FROST).

The Chair recognizes the gentleman from Texas.

Mr. FROST. Mr. Speaker, it is an honor to introduce my cousin and good friend, Rabbi Eugene Levy, who served as our guest chaplain today.

Rabbi Levy is with the Temple Beth-El in Tyler, Tex., and was formerly the director of the Hillel Foundation at the University of Oklahoma at Norman. He is a graduate of the University of Texas and of the Hebrew Union College of Cincinnati where he received his rabbinical degree.

Rabbi Levy grew up in San Antonio, Tex., where as a young man, he served as the president of the Texas-Oklahoma Federation of Temple Youth. Now living in Tyler with his wife, Bobbi, and their two children, Rabbi Levy has continued his active involvement in Tyler's civic affairs.

Because he has been my close friend for so many years, I take extra pride in introducing him to my friends and colleagues in the House.

## RABBI EUGENE LEVY

(Mr. GONZALEZ asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. GONZALEZ. Mr. Speaker, I follow my distinguished associate and colleague from the Dallas area, Congressman FROST, in welcoming Rabbi Levy, who gave us and offered the prayer as the guest chaplain.

Because of the fact that this distinguished family, both the Frost family as well the Levy family and their immediate forebears, have played a very important role in the development of the district I have the honor of representing, the city of San Antonio, cul-turally, socially, economically, the names Frost, Cohen, and Levy are outstanding.

In my own family, when my parents came to America from Mexico in the category of refugees, actually, and in the early dim years of my childhood, the earliest memory I have is accompanying my mother and my aunt to English and citizenship class intruction offered by the Jewish Federation of Women, the only organization anywhere that took any interest in trying to help the immigrant group. At that time the U.S. Immigration officials did everything they could to prevent people like my relatives from becoming citizens. The Frost family was in the forefront of the efforts of the San Antonio Federation of Jewish Women, who had their headquarters on Poplar Street and where English and citizenship instructions were imparted.

## VETO OVERRIDE NECESSARY TO SAVE FOREST PRODUCTS INDUSTRY

(Mr. DICKS asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. DICKS. Mr. Speaker, our Nation's economy is in very serious trouble. In the Pacific Northwest, unemployment has reached 13 percent, and in some counties in the State of Washington unemployment today is at 30 percent. The forest products industry is devastated, and yet we hear today that David Stockman is drafting a veto message for the President for the housing initiative that was passed by this Congress by a vote of 349-55.

The President says the housing bill will increase the deficit. This bill, by the way, pays for itself, and I will tell the Members why we have large deficits today. It is because unemployment has gone from 7 to 9.5 percent in the last 9 months, and every time unemployment goes up 1 percent, the Federal Government loses $25 billion in revenues, and we must pay $5 billion to take care of the unemployed.

That 2.5-percent increase in unemployment means that the deficit is increased by $75 billion. The best way to reduce the deficit is to get people back to work, and that is what this housing bill will do.

## CONGRESS URGED TO LEAD FIGHT FOR EQUAL RIGHTS FOR WOMEN

(Mr. LEHMAN asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. LEHMAN. Mr. Speaker, as a Floridian, I was particularly disappointed by the failure of the Florida Legislature earlier this week to ratify the equal rights amendment. I had hoped, that if our State had ratified the amendment, it would have encouraged at least two other States to do likewise before the amendment expires on June 30.

Those of us who believe strongly in equal rights for women cannot let this setback dissuade us from our purpose. Next month, I will join with other members of the Congressional Caucus for Women's Issues in reintroducing the equal rights amendment. I will work for its passage by the Congress and for its ratification by the States.

Equal rights for women is too important to be put on the back burner. I urge all my colleagues to show the country that the Congress will lead the fight for equal rights. I urge you to support the equal rights amendment when it is reintroduced on July 14.

## REPUBLICANS URGED TO VOTE TO OVERRIDE VETO

(Mr. PATTERSON asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. PATTERSON. Mr. Speaker, yesterday this House sent to the President of the United States the urgent supplemental appropriation, including the housing stimulus program. Strong rumor has it this morning that David Stockman has already drafted a veto message, and when the President arrives, if he signs that veto message, then we will vote to either override, or sustain the veto.

Let me remind my colleagues in the House that 349 of them voted for the housing stimulus and only 55 against it, a 7 to 1 vote. As recently as yesterday 74 Members of the Senate voted for the housing stimulus—a 3 to 1 vote.

If the President vetoes the housing stimulus bill, our President is asking Republican Members to fall on your swords. He is not asking you to fight a good battle. Let me tell you, if you fall on that sword, then November will be a lot easier for my side of the aisle. But in the interest of the health of the American economy and the bipartisan nature of this housing economic stimulus and the desperate need for recovery of the housing industry, I urge you to stand up and vote as you did previously, 349 strong, to override the veto.

□ 1030

## OUR FIRST RESPONSIBILITIES BEGIN AT HOME

(Mr. BONER of Tennessee asked and was given permission to address the House for 1 minute.)

Mr. BONER of Tennessee. Mr. Speaker, yesterday the House of Representatives passed a bill authorizing

assuring continued development in the future.

This resolution will send a clear message to to REA and other agencies. I urge my colleagues in the House to join with Mr. JONES and me in securing the rapid passage of this resolution.

The text of the resolution follows:

H. RES. 516

Resolution expressing the sense of the House of Representatives that the role of the Rural Electrification Administration should be enhanced to assure that Federal agencies consider the needs of rural America in establishing policies which affect telephone service in rural America

Whereas the Congress, in enacting the rural telephone loan program in the Rural Electrification Act of 1936, established a policy of special concern and attention for the needs of rural America regarding telephone service;

Whereas there are unique capitalization and service requirements applicable to the provision of rural telephone service which are reflected in the provisions of the Rural Electrification Act of 1936 and the policies and programs of the Rural Electrification Administration; and

Whereas there is a continuing need for the Federal Government to give special attention to the capitalization and financing needs of telephone service in rural areas and provide the greatest practicable support to the rural telephone financing programs administered by the Rural Electrification Administration: Now, therefore, be it

*Resolved,* That it is the sense of the House of Representatives that—

(1) the Administrator of the Rural Electrification Administration should establish policies and guidelines which will assure that Federal agencies consider the needs of rural America in connection with granting loans, prescribing rules, and establishing policies which affect the capitalization and other financial requirements of telephone service in rural America as established under the Rural Electrification Act of 1936; and,

(2) such Federal agencies should act consistent with all policies and guidelines established pursuant to paragraph (1) and should consult on a routine basis with the Administrator of the Rural Electrification Administration and with State agencies which administer rural development and rural telephone service programs when such Federal agencies are granting loans, prescribing rules, and establishing policies which affect the capitalization and other financial requirements of telephone service in rural America.●

● Mr. JONES of Tennessee. Mr. Speaker, today I join with Congressman GLENN ENGLISH in introducing a resolution which expresses the sense of this House that Federal agencies should pay special attention to the needs of rural America when taking actions which affect the development and financing of rural telephone service.

I believe that this resolution is vital. In this time of change for the U.S. communications industry, the needs of the millions of Americans who live scattered across the countryside could be ignored. It is all too easy to lose the small voices in the whirlwind of change sweeping through the world of telecommunications.

Even when the world was slower paced, the needs of rural America were ignored—in the 1930's and 1940's. The modern communications services which are critical in drawing this Nation together were not shared with the small towns and the countryside. America was poorer for that.

As chairman of the subcommittee of the Agriculture Committee which oversees rural telephone financing, I am pleased to say that amendments to the Rural Electrification Act in 1949 remedied that problem. The 1949 legislation authorized Federal financing of rural telecommunications through the Rural Electrification Administration.

The reasons that that legislation was enacted in 1949 remain valid today. First, large telephone companies serving cities and suburban areas consider high-cost; low-density rural areas unattractive investments. Second, small rural companies are simply unable to raise the capital for necessary development and expansion in the ordinary commercial markets.

Without the Federal assistance provided through the REA, the congressional policy of universal telephone service enunciated in other laws would never have been realized.

REA provides financing through three related programs: The Rural Telephone Bank, The insured telephone loan program, and the guaranteed loan program. Administration of these has given the REA a unique understanding of the needs and problems of rural telephone service. As it has assured the development of rural telephone service in the past, REA must redouble its efforts to assure the preservation and expansion of them in the future.

The resolution Mr. ENGLISH and I have introduced makes sure that the needs of rural America will get the attention they deserve. The Administrator of REA is charged with employing that agency's experience to develop policies and guidelines which will make sure that special attention is paid to the needs of rural America by the agencies of the Federal Government as they sort out the regulatory and policy changes demanded by the communications revolution.

I ask all of the Members of the House to join with Mr. ENGLISH and me in securing the speedy passage of this resolution.●

THE ERA WILL PREVAIL

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from Wisconsin (Mr. KASTENMEIER) is recognized for 5 minutes.

● Mr. KASTENMEIER. Mr. Speaker, on June 30, the first stage of the fight to enact the equal rights amendment will come to a close. I say the first stage because those of us committed to equality of rights under the law regardless of sex will not abandon the fight.

There are scores of us in the Congress prepared to reintroduce the equal rights amendment and work for what can only be described as a totally just and long overdue amendment to our Constitution.

The fact is that the Nation overwhelmingly supports the equal rights amendment. Over 75 percent of the American people support equality of rights under the law for women. These people will not be quieted.

At some point in our history I am certain we will look back and find it almost beyond comprehension that in 1982 we were still debating whether the women of this country—more than one-half of our population—should be treated equally under the law. Those future generations will surely wonder at the narrowmindedness of a few in power in States across the country who managed to keep women as second-class citizens. They will surely question how this could happen in a country that has touted to the world its history of freedom, equality, and virtually unlimited opportunity.

Mr. Speaker, we will make certain that that will not be the final note in the history books. We will win this fight. We will ultimately prevail. We will finally give truth to the statement that helped found our Nation—that all people in this country are created equal. History has shown time and again that with patience and perseverence justice finally wins the day. So, too, will the ERA.●

CLEAN AIR WORKING GROUP

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from Alabama (Mr. SHELBY) is recognized for 5 minutes.

● Mr. SHELBY. Mr. Speaker, as a member of both the full Energy and Commerce Committee and the Subcommittee on Health and the Environment, I know how difficult it is to evaluate and vote on amendments to the Clean Air Act. The issues are important and complex. It is equally important that we identify and discount passionate but unfounded rhetoric.

The Clean Air Working Group sent all Members of Congress a letter dated June 22, 1982, addressing this issue. I commend this letter to the attention of all Members and include it for printing in the RECORD:

THE CLEAN AIR WORKING GROUP,
*Washington, D.C., June 22, 1982.*
To Members of Congress: The Clean Air Working Group is a broad-based coalition of over 100 business and trade organizations supporting reform of the Clean Air Act this year. We support amendments to the Act that are a matter of public record complete with justification and documentation. The

15558                         CONGRESSIONAL RECORD—SENATE                         *July 1, 1982*

cated to the Senator from Massachusetts.

Mr. PACKWOOD. Mr. President, could I just for a moment suggest the absence of a quorum without being charged with the time?

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The clerk will call the roll.

The Assistant Secretary proceeded to call the roll.

Mr. PACKWOOD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The Senator from Oregon is recognized.

---

## THE EQUAL RIGHTS AMENDMENT

Mr. PACKWOOD. Mr. President, June 30, 1982, marked another milestone along the rough road toward equality for women in this country. Yesterday, the ratification deadline for the equal rights amendment expired. It is unfortunate, indeed tragic, that the deadline passed with us still three States short of the 38 needed to put the equal rights amendment into our Constitution. Today, however, is the beginning of a new era. Today we rededicate our efforts and reaffirm our commitment to equal rights for all Americans.

On July 14, Senator Tsongas and I will reintroduce the equal rights amendment in the Senate. To date, 45 Senators have indicated they will be cosponsors. Over 150 of our colleagues in the House will also reintroduce ERA in the House the same day.

Opponents of ERA say it is not needed. They say times have changed, laws have changed and equality has been achieved.

But the need for ERA is no less today than it was 10 years ago.

We have made progress in some areas: Title IX for equality in education, the Equal Pay and Credit Acts are notable examples. But these and other equal opportunity laws do not have the force of a constitutional amendment. What Congress gives, it can also take away.

The American Bar Association explained the need for ERA this way:

No ordinary statute can provide the bedrock protection assured by a Constitutional Amendment. No Court decision can provide that protection, for the courts can interpret, but they may not amend the Constitution.

Women should not have to fight for equality every 2 or 4 years with changing political winds. Equal protection and opportunity for women should not be subject to the capriciousness of politics. Equality is a basic constitutional right which must be guaranteed all Americans. A constitutional amend-

ment is the only permanent insurance women will have of equal opportunities in education, employment, credit, retirement plans, and numerous other areas.

There is no doubt the character of women's place in our society has changed. More than 44 million women are in the work force. Women account for over 60 percent of the net growth in our labor force in the last 10 years. Our typical American family structure is changing. The stereotypical image of an employed husband, full-time housewife, and two school age children applies to less than 10 percent of American families today. The most prevalent type of family is now the two-parent, two-wage earner family. The facts tell the story:

More than half the children under 18 have working mothers, and the mothers of 43 percent of the children under six work outside the home.

The number of employed wives has tripled since 1950, with 52 percent of all wives holding jobs outside the home.

One of every seven families is headed by a woman and one of every nine women in the labor force is the sole support of her family.

The average married woman is employed for 25 years; the average single woman for 45 years.

ERA is the most powerful tool to insure women equal pay and equal opportunity in jobs. ERA is necessary to permanently end discrimination in the workplace.

As significant as the equal rights amendment is for women in the work force, the amendment will aid homemakers more than any other group of women. The ERA will secure the legal and economic rights of homemakers and guarantee that marriage be viewed as a legal partnership between husband and wife. Homemakers will no longer be second-class citizens with little economic or legal clout. The full-time homemaker who provides valuable services to the community as well as to her family will be recognized as an individual in her own right—not as the property of her husband.

The equal rights amendment is for all Americans. It is not just for the 51.4 percent of Americans who are female. ERA will insure women and men equal protection under the law. To deny that protection or to discriminate against one group, is to discriminate against all. In the final analysis, the rights of the least of us are the rights of all of us. Deny them to a few and you will deny them to all. There is no substitute for ERA. And there is no excuse for its failure. We will redouble our efforts for passage of this amendment, and will not rest until equal rights for women is part of our Constitution.

Mr. President, as we are all aware, at midnight last night, time expired for

the ratification of the equal rights amendment. Because of the efforts of a handful of State legislators and a very small handful of States, the equal rights amendment was not passed.

Last night, Phyllis Schlafly, the self-acknowledged leader of the anti-ERA movement, hosted a party at one of the Washington hotels, calling it an Over-the-Rainbow Party, to celebrate the demise of the equal rights amendment.

Mr. President, I know during the fight on the equal rights amendment, each side engaged in what the other side probably thought were excesses. That is not unknown in combat, be it political or military.

In all battles we have our Mylais and our Malvinas which, when the war is over, we are ashamed of. And all of us have been involved in political battles where we may have said or done something untoward and in retrospect wish we had not done.

I am not now going to get into an argument over those who supported or those who opposed the equal rights amendment who, on occasion, made statements or did things that, in retrospect, they wish they had not done. The genuine test of a person's character is not whether they can stand adversity. It is whether they stand power.

The gala celebration, I think, reveals the attitude of those who are in opposition to the equal rights amendment. It was a victory celebration in which they played "Ding, Dong, the Witch Is Dead." John Lofton, the editor of the Conservative Digest, said, "We're here to celebrate a death, to dance on a grave."

Richard Viguerie said, "We've just witnessed a classic confrontation between the power elite and the people—and the people have won."

I might pause here to say to Mr. Viguerie that to the best of my knowledge most of the polls that exist in this country still show about two-thirds of the people supporting the equal rights amendment. I have not seen any polls on the power elite. Nor am I going to use the argument that because two-thirds of the people support this constitutional amendment it should pass. That is a bad argument to use.

It is an argument, it is a fair one, but to rest your sole defense or offense on that argument is a bad one because we are going to face a number of constitutional amendments in this Congress before the session is out. Some of those I will support; some of those I will oppose. Some of those that I oppose will have the support of a majority of the people who are polled, and vice versa.

When you are dealing with fundamental liberties, a retreat solely to the majority and to the polls in a danger-

ous approach. But as far as Mr. Viguerie is concerned, if he wonders who won and who lost, the people lost.

M. Stanton Evans, a conservative columnist, said, "When you hear the phrase 'gross national product'—that is not a reference to Bella Abzug." A very tasteful statement.

Then the group last night, to the music from "Kiss Me Kate," said, and I am paraphrasing their words quoting from the paper:

Where are you Ellie?
I'm sorry to tell you that your arguments were smelly.
Where are you Gloria?
Still pedaling your life style to housewives in Peoria.

Let me say to Ms. Schlafly, she has won a victory and I congratulate her. But she is the General Cornwallis of her movement. As the British had success at Bunker Hill and Fort Washington, and Brandywine and Germantown, so Ms. Schlafly one day will be at Yorktown. And at Yorktown when we win—and we will win—I hope that when we celebrate our victory we will celebrate it with grace and dignity and forgiveness. Because in victory, not in defeat, is measured the true magnanimity of all people.

The ACTING PRESIDENT pro tempore. Under the previous order, the Senator from Massachusetts (Mr. TSONGAS) is recognized for not to exceed 15 minutes.

Mr. TSONGAS. Mr. President, I would like to begin by commending the very thoughtful statement of the Senator from Oregon. I might say that my own view is that the victory of the Schlafly forces, if you will, is a Pyrrhic victory. Indeed, I think if viewed historically 10, 15, or 20 years from now, it will be understood that frustrating a fundamentally mainstream idea—the equal rights amendment—only results in greater momentum being built up as more and more women become politicized.

I think we will find they will not be involved in just the ERA issue, but in issues such as arms control and many others.

So I think in many respects the defeat of ERA yesterday, which was celebrated by the opponents, will, in the long term, have proven to be just the opposite. The fact that they had a gala event last night suggests that they have a rather short-term view of history.

Mr. President, yesterday, as the Senator from Oregon pointed out, marked the final deadline in the drive for ratification of the proposed equal rights amendment. The amendment was ratified by 35 States, just 3 States short of the number required to make the ERA the 27th amendment to the Constitution. It is now apparent that the march toward equal rights for women and men in this country must pause before it reaches its destination.

But the fight for equal rights will continue. As Sonia Johnson, one of seven women recently fasting in Illinois, said "the ERA is very much alive and compelling." In time, I am confident that this Nation will embrace the ERA, for it is a cause that is just.

Toward this end. I intend to reintroduce the ERA in the Senate on July 14, along with Senator BOB PACKWOOD and 44 colleagues. I expect to have more cosponsors by July 14. Indeed, I would like it to be at the 50-colleague level at that point. We hope that at least four more of our colleagues will see fit to join us by July 14.

In the House, a similar measure will be introduced the same day by Representative PAT SCHROEDER, Representative MARGARET HECKLER, and Representative DON EDWARDS.

Today my colleagues and I would like to discuss why the ERA should be made part of our Constitution.

The amendment seeks to eliminate sex as a factor in determining the legal rights of women or men. It requires that governments treat each person, female or male, as a citizen under the law without regard to gender. The amendment thus recognizes the fundamental dignity and individuality of each human being.

Since its first introduction, controversy over ERA has centered on essentially the same questions: Whether there should be room in the law for "reasonable" distinctions in the treatment of men and women; whether a constitutional amendment is the proper vehicle for improving the legal status of women; and how ERA might affect such areas as privacy, military service, domestic relations, criminal law, employment, education, and others. My colleagues and I would like to address these issues and discuss how each will be affected by the ERA.

The text of the amendment we plan to introduce on July 14 is the same amendment that was passed by the Congress in 1972. It reads:

SEC. 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of the article.

SEC. 3. This Amendment shall take effect two years after the date of ratification.

It is very simple, very straightforward, very compelling, which is why the polls show most Americans support it.

I believe the ERA is essential because it would, for the first time, grant women full status as equal citizens under the Constitution and establish a standard for eliminating discrimination based on sex. Only a constitutional amendment can adequately assure equal rights to the women and men of this country. It is the only insurance that women will have fair and equal opportunities in employment, educa-

tion, benefit and retirement plans, marriage, and divorce.

A statute-by-statute, piecemeal approach to ending sex discrimination, whether at the Federal or State level, has not worked. Title VII of the Civil Rights Act, title IX of the education amendments and the Equal Pay Act are the laws most often cited as providing equal opportunities for women. The experience in the past 21 years have shown, unfortunately, that these statutes have not provided adequate enforcement and have not resulted in desired changes in the patterns and practices of discrimination. The current laws are simply not enough. Moreover, equal employment laws can be repealed at any time.

In Federal statutes alone, more than 800 sections of the United States Code contain sexually biased terminology inconsistent with the Nation's purported commitment to equal rights. State laws are also replete with provisions that assign women, on the basis of their sex, to an inferior role.

It is also clear that existing constitutional guarantees will not mandate the changes that are needed. Judicial interpretation has allowed sex bias to survive. For example, those challenging sex discrimination in the courts have found the 5th and 14th amendments unreliable and inadequate as a remedy for sex discrimination. Further, the U.S. Supreme Court has failed to apply the same strict standard in sex discrimination cases that it has mandated for weighing racial discrimination.

ERA is needed more today than ever if women are to achieve permanent economic equity. As workers, women are paid only 64 cents to every dollar paid to men. This is the same ratio that was paid to women a quarter century ago. As wives, women are still subject to laws that deny them equal partnership in marriage. As students, they are often steered away from the education that could pierce the barrier to better paying jobs. Further, women endure a criminal justice system that too often judges them by their sex and not be the acts they commit or by which they are victimized. The reality today is all too obvious: Women have not achieved equality under the law.

Current administration proposals are actually moving women backward in equal employment, education, credit, and other economic and social issues. For example, the administration—through the Office of Federal Contract Compliance Programs (OFCCP) in the Department of Labor—has proposed regulations reducing affirmative action requirements for women by Federal contractors and has proposed significant changes in title IX of the Education amendments.

**15560**                    **CONGRESSIONAL RECORD—SENATE**                    *July 1, 1982*

So much for the President's remarks last night.

Public opinion polls show unmistakably that the vast majority of the American people favor passage of the equal rights amendment. In April, a Harris survey showed that ERA is supported by over 60 percent of the American public. I concur with Senator Packwood that that is only an argument and certainly not the basis on which one would argue ratification on such an important issue.

Organizational support for ERA is also strong. Over 500 organizations representing more than 50 million Americans have endorsed the ERA. These include major labor unions, church and civil rights groups, legal, educational and medical associations and all major women's groups. Indeed, the ERA was supported in the platforms of both major parties for four decades, until the Republican party reneged in 1980.

The need for ERA was great in 1923, when it was first introduced in Congress. The need was great in 1972, when Congress first approved it. The need is still as great.

Mr. President, I think the time will come when Americans will look back on this period and wonder what all the fuss was about, why something that made such eminent good sense, that seemed so normal, would have been the subject of such controversy that, in many respects, it would have been a kind of barometer of our time. It is my hope that the amendment will be cosponsored by two-thirds of the Senate. We are well on our way there. It is my hope that the States will ratify it, that we can put this issue behind us; that when my three daughters are adults, they will look on this as an issue of an ancient history.

Mr. President, let me read off the names of the cosponsors of the amendment:

Mark Andrews, Max Baucus, Joseph Biden, Jr., Rudy Boschwitz, Bill Bradley, Quentin Burdick, John Chafee, William Cohen, Alan Cranston, John Danforth, Dennis DeConcini, Alan Dixon, Christopher Dodd, David Durenberger, Thomas Eagleton, John Glenn, Slade Gorton, Gary Hart, Mark Hatfield, John Heinz, Ernest Hollings, Daniel Inouye, Henry Jackson, Nancy Kassebaum, Edward Kennedy, Patrick Leahy, Carl Levin, Charles Mathias, Jr., Spark Matsunaga, John Melcher, Howard Metzenbaum, George Mitchell, Daniel Patrick Moynihan, Bob Packwood, Claiborne Pell, Charles Percy, William Proxmire, Jennings Randolph, Donald Riegle, Paul Sarbanes, Harrison Schmitt, Arlen Specter, Robert Stafford, Ted Stevens, Paul Tsongas, and Lowell Weicker.

I ask you, Mr. President, can all these people be wrong?

Mr. President, I ask unanimous consent that the statement of Senator Cranston, who is unable to be with us this morning, be placed in the Record as if read.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

● Mr. CRANSTON. Mr. President, I join today, not in a ceremony of mourning for the equal rights amendment, but in a public reaffirmation of our commitment to the goal of placing within the Constitution of the United States a guarantee of full, equal rights of women—and men—in our country.

Let me first say that the equal rights amendment is not dead. On July 14, 1982, I will join with my colleagues in the Senate and the House of Representatives in reintroducing the equal rights amendment. We will not delude ourselves in believing that ratification of ERA will come easily, particularly under the hostility of the Reagan administration and its allies in the Congress toward women's rights. But neither should we feel that we will be starting from scratch.

The efforts of the past decade have not been in vain. The vast majority of Americans now strongly support the ERA. Every poll, every survey—even in the unratified States—show overwhelming support for the ERA. Ratification was blocked by a handful of individuals in key positions in the unratified States. They believed—mistakenly—that if the ratification period ran out, ERA would be dead. They are wrong. There can be no time limit placed on the pursuit of equality and justice.

Mr. President, ERA is needed today, as much as ever. Measured by any standard, sex discrimination has not been erased in our society. Women have made tremendous strides and hold important policymaking positions in every level of government, in every sector of our society. But discrimination and denial of equal opportunities because of gender continues. Women today earn on the average only 59 cents for every comparable dollar earned by men. Women continue to be concentrated in the lowest paying, least-valued jobs. The consequences of a lifetime of inequality is particularly devastating for older women. Because their lifetime earnings are lower, and many spend years out of the work force raising children, older women often have fewer resources to draw on. Poverty rates are much higher for older women, particularly those who outlive their husbands or who are unmarried. Women of all ages continue to face a patchwork of State laws and practices depriving them of equal ownership of property and continuing to stand as obstacles to equal opportunities and employment.

Although many barriers have been broken down and much progress has been made, without a constitutional amendment, much of the discrimination that still exists will continue. Without a constitutional amendment, much of the progress that has been made can be eroded. We have only to look at the recent proposals within the Reagan administration to repeal or weaken women's educational rights and to limit enforcement of equal employment opportunity laws, to see how quickly this progress can be curtailed.

Equality of rights without regard to sex must, like other basic civil rights, be a constitutional right. The women of this country deserve no less than a secure, constitutional guarantee of full citizenship and equality under the law.

Mr. President, I was an original cosponsor of the ERA when it was approved in 1972. I will be an original cosponsor when it is reintroduced on July 14, 1982. We must and will continue the ERA effort until it is successful, however long it takes. I believe that in the not too distant future, we will look back at 1982, not as the year ERA died, but as the year the final stages of ratification of ERA began.●

Mr. DeCONCINI addressed the Chair.

The ACTING PRESIDENT pro tempore. Under the previous order, the Senator from Florida (Mr. Chiles) is to be recognized for not to exceed 15 minutes.

Mr. TSONGAS addressed the Chair.

The ACTING PRESIDENT pro tempore. The Senator from Massachusetts.

Mr. TSONGAS. Mr. President, my understanding is that the Senator from Oregon and I have a combined total of 65 minutes. Has that time tolled?

The ACTING PRESIDENT pro tempore. The Senator is correct. The Senator may yield.

Mr. DeCONCINI. Mr. President, will the Senator from Massachusetts yield?

Mr. TSONGAS. I yield to the Senator.

The ACTING PRESIDENT pro tempore. The Senator from Arizona.

Mr. DeCONCINI. I thank the Senator.

The ACTING PRESIDENT pro tempore. The Senator may proceed.

Mr. DeCONCINI. Mr. President, a constitutional amendment which guarantees equal rights under the law to all persons regardless of sex is long overdue. I personally find it difficult to understand the controversy that has swirled around this issue. It is a simple matter: In a society of laws, which the United States is, all citizens must have equal standing. Anything less is simply unacceptable. I fear that too many well-meaning individuals have lost sight of the simple and profound elegance of the proposition, and have gone looking for demons and dragons. There are none. The equal rights amendment is what it says—nothing more, nothing less. We are all equal, that is all.

No one would disagree with the notion that the United States has long

15570 CONGRESSIONAL RECORD—SENATE July 1, 1982

become a part of the U.S. Constitution. A statement of principle so simple and so straightforward that many ERA supporters, men and women, were hardpressed to understand a basis for opposition.

Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

An eminently reasonable statement—who could disagree? In fact the principle appeared to be so obvious that some even questioned its necessity.

Well, we have come a long way since that naive beginning. As the disparity between male and female salaries became even greater—women earn 59 cents for every $1 earned by men—as it became obvious that the Supreme Court was not going to find the same protection for women in the Constitution that it held existed for other citizens, as the backlash against those who pioneered new avenues for women became stronger, we soon learned why the ERA was necessary.

And as the bitter, hardcore opponents of the ERA screamed for media attention, we began to realize how the ERA was going to be opposed. The ERA battle would not be fought on the high ground of reason; instead, it would descend to the hysterical level of accusation, exaggeration, and even outright fabrication. Men and women required to share public toilets, women forced onto the battlefield against their will, the family structure ripped asunder—this is the litany of horrors that would supposedly follow passage of the ERA. What happened to that simple, straightforward statement of equal rights?

Yet, ERA supporters continued to supply their Representatives with the undeniable facts and figures regarding inequality in America. We continued to believe that reason would prevail over hysteria. But as time passed, to our horror and disbelief, it became increasingly apparent that a vocal minority and a handful of powerful men might successfully block passage of this declaration of women's equality.

This is a shameful situation. It is shameful that the most rich and powerful Nation in the world will continue to deny equal rights under the law to 51 percent of its citizens.

But this situation will not continue. The history of the movement to achieve voting rights for women indicates the tenacity with which supporters of equal rights will continue this battle until it is won.

While the late 1960's and early 1970's saw the advent of the women's movement, the 1980's will be known as the decade that women became a powerful political force in this Nation. Recent polls reveal that women are voting in ever-increasing numbers and that they are beginning to vote their own interests rather than reflecting

the views of their fathers, husbands, or other men in their lives. No longer can the women's vote be ignored or taken for granted.

In the next decade, I predict that if that same small handful of men continue to use their key political positions to bar equal rights for women, they will be swept out of office and replaced by Representatives committed to true equality for women.

While it sometimes appears that the wheels of justice grind exceedingly slowly, the ERA cannot and will not be stopped.

Mr. President, I think it is appropriate that we give a moment's attention to that which occurred here in Washington last night. A group met here—they called themselves Somewhere Over the Rainbow—to celebrate the demise of ERA. That group probably should more appropriately have been called Somewhere Over the Hill, because those who were there, those who were the honorees, those who put the program together, are those who indeed are over the hill so far as America is concerned.

They would like to turn the clock back. They would like to turn the clock back on programs we have moved forward with over the years, such as programs for women, infants, and children, nutrition programs for young and old. They would like to cut social security. They would like to go backward with respect to minimum wage laws. They would like to go backward with respect to job programs.

Those who met and those who were excited last evening about Over the Rainbow were indeed those who are the forces of reaction in America. They are the forces of negativism. They are the negative thinkers of America.

They want to go backward, and the real question with respect to this constitutional amendment is whether or not this Nation will move forward, as it should, to that point in our history where we recognize the full equality of all of our people, particularly those who have been sexually discriminated against over a period of years.

Mr. President, I think it is high time for our Nation to move forward and not permit those who would turn the clock back to press upon the rest of us their negative thinking. I think it is time for a future America and not for a backward movement.

Those who foolishly celebrated a supposed victory yesterday will wake up tomorrow to discover that real victory lies with the vast majority of citizens in this country who will not be satisfied until equal justice for women has been achieved, not just as a constitutional principle, but as a practical reality.

The ACTING PRESIDENT pro tempore. The Senator from Massachusetts.

Mr. KENNEDY. Thank you very much, Mr. President.

First of all, I want to commend my colleague, Senator TSONGAS, and my friend Senator PACKWOOD for introducing this legislation, and I welcome the opportunity to cosponsor it.

This morning, Mr. President, I welcome this opportunity to reaffirm my strong commitment in making the equal rights amendment part of the Constitution of the United States.

The temporary defeat of ERA is a national disgrace. But the deadline which passed today will be only the starting line of a new crusade to pass and to ratify equal rights. Mr. President, I remember the time in the Senate Judiciary Committee when we had the distinguished Senator from Indiana, Senator Bayh, who was so extraordinarily effective and provided such leadership on this issue both in the passing of the initial proposal and then the extension of time, and I welcomed the opportunity to stand shoulder-to-shoulder with Senator Bayh in the Judiciary Committee during the consideration of the amendment and the extension, and I looked forward to working with my colleagues in the Judiciary Committee for another successful effort over the period of these following weeks and months. I led the successful fight in the Judiciary Committee to extend the period for ratification of ERA. I will join my colleagues in the reintroduction of the equal rights amendment in the Senate and the House of Representatives later this month. And I will be proud to lead the fight again in the Judiciary Committee to pass ERA.

For too long, women have been relegated to the position of second-class citizens. For too long, the minority whose skin is not white and the majority who are women have been denied equality—which is the right of all Americans. I will not rest or retreat until our Nation at long last holds this truth to be self-evident—that not only all men, but all people, are created equal.

The ERA is more than a symbol; it can become the mandate for the Federal Government and for every State to insure equality in both the law and the life of this land. The need for ERA is as compelling today as when it was introduced in this Chamber 10 years ago. The facts of sex discrimination, especially in employment and health care, are no less stark now than they were in 1972.

More women are working today than ever before. In 1965, only 39 percent of women were in the job force according to the Labor Department, but the rate is 52 percent today and is expected to rise as high as 65 percent by 1995. However, women, on the average earn only 59 percent for every dollar earned

**15586**
**CONGRESSIONAL RECORD—SENATE**
*July 1, 1982*

The ACTING PRESIDENT pro tempore. On whose time?

Mr. PACKWOOD. On my time.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. BIDEN. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mrs. KASSEBAUM). Without objection, it is so ordered.

Mr. TSONGAS. Will the Senator yield?

Mr. BIDEN. Yes.

Mr. TSONGAS. I request, after the Senator has completed his remarks, that the time remaining be yielded back.

The PRESIDING OFFICER. There are 5 minutes remaining.

Mr. TSONGAS. The Senator from Delaware is the last speaker, and he may not use all the time but I suspect he will.

ERA AND THE CRIMINAL JUSTICE SYSTEM

Mr. BIDEN. Madam President, throughout the past 10 years opponents of the equal rights amendment have managed to wage an intimidating campaign as to why we should not ratify ERA prior to last night's deadline. Visions of unisex toilets, young girls in foxholes dodging bullets, not to mention lecherous male soldiers following them through those foxholes, and homosexual marriages have danced through many heads.

That is what we have been told would happen by those who have been most strident in their opposition to the equal rights amendment.

Those were the arguments of those who now celebrate what they see as a death of ERA.

Obviously, all of us here on the floor are announcing the rebirth of ERA, not the death of ERA.

Madam President, you and my colleagues have heard from a number of distinguished speakers this morning discussing various aspects of why the ERA is so important. I associate myself with the remarks of my colleagues this morning. But I am going to be very specific, if I may. I would like to address my comments to ERA and the criminal justice system.

Madam President, as I said earlier, I do not believe the ERA is dead. I believe it is very much alive. A number of us from both parties in both Houses will be reintroducing the amendment on July 14. Having learned our lesson from the experience of the past 10 years, those of us who believe that women should be afforded equal constitutional protection will be better able to focus the ERA debate on the real issues of equal treatment of our citizens by our laws and not have to spend as much time talking about coed bathrooms.

And what better place to start than with an examination of the way in which the equal rights amendment would impact upon our Nation's criminal justice system.

Did you know, Madam President, that in some States a man finding his wife in the act of adultery may kill her on the spot and face a reduced charge of manslaughter? If the situation were reversed, however, and the wife found him in the midst of such an act, she would not have the passion killing defense available to her and would have to face trial on the charge of murder.

Did you know, Madam President, that several States punish prostitutes but do not punish those who seek to pay for their services?

Did you know, Madam President, that the Mann Act prohibits transporting females across State lines for "any immoral purpose" but does not protect males in the same manner?

Did you know, Madam President, that 25 States have no statutory rape laws protecting young boys?

Were you aware, Madam President, that many States have no laws recognizing the possibility that forcible rape can be committed by a husband against his wife regardless of the circumstances and the degree of coercion involved?

Are you further aware, Madam President, that many States still mandate intermediate sentences for women, while providing for minimum and maximum sentences for men?

This is done in the enlightened belief that women are more amenable to rehabilitation than men, but what this leads to, Madam President, are situations in which women must serve either much longer or much shorter sentences than men serve for precisely the same offense.

Finally, Madam President, did you know that the U.S. Civil Rights Commission, in a report issued in December 1978, concluded that women in prison generally receive far less vocational training or job placement assistance than men, and that training offered in women's prisons tends to be sex stereotyped, tracking women into lower paying and more traditional jobs?

In each of these cases, Madam President, Federal and State laws have the effect of discriminating against one or the other of the sexes. In each of these cases, Madam President, the equal rights amendment would result in the elimination of this discrimination, sometimes merely by changing one or two words in the law in order to make it sex neutral. Let me cite just two examples.

The Mann Act could be made to protect both sexes against interstate transportation for immoral purposes simply by changing the word "female" to "person." Prostitution laws can be made to hold members of both sexes

accountable for their actions by treating both prostitute and patron in a sex-neutral manner.

I point out at this time, Madam President, that no State operating with its own ERA has acted to legalize prostitution and that all these States, with the exception of Alaska, now operate under a sex-neutral law. Hardly the stuff of coed bathrooms; hardly the stuff of women in foxholes.

Madam President, it is simply not enough to claim that existing laws already give sufficient protection against sex discrimination. As we have seen, many existing laws actually embody such discrimination.

I might also add, Madam President, that Federal and State laws may be repealed at any time. Equal treatment under the law is an ideal that must not be subject to the time and caprice of 50-percent-plus-1 of any legislative body acting to satisfy some temporary popular sentiment.

It is not enough to claim, Madam President, that the Constitution already provides adequate protection against sex discrimination. In a recent Supreme Court opinion, Mr. Justice Lewis Powell wrote:

The court has never viewed sex as inherently suspect or as comparable to racial or ethnic classification for the purposes of equal protection statutes.

Let us further remember that it took half a century following the passage of the 14th amendment to grant women one of the most basic American rights of all, the right to vote—one, I suspect, they will not forget in the next election, in the light of what has happened to ERA.

Remember, too, Madam President, that for several years after the ratification of the 14th amendment, many States still had laws preventing women from owning property and holding certain jobs. The history of equal protection for women under the 14th amendment, therefore, is at best uneven and uncertain.

Madam President, I look forward with great anticipation to the committee and floor debate on the equal rights amendment following its reintroduction on July 14. The American people, by an overwhelming majority, want their Representatives in Congress to take positive action on this great commitment to equal justice. Let us listen to them, Madam President, and let us keep in mind what I said yesterday with regard to a totally different issue, the nuclear freeze, nuclear disarmament, mutually balanced and verifiable treaties. I said then that the freeze is an example, once again, of the American people leading their leaders.

So it is on the question of equal protection for women; once again, according to the public opinion polls, the outpouring of support from women

# Exhibit M


 ERA



While women enjoy more rights today than they did when the ERA was first introduced in 1923 or when it passed out of Congress in 1972, hard-won laws against sex discrimination do not rest on any unequivocal constitutional foundation. They can be inconsistently enforced or even repealed by a simple majority vote. Elements of sex discrimination remain in statutory and case law, and courts have had difficulty applying a consistent standard to gender-based classifications, which are not inherently suspect or comparable to racial or ethnic classifications under equal-protection analysis.

The need for a federal Equal Rights Amendment remains as compelling as it was in 1978, when now Supreme Court Justice Ruth Bader Ginsburg wrote in the *Harvard Women's Law Journal*: "With the Equal Rights Amendment, we may expect Congress and the state legislatures to undertake in earnest, systematically and pervasively, the law revision so long deferred. And in the event of legislative default, the courts will have an unassailable basis for applying the bedrock principle: All men and all women are created equal."

## Mode 1:  Constitutional Ratification Process (Article V)

The traditional constitutional amendment process is described in Article V of the Constitution. Congress must pass a proposed

C A R T  ( 0 )

 ERA 🟢                                                  🔍 ☰

used for ratification of every amendment to the Constitution thus far.

Article V also provides for an alternative process, which has never been utilized. If requested by two-thirds of the state legislatures, Congress shall call a constitutional convention for proposing amendments. To become part of the Constitution, any amendment proposed by that convention must be ratified by three-fourths of the states through a vote of either the state legislature or a state convention convened for that purpose.

The mode of ratification is determined by Congress, and in neither of these two processes is a vote by the electorate applicable to the ratification of a constitutional amendment.

Article V makes no mention of a time limit for the ratification of a constitutional amendment, and no amendment before the 20th century had a time limit attached to it. The first amendment with a time limit was the 18th Amendment (Prohibition), proposed in 1917. For political reasons, Congress included an arbitrarily chosen seven-year deadline in Section 3. The amendment was also the first to include a time delay before it would take effect, in that case one year after the date of ratification.

The next two proposed amendments, the 19th Amendment (Woman Suffrage) and the never-ratified Child Labor Amendment, had no time limit attached. However, beginning with the 20th Amendment, Congress has attached a time limit to the ratification of all proposed amendments. Some of these deadlines were in the language of the amendment itself, thus ratified by the states and not able to be changed. However, some of these deadlines, including the time limit for ratification of the Equal Rights Amendment, were in the proposing clause of the amendment, not in the language ratified by the state legislatures. In 1978, Congress acted on the premise that it could change a deadline in a proposing clause and passed by majority vote a bill to extend the ERA's ratification deadline from March 22, 1979 to June 30, 1982.

## Mode 2:  Three-State Strategy

*The "three-state strategy" for ERA ratification was originally developed through the work of the ERA Summit, a volunteer coalition organized in Washington, DC in 1992. U.S. Representative Robert Andrews (D-NJ)*

CART (0)

USCA Case #21-5096     Document #1928907     Filed: 01/03/2022     Page 300 of 355

 

*in the early implementation of this strategy.*

The three-state strategy for ERA ratification was developed following the 1992 ratification of the "Madison Amendment" as the 27th Amendment to the Constitution after a ratification period of 203 years. Given that acceptance, some ERA advocates contended that the ERA's ratification period of just over two decades would surely meet the "reasonable" and "sufficiently contemporaneous" standards required by Supreme Court decisions in 1921 and 1939. Time limits were not attached to proposed amendments until 1917, and Congress demonstrated its belief that it may alter a time limit in a proposing clause by extending the original ERA deadline. Precedent regarding a state's ability to withdraw its ratification by a rescission vote shows that such actions have not been accepted as valid. Thus, supporters argued, the 35 existing ratifications should still be legally viable, and Congress likely has the power to adjust or repeal the previous time limit on the ERA, determine whether state ratifications subsequent to 1982 are valid, and recognize the ERA as part of the Constitution after three more states ratify.

The legal rationale for the three-state strategy is explained in "The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States," by Allison Held, Sheryl Herndon, and Danielle Stager, published in the Spring 1997 issue of *William & Mary Journal of Women and the Law*.

This mode of ratification is getting closer to potential realization. With the ratification of the Equal Rights Amendment by the state of Nevada in 2017 and by the state of Illinois in 2018, one more state is needed to ratify the ERA to achieve the initial 38 states for federal ratification as determined in 1982. If one more state ratifies the ERA, the ratification process will move into the courts for determination regarding the constitutionality of the original deadline that was applied to the Equal Rights Amendment.

Currently efforts to ratify the ERA are active in North Carolina, Tennessee, and Florida.

## Time Limits

As the legal article explains, Article V of the U.S. Constitution gives Congress the power to propose an amendment and to determine the mode of ratification, but it is silent as to the power of Congress to impose time limits or its role after ratification by three-fourths of

 ERA 🟢                                                      🔍  ☰

Constitution once ratified by the final state constituting a three-
fourths majority of the states. The *Dillon* Court said that an
amendment should be ratified within a "reasonable" and
"sufficiently contemporaneous" time frame "to reflect the will of
the people in all sections at relatively the same period," because the
amendment process is presumably triggered by a perception of
"necessity" with respect to the subject of the amendment.

A 1939 Supreme Court decision (*Coleman* v. *Miller*) reaffirmed the
power of Congress to fix a reasonable time period for ratification
but also determined that Congress has the power to promulgate an
amendment after the final state constituting a three-fourths
majority ratifies. In *Coleman*, the Court held that Congress, upon
receiving notification of ratification by three-fourths of the states,
may determine whether the amendment is valid because it has
been ratified in a reasonable period of time, or whether "the
amendment has lost its vitality through lapse of time." The Court
called the timeliness decision a "political question" and said that
Congress is uniquely equipped to make that decision because of its
"full knowledge ... of the political, social and economic conditions
which have prevailed during the period since the submission of the
amendment."

It is important to note that Congressional promulgation is not a
necessary feature of ratification under Article V. In the history of the
amendment process Congress has promulgated only two
amendments, the 14th and the 27th, following the final state
ratification. In addition, the requirement for ratification within a
"sufficiently contemporaneous" time frame and the chronological
definition of "contemporaneous" are now open to question in light
of acceptance of the Madison Amendment.

The first time limit ever imposed on the ratification period of a
constitutional amendment was in the text of the 18th Amendment
(Prohibition) in 1917, and the limit of seven years was chosen by
Congress without extensive discussion. The 19th Amendment
(Woman Suffrage) was sent to the states in 1919 with no time limit,
as was a proposed Child Labor Amendment in 1924. Seven-year
time limits were placed in the text of the 20th, 21st, and
22nd Amendments, but Congress shifted the seven-year limit out
of the text and into the proposing clause of the 23rd, 24th, 25th,
and 26th Amendments.

The most recent amendment to the Constitution, the
27th Amendment, had no deadline attached because it was passed

                                                              C A R T  ( 0 )



USCA Case #21-5096    Document #1928907    Filed: 01/03/2022    Page 302 of 355

ERA ● 

Despite arguments by proponents that the Equal Rights Amendment should go to the states without a time limit in the tradition of the 19th Amendment, the ERA passed Congress in 1972 with a seven-year time limit in its proposing clause. If the time limit had been placed in the text of the amendment itself, that restriction would not be subject to alteration by Congress after any state legislature had ratified. However, the ERA language ratified by 35 states between 1972 and 1982 did not contain a time limit for ratification.

By transferring time limits from the text of an amendment to the proposing clause, Congress retained for itself the authority to review the time limit and to amend its own previous legislative action regarding it. In 1978, Congress clearly demonstrated its belief that it may alter a time limit in the proposing clause when it passed a bill moving the deadline from March 22, 1979, to June 30, 1982. A challenge to the constitutionality of the extension was dismissed by the Supreme Court as moot after the deadline expired, and no lower-court precedent stands regarding that point.

The *Coleman* decision asserted that Congress may determine whether the states have ratified in a "reasonable" time or whether the amendment is "no longer responsive to the conception which inspired it." Congress therefore could determine that the time period since the ERA went to the states for ratification in 1972 is "reasonable" and "contemporaneous" (particularly in light of the fact that it deemed the Madison Amendment's 203 years to be so), and it could decide that the ERA remains "responsive to the conception which inspired it" (indisputably so, since the fact that women's equal rights are not constitutionally affirmed will remain unchanged until the Constitution is amended or interpreted to establish unequivocally that women and men have equal rights).

Therefore, under the principles of *Dillon* and *Coleman*, and based on the fact that Congress voted to extend the ERA time limit and to accept the 203-year-long ratification period of the Madison Amendment as sufficiently "contemporaneous," it is likely that Congress has the power to legislatively adjust or remove the time limit constraint on the ERA if it chooses, to determine whether or not state ratifications which occur after the expiration of a time limit in a proposing clause are valid, and to promulgate the ERA after the 38th state ratifies.

C A R T  ( 0 )

JA 297

 

questionable. Article V of the Constitution speaks only to the states' power to ratify an amendment but not to the power to rescind a ratification. All precedents concerning state rescissions of ratifications indicate that such actions are not valid and that the constitutional amendment process as described in Article V allows only for ratification. For example, the official tally of ratifying states for the 14th Amendment in 1868 by both the Secretary of State and Congress included New Jersey and Ohio, states which had passed resolutions to rescind their ratifications. Also included in the tally were North Carolina and South Carolina, states which had originally rejected and later ratified the amendment. In the course of promulgating the 14th Amendment, therefore, Congress determined that both attempted withdrawals of ratifications and previous rejections prior to ratification had no legal validity.

Therefore, it is most likely that the actions of the five states that voted to rescind their ratification of the ERA between 1972 and 1982 are a legal nullity.


**BY STATE**


**IN CONGRESS**

© 2018 Alice Paul Institute • Site Design by Kathryn Elizabeth Colohan, Jill S. and Krista Joy Niles

  

CART ( 0 )

# Exhibit N

USCA Case #21-5096      Document #1928907      Filed: 01/03/2022      Page 305 of 355
TRY OUR CORPORATE SOLUTION FOR FREE!   📞 +1 (212) 419-5770   ✉ support@statista.com

Source: https://www.statista.com/statistics/241494/median-age-of-the-us-population/

## Median age of the U.S. population 1960-2019

Published by Erin Duffin, Jul 20, 2020

In 2018, the median age of the population of the United States was 38.4 years. While this may seem quite young, the median age in 1960 was even younger, at 29.5 years.

### The aging population

The year 2035 is expected to be a turning point for the population of the United States. This is the year that demographers expect there to be more adults over the age of 65 than children. Additionally, in the year 2060, there are expected to be about 604,000 people aged 100 and

**Median age of the resident population of the United States from 1960 to 2019**



ⓘ Additional Information

© Statista 2020 🏳

Show source ⓘ

**Source**
→ Show sources information
→ Show publisher information

**Release date**
June 2020

**Region**
United States

**Survey time period**
1960 to 2019

**Supplementary notes**
Data prior to 2010 can be found here.
Values have been rounded, and are estimates as of
July 31 each year.

JA 301

# Exhibit O



NATIONAL ARCHIVES

# Statement on Equal Rights Amendment Debate

Press Release ·
Thursday, December 19, 2019

**Washington, DC**

In light of the public interest and ongoing debate about the Equal Rights Amendment (ERA), the National Archives and Records Administration (NARA) requested guidance from the Department of Justice's Office of Legal Counsel on legal issues regarding ratification of the ERA. These issues are currently presented in a lawsuit filed by the states of Alabama, Louisiana, and South Dakota against the Archivist of the United States. NARA does not intend to take any action regarding the ERA until, at a minimum, it receives the guidance it previously requested and in no event before February 15, 2020.

**The U.S. National Archives and Records Administration**
1-86-NARA-NARA or 1-866-272-6272

# Exhibit P

Top

 NATIONAL ARCHIVES

# NARA Press Statement on the Equal Rights Amendment

Press Release ·
Wednesday, January 8, 2020

**Washington, DC**

At the request of the National Archives and Records Administration (NARA), the Department of Justice (DOJ) has issued an opinion on the Ratification of the Equal Rights Amendment (ERA) and the statutory role of the Archivist of the United States.

Under 1 U.S.C. § 106b, the Archivist performs a ministerial role with respect to certifying the ratification of amendments to the U.S. Constitution, as follows:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

In its January 6, 2020, opinion, the Office of Legal Counsel (OLC) has concluded "that Congress had the constitutional authority to impose a deadline on the ratification of the ERA and, because that deadline has expired, the ERA Resolution is no longer pending before the States." (OLC Opinion, at p.2.) Accordingly, the OLC opinion goes on to state that "the ERA's adoption could not be certified under 1 U.S.C. § 106b." (OLC Opinion, at p.37.)

These issues are currently presented in two federal lawsuits against the Archivist of the United States, one filed in the U.S. District Court for the Northern District of Alabama by the states of Alabama, Louisiana, and South Dakota and the other filed in the U.S. District Court for the District of Massachusetts by Equal Means Equal, The Yellow Roses, and Katherine Weitbrecht.

9/22/2020                NARA Press Statement on the Equal Rights Amendment | National Archives

Case 1:20-cv-00242-RC   Document 13   Filed 09/23/20   Page 87 of 89
USCA Case #21-5096        Document #1928907        Filed: 01/03/2022        Page 311 of 355

NARA defers to DOJ on this issue and will abide by the OLC opinion, unless otherwise directed by a final court order.


# # #

For press information contact the National Archives Public and Media Communications Staff at 202-357-5300.

---

**Connect with the National Archives on:**

🐦 **Twitter:** @USNatArchives
📘 **Facebook:** USNationalArchives
**t Tumblr:** usnatarchives
📷 **Instagram:** usnatarchives

---

**The U.S. National Archives and Records Administration**
1-86-NARA-NARA or 1-866-272-6272

Top

JA 306

# Exhibit Q

Newspapers.com
by Ancestry

https://www.newspapers.com/image/475336066

The Press-Tribune (Roseville, California) · Mon, Oct 4, 1982 · Page 3

Printed on Jul 5, 2020



Copyright © 2020 Newspapers.com. All Rights Reserved.



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| COMMONWEALTH OF VIRGINIA, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 20-242 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 29, 74, 100 |
| | : | | |
| DAVID S. FERRIERO, | : | | |
| | : | | |
| Defendant, | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| ALABAMA, *et al.*, | : | | |
| | : | | |
| Intervenor-Defendants. | : | | |

**<u>ORDER</u>**

**GRANTING DEFENDANT'S MOTION TO DISMISS;
GRANTING INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

For the reasons stated in the Court's Memorandum Opinion separately and

contemporaneously issued, the Archivist's motion to dismiss (ECF No. 29) is **GRANTED**;

Intervenors' motion for summary judgment construed as a motion to dismiss (ECF No. 74) is

**GRANTED**; and Plaintiffs' motion for summary judgment (ECF No. 100) is **DENIED**.  In

addition, Intervenors' unopposed motion to consolidate hearings (ECF No. 88) is **DENIED**; the

Archivist's motion to stay summary-judgment briefing (ECF No. 104) is **DENIED**; and amici's

motions for leave to file amicus briefs (ECF Nos. 31, 40, 44, 48, 51, 61, 66, 68, 73, 90, 91, 94,

96, 108) are **GRANTED**.

**SO ORDERED**.

Dated: March 5, 2021                              RUDOLPH CONTRERAS
                                                  United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| COMMONWEALTH OF VIRGINIA, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 20-242 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 29, 74, 100 |
| | : | | |
| DAVID S. FERRIERO, | : | | |
| | : | | |
| Defendant, | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| ALABAMA, *et al.*, | : | | |
| | : | | |
| Intervenor-Defendants. | : | | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANT'S MOTION TO DISMISS;**
**GRANTING INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;**
**DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Hoping to secure a place in the Constitution for sex equality, Plaintiffs Nevada, Illinois, and Virginia ratified the Equal Rights Amendment ("ERA") years after many presumed it was dead.  They now challenge the refusal of the Archivist of the United States to publish and certify the amendment as part of the Constitution.  Laudable as their motives may be, Plaintiffs run into two roadblocks that forbid the Court from awarding the relief they seek.  First, the Archivist's publication and certification of an amendment are formalities with no legal effect.  His failure to perform those formalities does not cause Plaintiffs any concrete injury, so they lack standing to sue.  Second, even if Plaintiffs had standing, Congress set deadlines for ratifying the ERA that

JA 311

expired long ago.  Plaintiffs' ratifications came too late to count.  For those two reasons, the

Court dismisses Plaintiffs' suit.

## II.  BACKGROUND

### A.  The Amendment Process

Article V lays out procedures for amending the Constitution.  It says:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall
> propose Amendments to this Constitution, or on the Application of the
> Legislatures of two thirds of the several States, shall call a Convention for
> proposing Amendments, which, in either Case, shall be valid to all Intents and
> Purposes, as Part of this Constitution, when ratified by the Legislatures of three
> fourths of the several States, or by Conventions in three fourths thereof, as the one
> or the other Mode of Ratification may be proposed by the Congress . . . .

U.S. Const. art. V.  The Article V framework thus consists of three steps: proposal, selection of a

"Mode of Ratification," and ratification.  A proposal can originate with either two-thirds of both

houses of Congress or a convention called by two-thirds of state legislatures.  Congress then

chooses whether states will have to ratify the proposal by legislature or convention.  And finally,

the proposal becomes part of the Constitution when three-fourths of the states ratify it.

Independent of the Article V process, Congress has charged the Executive with

publishing and certifying the validity of constitutional amendments since 1818.  Congress

initially gave the duty to the Secretary of State, then transferred it to the Administrator of

General Services, and most recently assigned it to the Archivist of the United States (the head of

the National Archives and Records Administration).  *See* Congressional Pay Amendment, 16 Op.

O.L.C. 85, 98 (1992), https://www.justice.gov/sites/default/files/olc/opinions/1992/05/31/op-olc-

v016-p0085_0.pdf.  Today, 1 U.S.C. § 106b codifies the Archivist's duties as follows:

> Whenever official notice is received at the National Archives and Records
> Administration that any amendment proposed to the Constitution of the United

2

JA 312

States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

## B.  History of the Equal Rights Amendment

Congress first considered a constitutional amendment guaranteeing sex equality almost one hundred years ago.  The original 1923 proposal did not get off the ground, but it heralded a series of successive proposals introduced in every session of Congress from then until 1971.  *See* Jean Witter, *Extending Ratification Time for the Equal Rights Amendment: Constitutionality of Time Limitations in the Federal Amending Process*, 4 Women's Rts. L. Rep. 209, 209, 216–17 (1978).  Over nearly fifty years, support for the idea ebbed and flowed before reaching its zenith in the 1960s and 1970s.  *See id.*  Then, in 1972, supermajorities in both houses of Congress adopted the following joint resolution proposing the ERA:

JOINT RESOLUTION

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein)*, That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1.  Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"SEC. 2.  The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"Sᴇᴄ. 3.  This amendment shall take effect two years after the date of ratification."

H.R.J. Res. 208, 92nd Cong., 86 Stat. 1523 (1972).

The clause central to this dispute is the ratification deadline, which requires state legislatures to ratify the ERA "within seven years from the date of its submission by the Congress."  Prior editions of the ERA had never contained a deadline, and the change was the result of a compromise.  *See* Witter, *supra*, at 215–16.  While debating the previous version of the ERA in 1970, opponents in the House and Senate called for a deadline.  Representative Celler lamented: "This amendment could roam around State legislatures for 50 years. Customarily we provide that ratification must occur within 7 years of its submission to the States.  But there is no provision of that sort in this resolution."  116 Cong. Rec. 28,012 (1970). Senator Ervin echoed the sentiment: "[E]very amendment which has been submitted by Congress to the States since 1939 . . . has carried a 7-year period as the time in which the amendment must be ratified or lapse in legal efficacy."  *Id.* at 36,302.  Proponents eventually relented and inserted a seven-year time limit.  Representative Griffiths, the ERA joint resolution's lead sponsor in the House, explained that the deadline was a "customary" and "perfectly proper" way to respond to "some of the objections" raised against the ERA and ensure that "it should not be hanging over our head forever."  117 Cong. Rec. 35,814–15 (1971); *see also* Ruth Bader Ginsburg, Observation, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 921 (1979) ("[P]rincipal congressional proponents of the ERA . . . . thought the stipulation innocuous, a 'customary' statute of limitations, not a matter of substance worth opposing." (footnotes omitted)).

State ratifications followed quickly at first.  By the end of 1972, twenty-two states had approved the ERA.  Ratification of the Equal Rights Amendment ("2020 OLC ERA Opinion"),

44 Op. O.L.C. __, slip op. at 6 n.6 (2020), https://www.justice.gov/olc/file/1232501/download (collecting state resolutions).  Over the next five years, however, the proposed amendment's momentum stalled.  Only thirteen more states ratified the ERA, *id.* at 7 n.7 (same), and four states even voted to rescind earlier ratifications, *id.* at 7 n.8 (same).  South Dakota passed a resolution stating that its ratification would be withdrawn if the ERA was not adopted by the time the seven-year period elapsed.  *Id.* at 7.  Excluding the purported rescissions, thirty-five states had ratified the ERA as its deadline approached—three short of Article V's three-fourths threshold.  So, with the deadline around the corner, Congress decided to give states more time.  In the fall of 1978, simple majorities in each house passed a joint resolution to extend the ratification deadline to June 30, 1982.  *See* H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978); *see also* 124 Cong. Rec. 26,264, 34,314 (1978).

When a few states and individual state legislators challenged the move, a district court sided with the challengers.  *See Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981), *vacated as moot*, 459 U.S. 809 (1982).  It held that Article V did not permit Congress to extend a ratification deadline.  *Id.* at 1153–54.  Because the extended deadline was drawing near, the Supreme Court agreed to hear the case on an expedited basis.  It granted certiorari before judgment in the court of appeals and stayed the district court's decision.  *Nat'l Org. for Women v. Idaho*, 455 U.S. 918 (1982).  But before the Court heard argument in the case, the extended deadline passed without any additional states having ratified the amendment.  The Court vacated the district court's judgment and ordered dismissal of the complaints as moot.  *Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982).

Most supporters and commentators assumed that was it for the ERA.  *See, e.g.*, Mary Frances Berry, *Why ERA Failed* 1 (1986) ("The failure of the Equal Rights Amendment

ratification effort had many causes."); Marjorie Hunter, *Leaders Concede Loss on Equal Rights*, N.Y. Times, June 25, 1982, at A1 ("Leaders of the fight for an equal rights amendment officially conceded defeat today."). Since then, federal legislators have repeatedly tried to start over from scratch, but Congress has never adopted one of their resolutions. *See* 2020 OLC ERA Opinion at 10 (collecting proposed resolutions). More recently, however, some ERA supporters have asserted that the 1972 proposal is still on the table. They claim that its deadlines are unenforceable, either because a deadline must be in an amendment's text to be effective or because Congress can decide an amendment's timeliness after the final state ratification. *See, e.g.*, Allison L. Held et. al., *The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States*, 3 Wm. & Mary J. Women & L. 113, 115 (1997).

Over the past four years, each of Plaintiffs' legislatures enacted joint resolutions ratifying the ERA. *See* S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017); S.J. Res. Const. Amend. 0004, 100th Gen. Assemb., Reg. Sess. (Ill. 2018); S.J. Res. 1, Gen. Assemb., Reg. Sess. (Va. 2020). With Virginia's ratification last year, Plaintiffs say that the ERA reached the three-fourths threshold and is now part of the Constitution. Compl. ¶ 57, ECF No. 1. The Archivist disagrees. After consulting with the Department of Justice's Office of Legal Counsel, *see* 2020 OLC ERA Opinion, he refuses to publish and certify the ERA "unless otherwise directed by a final court order," Compl. ¶ 62. Plaintiffs brought this suit to require him to do so.

### C. Procedural History

Plaintiffs filed a complaint seeking mandamus relief that would order the Archivist to publish and certify the ERA. Compl. at 16–17. In response, five other states intervened as defendants: Alabama, Louisiana, Nebraska, South Dakota, and Tennessee ("Intervenors"). *See* Order Granting Movants' Mot. to Intervene, ECF No. 33. Intervenors—two of which voted

down the ERA resolution and three of which purported to rescind their prior ratifications—argue that they should not have to spend resources defending their laws against an invalidly enacted ERA.  *See* Intervenors' Mot. to Intervene, ECF No. 10.

The Archivist asked the Court to dismiss Plaintiffs' complaint for lack of jurisdiction. *See* Mem. Supp. Def.'s Mot. Dismiss ("Def.'s Mot."), ECF No. 29-1; *see also* Pls.' Mem. Opp'n Def.'s Mot. Dismiss ("Pls.' Opp'n"), ECF No. 37; Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply"), ECF No. 101.  Intervenors then piled on with what the Court construes as another motion to dismiss.  *See* Intervenors' Mot. Summ. J. & Supp. Mem. ("Intervenors' Mot."), ECF No. 74; *see also* Pls.' Mem. Opp'n Intervenors' Mot. Summ. J., ECF No. 99; Intervenors' Reply Supp. Mot. Summ. J., ECF No. 112.[1]  In response, Plaintiffs moved for summary judgment.  *See* Pls.' Mot. Summ. J. & Mem. Supp., ECF No. 100.[2]

---

[1] Intervenors styled their motion as one for summary judgment but asked that it be treated as a motion to dismiss.  *See* Intervenors' Mot. at 13 n.2.  They explained that the Federal Rules of Civil Procedure gave them no choice but to file a summary judgment motion.  *Id.*  Rule 24(c) required them to file an answer with their motion to intervene, so they could not file a Rule 12(b) motion to dismiss.  And because the Archivist has not filed an answer yet, they could not move for a Rule 12(c) judgment on the pleadings either.  Plaintiffs do not object to Intervenors' request that the motion be considered a motion to dismiss.  *See* Pls. Opp'n Intervenors' Mot. Summ. J. at 1–3 (merely explaining the difference between the two motions).  Accordingly, the Court grants the request.  *Cf. Prade v. City of Akron*, 14-cv-188, 2015 WL 2169975, at *1–2 (N.D. Ohio May 8, 2015) (treating a Rule 12(c) motion as a Rule 12(b)(6) motion even though the movant had already filed an answer because other defendants had not yet filed their answers).

[2] In addition, numerous amici have asked the Court to consider their perspectives on the important issues at stake in this case.  The Court grants their motions to file amicus briefs and appreciates their input.  *See* Br. Amicus Curiae of Eagle Forum et al. in Supp. of Def.'s Mot., ECF No. 31-1; Br. of Business and Corporate Entities as Amicus Curiae in Supp. of Pls., ECF Nos. 40-1, 96-1; Br. for Generation Ratify et al. as Amicus Curiae in Supp. of Pls., ECF No. 44-1; Br. of Amici Curiae Constitutional Law Professors Erwin Chemerinsky et al. in Supp. of Neither Party, ECF No. 48-1; Amicus Curiae Br. in Supp. of Pls. for the U.S. Conference of Mayors et al., ECF No. 51-1; Br. for Equality Now et al. as Amicus Curiae in Supp. of Pls., ECF No. 61-1; Amicus Br. by Organizations that Advocated ERA Ratification in Virginia, Illinois, and Nevada in Opp'n to Def.'s Mot., ECF No. 66-1; Br. Amici Curiae of the ERA Coalition and Advocates in the Women's Movement in Supp. of Pls.' Opp'n to Def.'s Mot., ECF No. 68-1; Amicus Br. of Michigan Supp. Pls. in Requesting a Declaration that the Equal Rights

The Court grants the motions to dismiss. It therefore denies Plaintiffs' motion for summary judgment and the Archivist's motion to stay summary judgment briefing. *See* Def.'s Mot. Stay Summ.-J. Briefing, ECF No. 104. Furthermore, the Court can address the motions to dismiss without oral argument, so it denies Intervenors' motion to consolidate hearings on their and the Archivist's motions. *See* Intervenors' Unopposed Mot. Consolidate Hr'gs, ECF No. 88. With that housekeeping out of the way, the Court turns to the parties' dispute.

### III. LEGAL STANDARD

In one way or another, the Archivist's and Intervenors' attacks on the complaint are all jurisdictional. Intervenors focus on the merits. They argue that the ERA has not become part of the Constitution, so the Archivist has no obligation to publish and certify it. *E.g.*, Intervenors' Mot. at 13–14. But Plaintiffs seek relief under the Mandamus Act, which withholds subject-matter jurisdiction when mandamus is not warranted. *See Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020). It thus makes the merits question a jurisdictional one. *See id.* The Archivist advances merits arguments too, but he also adds more traditional justiciability arguments regarding standing, ripeness, and the political question doctrine. *E.g.*, Def.'s Mot. at 1–2. Because all these contentions go to the Court's jurisdiction, Federal Rule of Civil Procedure 12(b)(1) governs. It allows a defendant to seek dismissal of a claim for lack of jurisdiction.

---

Amendment Has Become the 28th Amendment to the U.S. Constitution, ECF No. 71; Br. Amicus Curiae of VoteERA.org and Leanne Littrell DiLorenzo in Supp. of Pls., ECF No. 73-1; Br. of Amicus Curiae Montana Governor Steve Bullock, ECF No. 76; Br. of Amicus Curiae Independent Women's Law Center Supp. Intervenors' Mot., ECF No. 90-1; Br. of Concerned Women for America and Susan B. Anthony List as Amici Curiae in Supp. of Intervenors, ECF No. 94-1; Br. on Behalf of Amici Curiae Kentucky-Based Women's-Rights Advocates in Supp. of Pls.' Mot. for Sum. J. and in Opp'n to Intervenors' Mot., ECF No. 108-1.

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, a federal court is presumed to lack jurisdiction unless the plaintiff proves otherwise. *Id.* "When ruling on a Rule 12(b)(1) motion, the court must 'treat the complaint's factual allegations as true' and afford the plaintiff 'the benefit of all inferences that can be derived from the facts alleged . . . .'" *Cause of Action Inst. v. IRS*, 390 F. Supp. 3d 84, 91 (D.D.C. 2019) (citation omitted). Because a court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," however, it scrutinizes a plaintiff's factual allegations more closely than it would in resolving a Rule 12(b)(6) motion for failure to state a claim. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001). If need be, it "may consider . . . materials outside the pleadings . . . to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), *aff'd*, No. 00-7176, 2001 WL 135857 (D.C. Cir. Jan. 18, 2001).

## IV.  ANALYSIS

The Archivist and Intervenors point to several barriers in the way of Plaintiffs' claim. For starters, Plaintiffs must show that their suit is justiciable. The Archivist asserts that Plaintiffs cannot make that showing for three reasons: they lack standing, their suit is not ripe, and their claim requires resolution of political questions that are outside the province of the Judiciary. Then, even if Plaintiffs can overcome those hurdles, they need to demonstrate that the Archivist has a duty to publish and certify the ERA as part of the Constitution. That requires two things to be true. First, the Archivist must be obliged to accept Plaintiffs' three ratifications regardless of the ERA's deadlines. And second, the five states' purported rescissions must be invalid. Only if

both propositions are true would thirty-eight (or three-fourths) of the states have ratified the amendment and triggered the Archivist's duty to publish it under section 106b.

Plaintiffs' claim collapses against at least two of these barriers. They lack standing because, by their own account, the certification they demand from the Archivist has no legal effect. His refusal to publish and certify the ERA thus does not cause them a concrete injury that could be remedied by ordering him to act. Plaintiffs are also wrong that the Archivist is bound to accept their ratifications as valid. Section 106b permits the Archivist to determine whether a ratification meets a deadline that Congress set when it proposed the amendment. And the ERA's ratification deadline is effective despite its location in the introductory clause of the amendment's proposing resolution.

Although the Court could end its analysis after concluding that Plaintiffs lack standing, it decides the deadline issue as an alternative holding to streamline appellate review. To reach the deadline issue, the Court first determines that it does not present a political question. As mentioned, all three questions—standing, the political question doctrine, and whether Plaintiffs deserve relief under the Mandamus Act—are jurisdictional. *Cf. Lovitky*, 949 F.3d at 758 ("Where . . . 'both standing and subject matter jurisdiction are at issue . . . [,] a court may inquire into either and, finding it lacking, dismiss the matter without reaching the other.'" (second omission in original) (citation omitted)). Having identified two independent grounds to dismiss the case for lack of jurisdiction, the Court does not discuss the rescission issue.

### A.  Plaintiffs Lack Standing

Article III of the Constitution gives federal courts the power to decide "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. That limited grant of jurisdiction gives rise to the standing doctrine. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing ensures

that a court will exercise its jurisdiction "only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'"  *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)).  It requires the plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, 136 S. Ct. at 1547.  "[T]he party invoking federal jurisdiction[] bears the burden of establishing these elements."  *Id.*  "[A]t the pleading stage," that means "the plaintiff must 'clearly . . . allege facts demonstrating' each element."  *Id.* (quoting *Warth*, 422 U.S. at 518).  For purposes of assessing standing, courts assume that plaintiffs will succeed on the merits of their claims.  *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012).

"A State's standing depends on the capacity in which it initiates a lawsuit."  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019).  Most straightforwardly, it can sue to "redress its own injury" in what is called a "direct injury lawsuit."  *Id.*  A state pressing a direct injury lawsuit must "meet only the ordinary demands of Article III."  *Id.*  Alternatively, a State can sometimes "sue in a representative capacity to vindicate its citizens' interests" in what is called a "*parens patriae* lawsuit."  *Id.*  That kind of suit requires the plaintiff state to satisfy Article III's standing requirements and "assert a quasi-sovereign interest 'apart from the interests of particular private parties.'"  *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).  Because states cannot bring a *parens patriae* lawsuit against the Federal Government, *id.* at 179–80, 183, Plaintiffs must show a direct injury.[3]

---

[3] Plaintiffs concede that current D.C. Circuit caselaw precludes a claim of *parens patriae* standing but preserve the issue for appeal.  *See* Pls.' Opp'n at 11 n.8.

Plaintiffs' theory of standing rests on an injury to one of their sovereign interests. They argue that, as sovereign states in the Constitution's federal system, they have "an interest in securing observance of the terms under which [they] participate[] in" that system. Pls.' Opp'n at 9 (alterations in original) (quoting *Snapp*, 458 U.S. at 607–08). One of those terms is the role that Article V gives states in amending the Constitution. *Id.* at 7–8. It promises that, "once a proposed amendment has been 'ratified by the Legislatures of three fourths of the several States,' it '*shall be* valid to all Intents and Purposes, as Part of th[e] Constitution.'" *Id.* at 8 (alteration in original) (quoting U.S. Const. art. V). According to Plaintiffs, however, the Archivist has "improperly interfere[d] with [their] constitutional authority to amend the Federal Constitution." *Id.* at 10–11. "By refusing to honor [their] ratification[s] of the Equal Rights Amendment," Plaintiffs assert, the Archivist has "intrude[d]" on their sovereignty and "disregard[ed] an exercise of their sovereign power." *Id.* at 9.

The problem with Plaintiffs' theory is that it assigns the Archivist's actions too much weight. Plaintiffs "seek mandamus relief to compel the Archivist to 'publish' and 'certif[y]'" the ERA as part of the Constitution, *id.* at 5 (alteration in original), supposedly because his "refusal to do so deprives . . . [them] of their sovereign prerogatives under Article V," *id.* at 27–28. But the Archivist's proclamation has no legal effect. Article V "makes no mention" of the Archivist or publication of an amendment. Lester Bernhardt Orfield, *The Amending of the Federal Constitution* 77 (1942); *see also* Congressional Pay Amendment, 16 Op. O.L.C. at 99 n.19. And, for that reason, both the Supreme Court and the D.C. Circuit have held that an amendment becomes law when it secures ratifications from three-fourths of the states—not when the Archivist publishes and certifies it. *See Dillon v. Gloss*, 256 U.S. 368, 376 (1921) (explaining that the Eighteenth Amendment became valid when it received its final ratification, so the date of

the Secretary of State's proclamation was "not material"); *U.S. ex rel. Widenmann v. Colby*, 265 F. 998, 1000 (D.C. Cir. 1920) ("It is the approval of the requisite number of states, not the proclamation, that gives vitality to the amendment and makes it a part of the supreme law of the land."), *aff'd*, 257 U.S. 619 (1921); *see also United States v. Sitka*, 845 F.2d 43, 47 (2d Cir. 1988) ("The authority created in the Secretary of State . . . was purely ministerial; it could not and did not affect the process of ratification itself, which is self-executing upon completion.").

Nowhere do Plaintiffs assert that the Archivist's publication of an amendment does anything legally significant. Far from it. They emphasize time and time again that publication is a formality and that the ERA is in fact already part of the Constitution. *See, e.g.*, Compl. ¶ 57 ("[T]he Equal Rights Amendment became part of the U.S. Constitution immediately upon Virginia's ratification."); *id.* ¶ 79 ("Under Article V, the Equal Rights Amendment has been added to the U.S. Constitution."); Pls.' Opp'n at 4 ("With Virginia's ratification earlier this year, the Article V requirements were satisfied and the Equal Rights Amendment became 'valid to all Intents and Purposes, as Part of th[e] Constitution." (citations omitted)); *cf. id.* at 13–14 (arguing that there is no need for Congress to approve an amendment for it to become effective). Plaintiffs' pronouncements undermine their claim to standing. *See NB*, 682 F.3d at 82 (explaining that a court assessing standing assumes that the plaintiff is right on the merits).

Because the Archivist's publication of an amendment does not affect the amendment's validity, Plaintiffs cannot show that his refusal to publish the ERA caused the injury that they claim: "interfere[nce] with [their] constitutional authority to amend the Federal Constitution." Pls. Opp'n at 10–11. By the same token, forcing the Archivist to publish the amendment "would avail [them] nothing." *Cf. Colby*, 265 F. at 1000 (explaining that a plaintiff who asked for the cancellation of a Secretary of State's proclamation "ha[d] no interest in the prayer of his

petition" because cancellation "would not affect the validity of the amendment"). Plaintiffs' intrusion-on-sovereignty theory thus cannot establish injury, causation, or redressability.

Plaintiffs also gesture nonspecifically toward "widespread confusion" as another possible source of injury. *See* Compl. ¶ 80; Pls.' Opp'n at 10. They acknowledge that "confusion alone would be insufficient to confer Article III standing" because it is a generalized grievance. Pls.' Opp'n at 10; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 575 (1992) (explaining that suits based on a "generalized grievance"—in which "the impact on plaintiff is plainly undifferentiated and common to all members of the public"—are "inconsistent with the framework of Article III" (cleaned up) (citation omitted)). But Plaintiffs say they have "much more at stake" because their allegation of confusion is "made in connection with [their] sovereign interests." Pls.' Opp'n at 10. They do not elaborate much beyond that. *See id.* And it is not the Court's job to flesh their argument out for them. *See Spokeo*, 136 S. Ct. at 1547 ("The plaintiff . . . bears the burden of establishing [standing].").

Nevertheless, Plaintiffs' earlier citation to *Massachusetts v. EPA*, 549 U.S. 497 (2007), suggests they believe that states may be able to rely on a confusion-based injury that would be insufficient for ordinary litigants. *See* Pls.' Opp'n at 7. Not so. Although *Massachusetts* recognized that "States are not normal litigants for the purposes of invoking federal jurisdiction," 549 U.S. at 518, and may sometimes be "entitled to special solicitude in [a] standing analysis," *id.* at 520, the D.C. Circuit has said that the case's holding is quite narrow. The case examined Massachusetts's standing to seek review of the EPA's denial of a petition to regulate greenhouse gases. *Id.* at 516–26. Massachusetts alleged injuries resulting from global warming, including rising sea levels that had begun to consume its coastal property. *Id.* at 521–23. The EPA retorted that global warming "inflict[ed] widespread harm," so it should not give rise to standing.

14

JA 324

*Id.* at 517.  The Supreme Court disagreed.  It emphasized that Massachusetts sued under a statute creating a procedural right to challenge the petition's denial and that Massachusetts was trying to vindicate its own interests in preserving its sovereign territory.  *Id.* at 519–20.  Even though the "climate-change risks [we]re 'widely shared,'" Massachusetts had "alleged a particularized injury in its capacity as a landowner"—namely, loss of its coastal land.  *Id.* at 522–23.

Properly understood, *Massachusetts* is of no help to Plaintiffs.  The D.C. Circuit has summarized the case in this way: "*Massachusetts* stands only for the limited proposition that, where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476–77 (D.C. Cir. 2009).  To be sure, states—as sovereigns—have "unique and sweeping interests" that ordinary litigants lack.  *California v. Trump*, No. 19-cv-960, 2020 WL 1643858, at *6 (D.D.C. Apr. 2, 2020); *see also Snapp*, 458 U.S. at 601–08 (providing an overview of states' nonsovereign, sovereign, and quasi-sovereign interests).  But they must still "establish a particularized harm" to one of those interests to prove standing.  *California*, 2020 WL 1643858, at *6.  Plaintiffs have not done that.  They merely assert that "[t]he Archivist's failure to carry out his ministerial duties to acknowledge the adoption of the amendment harms the Plaintiff States by creating widespread confusion regarding the effect of their ratifications."  Compl. ¶ 80.  That meager "allegation[] of confusion [is] simply too abstract to be judicially cognizable."  *Cf. Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 668 (D.C. Cir. 1987) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).[4]

---

[4] To the extent the Archivist's alleged noncompliance with section 106b may cause a procedural injury, Plaintiffs do not assert one.  And even then, Plaintiffs would still have to show some concrete, individualized harm associated with the procedural injury.  *See Equal Means*

Plaintiffs have failed to allege an injury specific to them that was caused by the Archivist's refusal to publish the ERA and would be remedied by ordering him to publish it. Consequently, they have not established standing. While that deficiency alone is enough reason to dismiss this case for lack of jurisdiction, the Court moves on to reach an alternative holding on the ratification deadline issue.[5]

### B. The Ratification Deadline Issue Does Not Present a Political Question

According to the Archivist, whether an amendment's deadline blocks its ratification is a nonjusticiable political question. The political question doctrine is a "narrow exception" to the general rule that "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton (Zivotofsky I)*, 566 U.S. 189, 194–95 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). It "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). The doctrine is therefore grounded in respect for "the constitutional principle of separation of powers." *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019).

---

*Equal v. Ferriero*, 478 F. Supp. 3d 105, 125 (D. Mass. 2020) (rejecting organizational plaintiffs' claim of standing because, "[e]ven assuming there was some procedural violation," they "ha[d] not alleged any concrete interest in tandem with the Archivist's failure"); *see also New Hampshire v. Holder*, 293 F.R.D. 1, 6 (D.D.C. 2013) ("[T]he procedural standing doctrine 'does not—and cannot—eliminate any of the irreducible elements of standing[.]'" (second alteration in original) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996))).

[5] Because the Court does not decide whether states can rescind their ratifications, it will not address the Archivist's ripeness argument, which pertains to only the rescission issue. *See* Def.'s Mot. at 11–12; Def.'s Reply at 4–6.

Assessing whether an issue presents a political question typically requires analysis of the six factors the Supreme Court laid out in *Baker v. Carr*, 369 U.S. 186 (1962).  A political question may exist if there is:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.  Supreme Court precedent indicates that the first two factors are preeminent in the political question analysis.  *See Al-Tamimi*, 916 F.3d at 12 ("At the very least, *Zivotofsky I* suggests that, if the first two *Baker* factors are not present, more is required to create a political question than apparent inconsistency between a judicial decision and the position of another branch." (citing *Zivotofsky I*, 566 U.S. at 194–201)).

Rather than argue in terms of the *Baker* factors, however, the Archivist says that the Supreme Court has already determined that questions around ratification deadlines are for the political branches to decide.  *See* Def.'s Mot. at 12–14; Def.'s Reply at 6–13.  His argument is based on the Court's decision in *Coleman v. Miller*, 307 U.S. 433 (1939).  *Coleman* involved a suit by Kansas legislators to prevent state officials from recognizing the legislature's ratification of the proposed Child Labor Amendment.  *Id.* at 436.  The Court considered two issues similar to the questions presented in this case: (1) whether Kansas's previous rejection of the amendment precluded the state's later ratification; and (2) whether the state's ratification of the amendment thirteen years after its proposal came too late to be effective.  *Id.* at 447.  The Court held that both questions were nonjusticiable.  *Id.* at 450, 456.

But *Coleman* does not apply here.  As an initial matter, *Coleman* does not establish that *all* questions related to the amendment process are political ones.  Even though four concurring members of the *Coleman* Court took that broad view, they failed to convince a majority.  *See id.* at 459 (Black, J., concurring) ("Undivided control of [the amendment] process has been given by the Article exclusively and completely to Congress."); *see also Dyer v. Blair*, 390 F. Supp. 1291, 1299–300 (N.D. Ill. 1975) (three-judge court) (Stevens, J.) (rejecting the argument that all amendment process questions are political ones in part because a majority of the *Coleman* Court "refused to accept that position").[6]  And elsewhere, the Supreme Court has repeatedly decided questions about the Article V process—even when faced with political question arguments.  *See Dyer*, 390 F. Supp. at 1300 & n.21 (collecting cases); 2020 OLC ERA Opinion at 30 n.24 (same); Walter Dellinger, *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 Harv. L. Rev. 386, 403–05 (1983) (same).[7]  A court's task, then, is to determine

---

[6] Chief Justice Hughes's opinion in *Coleman* is styled as the "Opinion of the Court" but had the approval of only three Justices.  *See* 307 U.S. at 435.  The opinion is nevertheless "the holding of the Court" because it articulated the "position taken by those Members who concurred in the judgments on the narrowest grounds."  *See Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted).  The four concurring Justices believed that all amendment-related questions were nonjusticiable while the three Justices who signed onto Chief Justice Hughes's opinion went only so far as to hold that the two questions before them were nonjusticiable.  *See Baker*, 369 U.S. at 214 (recognizing the *Coleman* plurality opinion as controlling); *Goldwater v. Carter*, 444 U.S. 996, 1002–03 (1979) (opinion of Rehnquist, J.) (same); *Dyer*, 390 F. Supp. at 1300 (same); *see also* 2020 OLC ERA Opinion at 29–30; 13C Charles Alan Wright et al., *Federal Practice and Procedure* § 3534.1 (3d ed. 2020).

[7] *See also, e.g.*, *Dillon*, 256 U.S. 368 (holding that Congress can set a reasonable time limit on the ratification of an amendment); *Nat'l Prohibition Cases*, 253 U.S. 350 (1920) (holding, *inter alia*, that Congress did not need to deem an amendment "necessary" to propose it and that the two-thirds vote of a quorum of each house was enough to propose an amendment); *Hollingsworth v. Virginia*, 3 U.S. (3 Dall.) 378, 381 n.* (1798) (holding that a President's veto power "applies only to the ordinary cases of legislation: He has nothing to do with the proposition, or adoption, of amendments to the Constitution").

whether the specific amendment-related questions before it are political ones. *See Dyer*, 390 F. Supp. at 1300.

*Coleman* does not control that narrower inquiry into the political nature of a ratification deadline either. Congress attached no deadline to the amendment under review in *Coleman*. 307 U.S. at 452. Embracing dicta in a previous case indicating that Article V implicitly required amendments to be ratified within a "reasonable" time after proposal, the *Coleman* Court declared that courts were unable to decide whether that nebulous requirement was met. *Id.* at 452–56 (citing *Dillon*, 256 U.S. 368). It explained that the host of "political, social and economic" considerations that inhere in such a reasonableness assessment were best left to the political branches. *Id.* at 453–54. But that reasoning has no force here. Congress set deadlines for the ERA and presumably considered those "political, social and economic" factors when it did so. *See id.* at 454 ("Our decision that the Congress has the power under Article V to fix a reasonable limit of time for ratification in proposing an amendment proceeds upon the assumption that the question, what is a reasonable time, lies within the congressional province."). Put simply, there is a difference between deciding whether a proposed amendment with no deadline has expired naturally and judging the effect of a clear deadline that Congress has already set.[8]

---

[8] The *Coleman* decision also depended on a promulgation theory of the amendment process under which Congress has the power, after receiving ratifications from three-fourths of the states on a proposed amendment, to adopt or reject the amendment. *See* 307 U.S. at 454–56. Commentators have widely panned the theory as out of sync with the text of Article V, prior precedent, and historical practice. *See, e.g.*, 2020 OLC ERA Opinion at 29–32; Congressional Pay Amendment, 16 Op. O.L.C. at 99–105; Dellinger, *supra*, at 398–405; Michael Stokes Paulsen, *A General Theory of Article v: The Constitutional Lessons of the Twenty-Seventh Amendment*, 103 Yale L.J. 677, 706–21 (1993); 3 William J. Rich, *Modern Constitutional Law* § 37:25 (3rd ed. 2020). Indeed, Plaintiffs and the Archivist both denounce the theory. *See* Pls.' Opp'n at 12–14; Def.'s Reply at 8. In any case, the *Coleman* opinion indicates that congressional promulgation—insofar as it is consistent with Article V and was actually part of the Court's holding—comes into play only when a proposed amendment has no deadline. *See* 307 U.S. at 454 ("If it be deemed that [the reasonableness] question is an open one when the

Having distinguished *Coleman*, the Court turns to the *Baker* factors to assess whether the effectiveness of the ERA's ratification deadline is a nonjusticiable political question. To begin, there is no "textually demonstrable constitutional commitment of the issue to a coordinate political department." *See Baker*, 369 U.S. at 217. Although Article V articulates a central role for Congress in the amendment process, nowhere does it discuss ratification deadlines or say that Congress should determine the validity of states' ratifications. *See Dyer*, 390 F. Supp. at 1300 ("The text of the Constitution does not expressly direct Congress, rather than the judiciary, to interpret the word 'ratified' as it is used in article V, or to decide whether a particular state has taken action which constitutes ratification of a proposed amendment."); Orfield, *supra*, at 13 (reasoning that Article V's "silen[ce]" on who should determine the procedural validity of amendments suggests that the issue, "like so many other controversies which may arise over the interpretation of the Constitution, is a legal question"). It certainly does not include the kind of specific delegation of authority usually associated with textual commitments that push questions beyond the reach of the judiciary. *Cf. Nixon v. United States*, 506 U.S. 224 (1993) (holding that the question of how to conduct an impeachment trial was nonjusticiable because Article I gave the Senate "sole Power to try all Impeachments"); *cf. also Al-Tamimi*, 916 F.3d at 10 (recognizing, despite numerous constitutional provisions "expressly commit[ting] certain foreign affairs questions to the Executive or the Legislature," that "not every case that involves foreign affairs is a political question"). Furthermore, Article V's careful division of the amendment

---

limit has not been fixed in advance, we think that it should also be regarded as an open one for the consideration of the Congress when, in the presence of certified ratifications by three-fourths of the States, the time arrives for the promulgation of the adoption of the amendment."); *see also* 2020 OLC ERA Opinion at 33 ("The opinion . . . repeatedly made clear that the Court was addressing the case where Congress did not include a deadline when proposing the amendment.").

power between Congress and the states suggests that the Framers did not intend for "either of those two parties to be the final arbiter of the process." *Freeman*, 529 F. Supp. at 1135. "It seems more logical that the courts, as a neutral third party, . . . decide . . . questions raised under article V." *Id.* After all, "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'" *Baker*, 369 U.S. at 210.

The deadline question also does not suffer from a "lack of judicially discoverable and manageable standards." *See id.* at 217. "It is primarily the character of the standards, not merely the difficulty of their application, that differentiates between those which are political and those which are judicial." *Dyer*, 390 F. Supp. at 1302. Political questions revolve around "political, social and economic" judgments. *See Coleman*, 307 U.S. at 453–54; *cf. Rucho v. Common Cause*, 139 S. Ct. 2484, 2500 (2019) (explaining how evaluating "fairness" in the partisan gerrymandering context "poses basic questions that are political, not legal"). Accordingly, the answer to a political question may change if the surrounding circumstances change. *See Dyer*, 390 F. Supp. at 1302 ("A question that might be answered in different ways for different amendments must surely be controlled by political standards rather than standards easily characterized as judicially manageable."); *accord Goldwater v. Carter*, 444 U.S. 996, 1003 (1979) (opinion of Rehnquist, J.).

Interpreting Article V's use of the terms "propose" and "ratification" to determine the effect of a proposed amendment's deadline requires nothing more than applying "familiar principles of constitutional interpretation" to "textual, structural, and historical evidence." *See Zivotofsky I*, 566 U.S. at 201. Though the task may be difficult on account of scarce or even competing evidence, "[t]his is what courts do." *Id.* In fact, the Supreme Court did not shrink

21

JA 331

from addressing a closely related issue in *Dillon v. Gloss*, 256 U.S. 368 (1921). There, a habeas petitioner convicted under a statute passed pursuant to the Eighteenth Amendment argued that the amendment was invalid because it contained a ratification deadline. *Id.* at 370–71. The Court held that Article V permitted Congress to affix ratification deadlines to proposed amendments. *See id.* at 375–76. Recognizing "[t]hat the Constitution contains no express provision on the subject" but "what is reasonably implied is as much a part of [the Constitution] as what is expressed," *id.* at 373, the Court looked to textual, structural, and historical evidence to determine that Congress's power to set a ratification deadline was "incident of its power to designate the mode of ratification," *id.* at 376. There is no reason the deadline question presented here would be any less susceptible to the same modes of analysis. If a court can consider whether Article V permits Congress to set a ratification deadline, it should also be able to consider whether that deadline affects late-coming ratifications.

In addition, the effect of a ratification deadline is not the kind of question that ought to vary from political moment to political moment. The political question doctrine is "a tool for maintenance of governmental order" and "will not be so applied as to promote only disorder." *Baker*, 369 U.S. at 215. Yet leaving the efficacy of ratification deadlines up to the political branches would do just that. "[I]nconsistent interpretations or approaches would create an incurable uncertainty regarding the validity of the acts of the participants, severely crippling the amendment process." *Freeman*, 529 F. Supp. at 1139; *see also* Orfield, *supra*, at 21 ("From the point of view of orderly amending procedure it is doubtful that the doctrine of political question should be extended to other procedural steps. If orderly procedure is essential in the enactment of ordinary statutes, should it not be even more so as to the adoption of important and permanent constitutional amendments?"). Because determining the effect of the ERA's ratification deadline

will not require resort to policy judgments, there is no need to allow such uncertainty.  The terms "propose" and "ratification" "must be interpreted with the kind of consistency that is characteristic of judicial, as opposed to political, decision making."  *See Dyer*, 390 F. Supp. at 1303; *accord Freeman*, 529 F. Supp. at 1139; *see also* 13C Charles Alan Wright et al., *Federal Practice and Procedure* § 3534.1 (3d ed. 2020) (declaring that *Dyer* and *Freeman* "provide convincing support for the conclusion that many of the issues growing out of the amendment process are justiciable").[9]

Finally, none of *Baker*'s four prudential factors demand that the deadline issue be kept from the Court.  Addressing the effect of the ERA's deadline would not entail making a policy determination, so all the Court has to do is interpret the Constitution.  Constitutional

---

[9] Critics of judicial review in the Article V context worry about courts "oversee[ing] the very constitutional process used to reverse [their] decisions."  Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433, 435 (1983) (quoting *Goldwater*, 444 U.S. at 1001 n.2 (Powell, J., concurring)); *see also, e.g.*, Fritz W. Scharp, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L.J. 517, 589 (1966).  While that concern is valid, it is not enough to justify a ban on review of procedural questions like the effectiveness of an amendment's deadline.  For one thing, the Judiciary is trusted with reviewing statutes that are sometimes meant to overturn court decisions—that is part of its constitutional duty "to say what the law is."  *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  Why should the constitutional amendment process be any different?  *See* Paulsen, *supra*, at 717 ("[T]here is no more justification for judicial abdication in [the constitutional] context than in interpreting statutes 'overruling' the Court's prior statutory interpretation cases.").  For another thing, "the adoption of amendments has only rarely been 'the . . . constitutional process used to reverse Supreme Court decisions.'"  Dellinger, *supra*, at 415 (omission in original).  Indeed, "[v]iewed historically, amendments to the Constitution are at least as likely to involve checks upon the power of Congress (as in the Bill of Rights and the 27th Amendment) as to represent efforts to overturn decisions of the Supreme Court (as in the case of the Eleventh Amendment)."  3 Rich, *supra*, § 37:25; *see also* Dellinger, *supra*, at 414–16.  If amendments may affect both institutions' interests and powers, why should just one branch be cut out from the amendment process?  *See* Paulsen, *supra*, at 717 ("If anything, such concerns cut in the opposite direction when an amendment limits Congress' power—suggesting that such issues should be found not to be 'congressional.'").  "In the end, . . . there is simply no escape from the fact that *any* institution entrusted with the responsibility of passing judgment upon amendment procedures might in some instance be perceived to have an institutional interest in the outcome of the process."  Dellinger, *supra*, at 416.

interpretation does not disrespect a coordinate branch of government, even when a court's interpretation does not accord with a political branch's view. *Powell v. McCormack*, 395 U.S. 486, 548–49 (1969); *see also Dyer*, 390 F. Supp. at 1301. Nor does it risk the embarrassment of "multifarious pronouncements by various departments on one question," because "it is the responsibility of [the Judiciary] to act as the ultimate interpreter of the Constitution." *Powell*, 395 U.S. at 549 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). The Court sees only the potential for "apparent inconsistency between a judicial decision and the position of another branch." *Al-Tamimi*, 916 F.3d at 12. But when "the first two *Baker* factors are not present," something "more is required to create a political question." *Id.*; *see also Zivotofsky I*, 566 U.S. at 207 (Sotomayor, J., concurring in part and concurring in the judgment) (describing how it is the "rare" and "exceptional" case when *Baker*'s final three factors "alone render a case nonjusticiable"). The Court will therefore proceed to examine whether the Archivist has a duty to ignore the ERA's deadline and publish the ERA.

### C. Plaintiffs Are Not Entitled to Mandamus Relief

Plaintiffs request mandamus relief to require the Archivist to certify and publish the ERA. Compl. ¶¶ 76–80; Pls.' Opp'n at 5.[10] The Mandamus Act provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "A court may grant mandamus relief only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy

---

[10] Plaintiffs also ask for a declaration that the ERA is "'valid' and 'part of th[e] Constitution.'" Compl. at 17 (alteration in original). Their right to that relief turns on their right to mandamus relief. *See Lovitky*, 949 F.3d at 758 (explaining that "the declaratory judgment statute 'is not an independent source of federal jurisdiction'" and that "the availability of declaratory relief presupposes the existence of a judicially remediable right" (citations omitted)).

available to plaintiff." *Lovitky*, 949 F.3d at 759 (quoting *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010)). The party seeking this "drastic" remedy bears the burden of establishing that the defendant's duty to act "is clear and indisputable." *Id.* at 759–60 (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)). That "does not mean that mandamus actions are ruled out whenever the statute allegedly creating the duty is ambiguous." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). Instead, a court "must interpret the underlying statute" to determine if it imposes the duty the plaintiff says it does. *Id.* The inquiry thus looks like an analysis of the merits, even though the Mandamus Act is jurisdictional. *Lovitky*, 949 F.3d at 759 ("[M]andamus jurisdiction under § 1361 merges with the merits." (quoting *In re Cheney*, 406 F.3d at 729)). Here, the Court needs to discuss only the first two elements of mandamus relief, which it does "concurrently" as courts "often do[]." *See id.* at 760.

According to Plaintiffs, the Archivist has a duty to publish and certify the ERA under 1 U.S.C. § 106b. Recall that the statute requires the Archivist to "cause [an] amendment to be published, with his certificate, specifying . . . that the same has become valid . . . as a part of the Constitution" when "official notice is received . . . that [the] amendment proposed . . . has been adopted[] according to the provisions of the Constitution." *Id.* The ERA will have been "adopted" if it secured proper ratifications from thirty-eight states. To prevail, then, Plaintiffs must show: (1) that their three ratifications count; and (2) that the rescissions of five other states do not. They cannot make the first showing because their ratifications postdate a deadline that Article V authorized Congress to impose. *See Dillon*, 256 U.S. at 375–76 ("Of the power of Congress . . . to fix a definite period for the ratification we entertain no doubt."). The Court focuses on the ERA's original seven-year deadline because if that deadline is effective, then it does not matter whether the extension was too—both deadlines have expired.

Plaintiffs offer two independent reasons why the Archivist must accept their ratifications as valid notwithstanding the seven-year deadline. First, they say that section 106b does not permit the Archivist to inquire into the validity of a state's ratification, so he must certify and publish an amendment whenever three-quarters of the states have claimed to ratify it. *See* Pls.' Opp'n at 18–19. Their position relies heavily on *United States ex rel. Widenmann v. Colby*, 265 F. 998 (D.C. Cir. 1920), which discussed the certification and publication duties. There, the plaintiff sought mandamus requiring the Acting Secretary of State to cancel his certification of the Eighteenth Amendment because the amendment was not validly adopted. *Id.* at 999. The court rejected his request. It looked to section 106b's predecessor statute and explained:

> It will be observed that by this section i[t] was the duty of the Acting Secretary of State, upon receiving official notice from three-fourths of the several states that the proposed amendment had been adopted, to issue his proclamation. He was not required, or authorized, to investigate and determine whether or not the notices stated the truth. To accept them as doing so, if in due form, was his duty. As soon as he had received the notices from 36 of the states that the amendment had been adopted, he was obliged, under the statute, to put forth his proclamation. No discretion was lodged in him. The act required was purely ministerial.

*Id.* (citation omitted). Holding that the Acting Secretary had fulfilled his statutory duties by issuing a certification, the court denied mandamus. *Id.* at 1000.

While at first glance *Colby* seems to support Plaintiffs' position, it is inapplicable. The *Colby* court suggested that the plaintiff there took issue with state ratification proceedings. It observed that there was no dispute the Acting Secretary had "receive[d] official notice from the requisite number of states" and then summarized the plaintiff's challenge as asserting "that the officials of the several states should not have issued the notices." *Id.* at 999. Faced with that contention, the *Colby* court declared that "the Acting Secretary had no authority to examine into that matter, to look behind the notices." *Id.* at 1000. This case presents a different issue. Here,

the Archivist did not "look behind" Plaintiffs' ratification notices to second-guess the proceedings that generated them. He instead determined that the notices—on their face—revealed an obvious and direct contradiction between Plaintiffs' claimed ratifications and a deadline that Congress had imposed pursuant to its Article V "power to designate the mode of ratification." *See Dillon*, 256 U.S. at 376.[11]

Before publishing an amendment, the Archivist may ensure that it complies with Article V's requirements and, consequently, any time limit that Congress put on the ratification process. Section 106b provides that the Archivist "shall" publish and certify an amendment only when the amendment "has been adopted[] *according to the provisions of the Constitution*." 1 U.S.C. § 106b (emphasis added). Surely implied in that language is the Archivist's authority to determine whether a proposed amendment has in fact been adopted according to Article V's procedures before he publishes it. *See* Congressional Pay Amendment, 16 Op. O.L.C. at 98–99. The ministerial nature of the Archivist's obligations does not mean that he must rubberstamp any ratification he receives but rather that, once he has determined that a proposed amendment has met Article V's requirements, he must publish it. *See id.* at 98 ("The Archivist may not refuse to certify a *valid* amendment." (emphasis added)); *cf. Dahl v. Dickson*, No. 19-cv-3267, 2020 WL 6887925, at *5 (D.D.C. Nov. 24, 2020) (explaining that a duty may be ministerial "if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required" (quoting *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988))). A contrary result would be absurd. On Plaintiffs' reading, for

---

[11] For the same reason, *Leser v. Garnett*, 258 U.S. 130 (1922), does not apply. *Leser* held that a state's notice of ratification can sometimes be "conclusive" on the Archivist. *See id.* at 137. But the claim at issue there was that two states' ratifications were invalid because they violated state legislative procedure rules—not Article V's requirements. *Id.*

example, the Archivist would have to accept a state's ratification by convention even if Congress had called for ratification by legislature.  Section 106b cannot possibly require the Archivist to publish and certify a proposed amendment that so clearly violates a condition of Article V.

A congressionally imposed ratification deadline is no different.  As mentioned earlier, the Supreme Court held in *Dillon* that Congress can attach a deadline to a proposed amendment "as an incident of its power to designate the mode of ratification."  256 U.S. at 376.  That means that Congress's power to set a ratification deadline comes directly from Article V.  *See* U.S. Const. art. V (providing for ratification by state legislatures or conventions "as the one or the other Mode of Ratification may be proposed by the Congress"); *see also United States v. Sprague*, 282 U.S. 716, 730 (1931) ("The choice . . . of the mode of ratification, lies in the sole discretion of Congress.").  The Archivist's assessment of whether a proposed amendment "has been adopted[] according to the provisions of the Constitution," 1 U.S.C. § 106b, should therefore include confirmation that the states ratified the amendment in accordance with any properly imposed ratification deadline.  Because Congress derives its power to set a ratification deadline from Article V, it would be just as absurd for the Archivist to ignore such a deadline as it would be for him to ignore a violation of one of the conditions stated expressly in Article V.  Contrary to Plaintiffs' contention, the Archivist does not have to accept their ratifications as valid merely because they told him to.

Plaintiffs' second reason for requiring the Archivist to publish the ERA despite its ratification deadline is that the deadline is not actually part of the proposed amendment.  *See* Pls.' Opp'n at 19–26.  The argument rests on a distinction between the preamble to the joint resolution proposing the ERA and the text of the proposed amendment itself.  The ERA's original deadline is in the former, not the latter.  *See* H.R.J. Res. 208, 86 Stat. 1523.  Whether the

distinction matters is a question of first impression.  Given that the deadline-setting power is implied in Article V to begin with, *see Dillon*, 256 U.S. at 375–76, the Constitution's text provides no guidance.  The Supreme Court has not spoken directly on the issue either.  Mindful that "the longstanding 'practice of the government' can inform our determination of 'what the law is,'" the Court looks to history.  *See NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (first quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819); and then quoting *Marbury*, 5 U.S. (1 Cranch) at 177).  It finds that Congress has routinely put ratification conditions in the preambles of proposing resolutions since the Founding.  And that practice is consistent with what few hints the Supreme Court has provided on the subject as well as the common understanding that Congress's ratification conditions have had meaning even when placed in introductory language.  Consequently, the Court holds that the ERA's ratification deadline is effective despite its location outside the text of the proposed amendment.

There is a long history of Congress placing ratification conditions in its proposing resolutions' prefatory language.  In the introduction to the joint resolution proposing the first constitutional amendments (ten of which became the Bill of Rights and another of which later became the Twenty-Seventh Amendment), the First Congress declared:

> the following articles be proposed to the legislatures of the several states, as amendments to the constitution of the United States, all or any of which articles, *when ratified by three fourths of the said legislatures*, to be valid to all intents and purposes, as part of the said Constitution . . . .

J. Res., 1st Cong., 1 Stat. 97 (1789) (emphasis added).  With that, Congress began the practice of dictating an amendment's "Mode of Ratification" through language in the proposing resolution's prefatory clause.  It has maintained that practice for every amendment proposed since.  *See* 2020 OLC ERA Opinion at 15 n.15 (collecting proposing resolutions).  And states have always followed Congress's direction without question—even the one time Congress called for

ratification by convention. *See generally* Everett S. Brown, *The Ratification of the Twenty-First Amendment*, 29 Am. Pol. Sci. Rev. 1005 (1935) (providing a detailed overview of the states' approaches to ratification conventions for the Twenty-First Amendment). This longstanding practice is significant because, as stated, Congress's power to fix a ratification deadline is "incident of its power to designate the mode of ratification." *Dillon*, 256 U.S. at 376. If Congress can dictate the mode of ratification in the prefatory language accompanying a proposed amendment, then it should be able to dictate a ratification deadline in the same fashion.

Congress has shown it believes that it can do just that. Congress began to set ratification deadlines with the Eighteenth Amendment in 1917 and, with the exception of the Nineteenth Amendment, has included a deadline in every proposed amendment since. 2020 OLC ERA Opinion at 15 (collecting proposing resolutions). It put the deadline for the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments in the texts of the proposed amendments. *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2. But beginning in 1960 with the proposal of the Twenty-Third Amendment, Congress started to put deadlines in proposing resolutions' introductory clauses.[12] The reason was simple: Congress wanted to stop "cluttering up" the Constitution with provisions that were useless immediately upon ratification.

---

[12] *See* S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960) (Twenty-Third Amendment); S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); S.J. Res. 1, 89th Cong., 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) (Twenty-Sixth Amendment); H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) (ERA); H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment). Notably, the proposing resolution for the D.C. Congressional Representation Amendment included a deadline in both the preamble and the text of the proposed amendment. *See* H.R.J. Res. 554, 92 Stat. 3795. Though debates on that amendment "did not show any significant acknowledgement of the fact" that the limit was in both places, the House Report stated: "The effect of placing this time limit in the text of the amendment prohibits subsequent Congresses from deciding to extend the period of time allowed for ratification." Witter, *supra*, at 214–15 (quoting H.R. Rep. No. 95-886, at 7 (1978)).

*E.g.*, 2020 OLC ERA Opinion at 20–21; Dellinger, *supra*, at 408; Ginsburg, *supra*, at 923.  It did

not expect that changing the location of a deadline would affect the deadline's effectiveness.  *See*

2020 OLC ERA Opinion at 21 ("[W]e have found no indication that Members of Congress (or

any court) seriously questioned the binding nature of a deadline stated in a resolution's proposing

clause rather than the text of its proposed amendment."); *see also* Grover Rees III, *Throwing*

*Away the Key: The Unconstitutionality of the Equal Rights Amendment Extension*, 58 Texas L.

Rev. 875, 917–19 (1980) (describing the legislative history behind Congress's decision to

transfer the deadline for the Twenty-Third Amendment from its text to prefatory language in the

proposing resolution).  While Congress has not included deadlines in proposed amendments'

introductions for as long as it has put the mode of ratification there, the practice has still persisted

for over sixty years.  The Court affords that practice due weight.  *See Noel Canning*, 573 U.S. at

525 ("[T]his Court has treated practice as an important interpretive factor even when the nature

or longevity of that practice is subject to dispute, and even when that practice began after the

founding era."); *cf. Dames & Moore v. Regan*, 453 U.S. 654, 684 (1981) ("[E]ven if the pre-1952

cases should be disregarded, congressional acquiescence in settlement agreements since that time

supports the President's power to act here.").

     Two clues from the Supreme Court corroborate the idea that ratification deadlines located

in proposing resolutions' preambles are as effective as those found in the proposed amendments

themselves.  First, the *Coleman* Court suggested that it did not matter where Congress put a

ratification deadline when, in distinguishing the amendment at issue there from the amendment

at issue in *Dillon*, it observed: "No limitation of time for ratification is provided in the instant

case either in the proposed amendment *or in the resolution of submission*."  307 U.S. at 452

(emphasis added); *see also* 2020 OLC ERA Opinion at 12, 19.

Second, the Supreme Court's vacatur of the decision in *Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981), appeared to tacitly acknowledge that the ERA's ratification deadline was effective. The *Freeman* court held, among other things, that a state could withdraw a prior ratification before an amendment reached the three-fourths threshold, *id.* at 1150, and that Congress could not extend the ERA's ratification deadline, *id.* at 1153. After the Supreme Court granted review but before it heard argument, the ERA's extended deadline elapsed. 2020 OLC Opinion at 23. "At that point, the Acting Solicitor General urged the Court to dismiss the case as moot because 'the Amendment has failed of adoption no matter what the resolution of the legal issues presented.'" *Id.* (quoting Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (U.S. July 9, 1982)). The Court agreed to dismiss the case. Citing the Acting Solicitor General's filing, it held that the case was moot and vacated the lower court's decision. *Nat'l Org. for Women*, 459 U.S. 809. To reach that conclusion, the Court must have assumed that the ERA's deadline barred further ratifications— as the respondents warned a mootness ruling would imply. *See* 2020 OLC Opinion at 24 ("Even an unexplained ruling that this case is moot would necessarily signal implicit acceptance of [the Acting Solicitor General's] position . . . ." (alteration in original) (quoting Resp. of Nat'l Org. for Women, Inc., et al., to Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (July 23, 1982))). If the deadline was ineffective, a live controversy would have remained because additional states' ratifications could have still pushed the ERA past the three-fourths threshold.

The point of recounting these clues is not to say that the Supreme Court has weighed in on the validity of ratification deadlines in a proposing resolution's preamble. Of course not. To call the first one "dictum" would be generous. And the second one is based on a summary

disposition that employed a doctrine "specifically aimed at preventing a decision subsequently mooted 'from spawning any legal consequences.'" *See Am. Fed'n of Gov't Emps. Nat'l Council, 118-ICE v. Fed. Labor Rels. Auth.*, 926 F.3d 814, 819 n.3 (D.C. Cir. 2019) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41 (1950)). Nevertheless, both clues are helpful because what they suggest accords with longstanding congressional practice: it makes no difference if a ratification deadline is in the prefatory text of a resolution proposing an amendment or in the amendment itself—either way, the deadline is valid.

Accepting that the location of a deadline is immaterial does not evade Article V's procedural requirements in any meaningful way. Congress considers the full proposing resolution alongside the proposed amendment's text, so the resolution's prefatory language still receives the assent of two-thirds of both houses of Congress. *See* 2020 OLC ERA Opinion at 14–15. In fact, Congress has debated proposing resolutions' preambles just as it has debated the text of proposed amendments since the Founding. *See id.* (discussing debate over a clause preceding the first twelve proposed amendments, which permitted the states to ratify "all or any" of those proposals, J. Res. 1, 1 Stat. at 97 (citing 4 *Documentary History of the First Federal Congress of the United States of America* 35–45 (Charlene Bangs Bickford & Helen E. Veit eds., 1986))). The Congress that proposed the ERA continued that tradition. Inclusion of a deadline was a compromise that helped Congress successfully propose the ERA where previous attempts to pass a proposal had failed. *See* 2020 OLC ERA Opinion at 4–6; Rees, *supra*, at 915–19; Witter, *supra*, at 215–17. There is likewise little doubt that the states were aware of the ERA's deadline. Twenty-five of the thirty-five states that ratified the ERA by 1977 voted on an instrument of ratification that quoted Congress's joint resolution in its entirety. *Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. on the Constitution of*

*the S. Comm. on the Judiciary*, 95th Cong. 739 (1979).  Five other states voted on instruments that did not quote the entire resolution but nonetheless referenced its seven-year deadline.  *Id.* at 739–40.  And two of the remaining five states that did not mention the ERA's deadline in their instruments of ratification cited to Congress's joint resolution.  *See id.* at 748, 751.  Given the debate over the deadline in Congress, the presence of the deadline in the proposing resolution, and the extensive media coverage of the ERA at the time,[13] the Court cannot believe that the deadline took anyone by surprise.  *See* 2020 OLC ERA Opinion at 23; Rees, *supra*, at 914–15.

Finally, Plaintiffs cite three cases for the general principle that prefatory language cannot affect the scope of operative language.  *See* Pls.' Opp'n at 25 n.22.  *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174 (1889), applied the principle to a statute's preamble.  *Id.* at 188.  *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), applied the principle to the Constitution's preamble.  *Id.* at 22.  And *District of Columbia v. Heller*, 554 U.S. 570 (2008), applied the principle to the prefatory clause in the Second Amendment.  *Id.* at 578–79 & n.3; *see also* U.S. Const. amend. II ("*A well regulated Militia, being necessary to the security of a free State*, the right of the people to keep and bear Arms, shall not be infringed." (emphasis added to prefatory clause)).

True as it generally is, the principle does not control here.  The process governing "the proposition, or adoption, of amendments to the Constitution" is different from that governing "ordinary cases of legislation."  *Hollingsworth*, 3 U.S. (3 Dall.) at 381 n.*.  And even though

---

[13] *See, e.g.*, Eileen Shanahan, *Equal Rights Amendment Is Approved by Congress*, N.Y. Times, Mar. 23, 1972, at 1 ("The amendment itself permits seven years to elapse before it dies, if unratified."); Judy Rollins, *Equal Rights Amendment—Pass or Not to Pass*, Salt Lake Trib., Jan. 14, 1973, at 77 ("The ERA will become law when passed by three-fourths of the state legislatures . . . within seven years of March, 1972."); Paul G. Edwards, *Senate Gives ERA Chance In Virginia*, Wash. Post, Jan. 25, 1977, at C1 ("Only three more states must ratify the amendment, which would ban discrimination based on sex, before March 22, 1979, to make it a part of the U.S. Constitution.").

34

*Jacobson* and *Heller* both dealt with text in the Constitution, the prefatory language at issue in those cases differs markedly from the ratification conditions that Congress puts in the introductions of proposing resolutions.  As the Supreme Court explained, the preamble to the Constitution and the prefatory clause in the Second Amendment are statements of general purpose.  *See Jacobson*, 197 U.S. at 22 ("Although that preamble indicates the general purposes for which the people ordained and established the Constitution, it has never been regarded as the source of any substantive power conferred on the government of the United States . . . ."); *Heller*, 554 U.S. at 577 (explaining that the Second Amendment's prefatory clause "announces a purpose").  They do not lay out discernable rules or standards that one would expect to have substantive effect.  By contrast, the ratification conditions that Congress has included in proposing resolutions' introductions—determining the "Mode of Ratification" or setting a deadline—draw unmistakable lines for states to follow and for the public to rely on.  There is no doubt that Congress intended them to be binding.  And few have questioned that they are.  The Court will not pull the rug out from under Congress's long-accepted practice of declaring ratification conditions in a proposing resolution's preamble based on a technicality.  *Cf. Sprague*, 282 U.S. at 731 ("The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition."); *McCulloch*, 17 U.S. (4 Wheat.) at 407 ("[W]e must never forget that it is a *constitution* we are expounding.").  It holds that the ERA's deadline barred Plaintiffs' late-coming ratifications.

*     *     *

To summarize, the Archivist has no duty to publish and certify the ERA. Section 106b permits him to consider whether a state's ratification complies with a congressionally imposed ratification deadline. And a ratification deadline in a proposing resolution's introduction is just as effective as one in the text of a proposed amendment. Plaintiffs' ratifications came after both the original and extended deadlines that Congress attached to the ERA, so the Archivist is not bound to record them as valid. Accordingly, Plaintiffs' request for mandamus is denied.

Equally significant as the Court's holding is what it does not hold. In light of its decision on the deadline issue, the Court does not reach the question of whether states can validly rescind prior ratifications. Nor does the Court make any statement on whether Congress's extension of the ERA deadline was constitutional. It does not need to. If the extension was unconstitutional, then the original deadline bars ratification; if the extension was constitutional, then the extended deadline has passed too. Congress has not tried to revive the ERA despite both deadlines' expirations, so the Court is not confronted with that difficult issue either. And because the Court holds that the ERA's deadline is effective, it does not need to discuss Intervenors' argument that the Constitution imposes an implicit reasonableness-based time limit on proposed amendments that would apply absent a deadline. *See* Intervenors' Mot. at 16–23; Intervenors' Reply at 5–9. Lastly, the Court does not express an opinion on the merits of the ERA as a matter of policy. It merely enforces a procedural time limit that Congress set when proposing the amendment.

## V. CONCLUSION

For the foregoing reasons, the Archivist's motion to dismiss (ECF No. 29) is **GRANTED**; Intervenors' motion for summary judgment construed as a motion to dismiss (ECF No. 74) is **GRANTED**; and Plaintiffs' motion for summary judgment (ECF No. 100) is **DENIED**. In addition, Intervenors' unopposed motion to consolidate hearings (ECF No. 88) is

**DENIED**; the Archivist's motion to stay summary-judgment briefing (ECF No. 104) is

**DENIED**; and amici's motions for leave to file amicus briefs (ECF Nos. 31, 40, 44, 48, 51, 61,

66, 68, 73, 90, 91, 94, 96, 108) are **GRANTED**.  An order consistent with this Memorandum

Opinion is separately and contemporaneously issued.


Dated: March 5, 2021                                    RUDOLPH CONTRERAS
                                                        United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA,  ) ) | |
| ) | |
| Plaintiffs,  ) | |
| ) | |
| v.  ) | Case No. 1:20-cv-00242 |
| ) | |
| DAVID S. FERRIERO, in his official capacity as Archivist of the United States,  ) ) | |
| ) | |
| Defendant,  ) | |
| and  ) | |
| ) | |
| ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, and TENNESSEE,  ) ) | |
| ) | |
| Intervenor-Defendants.  ) | |

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Plaintiffs the Commonwealth of Virginia, the State of

Illinois, and the State of Nevada appeal to the United States Court of Appeals for the District of

Columbia Circuit from this Court's Order (ECF No. 116) and Memorandum Opinion (ECF No.

117), both dated March 5, 2021, granting Defendant's motion to dismiss and Intervenor-

Defendants' motion for summary judgment construed as a motion to dismiss.


Dated: May 3, 2021                     Respectfully submitted,


                                       COMMONWEALTH OF VIRGINIA, STATE OF
                                       ILLINOIS, and STATE OF NEVADA


JA 348

KWAME RAOUL
Attorney General of Illinois

By:   */s/ Kathryn Hunt Muse*
KATHRYN HUNT MUSE
CHRISTOPHER WELLS
ELIZABETH ROBERSON-YOUNG
Office of the Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3000 – Telephone
(312) 814-5024 – Facsimile
Kathryn.Muse@illinois.gov
Elizabeth.Roberson-Young@illinois.gov
Christopher.Wells@illinois.gov

*Attorneys for Plaintiff*
*State of Illinois*


AARON D. FORD
Attorney General of Nevada

By:   */s/ Heidi Parry Stern*
HEIDI PARRY STERN
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

*Attorneys for Plaintiff*
*State of Nevada*

MARK R. HERRING
Attorney General of Virginia

By:   */s/ Michelle S. Kallen*
MICHELLE S. KALLEN [1030497]
TOBY J. HEYTENS [490314]
JESSICA MERRY SAMUELS [1552258]
KENDALL T. BURCHARD
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile
mkallen@oag.state.va.us

*Attorneys for Plaintiff*
*Commonwealth of Virginia*

JA 349

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 5.4(d), I hereby certify that on May 3, 2021, I filed this notice electronically through the Court's CM/ECF system, which will effect service on all counsel who have appeared.

*/s/ Michelle S. Kallen*
Michelle S. Kallen

*Counsel for Plaintiff*
*Commonwealth of Virginia*