ORAL ARGUMENT NOT YET SCHEDULED
Case No. 21-5096

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 ℭ𝔬𝔩𝔲𝔪𝔟𝔦𝔞

COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and STATE OF NEVADA,

*Plaintiffs-Appellants*,

v.

DAVID FERRIERO, in his official capacity as Archivist of the United States,

*Defendant-Appellee*,

STATE OF ALABAMA, STATE OF LOUISIANA, STATE OF NEBRASKA, STATE OF SOUTH DAKOTA, and STATE OF TENNESSEE,

*Intervenors for Defendant-Appellee.*

On Appeal from the United States District Court for the District of Columbia
No. 20-cv-00242-RC

**BRIEF FOR STATES OF NEW YORK, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW JERSEY, NEW MEXICO, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN; GOVERNOR OF KANSAS; AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS**

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
SARAH L. ROSENBLUTH
  *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
  *Attorney General of the*
  *State of New York*
The Capitol
Albany, New York 12224
(518) 776-2025

Dated: January 10, 2022

(*Counsel listing continues on signature pages.*)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

**A. Parties and Amici.** All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Plaintiffs-Appellants.

**B. Rulings Under Review.** References to the ruling at issue appear in the Brief for Plaintiffs-Appellants.

**C. Related Cases.** To amici's knowledge, there are no related cases.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

GLOSSARY OF ABBREVIATIONS ..........................................................ix

INTEREST OF AMICI CURIAE ...............................................................1

SUMMARY OF ARGUMENT ....................................................................1

ARGUMENT ......................................................................................3

POINT I        ...........................................................................3

    PLAINTIFFS HAVE STANDING ....................................................3

POINT II       ...........................................................................6

    CONGRESS LACKED AUTHORITY TO IMPOSE A RATIFICATION
DEADLINE IN ITS JOINT RESOLUTION PROPOSING THE ERA ...................6

    A.  The Deadline Is Not Authorized by Article V's Text. ...............7

    B.  The Deadline Undermines the Framers' Deliberate
Choice of an Amendment Process Without Time
Constraints. ....................................................................8

    C.  The Deadline Disrupts Article V's Careful Balancing. ..........13

    D.  The Deadline Undermines the Original States'
Understanding of Article V When They Ratified the
Constitution. ..................................................................17

    E.  The Deadline Is Inconsistent with Congressional
Practice from the Founding Until 1960. .................................22

    F.  *Dillon v. Gloss* Does Not Control. ...................................25

POINT III ........................................................................28

PURPORTED RESCISSIONS OF ERA RATIFICATIONS ARE
INEFFECTIVE...................................................................28

CONCLUSION .....................................................................34

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Coleman v. Miller*
   307 U.S. 433 (1939) ................................................................ 6, 32

*Davenport v. Little-Bowser,*
   269 Va. 546 (2005) ...................................................................... 5

*Dillon v. Gloss,*
   256 U.S. 368 (1921) .................................................................... 25

*Dyer v. Blair,*
   390 F. Supp. 1291 (N.D. Ill. 1975) ............................................ 14

*Hawke v. Smith*,
   253 U.S. 221 (1920) ............................................. 8, 15, 16, 17

*Leser v. Garnett*,
   258 U.S. 130 (1922) .................................................................... 32

*Martinez v. County of Monroe,*
   50 A.D.3d 189 (N.Y. App. Div. 2008) ......................................... 5

*United States v. Sprague,*
   282 U.S. 716 (1931) ............................................................... 7, 29

## United States Constitution

Articles
   V ................................................................................. 7, 11, 13

Amendments
   XVIII ........................................................................................ 25
   XX ............................................................................................. 23
   XXI ........................................................................................... 23
   XXII ......................................................................................... 23

| Federal Statutes | Pages(s) |
|---|---|

1 U.S.C. § 106b ........................................................ 26

1 Stat. 97 (1789) ....................................................... 22

1 Stat. 402 (1794) ..................................................... 22

2 Stat. 306 (1803) ..................................................... 22

2 Stat. 613 (1810) ..................................................... 22

12 Stat. 251 (1861) ................................................... 22

13 Stat. 567 (1865) ................................................... 22

14 Stat. 358 (1866) ................................................... 22

15 Stat. 346 (1869) ................................................... 22

15 Stat. 709 (1868) ................................................... 32

16 Stat. 1131 (1870) ................................................. 32

36 Stat. 184 (1909) ................................................... 23

37 Stat. 646 (1912) ................................................... 23

40 Stat. 1050 (1917) ............................................ 23, 26

41 Stat. 362 (1919) ................................................... 23

43 Stat. 670 (1924) ................................................... 23

47 Stat. 745 (1932) ............................................. 23, 26

48 Stat. 1749 (1933) ............................................ 23, 26

**Federal Statutes**                                                                   **Pages(s)**

61 Stat. 959 (1947) .................................................................23, 26

74 Stat. 1057 (1960)....................................................................23

76 Stat. 1259 (1962)....................................................................24

79 Stat. 1327 (1965)....................................................................24

85 Stat. 829 (1971)......................................................................24

86 Stat. 1523 (1972).................................................................8, 24

**State Constitutions**

Delaware Constitution of 1776
    art. 30 ...............................................................................9, 11

Georgia Constitution of 1777
    art. LXIII ..........................................................................9, 11

Maryland Constitution of 1776
    LIX ....................................................................................9, 10

Massachusetts Constitution of 1780
    pt. 2, ch. 6, art. X.............................................................9, 10

New Hampshire Constitution of 1784
    pt. 2 ..................................................................................9, 10

Pennsylvania Constitution of 1776
    § 47 ...................................................................................9, 10

South Carolina Constitution of 1778
    XLIV .................................................................................9, 10

Vermont Constitution of 1786
    ch. 2, XL...............................................................................10

**State Constitutions**           **Page(s)**

Vermont Constitution of 1777
    ch. 2, XLIV ............................................................................. 9, 10

**Congressional Documents**

65 Cong. Rec. 4492 (1924) ...................................................... 33

66 Cong. Rec. 2159 (1925) ...................................................... 33

75 Cong. Rec. 3856 (1932) ...................................................... 24

101 Cong. Rec. 6628 (1955) .................................................... 24

H. J. Res. 68, 68th Cong., 2d Sess., 66 Cong. Rec. 2152 (1925) ............. 12

H. J. Res. 69, 67th Cong., 1st Sess., 61 Cong. Rec. 575 (1921) ............... 12

H. J. Res. 638 (1978) ............................................................. 27

S. 3, 96th Cong., 1st Sess. (1979) ............................................. 33

S. 215, 92d Cong., 1st Sess. (1971) ........................................... 33

S. 623, 91st Cong., 1st Sess. (1969) .......................................... 33

S. 1272, 93d Cong., 1st Sess. (1973) ......................................... 33

S. 1710, 96th Cong., 1st Sess. (1979) ........................................ 33

S. 2307, 90th Cong., 1st Sess. (1967) ........................................ 33

S. J. Res. 4, 68th Cong., 1st Sess., 65 Cong. Rec. 4488 (1924) ............. 12

**Scholarly Publications**

Akhil Amar, America's Constitution (2006) ............................ 26

## Scholarly Publications                                    Page(s)

Charles Burdick, The Law of the American Constitution
(1922) ........................................................................ 30, 33

David Watson, The Constitution of the United States (1910) .......... 29, 30

Fasteau & Fasteau, May a State Legislature Rescind Its
Ratification of a Pending Constitutional Amendment?,
1 Harv. Women's L.J. 27 (1978) ........................................ 31

Greg Abbott, The Myths and Realities of Article V,
21 Tex. Rev. L. & Pol. (2016) ........................................ 19, 22

John Jameson, A Treatise on Constitutional Conventions
(4th ed., 1887) ........................................................ 30

Joseph Story, Commentaries on the Constitution of the
United States (1833) .................................................. 18

Judith Elder, Article V, Justiciability, and the Equal Rights
Amendment, 31 Okla. L. Rev. 63 (1978) ................................ 31

Kanowitz & Klinger, Can a State Rescind Its Equal Rights
Amendment Ratification, 28 Hastings L.J. 979 (1977) ................... 31

Lester Orfield, The Amending of the Federal
Constitution (1942) ................................................. 9, 30

Pauline Maier, Ratification (2010) .................................. 18, 29

Ralph Martig, Amending the Constitution,
35 Mich. L. Rev. 1253 (1937) ........................................ 9, 12

Ruth Bader Ginsburg, Ratification of the Equal Rights
Amendment, 57 Tex. L. Rev. 919 (1979) ............................... 34

The Documentary History of the Ratification of the Constitution
(Jensen & Kaminski eds.) ................................. 19, 20, 21, 30

The Records of the Federal Convention of 1787 (Max Farrand
ed., 1937) ........................................................ 14, 15

## Scholarly Publications                                          Page(s)

Walter Dellinger, The Legitimacy of Constitutional Change,
97 Harv. L. Rev. 386 (1983) .................................................... 16, 27, 31

William Heckman, Ratification of a Constitutional
Amendment, 6 Conn. L. Rev. 28 (1973) ............................... 31

Yvonne Burke, Validity of Attempts to Rescind Ratification
of the Equal Rights Amendment, 8 U.W.L.A. L. Rev. 1
(1976) ...................................................................................... 31

## Other Authorities

Articles of Confederation of 1781
art. XIII................................................................................. 15

Memorandum for Robert Lipshutz, Counsel to the President,
from John Harmon, Assistant Attorney General, Office of
Legal Counsel (June 27, 1978), reprinted in Equal Rights
Amendment Extension: Hearings on S.J. Res. 134 Before the
Subcomm. on the Constitution of the Senate Comm. on the
Judiciary, 95th Cong., 2d Sess., 80-99 (1978) ................................... 31

The Federalist No. 39 (Madison) ............................................. 13

The Federalist No. 43 (Madison) ......................................... 15, 16

The Federalist No. 85 (Hamilton)............................................. 21

# GLOSSARY OF ABBREVIATIONS

ERA    Equal Rights Amendment

## INTEREST OF AMICI CURIAE

Amici are the States of New York, Colorado, Connecticut, Delaware, Hawai'i, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, plus the Governor of Kansas and the District of Columbia.

Amici have two distinct interests in this litigation. First, the amici States have a strong interest in vindicating their role as sovereign participants in the constitutional amendment process—a role undermined by the Archivist's refusal to certify the Equal Rights Amendment ("ERA") as a valid amendment to the United States Constitution. Second, all amici here strive to guarantee their residents the highest protection from sex discrimination, both when they interact with the federal government and when they travel to other States. Amici thus have an important stake in ensuring that the ERA's nationwide guarantee of equality takes its rightful place in the Constitution.

## SUMMARY OF ARGUMENT

The district court correctly concluded that the validity of the ERA's ratification deadline does not present a political question. The court

erred, however, in holding that plaintiffs lack standing and that they are not entitled to mandamus relief. Amici write to address those two points.

*First*, plaintiffs have standing to seek relief directing the Archivist to publish and certify the ERA as a constitutional amendment. The Archivist's refusal to do so reflects a determination that the ERA, and thus States' ratifying votes, are invalid. Withholding official recognition of the validity of the ERA prevents realization of its benefits, nullifies States' legislative achievements, and undercuts States' constitutional role as equal partners in the amendment process. The relief sought here would redress each of these injuries.

*Second*, on the merits, the requisite thirty-eight States have properly ratified the ERA. The ratifications are valid notwithstanding the supposed seven-year deadline set by Congress. While Congress may have the authority to impose a deadline in the text of a proposed amendment, Congress cannot diminish the States' ratification power by imposing a deadline in a resolution proposing an amendment. Congress's attempt to impose such an external constraint is inconsistent with the original understanding of Article V: both the Framers and the States that originally ratified the Constitution understood Article V to confer on the

States a plenary ratification power with which the federal government could not interfere.

Further, the purported rescissions by six States are ineffective because Article V does not permit States to withdraw ratifications once duly submitted. The text and history of Article V establish that the States' power to ratify an amendment is just that—the power to ratify. Further, there is a longstanding consensus dating back to the Founding that ratifications are final and irrevocable. That consensus was critical not only to the ratification of the Constitution itself, when the States rejected the possibility of conditional ratification of the Constitution, but also to the ratification of the Fourteenth Amendment, whose adoption turned on the rejection of two States' rescission attempts. Any other rule would undermine the finality of the ratification process as the Framers envisioned it.

## ARGUMENT
### POINT I
#### PLAINTIFFS HAVE STANDING

The district court held that plaintiffs lack standing because, in its view, the relief sought—the Archivist's publication and certification of

the ERA as a constitutional amendment—would avail the ratifying States of nothing. (App.323.) That view is mistaken.

The district court assumed that publication by the Archivist does not affect the amendment's validity, and therefore held that the refusal to publish the amendment did not injure the plaintiffs. (App.323.) But the fact that publication does not itself give an amendment legal effect does not mean that the failure to publish has no impact. As the district court itself recognized, the Archivist's publication of an amendment subsumes a determination that the amendment "has in fact been adopted according to Article V's procedures." (App.337.) The Archivist's refusal to publish the ERA similarly reflects a determination that the ratifying States' legislative acts are invalid. Indeed, the very purpose of the Archivist's refusal to publish the ERA was to delegitimize the amendment by withholding the federal government's official imprimatur, in accordance with the advice of the Office of Legal Counsel. (*See* ECF No. 29-1 at 26.)

To say, as the district court did, that recognition by the Archivist of the ERA's validity through publication would avail the ratifying States of nothing (App.323) is similar to saying that one jurisdiction's

4

recognition of a same-sex marriage lawfully performed in another jurisdiction avails the couple of nothing. But litigation about marriage *recognition*—before States were required to *authorize* same-sex marriage—established the opposite. Tangible and intangible benefits flowed from official recognition of same-sex marriages performed elsewhere, and the withholding of that recognition resulted in concrete injuries that were judicially redressed. For example, in *Martinez v. County of Monroe*, 50 A.D.3d 189, 194 (N.Y. App. Div. 2008), a New York court declared that the plaintiff's Canadian same-sex marriage "was entitled to recognition in New York State," and thereby cleared the way for the provision of spousal healthcare benefits by plaintiff's employer.

Same-sex adoptions have implicated similar recognition concerns. In *Davenport v. Little-Bowser*, 269 Va. 546 (2005), Virginia's high court granted mandamus relief to out-of-state same-sex parents who had validly adopted children born in Virginia; the court held that the Virginia registrar was required to recognize those parental relationships and revise the birth certificates accordingly. By requiring the registrar to recognize the validity of legal actions undertaken elsewhere, the court cleared the way for the realization of attendant benefits.

By declining to recognize the ERA, the Archivist does not directly withhold benefits that should flow from it; he does, however, signal to other government actors—federal and state—that they are free to reject the validity of the ERA and its attendant benefits. As in *Martinez* and *Davenport*, mandamus relief here would clear the way for realizing those benefits.

Withholding recognition of the ERA's validity also injures the ratifying States, whose votes have been ignored. Just as the plaintiff senators in *Coleman v. Miller,* 307 U.S. 433, 438 (1939), had a "plain, direct and adequate interest in maintaining the effectiveness of their votes," amici States have that same interest in maintaining the effectiveness of their ratification votes. Ignoring those ratification votes undercuts States' constitutionally mandated role as an equal partner in the amendment process. *See* Point II.C, *infra*. These are all concrete, redressable injuries.

## POINT II

### CONGRESS LACKED AUTHORITY TO IMPOSE A RATIFICATION DEADLINE IN ITS JOINT RESOLUTION PROPOSING THE ERA

The district court erroneously held that Congress could impose a ratification deadline on the States in its joint resolution proposing the

6

ERA. While Congress's Article V authority to "propose amendments" may permit inclusion of effective-date language in the text of an amendment, it does not authorize the enactment of separate provisions imposing temporal conditions on the ratification process. Because the ERA's deadline is set forth in a separate provision—the joint resolution—it is unauthorized by the text of Article V and is also inconsistent with the original understanding of Article V, as reflected in its structure, its history, and congressional practice for the first two centuries of our nation's history.

### A.    The Deadline Is Not Authorized by Article V's Text.

Article V sets forth a simple procedure for the Constitution's amendment, in language that "is clear in statement and in meaning, contains no ambiguity, and calls for no resort to rules of construction." *United States v. Sprague*, 282 U.S. 716, 730 (1931). It provides that a proposed amendment "shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states." U.S. Const., art. V. Article V thus unambiguously defines "when" a proposed amendment becomes part of the Constitution: "when ratified." This open-ended temporal language imposes no deadline

on the state ratification process.

In the resolution proposing the ERA, Congress quoted verbatim from Article V, but then added the clause "within seven years from the date of its submission by the Congress." 86 Stat. 1523 (1972). Congress thus imposed a restriction that is unauthorized by constitutional text. Under the circumstances presented here—when ratification does *not* occur within seven years—the language in Article V is satisfied, while the temporal condition added by Congress is not. Congress thus improperly altered the method fixed by the Constitution. *Hawke v. Smith*, 253 U.S. 221, 227 (1920).

### B.   The Deadline Undermines the Framers' Deliberate Choice of an Amendment Process Without Time Constraints.

The ERA's ratification deadline undermines the Framers' intent to create an amendment process free of time constraints. That intent is confirmed by comparing Article V with the alternative models of constitutional amendment that existed at the time of the founding.

When the federal Constitution was drafted in 1787, eight of the thirteen state constitutions then in existence contained amendment

provisions.[1] These constitutions were among the first written constitutions in the world to set forth the process for their own amendment; they therefore provided prominent models for the Framers. *See* Ralph Martig, Amending the Constitution, 35 Mich. L. Rev. 1253, 1253-55 (1937); *see also* Lester Orfield, The Amending of the Federal Constitution 1-2 (1942). Of the eight state constitutions that contained amendment provisions, all but two imposed specific timelines on various aspects of the process. The Framers nonetheless rejected the dominant model, opting instead for an amendment provision that allowed the process to unfold without any time constraints.

Three States (Pennsylvania, Vermont, and Maryland) expressly limited the time between an amendment's proposal and its adoption, as Congress sought to do in proposing the ERA. Under the Pennsylvania Constitution of 1776, the Council of Censors—a body that sat periodically to review the constitutionality of state laws—could propose a constitutional amendment to be voted on at a convention "within too [sic]

---

[1] Del. Const. of 1776, art. 30; Ga. Const. of 1777, art. LXIII; Md. Const. of 1776, LIX; Mass. Const. of 1780, pt. 2, ch. 6, art. X; N.H. Const. of 1784, pt. 2; Pa. Const. of 1776, § 47; S.C. Const. of 1778, XLIV; Vt. Const. of 1777, ch. 2, XLIV.

years after their sitting." Pa. Const. of 1776, § 47. A proposed amendment could thus remain pending for at most two years. The Vermont Constitutions of 1777 and 1786 contained a nearly identical amendment provision. Vt. Const. of 1777, ch. 2, XLIV; Vt. Const. of 1786, ch. 2, XL. Under the Maryland Constitution of 1776, an amendment proposed by the General Assembly would not be adopted unless confirmed by that body "after a new election of Delegates, in the first session after such new election." Md. Const. of 1776, LIX. Because delegates were elected annually in October and the General Assembly convened at least annually in November, *id.* at IV, XXIII, a period of at most thirteen months—from October to the following November—could elapse between an amendment's proposal and its ultimate adoption.

Three additional States (New Hampshire, Massachusetts, and South Carolina) imposed deadlines on other aspects of their amendment processes. *See* N.H. Const. of 1784, pt. 2 (constraining time for *proposing* amendments, but not *adopting* proposed amendments); Mass. Const. of 1780, pt. 2, ch. 6, art. X (same); S.C. Const. of 1778, XLIV (imposing deadline on time that could elapse between amendment's adoption and its effective date).

10

The two remaining States, Delaware and Georgia, imposed no timeline on any aspect of their amendment processes. The Delaware Constitution of 1776 provided: "No other part of this constitution shall be altered, changed, or diminished without the consent of five parts in seven of the assembly, and seven members of the legislative council." Del. Const. of 1776, art. 30. The Georgia Constitution of 1777 provided that no alteration could be made unless petitions for a convention were presented by a majority of counties and signed by a majority of voters in each county. Ga. Const. of 1777, art. LXIII.

In crafting Article V, the Framers opted against following either of the state constitutional models that imposed time limits on the proposal or adoption of amendments—or, indeed, to temporally limit any other aspect of the amendment process (other than a now-obsolete limit on the adoption, before 1808, of an amendment that would interfere with the slave trade or impose direct taxes).[2] Instead, the Framers opted for an amendment provision that, like that of Delaware and Georgia, contemplated no time limit for either aspect of the process. This

---

[2] *See* U.S. Const., art. V ("[N]o amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner affect the first and fourth clauses in the ninth section of the first article.").

11

deliberate choice reflects an intent not to impose any fixed time limit either on Congress in crafting a proposed amendment or on States in deciding whether to ratify the amendment.

That intent is similarly reflected in subsequent attempts by Congress, all unsuccessful, to amend Article V to include precisely such time constraints. One prominent proposal, known as the Wadsworth-Garrett Amendment, would have created a process analogous to that specified in the Maryland Constitution of 1776 discussed above. It would have prevented a State's ratification until at least one branch of the state legislature had been elected since Congress's submission of the amendment to the States for ratification, and required that ratification occur within six years of congressional submission, among other requirements. H. J. Res. 68, 68th Cong., 2d Sess., 66 Cong. Rec. 2152-61 (1925); S. J. Res. 4, 68th Cong., 1st Sess., 65 Cong. Rec. 4488-98 (1924); H. J. Res. 69, 67th Cong., 1st Sess., 61 Cong. Rec. 575 (1921). And Congress considered, but declined to advance, many other proposals that would have imposed constraints on the timing and procedure of the State ratification process. *See* Martig, *supra*, at 1277-83. The fact that Congress considered an amendment of Article V necessary to authorize

12

the imposition of constraints on the state ratification process reflects an understanding that Article V, as drafted by the Framers, contains no such constraints.

## C. The Deadline Disrupts Article V's Careful Balancing.

The seven-year deadline that Congress purported to impose on the ERA's ratification disrupts the careful balance that the Framers struck in crafting Article V, in two important respects.

*First*, the deadline upsets the careful balance between state and federal power. The Framers sought to create an amendment process that would be "neither wholly national nor wholly federal." The Federalist No. 39 (Madison). The Framers thus empowered Congress to "propose amendments" and to choose "one or the other mode of ratification"—by state legislatures or conventions—while they empowered the States to demand "a convention for proposing amendments" and to ratify amendments, whether proposed by Congress or a convention. U.S. Const., art. V. In assigning these coordinate roles, the Framers sought to avoid giving Congress too much control over the amendment process, lest it "abuse their power, and refuse their consent" to necessary

13

amendments. 1 The Records of the Federal Convention of 1787, at 202-03 (Max Farrand ed., 1937) ("Farrand") (George Mason). Indeed, earlier versions of Article V gave Congress no role in the amendment process at all, *see id.* at 121-22, 194; 2 Farrand at 148, 159, 174, an approach that had broad support until Gouverneur Morris and Alexander Hamilton successfully advocated for a balanced approach giving Congress and the States co-equal roles. 2 Farrand at 464-68, 558-59.

The ERA's ratification deadline disrupts this careful balance of power by allowing Congress to curtail the ratification power reserved to the States. That power includes the ability to decide the timing and other basic logistics of ratification. *See Dyer v. Blair*, 390 F. Supp. 1291, 1304 (N.D. Ill. 1975) (holding that Illinois had authority to decide whether ratification by its legislature required simple majority or supermajority). Allowing Congress to usurp the States' control over the ratification process would undermine the Framers' intent to create an amendment process that protects the States from an overreaching federal government.

*Second*, giving effect to the deadline would upset the equally careful balance that the Framers sought to achieve between "that extreme

facility, which would render the Constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults." The Federalist No. 43 (Madison). That balance is embodied in Article V's supermajority provisions, which require that Congress (or the States) propose amendments by two-thirds supermajorities and that a three-quarters supermajority of the States ratify proposed amendments. These requirements "secur[e] deliberation and consideration before any change can be proposed" or ratified, *Hawke*, 253 U.S. at 226, without unduly impeding the ratification process. The Framers were keen to avoid the major flaw of the Articles of Confederation, whose amendment clause required unanimous consent among the States, making amendments nearly impossible. *See* Articles of Confederation of 1781, art. XIII, ¶ 1. As Hamilton explained, "It had been wished by many and was much to have been desired that an easier mode for introducing amendments had been provided." 2 Farrand at 558.

The ERA's ratification deadline upsets the Framers' balance between ease and difficulty of amendment by imposing a hurdle in the amendment process absent from Article V's precise framework. It is difficult enough to meet Article V's demanding supermajority

requirements, which the Framers understood as a bulwark against the hasty adoption of constitutional amendments. Limiting the time in which those supermajorities must be achieved imposes a layer of difficulty that the Framers did not intend—nor could they have, since "[a] ratification process involving fifty legislatures and requiring affirmative action by thirty-eight is more complex than anything foreseen by the framers in 1787." Walter Dellinger, The Legitimacy of Constitutional Change, 97 Harv. L. Rev. 386, 421 (1983).

The history of the ERA demonstrates the importance of "deliberation and consideration" in this complex process. *Hawke*, 253 U.S. at 226. Congress deliberated for nearly five decades, before finally passing a joint resolution proposing the ERA in 1972. (*See* App.80-82.) It took almost an identical amount of time, from 1972 to 2020, for thirty-eight States to ratify the amendment. (*See* App.82-86.) In curtailing the period of deliberation that Article V affords States, Congress not only usurps the States' ratification power; it also tips the scales toward that "extreme difficulty" in effectuating constitutional change that the Framers sought to avoid. The Federalist No. 43 (Madison).

16

Indeed, as the Supreme Court has recognized, "[i]t is not the function of courts or legislative bodies, national or state, to alter the method [of amendment] which the Constitution has fixed." *Hawke*, 253 U.S. at 227. The Court in *Hawke* rejected an attempt to graft an additional ratification prerequisite onto Article V, holding that the Ohio Constitution's allowance of a popular referendum on the legislature's ratification of a proposed amendment was inconsistent with Article V's precise language and design. *Id.* at 225-27. The seven-year ratification deadline at issue here suffers from the same defect: it imposes an additional constraint on the ratification process that is absent from and inconsistent with Article V.

### D. The Deadline Undermines the Original States' Understanding of Article V When They Ratified the Constitution.

Allowing Congress to impose additional constraints on the constitutional amendment process would also undermine the understanding of Article V that prevailed among the States when they ratified the federal Constitution.

After the Framers drafted the Constitution, the original thirteen States each held a convention to decide whether to ratify it. Under Article

VII of the Constitution, the Constitution would be adopted if ratified by at least nine of the thirteen States. The outcome of the ratification process was far from certain. In several States, an influential faction of Anti-Federalist delegates vehemently opposed the Constitution as drafted, particularly because it lacked a bill of rights. *See generally* Pauline Maier, Ratification (2010); 1 Joseph Story, Commentaries on the Constitution of the United States 191-205 (1833).

Many of those delegates were persuaded to support the Constitution only because Article V provided the States a clear mechanism for curing the Constitution's defects without undue interference from the national government. For example, in Massachusetts, where the Federalists' narrow victory lent critical momentum to the ratification process, a prominent Anti-Federalist named Charles Jarvis declared that Article V was responsible for his ultimate decision to support unconditional ratification of the Constitution. Jarvis explained that, while he had deep reservations about other aspects of the Constitution, Article V "has been a resting place, on which I have reposed myself in the fullest security, whenever a doubt has occurred, in considering any other passage in the proposed Constitution."

Article V, he explained, furnished "an adequate provision for all the purposes of political reformation," allowing the States to temper the federal government if it became "too severe" and to reinvigorate it if it became "too languid." 6 The Documentary History of the Ratification of the Constitution ("DHRC") 1374 (Jensen & Kaminski eds.), *available at* https://search.library.wisc.edu/digital/aconstitution.

Many other delegates expressed a similar understanding of the States' plenary authority under Article V. Throughout the ratification debates, "[w]henever the Anti-Federalists criticized the [Constitution] and urged a vote against ratification, the Federalists relied on Article V as their trump card." Greg Abbott, The Myths and Realities of Article V, 21 Tex. Rev. L. & Pol. 1, 13 (2016). The Federalists emphasized the States' "primary role in the Article V process—a particularly powerful retort given that the principal source of Anti-Federalists' criticisms was that the Constitution did too little to protect states' rights." *Id.* at 14. For instance, a Massachusetts delegate relied on Article V to address the concern that "Congress will have it in their power to make what laws they please, and what alterations they think proper in the constitution, after the people have adopted it." 5 DHRC at 512. The delegate explained

19

that "[t]he Constitution expressly says, that any alteration in the constitution must be ratified by three fourths of the States." *Id.* And after explaining that the States also had the authority to propose amendments by calling for a constitutional convention, the delegate concluded: "If this article does not clearly demonstrate that all power is in the hands of the people, then the language by which we convey our ideas, is shockingly inadequate to its intended purpose." *Id.*

In response to an important Anti-Federalist essay, the Federalists published an essay during the Massachusetts ratification debates that underscored that Article V imposes no "limitation of time" on the amendment process, thus providing a greater "degree of liberty" than the amendment provision of their own state constitution: "For the citizens of this Commonwealth are only permitted *at a given time* to revise their Constitution and then only if two thirds are agreed; but in the other case, the citizens of the United States can do it, *without any limitation of time*." 4 DHRC 182 (emphases added).

Similarly, to counter Anti-Federalist arguments in New York, a prominent Pennsylvanian Federalist, Tench Coxe, wrote to the New York Convention explaining that "if three fourths of the state legislatures or

20

conventions approve such proposed amendments, they become an actual and binding part of the constitution, *without any possible interference of Congress*." 20 DHRC at 1143 (emphasis added). Hamilton made a similar point in addressing the widespread concern among state delegates that "the persons delegated to the administration of the national government will always be disinclined to yield up any portion of the authority of which they were once possessed." The Federalist No. 85 (Hamilton). Hamilton explained that, under Article V, when two-thirds of the States demanded a convention to propose constitutional amendments, the demand would be "peremptory": Article V requires that "the Congress 'shall call a convention,'" and "[n]othing in this particular is left to the discretion of that body." *Id.* (quoting Article V). The same logic applies to the ratification process. Article V provides that, when three-quarters of the States ratify a proposed amendment, the amendment "shall be valid to all intents and purposes, as part of this Constitution." Nothing—not even the timeframe for ratification—is left to the discretion of Congress.

The notion that Congress could unilaterally impose additional constraints on the States' ratification power, as Congress sought to do in the ERA resolution, is inconsistent with this foundational history.

21

Ultimately, "it was Article V (and the states' primacy in the amendment process) that flipped the Anti-Federalists' votes in key states in favor of ratification." Abbott, *supra*, at 15. Had Article V permitted Congress to constrain the States' power in the manner urged by the Archivist here, the States might never have ratified the Constitution.

### E.   The Deadline Is Inconsistent with Congressional Practice from the Founding Until 1960.

Congressional practice during the first two centuries of our nation's history confirms the foundational understanding that a congressional resolution may not impose a deadline on the state ratification process.

From the 1789 proposal of the Bill of Rights to the proposal of the Twenty-Second Amendment in 1947, congressional joint resolutions submitting proposed amendments to the States contained almost identical language quoting the text of Article V, with only minor stylistic variations.[3] In 1917, in proposing the Eighteenth Amendment, Congress

---

[3] 1 Stat. 97 (1789) (Bill of Rights, plus amendment that became Twenty-Seventh); 1 Stat. 402 (1794) (Eleventh Amendment); 2 Stat. 306 (1803) (Twelfth Amendment); 2 Stat. 613 (1810) (unratified amendment regarding titles of nobility); 12 Stat. 251 (1861) (unratified amendment regarding interference with slavery); 13 Stat. 567 (1865) (Thirteenth Amendment); 14 Stat. 358 (1866) (Fourteenth Amendment); 15 Stat. 346 (1869) (Fifteenth

*(footnote continues on next page)*

22

first sought to impose a deadline on the States' authority to ratify amendments, and did so by including a deadline within the text of the proposed amendment. 40 Stat. 1050 (1917). Three subsequent amendments similarly contained deadlines in text. *See* U.S. Const., amends. XX § 6, XXI § 3, XXII § 2. Because the States ratified those amendments within the deadlines imposed, the validity of those deadlines was never tested.

In 1960, Congress chose for the first time, in connection with the Twenty-Third Amendment, to put a deadline not in the amendment itself but in the joint resolution proposing the amendment. The proposing resolution, unlike all previous proposing resolutions, provided that the amendment "shall be valid to all intents and purposes as part of the Constitution only if ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress." 74 Stat. 1057 (1960). Congress used the same language in the

---

Amendment); 36 Stat. 184 (1909) (Sixteenth Amendment); 37 Stat. 646 (1912) (Seventeenth Amendment); 40 Stat. 1050 (1917) (Eighteenth Amendment); 41 Stat. 362 (1919) (Nineteenth Amendment); 43 Stat. 670 (1924) (unratified amendment regarding child labor); 47 Stat. 745 (1932) (Twentieth Amendment); 48 Stat. 1749 (1933) (Twenty-First Amendment); 61 Stat. 959 (1947) (Twenty-Second Amendment).

joint resolutions proposing the next three amendments, as well as the ERA, except that it replaced "only if" with "when" for all but the Twenty-Fourth Amendment. 76 Stat. 1259 (1962) (Twenty-Fourth); 79 Stat. 1327 (1965) (Twenty-Fifth); 85 Stat. 829 (1971) (Twenty-Sixth); 86 Stat. 1523 (1972) (ERA).

In total, then, besides the ERA, twenty-three of the twenty-seven amendments now part of our Constitution were submitted to the States with joint resolutions that included no ratification deadline and thus mirrored Article V. Only the Twenty-Third through Twenty-Sixth— proposed over a period of eleven years—were submitted with joint resolutions containing such a deadline. And none of those resolution deadlines was ever challenged in court. While some members of Congress assumed that moving the deadline to a joint resolution would make no substantive difference, 101 Cong. Rec. 6628 (1955) (Sen. Kefauver), others questioned that assumption, 75 Cong. Rec. 3856 (1932) (Rep. Jeffers). Indeed, Congress earlier declined to place a deadline in a joint resolution to avoid that very issue. *Id.* (Rep. Ramseyer).

24

### F.    *Dillon v. Gloss* Does Not Control.

The Supreme Court's decision in *Dillon v. Gloss*, 256 U.S. 368 (1921), does not, as the district court suggested (*see* App.338), control the ratification issue presented here.

*Dillon* held that a person convicted under the National Prohibition Act could not invalidate the conviction by challenging the Eighteenth Amendment, which authorized that Act, on the ground that the Amendment improperly contained a ratification deadline. 256 U.S. at 376-77. Preliminarily, *Dillon* is distinguishable because the deadline there did not ultimately have the effect of diminishing the States' ratification authority: while Congress set a seven-year deadline for ratification of the Eighteenth Amendment, ratification by three-quarters of the States was achieved in roughly one year, and thus the deadline was rendered academic. Accordingly, whatever the Court may have said in dictum about Congress's authority to set a period for ratification, the Court had no occasion to consider the extent of that authority.

Moreover, the deadline at issue in *Dillon* was placed directly in the text of the amendment. *See* U.S. Const., amend. XVIII § 3. This type of

ratification deadline is categorically distinct from the deadline at issue here, for three reasons.

*First*, the joint resolutions proposing the Eighteenth and Twentieth through Twenty-Second Amendments all provided, consistent with Article V, that the amendments would "become valid as part of the Constitution when ratified by the legislatures of the several States as provided by the Constitution." 40 Stat. 1050 (1917); 47 Stat. 745 (1932); 48 Stat. 1749 (1933); 61 Stat. 959 (1947). Once ratified, the amendments provided by their own terms that they would be "inoperative" if the ratification process took more than seven years. The amendments would thus be valid constitutional amendments—and would have to be certified as such under 1 U.S.C. § 106b—but would have no legal effect. *See* Akhil Amar, America's Constitution 417-19 (2006). Indeed, the deadlines rendering the amendments inoperative would not themselves be valid unless and until the amendments were ratified. The ERA's deadline, in contrast, purports to override Article V by precluding the ERA from ever becoming a valid amendment, even after it has been ratified by thirty-eight States.

26

*Second*, Congress's power to impose a ratification deadline in the text of an amendment is based on "the plenary authority of Congress to propose the texts of amendments." Dellinger, *supra*, at 408 n.120. That authority necessarily implies the power to decide the content of a proposed amendment, which the States can thereafter choose to ratify or not. But no such authority is implicated where, as here, Congress merely places the deadline in the proposing clause of a joint resolution. Such a deadline constitutes a purely external and atextual constraint on the ratification process.

*Third*, Congress cannot modify a deadline in the text of an amendment—or any other aspect of the amendment—once the amendment has been submitted to the States for ratification. By contrast, if Congress places a ratification deadline in its joint resolution proposing an amendment, nothing prevents it from passing another joint resolution modifying or eliminating that deadline (assuming the deadline has any validity in the first place). Indeed, Congress did just that with respect to the ERA, passing a joint resolution extending the ratification deadline by three years and three months. H. J. Res. 638 (1978). While some dispute Congress's authority to pass such an extension resolution,

27

that question is not presented in this case. What matters here is that there is a difference between a ratification deadline placed in an amendment's text—which cannot be extended—and a deadline placed in a joint resolution, which, according to a wealth of authority, can be.

## POINT III

### PURPORTED RESCISSIONS OF ERA RATIFICATIONS ARE INEFFECTIVE

While the district court did not address the validity of certain States' attempted rescissions of their ERA-ratification votes, those attempted recissions were invalid, and plaintiffs were therefore entitled to the mandamus relief requested.[4] Text, history, and tradition support the conclusion that once a State ratifies an amendment, it cannot rescind its ratification.

Article V gives States the right to "ratif[y]" proposed amendments; it does not grant a right of rescission. Had the Framers wished to give States that right, "nothing would have been simpler than so to phrase

---

[4] Three of the five intervening States (Nebraska, South Dakota, and Tennessee) purported to rescind their ERA ratifications, while the other two (Alabama and Louisiana) never ratified the amendment. The total number of purported rescissions is now six, including North Dakota's 2021 rescission.

article 5 as to exclude implication or speculation." *Sprague*, 282 U.S. at 732. Given Article V's precise language, the absence of a textual right of rescission is "persuasive evidence" that the Framers intended ratification as an irrevocable event. *Id.*

The history of the Constitution's ratification establishes that the Framers intended a ratification to be irrevocable. As discussed above, many delegates to State conventions had serious misgivings about the Constitution because it lacked a bill of rights. The delegates understood, however, that a vote to ratify the Constitution would be final and could not be conditioned on the subsequent adoption of amendments. *See* Maier, *supra*, at 379-82, 385-96, 431. For example, when conditional ratification was considered in New York, delegate Alexander Hamilton sought advice from James Madison, who advised that the Constitution "requires an adoption *in toto* and *for ever*" and that "any *condition* whatever must vitiate the ratification." Letter from James Madison to Alexander Hamilton (July 1788), reprinted in 2 David Watson, The Constitution of the United States 1314-17 (1910). Based on this view, New York and other States rejected proposals to ratify the Constitution

that would have reserved the "right to recede and withdraw from the said Constitution." 23 DHRC at 2290-91.

A longstanding consensus among commentators confirms the Framers' understanding of ratification as irrevocable. As one scholar explained, Article V confers on the States "a special power" to ratify proposed amendments but, "[w]hen exercised, as contemplated by the constitution, by ratifying, it ceases to be a power, and any attempt to exercise it again must be nullity." John Jameson, A Treatise on Constitutional Conventions 628 (4th ed., 1887). Another scholar likewise explained that "the act of ratification is final in each case," reasoning that "any other doctrine would lead to great confusion in determining when an amendment has in fact been adopted." Charles Burdick, The Law of the American Constitution 43-44 (1922); *see also* Orfield, *supra*, at 51-52; 2 Watson, *supra*, at 1313-18.

In the 1970s, when certain States began considering rescinding their ERA ratifications, a large body of scholarship emerged opining that such rescissions would be invalid based on, among other things, the text

30

of Article V and historical precedent.[5] The Department of Justice adopted the same view.[6] Many state Attorneys General—including those of States that ultimately purported to rescind their ratifications—adopted the same view. Fasteau & Fasteau, *supra*, at 39-42. Indeed, "[e]very state legislature that passed a resolution rescinding a prior ratification of the ERA did so under the cloud of an express opinion that such an action would be a legal nullity." Dellinger, *supra*, at 423 & n.179.

Historical precedent supports that opinion. All prior attempts by States to rescind ratifications of proposed amendments have been rejected. The Fourteenth Amendment is the most prominent example. The adoption of that amendment turned on Congress's decision to reject

---

[5] *See, e.g.*, Fasteau & Fasteau, May a State Legislature Rescind Its Ratification of a Pending Constitutional Amendment?, 1 Harv. Women's L.J. 27 (1978); Kanowitz & Klinger, Can a State Rescind Its Equal Rights Amendment Ratification, 28 Hastings L.J. 979 (1977); Yvonne Burke, Validity of Attempts to Rescind Ratification of the Equal Rights Amendment, 8 U.W.L.A. L. Rev. 1 (1976); William Heckman, Ratification of a Constitutional Amendment, 6 Conn. L. Rev. 28 (1973); *but see* Judith Elder, Article V, Justiciability, and the Equal Rights Amendment, 31 Okla. L. Rev. 63 (1978) (rescission should be permitted).

[6] *See* Memorandum for Robert Lipshutz, Counsel to the President, from John Harmon, Assistant Attorney General, Office of Legal Counsel (June 27, 1978), reprinted in Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary, 95th Cong., 2d Sess., 80-99 (1978).

Ohio and New Jersey's attempts to rescind their earlier ratifications. The ratification of at least one of those States was required to reach the requisite three-quarters. After learning of the States' purported rescissions, Congress nonetheless passed a joint resolution listing both States as having ratified the amendment and directing the Secretary of State (then fulfilling a similar role as the one now fulfilled by the Archivist) to certify the amendment as validly adopted, which he did. 15 Stat. 709-10 (1868). Similarly, two years later, in certifying the adoption of the Fifteenth Amendment, the Secretary of the State listed New York among the ratifying States, even though New York had earlier purported to rescind its ratification. 16 Stat. 1131 (1870). The Supreme Court has expressly approved this historical practice of treating rescissions as invalid. *See Coleman* 307 U.S. at 448-50; *Leser v. Garnett*, 258 U.S. 130, 136 (1922).

The fact that Congress has specifically sought without success to amend Article V to authorize the rescission of State ratifications of proposed amendments provides further evidence that States do not currently have that right. For example, the Wadsworth-Garrett Amendment discussed above would have given States the right to

reconsider their ratifications at any time until three-quarters of the States had ratified the amendment or more than one-quarter had rejected it. Both proponents acknowledged that "under Article V, as now drawn, no State can change its vote from the affirmative to negative." 65 Cong. Rec. 4492 (1924) (Wadsworth); *see also* 66 Cong. Rec. 2159 (1925) (Garrett). Similar legislation was introduced from 1967 to 1973,[7] and also in 1979.[8] None of those proposals passed either House, suggesting an acceptance of the prevailing view that ratifications are final and rescissions invalid.

Finally, allowing States to rescind their ratifications "would lead to great confusion in determining when an amendment has in fact been adopted." Burdick, *supra*, at 43-44. States could attempt to rescind their ratifications shortly before three-quarters of the States had submitted their ratifications, sowing doubt about whether and when ratification occurred. States could even seek to rescind their ratifications of an amendment *after* three-quarters of the States had ratified it, seeking to

---

[7] S. 2307 § 15(a), 90th Cong., 1st Sess. (1967); S. 623 § 13(a), 91st Cong., 1st Sess. (1969); S. 215 § 13(a), 92d Cong., 1st Sess. (1971); S. 1272 § 13(a), 93d Cong., 1st Sess. (1973);

[8] S. 3 § 13(a), S. 1710 § 13(a), 96th Cong., 1st Sess. (1979).

33

unwind amendments that have already taken effect. Allowing States to rescind their ratifications would also undermine the seriousness that state legislators accord to their ratification votes, because a vote to ratify could be undone when politically expedient. "[S]tates would be encouraged to treat their ratification lightly because the issue could be taken up 'again and again and again.'" Ruth Bader Ginsburg, Ratification of the Equal Rights Amendment, 57 Tex. L. Rev. 919, 921 (1979) (citation omitted). Such an outcome would undermine the precise and straightforward amendment process the Framers designed in crafting Article V.

## CONCLUSION

The Court should vacate the district court's order and remand for further proceedings.

Dated:   Albany, New York
         January 10, 2022

                                       Respectfully submitted,

                                        LETITIA JAMES
                                         *Attorney General*
                                         *State of New York*

                           By:   /s/ Sarah L. Rosenbluth
                                       SARAH L. ROSENBLUTH
                                     Assistant Solicitor General

                                        The Capitol
                                        Albany, New York 12224
                                        (518) 776-2025

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
SARAH L. ROSENBLUTH
  *Assistant Solicitor General*
     *of Counsel*

(*Counsel listing continues on next page.*)

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway
Denver, Colorado 80203

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, Massachusetts 02108

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, Connecticut 06106

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, Minnesota 55155

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, Delaware 19801

ANDREW J. BRUCK
  *Acting Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625

HOLLY T. SHIKADA
  *Attorney General*
  *State of Hawai'i*
425 Queen Street
Honolulu, Hawai'i 96813

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, New Mexico 87504

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, Maine 04333

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, Oregon 97301

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, Maryland 21202

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of Pennsylvania*
Strawberry Square
Harrisburg, Pennsylvania 17120

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, Rhode Island
02903

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, Vermont 05609

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
1125 Washington Street SE
P.O. Box 40100
Olympia, Washington 98504

JOSHUA L. KAUL
  *Attorney General*
  *State of Wisconsin*
17 W. Main Street
P.O. Box 7857
Madison, Wisconsin 53707

LAURA KELLY
  *Governor*
  *State of Kansas*
Statehouse, 2d Floor
300 SW 10th Avenue
Topeka, Kansas 66610

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
400 6th Street, NW
Suite 8100
Washington, District of Columbia 20001

37

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Sarah L. Rosenbluth, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,479 words and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7) and corresponding local rules.

 /s/ Sarah L. Rosenbluth
SARAH L. ROSENBLUTH