IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

COMMONWEALTH OF VIRGINIA, STATE OF ILLINOIS, and
STATE OF NEVADA,

*Plaintiffs-Appellants*,

v.

DAVID S. FERRIERO, in his official capacity as Archivist of the United States,

*Defendant-Appellee*,

and

ALABAMA, LOUISIANA, NEBRASKA, SOUTH DAKOTA, and
TENNESSEE,

*Intervenors-Appellees.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:20-cv-00242-RC
Before the Honorable Rudolph Contreras

**BRIEF FOR *AMICI CURIAE* CONSTITUTIONAL LAW PROFESSORS
ERWIN CHEMERINSKY, NOAH FELDMAN, DAVID POZEN, AND
JULIE C. SUK IN SUPPORT OF NEITHER PARTY**

Jessica L. Ellsworth
Kaitlyn A. Golden
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Amici Constitutional Law
Professors*

January 10, 2022

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), *amici curiae* certify the following:

**Parties and *Amici***.  With the exception of Erwin Chemerinsky, Noah Feldman, David Pozen, and Julie C. Suk, all parties, intervenors, and amici appearing in this Court are listed in the Brief for Plaintiffs-Appellants.

**Ruling Under Review**.  Reference to the ruling at issue appears in the Brief for Plaintiffs-Appellants.

**Related Cases**.  Reference to related cases appears in the Brief for Plaintiff-Appellants.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ..........i

TABLE OF AUTHORITIES ...............................................................................iii

INTEREST OF *AMICI CURIAE* ........................................................................ 1

INTRODUCTION ............................................................................................3

BACKGROUND ..............................................................................................3

ARGUMENT ...................................................................................................7

    I.     THE POLITICAL QUESTION DOCTRINE AND LACK OF
         ANY CONCRETE INTERESTS AT STAKE CURRENTLY
         PRECLUDE JUDICIAL REVIEW OF THE VALIDITY OF THE
         ERA'S RATIFICATION ................................................................. 7

    II.    CONGRESS, NOT THIS COURT, IS CONSTITUTIONALLY
         AUTHORIZED TO RESOLVE WHETHER THE REQUISITE
         NUMBER OF STATES HAVE EFFECTIVELY RATIFIED A
         CONSTITUTIONAL AMENDMENT ......................................... 14

CONCLUSION .................................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES:</small>

*Allen v. Wright*,
    468 U.S. 737 (1984).................................................................7, 13

*Baker v. Carr*,
    369 U.S. 186 (1962).................................................................8, 19

*\*Coleman v. Miller*,
    307 U.S. 433 (1939)...................................8, 10, 11, 12, 16, 18, 19

*\*Commonwealth v. Ferriero*,
    525 F. Supp. 3d 36 (D.D.C. 2021)....................................3, 7, 10, 19

*Craig v. Boren*,
    429 U.S. 190 (1976).....................................................................21

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006).....................................................................14

*Dillon v. Gloss*,
    256 U.S. 368 (1921)...............................................................11, 15

*Dyer v. Blair*,
    390 F. Supp. 1291 (N.D. Ill. 1975).................................................20

*Frontiero v. Richardson*,
    411 U.S. 677 (1973).....................................................................21

*Goesaert v. Cleary*,
    335 U.S. 464 (1948).....................................................................13

*Goldwater v. Carter*,
    444 U.S. 996 (1979).................................................................9, 20

*Hammer v. Dagenhart*,
    247 U.S. 251 (1918).....................................................................12

*Hawke v. Smith*,
    253 U.S. 221 (1920).....................................................................12

*Hollingsworth v. Virginia*,
    3 U.S. 378 (1798).........................................................................12

* Authorities upon which we chiefly rely are marked with asterisks.

*Hoyt v. Florida*,
   368 U.S. 57 (1961) ................................................................... 13

*Idaho v. Freeman*,
   529 F. Supp. 1107 (D. Idaho 1981) ............................................ 5

*INS v. Chadha*,
   462 U.S. 919 (1983) ................................................................. 12

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................... 7

*Nixon v. United States*,
   506 U.S. 224 (1993) ................................................................. 13

*Reed v. Reed*,
   404 U.S. 71 (1971) ................................................................... 20

*Rhode Island v. Palmer*,
   253 U.S. 350 (1920) ................................................................. 21

*United States v. Windsor*,
   570 U.S. 744 (2013) ................................................................... 9

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ............................................................... 8, 9

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. amend XVIII, § 3 (repealed 1933) .............................. 17

U.S. Const. amend. XX, § 6 ........................................................ 17

U.S. Const. amend. XXI, § 3 ....................................................... 17

U.S. Const. amend. XXII, § 2 ...................................................... 17

*U.S. Const. art. V ................................................................. 5, 14

**STATUTE:**

15 Stat. 709, 710 (1868) ............................................................ 15

**LEGISLATIVE MATERIALS:**

65 Cong. Rec. 10,092 (1924) ...................................................... 12

* Authorities upon which we chiefly rely are marked with asterisks.

106 Cong. Rec. 12,571 (1960) .................................................18

108 Cong. Rec. 5,102 (1962) ...................................................18

116 Cong. Rec. 27,999-28,004 (1970)........................................4

116 Cong. Rec. 36,450-51 (1970)..............................................4

117 Cong. Rec. 35,296 (1971) .................................................13

138 Cong. Rec. 11,869 (1992) .................................................16

138 Cong. Rec. 12,052 (1992) .................................................16

166 Cong. Rec. S2719 (2020) ..................................................23

Cong. Globe, 40th Cong., 2d Sess. 4296 (1868) .......................15

Cong. Globe, 40th Cong., 2d Sess. 4295-96 (1868) ..................15

Cong. Research Serv., R42979, *The Proposed Equal Rights Amendment: Contemporary Ratification Issues* (updated 2019)...................4

*Equal Rights Amendment Extension, Hearings on H.J. Res. 638 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm.on the Judiciary*, 95th Cong. 64 (1978) ........................22

*Equal Rights Amendment Extension, Hearings on S.J. Res. 134 Before the Subcomm.on the Constitution of the S. Comm. on the Judiciary*, 95th Cong. 262-64 (1978) .....................................22, 23

H.R.J. Res. 75, 68th Cong. (1923) ............................................3

H.R.J. Res. 79, 116th Cong. (2020) ..........................................6

*H.R.J. Res. 208, 92nd Cong. (1972) .....................................4, 17, 18

H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978)........................5, 18

S.J. Res. 1, 117th Cong. (2021) ...............................................6

S.J. Res. 2, 79th Session (Nev. 2017) .......................................22

* Authorities upon which we chiefly rely are marked with asterisks.

**OTHER AUTHORITIES:**

Robert Black, *Could the Equal Rights Amendment Become a Reality?*, Nat'l Const. Ctr. (Jan. 15, 2020), https://constitutioncenter.org/blog/could-the-equal-rights-amendment-become-a-reality ...........................................................5

Jane Mansbridge, *Why We Lost the ERA* (1986) ..................................................5

*David Pozen & Thomas Schmidt, *The Puzzles and Possibilities of Article V*, 121 Colum. L. Rev. 2317 (2021) ......................................11, 19, 20

*Julie C. Suk, *We the Women: The Unstoppable Mothers of the Equal Rights Amendment* 129-71 (2020)..............................................5, 16, 18

Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433 (1983)........................13

John R. Vile, *Encyclopedia of Constitutional Amendments, Proposed Amendments, and Amending Issues, 1789-2015* (2d ed. 2003) ...........................................................................................4

13C Charles Alan Wright et al., Federal Practice and Procedure § 3534.1 (3d ed. 2021)....................................................................11

* Authorities upon which we chiefly rely are marked with asterisks.

# INTEREST OF *AMICI CURIAE*

*Amici curiae* are scholars in constitutional law.[1]  They write to offer their perspective to the Court on the Constitution's amendment process generally and the important role it plays in the Constitution's separation of powers.

**Erwin Chemerinsky** is the Dean of Berkeley Law and an expert in constitutional law, federal jurisdiction, and civil rights.  He is the author of eleven books on those topics, including leading casebooks and treatises.  His most recent books are:  *Presumed Guilty: How the Supreme Court Empowered the Police and Subverted Civil Rights,* and *The Religion Clauses: The Case for Separating Church and State*.

**Noah Feldman** is the Felix Frankfurter Professor of Law at Harvard Law School.  His research focuses on constitutional studies, with a particular emphasis on the relationship between law and religion, free speech, constitutional design, and the history of legal theory.  He has written eight books, including, most recently, *Scorpions: The Battles and Triumphs of FDR's Great Supreme Court Justices* and *The Broken Constitution: Lincoln, Slavery, and the Refounding of America*.  He frequently contributes analysis to publications such as the New York Times Magazine and Bloomberg News.  He is co-author, with Kathleen Sullivan,

---

[1] This brief is filed with the consent of all parties.  Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part, and that no party or person other than *amici* or their counsel contributed money toward the preparation or filing of this brief.

of the leading textbook, *Constitutional Law*, now in its twentieth edition.  In 2019, he was called to testify before the House Judiciary Committee as part of the House impeachment hearings.

**David Pozen** is the Vice Dean for Intellectual Life and Charles Keller Beekman Professor of Law at Columbia Law School.  A scholar of constitutional law, his body of work includes dozens of articles, essays, and book chapters, including, most recently, *The Puzzles and Possibilities of Article V* (with Thomas Schmidt, 2021) and *Anti-Modalities* (with Adam Samaha, 2021).

**Julie C. Suk** is a Professor of Law at Fordham University School of Law. She is an expert on the Equal Rights Amendment and author of the 2020 book, *We the Women: The Unstoppable Mothers of the Equal Rights Amendment*.  She is a scholar of comparative constitutional law whose recent work focuses on gender equality amendments in constitutions around the world.  Her scholarship was cited by the House Judiciary Committee's favorable report on removing the Equal Rights Amendment's deadline.  She teaches courses on civil procedure, comparative constitutional law, and gender, law, and policy.

## INTRODUCTION

The power to resolve a dispute about the ratification of a constitutional amendment lies with Congress, at least in the first instance. The District Court incorrectly decided otherwise, finding that it was not a political question, and finding the Equal Right Amendment ("ERA") was not validly ratified. *Commonwealth v. Ferriero*, 525 F. Supp. 3d 36, 49-61 (D.D.C. 2021). This contravenes the text of Article V, Supreme Court precedent, and history, all of which suggest that this is a political question for Congress. Congress is currently considering the issue, and thus, at present, there is no concrete controversy for this Court to resolve. The separation of powers requires this Court to refrain from adjudicating the ERA's validity in this litigation. The District Court's decision addressing the ratification issue on its merits prematurely entangled the Court in deciding abstract issues that are unnecessary to resolve a concrete controversy. Congress—the democratically elected, federal-lawmaking branch of government—is best placed to resolve disagreements between states about the validity of a federal constitutional amendment.

## BACKGROUND

1.      **The Equal Rights Amendment**.   In 1923, a constitutional amendment guaranteeing equality of rights, not to be denied or abridged on account of sex, was first introduced in Congress. *See* H.R.J. Res. 75, 68th Cong. (1923). From 1923 through 1971, the judiciary committees of both houses of Congress held hearings on the ERA. The Senate adopted it by a two-thirds vote

in 1950 and 1953, but it was not until 1970 that the ERA got its first debate and vote on the floor of the House of Representatives. John R. Vile, *Encyclopedia of Constitutional Amendments, Proposed Amendments, and Amending Issues, 1789-2015* 177 (2d ed. 2003).

In 1970, Congresswoman Martha Griffiths led a discharge petition to get the ERA to the House floor over the objections of the House Judiciary Committee. *See* 116 Cong. Rec. 27,999-28,004 (1970). The House then voted 352 to 15 to adopt the ERA, but the Senate did not follow suit in that session. *See* Vile, *supra*, at 177. The Senate added a seven-year deadline to the ERA without voting on whether to adopt the constitutional amendment. *See* 116 Cong. Rec. 36,450-51. The next congressional session, in 1971-72, saw the successful reintroduction of the ERA. *See* Vile, *supra*, at 177. The resolution proposing the constitutional amendment included language that the amendment would be valid "when ratified . . . within seven years" of the date of submission. H.R.J. Res. 208, 92nd Cong. (1972). Both houses adopted the ERA by over 90 percent of the vote in that session, and sent it out to the States for ratification on March 22, 1972. *See* Vile, *supra*, at 177; Cong. Research Serv., R42979, *The Proposed Equal Rights Amendment: Contemporary Ratification Issues* 16 (updated 2019).

Initially, States were quick to ratify the ERA. By the end of 1973, thirty state legislatures had ratified the ERA. *See, supra*, Cong. Research Serv., R42979 at 16. By 1977, thirty-five had ratified the ERA, three states short of the thirty-eight needed to constitute three-fourths of the States required by Article V. *See*

4

*id.*; U.S. Const. art. V.  In 1978, Congress adopted a resolution extending the time period for ratification by thirty-nine months.  *See* H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978).  Meanwhile, from 1973 to 1978, four states—Nebraska, Tennessee, Idaho, and Kentucky—voted to rescind their ratifications of the ERA. *See Idaho v. Freeman*, 529 F. Supp. 1107, 1112 n.2 (D. Idaho 1981).  A fifth state, South Dakota, passed a resolution stating that its prior ratification would cease to be valid on the date of the original 1979 time period of Congress, unless three-fourths of the States ratified by then.  Robert Black, *Could the Equal Rights Amendment Become a Reality?*, Nat'l Const. Ctr. (Jan. 15, 2020), https://constitutioncenter.org/blog/could-the-equal-rights-amendment-become-a-reality.  No additional state ratified the ERA between March 22, 1979 (the date when the original time period lapsed) and June 30, 1982 (the date when the revised time period lapsed).  *See* Jane Mansbridge, *Why We Lost the ERA* 13 (1986). Many assumed that the ERA was no longer viable.

    **2.**    **The Present Dispute Over Virginia, Illinois, and Nevada's Purported Ratifications.**  In March 2017, the Nevada legislature ratified the ERA, and, in May 2018, the Illinois legislature followed suit.  Then, in January 2020, the Virginia legislature ratified the ERA, making it the thirty-eighth state to have done so.  *See* Julie C. Suk, *We the Women: The Unstoppable Mothers of the Equal Rights Amendment* 129-71 (2020).  In February 2020, apparently prompted by Virginia's ratification vote and the possibility that 38 states had now ratified the ERA, the House of Representatives adopted a resolution eliminating the prior

time listed for ratification. *See* H.R.J. Res. 79, 116th Cong. (2020). The resolution, which passed by a vote of 232 to 183, declared that the ERA would be part of the Constitution "whenever ratified" by three-fourths of the States. But the Senate did not take similar action in that legislative session. A newly elected House of Representatives adopted H.J. Res. 17 in March 2021, textually identical to the previous session's resolution eliminating the ERA ratification deadline. A bipartisan resolution has also been introduced in the Senate, *see* S.J. Res. 1, 117th Cong. (2021).

Shortly after Virginia's ratification, Appellants Virginia, Illinois, and Nevada filed this suit against the Archivist of the United States seeking a judicial declaration that the ERA was now part of the Constitution and requiring the Archivist to perform his "purely ministerial duty" to publish the amendment. Their position was that the ERA is validly ratified and currently part of the U.S. Constitution because: (1) no ratification deadline validly existed; (2) Congress lacks constitutional power to set a deadline for ratification; and (3) the Constitution does not permit States to rescind their ratifications. Appellee-Intervenor States—who either never ratified or have since tried to rescinded their prior ratifications—argue that: (1) the ERA expired due to a valid ratification deadline; (2) the Constitution implicitly limits the time available for state ratification and that tacit deadline has passed; and (3) the ERA lacks support due to rescissions of ratifications by five states. Intervenors' Mot. for Summ. J.

at 13-14, *Commonwealth v. Ferriero*, No. 1:20-cv-242-RC (D.D.C. July 5, 2020), ECF No. 74.

The District Court dismissed the complaint and held that Virginia, Illinois, and Nevada lacked standing because, in its view, the Archivist had no "legally significant" role. *Ferriero*, 525 F. Supp. 3d at 47. While acknowledging that lack of standing was "enough reason to dismiss this case for lack of jurisdiction," the court "move[d] on" to decide that "judging the effect" of any ratification deadline did not present a political question. *Id.* at 49, 51. And, pressing on, the court decided that the ERA was not part of the Constitution because Virginia, Illinois, and Nevada's "ratifications came too late to count." *Id.* at 40, 54-61.

## ARGUMENT

### I. THE POLITICAL QUESTION DOCTRINE AND LACK OF ANY CONCRETE INTERESTS AT STAKE CURRENTLY PRECLUDE JUDICIAL REVIEW OF THE VALIDITY OF THE ERA'S RATIFICATION.

This case presents nonjusticiable questions that should be resolved by Congress—where legislators representing their voters are currently attempting to do so—and not the courts. Justiciability doctrines are fundamentally about the separation of powers and appropriate role of the federal courts in our democratic constitutional system. *See Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). As Supreme Court case law indicates, courts should not rush to resolve difficult constitutional questions whose contours may be changed by the branch to whom the Constitution has entrusted responsibility for the amendment

process and which is actively considering the matter. Honoring these justiciability doctrines here is of real importance, because they are designed to protect the separation of powers and prevent the inappropriate exercise of the judicial power—concerns that apply a fortiori to judicial review of the constitutional amendment process. *See Coleman v. Miller*, 307 U.S. 433, 452-55 (1939).

The political question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). A case involves a political question in circumstances such as when there is:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.*; *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195, 197-98 (2012) (emphasizing as key whether an issue is textually committed to another branch, whether there are judicially manageable standards, and concluding that the constitutionality of the federal statute at issue was a question for the courts to decide). Questions relating to the efficacy of an amendment's ratification after an extended delay are committed to Congress under Article V. *See Coleman*, 307 U.S. at 452-53.

Moreover, "the political-question doctrine rests in part on prudential concerns calling for mutual respect among the three branches of Government." *Goldwater v. Carter*, 444 U.S. 996, 1000 (1979) (Powell, J. concurring in the judgment). In *Zivotofksy*, the Court's justiciability ruling focused primarily on textual commitment and judicially manageable standards, but Justice Sotomayor's concurrence emphasized the continued importance of prudential factors. 566 U.S. at 202-03 (Sotomayor, J., with Breyer, J., concurring in part and concurring in the judgment) (emphasizing the need to consider all of the *Baker v. Carr* factors and noting that prudential factors may call for judicial "abstention" from decision). Indeed, judicial review may be inappropriate even for questions not entirely committed to another branch. *See, e.g.*, *Goldwater*, 444 U.S. at 996 (Powell, J., concurring in the judgment) (disagreeing that issue was political question, but finding it nevertheless "not ripe for judicial review"); *see also United States v. Windsor*, 570 U.S. 744, 757, 759 (2013) (even for cases justiciable under Article III, the "[r]ules of prudential standing" are "flexible" and "designed to protect the courts from deciding abstract questions of wide public significance even when other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights" (cleaned up)).

In *Coleman v. Miller*, the Supreme Court applied the political question doctrine to the amendment context, concluding that both "the question of the efficacy of ratifications by state legislatures, in the light of previous rejection or

attempted withdrawal" and "what is a reasonable period within which ratification may be had," at least where Congress had specified no time limit, were "political questions," committed to congressional resolution. 307 U.S. at 450, 452, 454; *see also id.* at 459-60 (Black, J., concurring). In that context, the Court explained that the issue of a time period for ratification was a non-justiciable political question because resolving it involved:

> an appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice and as to which it would be an extravagant extension of judicial authority to assert judicial notice as the basis of deciding a controversy with respect to the validity of an amendment actually ratified.

*Id.* at 453-54. As such, the Court concluded, "these conditions are appropriate for the consideration of the political departments of the Government[,]" because "[t]he questions they involve are essentially political and not justiciable." *Id.* at 454.

Here, unlike in *Coleman v. Miller*, the resolution proposing the amendment specifically included a time period. The District Court disagreed with *Coleman*'s applicability on that basis, concluding that the court could "judg[e] the effect of a clear deadline that Congress has already set." *Ferriero*, 525 F. Supp. 3d at 51. According to the District Court, such a judgment did not involve a political question because "[i]f a court can consider whether Article V permits Congress to set a ratification deadline, it should also be able to consider whether that deadline affects late-coming ratifications." *Id.* at 53. But "[t]hat question was not

involved in *Dillon v. Gloss*," and the District Court ignored the Supreme Court's admonition that "what was there said must be read in the light of the point decided." *Coleman*, 307 U.S. at 453.

In *Dillon*, the Supreme Court addressed whether the Eighteenth Amendment—added to the Constitution two years prior—was "invalid, because the congressional resolution . . . proposing the amendment declared that it should be inoperative unless ratified within seven years." *Dillon v. Gloss*, 256 U.S. 368, 370-71 (1921). Given that the States took little over a year to ratify the amendment, the Supreme Court had no cause to consider the validity of a *seven*-year period. *See* David Pozen & Thomas Schmidt, *The Puzzles and Possibilities of Article V*, 121 Colum. L. Rev. 2317, 2370 n.314 (2021). The Court only decided that Congress's inclusion of a time period did not ipso facto render the amendment void.

The petitioners in *Coleman* seized on *Dillon*'s dicta that Congress must "keep[] within reasonable limits" in selecting a deadline, *Dillon*, 256 U.S. at 375-76, and argued that "the Court can and should decide what is a reasonable period" if Congress sets no limitation. *Coleman*, 307 U.S. at 452. The Supreme Court rejected that position,[2] explaining that it was without power to "decid[e] what constitutes a reasonable time and determine accordingly the validity of

---

[2] "Seven justices agreed that political questions were presented by the claim that ratification was precluded by prior rejection, and by the claim that ratification had been too long delayed to be effective." 13C Charles Alan Wright et al., Federal Practice and Procedure § 3534.1 (3d ed. 2021).

ratification," because "the question, what is a reasonable time, lies within the congressional province." *Coleman*, 307 U.S. at 453-54. The distinction that the District Court relied on below is thus without a difference; the outcome in *Coleman* would have been the same even if Congress *had* set a limitation. Time limit or not, the issue belonged to "the class of questions deemed to be political and not justiciable." *Id*. at 454.

*Coleman*'s decision to refrain from reviewing the ratification process serves several important purposes.

1. First, broad judicial review of the ratification process poses risks to the Constitution's system of checks and balances. After all, a constitutional amendment is not a form of ordinary legislation, governed by the bicameralism and presentment requirements of Article I, Section 7. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 955 & n.21 (1983); *Hawke v. Smith*, 253 U.S. 221, 230 (1920); *Hollingsworth v. Virginia*, 3 U.S. 378, 379-80 (1798). Rather, amendment is one of the only checks on the Court's power to interpret the Constitution. Indeed, Congress often proposes amendments to interpret the Constitution differently from courts. For instance, the amendment at issue in *Coleman v. Miller* was intended to supersede the Supreme Court's interpretation of the Constitution in *Hammer v. Dagenhart*, 247 U.S. 251 (1918). *See* 65 Cong. Rec. 10,092 (1924) (Remarks of Senator Shortridge).

So, too, with the ERA. Congress proposed the ERA in 1972 because it judged the Supreme Court's protection against gender discrimination in cases like

*Goesaert v. Cleary*, 335 U.S. 464 (1948) (upholding partial ban on female bartenders), and *Hoyt v. Florida*, 368 U.S. 57 (1961) (upholding women's exemption from jury service), to be inadequate. *See* 117 Cong. Rec. 35,296 (1971) (floor speech by Congresswoman Martha Griffiths noting *Goesaert v. Cleary* and *Hoyt v. Florida* as evidence of the Supreme Court's reluctance to invalidate sex-discriminatory laws under the Equal Protection Clause). As Professor Tribe has argued, "judicial supervision would significantly undercut the independence of article V from normal legal processes and erode its special role in the constitutional scheme," and would ultimately involve the Supreme Court "pass[ing] on the legitimacy of actions taken to correct perceived flaws in its own jurisprudence—a task with uncomfortable implications for the integrity of the judicial enterprise." Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433, 444 (1983); *cf. Nixon v. United States*, 506 U.S. 224, 234-35 (1993) (explaining that because impeachment is the only check that Congress has on judges, "judicial review would be inconsistent with the Framers' insistence that our system be one of checks and balances").

2. Second, a narrow judicial role in reviewing proposed amendments protects the separation of powers. The Court explained in *Allen v. Wright* that justiciability doctrines, like the political question doctrine discussed in *Coleman*, "define[] with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded" and are "concern[ed] about the

proper—and properly limited—role of the courts in a democratic society." 468 U.S. at 750 (internal quotation marks omitted). Together with the related doctrines of standing, ripeness, and mootness, the political question doctrine plays an important role in sustaining the legitimacy of the courts and in maintaining the balance among the branches of government, critical to the health of our constitutional system of representative democracy. *Cf. DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (explaining that these doctrines "originate in Article III's 'case' or 'controversy'" requirement). Through these doctrines, courts protect Congress's constitutionally prescribed role—as the elected, national lawmaking body—in the amendment process.

3. Third, a narrow judicial role honors the design of Article V. Article V assigns constitutional amendments to the judgments of our most representative bodies—Congress and state legislatures—and requires supermajority votes in both to amend the Constitution. *See* U.S. Const. art. V. Broad judicial review of the ratification process undermines Congress's constitutionally prescribed role.

## II. CONGRESS, NOT THIS COURT, IS CONSTITUTIONALLY AUTHORIZED TO RESOLVE WHETHER THE REQUISITE NUMBER OF STATES HAVE EFFECTIVELY RATIFIED A CONSTITUTIONAL AMENDMENT.

Congress is the only standing body of the national government with a textually prescribed role in amending the Constitution. *See* U.S. Const. art. V. As such, Congress should have the opportunity to decide whether the ERA has been effectively ratified. Congress's historic role in resolving disagreements

about constitutional amendment ratification underscores the appropriateness of awaiting action by Congress—as does the intensely political nature of the question.

1.    History demonstrates that Congress has authority to resolve disagreements on ratification.  Congress has exercised that authority to resolve arguments among the States regarding ratification time limits and rescissions.  On two occasions, Congress passed resolutions to recognize the validity of a constitutional amendment to dispel doubts as to whether it had been effectively ratified.  Indeed, the range of congressional action throughout the amendment process indicates the wide discretion the Constitution has committed to Congress.

While the Fourteenth Amendment was still pending before the States, Ohio and New Jersey voted to rescind their earlier ratifications of the amendment.  *See* Cong. Globe, 40th Cong., 2d Sess. 4296 (1868).  Notwithstanding those purported rescissions, Congress adopted a concurrent resolution stating that the required three-quarters of states had ratified the Fourteenth Amendment, and it was thus adopted as part of the Constitution.  15 Stat. 709, 710 (1868).  The resolution listed Ohio and New Jersey among the ratifying states.  *See id.*; *see also* Cong. Globe, 40th Cong., 2d Sess. 4295-96 (1868).

The Twenty-Seventh Amendment posed a different sort of uncertainty. Though sent to the States for ratification in 1789, the amendment languished for 203 years—during which time the Supreme Court remarked that it had effectively expired.  *Dillon*, 256 U.S. at 375.  Yet in 1992, the amendment was ratified by a

38th State. Despite the long lag between promulgation and the last state's ratification, both chambers of Congress passed resolutions affirming that the amendment was validly ratified, *see* 138 Cong. Rec. 11,869 (1992); 138 Cong. Rec. 12,052 (1992), and it was added to the Constitution.

This history confirms what the Supreme Court has said: Article V commits wide latitude to Congress to resolve "the question of the efficacy of ratifications by state legislatures," including whether constitutional amendments have been validly ratified by a sufficient number of States to become part of the Constitution. *Coleman*, 307 U.S. at 450.

2. While *Coleman* affirmed Congress's authority to determine the timeliness of a constitutional amendment in circumstances different from the ERA, the exercise of judicial restraint in *Coleman* underscored prudential concerns that are applicable here. *Id.* at 453-54:

> [T]he question of a reasonable time in many cases would involve . . . an appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice and as to which it would be an extravagant extension of judicial authority to assert judicial notice as the basis of deciding a controversy with respect to the validity of an amendment actually ratified.

The time period for ratification of the ERA was neither included in the text of the amendment nor expressed as a condition of ratification, thereby allowing room for congressional resolution. *See* Suk, *We the Women*, *supra*, at 177. The text of the ERA itself does not include a deadline by which it had to be ratified. Instead,

the deadline was part of the resolution proposing the constitutional amendment. *See* H.R.J. Res. 208, 92nd Cong. (1972). The resolution reads:

> [T]he following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution *when ratified* by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress.

*Id.* (emphasis added). The language providing that the ERA becomes valid "when ratified" leaves open whether the ERA remains viable even if not ratified within seven years.

In contrast to this language, Congress has used explicitly conditional language in other proposed constitutional amendments. For example, the text of the Eighteenth Amendment itself makes clear that the time limit is mandatory: "This article shall be *inoperative unless* it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress." U.S. Const. amend XVIII, § 3 (repealed 1933) (emphasis added). Congress used identical language—making an amendment "inoperative unless . . . ratified . . . within seven years"—in the text of the Twentieth, Twenty-First, and Twenty-Second Amendments. *See* U.S. Const. amend. XX, § 6; U.S. Const. amend. XXI, § 3; U.S. Const. amend. XXII, § 2.

In other instances, when Congress has included time limits outside of the text of an amendment itself, it used language of limitation not found in the ERA.

The preambles to the Twenty-Third and Twenty-Fourth Amendments say "the following article is hereby proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution *only if* ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission to Congress." 106 Cong. Rec. 12,571 (1960) (emphasis added); 108 Cong. Rec. 5,102 (1962). This conditional language more strongly implies that the time limits in those amendments were intended as conditions of ratification.

No such language appears in the text of the ERA. And the language that appears in the resolution proposing the ERA is more ambiguous. In fact, it uses no conditional language at all. Instead, the resolutions say that the amendment would be valid "*when ratified* by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress." *See* H.R.J. Res. 208, 92nd Cong. (1972). The phrase "when ratified" is ambiguous; Congress might find that the ERA could remain viable if the seven-year period is extended. Indeed, Congress itself sanctioned this interpretation when, in 1978, it extended the deadline. *See* H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978). Suk, *We the Women*, *supra*, at 118-19.

In so doing, Congress acted consistently with *Coleman v. Miller*'s explanation that the determination as to "whether a reasonable time had elapsed" since the submission of the amendment for ratification is to be made by "the Congress with the full knowledge and appreciation ascribed to the national

18

legislature of the political, social and economic conditions which have prevailed during the period since the submission of the amendment." 307 U.S. at 453-54.

3.    The "persistent controversy over the validity of amendments" demonstrates a "prudential rationale for allowing one organ of government to resolve the status of a new amendment," a task that Congress can accomplish "more quickly and democratically than the Court is capable of."  Pozen & Schmidt, *supra*, at 2324.  The District Court said that in "[a]ddressing the effect of the ERA's deadline," all it "has to do is interpret the Constitution."  *Ferriero*, 525 F. Supp. 3d at 54.  "But few and far between are the Article V practices that have been 'open, widespread, and unchallenged since the early days of the Republic,'" and "unsettled questions substantially exceed the settled ones in both number and significance."  Pozen & Schmidt, *supra*, at 2376 (internal quotation omitted).  The District Court's conclusion that Virginia, Illinois, and Nevada's "ratifications came too late to count," *Ferriero*, 525 F. Supp. 3d at 40, overlooks the possibility that Congress could "pass a joint resolution retroactively waiving the deadline and directing the Archivist of the United States to publish the ERA as the Twenty-Eighth Amendment."  Pozen & Schmidt, *supra*, at 2392.  The resulting "multifarious pronouncements by various departments on one question," *Baker*, 369 U.S. at 217, would "inevitably embarrass the course of amendment," *Coleman*, 307 U.S. at 458 (Black, J., concurring).

Furthermore, Congress has greater flexibility than a court in overseeing the Article V process.  Congress may decide, for instance, that in light of the unique

circumstances of the ERA, it would be appropriate both to extend the ERA's ratification deadline and to recognize state rescissions. *See Goldwater*, 444 U.S. at 1003 (Rehnquist, J., concurring in the judgment) (suggesting that the efficacy of rescission " 'might be answered in different ways for different amendments' " (quoting *Dyer v. Blair*, 390 F. Supp. 1291, 1302 (N.D. Ill. 1975) (three-judge court))); Pozen & Schmidt, *supra*, at 2392 n.421. That flexibility is yet another prudential reason to favor Congress over the courts in resolving the status of contested amendments.

Congress is best able to take into account the circumstances relevant to resolving disagreements on the vitality of the ERA. As *Coleman v. Miller* suggested, decisions about the relevant time period over which an amendment could be ratified involve "appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice." *Id.* at 453. The years since the ERA passed Congress have seen both change and continuity in our country's understanding of sex equality.

Even as Congress contemplated the ERA, the Supreme Court began developing its sex equality jurisprudence. Between the House's vote to adopt the ERA in 1971 and the Senate's vote in 1972, the Court invalidated *de jure* gender discrimination for the first time in *Reed v. Reed*, 404 U.S. 71 (1971). After the ERA was put to the States for ratification, the Court held that heightened scrutiny applied to sex classifications and began invalidating statutes reflecting

stereotyped distinctions between the sexes. *See Craig v. Boren*, 429 U.S. 190 (1976); *see also Frontiero v. Richardson*, 411 U.S. 677, 685, 687-88 (1973) (plurality op.). In *Frontiero*, two members of the Court took note of the ERA's adoption by Congress and its pendency. 411 U.S. at 685, 687-88 (Brennan, J.); *id.* at 692 (Powell, J., concurring). The plurality even took the position that Congress's actions, as a "coequal branch of Government," to prohibit sex discrimination, was "not without significance" to the Court's interpretation of the Fifth Amendment—further evidencing judicial respect for the constitutional role of a coordinate branch of government. *Id.* at 687-88.

It is for Congress, not the courts in the first instance, to resolve whether this amendment has or can yet be ratified. States' deliberations over time may well have been influenced by the body of constitutional sex equality law, consisting of judicial interpretations of the Fifth and Fourteenth Amendments, that has developed in the decades since the ERA was passed by Congress. Resolving the question of efficacy of ratifications over this period of time requires judgments about whether the amendment remains "necessary," an unreviewable determination that Article V assigns to Congress as part of its authority to propose amendments. *Cf. Rhode Island v. Palmer*, 253 U.S. 350, 384-85 (1920) (concluding that Congress need not expressly declare that it regarded an amendment as necessary). Such judgments are fundamentally political and should be taken up in the first instance by Congress—the branch most responsible for

representing "the people" and the only branch of the federal government charged, under Article V, with a role in the amending process.

Nevada's ratification of the ERA in 2017 explicitly recognized the singular role Congress plays in evaluating these questions, observing that "Congress is in a unique position to judge the tenor of the nation, to be aware of the political, social, and economic factors affecting the nation, and to be aware of the importance to the nation of the proposed amendment."  S.J. Res. 2, 79th Session (Nev. 2017).  In ratifying decades after the time limit, Nevada assumed that "it is for Congress, under the principles of *Coleman v. Miller*, to determine the validity of the state ratifications occurring after a time limit in the resolving clause, but not in the amendment itself."  *Id.*

During the 1978 hearings on the ERA deadline extension, the late Justice Ruth Bader Ginsburg observed that "fundamental human rights guarantees" such as the ERA may take longer than seven years because they are "stated at a level of majestic generality," and therefore warrant sustained national debate about the "purpose and probable effects of the amendment."  *Equal Rights Amendment Extension, Hearings on S.J. Res. 134 Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 95th Cong. 262-64 (1978) (statement of Justice Ruth Bader Ginsburg, then professor at Columbia University) ("1978 S. Hr'g. Statement").  The need for time and sustained debate was also emphasized by Professor Thomas Emerson, a professor at Yale Law School.  *See Equal Rights Amendment Extension, Hearings on H.J. Res. 638 Before the Subcomm. on Civil*

*and Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 64 (1978) (Professor Emerson noted that women's suffrage was under consideration for at least three-quarters of a century before a constitutional amendment guaranteeing it was adopted in 1920, as "[h]istory has demonstrated that a long period of time is necessary for the nation to make up its mind with respect to fundamental changes in the status of large groups in the population.").

In her Senate testimony, Ruth Bader Ginsburg further emphasized that Congress had the responsibility to determine whether "the equal rights amendment has lost vitality," and whether the amendment had "received a full and fair hearing on the merits." 1978 S. Hr'g. Statement at 263. These are precisely the questions that Congress is now contemplating. *See, e.g.*, 166 Cong. Rec. S2719 (2020) (Remarks of Senator Lisa Murkowski on Women's Suffrage) ("I have introduced a resolution, S.J. Res. 6, which would remove the time limit from the joint resolution that passed the Congress in 1972. I have asserted time and again . . . that you cannot put a time limit on women's equality.").

This Court should accordingly allow Congress to speak to the continuing need for the ERA.

## CONCLUSION

This Court should reserve the interpretation of the ERA's time period to Congress as a political question.

Respectfully submitted,

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth
Kaitlyn A. Golden
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

DATED: January 10, 2022     *Attorneys for Amici Constitutional Law Professors*

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limits of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,755 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed with the Clerk using the appellate CM/ECF system on January 10, 2022. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

.                                    /s/ Jessica L. Ellsworth
                                     Jessica L. Ellsworth