## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

COMMONWEALTH OF VIRGINIA, et al.,

*Plaintiff-Appellants,*

v.

DAVID FERRIERO,
in his official capacity as Archivist of the United States,

*Defendant-Appellee,*

STATE OF ALABAMA, et al.,

*Intervenor-Defendant-Appellees.*

On Appeal from the United States District Court for the District of
Columbia, No. 1:20-cv-00242, Hon. Rudolph Contreras

**BRIEF OF EQUALITY NOW, THE WORLD POLICY ANALYSIS CENTER, THE LATIN AMERICAN AND CARIBBEAN COMMITTEE FOR THE DEFENSE OF WOMEN'S RIGHTS (CLADEM), THE EQUAL RIGHTS TRUST, THE EUROPEAN WOMEN'S LOBBY, FEMNET, THE ARAB WOMEN ORGANIZATION, AND THE SISTERHOOD IS GLOBAL INSTITUTE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANTS AND IN SUPPORT OF REVERSAL**

Jesse Solomon
Amelia T.R. Starr
Margarita Clarens
Alexa B. Lutchen
Courtney Daukas
Davis Polk & Wardwell LLP
901 15th Street NW
Washington, D.C. 20005
(202) 962-7138
jesse.solomon@davispolk.com

Antonia Kirkland
Equality Now
90 Church Street
Unit 7160
New York, NY 10008-7160
(212) 586-0906
akirkland@equalitynow.org

*Counsel for* Amici Curiae

January 10, 2022

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

All parties have consented to the filing of this brief. Pursuant to Circuit Rule 29(d), *amici curiae* certify that this separate brief is necessary because it reflects a perspective not found in the parties' briefs or in any of the other *amici* briefs. A separate brief is necessary given the *amici*'s extensive experience in every region of the world advocating for the protection and promotion of the rights of women and girls. The *amici*, as organizations that fight for equality around the world, would highlight for the Court their global experience with constitutional sex equality provisions and the concrete injury effected by the United States' failure to guarantee sex equality at the constitutional level.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to District of Columbia Circuit Rule 28(a)(1), counsel for the *amici* certify the following:

A.   Parties and *Amici Curiae*

All parties and *amici curiae* who appeared before the district court appear in Plaintiff-Appellants' brief.  The parties appearing in this Court include those listed in Plaintiff-Appellants' brief and the *amici* listed in Defendants-Appellees' brief.

B.   Ruling Under Review

An accurate reference to the ruling at issue appears in Plaintiff-Appellants' brief.

C.   Related Cases

The only related case of which counsel are aware is identified in Plaintiff-Appellants' Brief.

# CORPORATE DISCLOSURE, AUTHORSHIP, AND FINANCIAL CONTRIBUTION STATEMENTS

Pursuant to Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure and D.C. Cir. Rule 26.1(a), *amici curiae* are nonpartisan, nonprofit organizations with no parent corporations and declare that no publicly held corporation owns 10% or more of their respective stock or other interest in the organizations.

Pursuant to D.C. Cir. Rule 26.1(b), *amici curiae* state that their general nature and purpose are organizations working for the protection and promotion of the rights of all women and girls worldwide.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that no counsel to a party in the matter before the Court authored this brief in whole or in part; that no party or party's counsel contributed money intended to fund preparing or submitting this brief; and that no person contributed money to *amici curiae* that was intended to fund preparing or submitting this brief.

# TABLE OF CONTENTS

P<small>AGE</small>

INTEREST OF AMICI CURIAE........................................................ 11

SUMMARY OF ARGUMENT ........................................................ 12

ARGUMENT ................................................................................. 16

I.    THE VAST MAJORITY OF COUNTRIES AROUND THE
WORLD RECOGNIZE THE CONCRETE AND
PARTICULARIZED HARM ARISING FROM SEX
INEQUALITY AND THE NEED FOR EXPRESS
CONSTITUTIONAL GUARANTEES OF EQUALITY ON
THE BASIS OF SEX ............................................................ 16

    A.    The district court failed to recognize the international
consensus that express constitutional provisions are
necessary to address significant harm to all caused by
sex discrimination. ...................................................... 16

    B.    Constitutional sex equality provisions around the
world have facilitated the elimination of discriminatory
laws and the implementation of affirmative measures
to prevent discrimination and violence against women
and girls. ..................................................................... 20

        1.    Elimination of discriminatory laws.................... 21

        2.    Affirmative measures to prevent
discrimination.................................................... 24

        3.    The ERA's potential impact in the United
States ................................................................ 31

II.    THE UNITED STATES IS REQUIRED TO ADOPT THE
ERA TO COMPLY WITH ITS TREATY COMMITMENTS 39

III.    THE UNITED STATES SHOULD ADOPT THE ERA TO
COMPLY WITH INTERNATIONAL LAW AND HUMAN
RIGHTS STANDARDS.......................................................... 43

CONCLUSION.............................................................................. 48

CERTIFICATE OF COMPLIANCE................................................ 49

CERTIFICATE OF SERVICE ......................................................... 50

APPENDIX A ................................................................................ 51

# TABLE OF AUTHORITIES

P<small>AGE</small>

C<small>ASES</small>

*Al-Bihani v. Obama,*
   619 F.3d 1 (D.C. Cir. 2010) ..................................................... 42

*Baker v. Carr,*
   369 U.S. 186 (1962) ................................................................ 32

*Commonwealth v. Ferriero,*
   525 F. Supp. 3d 36 (D.D.C. 2021) .................................. 9, 32, 33

*Gonzales v. Raich,*
   545 U.S. 1 (2005) .................................................................... 35

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ............................................... 16, 32, 33, 34

*Tuan Anh Nguyen v. INS,*
   533 U.S. 53 (2001) .................................................................. 29

*United States v. Morrison,*
   529 U.S. 598 (2000) ...................................................... 26, 30, 35

*United States v. Nagarwala,*
   350 F. Supp. 3d 613 (E.D. Mich. 2018) .............................. 16, 30

### Foreign Cases

*Attorney General v. Unity Dow,* (1992) 103 I.L.R. 128 (Bots.) ...... 18

*Benin Constitutional Court Decision,* DCC 14-172 (Sept. 16, 2014)................................................................................... 18, 19

*Benner v. Canada (Sec'y of State)*, [1997] 1 S.C.R. 358 (Can.)...... 18

Bundesverfassungsgericht (BVerfG) [Federal Constitutional
 Court] May 21, 1974, 37 Entscheidungen des
 Bundesverfassungsgerichts [BVerfGE] 217 (Ger.) .................. 18

*Meera Gurung v. Her Majesty's Gov't, Dep't of Central
 Immigration, Ministry of Home Affairs*, Dec'n No. 4858 2051, ¶
 14 (S. Ct. 1994) (Nepal) ............................................................. 18

*Rattigan and Others v. Chief Immigration Officer*, 1995(2) SA 182
 (ZS) (Zim.) .................................................................................... 18

*Romein v. Adv. General for Scotland*, [2016] CSIH 24 (Scot.)...... 19

Saikō Saibansho [Sup. Ct.] June 6, 2008, Hei 6 (Gyo-Tsu) no. 135,
 62 Saikō Saibansho Minji Hanreishū [Minshū] Majority § 2
 (Japan) (translated
 at http://www.courts.go.jp/app/hanrei_en/detail?id=955) ....... 18

<u>S</u>TATUTES & <u>R</u>ULES

D.C. Cir. R. 26.1(a) ........................................................................  3
D.C. Cir. R. 26.1(b) ........................................................................  3
D.C. Cir. R. 28 (a)(1) ......................................................................  2
Fed. R. App. P. 29(a)(4)(A) ............................................................  3
Fed. R. App. P. 29(a)(4)(E) ............................................................  3
Fed. R. App. P. 29(d) ......................................................................  1

## Other Authorities

Ayaz Gul, *Taliban Say They Will Use Parts of Monarchy Constitution to Run Afghanistan for Now*, VOICE OF AMERICA (Sept. 28, 2021, 12:03 PM), https://www.voanews.com/a/taliban-say-they-will-use-parts-of-monarchy-constitution-to-run-afghanistan-for-now/6248880.html ........................................... 11

Catharine A. MacKinnon, *Creating International Law: Gender as Leading Edge*, 36 HARV. J.L. & GENDER 105 (2013) ................. 42

*Child Marriage in the United States: A Synthesis of Evidence on the Prevalence & Impact,* ICRW (Aug. 2020), https://www.icrw.org/wp-content/uploads/2020/08/child-marriage-in-the-US-prevalence-impact_8-2020_ICRW.pdf. .... 35

Convention on the Elimination of All Forms of Discrimination against Women, Dec. 18, 1979, 1249 U.N.T.S. 13 (entered into force Sept. 3, 1981), https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-8&chapter=4&clang=_en. ........................................................................... 40

Corte cost., 28 Gennaio 1983, Giur. it. 1983, I, 91 (It.) ................. 18

HUMAN RIGHTS COMMITTEE, GENERAL COMMENT NO. 28, EQUALITY OF RIGHTS BETWEEN MEN AND WOMEN (ARTICLE 3), U.N. DOC. CCPR/C/21/REV.1/ADD.10, ¶ 4 (Mar. 29, 2000).......................... 37

International Covenant on Civil and Political Rights, arts. 2, 3, 26, Mar. 23, 1976, 99 U.N.T.S. 171. ......................................... 11, 36

Lindsey Sacher, *From Stereotypes to Solid Ground: Reframing the Equal Protection Intermediate Scrutiny Standard and Its Application to Gender-Based College Admissions Policies*, 61 CASE W. RES. L. REV. 1411 (2011). ............................................. 29

S. Todd Rogers, *The Originalist*, Legally Speaking (Jan. 2011), https://podcast.uctv.tv/webdocuments/legally-speaking/11_01LegallySpeaking_Scalia.pdf ............................. 38

The United States signed the Vienna Convention on April 24, 1970. https://treaties.un.org/pages/ViewDetailsIII.aspx?src=TREATY&mtdsg_no=XXIII-1&chapter=23&Temp=mtdsg3&clang=_en ................................................ 40

*US Laws against FGM – State by State,* Equality Now (Feb. 2, 2021), https://www.equalitynow.org/us_laws_against_fgm_state_by_state/ ...................................... 31

*United States' Child Marriage Problem: Study Findings*, Unchained At Last (Apr. 2021), https://www.unchainedatlast.org/united-states-child-marriage-problem-study-findings-april-2021/ ...................................................... 31

Vienna Convention on the Law of Treaties art. 18, May 23, 1969, 1155 U.N.T.S. 331 ................................................. 40

World Pol'y Analysis Ctr., https://www.worldpolicycenter.org/data-tables/policy/does-the-constitution-explicitly-guarantee-equality-or-non-discrimination-across-sex-and-or-gender ................................. 13

## INTEREST OF AMICI CURIAE

The following organizations, from nearly every region of the world, all advocate for the rights of women and girls and join Equality Now, an international human rights organization incorporated in New York, in its submission of this brief: the WORLD Policy Analysis Center, the Latin American and Caribbean Committee for the Defense of Women's Rights ("CLADEM"), the Equal Rights Trust, the European Women's Lobby, FEMNET, the Arab Women Organization, and the Sisterhood is Global Institute.[1]

Given the relevance of this lawsuit to the rights of all women and girls and the important effects that this case may have on efforts to prevent sex discrimination and gender-based violence in the United States, Equality Now and *amici* have a strong interest in the outcome of the case. The United States' failure to publish and certify the Equal Rights Amendment specifically impedes the work and mission of the *amici* because of the significant role of the

---

[1] Full descriptions of *amici* appear in the Appendix to this brief.

United States as a global leader that can influence global gender policy, as well as jurisprudence around the world.

## SUMMARY OF ARGUMENT[2]

The Equal Rights Amendment (the "ERA") adds express language to the United States Constitution (the "Constitution") guaranteeing equality on the basis of sex.  In the course of almost thirty years of working to address sex inequality and violence around the world, Equality Now has seen the damage wrought by inequality, and the benefits gained by countries that have embraced sex equality.  In this brief,[3] *amici* seek to highlight the worldwide success of constitutional sex equality amendments, provisions required under international law, and to refute the district court's claim that Plaintiff-Appellant states failed to

---

[2] The authors thank Divya Srinivasan for her invaluable assistance with this brief.

[3]  While this submission focuses on these specific points, *amici* disagree with each of the government's positions on appeal. The Plaintiff-Appellants' brief addresses these additional arguments.

"establish a particularized harm" to their sovereign interests.[4]
The district court admitted below that sovereigns have "unique
and sweeping interests that ordinary litigants lack" but
nevertheless concluded the harm alleged by the Plaintiff-
Appellants was "too abstract to be judicially cognizable."[5]
Equality Now's experience demonstrates that the harms suffered
by the Plaintiff-Appellants are anything but "abstract."  Like
women and girls around the world, the Plaintiff-Appellant states
suffer concrete injury from ongoing discrimination, lack of political
and economic representation, and inadequate protection of their
citizens from gender-based violence.

   The failure of the United States to provide constitutional
protection for equality on the basis of sex undermines any efforts
by individual states to address this systemic issue.  Indeed, the
international experience demonstrates that an incomplete

_____

   [4] *See Commonwealth v. Ferriero*, 525 F. Supp. 3d 36, 47
(D.D.C. 2021).

   [5] *Id.*

patchwork of local efforts cannot remedy these harms—only constitutional action on a nationwide basis can ensure the universal right to equality for all women and girls.[6]  In nations without nationwide guarantees of sex equality without exception for religious, customary, or traditional law, the rights of women and girls are tenuous and their political advances fleeting.  Look no further than the recent tragedies in Afghanistan to see how quickly the majoritarian tides can turn.  Our Constitution exists precisely to protect certain rights from the will of temporary political majorities.[7]

---

[6]  The vast majority of U.N. member states have a single, written constitutional document.  The remainder have a series of documents understood to have constitutional status, such as the Equality Act in the United Kingdom and the Basic Laws of Israel.

[7] Though Article 22 of Afghanistan's 2004 Constitution contained a sex-equality provision, it was cabined by Article 3, which read: "No law shall contravene the tenets and provisions of the holy religion of Islam in Afghanistan."  The Taliban recently announced a plan to abandon the 2004 Constitution and enact articles from a prior, 1964 Constitution that "are not in conflict with Islamic Sharia law and the principles of" their new government.  *See* Ayaz Gul, *Taliban Say They Will Use Parts of Monarchy Constitution to Run Afghanistan for Now*, VOICE OF AMERICA (Sept. 28, 2021, 12:03 PM),

The United States' failure to guarantee equality at the constitutional level is shocking.  The rest of the world has recognized the harms of discrimination on the basis of sex, including violence against women and girls, and that constitutional action is necessary to address them.  These constitutional guarantees of equality have enabled national legal reforms that eliminated discriminatory statutes and have facilitated laws that protect women and girls.

Additionally, the United States' failure to adopt the ERA violates its binding international legal obligations.  In 1992, the United States ratified the International Covenant on Civil and Political Rights ("ICCPR"), which *requires* it to take *all steps necessary* to put an end to sex discrimination and to ensure that the *law prohibits discrimination* on the basis of sex.[8]  Without the ERA, the current constitutional structure in the United States is

---

https://www.voanews.com/a/taliban-say-they-will-use-parts-of-monarchy-constitution-to-run-afghanistan-for-now/6248880.html.

[8] *See* International Covenant on Civil and Political Rights, arts. 2, 3, 26, Mar. 23, 1976, 99 U.N.T.S. 171.

inadequate to bring the United States into compliance with the ICCPR and other international law and standards.

Immediate certification of the ERA is necessary to remedy the failures of the United States to comply with its obligations under international law. To the extent this Court finds any ambiguity as to the effect of the ERA's preamble, that ambiguity should be resolved in favor of the United States' longstanding international legal obligations.

## ARGUMENT

### I. THE VAST MAJORITY OF COUNTRIES AROUND THE WORLD RECOGNIZE THE CONCRETE AND PARTICULARIZED HARM ARISING FROM SEX INEQUALITY AND THE NEED FOR EXPRESS CONSTITUTIONAL GUARANTEES OF EQUALITY ON THE BASIS OF SEX

#### A. The district court failed to recognize the international consensus that express constitutional provisions are necessary to address significant harm to all caused by sex discrimination.

The United States' failure to include an express guarantee of equality on the basis of sex in its Constitution stands in stark contrast to the rest of the world. Among the 193 U.N. member

states, 85 percent guarantee equality or nondiscrimination based on sex and/or gender in their constitutions.[9]  Only sixteen other nations grant constitutional equality or nondiscrimination to all citizens without expressly mentioning gender or sex.[10]

Indeed, recognizing the concrete harms caused by sex inequality, recently adopted constitutions worldwide have been nearly unanimous in guaranteeing equality on the basis of sex.[11]  Ninety-four percent of constitutions adopted since 1970 have included a constitutional guarantee of equality on the basis of sex,

---

[9] JODY HEYMANN, ALETA SPRAGUE & AMY RAUB, ADVANCING EQUALITY 49 (2020).

[10] *Does the Constitution Explicitly Guarantee Equality or Non-Discrimination Across Sex and/or Gender?*, WORLD POL'Y ANALYSIS CTR., https://www.worldpolicycenter.org/data-tables/policy/does-the-constitution-explicitly-guarantee-equality-or-non-discrimination-across-sex-and-or-gender (last visited June 26, 2020).  These nations include Belarus, Costa Rica, El Salvador, Indonesia, Ireland, Jordan, Latvia, Lebanon, Monaco, Norway, Seychelles, Singapore, Tonga, United Arab Emirates, Uruguay, and Yemen.  *Id.*  In addition, certain nations have no constitutional guarantee of equality or nondiscrimination, including Australia, The Bahamas, Barbados, Brunei, Denmark, Kiribati, Nauru, and Saudi Arabia.  *Id.*

[11] *See* HEYMANN ET AL., *supra* note 9, at 50-51.

including all of those adopted since 2000.[12]  Many nations have also amended an older constitution and added guarantees of constitutional equality on the basis of sex, including France, Germany, and Luxembourg.[13]

While the Equal Protection Clause of the Fourteenth Amendment has been interpreted to apply to sex discrimination, it does not serve as a constitutional guarantee of equality on the basis of sex.  Courts analyzing a law discriminating on the basis of sex apply only intermediate scrutiny, as opposed to strict scrutiny, which does not provide the same level of protection as an express constitutional provision guaranteeing equality for women and girls.

Perhaps recognizing that enforcing sex equality through the Fourteenth Amendment leaves its citizens at a significant

---

[12] *Id.*

[13] *Id.* at 58; Julie C. Suk, *An Equal Rights Amendment for the Twenty-First Century: Bringing Global Constitutionalism Home*, 28 YALE J.L. & FEMINISM 381, 385 (2017).

disadvantage, the government claimed below that it is sufficient that the states may address sex discrimination in their own constitutions.[14]  But an incomplete patchwork of state-based action does not alter the reality that the United States is a global outlier.  In most other countries, a woman or girl's rights do not depend on which state she happens to reside in.  An American woman or girl should enjoy the same rights and protections whether she lives in Virginia or Illinois (which have passed state-level constitutional sex equality amendments) or Alabama, Louisiana, South Dakota, or Tennessee (which lack state-level constitutional sex equality guarantees and which all intervened below to block equal rights).

Moreover, given the pervasive nature of inequality, the refusal of certain states to provide protections on the basis of sex undermines the efforts of states that do provide such protections. For example, the failure of certain states to prohibit female genital mutilation ("FGM") results in perpetrators transporting

---

[14] *See* Def's Mot. Dismiss 10-11.

girls from states with protections to states that lack them.[15]

These harms are not theoretical or abstract. *Cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 519 (2007) (Because "Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions" and given its "stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis.").

A constitutional mandate of equality is an effective remedy to very real injuries suffered by the Plaintiff-Appellants. Based on the experience of the *amici*, the district court's claim that Plaintiff-Appellants have not suffered a concrete injury is meritless. Now that the ERA has been ratified, it is time for the United States to guarantee all its citizens the same rights on the basis of sex afforded to the vast majority of women and girls around the world.

**B. Constitutional sex equality provisions around the world have facilitated the elimination of**

---

[15] *See United States v. Nagarwala*, 350 F. Supp. 3d 613, 615-16 (E.D. Mich. 2018) (noting that victims subjected to FGM at a Michigan clinic had been brought from Minnesota and Illinois).

**discriminatory laws and the implementation of affirmative measures to prevent discrimination and violence against women and girls.**

Constitutional guarantees of equality on the basis of sex have been effective in combating gender-based violence and discrimination. These equality guarantees eliminated many laws that discriminated against women and girls. In addition, these provisions provide an avenue for the implementation of affirmative laws that prevent future discrimination and violence. While not providing a precise guide to how the ERA will impact United States law, these global examples provide insight into the types of protections that could be achieved.

1.    *Elimination of discriminatory laws*

Countries with constitutional guarantees of equality on the basis of sex have eliminated laws that historically discriminated against women and girls. For example, the Court of Appeal in Tanzania upheld a decision finding the Law of Marriage Act, which allows girls of fifteen to be married off with parental consent, while boys must be eighteen years old, to be unconstitutional and in violation of Article 13 of Tanzania's

Constitution, which guarantees equality on the basis of sex.[16]

Similarly, a marital rape exception to Nepal's criminal rape law

was invalidated under Nepal's constitutional sex equality

provision.[17] And, over the past four decades, ten national supreme

courts have relied on constitutional equality provisions to

invalidate sex-based qualifications in national citizenship laws.[18]

---

[16] *Attorney General v. Rebeca Z. Gyumi*, Civil Appeal No. 204 of 2017, CA 348 (Oct. 23, 2019) (Tanz.), https://tanzlii.org/tz/judgment/court-appeal-tanzania/2019/348.

[17] *Forum for Women, Law and Development, Thapathali v. His Majesty's Government*, Writ No. 55 of 2058 BS (2001-02) (SC) (Nepal), https://www.globalhealthrights.org/wp-content/uploads/2013/10/The-Forum-for-Women-Law-and-Development-Nepal-2002.pdf.

[18] *See Benner v. Canada (Sec'y of State)*, [1997] 1 S.C.R. 358, ¶ 10 (Can.); Saikō Saibansho [Sup. Ct.] June 6, 2008, Hei 6 (Gyo-Tsu) no. 135, 62 Saikō Saibansho Minji Hanreishū [Minshū] Majority § 2 (Japan) (translated at http://www.courts.go.jp/app/hanrei_en/detail?id=955); Bundesverfassungsgericht (BVerfG) [Federal Constitutional Court] May 21, 1974, 37 Entscheidungen des Bundesverfassungsgerichts [BVerfGE] 217 (Ger.); Corte cost., 28 Gennaio 1983, Giur. it. 1983, I, 91 (It.); *Attorney General v. Unity Dow*, (1992) 103 I.L.R. 128, 131 (Bots.); *Rattigan and Others v. Chief Immigration Officer*, 1995(2) SA 182 (ZS) (Zim.); *Meera Gurung v. Her Majesty's Gov't, Dep't of Central Immigration, Ministry of Home Affairs*, Dec'n No. 4858 2051, ¶ 14 (S. Ct. 1994) (Nepal); *Benin Constitutional Court Decision*, DCC 14-172 (Sept.

In addition, constitutional guarantees of equality for women have enabled the elimination of laws that discriminated against pregnant women.[19]  Germany's Constitutional Court relied on the country's gender equality provision to strike down laws that insufficiently protected pregnant women from being fired.[20]

These examples demonstrate the positive impact that constitutional sex equality provisions have had in other countries. The adoption of the ERA will have a similarly positive effect in the United States because, contrary to the district court's curt dismissal of the idea that Plaintiff-Appellant states and their citizens have suffered harm, painful and systemic gender inequality still exists in the United States.  A 2016 report by the United Nations Working Group on Discrimination against women and girls concluded: "[W]omen in the United States do not take

16, 2014); *Romein v. Adv. General for Scotland*, [2016] CSIH 24 (Scot.).

[19] *See also* the Constitutional Court of Colombia's decision to affirm the right to health coverage for a miscarriage.  HEYMANN ET AL., *supra* note 9 at 53.

[20] Suk, *supra* note 13, at 410.

their due place as citizens of the world's leading economy . . . .

[W]omen are left behind in terms of international standards as

regards their public and political representation, their economic

and social rights and their health and safety protections."[21]

## 2. *Affirmative measures to prevent discrimination*

Countries with constitutional guarantees of sex equality

have used such guarantees to uphold and implement laws that

prevent future discrimination on the basis of sex.[22]  Without a

dedicated constitutional provision and guarantee of sex equality

supporting analogous remedial and preventative legislation within

the United States, Plaintiff-Appellants risk having their

legislative efforts invalidated by the courts.  Constitutional

authority to pass such laws is critical to ending gender-based

---

[21] HUMAN RIGHTS COUNCIL, REPORT OF THE WORKING GROUP ON THE ISSUE OF DISCRIMINATION AGAINST WOMEN IN LAW AND IN PRACTICE ON ITS MISSION TO THE UNITED STATES OF AMERICA ¶ 84 (2016), https://undocs.org/A/HRC/32/44/Add.2 [hereinafter HUMAN RIGHTS COUNCIL REPORT].  The report recommended that the United States adopt a constitutional sex equality amendment. *Id.* ¶ 90(b).

violence and discrimination, particularly for marginalized populations with other intersecting vulnerabilities.

Germany and France have particularly strong track records of using their constitutional sex and/or gender equality provisions to advance new laws. For instance, the German Constitutional Court upheld a new law providing "bonus" months of parental leave if a father took leave and creating an entitlement to public daycare placement for any child older than twelve months, which it noted were measures designed to advance equal rights in practice.[23] Similarly, France, relying on the "comprehensive gender equality statute" in its constitution, implemented measures to reduce the gender pay gap; reform parental leave to incentivize equal caregiving by fathers and mothers; provide aid to victims of violence against women; and institute gender balance rules in new institutional settings where they had not previously

---

[23] Suk, *supra* note 13, at 416-17; HEYMANN ET AL., *supra* note 9, at 62-63.

applied.[24]  In addition, certain nations, including Spain[25] and

Switzerland,[26] have used gender equality guarantees under the

constitution to mandate wage equality requirements.

In contrast, the United States falls behind its peers in

protecting equal workplace access for men and women.[27]  Thus, it

is no surprise that women have disproportionately shouldered the

---

[24] Suk, *supra* note 13, at 429.

[25] David Díaz et al., *Royal Decree-Law 6/2019, of 1 March, on Urgent Measures to Guarantee Equal Treatment and Opportunities for Women and Men in Employment and Occupation*, BAKER MCKENZIE, https://f.datasrvr.com/fr1/619/ 23682/Igualdad_-_Alerta_-_PDF_Document_ENG.PDF (last visited June 27, 2020).

[26] *See Big Firms Required to Publish Gender Pay Gap in 2021*, SWISSINFO.CH (Aug. 21, 2019, 12:03 PM), https://www.swiss info.ch/eng/gender-equality_firms-required-to-publish-gender-pay-gap-in-2021/45175268.

[27] For example, the United States is one of six countries *in the world* without any form of national paid leave and the only industrialized nation without it.  *See* Claire Cain Miller, *The World 'Has Found a Way to Do This': The U.S. Lags on Paid Leave*, N.Y. TIMES (Nov. 23, 2021), https://www.nytimes.com/2021 /10/25/upshot/paid-leave-democrats.html (noting besides the United States, the only other countries with no national paid maternity leave are the Marshall Islands, Micronesia, Nauru, Palau, and Tonga) (citing study from *amici* The WORLD Policy Analysis Center).

economic fallout of the COVID-19 pandemic.  In what has been

dubbed the "shecession,"[28] women have lost their jobs, been forced

to leave the workforce, lost productivity, and been denied

promotions, all at rates much higher than their male

counterparts.[29]  The unemployment rate for women in the United

States jumped from 3.4% in February 2020 to 15.7% in April

2020,[30] with one out of four of those women reporting that their

job loss was due to a lack of childcare, twice the rate of the men

surveyed.[31]  By September 2020, mothers were three times more

---

[28] *COVID-19 is reversing the important gains made over the last decade for women in the workforce* - PwC Women in Work Index, PRICEWATERHOUSECOOPERS (Feb. 3, 2021), https://www.pwc.com/gx/en/news-room/press-releases/2021/women-in-work-index-2021.html.

[29] Olivia Rockeman, *The First Female Recession Threatens to Wipe Out Decades of Progress for U.S. Women*, BLOOMBERG NEWS (Oct. 1, 2020), https://www.bloomberg.com/news/articles/2020-09-30/u-s-recovery-women-s-job-losses-will-hit-entire-economy.

[30] Rakesh Kochhar & Jesse Bennett, *U.S. labor market inches back from the COVID-19 shock, but recovery is far from complete*, PEW RSCH. CTR. (Apr. 14, 2021), https://www.pewresearch.org/fact-tank/2021/04/14/u-s-labor-market-inches-back-from-the-covid-19-shock-but-recovery-is-far-from-complete/.

[31] Nicole Bateman and Martha Ross, *Why has COVID-19 been especially harmful for working women?*, THE BROOKINGS INST.

likely than fathers to have lost jobs in the pandemic.[32]  By

February 2021, the female workforce participation rate had fallen

to 57%, the lowest level since 1988.[33]  These effects have been

most acutely felt by low-income women and women of color, who

are left far behind other groups in financial recovery and

returning to the workforce,[34] and who—even before the

pandemic—were subjected to greater economic inequality due to

intersectional systemic racism and sexism.[35]  A 2021 report found

---

(Oct. 2020), https://www.brookings.edu/essay/why-has-covid-19-been-especially-harmful-for-working-women/.

[32] Tim Henderson, *Mothers Are 3 Times More Likely Than Fathers to Have Lost Jobs in Pandemic*, THE PEW CHARITABLE TRS. (Sept. 28, 2020), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/09/28/mothers-are-3-times-more-likely-than-fathers-to-have-lost-jobs-in-pandemic.

[33] Clare Ewing-Nelson, *Another 275,000 Women Left the Labor Force in January*, NAT'L WOMEN'S L. CTR. (Feb. 2020), https://nwlc.org/wp-content/uploads/2021/02/January-Jobs-Day-FS.pdf.

[34] Megan Cassella, *The pandemic drove women out of the workforce. Will they come back?*, POLITICO (July 22, 2021, 4:30 AM), https://www.politico.com/news/2021/07/22/coronavirus-pandemic-women-workforce-500329.

[35] Robin Bleiweis, Jocelyn Frye & Rose Khattar, *Women of Color and the Wage Gap*, CTR. FOR AM. PROGRESS (Nov. 17, 2021),

that in order to "undo the damage caused by COVID-19 to women in work - even by 2030, progress towards gender equality needs to be twice as fast its historical rate."[36]  American women entered the pandemic without constitutional equality and the fundamental workplace and care protections that it demands, and thus lacked the legal recourse, support, and resources needed to avoid this devastating economic regress.

While Plaintiff-Appellants have implemented statewide sex discrimination laws, the American workforce crosses state lines. The growing acceptance of remote work during the pandemic has only accelerated this trend.  Without a constitutional gender equality provision, Plaintiff-Appellants and their residents who work in other states are exposed to heightened risks of sex discrimination but have few if any avenues of recourse if they are the victims of discrimination.

---

https://americanprogress.org/article/women-of-color-and-the-wage-gap/.

[36] PRICEWATERHOUSECOOPERS, *supra* note 28.

Finally, growing evidence indicates that since the pandemic began, intimate partner violence in the United States has become more pervasive and severe.[37] Police departments report that as a result of COVID-related lockdowns across the United States, reports of domestic violence increased substantially—including by 18% in San Antonio, 22% in Portland, Oregon, and 10% in New York City.[38] One study found that at Brigham and Women's Hospital in Boston, injuries consistent with domestic abuse in 2021 exceeded the totals for 2018 and 2019 combined.[39] And yet, survivors of intimate partner violence cannot sue their attackers in federal court for damages or other relief because the Supreme Court has ruled that Congress lacks the constitutional authority to provide such a cause of action.[40] Nor will many of those

---

[37] Jeffrey Kluger, *Domestic Violence Is a Pandemic Within the COVID-19 Pandemic*, TIME (Feb. 3, 2021, 11:15 AM), https://time.com/5928539/domestic-violence-covid-19/.

[38] *Id.*

[39] *Id.*

[40] *See United States v. Morrison*, 529 U.S. 598 (2000); *see also Lenahan v. United States*, Case 12.626, Inter-Am. Comm'n H.R., Report No. 80/11 ¶ 162 (2011). In *Lenahan*, the Inter-

survivors have a state court remedy.  Certification of the ERA will

potentially empower Congress to provide women and girls,

including survivors of domestic violence, with additional and

necessary pathways to justice.

3. *The ERA's potential impact in the United States*

The ERA could provide women and girls in the United States

with protections from gender-based violence, discrimination, and

inequality that currently do not have a clear constitutional basis,

including laws relating to child marriage, domestic violence,

pregnancy discrimination, and parental rights, among others.

Current provisions of the Constitution are inadequate to

protect these rights, and states and their residents have suffered

accordingly.  Courts considering Equal Protection Clause

---

American Commission on Human Rights found that the United
States failed to protect Jessica Lenahan and her children—who,
despite Lenahan's repeated requests that the police enforce a
restraining order, were abducted and killed by Lenahan's abusive
husband—in violation of the equality clause of the American
Declaration of the Rights and Duties of Man and the United
States' due diligence obligation to prevent and respond to violence
against women.

challenges to laws alleged to discriminate on the basis of sex apply an intermediate scrutiny standard, which is more permissive, and less predictable, than the standard of review for laws that differentiate based on other traits, such as race, religion, and national origin (strict scrutiny). One study found that the probability of success for a litigant alleging discrimination is only 47% under intermediate scrutiny; under strict scrutiny, the probability of success rises to 73%.[41] The study also highlighted the lack of predictability of the intermediate scrutiny standard (as opposed to the rational basis and strict scrutiny standards) and concluded that the indeterminacy of the intermediate scrutiny standard of review left considerable room for ideological impact.[42] Moreover, courts applying intermediate scrutiny often analyze government interests in terms of whether the interest is in defense of an "archaic" gender stereotype about male versus

---

[41] Lee Epstein, Andrew D. Martin, Lisa Baldez & Tasina Nitzschke Nihiser, *Constitutional Sex Discrimination*, 1 TENN. J.L. & POL'Y 11, 49-50 (2004).

[42] *Id.*

female roles in society.[43]  "[I]t follows that present-day 'stereotypes' were once well-accepted truths that could be invoked to justify gender-based discrimination"; how those stereotypes are defined at any one time, or by any one person, can vary greatly.[44] That intermediate scrutiny is both more permissive and more amorphous makes it easier for state and federal governments to defend laws discriminating against women and girls, hindering the ability to achieve gender equality on a national basis.

---

[43] *See* Lindsey Sacher, *From Stereotypes to Solid Ground: Reframing the Equal Protection Intermediate Scrutiny Standard and Its Application to Gender-Based College Admissions Policies*, 61 CASE W. RES. L. REV. 1411, 1421 (2011).  We also note that the failure to adopt the ERA affects American men in addition to women.  For example, in *Nguyen v. INS*, 533 U.S. 53 (2001), the son of a United States citizen challenged the federal law's requirement that an unwed father (but not an unwed mother) had to declare financial support in writing as a condition to giving citizenship to a child born abroad.  The Court held that the law does not violate the equal protection guarantee of the United States Constitution.  *Id.* at 61-71.  In her dissenting opinion, Justice O'Connor wrote, "[i]ndeed, the majority's discussion may itself simply reflect the stereotype of male irresponsibility that is no more a basis for the validity of the classification than are stereotypes about the 'traditional' behavior patterns of women." *Id.* at 94 (O'Connor, J. dissenting).

[44] *Id.*

Advocates have been forced to rely on other constitutional provisions, such as the Commerce Clause, to extend protections to women and girls. However, current constitutional jurisprudence poses an obstacle to this approach. For example, the Eastern District of Michigan held that neither the Commerce Clause nor the Necessary and Proper Clause could support a federal law criminalizing FGM, ending the prosecution of a doctor for allegedly performing female genital mutilation on nine children.[45] The Supreme Court similarly invalidated the portion of the Violence Against Women Act of 1994 that provided a civil remedy for victims of gender-motivated violence on the basis that Congress lacked the authority to enact this provision under the Constitution.[46]

Tiers of scrutiny and commerce clause jurisprudence are not just legal concepts. They affect the day-to-day lives of women and girls. The limitations of intermediate scrutiny of laws that

---

[45] *United States v. Nagarwala*, 350 F. Supp. 3d 613, 630-31 (E.D. Mich. 2018).

[46] *United States v. Morrison*, 529 U.S. at 617-18, 627.

discriminate on the basis of sex and the limitations of the

Constitution have fostered continued human rights violations and

have blocked the enforcement of Congress' crucial protective

action.  A young American girl should not have to fear FGM

simply because she was born in one of the eleven states that have

not yet criminalized this practice.[47]  Nor should she be forced into

child marriage in the forty-four states that still allow marriage

under the age of eighteen (including some that allow child

marriage at any age at all)[48] in violation of international law.

Rather than grapple with these painful realities, the district

court tried to reframe the alleged injuries as "abstract" by

collapsing the standing and merits inquiries.  The court claimed

that because "Article V makes no mention of the Archivist or

---

[47] *See US Laws against FGM – State by State,* EQUALITY
NOW (Feb. 2, 2021), https://www.equalitynow.org/us_laws_
against_fgm_state_by_state/.

[48] *See United States' Child Marriage Problem: Study
Findings*, UNCHAINED AT LAST (Apr. 2021), https://www.unchained
atlast.org/united-states-child-marriage-problem-study-findings-
april-2021/.  After this study was completed, Rhode Island and
New York outlawed marriage before eighteen without exception.

publication of an amendment," the Archivist's failure to publish and certify the ERA "has no legal effect"—and thus does not harm the Plaintiff-Appellants—because constitutional amendments are self-ratifying.[49]  Except, apparently, when a court decides that a particular amendment is not, in fact, self-executing because the "longstanding practices of our government" instruct otherwise. Whatever this Court concludes about the district court's treatment of the ERA's ratification deadline, that conclusion has no bearing on *standing*, which is, "[a]t bottom," a question about whether "petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues.'"[50]  Plaintiff-Appellants have such a stake in protecting their citizens from the myriad of

---

[49] *See Commonwealth v. Ferriero*, 525 F. Supp. 3d 36, 47 (D.D.C. 2021) (internal quotation marks omitted).

[50] *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

exploitive or violent practices that remain lawful in their neighboring states.[51]

The district court also found that Plaintiff-Appellants lacked standing because they alleged only a "generalized grievance" that was "common to all members of the public."[52] It held that *Massachusetts v. EPA* was of no help because it implicated Massachusetts' "particularized injury in its capacity as a landowner—namely, loss of its coastal land."[53] In other words, Massachusetts gets to sue for injury to its *coastal property* because it has more coastline than, say, Colorado, but not to protect its *female citizens* because Massachusetts and Colorado break down rather evenly across gender lines.[54] But just because the harm

---

[51] As the district court conceded, "[s]tates are not normal litigants for the purposes of invoking federal jurisdiction." *Ferriero*, 525 F. Supp. 3d at 48 (quoting *Massachusetts v. E.P.A.*, 549 U.S. at 518).

[52] *Ferriero*, 525 F. Supp. 3d at 48.

[53] *Id.*

[54] The court pressed the idea that standing can only lie where there is an injury to a State's "sovereign interests" "wholly apart" from the interests of "private parties," belying the reality that sovereigns are legal fictions composed, not of their coastal

alleged herein is "widely shared does not minimize [an individual state]'s interest in the outcome of this litigation."[55]

If Massachusetts possesses a "sovereign interest" sufficient to challenge the EPA's enforcement of a single section of a law *passed by Congress* dealing with new motor vehicle emissions—a tiny category of emissions among a number of other factors contributing to climate change and thus to Massachusetts's loss of coastline—then surely the Plaintiff-Appellants have a "sovereign interest" in the certification of a constitutional amendment *Plaintiff-Appellants themselves ratified* that would immediately grant equality to over 50% of their citizens and influence innumerable state and federal laws. A woman or girl should never hear that her national government cannot protect her from genital mutilation, or child marriage, or intimate partner violence because that's just "private conduct," with an "attenuated effect

---

land, but of their people. *See id.* at 46. Surely, a state has a "sovereign interest" in protecting roughly half of its population from discrimination and sex-based violence.

[55] *Massachusetts v. EPA*, 549 U.S. at 522.

upon interstate commerce."[56]  The district court's claim that the injury to Plaintiff-Appellants is "abstract" shows a complete disregard for the life-altering and detrimental sex-based discrimination, including violence, that too many people in the United States still face.[57]

## II.    THE UNITED STATES IS REQUIRED TO ADOPT THE ERA TO COMPLY WITH ITS TREATY COMMITMENTS

---

[56] *United States v. Morrison*, 529 U.S. at 599, 615; *cf. Gonzales v. Raich*, 545 U.S. 1, 22 (2005) ("[W]e have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA.").

[57] A recent study, for example, found that nearly 300,000 children were legally married in the U.S. between 2000 and 2018. A few were as young as ten.  The majority were girls wed to adult men an average of four years older.  *See* UNCHAINED AT LAST, *supra* note 48.  Girls who marry before the age of sixteen are 31% more likely to live in poverty and 50% more likely to drop out of school.  Eighteen out of twenty women wed as children reported experiences of physical, sexual, or emotional abuse by their husbands during their marriage.  *See Child Marriage in the United States: A Synthesis of Evidence on the Prevalence & Impact,* ICRW (Aug. 2020), https://www.icrw.org/wp-content/uploads/2020/08/child-marriage-in-the-US-prevalence-impact_8-2020_ICRW.pdf.

On March 24, 1992, the United States Senate ratified the International Covenant on Civil and Political Rights ("ICCPR").[58] The ICCPR requires the United States to ensure equal enjoyment of civil and political rights and to prevent sex discrimination and gender-based violence to ensure equal enjoyment of those rights. Article 2(1) of the ICCPR guarantees individuals a wide range of civil and political rights without discrimination on the basis of sex.[59] Article 2 also states that "[w]here not already provided for by existing legislative or other measures, each State Party to the [ICCPR] undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the [ICCPR], to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the [ICCPR]."[60]

Article 3 of the ICCPR requires the United States to "ensure the equal right of men and women to the enjoyment of all civil and

---

[58] S. Rep. No. 102-23, at 1 (1992).

[59] International Covenant on Civil and Political Rights, art. 2, Mar. 23, 1976, 99 U.N.T.S. 171 [hereinafter ICCPR].

[60] *Id.*

political rights set forth" in the treaty.[61]  Accordingly, the treaty

requires the United States to "take all steps necessary, including

the prohibition of discrimination on the ground of sex, to put an

end to discriminatory actions."[62]  In addition to these two

provisions, Article 26 of the ICCPR explicitly requires that "the

law shall prohibit any discrimination" on the ground of sex.

Further, the ICCPR also guarantees citizens' rights to protection

from sexual and gender-based violence,[63] which requires that

parties must take all "necessary steps" to eliminate gender-based

violence.[64]

Together, these provisions require the United States to

adopt a constitutional sex equality amendment.  Sex equality is

---

[61] *Id.* art. 3.

[62] *See* HUMAN RIGHTS COMMITTEE, GENERAL COMMENT NO.
28, EQUALITY OF RIGHTS BETWEEN MEN AND WOMEN (ARTICLE 3),
U.N. DOC. CCPR/C/21/REV.1/ADD.10, ¶ 4 (Mar. 29, 2000).

[63] Sexual and gender-based violence are forms of sex-based
discrimination prohibited by the ICCPR under Articles 2, 3, and
26.  *Id.* at ¶ 11.

[64] ICCPR, *supra* note 59, art. 3.

"not already provided for" in the United States Constitution.[65]

And as explained above in section I.B.3, the intermediate scrutiny regime the United States currently uses is woefully insufficient "to put an end to discriminatory actions."[66]  Indeed, the Human Rights Committee, the United Nations treaty-monitoring body that oversees State party implementation of the ICCPR, has observed that "many [U.S.] federal laws which address sex-discrimination are limited in scope and restricted in implementation."[67]  The Committee thus recommended to the United States that it bring itself into compliance with the ICCPR

---

[65] *Id.* at art. 2.  Indeed, Justice Scalia expressly stated that the Constitution does not prohibit discrimination on the basis of sex.  *See* S. Todd Rogers, *The Originalist*, LEGALLY SPEAKING (Jan. 2011), https://podcast.uctv.tv/webdocuments/legally-speaking/11_01LegallySpeaking_Scalia.pdf (stating, in an interview, "Certainly the Constitution does not require discrimination on the basis of sex.  The only issue is whether it prohibits it.  It doesn't.  Nobody ever thought that that's what it meant.  Nobody ever voted for that.").

[66] HUMAN RIGHTS COMMITTEE, GENERAL COMMENT NO. 28, *supra* note 62, at ¶ 4.

[67] HUMAN RIGHTS COMMITTEE, CONCLUDING OBSERVATIONS OF THE HUMAN RIGHTS COMMITTEE, U.N. DOC. CCPR/C/USA/CO/3, ¶ 28 (Sept. 15, 2006).

by taking all steps "to ensure the equality of women before the law and equal protection of the law."[68]  However, the United States' current constitutional doctrine is an obstacle to the passage of laws designed to rectify gender inequality.[69]

In its motion to dismiss below, the government asserted that it is sufficient that states address sex discrimination in their own constitutions.  But state-level efforts do not satisfy the *United States'* obligations as a nation under the ICCPR, including the Article 26 requirement that the law guarantee to all persons equal and effective protection against discrimination.

## III. THE UNITED STATES SHOULD ADOPT THE ERA TO COMPLY WITH INTERNATIONAL LAW AND HUMAN RIGHTS STANDARDS

The Convention on the Elimination of All Forms of Discrimination against Women ("CEDAW") is the chief binding

---

[68] *Id.*

[69] *See supra* Section I.B.3.  In a recognition of these obstacles, the United Nations Working Group on Discrimination against women and girls recommended that the United States adopt a constitutional equal rights amendment.  *See* HUMAN RIGHTS COUNCIL REPORT, *supra* note 21, ¶¶ 23, 24, 90(b).

global women's rights treaty. The United States is among only a small handful of U.N. members (Iran, Palau, Somalia, Sudan, and Tonga) that have not ratified CEDAW.[70]

President Jimmy Carter signed CEDAW on July 17, 1980,[71] and the United States' National Strategy on Gender Equity and Equality supports the ratification of CEDAW and supports the ERA. International law obliges States not to undermine the object or purpose of treaties they have signed, even if they have not yet ratified such treaties.[72] Therefore, under international law, the United States has the obligation not to defeat the object and purpose of CEDAW, which would also be consistent with its

---

[70] *See, e.g.*, Convention on the Elimination of All Forms of Discrimination against Women, Dec. 18, 1979, 1249 U.N.T.S. 13 (entered into force Sept. 3, 1981), https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-8&chapter=4&clang=_en.

[71] *Id.*

[72] *See* Vienna Convention on the Law of Treaties art. 18, May 23, 1969, 1155 U.N.T.S. 331 (Treaty signatories are "obliged to refrain from acts which would defeat the object and purpose" of a treaty. (article 18)). The United States signed the Vienna Convention on April 24, 1970. https://treaties.un.org/pages/ViewDetailsIII.aspx?src=TREATY&mtdsg_no=XXIII-1&chapter=23&Temp=mtdsg3&clang=_en

national strategy. By failing to adopt the ERA, the United States violates a core provision of CEDAW: the Article 2 directive to pursue the elimination of discrimination by all means necessary, including "undertak[ing]. . . [t]o embody the principle of the equality of men and women *in their national constitutions* or other appropriate legislation if not yet incorporated therein."[73] Moreover, in 1995, the United States joined 188 other countries in adopting the Beijing Declaration and Platform for Action, a U.N. resolution adopted to advance the implementation of CEDAW that specifically calls on countries to "[p]rovide constitutional

---

[73] *Id.* (emphasis added). For the countries that have ratified CEDAW, Article 2 has been an important legal tool for protecting women from discrimination. For example, in 2021, the High Court of Kenya relied on Article 2 to dismiss a challenge to the country's Prohibition of Female Genital Mutilation Act, noting that Article 2 obligates Kenyan officials to "condemn discrimination against women in all its forms," including by abolishing existing "customs and practices which constitute discrimination against women." *Tatu Kamau v. Attorney General & 2 others* (2021), Pet. No. 244 of 2019, (H.C.K.), http://kenyalaw. org/caselaw/cases/view/209223/.

guarantees and/or enact appropriate legislation to prohibit discrimination on the basis of sex for all women and girls."[74]

Adding to ICCPR's and CEDAW's clear expression of a global commitment to and requirement to uphold sex equality, a broad array of other sources of international law, including agreements, customary international law,[75] and decisions of international tribunals, evince a global recognition of sex equality as a fundamental human right.

International agreements include, *inter alia*, the Universal Declaration of Human Rights, which was adopted unanimously by all U.N. members, including the United States, in 1948 and provides that "[e]veryone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind such

---

[74] Beijing Declaration and Platform for Action, U.N. Doc. A/CONF. 177/20, Ch. II, ¶ 232(b) (Sept. 15, 1995).

[75] *See* Catharine A. MacKinnon, *Creating International Law: Gender as Leading Edge*, 36 HARV. J.L. & GENDER 105, 118-19 n.43 (2013) (noting a "building" "international consensus" that sex discrimination and gender crimes violate customary international law); *see generally Al-Bihani v. Obama*, 619 F.3d 1, 13 n.2 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing en banc).

as . . . sex."[76]  The American Convention on Human Rights, a regional treaty signed by the U.S. in 1977, requires State parties to "undertake to . . . ensure to all persons subject to their jurisdiction the free and full exercise of those rights and freedoms, without any discrimination for reasons of . . . sex."[77]

Adopting the ERA would be a significant step toward aligning U.S. law with the overwhelming consensus of international law, which it supports and to which it is bound, including through ratifying the ICCPR, signing CEDAW and the American Convention on Human Rights, and adopting the Beijing Platform for Action, among others.  The United States must no longer stand apart in failing its citizens by denying them the fundamental right to equality on the basis of sex in its Constitution.

---

[76] Universal Declaration of Human Rights, G.A. Res. 217A (III) at 71, U.N. Doc. A/218 (Dec. 10, 1948).

[77] American Convention on Human Rights art. 1(1), Nov. 22, 1969, 1144 U.N.T.S. 143.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Plaintiff-Appellants' briefs on appeal, *amici curiae* respectfully request that this Court reverse the judgment of the district court.

Dated: January 10, 2022

Respectfully Submitted,

/s/ Jesse Solomon
Jesse Solomon
Amelia T.R. Starr
Margarita Clarens
Alexa B. Lutchen
Courtney Daukas
Davis Polk & Wardwell LLP
901 15th Street NW
Washington, D.C. 20005
(202) 962-7138
jesse.solomon@davispolk.com

*Counsel for* Amici Curiae

# CERTIFICATE OF COMPLIANCE

As required by Rule 32(g) of the Federal Rules of Appellate Procedure, I certify that this brief complies with the type-volume limitation of Rules 29(a)(5) and 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 6500 words, as calculated by the Microsoft Word 2016 software used to prepare the brief.

I further certify that the attached brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016, 14-point Century Schoolbook font.

/s/ Jesse Solomon
Jesse Solomon

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on January 10, 2022. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Executed this 10th of January 2022.

<u>/s/ Jesse Solomon</u>
Jesse Solomon

## APPENDIX A

**Equality Now** is an international human rights organization, incorporated in New York, as well as in London and Nairobi, and with an office in Beirut and a global presence, working for the protection and promotion of the rights of women and girls worldwide with a network of individuals and organizations around the world. Founded in 1992, Equality Now has advocated for women and girls in the United States since its inception and has a long history of working to achieve legal and systemic change, including constitutional reform, which addresses violence and discrimination against women and girls worldwide. For nearly thirty years, with a team of lawyers and legal experts, Equality Now has focused on eliminating sex discriminatory laws around the globe. Equality Now is a coalition partner in the national ERA Coalition and has actively supported ratification of the Equal Rights Amendment at the state and federal levels.

The **WORLD Policy Analysis Center** ("WORLD") is a nonpartisan research institution based at the University of

California, Los Angeles. WORLD analyzes globally comparative measures of constitutional rights, laws, and policies in areas fundamental to equal opportunities, and uses this information to understand legal gaps, the impact of laws on outcomes, and feasible approaches to strengthening protections. WORLD also examines whether countries have enacted laws to realize their commitments under the Universal Declaration of Human Rights, the Sustainable Development Goals, and a wide range of other UN, ILO, and other global body treaties and agreements. WORLD has led a detailed analysis of equality provisions in the constitutions of all 193 U.N. Member States, which examines guarantees for equal rights not only on the basis of sex or gender but also on the basis of pregnancy, marital, and family status. In addition to constitutional protections, WORLD examines a wide range of laws and policies in all 193 countries in areas relevant to gender equality, equality of opportunity overall, work, health, and education.

The **Latin American and Caribbean Committee for the Defense of Women's Rights** (CLADEM), founded in 1987, is a

feminist regional network of individuals and non-governmental organizations based in Lima, Peru with affiliates in fifteen countries working for the full enjoyment of women's rights, based on principles of equality and non-discrimination, among others. CLADEM has had consultative status with the United Nations since 1995 and was authorized to take part in activities at the Organization of American States in 2002, and has had consultative status with UNESCO since 2009.  CLADEM promotes the development and adoption of international and regional human rights instruments, and it holds governments accountable for the lack of implementation of women's human rights standards by submitting reports as well as filing strategic litigation cases at the national and international levels.  In March 2009, CLADEM was awarded the King of Spain Human Rights Prize and the Gruber Prize in 2010.

The **Equal Rights Trust** (the "Trust") is an independent international non-governmental organization, which exists to combat all forms of discrimination and ensure everyone can participate in society on an equal basis.  The Trust works in

partnership with civil society and lawyers to secure the adoption and implementation of equality laws.  Members of the Trust's staff and board have extensive experience of engaging in litigation at the national, regional, and international levels in relation to cases that raise important legal questions on equality or nondiscrimination.  In terms of the present case, the Trust has considerable expertise in the area of equality on the basis of sex, having acted as a third-party intervenor or *amicus curiae* in relevant cases before the Committee on the Elimination of Discrimination against Women (*see Cretu v. Moldova*, No. 3564/11), the European Court of Human Rights (see among others, *Volodina v. Russia*, No. 41261/7), and the Inter-American Court of Human Rights (see *Gretel Artavia Murillo et al. ("In Vitro Fertilisation") v. Costa Rica*, Case No: 12.361).

The **European Women's Lobby** ("EWL"), founded in 1990, is the largest European umbrella network of women's associations representing a total of more than 2,000 organizations in the EU coming together to campaign for their common vision of a Feminist Europe.  The EWL has members in twenty-six EU

54

Member States, three Candidate Countries, the United Kingdom, and Iceland, as well as seventeen European-wide organizations representing the diversity of women and girls in Europe. Together with our members, we aim to influence the general public and European institutions in support of women's human rights and equality between women and men.

**FEMNET**—the African Women's Development and Communication Network—is a Pan-African, membership-based feminist network based in Nairobi with over 700 members across fourty-six African countries. FEMNET envisions an African society where gender equality is achieved and women and girls enjoy all their rights and live in dignity. FEMNET exists to facilitate and coordinate the sharing of experiences, ideas, information, and strategies for human rights promotion among African women's organizations through networking, communication, capacity-building, and advocacy at the regional and international levels.

The **Arab Women Organization** ("AWO") is a women's rights organization working for the promotion of the rights of

women and girls with a membership network that includes eighty-eight women's community-based organizations (CBOs). AWO has been working for gender equality and women's rights since 1970.

The **Sisterhood is Global Institute** is an international feminist think tank that was founded in 1984 by Robin Morgan, Simone de Beauvoir, and women from eighty countries who pledged visionary yet pragmatic action in support of women's rights, freedoms, and power. Among its many activities over the past thirty-five years, the Sisterhood is Global Institute pioneered the first Urgent Action Alerts regarding women's rights, the first Global Campaign to Make Visible Women's Unpaid Labor in National Accounts, and the first Women's Rights Manuals for Muslim Societies. It currently hosts the Donor Direct Action Fund for Women, a project working to strengthen women's rights organizations around the world by increasing their access to financial resources, political leaders, and public visibility. Donor Direct Action currently has fourteen partner grantees around the world working in Afghanistan, the Democratic Republic of Congo, El Salvador, Kenya, Latvia, Libya, Nepal, Palestine, Peru,

Somalia, Syria, and South Africa.  Donor Direct Action also has two global funds, the Efua Dorkenoo Fund to End Female Genital Mutilation and the Gloria Steinem Equality Fund to End Sex Trafficking.