# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

COMMONWEALTH OF VIRGINIA, ET AL.,

*Appellants,*

v.

DAVID FERRIERO, IN HIS OFFICIAL CAPACITY AS
ARCHIVIST OF THE UNITED STATES, ET AL.,

*Appellees.*

———————————

On Appeal from the United States District Court
for the District of Columbia, Civ. A. No. 20-242
(The Honorable Rudolph Contreras)

———————————

## BRIEF OF *AMICI CURIAE* FORMER STATE LEGISLATORS IN ILLINOIS, NEVADA, AND VIRGINIA IN SUPPORT OF APPELLANT STATES' BRIEF IN FAVOR OF REVERSAL

———————————

Tacy F. Flint
Elizabeth Y. Austin
Meredith R. A. McBride
Mark Priebe
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL. 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-8036
tflint@sidley.com
laustin@sidley.com
meredith.mcbride@sidley.com
mpriebe@sidley.com

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A) Parties and Amici.** Except for the following and any other individuals or entities that have filed an *amicus curiae* brief to date in this Court, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Briefs for Appellants filed on January 3, 2022.

Hon. Steven Andersson,

Hon. Jennifer Carroll Foy,

Hon. Amber Joiner,

Hon. Lou Lang,

Hon. Karen McConnaughay,

Hon. David R. Parks,

Hon. Julia Ratti,

Hon. Ellen B. Spiegel,

Hon. Heather Steans,

Hon. Heidi Swank, and

Hon. Joyce Woodhouse.

**(B) Rulings Under Review.** References to the rulings at issue appear in the Briefs of Appellants filed on January 3, 2022.

**(C) Related Cases.** The case on review was not previously before this Court. To counsels' knowledge, there are no other related cases currently pending in this Court or any other court.

## STATEMENT OF CONSENT TO FILE AND SEPARATE BRIEFING, AND DISCLOSURE OF RELATIONSHIPS WITH PARTIES AND COUNSEL

Pursuant to Federal Rule of Appellate Procedure 29(a), this brief is accompanied by representation of consent of all parties in filing. Pursuant to Rule 29(a)(4)(E), no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person or entity made a monetary contribution to the preparation of this brief.

Pursuant to Circuit Rule 29(d), *Amici Curiae* state that separate briefs are necessary because *Amici* represent individual State legislators who have a special and unique interest—apart from the interest of the States themselves—in the ratification of amendments for which they have personally cast a vote on behalf of their constituents.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .i

STATEMENT OF CONSENT TO FILE AND SEPARATE BRIEFING, AND DISCLOSURE OF RELATIONSHIPS WITH PARTIES AND COUNSEL...................................................................................................iii

TABLE OF CONTENTS .................................................................iv

TABLE OF AUTHORITIES.............................................................v

IDENTITY AND INTEREST OF AMICI CURIAE...................................1

SUMMARY OF ARUGMENT AND INTRODUCTION .........................5

ARGUMENT ...............................................................................9

    I.    The States Have Been Injured by the Archivist's Failure to Perform His Statutory Duty to Publish and Certify the Equal Rights Amendment .................................................9

        A.    Under Article V and Section 106b, the Archivist had a Legal Duty to Publish and Certify the Equal Rights Amendment. .......................................11

        B.    The Archivist's Failure to Perform His Duty to Ratify the Equal Rights Amendment Supports Federal Jurisdiction......................................17

    II.    Archivist Has No Authority to Decide Contested Questions about Congress' Power to Impose a Ratification Deadline on the States ......................................19

CONCLUSION ..........................................................................24

CERTIFICATE OF COMPLIANCE .............................................26

CERTIFICATE OF SERVICE......................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*13th Regional Corp. v. U.S. Dept. of Interior,*
    654 F.2d 758 (D.C. Cir. 1980) ......................................................22

*Alden v. Maine,*
    527 U.S. 706 (1999) ................................................................ 4, 18

*Bennett v. Spear,*
    520 U.S. 154 (1997) ......................................................................23

*Coleman v. Miller,*
    307 U.S. 433 (1939) ......................................................................17

*Dillon v. Gloss,*
    256 U.S. 368 (1921) ................................................................ 12, 21

*Hawke v. Smith,*
    223 U.S. 221 (1920) ............................................................ 3, 7, 18

*Lovitky v. Trump,*
    949 F.3d 753 (D.C. Cir. 2020) ....................................................19

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ......................................................................10

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ......................................................................10

*United States ex rel. Widenmann v. Colby,*
    265 F. 998 (D.C. Cir. 1920) ................................................. 12, 20

**Statutes**

1 U.S.C. § 106b ............................................................................. *passim*

5 U.S.C. § 160 (1926) ......................................................................15

### Other Authorities

*An American Dictionary of the English Language* (1st ed. 1828), available at http://www.webstersdictionary1828.com........... 15, 17

Letter from George Washington to the Board of War (May 22, 1779), *The Papers of George Washington, Revolutionary War Series* ................................................................. 16

Hamilton, Alexander, Federalist No. 85 ........................................ 3, 7, 18

Madison, James, Federalist No. 39................................................. 3, 7, 18

U.S. Const., Art. V ......................................................................... *passim*

# IDENTITY AND INTEREST OF AMICI CURIAE

*Amici* are distinguished former legislators from across the political spectrum, and from each of the Appellant States, who, during their time in the legislatures of Illinois, Nevada, and Virginia, exercised the power granted to them in Article V of the U.S. Constitution to vote in favor of ratification of the Equal Rights Amendment to the Constitution of the United States. The votes of the legislatures in these three States ultimately brought the total number of ratifying States to 38—*i.e.*, a three-quarters majority of States as is required for ratification under the Constitution. *See* U.S. Const., Art. V.

In particular, *Amici* are as follows:

- Hon. Steven Andersson, formerly of the Illinois House of Representatives;

- Hon. Jennifer Carroll Foy, formerly of the Virginia House of Delegates;

- Hon. Amber Joiner, formerly of the Nevada Assembly;

- Hon. Lou Lang, formerly of the Illinois House of Representatives;

- Hon. Karen McConnaughay, formerly of the Illinois Senate;

- Hon. David R. Parks, formerly of the Nevada Senate;

- Hon. Julia Ratti, formerly of the Nevada Senate;

- Hon. Ellen B. Spiegel, formerly of the Nevada Assembly;

- Hon. Heather Steans, formerly of the Illinois Senate;

- Hon. Heidi Swank, formerly of the Nevada Assembly; and

- Hon. Joyce Woodhouse, formerly of the Nevada Senate.

Despite the fact that—with the votes cast by *Amici* and others in the *Amici*'s State legislatures—the Equal Rights Amendment was ratified by the number of States required to add the Amendment to the Constitution, the Archivist of the United States refused to carry out his statutory obligation to publish the ratified amendment, and the District Court in effect sanctioned that refusal. In other words, although legislators, including *Amici,* in more than the constitutionally required three-quarters of State legislatures had exercised their power to enshrine equality into the U.S. Constitution, the Archivist unilaterally negated those votes.

*Amici* write in support of the Appellant States in order to highlight the overreach inherent in permitting the Archivist—one unelected individual serving in the federal government—effectively to overturn the votes of legislators, like *Amici*, popularly elected to State legislative bodies. Article V of the Constitution expressly and

2

specifically delegates authority for ratification of constitutional amendments to the States, either through their legislatures or through constitutional conventions. U.S. Const., Art. V. The delegation to State legislators like *Amici* is a deliberate and important part of the balance of powers enshrined in the Constitution. *See* Alexander Hamilton, Federalist No. 85 (stating that Article V's reliance "on the disposition of the State legislators to erect barriers against the encroachments of the national authority"); James Madison, Federalist No. 39 (describing the "neither wholly federal nor wholly national" character of the method for amending the constitution); *see also Hawke v. Smith*, 223 U.S. 221 (1920) (holding that both methods of ratification "call for action by deliberate assemblages representative of the people, which it was assumed would voice the will of the people").

*Amici* agree with the Appellant States that permitting this overreach by the Archivist would upend the careful balance our Founders constructed in Article V of the Constitution, disregard the specially assigned role of State legislatures in the constitutional amendment process, and ignore the respect and dignity due to the Appellant States as "residuary sovereigns and joint participants in the

Nation's governance." *Alden v. Maine*, 527 U.S. 706, 709 (1999). *Amici* accordingly submit this brief in favor of reversal of the District Court's decision below.

## SUMMARY OF ARGUMENT

When the Equal Rights Amendment was ratified by the three Appellant States under 1 U.S.C. § 106b, the Archivist of the United States was required, in conformity with the States' constitutionally prescribed role in the constitutional amendment process, to publish and certify the Amendment "as a part of the Constitution of the United States." Whether to ratify a constitutional amendment is a decision assigned solely to State legislatures and the individual legislators elected to populate them—not to an unelected federal officer. By independently adjudicating the timeliness of the votes by *Amici* and their fellow legislators in Illinois, Nevada, and Virginia, the Archivist has usurped the States' sovereign authority—and undermined the legislative authority conferred on *Amici* and their colleagues when they were elected by the people of their home States to serve in their respective State legislatures. Accordingly, *Amici* support the efforts of the Appellant States to obtain a writ of mandamus to force the Archivist to comply with his statutory—and Constitutional—obligations.

The District Court halted Appellant States' lawsuit before it had even begun by holding that the States had no standing to challenge the

Archivist's action (or inaction). First, the District Court held that the Appellant States lacked standing, finding that they had not been injured because, the District Court held, the Archivist's certification has no legal effect on the actual substance of the Constitution. Second, the District Court held that the Archivist exercised his statutory authority to examine the ratifications' compliance with Congress' deadline, and to reject them on that basis. The District Court erred in affirming the Archivist's overreach in interpreting Section 106b.

*First*, the plain language of 1 U.S.C. § 106b prohibits the broad grant of authority that the Archivist took it to convey. To the contrary, the provision contemplates that the Constitution will *already* have been amended by the actions of State legislatures *before* the Archivist receives notice of that amendment and thereby is obligated to publish and certify it. The Archivist's statutory duty, accordingly, *is triggered by* the legal effect of the State legislatures' ratifications. When the legislatures of Illinois, Nevada, and Virginia cast their votes to ratify the Equal Rights Amendment, the Constitution was amended—yet, by virtue of the Archivist's unilateral action, the amendment has been neither certified nor published. Appellant States have been injured by virtue of their

6

special interest, as sovereign States with a critical role in our nation's Constitutional design, in their statutory right to ensure that the official record of the Constitution reflects that document's actual contents as it has been amended by action of the States.

Article V of the Constitution expressly and specifically delegates authority for ratification of constitutional amendments to State legislatures. U.S. Const., Art. V. That delegation is a deliberate and important part of the balance of powers enshrined in the Constitution. *See* Alexander Hamilton, Federalist No. 85 (stating that Article V's reliance "on the disposition of the State legislators to erect barriers against the encroachments of the national authority"); James Madison, Federalist No. 39 (describing the "neither wholly federal nor wholly national" character of the method for amending the constitution); *see also Hawke v. Smith*, 223 U.S. 221 (1920) (holding that both methods of ratification "call for action by deliberate assemblages representative of the people, which it was assumed would voice the will of the people"). *Amici* properly exercised this solemn authority in voting for the Equal Rights Amendment, and the effect of those votes has been erased by the

Archivist's usurpation of authority. The Appellant States *Amici* served have therefore suffered an injury giving rise to Article III standing.

***Second***, the District Court similarly erred in finding that the Archivist has statutory or Constitutional authority to make an independent determination as to the validity of Congress' attempt to set a ratification deadline, and the Appellant States' compliance with that deadline. The District Court was wrong to hold that this was a lawful reason for the Archivist to refuse to perform his statutory duties to publish and certify the Equal Rights Amendment as part of the U.S. Constitution. The Archivist, one individual serving in the federal government who is not popularly elected, is not permitted to resolve the contested question of an amendment's "adopt[ion] according to the provisions of the Constitution." The statute gives the Archivist no leeway to make this determination as a prerequisite to his mandatory duties of publication and certification. 1 U.S.C. § 106b.

Because Virginia, Nevada, and Illinois have Article III standing, and because the District Court has jurisdiction over their mandamus claim, this Court should reverse the District Court's ruling, with instructions to consider Appellant States' claim on the merits.

# ARGUMENT

## I. The States have been injured by the Archivist's failure to perform his statutory duty to publish and certify the Equal Rights Amendment.

The Equal Rights Amendment provides: "Equality of rights under the law shall not be denied or abridged by the United States or any State on account of sex." U.S. Const. amend XXVIII. As of January 2020, legislators in thirty-eight states—including the *Amici* here—had cast their votes to ratify this amendment and constitutionally enshrine equality on the basis of sex throughout the nation.

Regardless, when the Archivist failed to recognize the votes of the Appellant States' legislatures, the District Court held that the Appellant States lacked standing to challenge the failure of the Archivist because their theory "assigns the Archivist's actions too much weight." Dist. Ct. Op. at 12. In the District Court's view, if Article V gives the authority to amend the Constitution entirely to Congress and the States, then the Archivist's publication and/or certification of that amendment has no legal effect and his failure to do so cannot be an injury. *Id.* at 12. The only other option for pleading an injury, in the District Court's view, was Appellant States' attempt to "gesture nonspecifically toward 'widespread

9

confusion'" as to the exact contents of the Constitution. *Id.* at 14. This, the District Court held, fails because the injury is too generalized to be sufficient for ordinary Article III standing, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 575 (1992), and not particularized enough to qualify for special solicitude as a State litigant under *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

The District Court's reasoning failed to accord the States and their legislatures the dignity granted to them by our federalist structure and the unambiguous language of the Constitution. As the framers expressly provided, it is *the States' legislatures*—not a federal official—who determine ratification. That the Constitution is amended once three-quarters of State legislatures ratify an amendment is compelled by the plain text of Article V: an amendment "*shall be valid* to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states." Art. V, U.S. Const. (emphasis added). Consistent with this constitutional directive, a completed and effective ratification is contemplated by Section 106b and forms a prerequisite to the Archivist's duty to publish and certify that amendment. It is precisely the independent legal effect of the State

legislatures' ratification that triggers the statute. By his failure to publish and certify the Equal Rights Amendment, the Archivist has failed to comply with his mandatory statutory duties and has uniquely and specifically harmed the States by discounting the exercise of the State legislatures' Article V authority.

**A. Under Article V and Section 106b, the Archivist had a legal duty to publish and certify the Equal Rights Amendment.**

Article V of the U.S. Constitution provides:

> The Congress, whenever two thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or, on the application of the legislatures of two thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the several states, or by conventions in three fourths thereof, as the one or the other mode of ratification may be proposed by the Congress; provided that no amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner affect the first and fourth clauses in the ninth section of the first article; and that no state, without its consent, shall be deprived of its equal suffrage in the Senate.

Art. V, U.S. Const. In brief, once an amendment is proposed, either by statute or constitutional convention, that amendment "*shall be valid to all intents and purposes*, as part of this Constitution, *when ratified by the legislatures of three fourths of the several States*, or by conventions in

three fourths thereof." Art. V, U.S. Const. (emphasis added). Congress proposed the Equal Rights Amendment by statute, and three-fourths of the States have voted to ratify it. Compl. ¶¶ 31–55. Under Article V, the Equal Rights Amendment—with its long-fought-for guarantee of equality—is the law of the land. *See Dillon v. Gloss*, 256 U.S. 368, 376 (1921); *United States ex rel. Widenmann v. Colby*, 265 F. 998, 1000 (D.C. Cir. 1920).

The statute directing the Archivist's subsequent responsibilities, in turn, provides:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

1 U.S.C. § 106b. In the court's view, the legal effect of ratification obviates the need for the Archivist to take any subsequent steps to bless the amendment. But it is not the Archivist's blessing that Appellant States seek; they want him to publish and certify the ratified Equal Rights Amendment so that the published laws of the United States reflect what

the States have done. All statutory prerequisites for him to do so are satisfied.

This is evident from a plain reading of the statute. The statute states that "[w]henever official notice is received…that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution," then the Archivist's duties are triggered. The statute recognizes that the actual, legal adoption of the amendment happens strictly according to the provisions of the Constitution—which, again, provides a role only for Congress and the States. The next step is for the Archivist to receive official notice that this has happened. Again, Appellant States provided him with this notice (and he went so far as to record Nevada and Illinois' ratifications). *See* Compl. ¶¶ 40, 47. After receiving such notice, the statute mandates that the Archivist then publish and certify the amendment. This is, of course, what he has failed to do with regard to the Equal Rights Amendment, and the injury of which Appellant States now complain.

Contrary to the District Court's reading, the statute does not contemplate that the Archivist's action is necessary to give legal effect to the Constitutional amendment. Nor could it: Article V is clear that that

is reserved to Congress and the States, acting together. Rather, once an amendment *has* taken legal effect, it is the Archivist's nondiscretionary duty (as the statute reads, "the Archivist of the United States *shall forthwith cause*") to publish and certify that amendment. Here, Appellant States bring suit to redress, among other things, their unique entitlement to the Archivist's action.

The original public meaning of 1 U.S.C. § 106b likewise supports this interpretation. Section 106(b) dates back to an 1818 statute enacted by the 15th Congress, which originally mandated the Secretary of State to publish constitutional amendments. Employing substantially similar language as the present-day statute, the 1818 statute read that "whenever official notice shall have been received, at the Department of State, that any amendment . . . proposed to the constitution of the United States, has been adopted, it shall be the duty of the said Secretary of State forthwith to cause the said amendment to be published[.]"[1] Law of

---

[1] At the time, Congress charged the Secretary of State with publishing constitutional amendments in "newspapers authorized to promulgate the laws." Law of April 20, 1818, ch. 80, § 2. Since 1789, the Secretary of State had a duty to publish "every such law, order, resolution, and vote . . . in at least three public newspapers authorized to promulgate laws," and Congress in 1818 simply applied this mandate to constitutional amendments. Law of Sept. 15, 1789, ch. 14, § 2. Congress did not omit

April 20, 1818, ch. 80, § 2. Congress transferred this mandate to the Administrator of General Services in 1950—and again in 1984 to the Archivist. *See* 1 U.S.C. § 106b (1951); 1 U.S.C. § 106b (1984). Importantly however, since the statute's inception, the operational language has remained the same: when an amendment "has been adopted," the certain individual has a duty to "publish" it.

In the early 19th century, similar to today, the word "adopted" or "to adopt" meant something that was "selected for use" or "received as own's own," as in "to adopt the opinions of another." Adopted (Adopt), *An American Dictionary of the English Language* (1st ed. 1828), available at http://www.webstersdictionary1828.com. As such, in 1818 a proposal that "has been adopted" was a proposal that was *already* "selected for use," or already had the force of law. Founding-era sources a few decades earlier support the same. In a 1777 letter from George Washington to Thomas Jefferson, Washington—in requesting additional supplies for military troops—noted that "under the authority of Congress, compulsory measures *have been adopted* in some cases to draw aid from the

the requirement to publish constitutional amendments in newspapers until over a century later. *See* 5 U.S.C. § 160 (1926).

disaffected[.]" Letter from George Washington to Thomas Jefferson (Nov. 6, 1777), *The Papers of George Washington, Revolutionary War Series* 144-45 (Frank Grizzard & David Hoth eds., University Press of Virginia 2002) (emphasis added). Here, Washington was referring to an enacted statute that already granted him the authority to pull additional supplies to military units (*i.e.*, a statute that already had the force of law). Similarly, in a 1779 letter from George Washington to the Board of War, Washington—in resolving a dispute regarding a military promotion— noted that to promote a particular General "would be to violate and exclude the principle which *has been adopted* by Congress . . . [regarding] that of appointing Brigadiers from the Officers of the line of each state in proportion to their Quotas of Troops[.]" Letter from George Washington to the Board of War (May 22, 1779), *The Papers of George Washington, Revolutionary War Series* 571-73 (Edward Lengel ed., University Press of Virginia 2010) (emphasis added). Once more, Washington was referring to a congressional statute that already had the full force of law.

Accordingly, in 1818 a constitutional amendment that "had been adopted" by three fourths of the States already had legal effect and the force of law. In turn, the Secretary of State (now the Archivist) had the

nondiscretionary duty to publish and certify that amendment. After all, "to publish" in the early 19th century simply meant to "promulgate or proclaim, as a law or edit," as in the example of publishing laws "by printing or by proclamation." Publish, *An American Dictionary*, *supra.* That is, while Congress and the States had the authority to officially enact a constitutional amendment, the Secretary of State's duty merely was to publicly declare it—a strict statutory mandate. So too the Archivist today.

### B. The Archivist's failure to perform his duty to ratify the Equal Rights Amendment supports federal jurisdiction.

The specific harm of failure to maintain "a proper record of legislative action" in the ratification of Constitutional amendments has long been held sufficient to support federal jurisdiction on its own. *Coleman v. Miller*, 307 U.S. 433, 437–38 (1939). Additionally, Article V assigns States the unique and highly specific right to partner with Congress in amending the Constitution—a right that became the sacrosanct responsibility of individual state legislators like *Amici*.

The ratification of amendments like the Equal Rights Amendment is a deliberate and critical function of State legislators that no other governmental official in the United States has the constitutional

authority to perform. *See* Alexander Hamilton, Federalist No. 85 (stating that Article V's reliance "on the disposition of the State legislators to erect barriers against the encroachments of the national authority"); James Madison, Federalist No. 39 (describing the "neither wholly federal nor wholly national" character of the method for amending the constitution); *see also Hawke v. Smith*, 223 U.S. 221 (1920) (holding that both methods of ratification "call for action by deliberate assemblages representative of the people, which it was assumed would voice the will of the people"). The performance of that right forms the sole prerequisite for the action that Section 106b requires of the Archivist. In shirking his statutory duties in this regard, and in improperly taking on the mantle of determining, as a final matter, whether the ratification was timely or otherwise complied with requirements as the Archivist understands them, the Archivist dramatically undermined the unique and deliberate role that *Amici* and their fellow State legislators play in our federalist system. This failure is a substantive, rather than merely procedural, harm the Archivist has caused to the Appellant States that *Amici* served. *Alden,* 527 U.S. at 714 (affirming the "inviolable sovereignty" of the States in their respective spheres).

Appellant States have suffered an injury in fact: the Archivist's failure to carry out his nondiscretionary statutory duty to publish and certify ratified amendments to the Constitution. States have a special interest in the performance of this duty given their privileged role in the ratification process laid out in Article V—a process which serves as a *prerequisite*, rather than a *substitute*, for the Archivist's publication and certification. Appellant States' injury is completely traceable to the Archivist's refusal to act. And it will be wholly redressed once the writ of mandamus issues and the Archivist publishes the Equal Rights Amendment as part of the Constitution. Appellant States have standing to seek mandamus relief.

## II. The Archivist has no authority to decide contested questions about Congress' power to impose a ratification deadline on the States.

Not only do Appellant States have standing to seek mandamus relief, they are entitled to that relief. Mandamus relief is appropriate where: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (quoting *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010)).

19

Appellant States have a clear right to relief, the Archivist's statutory duties are nondiscretionary and he refused to perform them, and there is no other adequate remedy. Accordingly, mandamus relief is warranted.

The District Court reasoned that the Archivist did not "look behind" the ratification notices, which is proscribed by the longstanding controlling precedent of this Court. *See Colby*, 265 F. at 1000 ("He was not required, or authorized, to investigate and determine whether or not the notices stated the truth. To accept them as doing so, if in due form, was his duty."); Dist. Ct. Op. at 26. Instead, the District Court held, the Archivist only facially compared the date of their receipt with the deadline Congress included in the prefatory language of the statute proposing the Equal Rights Amendment to the States, and by doing so was able to see that the ratifications were not valid. *Id.* at 27. Among other arguments regarding the timeline for passage of the Amendment, as set out in the Appellant States' briefs and elsewhere, Article V itself nowhere imposes a ratification deadline or gives Congress the authority to do so. Even if the Archivist had authority to perform a brief, facial check for compliance with "the provisions of the Constitution," that is not what he did.

20

Far from a simple check for facial compliance with Article V, as described by the Archivist, rejecting the Equal Rights Amendment on the basis of ratification date required each of the following discretionary, interpretive steps. The Archivist's decision to take each one of these steps was an improper usurpation of the special role assigned to State legislators like *Amici*, who were vested with the sole Constitutional authority to determine whether or not a constitutional amendment should be ratified.

First, the Archivist did not merely look at Article V; he also looked at Congress' statute proposing the Equal Rights Amendment. Within that statute, he did not merely look at the text of the proposed amendment—which does not contain a ratification deadline. Instead, he looked to the prefatory text of the statute.

Additionally, the Archivist made the judgment that the imposition of this deadline, as expressed in this location of the statute, was lawful, resolving contested questions of law that even the Supreme Court has not yet addressed. On this point, the Archivist and the District Court rely on *Dillon v. Gloss*, 256 U.S. 368, 374–75 (1921), which holds that Congress may "keep[] within reasonable limits" to impose a deadline on

ratification. But the deadline for ratification at stake in *Dillon* was contained *within the text* of the Eighteenth Amendment that was proposed to the States, not in prefatory statutory language. No court has held a deadline in prefatory text should have the same effect as one contained within the amendment, much less the Supreme Court.

Because the Archivist has no authority to settle contested legal questions, whether under 1 U.S.C. § 106b or any other source of law, he should not have done so here and on that basis refuse to carry out his nondiscretionary statutory duty to publish and certify the Equal Rights Amendment. "The requirement that a duty be 'clearly defined' to warrant issuance of a writ does not rule out mandamus actions in situations where the interpretation of the controlling statute is in doubt. The Supreme Court concluded that it would 'greatly impair ( ) . . . the value of this writ' if '(e)very executive officer whose duty is plainly devolved upon him by statute might refuse to perform it, and when his refusal is brought before the court he might successfully plead that the performance of the duty involved the construction of a statute by him.'" *13th Regional Corp. v. U.S. Dept. of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *Roberts v. United States*, 176 U.S. 221, 231 (1900)

(parentheses in original)). "[A]ny contention that the relevant provision of" the statute "is discretionary would fly in the face of its text, which uses the imperative 'shall.'" *Bennett v. Spear*, 520 U.S. 154, 175 (1997). After receiving official notice from the thirty-sixth, thirty-seventh, and thirty-eighth States to ratify the Equal Rights Amendment, the Archivist had no choice, under the text of Section 106b, but to publish and certify that Amendment.

# CONCLUSION

For the foregoing reasons and those stated in the brief of Appellant States, this Court should reverse the District Court's decision, hold that Appellant States have standing, and issue a writ of mandamus instructing the Archivist of the United States to publish and certify the Equal Rights Amendment.

Date: January 10, 2022

Respectfully submitted,

*/s/ Tacy F. Flint*

TACY F. FLINT
ELIZABETH Y. AUSTIN
MEREDITH R. ASKA MCBRIDE
MARK C. PRIEBE
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
tflint@sidley.com
laustin@sidley.com
meredith.mcbride@sidley.com
mpriebe@sidley.com

*Attorneys for Amici Curiae Hon. Steven Andersson, Hon. Jennifer Carroll Foy, Hon. Lou Lang, Hon. Julia Ratti, Hon. Ellen B. Spiegel, Hon. Heather Steans, Hon. David R. Parks, Hon. Joyce Woodhouse, Hon. Amber Joiner,*

*Hon. Karen McConnaughay,*
*Hon. Heidi Swank*

**CERTIFICATE OF COMPLIANCE WITH WORD LENGTH AND
TYPEFACE REQUIREMENTS**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 4,439 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Date: January 10, 2022

*/s/ Tacy F. Flint*
TACY F. FLINT
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
tflint@sidley.com

*Attorney for Amici Curiae*

# CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(c) and Cir. R. 25(a), that on January 10, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia by using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Date: January 10, 2022

*/s/ Tacy F. Flint*
TACY F. FLINT
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
tflint@sidley.com

*Attorney for Amici Curiae*