**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 21-5096**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF ILLINOIS, et al.,

Plaintiffs-Appellants,

v.

DAVID FERRIERO, in his official capacity as Archivist of the United States,

Defendant-Appellee,

STATE OF ALABAMA, et al.,

Intervenors-Defendants-Appellees.

On Appeal from the United States District Court
for the District of Columbia

**BRIEF FOR THE ARCHIVIST OF THE UNITED STATES**

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
  *Attorneys, Appellate Staff
  Civil Division, Room 7323
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-4332*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

Except for the following, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the appellants' Certificate as to Parties, Rulings, and Related Cases.

The Commonwealth of Virginia has been dismissed as a party to this appeal.

Additional amici appearing before this Court are: Amber Joiner; American Medical Women's Association (AMWA); ASG III, LLC; BKForge (Brooklyn for Reproductive and Gender Equity); Catharine A. MacKinnon; Constitutional Accountability Center; David Pozen; David R. Parks; Deborah Jones Merritt; Dorothy Roberts; Diane Rosenfeld; Ellen B. Spiegel; Feminist Front; Geoffrey R. Stone; Gerald Torres; Gen-Z for Change; GLBTQ Legal Advocates & Defenders (GLAD); Greater Good Initiative; Heather Steans; Heidi Swank; iFeminist; Illinois Coalition Against Domestic Violence (ICADV); Illinois Coalition Against Sexual Assault (ICASA); InnovateX; Jane S. Schacter; Jennifer

Carroll Foy; Jessica Neuwirth; Joyce Woodhouse; Julia Ratti; Karen McConnaughay; Kimberle Crenshaw; Laurence H. Tribe; Lawrence Lessig; League of Women Voters of Illinois; Loretto Feminist Network; Lou Lang; Margaret Jane Radin; Martha Field; Martha Minow; Momentive Inc.; Montgomery County Students for Change (MoCo4Change); National Council of Negro Women (NCNW); NETWORK Lobby for Catholic Social Justice; Nevada Coalition to End Domestic Violence and Sexual Assault (NCEDVSA); Nevada Women's Lobby; Pad Project; Paul Brest; Pride Liberation Project; Rebecca Brown; Shattering Glass; South Carolina Equal Means ERA; Steven Andersson; US Women's Caucus at the UN; VoteEqualityUS; Women Employed; YWCA Elgin; YWCA McLean County; YWCA of the University of Illinois; Youth Against Sexual Violence; and Zonta USA Caucus.

**B.    Rulings Under Review**

The rulings under review by Judge Rudolph Contreras are an order (JA309) and memorandum opinion (JA311) issued on March 5, 2021, dismissing the complaint for lack of jurisdiction.  The memorandum opinion is reported at 525 F. Supp. 3d 36 (D.D.C. 2021).

**C.    Related Cases**

This case has not previously been before this or any other court.  A case involving similar claims was recently decided by the Court of Appeals for the First Circuit.  *See Equal Means Equal v. Ferriero*, 3 F.4th 24 (1st Cir. 2021), *reh'g denied* (Jan. 4, 2022).

*/s/ Thomas Pulham*

Thomas Pulham

# TABLE OF CONTENTS

**Page**

GLOSSARY ............................................................................ xiii

INTRODUCTION ...................................................................... 1

STATEMENT OF JURISDICTION .......................................... 5

STATEMENT OF THE ISSUES ............................................... 5

PERTINENT STATUTES AND REGULATIONS ..................... 5

STATEMENT OF THE CASE ................................................. 6

    A.    Background .............................................................. 6

    B.    Prior Proceedings ................................................. 16

SUMMARY OF ARGUMENT ................................................ 18

STANDARD OF REVIEW .................................................... 21

ARGUMENT ....................................................................... 21

I.    The District Court Correctly Concluded that the Plaintiff
States Lack Standing. .................................................... 21

    A.    The Plaintiff States Have Alleged No Cognizable Injury
Redressable Through Relief Against the Archivist. ............ 23

    B.    The Plaintiff States Fail To Identify Any Error in the
District Court's Reasoning .................................... 32

II.    The Plaintiff States Fail To Satisfy the Threshold
Requirements for Mandamus Jurisdiction. ................... 39

    A.    Section 106b Does Not Impose a Clear Duty Subject To
Mandamus Here. ................................................. 40

B.   The Plaintiff States Have Not Established a Clear and Indisputable Right to Relief. ...............................................45

III.   If This Court Does Not Affirm the Dismissal of the Complaint, a Remand for Additional Proceedings Is Required...........................................................................................54

CONCLUSION ........................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

v

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Alaska v. U.S. Dep't of Transp.*,
   868 F.2d 441 (D.C. Cir. 1989)................................................................29

*Alaska Legislative Council v. Babbitt*,
   181 F.3d 1333 (D.C. Cir. 1999) ............................................................31

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) ...............................................................................29

*American Hosp. Ass'n v. Burwell*,
   812 F.3d 183 (D.C. Cir. 2016).........................................................55, 56

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
   576 U.S. 787 (2015) ...............................................................................30

*Armour & Co. v. Wantock*,
   323 U.S. 126 (1944) ...............................................................................44

*Brunett v. Convergent Outsourcing, Inc.*,
   982 F.3d 1067 (7th Cir. 2020) ...............................................................23

*Cheney v. U.S. Dist. Court for the Dist. of Columbia*,
   542 U.S. 367 (2004) ...............................................................................39

*Chiafalo v. Washington*,
   140 S. Ct. 2316 (2020) ...........................................................................53

*Citizens for Responsibility & Ethics in Washington v. Trump*,
   924 F.3d 602 (D.C. Cir. 2019)................................................................39

*Coleman v. Miller*,
   307 U.S. 433 (1939) ...........................................................30, 48, 50, 55

vi

*Community for Creative Non-Violence v. Pierce*,
  814 F.2d 663 (D.C. Cir. 1987)................................................................23

*Consolidated Edison Co. of New York, Inc. v. Ashcroft*,
  286 F.3d 600 (D.C. Cir. 2002).............................................................42

*CTS Corp. v. EPA*,
  759 F.3d 52 (D.C. Cir. 2014) ..............................................................31

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ............................................................................53

*Delaware Dep't of Nat. Res. & Envtl. Control v. FERC*,
  558 F.3d 575 (D.C. Cir. 2009).............................................................32

*Dillon v. Gloss*,
  256 U.S. 368 (1921) ...................................... 19, 20, 26, 43, 45, 46, 48, 51

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
  944 F.3d 945 (D.C. Cir. 2019).......................................................39, 53

*Equal Means Equal v. Ferriero*,
  3 F.4th 24 (1st Cir. 2021) ..............................................................28, 38

*Fairchild v. Hughes*,
  258 U.S. 126 (1922) ............................................................................24

*Field v. Clark*,
  143 U.S. 649 (1892) ............................................................................42

*Government of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019).............................................................21

*Hawke v. Smith*,
  253 U.S. 221 (1920) ............................................................................30

*Idaho v. Freeman*,
  529 F. Supp. 1107 (D. Idaho 1981) ...............................................11, 49

*Interstate Commerce Comm'n v. United States*
  *ex rel. Arcata & M.R.R. Co.*,
  65 F.2d 180 (D.C. Cir. 1933) ................................................ 41

*Leser v. Garnett*,
  258 U.S. 130 (1922) ............................................................ 42

*Lovitky v. Trump*,
  949 F.3d 753 (D.C. Cir. 2020)........................ 21, 39, 40, 45, 56

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................... 22, 24, 34

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ........................................ 34, 35

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ...................................................... 32, 33

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ............................................................ 21

*Mistretta v. United States*,
  488 U.S. 361 (1989) ............................................................ 50

*National Labor Relations Bd. v. Noel Canning*,
  573 U.S. 513 (2014) ............................................................ 50

*National Org. for Women, Inc. v. Idaho*,
  455 U.S. 918 (1982) ............................................................ 11

*National Org. for Women, Inc. v. Idaho*,
  459 U.S. 809 (1982) ...................................................... 12, 49

*Power v. Barnhart*,
  292 F.3d 781 (D.C. Cir. 2002)........................................ 40, 42

*Public Citizen, Inc. v. National Highway Traffic Safety Admin.*,
   489 F.3d 1279 (D.C. Cir. 2007) ............................................................ 23

*Raines v. Byrd*,
   521 U.S. 811 (1997) ........................................................... 25, 30, 31

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
   140 S. Ct. 2183 (2020) ........................................................... 34, 35

*Seminole Tribe of Fla. v. Florida*,
   517 U.S. 44 (1996) ........................................................................ 51

*Sierra Club v. EPA*,
   322 F.3d 718 (D.C.Cir.2003) .......................................................... 51

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ....................................................................... 25

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ....................................................................... 22

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ....................................................................... 22

*Texas v. EPA*,
   726 F.3d 180 (D.C. Cir. 2013)......................................................... 32

*The Pocket Veto Case*,
   279 U.S. 655 (1929) ....................................................................... 53

*13th Reg'l Corp. v. U.S. Dep't of Interior*,
   654 F.2d 758 (D.C. Cir 1980) ......................................................... 40

*United States v. Sitka*,
   845 F.2d 43 (2d Cir. 1988)......................................................... 27, 42

*United States v. Sprague*,
   282 U.S. 716 (1931) ................................................................... 6, 51

*United States v. Students Challenging Regulatory Agency Procedures*,
412 U.S. 669 (1973) .............................................................. 35

*United States v. Thomas*,
788 F.2d 1250 (7th Cir. 1986) ...................................... 41, 42

*United States ex rel. Widenmann v. Colby*,
265 F. 998 (D.C. Cir. 1920).................... 18, 26, 27, 43, 44, 45

*Wilbur v. United States ex rel. Kadrie*,
281 U.S. 206 (1930) .......................................................... 42

## U.S. Constitution:

Art. V .............................................................. 6, 26, 42

Amend. XVIII, § 3 ......................................................... 7

Amend. XX, § 6 ............................................................ 7

Amend. XXI, § 3 ........................................................... 7

Amend. XXII, § 2 .......................................................... 7

## Statutes:

1 U.S.C. § 106b ..................................... 2, 13, 19, 40

28 U.S.C. § 1291............................................................ 5

28 U.S.C. § 1331............................................................ 5

28 U.S.C. § 1361..................................................... 5, 39

1 Stat. 97 (1789)...................................................... 7, 47

48 Stat. 1749 (1933).................................................................47

74 Stat. 1057 (1960)...................................................................8

76 Stat. 1259 (1962)...................................................................8

79 Stat. 1327 (1965)...................................................................8

85 Stat. 825 (1971).....................................................................8

86 Stat. 1523 (1972)....................................................1, 8, 9, 38

92 Stat. 3795 (1978).............................................................8, 11

92 Stat. 3799 (1978)...................................................................2

## Legislative Materials:

101 Cong. Rec. 6628 (1955) ........................................................8

117 Cong. Rec. 35,814 (1971) ...................................................10

H.R.J. Res. 17, 117th Cong. (2021) ...........................................15

H.R.J. Res. 28, 117th Cong. (2021) ...........................................12

S. Rep. No. 92-689 (1972) ..............................................9, 10, 46

H.R.J. Res. 1, 2020 Sess. (Va. 2020) .........................................14

S.J. Res. 2, 79th Leg. (Nev. 2017) .............................................12

S.J. Res. Const. amend. 4, 100th Gen. Assemb. (Ill. 2018)....................12

**Other Authorities:**

*Congressional Pay Amendment*,
   16 Op. O.L.C. 85 (1992) ................................................................13, 41

*Effect of 2020 OLC Opinion on Possible Congressional Action*
   *Regarding Ratification of the Equal Rights Amendment*,
   46 Op. O.L.C., slip op. (2022), https://go.usa.gov/xz3bq.......................15

Letter from Gary M. Stern, General Counsel, Nat'l Archives and
   Records Admin., to Steven A. Engel, Assistant Attorney General,
   Office of Legal Counsel, U.S. Dep't of Justice (Dec. 12, 2018),
   https://go.usa.gov/xs3fm .................................................................13, 14

Office of Legal Counsel, *Constitutionality of Extending the*
   *Time Period for Ratification of the Proposed Equal Rights*
   *Amendment* (Oct. 31, 1977), *reprinted in Equal Rights*
   *Amendment Extension: Hearings on H.J. Res. 638 Before the*
   *Subcomm. on Civil & Constitutional Rights of the H. Comm.*
   *on the Judiciary*,
   95th Cong. 7, 13 (1978) ............................................................8, 11, 52

Press Release, Nat'l Archives and Records Admin.,
   *NARA Press Statement on the Equal Rights Amendment*
   (Jan. 8, 2020), https://go.usa.gov/xz34q ...............................................14

Press Release, The White House, *Statement from*
   *President Biden on the Equal Rights Amendment*
   (Jan. 27, 2022), https://go.usa.gov/xtJcX.........................................4, 15

*Ratification of the Equal Rights Amendment*,
   44 Op. O.L.C., slip op. (2020),
   https://go.usa.gov/xtJ3J..........................3, 6, 7, 9, 10, 12, 14, 47, 52, 53

Ruth Bader Ginsburg, *Ratification of the Equal*
   *Rights Amendment: A Question of Time*,
   57 Tex. L. Rev. 919 (1979)...................................................................10

# GLOSSARY

| | |
|---|---|
| Br. | Appellants' Opening Brief |
| ERA | Equal Rights Amendment |
| JA | Joint Appendix |

**INTRODUCTION**

Whether the Equal Rights Amendment (ERA) has been validly ratified and thus become part of the United States Constitution is a question of profound importance that may well be resolved by the courts in an appropriate dispute.  This case, in which the plaintiff States seek to compel the Archivist of the United States to certify and publish the amendment, is not the proper vehicle to decide that issue.  This challenge cannot proceed because the plaintiffs suffer no injury by the Archivist's failure to engage in that purely administrative function and because they have shown no entitlement to mandamus-style relief.  The fate of the ERA should await resolution in another case without these defects.

When Congress proposed the ERA, it included a deadline for ratification: the amendment would become part of the Constitution "when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress."  86 Stat. 1523 (1972).  As that deadline approached, only thirty-five of the necessary thirty-eight States had ratified the ERA, and five of those had attempted to rescind their approvals.  Congress passed a second

resolution to extend the ratification deadline by three years, 92 Stat. 3799 (1978), but no additional States voted to ratify the amendment during that period.  Thus, the ERA did not receive the requisite number of ratifications within either of the deadlines set by Congress.

Thirty-five years later, however, three additional States attempted to revive the ratification effort.  In 2020, Virginia became the thirty-eighth State to pass a resolution to ratify the ERA.

Although the Constitution provides no role for the Executive Branch in amending the Constitution, Congress has charged the Archivist with certain record-keeping duties related to amendments. Whenever a new amendment "has been adopted, according to the provisions of the Constitution," the Archivist must publish the amendment along with a certificate declaring that it "has become valid, to all intents and purposes, as a part of the Constitution of the United States."  1 U.S.C. § 106b.  Precedents from this Court and the Supreme Court make clear that this administrative action has no substantive legal effect.  The absence of publication and certification do not render an otherwise valid amendment ineffective; nor would publication and

certification somehow cure inadequacies in an otherwise invalid amendment.

Nonetheless, given the unprecedented circumstances here, the Archivist sought the views of the Department of Justice regarding the effect of the recent state resolutions. The Department's Office of Legal Counsel advised that "the ERA Resolution has expired," and actions by state legislatures after the deadline set by Congress "would not complete the ratification of the amendment." *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C., slip op. at 37 (2020), https://go.usa.gov/xtJ3J (*Ratification of the ERA*). Accordingly, the Office of Legal Counsel concluded, "the ERA's adoption could not be certified." *Id.*

The plaintiffs, two States that passed resolutions to ratify the ERA after Congress's deadline had lapsed, sued the Archivist. Although they recognize that his certification would have no legal effect on the ERA's status, the States seek mandamus-style relief compelling the Archivist to act, as well as a judicial declaration that the ERA has been adopted as the Twenty-Eighth Amendment.

3

The district court properly dismissed the complaint.  The court held, first, that the plaintiff States lacked standing because the Archivist's inaction had caused them no redressable injury.  It then held that, even if the plaintiffs had standing, they could not establish entitlement to mandamus-style relief given the ERA's ratification deadline, which the court held valid.

President Biden recently reiterated his decades-long support for the ERA, emphasizing that "[n]o one should be discriminated against based on their sex" and urging that "we, as a nation, must stand up for full women's equality."  Press Release, The White House, *Statement from President Biden on the Equal Rights Amendment* (Jan. 27, 2022), https://go.usa.gov/xtJcX.  But this case is not the proper vehicle for deciding whether the ERA was validly adopted.  The legal status of the ERA raises novel and difficult issues not appropriately presented in a suit by States against an Executive Branch official who has no role in the ratification or application of constitutional amendments.  This Court should affirm the district court's judgment without resolving the ERA's legal status.

4

## STATEMENT OF JURISDICTION

The plaintiffs attempted to invoke the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1361.  JA77.[1]  The district court dismissed the complaint for lack of jurisdiction on March 5, 2021, and the plaintiffs timely appealed on May 3.  JA309, 348.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Have the plaintiffs established Article III standing to bring this suit?

2.  Does the Mandamus Act, 28 U.S.C. § 1361, provide jurisdiction for this suit against the Archivist?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

---

[1] "JA" refers to the Joint Appendix; "Br." refers to the plaintiffs' opening brief; and "[X] Amicus Br." refers to the amicus brief of the designated party.

## STATEMENT OF THE CASE

### A.    Background

**1.**  Article V provides that Congress may propose new amendments to the Constitution "whenever two thirds of both Houses shall deem it necessary."  U.S. Const. art. V.  Congress has traditionally done so through a joint resolution that has two parts: a "proposing clause" that describes what Congress has done and the text of the amendment as it would appear in the Constitution.  *See, e.g.*, JA145.  Article V further provides that an amendment "shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress."  U.S. Const. art. V.

The choice as to "the mode of ratification[] lies in the sole discretion of Congress."  *United States v. Sprague*, 282 U.S. 716, 730 (1931).  In the exercise of that discretion, "Congress has specified the mode of ratification in the proposing clause included within every resolution proposing a constitutional amendment."  *Ratification of the ERA*, slip op. at 14.  Thus, for every constitutional amendment ever

6

adopted, Congress dictated the mode of ratification (*i.e.,* by state legislatures or state conventions) in the proposing clause rather than in the text of the amendment itself. *See id.* at 14-15, 15 n.15 (collecting examples).

Congress has also used the proposing clause to convey other procedural instructions relating to ratification. This practice began with the First Congress, which proposed twelve constitutional amendments in a single joint resolution. *See* 1 Stat. 97, 97-98 (1789). The proposing clause authorized the state legislatures to ratify "all" twelve together or "any of" them individually. *Id.* The States ratified ten of the twelve proposed amendments in 1791 as the Bill of Rights, and another in 1992 as the Twenty-Seventh Amendment.

Later, Congress began imposing deadlines for ratification. While the early resolutions proposing amendments did not limit the time for ratification, *see*, e.g., 1 Stat. at 97, Congress included seven-year deadlines in the texts of what became the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments. *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2. When proposing the Twenty-Third Amendment in 1960, Congress included the ratification

deadline in the proposing clause rather than in the text of the proposed amendment. *See* 74 Stat. 1057 (1960). "The general idea was that it was better not to make the 7-year provision a part of the proposed constitutional amendment itself" because this "would clutter up the Constitution." 101 Cong. Rec. 6628 (1955) (statement of Sen. Kefauver). Since then, Congress has placed a deadline for ratification in the proposing clause of every constitutional amendment it has approved. See 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); 85 Stat. 825 (1971) (Twenty-Sixth Amendment); 86 Stat. at 1523 (proposed ERA); 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment).[2]

Notably, "Congress moved from inclusion of the limit in the text of proposed amendments to including it within the proposing clauses," and occasionally varied the specific wording, "without ever indicating any intent to change the substance of their actions." Office of Legal Counsel, *Constitutionality of Extending the Time Period for Ratification of the Proposed Equal Rights Amendment* (Oct. 31, 1977)

---

[2] The proposed D.C. Congressional Representation Amendment had a deadline in the text of the amendment as well. 92 Stat. at 3795.

(*Constitutionality of ERA Extension*), *reprinted in Equal Rights Amendment Extension: Hearings on H.J. Res. 638 Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 7, 13 (1978).[3]  Indeed, the Senate Report on the ERA lumped the two practices together when it observed that a seven-year time limitation "ha[d] been included in every amendment added to the Constitution in the last 50 years."  S. Rep. No. 92-689, at 20 (1972).

    **2.**  On March 23, 1972, both Houses of Congress adopted (by two-thirds majority) a joint resolution to submit the ERA to the state legislatures.  86 Stat. at 1523.  As it had done several times before, Congress imposed a seven-year deadline for ratification.  The proposing clause stated that the amendment would become "part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress."  *Id.*  By this time, such language was accepted as part of "the traditional form of a joint resolution proposing a constitutional

---

[3] Some objections were made to a suggestion to add a deadline to the proposing clause of the Twentieth Amendment.  *See Ratification of the ERA*, slip op. 20-21 n.18.  But there do not appear to have been any similar expressions of concern with respect to the Twenty-Third or any subsequent Amendment.  *Id.*

amendment for ratification by the States."  S. Rep. No. 92-689, at 20.

Even "principal congressional proponents of the ERA accepted addition

of a seven year specification to the proposing clause" as "a 'customary'

statute of limitations."  Ruth Bader Ginsburg, *Ratification of the Equal*

*Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 921 & n.

14 (1979) (quoting 117 Cong. Rec. 35,814-15 (1971) (remarks of Rep.

Griffiths)).

"State ratifications followed quickly at first," but then "momentum

stalled."  JA314-15.  By the end of 1972, 22 States had ratified the ERA.

*Ratification of the ERA*, slip op. at 6 & n.6.  Over the next five years,

only thirteen more States followed suit, four States voted to rescind

previous ratifications, and a fifth passed a resolution stating that its

prior ratification would be rescinded if the ERA were not adopted

within the seven-year period.  *Id.* at 7 & nn. 7-8.

In 1978, "with the deadline around the corner, Congress decided to

give states more time."  JA315.  Such action was unprecedented—

"Congress had never before sought to adjust the terms or conditions of a

constitutional amendment pending before the States."  *Ratification of*

*the ERA*, slip op. at 7.  But the political branches agreed that such an

extension was constitutional.  The Department of Justice advised the President that, while "respectable arguments can be made on both sides of this question," Congress could "act to extend the seven-year limitation placed . . . in the proposing clause of the ERA." *Constitutionality of ERA Extension*, *supra*, at 10, 13.  By simple majorities, both Houses passed a joint resolution extending the deadline for the ERA's ratification by three years to June 30, 1982.  92 Stat. at 3799.

In response, several States and state legislators sued to prevent the ratification of the ERA under the extended deadline.  *See Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981).  The district court ruled in their favor, holding that the resolution extending the time for ratification was unconstitutional.  *Id*. at 1150-54.

The Supreme Court granted certiorari before judgment and stayed the district court's judgment.  *National Org. for Women, Inc. v. Idaho*, 455 U.S. 918 (1982).  But before the Court was able to decide the case, the extended deadline expired without any additional ratifications.  At the suggestion of the Solicitor General, the Court vacated the district court's judgment and remanded the case with instructions to dismiss

11

the complaints as moot. *National Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982).

When the ERA was not ratified by the requisite number of States within either of the deadlines set by Congress, "[m]ost supporters and commentators assumed that was it." JA315; *see also* JA263-76. Resolutions to restart the process from the beginning—*i.e.*, to propose a new amendment for ratification—were introduced in Congress in 1982, 1983, and repeatedly thereafter. *See Ratification of the ERA*, slip op. at 9-10. None succeeded. *Id.*; *see also* H.R.J. Res. 28, 117th Cong. (2021) (proposing a new equal rights amendment).

Separately, the plaintiff States resumed efforts to secure ratification of the proposal submitted by Congress in 1972. In 2017, Nevada passed a resolution to ratify the ERA, S.J. Res. 2, 79th Leg. (Nev. 2017); Illinois followed suit the following year, S.J. Res. Const. amend. 4, 100th Gen. Assemb. (Ill. 2018). If those two actions counted as timely ratifications, and the States that voted to rescind their ratifications were not subtracted, then thirty-seven States would have voted to ratify the ERA. This prompted certain Members of Congress to ask the Archivist "what actions he would take in the event that a 38th

12

state ratifies."  Letter from Gary M. Stern, General Counsel, Nat'l

Archives and Records Admin., to Steven A. Engel, Assistant Attorney

General, Office of Legal Counsel, U.S. Dep't of Justice (Dec. 12, 2018),

https://go.usa.gov/xs3fm (Archivist Letter).

This is the Archivist's statutory responsibility with respect to

constitutional amendments:

> Whenever official notice is received at the National Archives
> and Records Administration that any amendment proposed
> to the Constitution of the United States has been adopted,
> according to the provisions of the Constitution, the Archivist
> of the United States shall forthwith cause the amendment to
> be published, with his certificate, specifying the States by
> which the same may have been adopted, and that the same
> has become valid, to all intents and purposes, as a part of
> the Constitution of the United States.

1 U.S.C. § 106b.  Section 106b and its antecedents—which previously

assigned this duty to the Secretary of State and the Administrator of

General Services—"have long been understood as imposing a

ministerial, 'record-keeping' duty upon the executive branch."

*Congressional Pay Amendment*, 16 Op. O.L.C. 85, 98 (1992).  But

"before performing this ministerial function, the Archivist must

determine whether he has received 'official notice' that an amendment

has been adopted 'according to the provisions of the Constitution.'"  *Id.*

13

at 99.  The Archivist sought advice from the Office of Legal Counsel

with respect to his role under the statute in the event that thirty-eight

States voted to ratify the ERA.  Archivist Letter 2.

On January 6, 2020, the Office of Legal Counsel issued an opinion

concluding that "the deadline in the proposing clause of the ERA

Resolution was a valid and binding exercise of Congress's authority to

set a deadline on ratification."  *Ratification of the ERA*, slip op. at 24.

Regardless of whether the subsequent extension was proper, the

opinion concluded, "the deadline lapsed without ratifications from the

requisite thirty-eight States."  *Id.*  Thus, "[e]ven if one or more state

legislatures were to ratify the 1972 proposal, that action would not

complete the ratification of the amendment, and the ERA's adoption

could not be certified under 1 U.S.C. § 106b."  *Id.* at 37.

On January 8, 2020, the Archivist announced that he would "abide

by the [Office of Legal Counsel's] Opinion."  Press Release, Nat'l

Archives and Records Admin., *NARA Press Statement on the Equal

Rights Amendment* (Jan. 8, 2020), https://go.usa.gov/xz34q.  A few

weeks later, Virginia passed a joint resolution to ratify the ERA.  H.R.J.

Res. 1, 2020 Sess. (Va. 2020).  The Archivist recorded all three of the

14

recent ratification actions, JA237, but has not certified the adoption of the ERA.

On January 26, 2022, the Office of Legal Counsel clarified that nothing in its 2020 opinion is "an obstacle either to Congress's ability to act with respect to ratification of the ERA or to judicial consideration of the pertinent questions" related to ratification. *Effect of 2020 OLC Opinion on Possible Congressional Action Regarding Ratification of the Equal Rights Amendment*, 46 Op. O.L.C., slip op. at 3 (2022), https://go.usa.gov/xz3bq. The following day, President Biden issued a statement expressing his "support for the ERA loudly and clearly." *Statement from President Biden on the Equal Rights Amendment*, *supra*. The President declared that nothing prevents Congress from taking legislative action to "recogniz[e] ratification of the ERA." *Id.* To date, Congress has taken no such action, and the legal effect of any such action is not presently before this Court.[4]

---

[4] The House of Representatives approved a joint resolution stating that the ERA would be valid "whenever ratified by the legislatures of three-fourths of the several States," notwithstanding the earlier deadline. H.R.J. Res. 17, 117th Cong. (2021). The Senate has taken no comparable action.

15

### B.    Prior Proceedings

**1.**  The plaintiff States filed suit against the Archivist.  They contend that the deadline set by Congress in the proposing clause "did not strip the plaintiff States of their power to ratify" the ERA, and that "States have no power to rescind prior ratifications."  JA88, 91. Therefore, the plaintiffs argue, "38 States have performed the ratification role assigned to them by Article V, [and] the Equal Rights Amendment has become the 28th Amendment to the United States Constitution."  JA91.  They seek mandamus-style relief compelling the Archivist to certify and publish the ERA, as well as a judicial declaration "that the Equal Rights Amendment is 'valid' and 'part of th[e] Constitution.'" JA92 (alteration in original).

**2.**  The district court dismissed the plaintiff States' complaint, holding that it lacked jurisdiction for two independent reasons.  First, the plaintiff States lacked standing to sue because they "failed to allege an injury specific to them that was caused by the Archivist's refusal to publish the ERA and would be remedied by ordering him to publish it." JA326.  The court noted that "an amendment becomes law when it secures ratifications from three-fourths of the states—not when the

16

Archivist publishes and certifies it."  JA322.  Thus, the Archivist's

action could not have harmed the States' claimed sovereign interest in

their "authority to amend the Federal Constitution."  JA323.  The court

dismissed allegations of "widespread confusion regarding the effect of

their ratifications" as an abstract and generalized grievance.  JA 324-25

(quoting JA92).

Second, the district court held that, even if the plaintiff States had

standing, they could not establish mandamus jurisdiction.  The court

concluded that the Archivist had no duty to publish and certify the

ERA, and the plaintiff States had no clear right to relief, because their

attempted ratifications were made after the deadline set by Congress.

JA335-46.[5]  Section 106b permitted the Archivist "to consider whether a

state's ratification complies with a congressionally imposed ratification

deadline," the court explained, and a deadline placed "in a proposing

resolution's introduction is just as effective as one in the text of a

proposed amendment."  JA346.

---

[5] The court held that the political question doctrine did not
prevent it from considering whether the ERA's deadline was effective.
JA326-34.

17

## SUMMARY OF ARGUMENT

The plaintiff States in this lawsuit sought to ratify the ERA decades after the deadline set by Congress.  They now seek mandamus-style relief against the Archivist, compelling him to certify the adoption of the ERA, and a declaration that the ERA has been validly adopted. The district court correctly dismissed the complaint.

**I.**    The plaintiff States lack standing.  Their complaint alleges only abstract and undifferentiated harms shared with the public at large, including "widespread confusion" regarding the status of the ERA and a general "interest" in promoting the "will of the people."  JA92. These allegations fall short of establishing the kind of concrete and specific injury required for Article III standing.

In their brief, the plaintiff States assert a new theory of harm— that the Archivist's refusal to certify the ERA has caused direct injury to their sovereign interests in participating in the amendment process. But the Archivist's certification decision does not have any effect on the validity of a constitutional amendment.  *United States ex rel. Widenmann v. Colby*, 265 F.998, 1000 (D.C. Cir. 1920).  Rather, as the plaintiffs themselves recognize, the amendment process is complete

18

when three-fourths of the States properly ratify a proposed amendment, whether the Archivist publishes the amendment or not. *See Dillon v. Gloss*, 256 U.S. 368, 376 (1921). Because the Archivist could not, and did not, interfere with the States' ability to ratify the ERA, the plaintiff States have suffered no injury to their sovereign interests that could be redressed through this action.

The plaintiff States' reliance on legislative standing cases is misplaced. But even if these cases were relevant, they would only underscore the plaintiff States' lack of standing because their votes alone would not have been sufficient to secure adoption of the ERA.

**II.**     Even if the plaintiff States could establish standing, they could not establish the threshold requirements for jurisdiction under the Mandamus Act. Section 106b requires the Archivist to certify only those amendments adopted "according to the provisions of the Constitution." 1 U.S.C. § 106b. The Archivist must therefore ensure that any ratification actions comply with conditions properly imposed on the States through Article V, including any deadlines for ratification. Because this determination requires the exercise of judgment in these

19

circumstances, the Archivist's statutory duty cannot be controlled by mandamus.

Nor is it clear and indisputable that the ERA has been ratified. The Supreme Court long ago recognized "the power of Congress . . . to fix a definite period for the ratification" of proposed amendments, *Dillon*, 256 U.S. at 375-76, and Congress acted consistent with established practice by fixing that period through the ERA's proposing clause. Although the plaintiff States argue that the ERA has been validly adopted notwithstanding the congressional deadline, they have not identified any relevant legal authority establishing that this is so. In these circumstances, mandamus relief is not appropriate to compel the Archivist to certify that the ERA is part of the Constitution.

**III.** Should this Court conclude that the district court erred in its analysis, it should remand for consideration of additional threshold grounds not decided below or pressed here, as well as a weighing of the equitable merits necessary to support mandamus-style relief.

20

## STANDARD OF REVIEW

This Court reviews the district court's dismissal for lack of jurisdiction de novo. *Lovitky v. Trump*, 949 F.3d 753, 758 (D.C. Cir. 2020).

## ARGUMENT

### I.    The District Court Correctly Concluded that the Plaintiff States Lack Standing.

"A State's standing depends on the capacity in which it initiates a lawsuit." *Government of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019). A State may "sue to redress its own injury," or it may sue as *parens patriae* "to vindicate its citizens' interests." *Id.* As they did in district court, *see* JA321 n.3, the plaintiff States concede that a *parens patriae* lawsuit against the federal government is "foreclosed by precedent binding on this Court." Br. 20 n.9 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)); *see also Manitoba*, 923 F.3d at 179-83 (discussing the "*Mellon* bar").

To proceed on this complaint as a "direct injury lawsuit," the plaintiff States must meet "the ordinary demands of Article III—that is, establish injury-in-fact, causation and redressability." *Manitoba*, 923 F.3d at 178. "Where, as here, a case is at the pleading stage, the

21

plaintiff must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration and quotation marks omitted)).

Injury in fact, the "[f]irst and foremost of standing's three elements," *Spokeo*, 578 U.S. at 338 (alteration in original) (quotation marks omitted), "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The injury must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (quotation marks omitted). The causality element requires that the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and alterations omitted). And to satisfy redressability, it must be actually "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (quotation marks omitted).

### A.    The Plaintiff States Have Alleged No Cognizable Injury Redressable Through Relief Against the Archivist.

**1.**  The complaint in this case contains two allegations regarding the plaintiff States' standing.  First, they assert that "[t]he Archivist's failure to carry out his ministerial duties to acknowledge the adoption of the [ERA] harms the Plaintiff States by creating widespread confusion regarding the effect of their ratifications."  JA92.  Second, they claim "a significant interest in this case because the Archivist's delay continues to thwart the will of the people."  *Id.*

Both of these claimed injuries are abstract and undifferentiated, the very opposite of concrete and particularized. *See Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007) (explaining that concrete means "direct, real, and palpable—not abstract" and "particularized" means "personal, individual, distinct, and differentiated—not generalized or undifferentiated").  As this Court has previously recognized, "allegations of confusion . . . are simply too abstract to be judicially cognizable."  *Community for Creative Non-Violence v. Pierce*, 814 F.2d 663, 668 (D.C. Cir. 1987); *see also Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020)

23

("[T]he state of confusion is not itself an injury."). And a claim that the will of the people has been thwarted is precisely the kind of "generally available grievance about government—claiming only harm to [the plaintiff's] and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large"—that the Supreme Court has repeatedly held "does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74.

The Supreme Court has specifically applied these principles in litigation over the validity of a constitutional amendment. In *Fairchild v. Hughes*, 258 U.S. 126 (1922), a plaintiff challenged the procedures through which the Nineteenth Amendment was ratified. He sought to prevent the Secretary of State from proclaiming the ratification, arguing that such a proclamation "will mislead election officers." *Id.* at 129. The Court dismissed the suit, holding that "the right, possessed by every citizen, to require that the government be administered according to law" did not entitle a plaintiff "to secure by indirection a determination whether a . . . constitutional amendment, about to be adopted, will be valid." *Id.* at 129-30.

24

Additional allegations that the plaintiff States have a "significant interest," or even "a particularly acute interest," in the validity of the ERA likewise fall short. JA92. "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified" the plaintiff is to evaluate it, is not sufficient to confer standing. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). The party bringing suit "must allege facts showing that he is himself adversely affected" by the challenged act. *Id.* at 740. The complaint contains no such allegations.

**2.** The plaintiff States' briefing invokes a new harm not identified in their complaint. Rather than relying on widespread harms inflicted on "the people," the plaintiffs claim that they specifically have suffered direct injury to their sovereign interests. This effort comes too late. *See Raines v. Byrd*, 521 U.S. 811, 819 (1997) ("We have consistently stressed that a plaintiff's *complaint* must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him.") (emphasis added). But even if it did not, the brief fails to identify a cognizable injury caused by the Archivist.

25

First, the plaintiff States argue that the Archivist "is harming their sovereign interes[t] in  . . . performing their role in the Article V amendment process."  Br. 20.  But the Archivist's decision not to certify the ERA does not, as a matter of law, have any effect on the amendment process, much less prevent any State from participating in it.

The Constitution provides that an amendment "shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States."  U.S. Const. art. V.  The Supreme Court distinguished the adoption of an amendment from the Executive Branch's certification in *Dillon v. Gloss*, 256 U.S. 368 (1921).  In that case, the Court held that the Eighteenth Amendment became valid on the date it received its final state ratification.  The fact that the Secretary of State (who then performed the duties currently assigned to the Archivist) "did not proclaim its ratification" until sometime later was "not material, for the date of its consummation, and not that on which it is proclaimed, controls."  *Id*. at 376.

This Court applied the same principle in *United States ex rel. Widenmann v. Colby*, 265 F. 998 (D.C. Cir. 1920).  The petitioner in that

26

case contended that "the Eighteenth Amendment was not validly adopted" and therefore sought to compel the Secretary of State "to cancel the proclamation and certificate" stating the contrary. *Id*. at 999. The Court explained that a ruling on the Secretary's proclamation "would not affect the validity of the amendment," which depended solely on "the approval of the requisite number of states." *Id*. at 1000. Thus, Widenmann had "no interest in the prayer of his petition, because, if granted, it would avail him nothing." *Id*.

The "process of ratification" is "self-executing upon completion." *United States v. Sitka*, 845 F.2d 43, 47 (2d Cir. 1988). Thus, the Archivist's decision not to certify the ERA "could not and did not affect th[at] process." *Id*.

Indeed, the plaintiff States' own complaint contradicts their theory of cognizable harm. They claim there that they have already successfully exercised their authority to add a new amendment to the Constitution. *See, e.g.*, JA87 ("[T]he Equal Rights Amendment became part of the U.S. Constitution immediately upon Virginia's ratification."); JA91 ("Because 38 States have performed the ratification role assigned to them by Article V, the Equal Rights Amendment has become the

27

28th Amendment . . . ."); *see also* JA88 (noting the views of an earlier Archivist that "the votes by three-fourths of the States—not the Archivist's signature or any action by his office—formally added the [27th] amendment to the Constitution"). If, as the plaintiffs asserted, "the process set forth in Article V . . . was complete" before the Archivist could act, JA76, then the "practical consequences" of a decision not to certify and publish the amendment—the absence of a "ceremonial" signing event or updates to various government publications—could hardly have thwarted their participation in that process. Br. 26-27.[6]

The second "sovereign interest" invoked by the plaintiff States (Br. 27-28) is an interest in "ensuring that their legislatures' ratifications of the Equal Rights Amendment are given effect." But this interest also fails to support plaintiffs' standing for all the reasons set out above: the

---

[6] *Amici* New York, et al., point to a different set of practical consequences, arguing that the Archivist's decision "signal[s] to other government actors—federal and state—that they are free to reject the validity of the ERA and its attendant benefits." New York Amicus Br. 6. To the extent this is true, the injury would be caused by the independent actions of those other government actors, not the Archivist. *See, e.g.*, *Equal Means Equal v. Ferriero*, 3 F.4th 24, 28 (1st Cir. 2021) (finding a lack of standing where plaintiffs argued that the Archivist's decision "has made it more difficult for them to obtain the benefits of the ERA's presumptive validity").

Archivist's failure to certify and publish an amendment could not prevent any State's ratification from being effective. The Supreme Court has recognized that States possess an interest in the "exercise of sovereign power over individuals and entities within the relevant jurisdiction," which "involves the power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *see also Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (finding harm to this interest where federal regulations preempted state law).[7] But the plaintiff States do not claim any impediment to their exercise of sovereign authority over individuals within their borders or to their ability to enact and enforce their own legislation. Nothing the Archivist has done (or could do) prevents the States from changing their own laws to protect their citizens from sex-based discrimination. Their claim is that the Archivist has somehow prevented them from requiring other sovereigns to change their laws.

---

[7] States also have a sovereign interest in "the demand for recognition from other sovereigns," which often "involves the maintenance and recognition of borders" or water rights. *Snapp*, 458 U.S. at 601.

Perhaps unsurprisingly, the plaintiff States do not rely on cases addressing sovereign interests to advance this argument. Instead, they cite cases on legislative standing. Such cases are of doubtful relevance here. *Cf. Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 806 (2015) ("[R]atification by a State of a constitutional amendment is not an act of legislation within the proper sense of the word." (quoting *Hawke v. Smith*, 253 U.S. 221, 229 (1920))).

But even if these cases did apply, they would not establish the plaintiff States' standing. Legislative actors have standing to sue "on the ground that their votes have been completely nullified" only if their "votes would have been sufficient to defeat (or enact)" the challenged legislative act. *Arizona State Legislature*, 576 U.S. at 803 (quoting *Raines*, 521 U.S. at 823). Qualifying plaintiffs could be a sufficiently large collection of individual legislators, as in *Coleman v. Miller*, 307 U.S. 433 (1939), or the "entire legislative body," (Br. 28) as in *Arizona State Legislature*.

Here, though, the two plaintiff States could not have adopted the ERA on their own. Article V requires that three-fourths of the States vote to ratify an amendment—no one State can amend the Constitution

30

without at least 37 others voting the same way.  In that sense, any one

State is similarly situated to a single legislator for purposes of a

legislative standing analysis.  And under *Raines*, any injury caused by

Archivist's action would be "wholly abstract and widely dispersed," one

that that "necessarily damages all" States that voted to ratify the

amendment "equally."  521 U.S. at 821, 830.  Thus, even if the plaintiff

States are correct that the doctrine of legislative standing applies here,

they "do not have a sufficient 'personal stake' in this dispute and have

not alleged a sufficiently concrete injury to have established Article III

standing" under that doctrine.  *Id.* at 830.

In a footnote, the plaintiff States contend (Br. 30 n.17) that their

ratification votes were "'denied [their] full validity in relation to the

votes of' other States."  Br. 30 n.17 (alteration in original) (quoting

*Alaska Legislative Council v. Babbitt*, 181 F.3d 1333, 1338 n.3 (D.C. Cir.

1999)).  To the extent this argument advances a distinct injury, it is

forfeited.  *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014).

Regardless, the plaintiff States cannot show that they were subjected to

discriminatory treatment.  *Raines*, 521 U.S. at 824 n.7.  Any

infringement on the States' ratification power caused by the ERA's deadline was inflicted on all of them equally.

## B. The Plaintiff States Fail To Identify Any Error in the District Court's Reasoning.

The Plaintiff States make several attempts to undermine the district court's standing analysis. None succeeds.

First, the plaintiff States ask (Br. 22-23) for a thumb on the scale because sovereigns are entitled to "special solicitude" under *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). But such "special solicitude does *not* eliminate the state [plaintiffs'] obligation to establish a concrete injury." *Delaware Dep't of Nat. Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009); *see also Texas v. EPA*, 726 F.3d 180, 199 (D.C. Cir. 2013) ("[N]othing in the Court's opinion . . . remotely suggests that states are somehow exempt from the burden of establishing a concrete and particularized injury in fact.").

In *Massachusetts*, the Commonwealth had "alleged a particularized injury in its capacity as a landowner" faced with the prospect of "rising seas" caused by global warming. 549 U.S. at 522. While this harm was widely shared (and imminence and redressability somewhat tenuous as well), the Court afforded Massachusetts "special

32

solicitude" in the standing analysis because of its "quasi-sovereign interests" in preserving its territory and its "procedural right" to challenge the EPA's action. *Id.* at 520; *see also id.* at 517-18 (explaining that "a litigant to whom Congress has accorded a procedural right to protect his concrete interests . . . can assert that right without meeting all the normal standards for redressability and immediacy" (quotation marks omitted)). The plaintiff States have disclaimed reliance on any quasi-sovereign interests and have not identified a procedural right to challenge the Archivist's action. Thus, "[p]roperly understood, *Massachusetts* is of no help" to them. JA325.

Next, the plaintiff States contend (Br. 30) that the district court "improperly add[ed] a 'legal effect' requirement to the standing analysis." They do not dispute the district court's statement that "the Archivist's proclamation has no legal effect," JA322; rather, they contend that it is not relevant. But this argument fails to engage with either the substance of the district court's analysis or the plaintiff States' own theory of the case. As the district court explained, the fact that the Archivist plays no role in the amendment process is what

33

prevents the plaintiff States from establishing the essential elements of standing:

> Because the Archivist's publication of an amendment does not affect the amendment's validity, Plaintiffs cannot show that his refusal to publish the ERA caused the injury that they claim: interference with their constitutional authority to amend the Federal Constitution. By the same token, forcing the Archivist to publish the amendment would avail them nothing. Plaintiffs' intrusion-on-sovereignty theory thus cannot establish injury, causation, or redressability.

JA323 (alterations and citations omitted).

The plaintiff States get things backwards when they contend that "a plaintiff need not allege that the requested relief 'does anything legally significant' to establish standing." Br. 33 (quoting JA323). It is black-letter law that a plaintiff must establish a likelihood that the claimed "injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561.

Neither *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), nor *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), suggests otherwise. In the former, the Court explained that, once Marbury was appointed as justice of the peace, "he ha[d] a consequent right to the commission; a refusal to deliver which, is a plain violation of that right." *Marbury*, 5 U.S. at 168; *see also id.* at 155

34

(explaining that the "evidences of office . . . became his property"). Because Marbury had a "vested legal right" in his commission, *id.* at 162, mandamus relief compelling its delivery would have a "legal impact on [his] rights," even if it did not affect his appointment.  Br. 31.[8]  In *Seila Law*, the Supreme Court again spelled out the significance of the requested relief: the law firm had been ordered to comply with a civil investigative demand, and that injury "would be fully redressed" by a reversal of the judgment and a "remand with instructions to deny the Government's petition to enforce the demand."  140 S. Ct. at 2196. The plaintiff States' assertion (Br. 33) that resolution of the litigation "would carry no consequences for the law firm's legal rights" is without basis.

The plaintiff States are no more successful in their criticism (Br. 35) of the district court's reliance on *Colby*.  They attempt to distinguish that case as involving a "challenge [to] the legal validity of [an] amendment (which publication and certification do not affect)," while

---

[8] The plaintiff States contend that Marbury was "fighting for the 'principle.'"  Br. 32.  Maybe so.  But "the principle" supplies only "the motivation" to sue, not "the basis for standing."  *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973).

this suit involves a challenge to "the omission of [an] amendment from the Constitution's text (which publication and certification do affect)." Br. 35. To the extent there is any difference between those categories of claims, the complaint here falls on the *Colby* side of the line because it expressly seeks a declaration that "the Equal Rights Amendment is 'valid' and 'part of th[e] Constitution'" and devotes an entire section to the contention that "ARGUMENTS DISPUTING THE VALIDITY OF THE EQUAL RIGHTS AMENDMENT HAVE NO MERIT." JA88, JA92 (alteration in original).

Finally, the plaintiff States maintain (Br. 35) that the district court's holding that they lack standing "cannot be reconciled with" the court's prior conclusion that the intervenor States had sufficiently demonstrated standing for purposes of their intervention motion. The answer to this argument is found within the district court's intervention opinion: the standing analysis there was "preliminary" and conducted in the absence of "fully adversarial briefing on the issue." JA102. The court made clear that "[b]y recognizing [the intervenor States'] interests" at that time, it did "not mean to prejudge the issue of Plaintiffs' standing"; rather "it simply s[ought] to facilitate the efficient

36

presentation of arguments from apparently concerned parties." JA102.
Having received those arguments, the court concluded that States do
not have standing to challenge the Archivist's action.

While the district court's final analysis suggests that the
intervenor States also lack a cognizable interest in the Archivist's
certification decision (such that they could not sue to compel a
rescission if he had come out the other way), there is one difference
between the two groups of States that underscores the plaintiffs' lack of
injury. If the ERA were validly adopted, States that opposed it would
be compelled to change their laws against their will. *See* JA102 (noting
that the intervenors have an "interest in their regulatory powers not
being constrained or preempted by a procedurally invalid constitutional
rule"). The plaintiff States are in the exact opposite position—they
voluntarily seek to relinquish the ability to enact or enforce laws
inconsistent with the ERA. It is difficult to see how this imposes a
harm to their sovereign interests.

*    *    *

The district court correctly concluded that the plaintiff States lack
standing to challenge the Archivist's decision not to certify and publish

37

the ERA.  If this Court agrees with that holding, it need not (and should not) go further.

The States' lack of standing does not mean that no court could ever reach the underlying "federal constitutional questions . . . concerning the legal status of the ERA." *Equal Means Equal v. Ferriero*, 3 F.4th 24, 31 (1st Cir.2021).  For these questions "[t]o be fit for adjudication in federal court, however, they must be raised in a suit that satisfies the requirements of Article III." *Id.*  If the plaintiff States are correct that the ERA was fully ratified when Virginia voted to ratify on January 27, 2020, JA86, then the amendment has already come into force.  *See* 86 Stat. 1523, § 3 ("This amendment shall take effect two years after the date of ratification.").  A person whose equality of rights has been denied or abridged on account of sex might therefore bring suit on the theory that the offending state action violates the ERA.  Whether any particular litigant would have standing, and whether the suit might ultimately succeed, are questions that cannot be answered now.  But affirming the district court's judgment on standing grounds does not necessarily foreclose any such action in the future.

## II.     The Plaintiff States Fail To Satisfy the Threshold Requirements for Mandamus Jurisdiction.

The Mandamus Act confers jurisdiction on the district courts over actions "in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.[9] "Mandamus is 'one of the most potent weapons in the judicial arsenal,' a 'drastic and extraordinary remedy reserved for really extraordinary causes.'" *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 944 F.3d 945, 949 (D.C. Cir. 2019) (quoting *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 380 (2004)).  In order to obtain mandamus-style relief, "a plaintiff must demonstrate (1) a clear and indisputable right to relief, (2) that the government official has a clear duty to act, and (3) that no adequate alternative remedy exists." *Citizens for Responsibility & Ethics in Washington v. Trump*, 924 F.3d 602, 606 (D.C. Cir. 2019) (quotation marks omitted).  "These three threshold requirements are

---

[9] The plaintiff States have suggested (Br. 2; JA77) that the district court had jurisdiction under the federal question statute, 28 U.S.C. § 1331, but they provide no supporting argument, and such jurisdiction is not available in any event.  *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020).  "That leaves only the Mandamus Act as a potential source of jurisdiction."  *Id.*

39

jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020).

## A.   Section 106b Does Not Impose a Clear Duty Subject To Mandamus Here.

A party seeking mandamus relief must demonstrate that a government official is violating "a clear duty to act." *Citizens for Responsibility & Ethics*, 924 F.3d at 606.  The duty to be performed must be "ministerial and the obligation to act peremptory, and clearly defined." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir 1980).  "[W]here an alleged duty is not . . . plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." *Power v. Barnhart*, 292 F.3d 781, 786 (D.C. Cir. 2002) (alterations in original; quotation marks omitted).

Section 106b provides that the Archivist "shall" certify and publish an amendment when he receives notice that the amendment "has been adopted[] according to the provisions of the Constitution." 1 U.S.C. § 106b.  This language can impose a "ministerial, 'record-keeping' duty on the executive branch," but only when the required

condition is satisfied. *Congressional Pay Amendment*, 16 Op. O.L.C. at 98. Section 106b "clearly requires that, before performing this ministerial function, the Archivist must determine whether . . . an amendment has been adopted 'according to the provisions of the Constitution.'" *Id.* at 99.

This determination can require the exercise of judgment. *See Interstate Commerce Comm'n v. United States ex rel. Arcata & M.R.R. Co.*, 65 F.2d 180, 182-83 (D.C. Cir. 1933) (holding that an act could be ministerial where relevant facts were undisputed but require "judgment and discretion" in other circumstances). For example, the state instruments ratifying the Sixteenth Amendment were found to contain various "errors of diction, capitalization, punctuation, and spelling." *See United States v. Thomas*, 788 F.2d 1250, 1253 (7th Cir. 1986). The Secretary of State certified its adoption only after "taking into account both the triviality of the deviations and the treatment of earlier amendments that had experienced more substantial problems." *Id.*; *see*

41

*Sitka*, 845 F.2d at 47 (noting that the Sixteenth Amendment was "certified after careful scrutiny" by the Secretary).[10]

Here, the application of Article V to the ERA is "sufficiently uncertain" as to "involve the exercise of judgment and discretion." *Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 221 (1930); *see also id.* at 219; *Power*, 292 F.3d at 786. The Constitution declares that an amendment "shall be valid . . . when ratified by the Legislatures of three fourths of the several States." U.S. Const. art. V. This text does not clearly require the Archivist to disregard a congressional deadline for ratification and to treat as valid any actions taken after that deadline. The plaintiff States therefore fail to identify a duty "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Consolidated Edison Co. of New York, Inc. v. Ashcroft*, 286 F.3d 600, 606 (D.C. Cir. 2002) (quoting *Wilbur*, 281 U.S. at 218).

---

[10] In deciding that the Secretary's certification decision was beyond judicial review, the Seventh Circuit relied on *Leser v. Garnett*, 258 U.S. 130 (1922), which it understood to "trea[t] as conclusive the declaration of the Secretary of State that the nineteenth amendment had been adopted." *Thomas*, 788 F.2d at 1253. What *Leser* in fact treated as "conclusive upon the courts" (and the Secretary alike) was the "official notice" from two States that they had adopted the resolutions of ratification. 258 U.S. at 137 (citing *Field v. Clark*, 143 U.S. 649, 669-73 (1892)).

The plaintiff States concede (Br. 46) that "the Archivist may ensure that the textually enumerated provisions of Article V—ratification by three-fourths of the States, and by State legislature or convention as chosen by Congress—have been met."  But they contend that a congressionally mandated deadline is a "ratification conditio[n] beyond those expressly stated in Article V."  *Id.*  This argument is precluded by *Dillon v. Gloss*, 256 U.S. at 376, which explained that a ratification deadline is "a matter of detail which Congress may determine as incident of its power to designate the mode of ratification."  "That means that Congress's power to set a ratification deadline comes directly from Article V" and that, under § 106b, the Archivist may "confirm that the states ratified the amendment in accordance with any properly imposed ratification deadline."  JA338.

The plaintiff States acknowledge (Br. 45-46) that this determination could "requir[e] significant judgment on the Archivist's part," but they contend that the exercise of judgment is "foreclose[d]" by *Colby*'s description of the statute as imposing a purely "ministerial" duty.  265 F. at 999.  This argument ignores the principle that the "words of [judicial] opinions are to be read in the light of the facts of the

43

case under discussion." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). In *Colby*, the petitioner asked the Court to "look behind the notices" from States claiming to have ratified the Eighteenth Amendment, 265 F. at 1000, and to "second-guess the proceedings that generated them," JA337. The Court held that the Secretary of State "had no authority to examine into that matter" and—because there was no dispute that "the requisite number of states" had submitted facially valid ratifications—was required to certify adoption of the amendment. 265 F. at 999-1000. "This case presents a different issue," namely whether § 106b imposes a clear duty on the Archivist to certify a constitutional amendment not ratified in accordance with a congressional deadline. JA336-37.

Construing § 106b to require the Archivist to confirm compliance with the Constitution before acting does not, as the plaintiff States suggest (Br. 47-49), raise any constitutional concerns. The statute does not, and cannot, give the Archivist any role in the amendment process. *See supra* pp. 26-28. The statute gives the Archivist a role in publishing and certifying the adoption of constitutional amendments, a task that

has no effect on their legal status or validity.  *See Dillon*, 256 U.S. at 376; *Colby*, 265 F. at 1000.

## B.    The Plaintiff States Have Not Established a Clear and Indisputable Right to Relief.

**1.**  Even if § 106b did not require the Archivist to exercise some measure of judgment, mandamus jurisdiction would still be lacking because it is neither clear nor indisputable that the ERA has been ratified.[11]  Of the 38 ratification actions that the plaintiff States rely on to support their entitlement to mandamus relief, three were taken after the ratification deadline set by Congress had passed.[12]  "To prevail, then, Plaintiffs must show . . . that [those] three ratifications count . . . ."  JA 335.

---

[11] The plaintiff States contend (Br. 50 n.22) that the Court "need not resolve whether Congress had authority to set the type of deadline imposed here" if it concludes that the Archivist's duty is ministerial. But the party seeking mandamus bears the burden of establishing *both* a clear duty to act *and* a clear right to relief.  *Lovitky*, 949 F.3d at 759-60.

[12] Congress has twice set deadlines for ratification of the ERA, first when it originally proposed the amendment to the States and again in a subsequent joint resolution.  *See supra* pp. 9-11.  Like the district court, this brief refers to the ERA's original seven-year deadline because if Congress had the authority to impose that deadline, then it does not matter whether it also had the authority to extend it later—both deadlines had expired before Virginia voted to ratify.  *See* JA335.

The Supreme Court long ago recognized "the power of Congress . . . to fix a definite period for the ratification" of proposed amendments. *Dillon*, 256 U.S. at 375-76. In *Dillon*, a prisoner in custody for violating the National Prohibition Act argued that the Eighteenth Amendment was invalid on account of the seven-year ratification deadline imposed by Congress. *Id.* at 370-71. The Court rejected the argument, finding "no doubt" as to Congress's power to set such a limit "as an incident of its power to designate the mode of ratification." *Id.* at 376.

When it submitted the ERA to the States, Congress again adopted a seven-year ratification deadline. As the Senate Judiciary Committee explained, such a "time limitation assures that ratification reflects the contemporaneous views of the people." S. Rep. No. 92-689, at 20; *see also Dillon*, 256 U.S. at 375 (same). By placing the deadline in the proposing clause, Congress continued a practice it had begun with the Twenty-Third Amendment and applied to the Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth Amendments. *See supra* pp. 7-8; *see also* S. Rep. No. 92-689, at 20 (explaining that Congress had employed "the

46

traditional form of a joint resolution proposing a constitutional amendment for ratification by the States").

Congress also acted within the context of an even longer-running practice of "placing ratification conditions in its proposing resolutions' prefatory language." JA339. In the proposing clause of the very first joint resolution submitting constitutional amendments to the States in 1789, Congress specified the mode of ratification and further invited the States to ratify the proposed amendments individually or as a group. 1 Stat. 97. Congress has likewise "specified the mode of ratification in the proposing clause of every resolution proposing a constitutional amendment since then." *Ratification of the ERA*, slip op. at 19. "And states have always followed Congress's direction without question— even the one time Congress called for ratification by convention." JA 339-40; *see* 48 Stat. 1749 (1933) (Twenty-First Amendment).

Whatever else might be said, placing the seven-year deadline for ratification of the ERA in the proposing clause did not "clearly" and "indisputably" render it invalid. While the Supreme Court has not decisively addressed the issue, it has offered three "clues" that the validity of a ratification deadline does not turn on its precise location

47

within the joint resolution. JA341. The first comes in *Dillon* itself. The Court described the question in that case as whether the Eighteenth Amendment was "invalid, because the congressional resolution proposing the amendment declared that it should be inoperative unless ratified within seven years." 256 U.S. at 370-71 (citation omitted). Notably, the Court did not specify where in the resolution the deadline was placed (the proposed constitutional text, as it turns out), perhaps because it did not attach any significance to that particular detail.

Second, the Court maintained this apparent indifference when the issue of ratification timing arose again in *Coleman*. It distinguished the Child Labor Amendment from the Eighteenth Amendment by noting that "[n]o limitation of time for ratification is provided in the instant case either in the proposed amendment or in the resolution of submission." 307 U.S. at 452. There would have been no need to confirm the absence of a deadline in the proposing clause if such a deadline could not have been effective.

Third, and most telling, is the Court's decision in 1982 that the controversy regarding Congress's extension of the ERA's deadline became moot when the extended deadline expired. After the district

48

court held that Congress lacked the power to extend the initial deadline set in the proposing clause, *Idaho v. Freeman*, 529 F. Supp. 1107, 1153 (D. Idaho 1981), the federal government and others sought immediate review in the Supreme Court.  The Court granted certiorari before judgment, but the June 1982 deadline expired before the case could be argued.  The Solicitor General urged the Court to dismiss the case as moot because "the Amendment has failed of adoption no matter what the resolution of the legal issues presented."  Memorandum for the Administrator of General Services Suggesting Mootness at 3, *National Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982) (Nos. 81-1282 et al.). Citing that filing, the Court vacated the lower court's decision and remanded with instructions "to dismiss the complaints as moot." *National Org. for Women*, 459 U.S. at 809.  As the district court recognized, "[i]f the deadline was ineffective, a live controversy would have remained because additional states' ratifications could have still pushed the ERA past the three-fourths threshold."  JA342.

**2.**  The plaintiff States advance a series of arguments why the ERA's deadline should be disregarded and their ratification actions

counted as constitutionally effective.  All fall far short of establishing a clear and indisputable right to relief.

First, they contend (Br. 51-53) that Article V does not provide Congress "the authority to set deadlines on the amendment process." This argument disregards *Dillon*, which this Court is not free to do.  It also disregards Congress's well-established practice—in place for over a century now—of setting such deadlines.  These "traditional ways of conducting government . . . give meaning to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (omission in original).  This is true "even when that practice began after the founding era," as is the case here, and "even when the nature or longevity of that practice is subject to dispute," which this is not. *National Labor Relations Bd. v. Noel Canning*, 573 U.S. 513, 525 (2014).

The plaintiff States next attempt (Br. 56-57) to minimize the reasoning of *Dillon* as *dictum*.  But the Court in that case "*held* that the Congress in proposing an amendment may fix a reasonable time for ratification."  *Coleman*, 307 U.S. at 452 (emphasis added).  Further, this Court is bound by "not only the result" in *Dillon* that Congress lawfully

50

imposed a deadline for ratification of the Eighteenth Amendment, "but also those portions of the opinion necessary to that result." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996).[13]

Finally, the plaintiff States argue (Br. 58) that "even if *Dillon* could be viewed as determining Congress's power to set deadlines for State ratification, that holding would not apply here" because it concerned a deadline within the amendment's text "and not in a proposing clause." Nothing in *Dillon* itself requires such a distinction. As noted above, the Court referred generally to a deadline in "the congressional resolution proposing the amendment." 256 U.S. at 370-71 (citation omitted). Further, *Dillon* expressly linked Congress's power to impose such a deadline with the power to specify a mode of ratification. *Id.* at 376. Congress has consistently specified the mode of ratification

---

[13] The plaintiff States observe (Br. 56-57) that Supreme Court later characterized unspecified "statements" in *Dillon* "with respect to the power of Congress in proposing the mode of ratification" as "not in the strict sense necessary" to the decision. *United States v. Sprague*, 282 U.S. 716, 732 (1931). This would not undermine *Dillon*'s holding that Congress has the power to set a ratification deadline. Regardless, the Court in *Sprague* went on to emphasize that the statements at issue resulted from "carefu[l]" analysis and were "not idly or lightly made." *Id.* at 732-33. Such "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C.Cir.2003).

in the proposing clause, and no precedent suggests that Congress could

not validly exercise the "incident" authority of setting a deadline in the

same manner.

But whether *Dillon* applies or not, it is far from "clear and

indisputable" that a deadline placed in a proposing clause must be less

effective than one placed in the proposed amendment's text. Both

provide clear notice of congressional intent to the States and permit

equal opportunity to ratify within the time specified by Congress. *See*

*Ratification of the ERA*, slip op. at 22-23.[14] Members of Congress did

not ascribe any substantive difference to the two types of deadlines. *See*

*Constitutionality of ERA Extension*, *supra*, at 13 (noting that Congress

moved the location "without ever indicating any intent to change the

substance of their actions."); *see also Ratification of the ERA*, slip op. at

21 (finding "no indication that Members of Congress (or any court)

---

[14] The plaintiff States suggest (Br. 54) that a deadline placed in
the text of proposed amendments better "respects" their "constitutional
prerogative" because it permits them, after the deadline has lapsed, to
ratify an amendment that would be immediately "inoperative." It is
difficult to see how permitting the formal adoption of a constitutional
amendment that all agree would have "no legal effect" (New York
Amicus Br. 26) serves any salutary purpose; it certainly does not
promote State sovereignty.

seriously questioned the binding nature of a deadline stated in a resolution's proposing clause").  Rather, Congress sought to preserve the elegance of the Constitution's text by no longer "clutter[ing]" it "with extraneous sections imposing conditions on ratification that had no prospective effect." *Ratification of the ERA*, slip op. at 20.  And substantial historical practice—beginning "over sixty years" ago, JA341—supports Congress's authority to exercise its power in this manner.  *See The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character."), *quoted in Chiafalo v. Washington*, 140 S. Ct. 2316, 2326 (2020); *see also Dames & Moore v. Regan*, 453 U.S. 654, 684 (1981) (relying on historical practice of less than 40 years).

Perhaps most importantly for present purposes, the plaintiff States have not identified any relevant legal authority requiring the Archivist to certify the adoption of an amendment ratified after a deadline imposed by Congress.  *See Dunlap*, 944 F.3d at 950 (denying mandamus relief where the plaintiff "cites no case or statute" extending a right of access to the particular type of materials sought).  Given that

the question of the ERA's validity is, at best, uncertain, and that Congress has repeatedly acted on the assumption that the deadline is valid (including by voting to extend it), the plaintiff States cannot establish a clear and indisputable right to the relief they seek. Indeed, it would be remarkable if mandamus relief were issued against the Archivist for *ensuring compliance with* a requirement set by Congress.

## III. If This Court Does Not Affirm the Dismissal of the Complaint, a Remand for Additional Proceedings Is Required.

The district court was clear in its opinion as to which issues it decided and which it did not address. It held that the plaintiff States lacked standing to sue the Archivist and that they had not established either that the Archivist had a clear duty to act or that they were clearly entitled to relief. But even if the district court were mistaken on both counts, this would not be enough to establish mandamus jurisdiction, let alone an entitlement to relief on the merits.

For example, the district court did not consider "the question of whether states can validly rescind prior ratifications." JA346. To fully demonstrate a clear right to relief based on the effective ratification of the ERA by 38 States, the plaintiff States "must show" *both* that the

54

three recent "ratifications count" *and* "that the rescissions of five other states do not."  JA335.  The district court did not consider the latter question and the plaintiff States have not briefed it here.  Thus, remand would be required to resolve this jurisdictional issue.

Indeed, the Archivist himself has not determined whether the five States' attempted rescissions would themselves be a basis for refusing to certify the ERA, even if the deadline were inoperative.  The district court would need to await the Archivist's decision to know whether there is any controversy between the parties on this issue.  *See* JA326 n.5 (noting the Archivist's ripeness argument).  Assuming such a dispute existed, the district court might then have the opportunity to consider whether the effectiveness of the attempted rescissions presents a non-justiciable political question.  *See* Dkt. No. 29, at 14-15 (arguing that "the question of the efficacy of . . . attempted withdrawal [of a state's prior ratification], should be regarded as a political question pertaining to the political departments" (alterations in original) (quoting *Coleman*, 307 U.S. at 450)).

Quite apart from these unresolved threshold issues, there remains the question of the "equitable merits."  *See American Hosp. Ass'n v.*

55

*Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016).  "Even when the legal

requirements for mandamus jurisdiction have been satisfied, . . . a court

may grant relief only when it finds compelling equitable grounds."

*Lovitky*, 949 F.3d at 759.  Whether such grounds exist is a "difficult

decision" that "rests in the first instance with the district court."

*American Hosp. Ass'n*, 812 F.3d at 192 (remanding for consideration of

this issue after reversing on jurisdiction).  The plaintiff States do not

appear to believe otherwise; they declined to brief the equities here in

their opening brief.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MICHAEL S. RAAB

 */s/ Thomas Pulham*
THOMAS PULHAM
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7323*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4332*
  *thomas.pulham@usdoj.gov*

March 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's order of September 14, 2021, because it contains 10,991 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Thomas Pulham*

Thomas Pulham

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Thomas Pulham*

Thomas Pulham

**ADDENDUM**

# TABLE OF CONTENTS

1 U.S.C. § 106b ........................................................................... A1

**1 U.S.C. § 106b**

**§ 106b. Amendments to Constitution**

Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.