ORAL ARGUMENT NOT YET SCHEDULED

No. 21-5096

## UNITED STATES COURT OF APPEALS
## FOR THE D.C. CIRCUIT

STATE OF ILLINOIS and STATE OF NEVADA,

*Plaintiffs-Appellants,*

v.

DAVID FERRIERO, in his official capacity as Archivist of the United States,

*Defendant-Appellee,*

STATE OF ALABAMA, STATE OF LOUISIANA, STATE OF NEBRASKA, STATE OF SOUTH DAKOTA, and STATE OF TENNESSEE,

*Intervenors for Defendant – Appellees.*

On Appeal from the U.S. District Court for the
District of Columbia, No. 1:20-cv-242-RC

### BRIEF FOR INTERVENORS-APPELLEES

STEVE MARSHALL
Attorney General of Alabama

Edmund G. LaCour Jr.
 *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAl
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
(334) 353-2196
edmund.lacour@AlabamaAG.gov

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109

Cameron T. Norris
Tiffany H. Bates
James P. McGlone*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*Licensed in MA; work super-
vised by members of the firm.

[*Additional counsel listed on inside cover*]

JEFF LANDRY
Attorney General of Louisiana

Elizabeth B. Murrill
  *Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov


JASON RAVNSBORG
Attorney General of South Dakota

Jason Ravnsborg
Paul S. Swedlund
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
605-773-3215
paul.swedlund@state.sd.us

DOUGLAS J. PETERSON
Attorney General of Nebraska

James A. Campbell
  *Solicitor General*
OFFICE OF THE ATTORNEY
GENERAL OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov


HERBERT H. SLATERY III
Attorney General and Reporter
of Tennessee

Andrée S. Blumstein
  *Solicitor General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 741-3492
andree.blumstein@ag.tn.gov

*Counsel for Intervenors-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

**Parties and Amici**. All parties, intervenors, and amici appearing before the district court and this Court are listed in appellants' and defendant-appellee's briefs.

**Ruling Under Review**. References to the ruling at issue appear in appellants' brief.

**Related Cases**. This case has not been before this Court or any other (besides the district court). Counsel is aware of no related cases, as defined by Circuit Rule 28(a)(1)(C), currently pending in this Court or any other.

# TABLE OF CONTENTS

Table of Authorities..................................................................................iii

Introduction................................................................................................1

Statutes & Constitutional Provisions....................................................5

Statement of Case .....................................................................................5

Summary of Argument...........................................................................11

Argument...................................................................................................12

    I.     This case should be decided on the merits........................................13

         A.     Plaintiffs have standing. ............................................................13

         B.     No issue in this case is a political question. ...........................18

         C.     Mandamus does not change the merits....................................25

    II.    The Equal Rights Amendment has not been ratified......................27

         A.     The congressional deadline expired before 38 States
              ratified. ........................................................................................28

         B.     A constitutionally reasonable amount of time expired
              before 38 States ratified. ..........................................................35

          C.     At least five States validly rescinded their ratifications........43

Conclusion.................................................................................................47

Certificate of Compliance ......................................................................49

Certificate of Service...............................................................................49

# TABLE OF AUTHORITIES[*]

**Cases**

*Agostini v. Felton*,
  521 U.S. 203 (1997) ..............................................................29

*Alden v. Maine*,
  527 U.S. 706 (1999) ..............................................................14

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ............................................29

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015) ..............................................................13

*Att'y Gen. v. Mass. Interscholastic Athletic Ass'n, Inc.*,
  393 N.E.2d 284 (Mass. 1979) ................................................2

*Bostock v. Clayton Cty.*,
  140 S. Ct. 1731 (2020) ...........................................................4

*Califano v. Goldfarb*,
  430 U.S. 199 (1977) ................................................................1

*Cameron v. EMW Women's Surgical Ctr.*,
  595 U.S. ___ (Mar. 3, 2022) ................................................18

*Carmen v. Idaho*,
  459 U.S. 809 (1982) ..........................................................8, 34

*Chiafalo v. Washington*,
  140 S. Ct. 2316 (2020) .........................................................41

*Clark v. Jeter*,
  486 U.S. 456 (1988) ................................................................2

*Coleman v. Miller*,
  307 U.S. 433 (1939) .......................................13, 21, 22, 24, 29, 34

*Colonial Times, Inc. v. Gasch*,
  509 F.2d 517 (D.C. Cir. 1975) ............................................26

*Cutler v. Hayes*,
  818 F.2d 879 (D.C. Cir. 1987) ............................................21

*D.C. v. Heller*,
  554 U.S. 570 (2008) ..............................................................31

---

[*] Our chief authorities are marked with asterisks.

*Dillon v. Gloss,
  256 U.S. 368 (1921) ...........1, 4, 19, 20, 21, 28, 31, 33, 35, 36, 37, 38, 41, 42, 43

Dyer v. Blair,
  390 F. Supp. 1291 (N.D. Ill. 1975)........................................................18, 23, 29

Epic Sys. Corp. v. Lewis,
  138 S. Ct. 1612 (2018) ...........................................................................................3

Equal Means Equal v. Ferriero,
  3 F.4th 24 (1st Cir. 2021) ...................................................................................30

Ex parte Young,
  209 U.S. 123 (1908) ............................................................................................26

Gabbs Expl. Co. v. Udall,
  315 F.2d 37 (D.C. Cir. 1963) .............................................................................37

Harris v. McRae,
  448 U.S. 297 (1980) ..............................................................................................2

Hawke v. Smith,
  253 U.S. 221 (1920) .....................................................................14, 19, 23, 31

Hollingsworth v. Virginia,
  3 U.S. (3 Dall.) 378 (1798) ...........................................................................19, 30

*Idaho v. Freeman,
  529 F. Supp. 1107 (D. Idaho 1981)................................4, 7, 17, 19, 20, 23, 24,
                                                        26, 34, 43, 44, 45, 46

In re Aggrenox Antitrust Litig.,
  2016 WL 4204478 (D. Conn. Aug. 9).................................................................24

In re Cheney,
  406 F.3d 723 (D.C. Cir. 2005) (en banc) .........................................................25

Johnson v. City of Shelby,
  574 U.S. 10 (2014) ..............................................................................................26

Larson v. Domestic & Foreign Com. Corp.,
  337 U.S. 682 (1949) ............................................................................................26

Leser v. Garnett,
  258 U.S. 130 (1922) ...................................................................16, 19, 33

Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,
  140 S. Ct. 2367 (2020) .......................................................................................17

*Loggins v. Thomas*,
654 F.3d 1204 (11th Cir. 2011) ........................................................33

*Lovitky v. Trump*,
949 F.3d 753 (D.C. Cir. 2020) ..........................................................27

*Lynch v. Donnelly*,
465 U.S. 668 (1984) ..........................................................................39

*Mass. Lobstermen's Ass'n v. Ross*,
945 F.3d 535 (D.C. Cir. 2019) ..........................................................37

*N.M. Right to Choose/NARAL v. Johnson*,
975 P.2d 841 (N.M. 1998) ...................................................................2

*Nat'l Ass'n for Fixed Annuities v. Perez*,
217 F. Supp. 3d 1 (D.D.C. 2016) ......................................................21

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) ..........................................................................21

*Patterson v. City of Toledo*,
2012 WL 1458115 (N.D. Ohio Apr. 26) ...........................................24

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) ..........................................................................33

*Printz v. United States*,
521 U.S. 898 (1997) ....................................................................14, 41

*Sampson v. United States*,
832 F.3d 37 (1st Cir. 2016) ...............................................................24

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) ............................................................................37

*Sierra Club v. EPA*,
322 F.3d 718 (D.C. Cir. 2003) ..........................................................37

*The Nat'l Prohibition Cases*,
253 U.S. 350 (1920) ....................................................................19, 31

*Trailmobile Co. v. Whirls*,
331 U.S. 40 (1947) ............................................................................38

*U.S. ex rel. Widenmann v. Colby*,
265 F. 998 (D.C. Cir. 1920) ........................................................15, 46

*United States ex rel. Yelverton v. Fed. Ins. Co.*,
831 F.3d 585 (D.C. Cir. 2016) ..........................................................27

*United States v. Morrison*,
   529 U.S. 598 (2000) ........................................................................41

*United States v. Nixon*,
   418 U.S. 683 (1974) ........................................................................23

*United States v. Sitka*,
   666 F. Supp. 19 (D. Conn. 1987) ...................................................16

*United States v. Sprague*,
   282 U.S. 716 (1931) ...........................................................19, 29, 37

*United States v. Thomas*,
   788 F.2d 1250 (7th Cir. 1986).................................................16, 40

*Va. House of Delegates v. Bethune-Hill*,
   139 S. Ct. 1945 (2019) ...................................................................17

*Williams v. Seniff*,
   342 F.3d 774 (7th Cir. 2003)..........................................................27

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ...........................................................19, 20, 22

*Zivotofsky ex rel. Zivotofsky v. Sec'y of State*,
   725 F.3d 197 (D.C. Cir. 2013) .......................................................27

## Statutes

1 U.S.C. §106b ...........................................................................9, 15

12 Stat. 251 (1861)...........................................................................39

5 U.S.C. §3331 .................................................................................16

5 U.S.C. §555 ...................................................................................21

5 U.S.C. §702 ...................................................................................26

H.J. Res. 208 (1972) .....................................................................5, 31

H.R.J. Res. 1, 98th Cong. (1983).......................................................8

N.D. SCR 4010 (Mar. 24, 2021) .....................................................11

Nev. S.J. Res. 10, 79th Sess. (2017) ................................................46

S.J. Res. 1, 117th Cong. (2021-22) ....................................................9

W.Va. 85th Leg., SCR44 (passed Senate Feb. 11, 2022)..................11

## Other Authorities

116 Cong. Rec. 28,012 (1970) ..................................................6

116 Cong. Rec. 36,302 (1970) ..................................................6

117 Cong. Rec. 35,814 (1971) ...............................................5, 6

118 Cong. Rec. 9551-52 (1972) ...........................................5, 32

*1789 Amendment Is Ratified but Now the Debate Begins*,
  N.Y. Times (May 8, 1992), nyti.ms/33QJeKB .............................40

17A Am. Jur. 2d Contracts §57.................................................21

Blackman, *The Ratification of the Equal Rights Amendment Could Lead to an Article V Convention for Proposing Amendments*, Volokh Conspiracy (Feb. 11, 2020), bit.ly/3hFPw7j ...................................................46

Bush, *Maryland Legislators Repeal Pro-Slavery Law*,
  WAMU (Apr. 11, 2014), bit.ly/3KeQLq9 ..................................45

Cong. Globe, 40th Cong. 2d Sess. 878 (1868) .................................45

*Congressional Pay Amendment*,
  16 Op. OLC 85 (1992).....................................................16, 25, 41

*Effect of 2020 OLC Opinion on Possible Congressional Action Regarding Ratification of the Equal Rights Amendment*,
  46 Op. OLC ___ (Jan. 26, 2022)..............................................11

*Foley Drops His Opposition to Congress Pay Raise Amendment*,
  L.A. Times (May 15, 1992), bit.ly/33YqXem.................................40

Ginsburg & Tyler, *Justice, Justice Thou Shalt Pursue* (2021) ...............1

Ginsburg, *Ratification of the Equal Rights Amendment*,
  57 Tex. L. Rev. 919 (1979).................................................5, 19, 29, 40

H.R. Rep. 95-1405 (1978) ......................................................6

Hatch, *The Equal Rights Amendment Extension*,
  2 Harv. J.L. & Pub. Pol'y 19 (1979) ........................................6

*Hearings on H.R.J. Res. 208 Before the House Comm. on the Judiciary*,
  92d Cong., 1st Sess. (1971) ................................................6, 38

*Hearings on S.J. Res. 134 Before the Senate Comm. on the Judiciary*,
  95th Cong., 2d Sess. (1978) ................................................7

Held et al., *The Equal Rights Amendment*,
  3 William & Mary J. of Women & L. 113 (1997) .............................30

Johnson, *50-Year Support in U.S. House 1971-2021 by % of Voting Members* (Mar. 18, 2021), bit.ly/3C9SbzE ...................................................................8

*Justice Ginsburg to Address New Georgetown Law Students*, Georgetown Law (Sept. 12, 2019), bit.ly/3bbokcd ..................................4, 47

Kessler, *The ERA and the U.S. Archivist: Anatomy of a False Claim*, Wash. Post (Feb. 9, 2022), wapo.st/3HvPRE0 ..............................................3

Linton, *State Equal Rights Amendments*, 70 Temp. L. Rev. 907 (1997).....................................................................................3

McCarthy, *Mixed Views Among Americans on Transgender Issues*, Gallup (May 26, 2021), bit.ly/35Grpm0 .........................................................3

*Memo. from John M. Harmon, Assistant Att'y Gen., OLC, DOJ, to Robert J. Lipshutz, Counsel to the President* (Oct. 31, 1977)..........................22, 23, 38, 41

Mills, *New Strategy Adopted to Revive ERA*, Sac. Bee (Dec. 12, 1993)......................................................................................8

*Paulsen, *A General Theory of Article V*, 103 Yale L.J. 677 (1993)................................................................43, 44, 45

*Prakash, *Of Synchronicity and Supreme Law*, 132 Harv. L. Rev. 1220 (2019) ......................................29, 37, 38, 39, 40, 41

*Press Statement in Response to Media Inquiries About the Equal Rights Amendment*, Nat'l Archives (Feb. 24, 2022), bit.ly/3IB19bz .......................11

*Ratification of the Equal Rights Amendment*, 44 Op. OLC ___ (Jan. 6, 2020)..............10, 15, 19, 20, 22, 25, 28, 29, 31, 32, 45

Saletan, *Abortion Funding Isn't as Popular as Democrats Think*, Slate (June 12, 2019), bit.ly/36UyDUh.............................................................3

*The Equal Rights Amendment and Abortion*, NRLC, bit.ly/3CalKAW ...................................................................................2

*The Equal Rights Amendment*, USCCB (Jan. 31, 2020), bit.ly/3ad2VhF ..............................................................2

*The Federalist No. 22* (Hamilton)..........................................................................38

*The Federalist No. 85* (Hamilton)..........................................................................38

Witter, *Extending Ratification Time for the Equal Rights Amendment*, 4 Women's Rts. L. Rep. 209 (1978)....................................................................6

**Constitutional Provisions**

U.S. Const. art. I, §3 ............................................................43

U.S. Const. art. II, §3, cl. 4 ...................................................16

*U.S. Const. art. V ....................................................1, 33, 38

**INTRODUCTION**

Amending the Constitution is hard. Absent a convention, amendments must be proposed by two-thirds of Congress and ratified by three-fourths of the States. U.S. Const. art. V. And the ratifications must occur within a "reasonable time" after the proposal. *Dillon v. Gloss*, 256 U.S. 368, 375 (1921). This difficult process ensures that changes to our founding charter are not made unless they reflect "the will of the people in all sections at relatively the same period." *Id.*

The Equal Rights Amendment failed to clear this bar decades ago. After two-thirds of Congress proposed the ERA in 1972, only 35 States (of the necessary 38) ratified it within the seven-year deadline. And of those 35, five rescinded their ratifications before the deadline expired. Everyone back then—commentators, activists, Congress, and even the Supreme Court—understood that the 1972 ERA had failed. Congress never proposed another ERA to the States.

The ERA's failure, however, does not mean that women's equality was never enshrined in our Constitution. In a series of cases, the Supreme Court held that the Equal Protection Clause already prohibits sex discrimination. *E.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 206-07 (1977). Getting the Court to that point required a sustained effort by civil-rights leaders like Ruth Bader Ginsburg. *See generally* Ginsburg & Tyler, *Justice, Justice Thou Shalt Pursue* (2021).

Plaintiffs diminish their legacy by suggesting that, without the ERA, women lack "equal treatment under the Constitution." Br.2.

Because the Constitution already guarantees women's equality, Plaintiffs' push to revive the ERA is about something else. It is an effort to *change* the law—to remove the precedent's existing limitations and to invalidate laws that are currently constitutional. The Constitution does not require public funding for abortion, for example, but activists have convinced state courts that state ERAs do. *Compare Harris v. McRae*, 448 U.S. 297 (1980), *with N.M. Right to Choose/NARAL v. Johnson*, 975 P.2d 841 (N.M. 1998). And while sex-based classifications are currently subject to intermediate scrutiny, state courts have interpreted ERAs to require more—an outcome that would jeopardize many programs and spaces reserved exclusively for women. *Compare Clark v. Jeter*, 486 U.S. 456, 461 (1988), *with Att'y Gen. v. Mass. Interscholastic Athletic Ass'n, Inc.*, 393 N.E.2d 284 (Mass. 1979).

Activists are candid about their plans to use a federal ERA to overhaul the law on abortion, gender identity, religious liberty, and more. *See, e.g.*, *The Equal Rights Amendment and Abortion*, NRLC, bit.ly/3CalKAW; *The Equal Rights Amendment*, USCCB (Jan. 31, 2020), bit.ly/3ad2VhF. People of good faith can disagree about whether removing health and safety regulations on abortion and undermining the bases for women's prisons, restrooms, and sports truly advance women's rights. *See* Linton, *State Equal Rights Amend-*

*ments*, 70 Temp. L. Rev. 907, 940-41 (1997) (documenting that most cases filed under state ERAs involve male litigants trying to take away benefits for women). Intervenors respectfully think otherwise.

These results are not supported by most Americans either, let alone supermajorities of Congress and the States. *See, e.g.*, Saletan, *Abortion Funding Isn't as Popular as Democrats Think*, Slate (June 12, 2019), bit.ly/36UyDUh ("In every poll, a plurality of Americans opposes public funding of abortions. In every poll but one, that plurality is a majority."); McCarthy, *Mixed Views Among Americans on Transgender Issues*, Gallup (May 26, 2021), bit.ly/35Grpm0 ("A majority of Americans (62%) say trans athletes should only be allowed to play on sports teams that correspond with their *birth* gender"). This democratic reality explains why Plaintiffs are trying to resuscitate an expired ERA from 1972, rather than convincing the country to approve a new one. In other words, Plaintiffs are suing *precisely because* the ERA currently lacks the supermajority support that Article V requires. That should tell the Court all it needs to know.

Plaintiffs' assertion that the ERA has already been ratified just earned "four Pinocchios." Kessler, *The ERA and the U.S. Archivist: Anatomy of a False Claim*, Wash. Post (Feb. 9, 2022), wapo.st/3HvPRE0. The theory requires an "interpretive triple bank shot." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018). It requires courts to ignore the ERA's ratification deadline—even

though a unanimous Supreme Court held that these deadlines are valid and enforceable. *Dillon*, 256 U.S. at 375-76. It requires courts to hold that amendments need not be ratified within a "reasonable time"—even though the same unanimous Court held that they must. *Id.* at 375. And it requires courts to hold that the Constitution forbids States from timely rescinding their ratifications—even though the only court to consider that question held otherwise. *Idaho v. Freeman*, 529 F. Supp. 1107, 1148-49 (D. Idaho 1981), *vacated due to subsequent mootness*, 459 U.S. 809 (1982).

This case is a policy outcome in search of a legal theory. Hence why most of Plaintiffs' amici simply register their support for the ERA, without making *any argument* for why the 1972 proposal has been validly ratified (the actual issue in this case). *E.g.*, Business-Br.; ERA-Coalition-Br.; Mich.-Br.; Mayors-Br.; Gen.-Ratify-Br.; Equality-Now-Br. Courts cannot indulge these "naked policy appeals." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1753 (2020). As one of the ERA's foremost proponents explained before she passed, the amendment fell "short of ratification" and must be "put back in the political hopper, starting over again, collecting the necessary number of States." *Justice Ginsburg to Address New Georgetown Law Students*, Georgetown Law (Sept. 12, 2019), bit.ly/3bbokcd (*Georgetown Address*).

The district court dismissed Plaintiffs' case for lack of standing and lack of merit. It was right about the latter. For that reason alone, this Court should affirm the district court's judgment.

## STATUTES & CONSTITUTIONAL PROVISIONS

All applicable statutes and constitutional provisions are in Plaintiffs' brief, with one exception. "U.S. Const. amend. XXVIII" does not exist. Br.4. The quoted language comes from H.J. Res. 208 (1972), a proposed amendment that is reproduced at JA224.

## STATEMENT OF CASE

Congress proposed the ERA to the States in 1972. The proposing resolution complied with Article V: It was passed by "two-thirds of each House." It told States to ratify through "legislatures," rather than conventions. And it required ratification "within seven years." JA117. That seven-year deadline tracked the seven-year deadlines that Congress put in the 18th, 20th, 21st, 22nd, 23rd, 24th, 25th, and 26th Amendments, as well as a failed amendment concerning D.C. *See* JA340 & n.12; JA118-19.

The ERA's deadline was crucial. Without it, the amendment would not have secured the necessary support. The ERA's proponents opposed including a deadline. *See* 118 Cong. Rec. 9551-52 (1972) (Sen. Hartke); 117 Cong. Rec. 35,814 (1971) (Rep. Griffiths); Ginsburg, *Ratification of the Equal Rights Amendment*, 57 Tex. L. Rev. 919, 921 (1979) (Ginsburg); Witter, *Extending Ratification Time for the Equal Rights Amendment*, 4 Women's Rts. L. Rep. 209, 216-

17 (1978) (Witter). But "several influential Members of both Houses objected to its absence." H.R. Rep. 95-1405, at 4 (1978). They worried that the ERA "could roam around State legislatures for 50 years." 116 Cong. Rec. 28,012 (1970) (Rep. Celler). And they warned that allowing it to "float around in space" was "very unwise." *Id*. at 36,302 (Sen. Ervin).

In fact, when the House passed a version of the ERA without the seven-year deadline, the measure died. *See* Witter 215-16. The bill was reintroduced in the next Congress, with the seven-year deadline included "to gain united support." Hatch, *The Equal Rights Amendment Extension*, 2 Harv. J.L. & Pub. Pol'y 19, 35 n.70 (1979) (citing *Hearings on H.R.J. Res. 208 Before the House Comm. on the Judiciary*, 92d Cong., 1st Sess. 41 (1971) (Rep. Griffiths) (*House Extension Hearings*)); *see also* 117 Cong. Rec. 35,814 (Rep Griffiths: explaining that the deadline's absence was "one of the objections last year" and that its inclusion should "weed out" opposition). This version of the ERA, with the seven-year deadline included, finally garnered the support of two-thirds of Congress—where all earlier versions had failed. JA80-82. Notably, the seven-year ratification deadline was quoted or referenced by 32 States in their ratification documents. JA343-44; JA232-33.

As the ERA's deadline approached, it was clear that the amendment would not be ratified in time. Three-fourths of 50 is 38, so the amendment could not be ratified if at least 13 States abstained. As of March 1979, 15 States

had not ratified the ERA, only 35 had ever ratified the ERA, and five had rescinded their ratifications. JA237. The rescinding States were Nebraska (1973), Tennessee (1974), Idaho (1977), Kentucky (1978), and South Dakota (1979). JA237. Their rescissions were delivered to the Archivist's predecessor, and the Archivist has acknowledged receipt. *See* JA245; JA237. In the *Freeman* case, Idaho sued the Archivist's predecessor for declaratory and injunctive relief, raising several issues concerning the ERA. 529 F. Supp. at 1111. The *Freeman* court declared, among other things, that Idaho's rescission was valid. *Id.* at 1150.

To buy the ERA more time, Congress passed a resolution purporting to extend the ratification deadline. In the legislative debates, no one argued that an extension was unnecessary because the original deadline was invalid or nonbinding. To the contrary, then-Professor Ginsburg compared the deadline to a "statute of limitations" and warned that the ERA would "die" if this "procedural time bar … ran out." *Hearings on S.J. Res. 134 Before the Senate Comm. on the Judiciary*, 95th Cong., 2d Sess. 262-63 (1978). Congress thus purported to extend the ERA's deadline from 1979 to 1982, though its resolution was approved by bare majorities rather than two-thirds of each House. JA315. The *Freeman* court held that the extension was unconstitutional. 529 F. Supp. at 1153. But its legality was ultimately irrelevant because no additional States ratified the ERA between 1979 and 1982. JA315.

When the extended deadline passed without additional ratifiers, everyone assumed that the 1972 proposal was dead. *E.g.*, JA125-26; JA263-76; JA282-83; JA308. The Supreme Court—which had granted certiorari before judgment in *Freeman*—dismissed the case as moot. *Carmen v. Idaho*, 459 U.S. 809 (1982). It cited the Government's memorandum on mootness, where the Government explained that the ERA had "failed of adoption no matter what the resolution of the legal issues presented here." JA245.

In the wake of *Freeman*, no ERA proponent suggested that the amendment was only three States away from ratification—a point they had every incentive to make, if they thought it was a serious possibility. Instead, they focused their energies on convincing Congress to start the process over again. *E.g.*, JA278-80; JA284. Congress tried to propose the ERA again in 1983, but the proposal fell short of the two-thirds threshold. H.R.J. Res. 1, 98th Cong. (1983). Congressional support for the ERA has steadily decreased ever since. *See* Johnson, *50-Year Support in U.S. House 1971-2021 by % of Voting Members* (Mar. 18, 2021), bit.ly/3C9SbzE.

The so-called "three-state strategy" did not emerge until the mid-90s. *See* Mills, *New Strategy Adopted to Revive ERA*, Sac. Bee (Dec. 12, 1993). This theory posits that, instead of starting over with a new ERA, the old ERA from 1972 can still be ratified. The most common version argues that, because the ERA's ratification deadline appears in the proposing clause rather than the

text of the proposed amendment, Congress can remove it through legislation. *E.g.*, JA294. (Congress has considered several such bills, but none passed both houses of Congress. *E.g.*, S.J. Res. 1, 117th Cong. (2021-22).) The three-state strategy would then count every State that ever ratified the ERA. That number is 35, since this theory assumes ratifications never expire and cannot be rescinded. JA295. To get to 38, proponents of the three-state strategy needed three more States to ratify the 1972 ERA. Nevada purported to do that in 2017, Illinois in 2018, and Virginia in 2020. JA83-86.

Shortly before Virginia completed the three-state strategy, some of Intervenors sued the Archivist in the Northern District of Alabama. Though the Constitution does not give the executive an express role in the amendment process, someone must collect the ratifications, ensure the constitutional requirements are met, and certify and publish amendments. Since the founding, that duty has been carried out by an executive-branch official. JA312-13. Today, it's the Archivist. 1 U.S.C. §106b. Like the plaintiffs in *Freeman*, the Alabama plaintiffs sued him for injunctive and declaratory relief. *See Alabama v. Ferriero*, Doc. 1, No. 7:19-cv-2032 (N.D. Ala. Dec. 16, 2019).

The Alabama case did not progress far. The Archivist asked for the Justice Department's advice. JA303. The Office of Legal Counsel then issued a formal opinion concluding that the ERA cannot be ratified unless it is "propose[d] … anew." *Ratification of the Equal Rights Amendment*, 44 Op. OLC ___

(slip op. 1) (Jan. 6, 2020) (2020 OLC). The Archivist agreed to abide by OLC's opinion and, should it ever change, to give the Alabama plaintiffs at least 45 days' notice before certifying the ERA. *See* Doc. 23, No. 7:19-cv-2032 (N.D. Ala. Feb. 27, 2020).

Plaintiffs filed this case in early 2020. They, too, sued the Archivist. But strangely, they argued that the Archivist has no real authority in the amendment process. JA87. And they characterized their case as a mandamus action. JA91-92. Intervenors were allowed to join the litigation as defendants, JA95, and both they and the Archivist asked the district court to dismiss Plaintiffs' case as a matter of law, JA317 n.1.

The district court dismissed Plaintiffs' case on two "alternative" grounds. JA320. First, it agreed with the Archivist that Plaintiffs lack Article III standing. Plaintiffs' "own" complaint alleges that his decision to publish and certify amendments "has no legal effect," so his refusal "does not cause them a concrete injury that could be remedied by ordering him to act." JA320. Second, the district court agreed with Intervenors that Plaintiffs' ratifications were ineffective because they came after the congressional deadline expired. (The Archivist also made this argument, but he simultaneously argued—unsuccessfully—that the question was nonjusticiable. Doc. 29-1 at 13-14; JA326.) The district court did not reach Intervenors' alternative

arguments that the ERA had expired under the force of the Constitution and that five States had validly rescinded their ratifications. JA335.

After the district court's opinion, Plaintiffs' case has only grown weaker. In March 2021, North Dakota passed a resolution declaring that its prior ratification of the ERA "lapsed" with the seven-year deadline and "should not be counted." N.D. SCR 4010 (Mar. 24, 2021). Similar resolutions are pending in other States that ratified the 1972 ERA. *E.g.*, W.Va. 85th Leg., SCR44 (passed Senate Feb. 11, 2022). Despite a change in presidential administration, moreover, OLC did not rescind its 2020 opinion concluding that Plaintiffs' late ratifications were ineffective. It issued another opinion in 2022 that "acknowledges and does not modify" that conclusion. *Press Statement in Response to Media Inquiries About the Equal Rights Amendment*, Nat'l Archives (Feb. 24, 2022), bit.ly/3IB19bz; *see Effect of 2020 OLC Opinion on Possible Congressional Action Regarding Ratification of the Equal Rights Amendment*, 46 Op. OLC ___ (Jan. 26, 2022). Further, the lead plaintiff in this suit, Virginia, has been voluntarily dismissed. Doc. #1936684. It no longer resists the district court's conclusion that its ratification was untimely and no longer asks to be counted among the ratifying States. *See* Doc. #1935815 at 2.

## SUMMARY OF ARGUMENT

Plaintiffs' case is flawed, but not procedurally. Plaintiffs sued the right defendant: The Archivist is injuring them by nullifying their attempts to

ratify the ERA. Plaintiffs raised justiciable questions: Courts have long adjudicated similar questions arising out of the amendment process. And Plaintiffs have a cause of action: They sue the Archivist for injunctive and declaratory relief (and their puzzling focus on mandamus is harmless).

The problem with this case is not that courts have no business deciding whether the ERA is our 28th Amendment. The problem is that the ERA obviously failed forty years ago. The district court rightly held that "Plaintiffs' ratifications came too late to count" because "Congress set deadlines for ratifying the ERA that expired long ago." JA311-12. To resolve the controversy over the 1972 ERA once and for all, this Court should also hold that Plaintiffs' ratifications were too late under the Constitution and were insufficient given the rescissions by at least five other States. Because these conclusions are all reasons for dismissing Plaintiffs' complaint, the district court's judgment should be affirmed.

## ARGUMENT

The district court dismissed Plaintiffs' complaint under Rules 12(b)(1) and 12(b)(6). Reviewing de novo, this Court should hold that no procedural obstacle prevents the judiciary from deciding whether the ERA has been ratified. But this Court should affirm because, for a variety of reasons, the ERA has not been ratified.

## I.     This case should be decided on the merits.

The Archivist argued below that this case should be dismissed on various procedural grounds. Those arguments are mostly wrong. Plaintiffs have Article III standing. No issue in this case presents a political question. And Plaintiffs' decision to characterize this case as a mandamus action, though puzzling, does not prevent this Court from reaching the merits.

### A.     Plaintiffs have standing.

Plaintiffs are correct that, if a State ratifies an amendment and the Archivist refuses to count it, then the State suffers an Article III injury. In *Coleman v. Miller*, a lieutenant governor purported to cast the tie-breaking vote in favor of a constitutional amendment, after the state legislature split 20-20. 307 U.S. 433, 436 (1939). The 20 dissenting legislators sued, arguing that their "no" vote should have prevailed because Article V gives state executives no role in the ratification process. *Id.* The Supreme Court held that the legislators had standing to raise this claim in federal court. Their interest in "maintaining the effectiveness of their votes" was a "plain, direct, and adequate" injury. *Id.* at 438. Still today, *Coleman* is good law for the proposition that "'legislators whose votes would have been sufficient to … enact[] a specific legislative Act have standing to sue if that legislative action … does not go into effect[].'" *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 803 (2015).

13

Plaintiffs suffered the *Coleman* injury. Under their view of the law, majorities of their legislatures successfully ratified the 1972 ERA. And under their view of the law, the Archivist nullified those ratifications by illegally refusing to count them. No case suggests that state legislatures and legislators can vindicate this injury but States themselves cannot. That result would be particularly anomalous in the context of Article V, a provision that treats the States as independent sovereigns and sets out an amendment process where they act in their sovereign capacity. *See Printz v. United States*, 521 U.S. 898, 918-19 (1997); *Alden v. Maine*, 527 U.S. 706, 713 (1999). When the federal government prevents a State from exercising this sovereign power, the State suffers a sovereign injury. *See Hawke v. Smith*, 253 U.S. 221, 229 (1920) ("[R]atification by a state of a constitutional amendment is not an act of legislation … but the expression of the assent of *the state* to a proposed amendment." (emphasis added)).

Though Plaintiffs agree they suffered this injury, Br.29-30, their overall theory of standing is incoherent. On the one hand, they argue that the Archivist is stopping them from "performing their role" and is preventing their ratifications from being "given effect." Br.20; *see* Br.23 (similar); Br.25 (similar); Br.27 (Archivist is "obstructing the resolutions passed by their legislatures"); Br.29 (Archivist is "effectively 'overrid[ing]' Plaintiff-States' legislatures' ratifications"); Br.30 n.17 ("Plaintiff-States' ratifications are not being

counted"). On the other hand, they deny that the Archivist's actions are "legally significant" and describe his role as a mere "formality." JA323; *see* Br.26-27. Both cannot be true. If the Archivist's actions have no legal significance, then he cannot "obstruct," "override," or "nullify" Plaintiffs' ratifications. Their role has been fully performed, and their ratifications are fully valid. What the Archivist says, thinks, or writes about them is irrelevant to this theory of injury—the only one that Plaintiffs press on appeal.

Plaintiffs are nevertheless *right* that they have standing because they are *wrong* that the Archivist plays no meaningful role. True, an amendment is adopted when the 38th State ratifies it. But someone must collect the ratification documents, ensure that Article V's requirements have been met, and formally pronounce that the amendment has been adopted. No single State could perform that role. And Congress has not traditionally performed that role. 2020 OLC 32. Instead, from the very beginning, that role has been performed by the executive branch—first the Secretary of State, then the General Services Administrator, and now the Archivist. 2020 OLC 6 n.5.

The Archivist's role is significant. It is partly ministerial: The Archivist cannot look behind States' ratification documents, or refuse to certify an amendment that satisfies the requirements of Article V. *See U.S. ex rel. Widenmann v. Colby*, 265 F. 998, 1000 (D.C. Cir. 1920). But his role is also partly discretionary. Per 1 U.S.C. §106b, the Archivist cannot publish an

15

amendment until he receives notice that it "has been adopted, *according to the provisions of the Constitution*." (Emphasis added.) This language has long been interpreted to require the Archivist to "*determine* whether a proposed amendment has *in fact* been adopted according to Article V's procedures before he publishes it." JA337 (emphasis added; citing *Congressional Pay Amendment*, 16 Op. OLC 85, 98-99 (1992) (1992 OLC)). Even if the statute didn't require it, the Archivist could not blindly publish an amendment that did not follow Article V. He swears an oath to follow the Constitution. 5 U.S.C. §3331. And he has a constitutional duty to "'take Care'" that the amendment process is faithfully executed. *United States v. Sitka*, 666 F. Supp. 19, 22 (D. Conn. 1987) (quoting U.S. Const. art. II, §3, cl. 4).

Contra the district court, the Archivist's certification does have "legal effect." JA322. Given his statutory and constitutional duties, his certification that an amendment has been validly ratified is generally considered "conclusive upon the courts." *Leser v. Garnett*, 258 U.S. 130, 137 (1922).* A determination that binds courts and ends litigants' ability to challenge a ratification is hardly a "formality." JA323. Accordingly, if the Archivist refuses to

---

* Intervenors do not concede that, if the Archivist unilaterally certifies the ERA, then his certification would bar Intervenors from challenging the ERA in court. Among other reasons, the principle from *Leser* should not apply when States sue the Archivist *before* he certifies an amendment. *Cf. United States v. Thomas*, 788 F.2d 1250, 1253-54 (7th Cir. 1986).

certify an amendment that has been ratified, then ordering him to certify it would provide the ratifying States meaningful relief.

The Archivist is thus a proper defendant. The *Freeman* court found that the plaintiffs had standing to sue his predecessor. 529 F. Supp. at 1118-19. And here, the district court agreed that issues concerning the ratification process are justiciable questions for the courts. *See* JA326. But the courts could never decide these issues unless States have someone to sue. The Archivist is the natural choice, given his role in administering the ratification process. And he's the only choice, as Plaintiffs note. Br.34. Plaintiffs should have been able to proceed against him.

One final point on standing. Plaintiffs suggest that, if they lack standing to sue, then Intervenors lacked standing to intervene. Br.35-36. Of course, Intervenors did not need standing to intervene *as defendants* in an *existing* case between Plaintiffs and the Archivist. *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1952 (2019); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020). But more fundamentally, Intervenors face injuries that Plaintiffs do not.

Intervenors *oppose* the 1972 ERA. If it is added to the Constitution, then the amendment will decrease their authority to legislate, cede more legislative authority to Congress, subject them to costly litigation, and jeopardize their democratically enacted laws. *See* Doc. 23 at 11-14; Doc. 10 at 9-10. The

ERA thus directly implicates Intervenors' "[p]aramount" and "sovereign" power to "enact and enforce" their laws. *Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. ___ (slip op. 8) (Mar. 3, 2022).

Plaintiffs, who want to *add* the ERA to the Constitution, cannot claim these injuries. If they like the ERA, nothing stops them from voluntarily complying with it today. And they have no particularized interest in legislation that Congress might pass in the future or in the constitutionality of other States' laws. Like other States, Plaintiffs can allege a sovereign injury if the Archivist is unlawfully ignoring or counting their ratification votes. But that injury is where the similarity between Plaintiffs and Intervenors ends.

## B.    No issue in this case is a political question.

Some have insisted that the merits questions in this case are for Congress, not the courts. The district court correctly rejected this argument for one of the merits questions. This Court should reject it for all three.

As then-Judge Stevens explained, the notion that legal disputes over constitutional amendments are nonjusticiable "is not one which a [lower court] is free to accept." *Dyer v. Blair*, 390 F. Supp. 1291, 1300 (N.D. Ill. 1975). The Supreme Court "has on several occasions decided questions arising under article V, even in the face of 'political question' contentions." *Id*. at 1300 & n.21. To quote then-Professor Ginsburg, the Supreme Court has "entertained and resolved on the merits a variety of questions relating to the

process of proposing and ratifying constitutional amendments." Ginsburg 943; *e.g.*, *United States v. Sprague*, 282 U.S. 716 (1931); *Leser*, 258 U.S. 130; *Dillon*, 256 U.S. 368; *The Nat'l Prohibition Cases*, 253 U.S. 350 (1920); *Hawke*, 253 U.S. 221. In fact, one of the Supreme Court's earliest decisions resolved a question about the ratification process—and did so on the merits. *Hollingsworth v. Virginia*, 3 U.S. (3 Dall.) 378 (1798).

The questions in this case do not satisfy either prong of the political-question doctrine. There's no "'textually demonstrable constitutional commitment of the issue to a coordinate political department.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). The executive branch is not mentioned in Article V. Congress is mentioned, but Plaintiffs and the Justice Department agree that nothing "in the text of Article V, historical practice, or other Supreme Court precedent" gives Congress the power "to determine the validity of a constitutional amendment after the States have submitted their ratifications." 2020 OLC 32; *accord* Doc. 37 at 18-20. Granting "plenary power to Congress to control the amendment process" would also "run[] completely counter to the intentions of the founding fathers." *Freeman*, 529 F. Supp. at 1126. Because Article V "split[s]" the amending power "between Congress and the states," "it is evident … that the framers did not intend either of those two parties to be the final arbiter of the process"; rather, "the

courts, as a neutral third party … [would] decide … questions raised under article V." *Id*. at 1135.

Nor do the questions in this case lack "'judicially discoverable and manageable standards for resolving [them].'" *Zivotofsky*, 566 U.S. at 195. Consider them in turn.

**Congressional Deadline**: The question whether Congress can limit the States' time for ratification is not only justiciable—the Supreme Court has already adjudicated it. *Dillon* held, squarely and unanimously, that Congress can "fix a definite period for the ratification" of constitutional amendments. 256 U.S. at 375-76. To reach that conclusion, the Court examined the text, structure, and history of the Constitution—reasoning that is right in the judiciary's wheelhouse. Here, too, the district court and the Government have eloquently explained why Congress has the power to set binding ratification deadlines. JA339-45; Doc. 29-1 at 24-31; 2020 OLC 12-24. "Recitation of [their] arguments—which sound in familiar principles of constitutional interpretation—is enough to establish that this case does not 'turn on standards that defy judicial application.'" *Zivotofsky*, 566 U.S. at 201.

**Constitutional Deadline**: Courts can similarly determine what constitutes a "reasonable time" for ratifying constitutional amendments under Article V. As a general matter, courts have no trouble deciding whether an amount of time is "reasonable"—a concept that is "ubiquitous in the law."

*Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 41-42 (D.D.C. 2016); *e.g.*, 5 U.S.C. §555 ("reasonable time"); *Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987) ("unreasonable delay"); 17A Am. Jur. 2d Contracts §57 ("[a]n offer lapses after the expiration of a reasonable time"). If the Supreme Court can determine that "more than 3 days but less than 10 days" is not a "substantially lengthy" recess, *NLRB v. Noel Canning*, 573 U.S. 513, 527, 537-38 (2014), then courts can determine what constitutes a "reasonable time" to ratify an amendment.

*Coleman* does not alter this conclusion. True, some Justices in *Coleman* thought that, "in the absence of a limitation" by Congress in either "the proposed amendment or in the resolution of submission," courts cannot determine what constitutes a reasonable ratification period under Article V. 307 U.S. at 452-53. But Congress *did* "fix a reasonable time" for ratifying the ERA "in the resolution of submission," *id*. at 452, so *Coleman*'s reasoning does not apply by its terms. In other words, even if this question is for Congress, Congress has spoken here. *Coleman* also did not overrule *Dillon*, where a unanimous Court concluded that Congress's seven-year deadline for the 18th Amendment was reasonable. 256 U.S. at 376. The Court made that determination by looking to "the periods within which prior amendments were ratified"—the kind of historical inquiry that is within the judiciary's competence. *Id*. at 376; *see, e.g.*, *Noel Canning*, 573 U.S. at 537-38.

Even in cases where Congress provides no guidance, *Coleman*'s discussion of whether courts can determine what constitutes a "reasonable time" under Article V was not an opinion of the Court. *See Memo. from John M. Harmon, Assistant Att'y Gen., OLC, DOJ, to Robert J. Lipshutz, Counsel to the President* 50 (Oct. 31, 1977) (1977 OLC) ("There was … no clear majority in *Coleman* … for the position that courts could never review the question of reasonableness."). The two Justices in dissent thought that courts were perfectly capable of deciding what constitutes a "reasonable time" under Article V, even when Congress is silent. *See* 307 U.S. at 470-73 (Butler, J., dissenting). As for the other seven Justices, four would not have reached that question because they thought the plaintiffs lacked standing. *See id.* at 460-70 (op. of Frankfurter, J.). The remaining three reaffirmed *Dillon* but thought that courts should not determine what constitutes a "reasonable time" under Article V when Congress is silent. *See id.* at 452-56. *Coleman* is far too "fractured," 2020 OLC 29, to resolve anything on this issue, let alone extend to a case (like this one) where Congress has spoken.

**State Rescissions**: Like Congress's power to impose ratification deadlines, the States' power to rescind ratifications is an ordinary, justiciable question of constitutional law. It "demands careful examination of the textual, structural, and historical evidence put forward by the parties …. This is what courts do." *Zivotofsky*, 566 U.S. at 201. The *Freeman* court, for

22

example, consulted these traditional sources to reach a well-informed con-
clusion about the constitutionality of state rescissions. *See* 529 F. Supp. at
1146-50. The Government and 17 state amici have also consulted this evi-
dence and drawn a firm (albeit incorrect) conclusion. *See* 1977 OLC 29-49;
NY-Br.28-34.

The Court can resolve this question too. Whether States have the
power to rescind turns largely on the meaning of "the word 'ratification'"—
a term in Article V that "must be interpreted with the kind of consistency
that is characteristic of judicial, as opposed to political, decision making."
*Dyer*, 390 F. Supp. at 1303; *Freeman*, 529 F. Supp. at 1137. The States' "power
to ratify a proposed amendment to the federal Constitution has its source in
the federal Constitution," *Hawke*, 253 U.S. at 230, and the Supreme Court
"has consistently exercised the power to construe and delineate claims aris-
ing under express powers" and implied "powers alleged to derive from enu-
merated powers," *United States v. Nixon*, 418 U.S. 683, 704 (1974).

True, the lead opinion in *Coleman* contains a stray passage suggesting
that the validity of state rescissions is a political question: "We think … the
question of the efficacy of ratifications by state legislatures, in the light of
previous rejection *or attempted withdrawal*, should be regarded as a political
question … with the ultimate authority in the Congress in the exercise of its
control over the promulgation of the adoption of the amendment." 307 U.S.

at 450 (emphasis added). But the italicized language was "clearly … dicta." *Freeman*, 529 F. Supp. at 1142. The *Coleman* litigation arose because Kansas purported to ratify the Child Labor Amendment after previously voting to reject it. 307 U.S. at 435-36. No State tried to rescind its ratification of the Child Labor Amendment, let alone Kansas, so "the effect of a rescission … was not before the court." *Freeman*, 529 F. Supp. at 1142. As the lead opinion in *Coleman* explains, "[t]he precise question" that the Court attempted to decide was whether a State could be "restrain[ed] … from certifying [its] ratification" of an amendment "because of an earlier rejection." 307 U.S. at 450.

Nor is *Coleman*'s discussion of rescissions the kind of "considered dicta" that binds this Court. *See Freeman*, 529 F. Supp. at 1142 (explaining that *Coleman*'s drive-by discussion of rescissions is, at most, "persua[sive]" authority). As explained, *Coleman* was a badly fractured opinion with no opinion representing a majority on the political-question doctrine. "[D]icta from a Supreme Court plurality opinion" is "non-precedential." *Sampson v. United States*, 832 F.3d 37, 45 (1st Cir. 2016); *accord In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *6 (D. Conn. Aug. 9) (distinguishing "*Marks*-doctrine dicta" from a "*Marks*-doctrine holding"); *Patterson v. City of Toledo*, 2012 WL 1458115, at *6 (N.D. Ohio Apr. 26) (explaining that "plurality dicta" that "was not even applied by the plurality in that case … cannot be … [the] law").

Like the *Freeman* court, this Court must draw its own conclusion about whether and how to decide the validity of state rescissions. And as far as persuasive authority goes, all agree that *Coleman*'s suggestion that Congress should resolve these questions through some kind of "promulgation" is wildly unpersuasive. *See* JA329 n.8; Doc. 37 at 18-20; 2020 OLC 29-32; 1992 OLC 102-05. These questions, like other questions concerning the meaning of Article V, have been and can be resolved by courts.

## C.    Mandamus does not change the merits.

Plaintiffs characterize this case as a mandamus action. Mandamus requires, foremost, a "'clear and indisputable'" right to relief. *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). The Archivist will argue that the questions in this case are open or difficult, so this Court can affirm the denial of mandamus without definitively answering them. This Court should reject that invitation for two main reasons.

First, mandamus is not qualified immunity. The clear-and-indisputable requirement, as the district court recognized, does not allow courts to throw up their hands in the face of hard or open questions. JA335. Courts "must *interpret* the underlying [law]" and determine whether the defendant has a "clear and compelling duty under the [law] *as interpreted*." *Cheney*, 406 F.3d at 729 (emphases added). In other words, mandamus requires courts to resolve "the merits." *Id.* Nothing prevents mandamus from being used to

"review an issue of first impression" or "settle new and important problems." *Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 524 (D.C. Cir. 1975) (cleaned up).

Second, Plaintiffs do not even need a writ of mandamus. Their decision to frame their case that way is both strange and unnecessary. The plaintiffs in *Freeman* sought injunctive and declaratory relief against the Archivist's predecessor, not mandamus. 529 F. Supp. at 1154, 1111. That same relief is available here. Given the Archivist's role in the ratification process, *supra* I.A, he has "some connection with the enforcement" of the governing rules, and thus can be sued for equitable relief under *Ex parte Young*, 209 U.S. 123, 157 (1908); *see Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689-91 (1949) (explaining that this implied equitable cause of action is available against both state and federal officers). The Archivist's decision not to count Plaintiffs' ratifications is also "agency action" that can be reviewed under the APA, 5 U.S.C. §702; *see* Doc. 29-1 at 31-32 (Government conceding that Plaintiffs could have brought this case under the APA).

This Court thus should not rest its decision on the peculiarities of mandamus. Plaintiffs' complaint can be fairly read to seek traditional injunctive and declaratory relief. *See* JA92-93. Even if it couldn't, courts typically do not fault plaintiffs for failing to plead the right cause of action. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014); *Williams v. Seniff*, 342 F.3d 774, 792 (7th Cir.

2003). A dismissal on that basis would serve little purpose, since the plaintiff usually can amend the complaint or file a new case. Instead of resting on a harmless foot fault, this Court should resolve this case once and for all by rejecting Plaintiffs' theory on the merits.

## II.     The Equal Rights Amendment has not been ratified.

The ERA proposed in 1972 was never ratified. To prove that it was, Plaintiffs must convince this Court to ignore three things: Congress's express deadline, the Constitution's implied deadline, and every state rescission. This Court cannot ignore even one.

Though the district court stopped after the first question, this Court should resolve all three. Dismissals can be affirmed on alternative grounds; and all three questions were briefed below, present pure questions of law, and would be reviewed de novo anyway. *United States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 589 (D.C. Cir. 2016); *e.g.*, *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 725 F.3d 197, 220 n.20 (D.C. Cir. 2013), *aff'd*, 576 U.S. 1. In a mandamus case, moreover, all three questions are "'jurisdictional.'" *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020).

A remand would cause "unnecessary delay and waste of judicial resources." *Yelverton*, 831 F.3d at 589. The loser of this appeal will likely seek further review in the Supreme Court, and the Supreme Court will benefit from this Court's full analysis. A decision on Intervenors' alternative

arguments also would provide finality on the status of the 1972 ERA. By holding that the old proposal was never approved and cannot be revived, this Court will make clear that the only path forward for the ERA is to "propose the amendment anew." 2020 OLC 1.

## A. The congressional deadline expired before 38 States ratified.

All agree that the ERA was not ratified by 1979, when Congress's seven-year deadline expired. (Though Congress purported to extend the deadline another three years, that extension is irrelevant because no additional States ratified by 1982.) Unless Plaintiffs can prove that the ERA's deadline is nonbinding, their untimely ratifications in 2017 and 2018 were ineffective. They cannot prove that.

Plaintiffs cannot argue that the congressional deadline is unconstitutional. *Cf.* Br.51-53. They affirmatively waived this argument below. *See* Doc. 99 at 14-15 (stressing that they "do not make" this argument); JA336-38 (addressing Plaintiffs' "two" arguments for ignoring the deadline, neither of which was the deadline's unconstitutionality).

For good reason. In *Dillon*, a unanimous Court held that Congress "no doubt" can "fix a definite period for the ratification" of constitutional amendments. 256 U.S. at 375-76. This power is a "matter of detail" that Article V gives Congress "as an incident of its power to designate the mode of ratification." *Id.* at 376. *Dillon*'s holding remains good law. In *Sprague*, the

Supreme Court reaffirmed *Dillon*'s "statements with respect to the power of Congress in proposing the mode of ratification." 282 U.S. at 732. And in *Coleman*, the lead opinion described *Dillon*'s analysis as "cogent" and confirmed that *Dillon* "*held* that the Congress … may fix a reasonable time for ratification." 307 U.S. at 452 (emphasis added). While four Justices "disapprov[ed] of the conclusion arrived at in *Dillon*," *id.* at 458 (Black, J., concurring), the other five Justices did not. *See Dyer*, 390 F. Supp. at 1299-300; Prakash, *Of Synchronicity and Supreme Law*, 132 Harv. L. Rev. 1220, 1277-78 (2019) (Prakash); Ginsburg 943. Nor is this Court free to say that the Supreme Court's "more recent cases have, by implication, overruled [*Dillon*]." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). *Contra* Br.58.

A contrary conclusion would call into question almost every amendment proposed by Congress in the last 100 years. 2020 OLC at 15-16; *cf. Sprague*, 282 U.S. at 734 (giving "weight" to Congress's prior practice when proposing amendments). And it would fatally undermine Plaintiffs' attempt to revive the 1972 ERA. As explained, without the seven-year deadline, the ERA would have been rejected by more than a third of Congress, and many States would have refused to ratify it. Intervenors made these points below, but Plaintiffs refused to engage. *Compare* Doc. 74 at 14-16, *with* Doc. 99 at 14-15, *and* Doc. 112 at 4-5. They cannot do so for the first time in a reply brief on appeal. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).

Instead of arguing that the seven-year deadline is unconstitutional, Plaintiffs claim that it simply lacks the force of law. The deadline appears in the proposing clause rather than the text of the proposed amendment. Plaintiffs claim that only the latter kind of deadline can constrain the States. Br.51.

This argument sets Plaintiffs apart from other proponents of the three-state strategy. Some argue that the seven-year deadline is unconstitutional. *E.g.*, NY-Br.7; *Equal Means Equal v. Ferriero*, 3 F.4th 24, 27 (1st Cir. 2021). Others argue that, because the deadline appears only in the proposing clause, Congress is free to remove it through legislation. *E.g.*, JA295; Held et al., *The Equal Rights Amendment*, 3 William & Mary J. of Women & L. 113, 126-31 (1997). But no proponents—until Plaintiffs in this case—argue that the deadline can be ignored *even though* Congress has the power to impose deadlines and *even though* Congress hasn't yet removed this deadline.

Plaintiffs' argument is wrong. It tries to analogize the "proposing clauses" in joint resolutions proposing constitutional amendments to the "prefatory clauses" in other laws. Br.59 n.29. But that analogy doesn't hold up.

Proposed amendments are not "ordinary cases of legislation." *Hollingsworth*, 3 U.S. at 381 n.*. Their proposing clauses look nothing like the prefatory clauses in ordinary statutes. Prefatory clauses explain the "purpose" or "'necessity'" of the operative statutory text. *D.C. v. Heller*, 554 U.S.

570, 578 & n.3 (2008). But Congress has never put this kind of information in proposing clauses. *See Nat'l Prohibition Cases*, 253 U.S. at 386. These clauses instead use direct, mandatory, and legally operative language. *See, e.g.*, H.J. Res. 208 (declaring that the ERA "shall be valid … when ratified by the legislatures of three-fourths of the several States within seven years"). For example, Congress has always used the proposing clause to specify which "mode" of ratification—legislature or convention—that the States must use. 2020 OLC 14-15 & n.15. Its choice of mode is indisputably mandatory on the States. *See Hawke*, 253 U.S. at 227. Since Congress's power to set ratification deadlines comes from its power to specify the mode of ratification, *Dillon*, 256 U.S. at 376, deadlines in proposing clauses must be mandatory too. JA335.

Congress itself believes that the deadlines in proposing clauses are binding on the States. (And Congress's view is crucial because, again, Plaintiffs do not deny that Congress *could* impose a binding ratification deadline; they argue only that Congress *did not* impose one here.) When Congress started putting ratification deadlines in proposing clauses, rather than the text of amendments themselves, no one in Congress thought that the deadlines would now be precatory. 2020 OLC 21. Congress thought the move was purely aesthetic—that it would stop "'cluttering up' the Constitution with

provisions that were useless immediately upon ratification." JA340-41 (collecting sources).

When the seven-year deadline was added to the ERA's proposing clause, moreover, both proponents and opponents recognized that it was mandatory. 2020 OLC 21-22; *e.g.*, 118 Cong. Rec. 9552 (Sen. Hartke) (opposing a deadline because its expiration would mean "we must begin the entire process once again."). Congress also passed a controversial bill to *extend* the ERA's original deadline, and it is still considering controversial bills to *remove* it—measures that make little sense if the deadline isn't binding to begin with. It's telling that, in a case with no shortage of amicus briefs, not a single Member of Congress has filed a brief in support of Plaintiffs' theory.

Plaintiffs also understate the strangeness of their theory. In Plaintiffs' world, a deadline is not binding unless it appears in the text of the proposed amendment. Br.53. Such a deadline is binding not because Congress said so, but by force of the Constitution alone. Br.54 & n.26. In other words, even after the deadline expires, States can keep ratifying the amendment. Br.58-59. And even if the 38th State ratifies after the deadline passed, the Archivist still must certify the expired amendment and put it in the Constitution. Br.42-45. The amendment then just sits there, forever entombed and never in force, rendered inoperative by its own text. That's a bizarre way to maintain a Constitution—so strange that, if the founders intended it, Plaintiffs

should be able to cite at least one historical source that contemplates it. They cite none. *Cf. Loggins v. Thomas*, 654 F.3d 1204, 1228 (11th Cir. 2011) ("the Constitution does not require pointless procedures"); *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009) (similar).

The Supreme Court seems to agree that a deadline's location makes no difference. *See* JA341-43 (discussing cases). Take *Dillon*, for example. Plaintiffs are correct that the deadline there appeared in the text of the proposed amendment, rather than the proposing clause. But if the Supreme Court agreed with Plaintiffs' theory, then its reasoning would have been different. The Court described the deadline as appearing in "the congressional resolution proposing the amendment," not the amendment's text. 256 U.S. at 370-71 (cleaned up). And it held that Congress had the power to set a deadline "as an incident of its power to designate the mode of ratification," *id.* at 376, not that Congress can put deadlines in the text of amendments that become effective *by force of the Constitution*. If the Supreme Court accepted Plaintiffs' view of the law, it would not have engaged in a lengthy discussion of deadlines. It would have simply held that, unless Congress is trying to deprive a State of its "equal suffrage in the Senate," Article V places no limits on what goes in the amendments that it proposes. U.S. Const. art. V; *see Leser*, 258 U.S. at 136.

The Supreme Court's vacatur in *Freeman* is also damning. After granting certiorari, the Court determined that the case had become "moot" once the extended deadline expired. 459 U.S. at 809. Plaintiffs say the Court didn't explain why it thought the case was moot. Br.61. But the Court said it had "consider[ed] the memorandum for the Administrator of General Services suggesting mootness, filed July 9, 1982, and the responses thereto." 459 U.S. at 809. The Government's memorandum—which apparently won the day— argued that the case had become moot because, after the expiration of the deadline, the ERA could no longer be ratified. JA245-46.

More importantly, if Plaintiffs are right that the ERA's ratification deadline is not binding, then the Supreme Court was wrong to deem *Freeman* moot. The *Freeman* plaintiffs sued the Archivist's predecessor under a theory of vote nullification—specifically, for illegally refusing to honor Idaho's rescission—and won a declaration that Idaho's rescission was valid. *See* 529 F. Supp. at 1118-21, 1155. That dispute was still live, unless the thing for which Idaho was trying to rescind its vote was permanently dead. That the ERA was still short of the 38-State threshold would have been irrelevant to this theory of injury; in *Coleman*, for example, the plaintiffs had standing even though the amendment in question had been ratified by only five States and rejected by 26. 307 U.S. at 436. The Supreme Court's mootness conclusion in *Freeman* thus made sense only if the Court was treating the ERA's deadline

as valid and binding. That assumption was safe, given the Court's express holding in *Dillon* and decades of prior congressional practice.

### B. A constitutionally reasonable amount of time expired before 38 States ratified.

Even if Congress's seven-year deadline were invalid or nonbinding, the Constitution contains its own ratification deadline: a "reasonable time" after the amendment's proposal. *Dillon*, 256 U.S. at 375. Plaintiffs' attempt to ratify the ERA more than four decades after its proposal falls well outside the zone of reasonableness.

Under Article V, a constitutional amendment must be ratified within a "reasonable time" after it is proposed. *Id*. That's what a unanimous Supreme Court held in *Dillon v. Gloss*. While *Dillon* acknowledged that Article V "contains no express provision" limiting the time for ratification, the Court deemed that omission "not … controlling" because constitutional rules can also be "reasonably implied." *Id*. at 373. One rule that can be reasonably "impli[ed] from article 5," the Court explained, is that amendments must be ratified within a "reasonable time" after they are proposed. *Id*. at 374-75.

The Court reached that conclusion for four reasons:

**1.** The text of Article V treats the acts of proposal and ratification "not … as unrelated acts, but as succeeding steps in a single endeavor." *Id*. The "natural inference" from this coupling is that proposal and ratification "are not to be widely separated in time." *Id*. at 375.

35

**2.** The text of Article V allows Congress to propose amendments "only when there is deemed to be a necessity therefor." *Id*. The "reasonable implication" of that language is that, once proposed, amendments "are to be considered and disposed of presently." *Id*.

**3.** By requiring a supermajority of "three-fourths of the states," ratification is meant to reflect "the expression of the approbation of the people." *Id*. Ratification must be "sufficiently contemporaneous" with proposal to "reflect the will of the people in all sections at relatively the same period"— something "ratification scattered through a long series of years would not do." *Id*.

**4.** The opposite view would have "untenable" results. *Id*. It would allow proponents to combine votes from "the present" with totally unrelated votes from "generations now largely forgotten." *Id*. And it would mean that "amendments proposed long ago—two in 1789, one in 1810 and one in 1861—are still pending." *Id*. That latter amendment would allow States to reinstitute slavery. *See id.* at 372 (discussing the Corwin Amendment).

*Dillon*'s conclusion that Article V limits the time for ratification was not dicta. True, the precise question in *Dillon* was whether the seven-year ratification deadline that Congress put in the 18th Amendment was constitutional. *Id*. at 370-71. And the Court held that Congress has the power to impose such deadlines. *Id*. at 376. But the *reason* Congress has that power,

36

according to the Court, is because the Constitution itself requires ratification to occur within a reasonable time. *See id.* at 374-76. "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which [courts] are bound." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996); *accord Gabbs Expl. Co. v. Udall*, 315 F.2d 37, 39 (D.C. Cir. 1963) (language "material to the decision" is not dicta). For that reason, *Dillon*'s analysis of Article V's limit on the time for ratification—which "took up the vast majority of the *Dillon* opinion" and was "a necessary building block for its ultimate conclusion"—binds this Court. Prakash 1281.

Even if *Dillon*'s analysis were dicta, it was "carefully considered" dicta—which binds this Court all the same. *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535, 541 (D.C. Cir. 2019). As the Supreme Court has explained, "article 5 was carefully examined" in *Dillon*, and "[*Dillon*'s] statements" about the meaning of Article V "were not idly or lightly made." *Sprague*, 282 U.S. at 732-33. The argument that *Dillon*'s discussion can be "dismiss[ed]" as dicta thus "carries no weight" for "this 'inferior Court,'" since "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) (cleaned up).

Binding or not, this Court should follow *Dillon*'s interpretation of Article V because it is correct as an original matter. To quote then-Professor

Ginsburg, "[i]mplicit in Article V is the requirement that ratification of a proposed constitutional amendment occur within some reasonable time." *House Extension Hearings* 122. The Justice Department, too, once deemed this principle "no longer open to question." 1977 OLC 19. Though the text of Article V does not spell out a particular timeframe for ratification, "the usual rule of construction where time is not expressly prescribed" is that "duration for a reasonable period is the term accepted by the law." *Trailmobile Co. v. Whirls*, 331 U.S. 40, 54-55 (1947) (citing *Dillon*, 256 U.S. at 375).

Indeed, the text of Article V expressly contemplates a reasonably contemporaneous ratification period. Article V requires Congress to "deem [an amendment] necessary"—a judgment that can be made only in light of current circumstances. *See* Prakash 1269. Article V also requires amendments to be approved by a supermajority democratic vote: "two thirds of both Houses" and "the Legislatures of three fourths" of the States. "One crucial element of majority rule"—let alone supermajority rule—"is the requirement that those in favor of some … constitutional amendment … actually constitute a majority at a given moment in time." Prakash 1224. As Hamilton put it, the Constitution rests on "the consent of the people," *The Federalist No. 22*, so it can change only when the people are "*united* in the desire of a particular amendment," *The Federalist No. 85* (emphasis added). No such unity

exists when different generations approve amendments in different circumstances over different decades. Prakash 1272.

"Historical practice" further confirms that "the amendment process must occur over a reasonable, and therefore limited, period." Prakash 1274. Until our most recent amendment, no amendment took longer than four years to ratify. JA226. The average time for ratification was one year, eight months, and seven days. JA226; *see* JA229-30.

Accepting Plaintiffs' view that *Dillon* is wrong would wreak havoc on our system. Plaintiffs' argument that every failed amendment is still pending before the States would reach even the Corwin Amendment—a despicable amendment that would forever enshrine slavery in the Constitution. 12 Stat. 251 (1861). Plaintiffs' argument also means that the ratification process can be stretched out over decades (or even centuries). That regime would make it impossible to conduct the most basic task of constitutional interpretation: divining an amendment's "contemporaneous understanding" or "original meaning." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984); *United States v. Jones*, 565 U.S. 400, 407 n.3 (2012). And it would allow an amendment to be ratified by accretion even though, at any given time, a supermajority of States *oppose* it. Prakash 1272.

In response to all this, Plaintiffs hang their hats on the 27th Amendment—an amendment that the Archivist deemed ratified in 1992, more than

200 years after Congress proposed it. *See* JA90. It's unclear what role the 27th Amendment plays in their argument, practical or legal. Either way, Plaintiffs' point fails.

Practically speaking, this Court can hold that Plaintiffs' ratifications were too late without undermining the 27th Amendment. Unlike the ERA, the Archivist has already certified the 27th Amendment as ratified. That distinction is practically important because, as explained, courts have generally held that his certification is conclusive, especially when it happened decades ago. *E.g.*, *Thomas*, 788 F.2d at 1253. Also unlike the ERA, Congress did not include any ratification deadline in the 27th Amendment. When determining what constitutes a "reasonable time" under Article V, courts could distinguish cases where two-thirds of Congress expressed a view—even if only a precatory view—from cases where Congress was silent. *Cf.* Ginsburg 944-45 & nn.159-60.

Legally speaking, the 27th Amendment means nothing. No court has ruled on the validity of its ratification. That issue was heavily disputed at the time, *e.g.*, *1789 Amendment Is Ratified but Now the Debate Begins*, N.Y. Times (May 8, 1992), nyti.ms/33QJeKB; *Foley Drops His Opposition to Congress Pay Raise Amendment*, L.A. Times (May 15, 1992), bit.ly/33YqXem, and is heavily disputed today, Prakash 1229 n.42 (collecting sources). Ohio's attempt to ratify the same amendment was controversial *in 1873* given the "great … lapse

of time" that had occurred, *Dillon*, 256 U.S. at 372 n.3, and the Supreme Court deemed it "untenable" that the amendment was still before the States in 1921, *id*. at 375. Nor is the Archivist's certification in the 1990s the sort of "historical practice" that helps courts determine the meaning of the Constitution. *See Printz*, 521 U.S. at 917-18 (explaining that examples from "the past few decades" are too "recent" to be "probative … of a constitutional tradition that lends meaning to the text").

In all events, this Court must follow *Dillon*, a unanimous interpretation of the Constitution by the Supreme Court—even if the 27th Amendment suggests the political branches disagree with that decision. *United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000). The political branches have not been consistent in their views either. Before the Justice Department described *Dillon*'s interpretation of Article V as "dicta," it insisted that *Dillon*'s interpretation was "no longer open to question." *Compare* 1992 OLC 90, *with* 1977 OLC 19. And up until the 27th Amendment, Congress consistently acted as though unratified amendments expire. Prakash 1274-79. The 27th Amendment does not trump this much longer historical practice, let alone the holding of *Dillon* or the text of Article V. *See Chiafalo v. Washington*, 140 S. Ct. 2316, 2328 (2020) ("[Parties] cannot rest a claim of historical tradition on one [example] in over 200 years.").

41

Because Article V requires amendments to be ratified within a "reasonable time," *Dillon*, 256 U.S. at 375, Plaintiffs' purported ratifications of the ERA were ineffective. A reasonable ratification period for the ERA is probably seven years. Seven years is the period that Congress chose for the ERA, and it's the period that Congress chose for nearly every amendment proposed in the last century. JA118.

But wherever Article V draws the line exactly, the 45-year gap between the ERA's proposal and Plaintiffs' ratifications is plainly unreasonable. "[C]onsidering the periods within which prior amendments were ratified," *Dillon*, 256 U.S. at 376, the ERA's ratification would have taken four decades longer than any amendment ratified in our first 200 years. JA118. Plaintiffs took far longer than the year it took Congress to debate and pass the 1972 proposal, and the three years it took the first 35 States to ratify. JA81-82; JA237. During that yawning gap, the country grew by 100 million people, had seven different Presidents, and saw near-complete turnover in its national and state "representatives." *Dillon*, 256 U.S. at 375; *see* JA127-28. The politics of the late 2010s are, to put it mildly, quite different from the politics of the late 1970s. And more than half of Americans alive today were not alive then. JA300. Article V does not allow "the present … generation" to reach back in this manner and "supplement[]" the work of "representatives of generations now largely forgotten." *Dillon*, 256 U.S. at 375.

42

In short, even if Congress could not set a time limit on ratification, the States' votes on the ERA were not "sufficiently contemporaneous … to reflect the will of the people in all sections at relatively the same period." *Id.* Article V does not allow an amendment to be ratified by a cluster of States, lay dormant for nearly half a century, and then be resurrected by a small minority of States. Because that is precisely what the Supreme Court held in *Dillon*, this ground is perhaps the easiest basis for affirming the district court.

### C.    At least five States validly rescinded their ratifications.

Even if Congress's proposed amendments never expire, the ERA is still several States short of 38. At least five States timely rescinded their ratifications. Those rescissions were effective. *Freeman*, 529 F. Supp. at 1146-50.

While Article V does not literally use the word "rescind," that power is inherent in the States' power to "ratif[y]." *See Dillon*, 256 U.S. at 373 ("That [Article V] contains no express provision on the subject is not in itself controlling; for … what is reasonably implied is as much a part of it as what is expressed."). Under our system of law, the "general rule" is that, until an enactment acquires independent legal significance, it "is repealable by the same authority that produced it." Paulsen, *A General Theory of Article V*, 103 Yale L.J. 677, 725 (1993) (Paulsen). For example, the Constitution gives Senators the power to "Vote" on bills, art. I, §3, but no one thinks a Senator who voted "yea" could not change her vote to "nay" before the voting officially

ends. In the same way, state ratifications have "technical significance" under Article V "at only one time—when three-fourths of the states have acted to ratify." *Freeman*, 529 F. Supp. at 1150. Until that three-fourths threshold is reached, there is "nothing in the nature of … state ratification legislation that creates vested legal interests"; each State "can repeal its contribution toward the creation of a whole until the whole has been finally created." Paulsen 726.

Allowing timely rescissions also furthers the purpose of Article V. "[T]he drafters of the Constitution considered it important" that constitutional amendments "draw on that same power which is the source of the original authority of the Constitution—'the consent of the people.'" *Freeman*, 529 F. Supp. at 1148. That consent is missing when a State timely rescinds its ratification. "To allow a situation where … the first act of a state is irrevocable … would permit an amendment to be ratified by a technicality … and not because there is really a considered consensus supporting the amendment." *Id*. at 1149. Counting the rescission would "giv[e] a truer picture of the people's will as of the time." *Id*. at 1148. And rejecting it would "remove the state's power to create a barrier to encroachment by the national government." *Id.* at 1146; *cf.* Br.23-25.

Depriving the States of rescissions is even more inappropriate if, as Plaintiffs contend, proposed constitutional amendments never expire and

can be ratified by future generations over the course of centuries. *See* 2020 OLC 26 n.21. It is "strange to say that a proposed amendment never dies but, 'Terminator'-like, lives on until it has completed its mission, no matter how many times it appears to have been 'killed' by the states, and that only an overtaking amendment ('Terminator II'?) retracting the prior amendment could stop the original proposal." Paulsen 724. The Court should not read the Constitution to require this bizarre one-way ratchet.

Perhaps this textual evidence could be overcome by a strong historical tradition of rejecting rescissions, but no such tradition exists. On balance, the historical record supports the power's existence. When debating the postwar amendments, for example, Congressmen expressed "differences of opinion" on the validity of rescissions. Cong. Globe, 40th Cong. 2d Sess. 878 (1868) (Sen. Johnson). The House passed a bill that would have nullified rescissions, but the Senate Judiciary Committee "reported it out adversely" and "the bill died without further action." *Freeman*, 529 F. Supp. at 1144.

Throughout our history, moreover, States *have* exercised the rescission power. For example, Amicus Maryland rescinded its prior ratification of the Corwin Amendment. *See* Bush, *Maryland Legislators Repeal Pro-Slavery Law*, WAMU (Apr. 11, 2014), bit.ly/3KeQLq9. Plaintiff Nevada has rescinded its prior calls for a constitutional convention. Blackman, *The Ratification of the Equal Rights Amendment Could Lead to an Article V Convention for Proposing*

45

*Amendments*, Volokh Conspiracy (Feb. 11, 2020), bit.ly / 3hFPw7j; *see* Nev. S.J. Res. 10, 79th Sess. (2017). And Amici New Jersey and New York rescinded their ratifications of the 14th and 15th Amendments, respectively. *Freeman*, 529 F. Supp. at 1143-44. Instead of dismissing these rescissions as illegal, the political branches "dignified" them by "waiting and collecting additional ratifications" until the rescinding States were no longer necessary to cross the three-fourths threshold. *Id*. at 1149.

Because rescissions are valid, the 1972 ERA is still short of the 38 votes necessary for ratification. Five States rescinded their ratifications before the ERA crossed the 38-State threshold, and even before the original seven-year ratification deadline expired. If any one of those rescissions is valid, then the ERA has not been ratified. Below, Plaintiffs suggested that Kentucky's and South Dakota's rescissions might have state-law "irregularities." JA131. But they did not explain what those irregularities were, even though these legal documents are matters of public record. They also identified no state-law irregularities in the rescissions of Tennessee, Nebraska, or Idaho—any one of which is sufficient to defeat their theory. And even if these rescissions somehow all violated state law, the Archivist would have no authority to reject them on that ground. *Colby*, 265 F. at 999-1000.

More, at least under Plaintiffs' theory, North Dakota's recent resolution counts as a sixth "rescission." NY-Br.28 n.4. No principled basis exists

for honoring Plaintiffs' late pronouncements but ignoring North Dakota's. As Justice Ginsburg put it, "[I]f you count a latecomer on the plus side, how can you disregard states that said 'we've changed our minds'?" *Georgetown Address*. North Dakota's action also drives home the major flaw with Plaintiffs' case: Contemporaneity matters because words, views, and needs change over time. Plaintiffs' assumption that both they and North Dakota voted to ratify the same thing is a fiction.

## CONCLUSION

The district court's judgment, though not all its reasoning, should be affirmed.

Dated: March 4, 2022                      Respectfully submitted,

STEVE MARSHALL
Attorney General of Alabama

 s/ Edmund G. LaCour Jr.                  s/ Cameron T. Norris

Edmund G. LaCour Jr.                      Cameron T. Norris
  *Solicitor General*                     Tiffany H. Bates
OFFICE OF THE ALABAMA                      James P. McGlone*
ATTORNEY GENERAL                           CONSOVOY MCCARTHY PLLC
501 Washington Ave.                        1600 Wilson Blvd., Ste. 700
P.O. Box 300152                            Arlington, VA 22209
Montgomery, AL 36130                       (703) 243-9423
(334) 353-2196                             cam@consovoymccarthy.com
edmund.lacour@AlabamaAG.gov
                                           Patrick Strawbridge
                                           CONSOVOY MCCARTHY PLLC
                                           Ten Post Office Square
                                           8th Floor South PMB #706
                                           Boston, MA 02109
                                           (617) 227-0548

                                           *Licensed in MA; work super-
                                           vised by members of the firm.

47

JEFF LANDRY
Attorney General of Louisiana

 s/ Elizabeth B. Murrill
Elizabeth B. Murrill
  Solicitor General
LOUISIANA DEPARTMENT
OF JUSTICE
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov


JASON RAVNSBORG
Attorney General of South Dakota


 s/ Jason Ravnsborg
Jason Ravnsborg
Paul S. Swedlund
  Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
605-773-3215
paul.swedlund@state.sd.us

DOUGLAS J. PETERSON
Attorney General of Nebraska

 s/ James A. Campbell
James A. Campbell
  Solicitor General
OFFICE OF THE ATTORNEY
GENERAL OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov


HERBERT H. SLATERY III
Attorney General and Reporter
of Tennessee


 s/ Andrée S. Blumstein
Andrée S. Blumstein
  Solicitor General
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 741-3492
andree.blumstein@ag.tn.gov

*Counsel for Intervenors for Defendant – Appellees*

48

**CERTIFICATE OF COMPLIANCE**

This brief complies with this Court's briefing order because it contains 10,944 words, excluding the parts that can be excluded. *See* Doc. #1913956. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Palatino font.

Dated: March 4, 2022                                  *s/ Cameron T. Norris*

**CERTIFICATE OF SERVICE**

I e-filed this brief, which will email everyone requiring service.

Dated: March 4, 2022                                  *s/ Cameron T. Norris*