# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 28, 2022      Decided February 28, 2023

No. 21-5096

STATE OF ILLINOIS AND STATE OF NEVADA,
APPELLANTS

v.

DAVID FERRIERO, IN HIS OFFICIAL CAPACITY AS ARCHIVIST OF
THE UNITED STATES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-00242)

*Jane Elinor Notz*, Deputy Corporation Counsel, Office of the Attorney General for the State of Illinois, argued the cause for appellants. With her on the briefs were *Kwame Raoul*, Attorney General, *Alex Hemmer*, Deputy Solicitor General, *Priyanka Gupta*, Assistant Attorney General, *Kathryn Hunt Muse*, Public Interest Division Deputy Chief, *Mark R. Herring*, Attorney General, Office of the Attorney General for the Commonwealth of Virginia, *Michelle S. Kallen*, Solicitor General, *Rohiniyurie Tashima,* John Marshall Fellow, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, and *Heidi Parry Stern*, Solicitor.

2

*Loretta E. Lynch, Liza M. Velazquez, Andrew G. Gordon, Daniela Lorenzo, Jeannie S. Rhee, Amanda Valerio,* and *Rebecca S. LeGrand* were on the brief for *amici curiae* Business and Corporate Entities in support of appellants.

*Jesse Solomon* and *Amelia T.R. Starr* were on the brief for *amici curiae* Equality Now, et al. in support of appellants.

*Ryan B. Witte* was on the brief for *amicus curiae* Organizations that Advocated for ERA Ratification in Virginia, Illinois, & Nevada in support of appellants.

*Beth S. Brinkmann, Laura Dolbow,* and *Nicole Antoine* were on the brief for *amici curiae* Generation Ratify and Ten Other Youth-Led Organizations in support of appellants.

*Ellyde R. Thompson*, *Kathleen M. Sullivan,* and *Rachel G. Frank* were on the brief for *amici curiae* Constitutional Law Scholars in support of appellants.

*Elizabeth B. Wydra, Brianne J. Gorod,* and *Brian R. Frazelle* were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellants.

*Letitia James,* Attorney General, Office of the Attorney General for the State of New York, *Barbara D. Underwood*, Solicitor General, *Sarah L. Rosenbluth*, Assistant Solicitor General of Counsel, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Holly T. Shikada*, Attorney General, Office of the Attorney General for the State of Hawaii, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Brian E.*

*Frosh*, Attorney General, Office of the Attorney General for the State of Maryland, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Andrew J. Bruck*, Acting Attorney General, Office of the Attorney General for the State of New Jersey, at the time the brief was filed, *Hector Balderas*, Attorney General, Office of the Attorney General for the State of New Mexico, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Josh Shapiro*, Attorney General, Office of the Attorney General for the Commonwealth of Pennsylvania, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Thomas J. Donovan, Jr.*, Attorney General, Office of the Attorney General for the State of Vermont, at the time the brief was filed, *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Joshua L. Kaul*, Attorney General, Office of the Attorney General for the State of Wisconsin, and *Karl A. Racine*, Attorney General, Office of the Attorney General for the District of Columbia, were on the brief for *amici curiae* State of New York, et al. in support of appellants.

*Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan, and *Fadwa A. Hammoud*, Solicitor General, were on the brief for *amicus curiae* State of Michigan in support of appellants.

*Katherine I. Funk* was on the brief for *amici curiae* United States Conference of Mayors, et al. in support of appellants.

*Christopher Man* and *Linda T. Coberly* were on the brief for *amicus curiae* The ERA Coalition and Advocates for Equality and Women's Rights in support of appellants.

4

*Linda H. Martin, Olivia A. Radin, Scott A. Eisman, Elena Hadjimichael*, and *Noelle Williams* were on the brief for *amici curiae* Marie Abrams, et al. in support of appellants.

*Tracy F. Flint, Elizabeth Y. Austin,* and *Meredith R. A. McBride* were on the brief for *amici curiae* Former State Legislators in Illinois, Nevada, and Virginia in support of appellants.

*Sarah E. Harrington*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Michael S. Raab* and *Thomas Pulham*, Attorneys.

*Steve Marshall*, Attorney General, Office of the Attorney General for the State of Alabama, *Edmund G. LaCour, Jr.,* Solicitor General, *Patrick Strawbridge, Cameron T. Norris, Tiffany H. Bates, Jeff Landry*, Attorney General, Office of the Attorney General for the State of Louisiana*, Elizabeth B. Murrill*, Solicitor General, *Jason Ravnsborg*, Attorney General, Office of the Attorney General for the State of South Dakota, at the time the brief was filed, *Douglas J. Peterson*, Attorney General, Office of the Attorney General for the State of Nebraska, *James A. Campbell*, Solicitor General, *Herbert H. Slatery, III,* Attorney General and Reporter, Office of the Attorney General for the State of Tennessee, at the time the brief was filed, were on the brief for intevenors in support of appellee. *Alexander B. Bowdre*, Deputy Solicitor, Office of the Attorney General for the State of Alabama, entered an appearance.

*Matthew J. Clark* was on the brief for *amicus curiae* Gregory Waston in support of appellee.

5

*Talmadge Butts* was on the brief for *amicus curiae* The Foundation for Moral Law in support of appellee.

*Kathryn E. Tarbert* was on the brief for *amicus curiae* Independent Women's Law Center in support of intervenors for appellee.

*Patrick M. McSweeney, William J. Olson, Jeremiah L. Morgan*, and *Robert J. Olson* were on the brief for *amici curiae* Eagle Forum, et al. in support of appellee.

*Austin Knudsen,* Attorney General, Office of the Attorney General for the State of Montana, *David M.S. Dewhirst*, Solicitor General, *Christian B. Corrigan*, Assistant Solicitor General, *Sean D. Reyes*, Attorney General, Office of the Attorney General for the State of Utah, *Melissa Holyoak*, Solicitor General, *Leslie Rutledge*, Attorney General, Office of the Attorney General for the State of Arkansas, *Eric Schmitt*, Attorney General, Office of the Attorney General for the State of Missouri, *John M. O'Connor,* Attorney General, Office of the Attorney General for the State of Oklahoma, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *Ken Paxton*, Attorney General, Office of the Attorney General for the State of Texas, were on the brief for *amici curiae* State of Montana, et al. in support of appellee.

*Jessica L. Ellsworth* was on the brief for *amici curiae* Constitutional Law Professors in support of neither party.

Before: WILKINS, RAO and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: The States of Illinois and Nevada (collectively referred to as "the States" or "Plaintiffs") filed this

6

mandamus action in the district court, seeking to compel the Archivist of the United States to certify and publish the Equal Rights Amendment ("ERA") as part of the Constitution of the United States. *See* 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.").

The States argued that the Archivist had a duty to certify and publish the ERA because it was ratified by the requisite three-fourths of the States of the Union as required by Article V of the Constitution. Alabama, Louisiana, Nebraska, South Dakota, and Tennessee (hereinafter "Intervenors") joined the litigation as intervenor-defendants. Both Intervenors and the Archivist moved the District Court to dismiss the States' case as a matter of law.

The District Court agreed, dismissing the case for lack of jurisdiction. The District Court first held that the States lacked standing. It ruled the States did not show that the Archivist's failure to certify and publish the ERA caused "a concrete injury that could be remedied by ordering him to act," and that his decision to certify and publish amendments "has no legal effect." *Commonwealth v. Ferriero*, 525 F. Supp. 3d 36, 45 (D.D.C. 2021). The District Court also ruled that Plaintiffs had not established that the Archivist had a clear duty to certify and publish the ERA or that their right to relief was clear and indisputable. The District Court did not reach Intervenors' arguments that the ERA had expired under Article V of the Constitution and that five states had validly rescinded their ratifications. The Plaintiffs timely appealed.

The grounds on which a district court may grant mandamus relief are narrow, and the demands are

7

austere. Because we agree that the States fail to show their right to relief is "clear and indisputable," we affirm.

## I.

The Framers recognized that the Constitution would "certainly be defective," making amendments "necessary." 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 202-03 (Max Farrand ed., 1911). As a result, they sought to provide an "easy, regular and Constitutional way" to adopt such amendments. *Id.* The framework for amending the Constitution is set forth in Article V, which states, in relevant part:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress…

U.S. CONST. art. V.

Thus, pursuant to Article V, three actions are required to enact an amendment initiated by Congress: (1) Congress must propose an amendment to the Constitution by a two-thirds vote of each chamber; (2) Congress must choose the "Mode of Ratification"; and (3) three-fourths of the States must ratify the

8

amendment.  As we will discuss below, the scope of Congress's incidental powers under Article V to designate a "Mode of Ratification" is the central dispute in this case.

**A.**

While Article V provides a method for amending the Constitution, it fails to specify how the ratification efforts of proposed amendments would be traced, so that Congress, and the nation, would know when an amendment becomes part of the Constitution.  James Madison "pleaded unsuccessfully" that the Article V amendment process be explicated "with more specificity and clarity," Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, 61 FORDHAM L. REV. 497, 498 (1992), to avoid "difficulties [that] might arise" to the form or quorum.  2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 630 (Max Farrand ed., 1911).

Difficulties surely arose.  In the late eighteenth and early nineteenth centuries, the lack of a consistent notification and publication process caused "frequent confusion about whether proposed amendments had become part of the Constitution." Jol A. Silversmith, *The "Missing Thirteenth Amendment": Constitutional Nonsense and Titles of Nobility*, 8 S. CAL. INTERDISC. L.J. 577, 591 (1999).  As one example, due to uncertainty as to whether the Eleventh Amendment had been ratified, Congress passed a resolution in 1797 calling upon the President "to adopt some speedy and effectual means of obtaining information from [several states] whether they have ratified the amendment," 1. Stat. 517, even though a sufficient number of states had approved the amendment to effectuate its ratification two years earlier.  *See* CONG. RSCH. SERV., THE CONSTITUTION OF THE UNITED STATES OF AMERICA: ANALYSIS AND INTERPRETATION, S. Doc. No. 112—9, at 28 n.3 (2d Sess.

9

2013).  Without a regularized mechanism for communicating states' adoption, rejection, or inaction on proposed amendments, "the President informed Congress from time to time of ratifications of pending amendments," albeit inconsistently.  Walter Dellinger, *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 HARV. L. REV. 386, 400 (1983).

To eliminate this confusion, Congress conferred upon the Secretary of State a duty to certify and publish the ratification of constitutional amendments.  *See* Act of April 20, 1818, ch. 80, § 2, 3 Stat. 439.  This act required the Secretary to publish amendments "in the said newspapers authorized to promulgate the laws, with his certificate, specifying the states by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the constitution." *Id.*  In 1951, over a century later, Congress transferred the certification and publication duty to the General Services Administrator.  *See* Act of Oct. 31, 1951, ch. 655, § 2(b), 65 Stat. 710, 710.  In 1984, Congress transferred the certification and publication role again, this time to the Archivist.  *See* National Archives and Records Administration Act of 1984, Pub. L. No. 98—497, § 107(d), 99 Stat. 2280, 2291 (codified at 1 U.S.C. § 106b).  Under current law, the Archivist must publish the amendment in the United States Statutes at Large, *id.*, which are "legal evidence of laws . . . and proposed or ratified amendments to the Constitution of the United States … in all the courts of the United States [and] the Several states[.]" 1 U.S.C. § 112.

**B.**

After suffering defeats in their efforts to obtain constitutional protection for women's rights, *see, e.g.*, *Bradwell v. State of Illinois*, 83 U.S. (16 Wall.) 130 (1873)

10

(Fourteenth Amendment's Privilege or Immunities Clause did not protect women's right to practice law); *Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1875) (Fourteenth Amendment's Privilege or Immunities Clause did not protect women's right to suffrage), women's rights leaders fixed their sights on amending the Constitution. Those efforts led to the ratification of the Nineteenth Amendment in 1920, granting women the right to vote. *See* U.S. CONST. amend. XIX. Soon thereafter, the movement turned its attention to procuring a constitutional amendment conferring upon women all the rights enjoyed by men.

Alice Paul, the leader of the National Women's Party, drafted the first iteration of the ERA, called the "Lucretia Mott Amendment," in honor of the legendary women's rights activist and abolitionist. J.A. 189. Ms. Paul's proposal gained a foothold in Congress in 1923, with the introduction of a proposed constitutional amendment declaring that "men an[d] women shall have equal rights throughout the United States and every place subject to its jurisdiction." *See* H.R.J. Res. 75, 68th Cong. (1923).

Every year, from 1923 through 1971, the judiciary committees of both chambers of Congress held hearings on the ERA. But it was not until 1970, after a fight led by Representative Martha Wright Griffiths, known as the "mother of the ERA," *see U.S. House of Representatives Profiles: Martha Wright Griffiths (1912—2003)*, https://history.house.gov/People/Detail/14160 (last visited February 6, 2023), that the proposed amendment made it to the House floor for a vote. *See* 116 Cong. Rec. 27,999—28,004 (1970). The House voted 352 to 15 to propose the ERA, but the session lapsed without a vote by the full Senate. *See* JOHN VILE, ENCYCLOPEDIA OF CONSTITUTIONAL AMENDMENTS, PROPOSED AMENDMENTS, AND AMENDING ISSUES, 1789—

11

2015, at 177 (2d ed. 2003). While the full Senate did not vote on the ERA, the Senate resolution was nonetheless quite significant because it added a seven-year deadline for ratification by the states. *See* 116 Cong. Rec. 36,450—51.

The ERA finally broke through the congressional gridlock in 1972, when both chambers passed the resolution by the requisite two-thirds margin and submitted it to the States for ratification. The resolution and proposed amendment read as follows:

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled* (*two-thirds of each House concurring therein*), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:
>
> "ARTICLE –
>
> "SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex."
> "SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."
> "SEC. 3. This amendment shall take effect two years after the date of ratification."

12

*Proposed Amendment to the U.S. Constitution*, H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972).  Notably, the proposed amendment included a seven-year ratification deadline in the proposing clause, as added by the Senate resolution during the previous session of Congress.

Many states moved quickly to ratify the ERA.  "Within forty-eight hours of Congressional passage, six states had ratified the ERA [and] within nine months . . . twenty-two states had ratified it."  Jean Witter, *Extending Ratification Time for the Equal Rights Amendment: Constitutionality of Time Limitations in the Federal Amending Process*, 4 WOMEN'S RTS. L. REP. 209, 209 (1979).  By the end of 1973, thirty state legislatures had ratified the ERA.  CONG. RSCH. SERV., R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES 16 (updated 2019).  By 1977, thirty-five states had ratified the ERA, three states short of the thirty-eight needed to meet the threshold three-fourths of the fifty States as required by Article V.  *See id*.  Meanwhile, between 1973 and 1978, four states—Nebraska, Tennessee, Idaho, and Kentucky—voted to rescind their ratifications of the ERA.  *See Idaho v. Freeman*, 529 F. Supp. 1107, 1112 n.2 (D. Idaho 1981), *vacated as moot sub nom. Nat'l Org. for Women, Inc.v. Idaho*, 459 U.S. 809 (1982).  South Dakota, a fifth state, passed a resolution stating that its prior ratification expired after the seven-year deadline, unless three-fourths of the States ratified by then.  S.J. Res. 2, 54th Leg. (S.D. 1979).

On October 20, 1978, Congress decided to extend the deadline for ratification three additional years to June 30, 1982.  *See* H.R.J. Res. 638, 95th Cong., 92 Stat. 3799 (1978).  Some states and individuals challenged this extension, arguing that Article V prohibited Congress from extending a ratification deadline.  *See Freeman*, 529 F. Supp. at 1153-54.  The Idaho District Court agreed.  *Id.*  The defendants in that case petitioned for certiorari, which the Supreme Court

13

granted. *Nat'l Org. for Women v. Idaho*, 455 U.S. 918 (1982). Before the Supreme Court could hear the case, however, the extended deadline lapsed. As a result, the Supreme Court dismissed the case as moot. *Nat'l Org. for Women v. Idaho*, 459 U.S. at 809. (We note this subsequent procedural history for the sake of completeness only, and we do not rely upon it to reach our decision. It is not clear what, if any, precedential weight we should give to the Court's order dismissing the case on mootness grounds.).

There was no further activity by the states until 2018, when Nevada became the thirty-sixth state to ratify the ERA. *See* S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017). Shortly thereafter, Illinois and Virginia became the thirty-seventh and thirty-eighth states to ratify the amendment, arguably pushing the ERA to the three-fourths threshold. *See* S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. Reg. Sess. (Ill. 2018); S.J. Res. 1, Gen. Assemb., Reg. Sess. (Va. 2020).

**C.**

When Virginia became the thirty-eighth state to ratify the ERA, the States urged the Archivist to certify and publish the amendment as part of the Constitution. Shortly before Virginia completed its ratification, however, some of the present Intervenors sued the Archivist in the Northern District of Alabama for injunctive and declaratory relief to block any such certification and publication. *See* Complaint, *Alabama v. Ferriero*, Doc. 1, No. 7:10-cv-2032 (N.D. Ala. Dec. 16, 2019), ECF No. 1.

Facing these competing demands, the Archivist asked the U.S. Department of Justice's Office of Legal Counsel ("OLC") to determine the legal status of the ERA. The OLC then issued a formal opinion stating that the ERA cannot be ratified unless

14

it is "propose[d] … anew." *Ratification of the Equal Rights Amendment*, 44 Op. OLC (slip op. 1) (Jan. 6, 2020) (hereinafter "2020 OLC Opinion"). Relying on the OLC's opinion, the Archivist refused to certify and publish the amendment and told Intervenors that if the situation changed, he would give the Alabama plaintiffs at least forty-five days' notice before certifying the ERA, effectively resolving the Alabama district court litigation. *See* Joint Stipulation and Plaintiffs' Notice of Voluntary Dismissal, *Alabama v. Ferriero*, No. 7:19-cv-2032 (N.D. Ala. Feb. 27, 2020), ECF No. 23.

Meanwhile, as stated above, the Plaintiffs filed this case in 2020, arguing that our district court should compel the Archivist to certify and publish the ERA because it was ratified by the requisite three-fourths of the States. And, as recounted above, the District Court dismissed the mandamus action for lack of standing and because the States had not shown a clear and indisputable right to relief.

We agree that the States have not met their burden of establishing a clear and indisputable right to relief.

**II**.

**A.**

To establish entitlement to mandamus relief, the plaintiff must demonstrate 1) a clear and indisputable right to the particular relief sought against the federal official, 2) that the federal official is violating a clear duty to act, and 3) that the plaintiff has no adequate alternate remedy. *See Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (citation omitted). If the plaintiff cannot establish all three of these threshold requirements, we must dismiss the case for lack of subject matter jurisdiction. *Id*. And even if those three

15

requirements are met, the plaintiff must additionally show "compelling equitable grounds" before we will grant mandamus relief. *In re Medicare Reimbursement Litigation*, 414 F.3d 7, 10 (D.C. Cir. 2005) (cleaned up). We review a district court's determination as to whether a plaintiff has met the three requirements for mandamus relief *de novo*, and we determine whether the court may grant relief on equitable grounds for abuse of discretion. *Id.*

Ordinarily, we have an obligation to confirm that the jurisdictional requirements of Article III standing are met before proceeding to the merits of the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). The obligation to find standing "is not simply technical," because proceeding to a decision on the merits where there is no standing "would allow a federal court to issue what would amount to 'an advisory opinion without the possibility of any judicial relief.'" *California v. Texas*, 141 S. Ct. 2104, 2116 (2021) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 129 (1983) (Marshall, J., dissenting)). But this is not an ordinary case; it is a mandamus action brought pursuant to 28 U.S.C. § 1361, in which the threshold requirements for mandamus relief are jurisdictional. *See Am. Hosp. Ass'n*, 812 F.3d at 189. "In other words, 'mandamus jurisdiction under §1361 merges with the merits.'" *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (quoting *In re Cheney*, 406 F.3d 723, 793 (D.C. Cir. 2005) (en banc)).

Where, as here, "both standing and subject matter jurisdiction are at issue, [we] may inquire into either and, finding [one] lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007) (citation omitted). Because the issue of whether the States have Article III standing is a close and complex question, we turn first to the relatively easier

16

evaluation of whether the States have met the stringent requirements for mandamus relief. *See Lovitky*, 949 F.3d at 759 (finding the district court lacked subject matter jurisdiction because the plaintiff failed to establish the mandamus requirements, and thus not reaching standing).

**B.**

Few legal standards are more exacting than the requirements for invoking mandamus jurisdiction under § 1361. Mandamus is a "drastic" remedy, only available in "extraordinary situations," and thus "is hardly ever granted[.]" *In re Cheney*, 406 F.3d at 729 (internal quotation marks and citations omitted). For this reason, we have referred to "mandamus [as] an option of last resort." *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 582 (D.C. Cir. 2020) (citations omitted).

The "clear and indisputable right to relief" and "clear duty to act" standards are equally stringent. To meet the "clear and indisputable" requirement, the plaintiff must show that the challenged action is "plainly and palpably wrong as [a] matter of law." *United States ex rel. Chicago Great W. R.R. Co. v. I.C.C.*, 294 U.S. 50, 61 (1935). "Accordingly, we will deny mandamus even if a petitioner's argument, though 'pack[ing] substantial force,' is not clearly mandated by statutory authority or case law." *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) (quoting *In re Khadr*, 823 F.3d 92, 99–100 (D.C. Cir. 2016)).

Likewise, to meet the "clear duty to act" standard, "[t]he law must not only authorize the demanded action, but require it; the *duty must be clear and indisputable*." *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931) (emphasis added) (citations omitted); *see also In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000) (mandamus is "reserved

17

only for the most transparent violations of a clear duty to act"). We will not grant mandamus to compel an official to perform an act unless the official's interpretation of her statutory duties is "clearly wrong." *Ass'n of Am. Med. Colls. v. Califano*, 569 F.2d 101, 110 n.80 (D.C. Cir. 1977). Even if we "might have come to a different conclusion had the question of [statutory] construction been presented to [us] in a distinct proceeding," "such a difference of opinion between the court and the officer" does not justify mandamus relief. *Reichelderfer v. Johnson*, 72 F.2d 552, 554 (D.C. Cir. 1934) ("Mandamus will not lie if the construction of the officer is a possible one, and there is room for an honest difference of opinion."). Thus, "if there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action." *In re Cheney*, 406 F.3d at 729.

Sometimes the analysis of the "clear and indisputable right to relief" requirement is distinct from the analysis of the "clear duty to act" requirement. Indeed, even where a plaintiff has established that the official had a clear duty to act on his permit application by a certain deadline, we will not award relief in the form of an injunction that would cause the plaintiff's application to "jump the line" and receive consideration before applications previously submitted by others. *Am. Hosp. Ass'n*, 812 F.3d at 191—92 (collecting cases). Thus, we must carefully examine precisely what form of relief is sought by a plaintiff to determine whether it seeks reallocation of government resources or some other action that is ordinarily beyond the power of mandamus. *Cf. In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75—76 (D.C. Cir. 1991).

We see no such complication here because the States only seek to compel the Archivist to certify and publish the ERA, a declaration that the Archivist has failed to comply with his statutory duties, and a declaration that the ERA is valid and a

18

part of the Constitution.  None of these forms of relief implicate the separation of powers concerns discussed above or raise any other complications distinct from our consideration of the Archivist's duties.  Thus, we can analyze the clear right to relief and clear duty to act requirements for mandamus "concurrently, as [we] often do[,]" *Lovitky*, 949 F.3d at 760, and the question becomes whether the States have "demonstrated a 'clear and indisputable right to relief' based on a 'clear and compelling duty' to act, as required to support mandamus relief." *Walpin v. Corp. for Nat'l & Cmty. Servs.*, 630 F.3d 184, 187 (D.C. Cir. 2011) (quoting *In re Cheney*, 406 F.3d at 729).

The States advance three primary arguments. As we will explain, none meet the high threshold of being clearly and indisputably correct.

## C.

The States' first argument is that neither Article V of the Constitution nor 1 U.S.C. § 106b (the relevant statute) permits the Archivist to consider anything other than whether the requisite number of states have ratified the proposed constitutional amendment.  Under this view, once the Archivist was provided notice that thirty-eight states (three-fourths of the states of the Union) had ratified the ERA, then pursuant to Article V and § 106b, the Archivist had a clear duty to certify and publish the ERA in the Statutes at Large as a part of the Constitution.  In essence, the States argue that the seven-year ratification deadline in the resolution passed by Congress has no legal relevance to the Archivist's certification and publication duties.

The problem for the States is that their interpretation is not the only permissible construction of the relevant statute. The

19

Archivist's certification and publication duties are set forth in § 106b as follows:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the *Archivist of the United States shall forthwith cause the amendment to be published*, with his certificate, *specifying* the States by which the same may have been adopted, and *that the same has become valid*, to all intents and purposes, as a part of the Constitution of the United States.

1 U.S.C. § 106b (emphasis added). The statute expressly provides that the Archivist's certification shall "specify[]" that the ERA "has become valid," which can be reasonably interpreted to give the Archivist authority to decide whether the fact that some of the ratifications occurred after Congress's seven-year deadline affects their validity. This is the interpretation proposed by the Archivist, and based solely on the statutory text, we cannot say that this interpretation is "clearly wrong," *Ass'n of Am. Med. Colls.*, 569 F.2d at 111 n.80, and "there is [no] room for an honest difference of opinion," *Reichelderfer*, 72 F.2d at 554.

We are not persuaded to the contrary by the States' reliance on our decision in *United States ex rel. Widenmann v. Colby*, 265 F. 998 (D.C. Cir. 1920). In *Colby*, the petitioner challenged the Secretary of State's certification and publication of the Eighteenth Amendment, arguing that due to some unspecified alleged impropriety, "the officials of the several states … should not have issued the notices" of ratification. *Id.*

20

at 999.  Construing the predecessor to § 106b, we rejected the petitioner's argument, stating that the Secretary's certification and publication role was "purely ministerial," and that he was "obliged" to certify and publish the amendment "upon receiving official notice from three-fourths of the several states that the proposed amendment had been adopted." *Id.* at 999—1000*.*  We further noted that the Secretary "was not required, or authorized, to investigate and determine whether or not the notices stated the truth." *Id.*

We acknowledge that *Colby* provides some support for the States' interpretation of our present statute, but it is not dispositive.  We also stated in *Colby* that the petitioner "has no interest" in the matter because, "even if the proclamation was canceled by order of this court, it would not affect the validity of the amendment." *Id.*  This ruling that the petitioner lacked standing could be construed as rendering our statements on the merits mere dictum.  But even more importantly, *Colby* is not dispositive because the case did not involve ratification deadlines, and our observation that the Secretary could not "look behind" the ratification notices can be harmonized with an interpretation that the statute allows the Secretary to observe the date that a state ratified the amendment, a fact that is apparent on the face of the notice. Even if *Colby* compels an understanding that the Archivist is not permitted to "investigate" or "look behind" the notices proffered by the several states, reading the words printed on the notice is not an "investigation," nor is it "looking behind" the notice.  Thus, reading the ratification notices to determine whether three-fourths of the states ratified the amendment prior to the deadline set by Congress is not clearly inconsistent with the language and reasoning of *Colby*, whether holding or dictum.

The States' contention that Article V prohibits the Archivist from considering the ratification dates on the official

21

notices essentially merges with its second argument, which is that the seven-year ratification deadline is *ultra vires*. Recall that Article V gives Congress the power to "propose" amendments, which

> shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress …

U.S. CONST. art. V.

The States submit that because the text of Article V only specifies that Congress can select the "mode of ratification," Congress has no power to place any other limitations on the states when it comes to ratification. According to the States, "mode of ratification" refers solely to the process of ratification either via a constitutional convention or a legislative vote, because those two modalities are expressly mentioned preceding the phrase "mode of ratification." Thus, the argument goes, affixing the timing of ratification falls outside of the plain meaning of "mode of ratification" and is not authorized by Article V. The States also argue that at the time of the founding, several state constitutions included deadlines for the ratification of proposed amendments, and thus the absence of deadlines in Article V was deliberate, rendering any attempt to "rewrite" Article V to include Congressional power to set such deadlines improper.

As a matter of the plain meaning, the States' textual interpretation is not without force. It is certainly plausible to read the word "mode" as only referring to *how* the amendment

22

may be ratified and not *when*. *See United States v. Sprague*, 282 U.S. 716, 733 (1931) (characterizing Congress's role pursuant to Article V as "the delegated agent of the people in the choice of the *method* of ratification") (emphasis added). The problem for the States is that the Supreme Court has also observed that Article V confers upon Congress an "incident[al] … power" to establish "matters of detail" that flows from its power to designate the "mode of ratification," including the establishment of a reasonable time limit for ratification. *Dillon v. Gloss*, 256 U.S. 368, 376 (1921).

In *Dillon*, a prisoner held in custody for violating the National Prohibition Act petitioned for a writ of habeas corpus, arguing that the Eighteenth Amendment was invalid because Congress placed a seven-year deadline in the text of the amendment. The amendment was ratified by the requisite number of states in just over a year, well before the seven-year deadline. But the petitioner argued that Congress's inclusion of the deadline exceeded its authority pursuant to Article V and thus voided the amendment, notwithstanding its timely ratification. While acknowledging that the text of Article V was silent on whether Congress could set a deadline for ratification and that the Eighteenth Amendment was the first proposed constitutional amendment to include a ratification deadline, *id.* at 371—72, the Court held that the inclusion of the deadline was consistent with Article V. "That the Constitution contains no express provision on the subject is not in itself controlling; for with the Constitution, as with a statute or other written instrument, what is reasonably implied is as much a part of it as what is expressed." *Id.* at 373. The Court reasoned that Article V conferred a "wide range of power" upon Congress when proposing amendments, and thus "entertain[ed] no doubt" that Congress may fix a definite period for ratification that is reasonable, and that the seven-year deadline it imposed was permissible. *Id.* at 373, 376.

23

In addition to *Dillon*, the language and reasoning of *Coleman v. Miller*, 307 U.S. 433 (1939), undermines the States' argument that Congress does not have the power to establish time limits for ratification. In *Coleman*, a group of Kansas state senators challenged the state's ratification of a proposed Child Labor Amendment. Congress did not include a ratification deadline in the proposed amendment, and state legislators who opposed the amendment argued that the ratification vote, coming thirteen years after Congress proposed the amendment, was invalid. *Id*. at 451—53. Citing *Dillon*, the legislators argued that "in the absence of a limitation by the Congress, the Court can and should decide what is a reasonable period within which ratification may be had." *Id*. at 452. Naturally, the opposing legislators asked the Court to hold that thirteen years was an unreasonably long time for Kansas to delay ratification.

The Court rejected the legislators' arguments. The Court explained that *Dillon* had decided that "Congress had the power to fix a reasonable time for ratification," *id*. at 452, and thus it followed that "the question, what is a reasonable time, lies within the congressional province," *id*. at 454. Accordingly, the Court stated that where Congress failed to set a deadline when proposing an amendment, "the question whether the amendment had been adopted within a reasonable time" should be made by Congress, and Congress's decision on the matter "would not be subject to review by the courts." *Id*. Thus, *Coleman*, like *Dillon*, supports the view that Congress has the power to set a ratification deadline, whether at the time it proposes a new constitutional amendment, or at some time thereafter.

The States point out that the Court in *Coleman* went on to declare that the question of whether an unreasonable amount of

24

time had lapsed prior to Kansas's ratification was a non-justiciable political question, *id*. at 454—55, rendering the Court's discussion of Congress's power to set ratification deadlines mere dictum.  Similarly, the States argue that because the Eighteenth Amendment was ratified in only one year (a clearly reasonable period), the only issue necessary for the Court's decision in *Dillon* was whether the inclusion of a ratification deadline in and of itself invalidated the amendment, and therefore any further language in *Dillon* about Congress's power to set "reasonable" deadlines was also dictum.  But as the Court itself has explained, "while the language used in [*Dillon*] was not in the strict sense necessary to a decision, it is evident that [A]rticle [V] was carefully examined and that the Court's statements with respect to the power of Congress in proposing the mode of ratification were not idly or lightly made." *Sprague*, 282 U.S. at 732—33.  Thus, even assuming the States are correct that the relevant language in *Dillon* and *Coleman* is dictum, that language still provides some support for the Archivist's view that Congress had the power to set a ratification deadline when it proposed the ERA.  *See Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) ("[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.") (cleaned up).  In sum, we cannot ignore the language and reasoning of *Dillon* and *Coleman*, and the Court's statements in those two cases fatally undermine the contention that it is "clear and indisputable" that Congress lacks the authority to set deadlines for ratification, including the seven-year deadline in the ERA.

Finally, the States argue that even if Congress has the power to impose a ratification deadline, the ERA's seven-year deadline is invalid.  The States contend that Congress lacks authority to set deadlines outside of the text of the amendment, *i.e.*, in the proposing clause of the amendment, as was done in the ERA.  The States point out that Congress placed the seven-

25

year ratification deadline in the Eighteenth Amendment as part of its text. *See* U.S. CONST. amend. XVIII § 3. Thus, according to the States, to the extent *Dillon* upheld Congress's power to impose the seven-year ratification deadline, the Court's reasoning is confined to deadlines placed in the text of the amendment, rather than in language "*separate*" from the text. We also find this argument to fall short of the clear and indisputable standard.

Significantly, the States cite no persuasive authority suggesting that Congress is prohibited from placing the mode of ratification—ratification either by convention or the state legislature—in the proposing clause of an amendment. At oral argument, the States conceded that Congress has placed the mode of ratification (ratification by legislature or ratification by convention) in the proposing clause of every constitutional amendment in the nation's history, Oral Arg. at 13:00—13:40; *see* 2020 OLC Opinion at 15 n.15 (collecting proposing resolutions), and the States further concede that Congress's specification of this aspect of the "mode" in the proposing clause does not invalidate any of those amendments. *Id.* If one aspect of the mode of ratification can be placed in the proposing clause, then why not also the ratification deadline? The States' argument that the proposing clause is akin to the inoperative prefatory clause in a bill is unpersuasive, not just because proposed constitutional amendments are not "ordinary cases of legislation," *Hollingsworth v. Virginia*, 3 U.S. (3 Dall.) 378, 381 n.* (1798), but also because if that were the case, then the specification of the mode of ratification in every amendment in our nation's history would also be inoperative. We do not find it clear and indisputable that Congress's consistent placement of the mode of ratification in the proposing clause of every amendment since the founding had no impact on the validity of any of those amendments, while Congress's placement of a ratification deadline in the proposing clause of the ERA (side-

26

by-side with the mode of ratification) renders the deadline invalid (but not the mode).

* * *

In conclusion, the States have not clearly and indisputably shown that the Archivist had a duty to certify and publish the ERA or that Congress lacked the authority to place a time limit in the proposing clause of the ERA. Under the rigid standard required for mandamus actions, this Court must affirm the District Court's dismissal of the States' complaint on the ground that the lower court lacked subject matter jurisdiction.

*So ordered.*