CASE NO. 21-5096

# United States Court of Appeals for the District of Columbia Circuit

STATE OF ILLINOIS AND STATE OF NEVADA,

*Plaintiffs-Appellants,*

v.

DAVID FERRIERO, IN HIS OFFICIAL CAPACITY AS ARCHIVIST OF THE UNITED STATES,

*Defendant-Appellee,*

STATE OF ALABAMA, STATE OF LOUISIANA, STATE OF NEBRASKA, STATE OF SOUTH DAKOTA AND STATE OF TENNESSEE,

*Intervenors for Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA NO. 20-CV-00242-RC

## BRIEF FOR STATES OF MONTANA, UTAH, ARKANSAS, MISSOURI, OKLAHOMA, SOUTH CAROLINA, AND TEXAS AS AMICI CURIAE IN SUPPORT OF APPELLEES

AUSTIN KNUDSEN
*Attorney General of Montana*
KRISTIN HANSEN
*Lieutenant General*
DAVID M.S. DEWHIRST
*Solicitor General*
CHRISTIAN B. CORRIGAN
*Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406)-444-2026
christian.corrigan@mt.gov

*Counsel for the State of Montana*

*(Additional Counsel listed after signature block)*

SEAN D. REYES
*Utah Attorney General*
MELISSA HOLYOAK
*Utah Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Telephone: (801) 538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

A.    **Parties and Amici**: All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Defendants-Appellees.

B.    **Rulings Under Review**: References to the ruling at issue appear in the Brief for Defendants-Appellees.

C.    **Related Cases:** There are no related cases to amici's knowledge.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................i

TABLE OF AUTHORITIES ................................................... iii

INTEREST OF AMICI CURIAE ............................................. 1

SUMMARY OF ARGUMENT ................................................. 1

ARGUMENT ...................................................................... 4

I.  Ratification of a constitutional amendment must be timely .............. 4

    A.  Congress may fix a time limit for ratification ............................ 5

    B.  Ratification must occur within a reasonable time period .......... 10

    C.  The States no longer consent to ratification of the ERA............ 14

        1.  The States are different politically, culturally, and demographically than they were when they ratified the ERA ................................................................ 14

        2.  An unreasonable ratification period creates a jurisprudential nightmare for courts ................................. 16

II.  THE ERA IS NOT ACTUALLY ABOUT EQUAL RIGHTS FOR WOMEN .................................................................... 22

    A.  States have historically led the charge in protecting women's rights ....................................................... 22

    B.  The ERA is not about sex discrimination, but about creating a federal constitutional backstop for abortion rights ....................................................... 26

        1.  The ERA is now about creating new substantive rights. ....27

        2.  The ERA will have unintended consequences ..................... 30

CONCLUSION ................................................................. 32

CERTIFICATE OF COMPLIANCE ..................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Adams v. Sch. Bd. of St. Johns Cty.*,
  968 F.3d 1286 (11th Cir. 2020) .................................................. 19, 20

*Adarand Constructors, Inc. v. Peña*,
  515 U.S. 200 (1995) ........................................................... 30

*Bostock v. Clayton Cty.*,
  140 S. Ct. 1731–43 (2020) ............................................. 16, 17, 18, 20

*Cnty. of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*,
  492 U.S. 573 (1989) ............................................................. 7

*Craig v. Boren*,
  429 U.S. 190 (1976) ........................................................... 30

*Dillon v. Gloss*,
  256 U.S. 368 (1921) .................................. 2, 5, 6, 7, 8, 9, 10, 11, 12, 32

*Dyer v. Blair*,
  390 F. Supp. 1291 (N.D. Ill. 1975) ....................................... 9

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) (plurality opinion) ............................................ 17

*Grimm v. Gloucester County School Board*,
  972 F.3d 586 (4th Cir. 2020) ...................................................... 19, 20

*Idaho v. Freeman*,
  529 F. Supp. 1107 (D. Idaho 1981) ....................................... 2

*In re Grand Jury Investigation*,
  916 F.3d 1047 (2019) ........................................................... 9

*Mass. Lobstermen's Ass'n v. Ross*,
  945 F.3d 535 (D.C. Cir. 2019) ......................................... 8

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ......................................... 18

*Nat'l Org. for Women, Inc. v. Idaho*,
459 U.S. 809 (1982) ........................................................... 2

*New Mexico Right to Choose/NARAL v. Johnson*,
975 P.2d 841 (N.M. 1998) .................................................. 29

*News Shipbuilding & Dry Dock Co. v. EEOC*
462 U.S. 669 ..................................................................... 17

*Seminole Tribe v. Florida*,
517 U.S. 44 (1996) ...................................................... 7, 8, 9

*United States v. Virginia*,
518 U.S. 515 (1996) .......................................... 2,18, 21, 25, 26, 30, 31

## Other Authorities

**Code of Federal Regulations**

34 C.F.R. §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41,
106.43. 106.52, 106.59, 106.61 ............................................ 17, 18, 30

**United States Code**

Tit. 20 U.S.C. § 1681 ........................................................ 17

Tit. 20 U.S.C. §§ 1681(a) ................................................... 17, 18, 30

**United States Constitution**

Amend V ............................................................ 4, 5, 6, 8, 10, 11, 12

**New Mexico Constitution**

Art. II, § 18 ..................................................................... 29

**Utah Constitution**

Art. IV, § 1 ...................................................................... 24

**Wyoming Constitution**

Art. 1, § 3 ........................................................................ 22

## Publications

*Carrie Hillyard, The History of Suffrage and Equal Rights Provisions in State Constitutions,*
   10 BYU J. Pub. L. 117 (1996) ............................................. 22

*David Strauss, The Irrelevance of Constitutional Amendments,*
   114 Harv. L. Rev. 1456 (2001) ........................................ 31

*Michael C. Dorf, Equal Protection Incorporation,*
   88 Va. L. Rev. 951 (2002) .............................................. 31

*Saikrishna Bangalore Prakash, Of Synchronicity and Supreme Law,*
   132 Harv. L. Rev. 1220–69 (2019) ...................................... 4

*Social Movements and Public Law,*
   150 U. Penn. L. Rev. 419 (2001) ....................................... 31

## INTEREST OF AMICI CURIAE

Amici are the States of Montana, Utah, Arkansas, Missouri, Oklahoma, South Carolina, and Texas ("the States").  Constitutional amendments affect the citizens of each state as well as the balance between state and federal power.  Several of the States ratified the Equal Rights Amendment ("ERA") during the original ratification period, but no longer consent to ratification for the reasons set forth in this brief.  The States believe equal rights for women are robustly protected by the Equal Protection Clause of the Fourteenth Amendment and federal civil rights legislation.  The States, moreover, have historically led in protecting equal rights for women and continue to do so.  The States are represented by their respective Attorneys General, who bear the duty and authority to represent the States in court.

## SUMMARY OF ARGUMENT

In March 1972—50 years ago this month—Congress approved House Joint Resolution 208 and sent the Equal Rights Amendment ("ERA") to the states for ratification by their legislatures.  Congress did so, however, with the express condition that the requisite three fourths of the states do so "within seven years from the date of its submission by the Congress."  H.R.J. Res. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972).

Only thirty-five of the required thirty-eight states ratified the ERA prior to its expiration date in 1979. Knowing the ERA was likely to expire short of its goal, in 1978 Congress "approved"[1] an extension for the ERA until 1982. H.R.J. Res. 638, 95th Cong., 2d Sess., 92 Stat. 3799 (1978). The extension was ultimately futile because the ERA failed to garner enough states for ratification prior to the second purported deadline. As the Congressional Research Service concluded, the ERA "formally died on June 30, 1982, after a disputed congressional extension of the original seven-year period for ratification." Congressional Research Service, *The Constitution of the United States of America: Interpretation and Analysis* (Washington, DC: Government Printing Office, 2017), S. Doc. No. 112-9, 112th Cong., 2nd Sess., August 26, 2017, p. 50. That notwithstanding, a group of three states purported to ratify the ERA in 2017 (Nevada), 2018 (Illinois), and 2020 (Virginia).

The Supreme Court's decision in *Dillon v. Gloss*, 256 U.S. 368 (1921), clearly and unequivocally forecloses ratification of the ERA

---

[1] Because Congress approved the extension by only simple majorities, a federal court declared the extension "unconstitutional and void." *Idaho v. Freeman*, 529 F. Supp. 1107, 1155 (D. Idaho 1981), *vacated as moot by Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982), *vacated as moot by NOW, Inc. v. Idaho*, 459 U.S. 809 (1982).

because three fourths of the states failed to ratify it prior to either expiration date. But even if the original seven-year deadline were somehow invalidated, proposed constitutional amendments do not wait in the wings in perpetuity. They must be ratified within a reasonable period of time or they expire. *Id.* at 375. To permit otherwise would create a plethora of problems from democratic, practical, and legal perspectives.

And importantly, ERA ratification isn't about equality for women anymore. The goals of the ERA movement have been accomplished by the Equal Protection Clause of the Fourteenth Amendment and various federal and state laws. That a federal constitutional amendment is somehow necessary to rescue women from the neglect of their states is belied by the legal protections actually afforded. Indeed, states have historically been at the forefront of protecting women's rights, often better and decades before any federal efforts. In reality, the movement is now a stalking horse that proponents hope will erect a new constitutional firewall against any rollback of abortion rights under *Roe v. Wade*. ERA proponents, moreover, fail to recognize the negative impact the ERA would have on women in America.

The district court's judgment was right, and this Court should af-

firm.

## ARGUMENT

### I. Ratification of a constitutional amendment must be timely.

James Madison remarked that Article V of the Constitution "guards

equally against that extreme facility which would render the Constitu-

tion too mutable; and that extreme difficulty which might perpetuate its

discovered faults." THE FEDERALIST NO. 43 (James Madison). Congress

and state legislatures must both participate in a process to make "useful

alterations … suggested by experience" in our Nation's governing char-

ter. *Id.* To that end, "[i]mplicit in Article V is the concept of synchronic-

ity, the notion that the relevant decisionmakers must make their assess-

ments in relative proximity, taking into account the difficulties of regis-

tering collective sentiment across dozens of legislatures and almost twice

as many chambers." Saikrishna Bangalore Prakash, *Of Synchronicity

and Supreme Law*, 132 Harv. L. Rev. 1220, 1268–69 (2019).

Or as then-Professor Ruth Bader Ginsburg told Congress when it

was considering the ERA extension, "[i]mplicit in Article V is the require-

ment that ratification of a proposed constitutional amendment occur

within some reasonable time."[2]  More than 40 years later, Justice Ginsburg stated publicly that ERA proponents needed to "start[] over again, collecting the necessary number of States."[3]

Justice Ginsburg was correct.

## A.  Congress may fix a time limit for ratification.

This Court is bound by the clear and unequivocal language of the Supreme Court's decision in *Dillon v. Gloss*, 256 U.S. 368.  As it did with the ERA, Congress may set a deadline for states to ratify constitutional amendments.   But even absent an express congressional deadline, constitutional amendments necessarily expire after a reasonable amount of time.  *Id.* at 375.

Article V of the Constitution lays out the procedure for amending the Constitution:

> The Congress, whenever two-thirds of both Houses shall deem it necessary, shall propose amendments of this Constitution, or, on the application of the legislatures of two-thirds of the several States, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and

[2] Extending the Ratification Period for the Proposed Equal Rights Amendment: Hearing on H.J. Res. 638 Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary, 95th Cong. 1 (1978) [hereinafter "ERA Hearings"].

[3] Justice Ginsburg Address to New Georgetown Law Students, Georgetown Law (Sept. 12, 2019).

purposes, as part of this Constitution, when ratified by the legislatures of three-fourths of the several States, or by conventions in three-fourths thereof, as the one or the other mode of ratification may be proposed by the Congress; Provided that no amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner affect the first and fourth clauses in the ninth section of the first article; and that no State, without its consent, shall be deprived of its equal suffrage in the Senate.

U.S. CONST. art. V, notably, remains silent on time period for ratification. It neither mandates an unlimited period for ratification nor requires Congress to establish a fixed period.  *Dillon*, 256 U.S. at 371.

*Dillon* concerned the Eighteenth Amendment, where Congress put in a seven-year time limit for states to ratify.  *Id.* at 373.  The *Dillon* Court *unanimously* determined that Article V's silence meant the Constitution left Congress the ability to set a fixed timeframe for ratification. *Id.* at 375–76.

The amici brief of pro-ERA states supporting Appellants attempts to circumvent *Dillon* by claiming that because the ratification period was not dispositive to the outcome, the Court's discussion of Congress's power to enact deadlines was dicta.  Brief for New York, et al. as Amici Curiae Supporting Plaintiffs-Appellants, Doc. 1929862, at 25.  *But see* Prakash, *supra*, at 1278 ("That unanimous Court's discussion of a limited

ratification period was not dictum.").  But any reasonable reading of *Dillon* belies amici's argument.  *See Seminole Tribe v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.") (citing *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) ("As a general rule, the principle of stare decisis directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law") (Kennedy, J., concurring and dissenting)).  The Court expressly considered two questions: (1) whether a seven-year ratification period was valid; and (2) even if the period was valid, whether the amendment had gone into effect when the offense was committed.  *See Dillon*, 256 U.S. at 370–71.

The *Dillon* opinion spans just over 7 pages, *see id.* at 370–77, devoting nearly all its real estate to discussing not just Congress's power to set time limits, but also an inherent temporal limitation on ratification—even absent a congressional proviso.  *See id.* at 371–76; *see also* Prakash, *supra*, at 1281 ("Only this reading of *Dillon* explains why the Court spent pages on the question of whether the Constitution itself contained

ratification limits."). It defies common sense to characterize the over-whelming mass of an opinion as unnecessary to the decision. *See Seminole Tribe*, 517 U.S. at 67.

*Dillon*'s plain text, moreover, clearly states the Court's holding regarding Congress's attendant Article V powers:

> Of the power of Congress, keeping within reasonable limits, to fix a definite period for the ratification we entertain no doubt. As a rule the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require; and Article V is no exception to the rule. Whether a definite period for ratification shall be fixed so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine as an incident of its power to designate the mode of ratification. It is not questioned that seven years, the period fixed in this instance, was reasonable, if power existed to fix a definite time; nor could it well be questioned considering the periods within which prior amendments were ratified.

256 U.S. at 375–76. If nothing else, the *Dillon* Court's recitation of the basic constitutional rules constitutes "the well-established rationale upon which the Court based the results of its earlier decisions." *Seminole Tribe*, 517 U.S. at 66–67; *see also Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535, 541 (D.C. Cir. 2019) ("a necessary part of [the court's] reasoning" is not dicta); Prakash, *supra*, at 1281 ("*Dillon*'s discussion of 'contemporaneous' ratification was not a gratuitous pronouncement, but

rather a necessary building block for its ultimate conclusion that Congress could impose a seven-year period.").[4]

It's also noteworthy that nearly every proposed amendment after *Dillon* contained a ratification period. Prakash, *supra*, at 1278. And by the 1970s—when the ERA was proposed— there was a "consensus that if sufficient states did not ratify a proposed amendment within a reasonable period after submission to them, the proposal was stale and a legal nullity." *Id.*; *see also Dyer v. Blair*, 390 F. Supp. 1291, 1304 (N.D. Ill. 1975) (noting "the Supreme Court has affirmed Congress' power to prescribe a time limit within which the ratifying process must be

---

[4] Even if somehow the *Dillon* passages are dicta, they're still entitled to great weight due to the thoroughness of the Court's discussion. *See Seminole Tribe*, 517 U.S. at 67; *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (2019) ("carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.").

completed"). This consensus was supported by contemporaneous litera-
ture,[5] congressional testimony,[6] and the Office of Legal Counsel.[7]

    *Dillon* controls. Congress may fix a time for ratification.

## B. Ratification must occur within a reasonable time period.

    *Dillon*'s thorough discussion of the Article V process makes clear
that there's also an independent limitation on the time period for ratifi-
cation, even if Congress does not insert one into the proposal or amend-
ment. Although the Constitution doesn't set a fixed time for ratification,
it still must occur "within some reasonable time after the proposal." *Dil-
lon*, 256 U.S. at 375. As discussed in Part I(A), *supra*, the Court's state-
ments regarding the time limit are not dicta and thus control this Court's

---

[5] Prakash, *supra*, at 1278 (citing *e.g.*, J.W. Peltason, CORWIN &
PELTASON'S UNDERSTANDING THE CONSTITUTION 111 (9th ed. 1982); Allen
Schick & Adrienne Pfister, AMERICAN GOVERNMENT: CONTINUITY AND
CHANGE 40 (1975)).

[6] Prakash *supra*, at 1278 (citing ERA Hearings (statement of Prof. Ruth
Bader Ginsburg, Columbia Law School)); *see also id.* at 68 (statement of
Prof. Charles L. Black, Jr., Yale Law School) (stating that there is a rea-
sonable time limit).

[7] Prakash *supra*, at 1278 (citing Memorandum for Robert J. Lipshutz,
Counsel to the President, from John M. Harmon, Assistant Attorney Gen-
eral, Office of Legal Counsel, Re: Constitutionality of Extending the Time
Period for Ratification of the Proposed Equal Rights Amendment (Oct.
31, 1977)).

analysis.  In addition to finding no textual basis for limiting Congress's authority, *id.* at 371, the Court looked to the structural, democratic, and practical bases for its conclusion.

"First, proposal and ratification are not treated as unrelated acts but as succeeding steps in a single endeavor, the natural inference being that they are not to be widely separated in time." *Id.* at 374.  As one scholar points out, "it is bizarre to suppose that while the Framers of the Constitution required synchronicity for the proposal of amendments (over one session or, at most, two years), they threw the door wide open for ratification of them. Prakash, *supra*, at 1274.  Article V, therefore, cannot contemplate an indefinite ratification period because the constitutional scheme requires a tighter nexus between proposal and ratification.

Second, the *Dillon* Court said, "it is only when there is deemed to be a necessity therefor that amendments are to be proposed, the reasonable implication being that when proposed they are to be considered and disposed of presently."  256 U.S. at 374.  Thus, because proposing a change to the Constitution implies some need to alter the status quo, that necessity dissipates with time as the status quo changes.  If the status

quo remains static—even after a reasonable period of time—Congress and the states are free to reintroduce the proposed amendment.

Finally, because "ratification is but the expression of the approbation of the people and is to be effective when had in three-fourths of the States, there is a fair implication that it must be sufficiently contemporaneous in that number of States to reflect the will of the people in all sections at relatively the same period, which of course ratification scattered through a long series of years would not do." *Id.* at 375. This rationale builds on the *Dillon* Court's first two points. Article V's proposal and ratification process is meant to address a need to change the status quo. But in addition to removing the necessity for the proposed amendment with each year that passes, time also erases the democratic legitimacy from ratification. *Id.* at 375 ("'an alteration of the Constitution proposed today has relation to the sentiment and the felt needs of today, and that, if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived, and not again to be voted upon, unless a second time proposed by Congress.'") (quoting JAMESON ON CONSTITUTIONAL CONVENTIONS § 585 (4th ed., 1887)).

Indefinite ratification periods create hosts of practical problems. For example, "if an amendment may be ratified over centuries, it may well be that there never is a supermajority of the states that favor it at any particular time." Prakash, *supra*, 1272. Across a ratification period extending 50 years, for example, it's possible that no more than one state supports a proposed amendment at any given point in time. *Id.*

It also raises questions about what number of states is needed for ratification if more states are added to the union between the time the amendment is proposed and time it is ratified. *Id.* For a proposed amendment to pass now, it requires 38 states to ratify. So, if the U.S. were to add an additional state after passage by Congress, would it then require 39 states to satisfy the three-fourths majority?

All these considerations militate strongly against Appellants' position that this Court should disregard the express will of Congress, the strictures of binding precedent, and common sense in order to unilaterally expand the ERA ratification period to approximately one-fifth the Nation's history.

**C. The States no longer consent to ratification of the ERA.**

**1. *The States are different politically, culturally, and demographically than they were when they ratified the ERA.***

The States that ratified the original ERA did so based on timely ratification processes. They didn't intend the ERA to float in the ether for all eternity.[8] Simply put, the world is different now than it was in 1972. Nearly every legislator that voted to ratify the ERA is either deceased or no longer in office. Even the youngest eligible voter that year would be nearly 70 years old now. The voters and their elected representatives have changed entirely since the ERA's ratification period expired.

Nearly half a century has passed since the states originally ratified—far more than can be considered "reasonable" under any metric. That's more than 20% of our country's history since the Constitution was ratified in 1789. Since the ERA was sent to the States in 1972, there

---

[8] There's also a strong argument that three fourths of the states never assented to ratification. Five states voted to rescind or withdraw their ratification of the ERA during the original ratification period: Idaho (1977), Kentucky (1978), Nebraska (1973), South Dakota (1979), and Tennessee (1974).

have been nine new Presidents, 24 new Congresses, 16 new Supreme Court Justices, 24 new national parks, and five decennial censuses. The nation saw its first black President, Secretary of State, and Attorney General; first female Supreme Court Justice, Vice President, Secretary of State, and Speaker of the House; and first Latino Attorney General and Supreme Court Justice.

The U.S. population has grown from approximately 210 million in 1972 to approximately 330 million in 2022. Demographics, culture, life-styles, beliefs, values, and the law have evolved significantly in the last half century. Population centers have shifted significantly. Not to mention things such as the Internet and information age, cellular and smart phones, the end of the Cold War, a second global pandemic, and Halley's comet have all occurred. To put it in perspective, the historical events chronicled in Billy Joel's *We Didn't Start the Fire* take place between 1948 (election of Harry Truman) and 1989 (China declaring martial law)—almost the same amount of time between Congress passing the ERA (1972) and the purported 38th State ratifying it (2020).

### 2.  *An unreasonable ratification period creates a jurisprudential nightmare for courts.*

Permitting ratification over unreasonably long periods of time presents "serious complications" for courts attempting to discern original public meaning or original intent of constitutional amendments.  Prakash, *supra*, at 1273.  State ratifiers in different decades or centuries may attribute different meanings to the same language.  *Id.*  For example, "some have argued that the public meaning of 'due process' in the mid-nineteenth century had a substantive component that the phrase lacked in the late eighteenth century" while "[o]thers have claimed that the meaning of the Bill of Rights changed from 1791 to 1868, when the Fourteenth Amendment incorporated it against the states."  *Id.*

This presents particular problems in the context of the ERA, which deals with equality on account of "sex."  Although the States contend the definition of "sex" remains static, courts have not remained faithful to textualism when interpreting the term.  *Compare Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738–43 (2020) (holding Title VII of the Civil Rights Act of 1964's prohibition of discrimination on the basis of "sex" prohibits discrimination on the basis of sexual orientation and gender identity) *with id.* at 1755 (Alito, J., dissenting) ("If every single living

American had been surveyed in 1964, it would have been hard to find any who thought that discrimination because of sex meant discrimination because of sexual orientation--not to mention gender identity, a concept that was essentially unknown at the time.").

The ERA passed both houses of Congress the same year as Title IX of the Education Amendments of 1972 ("Title IX"), *as amended*, 20 U.S.C. § 1681, *et seq.*, which prohibits discrimination on the basis of sex in any education program or activity receiving Federal financial assistance. Statutory and regulatory text and structure,[9] contemporaneous Supreme Court authorities,[10] and the U.S. Department of Education's historic practice[11] demonstrate that the ordinary public meaning of the term "sex"

---

[9] *See* 20 U.S.C. §§ 1681(a); 34 C.F.R. §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61.

[10] *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"); *see also Bostock*, 140 S. Ct. at 1739, 1784–91 (Appendix A) (Alito, J. dissenting); *Newport News Shipbuilding & Dry Dock Co. v. EEOC, 46*2 U.S. 669, 684 (1983) ("discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.").

[11] *See* U.S. Dep't of Educ., Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re: Bostock v. Clayton Cnty., at 2–3 (Jan. 8, 2021) (discussing Department's interpretation of "sex" in Title IX).

at the time of Title IX's enactment could only have been biological distinctions between male and female.

One of Title IX's crucial purposes is protecting women's and girls' athletic opportunities. A person's biological sex is relevant for Title IX considerations involving athletics, and distinctions based on sex are permissible (and may be required) because the sexes are—simply—not similarly situated. *See* 20 U.S.C. §§ 1681(a), 1686; 34 C.F.R. §§ 106.32(b), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (noting Title IX expressly authorizes separation based on sex in certain circumstances). This is because biological females and biological males possess physiological differences that are relevant to athletics. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring.").

But a new era has apparently arrived. The Department of Education reversed course in June 2021—determining that Title IX's unique statutory requirements are no different from Title VII's and interpreted "Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity."

Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637, 32,637 (June 22, 2021). Even federal courts have begun to diverge from the ordinary plain meaning of "sex" in 1972. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) (policy prohibiting transgender students from using restrooms that did not match their biological genders violated Equal Protection Clause); *Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286 (11th Cir. 2020) (school policy barring transgender student from the boys' restroom violated Equal Protection and Title IX), *vacated sub nom. Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299 (11th Cir.), *vacated by Adams v. Sch. Bd. of St. Johns Cnty.*, 9 F.4th 1369 (11th Cir. 2021) (granting *en banc* review).

This writing on the wall tells the States that a new interpretation of "sex" is coming for the ERA. When Representative Carolyn Maloney (D-NY) introduced a new version of the ERA during the 116th Congress, her press release stated that "[w]ith the ERA, we secure equality under

the law for women and all marginalized genders."[12]  During a 2021 congressional hearing on the ERA, actress and activist Alyssa Milano claimed that that the ERA is needed to address "gender-driven injustices" and that "anyone who is not a cisgender man" lacks "[c]onstitutional protections" without the ERA.[13]  The President of the TransLatin@ Coalition testified that the ERA will "ensure no discrimination against all people, poor, indigenous, Black, Trans, Women ALL PEOPLES!"[14]

It's impossible that the voters and representatives of Montana (1974), Nebraska (1972), South Dakota (1973), and Tennessee (1973) (or any other ratifying state for that matter) understood the term "sex" in the ERA to mean anything other than biological distinctions between male and female.  *See Adams*, 3 F.4th at 1322 (Pryor, C.J., dissenting) (collecting dictionary definitions from time of enactment); *Grimm*, 972

---

[12] Press Release, Office of Rep. Carolyn B. Maloney, Maloney, reed Introduce Equal Rights Amendment (Mar. 1, 2021), https://maloney.house.gov/media-center/press-releases/maloney-reed-introduce-equal-rights-amendment.

[13] *The Equal Rights Amendment: Achieving Constitutional Equality for All Hearing before the Committee on Oversight and Reform,* Serial No. 117-48, at 9–10, 117th Cong. (Oct. 21, 2021) (statement of Alyssa Milano) (Oct. 21, 2021) [hereinafter "2021 ERA Hearings"], https://www.congress.gov/117/chrg/CHRG-117hhrg46024/CHRG-117hhrg46024.pdf.

[14] 2021 ERA Hearings at 17 (statement of Bamby Salcedo).

F.3d at 632–33 (Niemeyer, J., dissenting) (same); *Bostock*, 140 S. Ct. at 1755 (Alito, J., dissenting).  Any contrary interpretation under the ERA would be at odds with the ordinary public meaning at the time Montana's elected representatives ratified it.  To impose an entirely different meaning on Montana voters 50 years later would be the constitutional equivalent of a bait and switch.

What's more is that there's unequivocal evidence that the States don't accept the new definition of "sex" advanced by ERA's current proponents.  Most notably, several states that ratified the ERA enacted legislation in the last 12 months to protect athletic opportunities for women by prohibiting biological males from competing in female athletics.  *See*, *e.g.*, H.B. 112, 2021 Leg. (Mt. 2021); H.B. 0003, 112th Gen. Assemb., Reg. Sess. (Tn. 2021); H.B. 25, 87th Sess. (Tx. 2021); H.B. 3293, 2021 Leg., Reg. Sess. (Wv. 2021).

The 2020 Virginia Legislature likely had a very different understanding of the term "sex" than the 1974 Montana Legislature.  How are reviewing courts supposed to evaluate the ordinary public meaning of terms with newly fluid definitions when ratification took place multiple

decades apart?  This Court can avoid this intergenerational constitutional squabble altogether by enforcing the plain terms of ERA.

## II.  The ERA is Not Actually About Equal Rights for Women

### A.  States have historically led the charge in protecting women's rights.

Historically, states have pioneered the path in championing women's rights. In 1869, 50 years before the Nineteenth Amendment was ratified, the territory of Wyoming was the first to enact a statute granting the women the right to vote and to hold office. Carrie Hillyard, *The History of Suffrage and Equal Rights Provisions in State Constitutions*, 10 BYU J. Pub. L. 117, 119 (1996). Later in ratifying its state constitution, Wyoming adopted both a provision providing for women's voting rights, as well as an equal rights provision: "Since equality in the enjoyment of natural and civil rights is made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever other than individual incompetency, or unworthiness …." WYO. CONST. art. I, § 3.

Utah became the second state or territory to grant women the right to vote, just a few months after Wyoming, in 1870. *See* Hillyard, *supra* at

125. Utah was founded by members of the Church of Jesus Christ of Latter-Day Saints. *Id.* at 122. Women played a key role in the community, many seeking outside employment. *Id.* The governor of the Utah Territory emphasized the importance of their role in society and encouraged their education and training: "Women are useful not only to sweep houses, wash dishes, make beds, and raise babies …. [T]hey should stand behind the counter, study laws of physics, or become good book-keepers and be able to do the business of any counting house, and all this to enlarge their sphere of usefulness for the benefit of society at large." *Id.* at 123–24 (quoting Ann Vest Lobb & Jill Mulvay Derr, *Women in Early Utah*, in UTAH'S HISTORY 337 (Richard D. Poll ed. 1978)).

Many outside Utah, however, were concerned for the welfare of the women of Utah involved in polygamy. Hillyard, *supra* at 123. Congress passed the Edmunds-Tucker Act of 1887, "[d]esigned initially just to 'abolish polygamy,' the act became 'one of the most far-reaching pieces of legislation ever passed in peacetime.'" Jeffrey S. Sutton, *Who Decides?* 115 (2022) (quoting Howard R. Lamar, *The Far Southwest, 1846-1912: A Territorial History* 344 (2000 ed.) (1966)). It gave federal marshals expansive law-enforcement powers, dissolved the Mormon Church and

seized its assets, and ironically—given the concern for women's welfare—disenfranchised Utah women. *See* Sutton, *supra* at 115.

Despite this setback in the suffragist movement, "women's political rights became a dominate issue" during the Utah constitutional convention leading up to its 1896 admission to statehood. Hillyard, *supra* at 126. The Utah Constitution was ratified with both recognition of women's right to vote and equal rights: "The rights of citizens of the State of Utah to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this State shall equally enjoy all civil, political, and religious rights and privileges." *Id.* at 127 (citing 1 NOTES ON THE UTAH CONSTITUTIONAL CONVENTION 421 (1898)); *see* UTAH CONST. art. IV, § 1.

While suffragists had first tried to include the right to vote in the Fourteenth Amendment (1868), they shifted their efforts to the states where "[o]ne after another, particularly states in the West, added the protection to their constitution or legislation." Sutton, *supra* at 338. It was the "groundwork laid in the states"—over 50 years—that led to the Nineteenth Amendment in 1920. *Id.* But the role the states play in promoting individual rights is unsurprising given the impervious nature the federal

constitution has to amendment. That is, "[t]he relative ease of amending state constitutions makes them a wandering showcase of American history over what we prefer our government to do in epochs and at various places." *Id.* at 341.

Equal rights for women took a similar, but slightly different path. An amendment to guarantee equal treatment regardless of sex was introduced in Congress in 1923. *Id.* at 339.  It wasn't until 1972 that Congress approved an Equal Rights Amendment. *Id.* And up to that time, only the Utah and Wyoming Constitutions included equal rights with their voting rights provisions. Hillyard, *supra* at 132.  In the 1970s, additional states added equal rights amendments to their state constitutions.  *Id.* But the momentum stopped.

Importantly, there were significant judicial developments. For example, in *United States v. Virginia*, the Court applied "heightened" scrutiny to Virginia Military Institute's (VMI) policy denying admission to women. 518 U.S. at 533. These developments may have stalled the equal rights movement because it is doubtful that anything could be gained by amending a state constitution or supporting the ERA: "After the VMI decision, it is fair to ask what the ERA could have accomplished that *United*

*States v. Virginia* did not. More than that, it is fair to wonder what the Nineteenth Amendment does that *United States v. Virginia* does not." Sutton, *supra* at 339. Thus, the idea that a federal constitutional amendment is now necessary to save women from their neglectful states simply is not true. Instead, as further explained in Part II(B), *infra*, there is much at risk—unintended consequences—if the ERA takes effect.

Finally, as discussed in Part I(C)(2), *supra*, some—including the federal government—now consider the term "sex" to mean something other than biological distinctions between male and female. The States, indeed, are again on the forefront of protecting women's rights by prohibiting biological males from competing in female athletics. *See*, *e.g.*, H.B. 112, 2021 Leg. (Mt. 2021).

## B. The ERA is not about sex discrimination, but about creating a federal constitutional backstop for abortion rights.

The relatively recent movement to resurrect the ERA is not truly about achieving equal rights for women. It's about providing a federal constitutional backstop for abortion in the event the Supreme Court overturns or limits *Roe v. Wade*. But in service of protecting *Roe*, the ERA would have unintended consequences.

### 1. The ERA is now about creating new substantive rights.

For starters, modern proponents of both the original ERA and newer iterations advocate for notions of women's equality that are fundamentally different from what ERA supporters advocated for initially. The original ERA prohibited discrimination on the basis of sex. Yet now feminist scholars argue that the new ERA should secure "a right to egalitarian institutions rather than a right against discrimination" and "substantive equality." *See, e.g.*, Julie C. Suk, *An Equal Rights Amendment for the Twenty-First Century: Bringing Global Constitutionalism Home*, 28 YALE J. L. & FEM. 381, 384, 385 (2017).

What is substantive equality? In the past few years, Congress has held hearings regarding both the original and new visions of the ERA. Witnesses during one 2019 congressional hearing on the ERA claimed it was necessary to enforce equal work for equal pay, stop female genital mutilation, and end things such as the blaming and shaming of female crime victims, the backlog of untested rape kits, cervical cancer, sexual

assault, and date rape.[15]  In the 2021 ERA hearing, the President of the ERA Coalition testified that the ERA "would be a Constitutional support for many issues that often affect women more than men, including intimate partner violence, sexual assault, paid leave, and equal pay" and that "enacting the Equal Rights Amendment would give women, and particularly women of color, a tool to fight for what they have earned: full pay equity."[16]

Abortion advocates, moreover, see the ERA as a trojan horse for a fortification or a contingent resurrection of *Roe*.  The National Organization for Women has said that the ERA "properly interpreted—could negate hundreds of laws that have been passed restricting access to abortion and contraception," and that the new ERA could "facilitate …

---

[15] *See generally Hearing on the Equal Rights Amendment Before the Subcomm. on Civil Rights and Civil Liberties of the H. Comm. on the Judiciary*, 116th Cong. (Apr. 30, 2019), https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=109330.

[16] 2021 ERA Hearings (written testimony of Carol Jenkins), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Jenkins%20Testimony.pdf.

expanding reproductive rights."[17]  The American Civil Liberties Union, in a letter to the House Judiciary Committee, argued that "the Equal Rights Amendment could provide an additional layer of protection against restrictions on abortion ….  The Equal Rights Amendment could be an additional tool against further erosion of reproductive freedom."[18] The Planned Parenthood Federation of America has openly said that "[t]here are no equal rights for women without access to abortion, plain and simple."[19]

Finally, state-level ERAs have shown the way for federal abortion advocates.  The New Mexico Supreme Court, notably, ruled that a state policy limiting public funding of abortion violated the state's ERA. *See Choose/Naral, Abortion & Reprod. Health Servs., Planned Parenthood of*

---

[17] *See* Bonnie Grabenhofer & Jan Erickson, *Is the Equal Rights Amendment Relevant in the 21st Century*?, National Organization for Women, at 3, https://now.org/wp-content/uploads/2015/09/Is-the-Equal-Rights-Amendment-Relevant-in-the-21st-Century.pdf.

[18] American Civil Liberties Union, *ACLU Statement for the Equal Rights Amendment 2019*, May 8, 2019, https://www.aclu.org/letter/aclu-statement-equal-rights-amendment-2019.

[19] *See* Eleanor Mueller and Alice Miranda Ollstein, *How the Debate Over the ERA Became a Fight Over Abortion*, POLITICO (Feb. 11, 2020), https://www.politico.com/news/2020/02/11/abortion-equal-rights-amendment-113505.

*the Rio Grande v. Johnson*, 975 P.2d 841 (N.M. 1998) (citing N.M. CONST. art. II, § 18).

### 2. The ERA will have unintended consequences.

The ERA would treat sex effectively the same as race when evaluating whether a law is constitutional. *Compare Adarand Constructors v. Peña*, 515 U.S. 200 (1995) (applying strict scrutiny to race-based classifications) with *Craig v. Boren*, 429 U.S. 190 (1976) (applying intermediate scrutiny to sex-based classifications). As the Supreme Court has recognized, however, race and sex are not the same and, thus, not all classifications based on sex are impermissible. *See Virginia*, 518 U.S. at 533 ("Supposed 'inherent differences' are no longer accepted as a ground for race or national origin classifications. Physical differences between men and women, however, are enduring[.]") (internal citations omitted).

The ERA would not only ban insidious discrimination on the basis of sex, but also all distinctions on the basis of sex designed to help women and girls. For example, as discussed in Part I(C)(2), *supra*, Title IX requires recipients of federal funding to take biological sex into account to advance opportunities for women. *See, e.g.*, 20 U.S.C. §§ 1681(a), 1686; 34 C.F.R. §§ 106.32(b), 106.33, 106.34, 106.40. That would be illegal

under the ERA.  One scholar points out that government programs to increase female participation in STEM fields, corporate management and business ownership would all be in jeopardy.[20]  There would also likely be no more single-sex settings such as schools, restrooms, locker rooms, prisons, and dormitories.[21]  It would also likely force women to register for the draft and serve in combat roles.  And it could deny women preferences in laws pertaining to alimony, spousal support, or child custody.

Equality for women is of course a worthy goal, but the goals of the ERA have been realized through the Equal Protection Clause of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, Equal Pay Act of 1963, Title IX, as well as a multitude of state laws.  Justice Ruth Bader Ginsburg said in 1997 that "[t]here is no practical difference between what has evolved and the ERA."  *See* Jeffrey Rosen, *The New Look of Liberalism on the Court*, N.Y. TIMES MAG., Oct. 5, 1997, at 60.  Prominent left-leaning legal scholars agree. *See, e.g.*, Michael C. Dorf, *Equal Protection Incorporation*, 88 VA. L. REV. 951, 985 (2002); David Strauss,

---

[20] Jane Kelly, *UVA Law Professor Breaks Down the Implications of the ERA, Just Passed in Virginia*, UVA TODAY (Jan. 16, 2020) (interview with Prof. Kim Forde-Mazrui), https://news.virginia.edu/content/uva-law-professor-breaks-down-implications-era-just-passed-virginia.

[21] *Id.*

*The Irrelevance of Constitutional Amendments*, 114 HARV. L. REV. 1456, 1476 (2001); William N. Eskridge, Jr., *Channeling: Identity-Based Social Movements and Public Law*, 150 U. PA. L. REV. 419, 502 (2001). The ERA is overkill when it comes to ensuring equal rights for women and threatens to throw our courts into constitutional chaos.

## CONCLUSION

The Supreme Court was crystal clear in *Dillon* that Congress may put time limits on the ratification of constitutional amendments and that amendments cannot linger indefinitely. They expire after a reasonable period of time. Allowing amendments to collect ratifications over decades creates a multitude of problems. This Court can avoid those problems by simply following Supreme Court precedent and enforcing the ERA's plain terms set by Congress. The ERA expired long ago.

The ERA may be dead, but equality for women is very much alive. The Equal Protection Clause and federal and state legislation have delivered what the original ERA proponents long sought. The push from modern ERA proponents, on the other hand, has nothing to do with true equality and everything to do with creating more constitutional protection for abortion.

For these reasons, the Court should affirm the judgment of the district court.

Respectfully submitted: March 14, 2022.

AUSTIN KNUDSEN
*Attorney General of Montana*
KRISTIN HANSEN
*Lieutenant General*
DAVID M.S. DEWHIRST
*Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406-444-2026

SEAN D. REYES
*Utah Attorney General*
MELISSA HOLYOAK
*Utah Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Telephone: (801) 538-9600
melissaholyoak@agutah.gov

*/s/ Christian Corrigan*
Christian B. Corrigan
*Assistant Solicitor General*
Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406.444.2026
christian.corrigan@mt.gov

*Attorneys for Amici Curiae*

**Additional Counsel for Amici Curiae:**

Leslie Rutledge
ARKANSAS ATTORNEY GENERAL

Eric Schmitt
MISSOURI ATTORNEY GENERAL

John M. O'Connor
OKLAHOMA ATTORNEY GENERAL

Alan Wilson
SOUTH CAROLINA ATTORNEY GENERAL

Ken Paxton
TEXAS ATTORNEY GENERAL

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Christian Corrigan, an employee in the Office of the Attorney General of the Montana, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,472 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7) and corresponding local rules.

*/s/ Christian Corrigan*

CHRISTIAN B. CORRIGAN