[Oral Argument Not Yet Scheduled]

No. 21-5096

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

STATES OF ILLINOIS AND NEVADA,

*Plaintiff-Appellants*,

v.

DAVID FERRIERO,
in his official capacity as Archivist of the United States,

*Defendant-Appellee*,

STATE OF ALABAMA, et al.,

*Intervenor-Defendant-Appellees.*

———————

On Appeal from the United States District Court for
the District of Columbia

———————

**REPLY BRIEF OF APPELLANTS**

———————

KWAME RAOUL
Attorney General of Illinois
JANE ELINOR NOTZ
ALEX HEMMER
PRIYANKA GUPTA
KATHRYN HUNT MUSE
ELIZABETH ROBERSON-YOUNG
Office of the Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3312 – Telephone
(312) 814-5024 – Facsimile
Jane.Notz@ilag.gov

Attorneys for Appellant
State of Illinois

AARON D. FORD
Attorney General of Nevada
HEIDI PARRY STERN
CRAIG NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

Attorneys for Appellant
State of Nevada

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...............................................................i

TABLE OF AUTHORITIES ........................................................iii

SUMMARY OF ARGUMENT ...................................................... 1

ARGUMENT ............................................................................. 4

I.  Plaintiff-States have standing ............................................. 4

    A.  The Archivist's refusal to publish and certify the Equal Rights Amendment injured Plaintiff-States, and an order compelling him to do so would redress that injury ...... 4

    B.  The Archivist's remaining arguments fail ........................... 11

II.  The district court had jurisdiction to order the Archivist to publish and certify the Equal Rights Amendment ....................... 17

    A.  The Archivist was required to publish and certify the Equal Rights Amendment notwithstanding Congress's ratification deadline ........................................... 18

        1.  Section 106b required the Archivist to publish and certify the Amendment without assessing Plaintiff-States' compliance with Congress's deadline ...................................................... 19

        2.  Congress's deadline for ratifying the Equal Rights Amendment was not binding ....................... 26

B.    Intervenors' remaining arguments are unpersuasive.......... 32

    1.    The Equal Rights Amendment is not barred by a "reasonable time" requirement ..................................... 34

    2.    States cannot rescind their ratifications of constitutional amendments........................................... 41

C.    No alternative remedy exists................................................. 46

CONCLUSION ........................................................................... 48

CERTIFICATE OF COMPLIANCE ......................................... 49

CERTIFICATE OF SERVICE.................................................... 50

# TABLE OF AUTHORITIES*

<u>Page(s)</u>

**CASES**

*13th Reg'l Corp. v. U.S. Dep't of Interior,*
  654 F.2d 758 (D.C. Cir. 1980) ....................................................18-19

*Abigail All. for Better Access to Developmental Drugs v.
  Eschenbach,*
  469 F.3d 129 (D.C. Cir. 2006) ............................................................13

*Alden v. Maine,*
  527 U.S. 706 (1999) ............................................................................4

*American Hosp. Ass'n v. Burwell,*
  812 F.3d 183 (D.C. Cir. 2016) ....................................................17, 33

*Arizona State Legislature v. Arizona Indep. Redistricting
  Commission,*
  576 U.S. 787 (2015) ........................................................................5, 6

*Barnes v. Kline,*
  759 F.2d 21 (D.C. Cir. 1984) ..............................................................9

*Bauer v. Marmara,*
  774 F.3d 1026 (D.C. Cir. 2014) ........................................................38

*Bostock v. Clayton Cnty.,*
  140 S. Ct. 1731 (2020) ......................................................................41

*Burke v. Barnes,*
  479 U.S. 361 (1987) ............................................................................9

*CC Distributors, Inc. v. United States,*
  883 F.2d 146 (D.C. Cir. 1989) ..........................................................33

*Chenoweth v. Clinton,*
  181 F.3d 112 (D.C. Cir. 1999) ..........................................................10

*Clinton v. City of N.Y.,*
  524 U.S. 417 (1998) ..........................................................................27

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Coleman v. Miller,
    307 U.S. 433 (1939)................................................4-5, 6, 7, 29, 32, 44

Crossroads Grassroots Pol'y Strategies v. FEC,
    788 F.3d 312 (D.C. Cir. 2015) ............................................................ 16

*Dillon v. Gloss,
    256 U.S. 368 (1921)..............................................7, 9, 29, 37, 38, 39

District of Columbia v. Heller,
    554 U.S. 570 (2008)............................................................................ 40

EC Term of Years Tr. v. United States,
    550 U.S. 429 (2007)............................................................................ 40

FEC v. Akins,
    524 U.S. 11 (1998)........................................................................ 8, 14

Gedulig v. Aiello,
    417 U.S. 484 (1974)........................................................................... 35

Hancock v. Urban Outfitters, Inc.,
    830 F.3d 511 (D.C. Cir. 2016)......................................................... 13

Haneke v. Sec'y of Health, Educ. & Welfare,
    535 F.2d 1291 (D.C. Cir. 1976)....................................................... 47

Hardt v. Reliance Standard Life Ins. Co.,
    560 U.S. 242 (2010) .......................................................................... 22

Hawke v. Smith,
    253 U.S. 221 (1920) ............................................................27, 43, 45

Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of
    Venezuela,
    743 F. App'x 442 (D.C. Cir. 2018)....................................................33

Hollingsworth v. Virginia,
    3 U.S. 378 (1798)............................................................................... 25

Idaho v. Freeman,
    529 F. Supp. 1107 (D. Idaho 1981) ................................................32

In re Cheney,
    406 F.3d 723 (D.C. Cir. 2005) .........................................................26

*International Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock,*
783 F.2d 237 (D.C. Cir. 1986) ............................................................ 34

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
478 U.S. 221 (1986) ............................................................ 46

*Keep Chi. Livable v. City of Chi.,*
913 F.3d 618 (7th Cir. 2019) ............................................................ 13

*Kennedy v. Sampson,*
511 F.2d 430 (D.C. Cir. 1974) ............................................................ 9-10

*LaRoque v. Holder,*
650 F.3d 777 (D.C. Cir. 2011) ............................................................ 33

*Leser v. Garnett,*
258 U.S. 130 (1922) ............................................................ 24-25, 39, 44

*Lovitky v. Trump,*
949 F.3d 759 (D.C. Cir. 2020) ............................................................ 19

*Marbury v. Madison,*
5 U.S. 137 (1803) ............................................................ 10, 11

*Marshall Field & Co. v. Clark,*
143 U.S. 649 (1892) ............................................................ 10

*McDonald v. City of Chi.,*
561 U.S. 742 (2010) ............................................................ 40

*Monmouth Med. Ctr. v. Thompson,*
257 F.3d 807 (D.C. Cir. 2001) ............................................................ 19, 26

*National Org. for Women, Inc. v. Idaho,*
459 U.S. 809 (1982) ............................................................ 32

*National Treasury Emps. Union v. Nixon,*
492 F.2d 587 (D.C. Cir. 1974) ............................................................ 20

*New Jersey v. EPA,*
989 F.3d 1038 (D.C. Cir. 2021) ............................................................ 11

*Raines v. Byrd,*
521 U.S. 811 (1997) ............................................................ 6, 10

*SAS Inst. v. Iancu,*
138 S. Ct. 1348 (2018) ............................................................ 20

iii

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) ....................................................29

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005) .................................................35

*Town of Chester v. Laroe Ests., Inc.*,
  137 S. Ct. 1645 (2017) ............................................16

*United States ex rel. Widenmann v. Colby*,
  265 F. 998 (D.C. Cir. 1920) .......................14, 15, 22, 23, 46

*United States v. Chambers*,
  291 U.S. 217 (1934) ................................................31

*United States v. Morrison*,
  529 U.S. 598 (2000) ................................................35

*United States v. Nagarwala*,
  350 F. Supp. 3d 613 (E.D. Mich. 2018) .........................35

*United States v. Sprague*,
  282 U.S. 716 (1931) ................................27, 29, 37, 43

*United States v. Thomas*,
  788 F.2d 1250 (7th Cir. 1986) ...................................24

*Vietnam Veterans of Am. & Veterans of Modern Warfare v. Shinseki*,
  599 F.3d 654 (D.C. Cir. 2010) ...................................47

*Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*,
  505 U.S. 214 (1992) ................................................32

## STATUTES

*1 U.S.C. § 106b........................................................1, 15, 20, 21

5 U.S.C. § 706 ..........................................................46

28 U.S.C. § 1361........................................................17

16 Stat. 1131 (1870)...................................................44

74 Stat. 1057 (1960)...................................................31

76 Stat. 1259 (1962)...................................................31

79 Stat. 1327 (1965)...................................................31

85 Stat. 825 (1971) ................................................................... 31

## CONSTITUTIONAL PROVISIONS

Md. Const. of 1776, § LIX ........................................................ 37

Penn. Const. of 1776, § 47 ....................................................... 37

Vt. Const. of 1786, ch. 2, § XL ................................................ 37

U.S. Const. amend. XIII, § 1 ................................................... 40

U.S. Const. amend. XVIII, § 3 ................................................ 29

U.S. Const. art. I, § 7, cl. 2 ..................................................... 10

U.S. Const. art. V ............................................................... 28, 43

U.S. Const. Preamble .............................................................. 1

## OTHER AUTHORITIES

75 Cong. Rec. 3856 (1932) ....................................................... 31

Charles Burdick, *The Law of the American Constitution* (1922) ........... 45

*Congressional Pay Amendment*, 16 Op. O.L.C. 87
(Nov. 2, 1992) ............................................................... 20, 37

John Jameson, *A Treatise on Constitutional Conventions*
(4th ed., 1887) .................................................................. 45

Letter from James Madison To Alexander Hamilton (July 20,
1788), in *Founders Online*, Nat'l Archives, ............................ 43

"Mode," Merriam-Webster Dictionary ..................................... 30

Michael Stokes Paulsen, *A General Theory of Article V: The
Constitutional Lessons of the Twenty-seventh Amendment*,
103 Yale L.J. 678 (1993) ....................................................... 40

Provision, Black's Law Dictionary (11th ed. 2019) .................. 21

S.D. Atty. Gen. Op. No. 75-33 (Feb. 21, 1975) ....................... 42

S.J. Res. 2, 54th Leg. (S.D. 1979) ........................................... 42

*The Documentary History of the Ratification of the Constitution*
(Jensen & Kaminski eds.) .................................................. 43

*The Federalist* No. 43 (James Madison) .................................................. 41

*The Federalist* No. 78 (Alexander Hamilton) ......................................... 40

*The Federalist* No. 85 (Alexander Hamilton) .................................... 25, 27

## SUMMARY OF ARGUMENT

Congress and the States have performed their constitutionally-assigned roles to make our nation's foundational document "more perfect," U.S. Const. Preamble:  Following Congress's proposal and ratification by 38 States, our Constitution has been amended to recognize that all individuals are equal regardless of their sex.  Yet this declaration appears nowhere in the Constitution's official text because the Archivist, an unelected executive official, has refused to perform his statutory duty under 1 U.S.C. § 106b.  The district court wrongly concluded that it lacked jurisdiction to resolve an action by Plaintiff-States to compel the Archivist to publish and certify the Equal Rights Amendment.

Plaintiff-States have standing to vindicate their ratifications of the Amendment, as Intervenors agree.  They have important sovereign interests in exercising their constitutional prerogative to ratify amendments and ensuring that their ratifications are given effect.  The Archivist is wrong to suggest that these interests are not impaired because his failure to publish and certify the Amendment does not affect its validity.  Just like when the executive branch refuses to treat a duly enacted statute as law, the Archivist's refusal to treat the Equal Rights

1

Amendment as a duly ratified amendment has real consequences, which are felt by Plaintiff-States most acutely as the sovereigns that ratified it. That the Archivist's inaction has "no legal effect" on the Amendment's validity does not negate the direct and specific injury suffered by Plaintiff-States.

Moreover, federal courts have jurisdiction to entertain Plaintiff-States' mandamus claim. As all parties agree, the Archivist has a ministerial duty to publish and certify constitutional amendments. The Archivist and Intervenors recognize that the executive branch cannot play a substantive role in the amendment process, yet submit that the Archivist has discretion to assess whether Congress imposed a valid deadline and to discard State ratifications that do not meet that deadline. That argument cannot be reconciled with Section 106b's plain text, this Court's prior analysis, or Article V's design. But even if it could be, the Archivist improperly disregarded Plaintiff-States' ratifications because the prefatory deadline imposed here was not binding.

This Court should not reach Intervenors' arguments that mandamus is unavailable because Article V implies that amendments must be ratified within a reasonable time and because several States

rescinded their ratifications. These complex arguments are best addressed by the district court in the first instance with full briefing by all parties (including the Archivist). They are, in any event, unpersuasive, as Article V—which the Supreme Court has repeatedly recognized is clear—is silent on both issues and a contrary reading would disrupt the amendment process designed by the framers.

This Court, therefore, should reverse the district court's decision concluding that it lacked jurisdiction to hear this action, and remand for the district court to resolve any remaining issues.

# ARGUMENT

## I.    Plaintiff-States have standing

Plaintiff-States have standing because the Archivist's refusal to publish and certify the Equal Rights Amendment impairs their sovereign interests in performing the constitutional role ascribed to them by Article V and ensuring their legislatures' ratifications are given effect.  Opening Br. 20-37.  The district court's contrary decision is flawed—as Intervenors agree, Intervenors' Br. 13-18—and the Archivist's attempts to defend it lack merit.[2]

### A.    The Archivist's refusal to publish and certify the Equal Rights Amendment injured Plaintiff-States, and an order compelling him to do so would redress that injury

Article V guarantees the States a role in the amendment process. *Alden v. Maine*, 527 U.S. 706, 713 (1999).  In fulfilment of that role, Plaintiff-States' legislatures voted to ratify the Equal Rights Amendment.  But the Archivist refuses to perform the role Congress gave him:  publishing and certifying the Amendment.  Just as in *Coleman v.*

---

[2]    Below, the Archivist argued that Plaintiff-States' claims presented a non-justiciable political question.  Doc. 29 at 12-15.  The district court correctly rejected that argument, JA 326-34, and the Archivist does not renew it on appeal.

*Miller*, 307 U.S. 433 (1939), in which the Supreme Court held that a group of State legislators had standing to challenge the effective nullification of their votes regarding a proposed constitutional amendment, Plaintiff-States have a "plain, direct, and adequate interest" in defending their ratifications, an interest the Archivist's refusal to act has impaired, *id.* at 438.

The Archivist cannot genuinely contest that Plaintiff-States and their legislatures possess cognizable interests in the amendment process. He suggests that *Coleman* and *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015), are inapposite because they recognize the standing of legislatures and legislators, not States, to challenge conduct that impairs the validity of State laws. Archivist Br. 30-31. But the Archivist identifies no authority suggesting that only a State legislature (or legislators) would have standing in such a case, nor would such a distinction make sense. Indeed, the Supreme Court in *Coleman* justified its decision by analogizing that case to one in which a "state officer"—i.e., an executive-branch officer— invokes federal jurisdiction to defend the constitutionality of a State law he or she enforces. 307 U.S. at 442-43. In each case, a State

representative is seeking to defend the validity of the State's enactments. As Intervenors observe, it would be "particularly anomalous" to hold that only State legislatures can defend a State's ratification of a proposed amendment, because Article V "treats the States as independent sovereigns and sets out an amendment process where they act in their sovereign capacity." Intervenors' Br. 14.[3]

The Archivist also errs in suggesting that *Coleman* and its progeny are irrelevant because Plaintiff-States "could not have adopted the [Amendment] on their own" (and so, he says, are analogous to individual legislators without a cognizable stake in the dispute, see *Raines v. Byrd*, 521 U.S. 811, 830 (1997)). Archivist Br. 30-31. That argument cannot be squared with *Coleman*, which similarly concerned a single State's ratification of a proposed amendment that could not by itself have added the amendment to the Constitution. Nonetheless, the Court had no

---

[3] The Archivist quotes *Arizona State Legislature*'s observation that the "'ratification . . . of a constitutional amendment is not an act of legislation within the proper sense of the word,'" Archivist Br. 30 (quoting 576 U.S. at 806), but the Court made that statement in discussing the merits of the legislature's claim, not its standing to bring that claim. The distinction between passing a State law and ratifying a proposed constitutional amendment is irrelevant for standing purposes, as *Arizona State Legislature*'s reliance on *Coleman* reflects.

trouble holding that the legislators had standing to challenge the amendment's adoption.  307 U.S. at 438.  The fact that the State's ratification, "on [its] own," Archivist Br. 30, did not have independent legal effect was immaterial, given the role accorded the States by Article V.

In the end, the Archivist's principal argument is not that Plaintiff-States lack cognizable interests in the amendment process, but that his refusal to publish and certify the Equal Rights Amendment has not impaired those interests.  Archivist Br. 26-28, 33-34.  The thrust is that the Archivist's publication and certification of an amendment is a ministerial act that has no effect on the amendment's legal validity and thus no legally cognizable impact on Plaintiff-States.  *Id.* at 27-28.  But that argument, too, fails.

The Archivist misunderstands the consequences of his refusal to act.  He is correct that a constitutional amendment becomes law when the 38th State ratifies it, not when the Archivist certifies or publishes it.  See *Dillon v. Gloss*, 256 U.S. 368, 376 (1921).  But that does not mean that a refusal to certify or publish an amendment is without consequence, any more than (say) a refusal to publish a duly enacted statute in the

7

Statutes at Large would be without consequence. To the contrary, the executive branch's refusal to *treat* duly enacted law as law has significant consequences. The Archivist's refusal to publish the Equal Rights Amendment means that it is not part of the official version of the U.S. Constitution taught in schools or displayed in the National Archives. Opening Br. 26-27. And absent formal recognition, aggrieved individuals do not understand they enjoy the rights that Plaintiff-States have secured them by ratifying the Amendment (as alleged, JA 91-92). See CAC Br. 18-19 (Archivist's action triggers processes to inform citizens of their rights). Publication and certification, in other words, are not mere "formalit[ies]," JA 323; rather, they mark the culmination of the ratification process, and their absence carries practical consequences.

To be sure, the practical effects of recognition (or, in this case, non-recognition) are felt by others, too. But that does not make Plaintiff-States' injuries too "abstract and undifferentiated" for standing, as the Archivist argues. Archivist Br. 23; cf. *FEC v. Akins*, 524 U.S. 11, 24-25 (1998) (that a concrete injury is "widely shared" does not deprive courts of jurisdiction to remedy it). Plaintiff-States have ratified the Equal Rights Amendment, but the Archivist, by withholding his formal

recognition, has prevented the practical effects Plaintiff-States intended to generate from occurring. The Equal Rights Amendment may be the law of the land, *Dillon*, 256 U.S. at 376, but if it is not treated as such by the Archivist, Plaintiff-States have not secured the practical benefits (not just the legal benefits) of ratification—benefits they sought but have not yet realized. That injury is both concrete and specific to Plaintiff-States' status as the ratifiers of the Amendment; it is caused by the Archivist's failure to publish and certify the Amendment; and it is redressable by a court order directing him to do so. See Intervenors' Br. 16-17 (ordering Archivist to publish and certify Amendment "would provide the ratifying States meaningful relief"); CAC Br. 5-6 (Archivist's certification has "palpable effects").

Presumably for these reasons, this Court has repeatedly permitted cases concerning the validity of statutory enactments to proceed against the executive-branch officials responsible for the formal publication of those statutes. E.g., *Barnes v. Kline*, 759 F.2d 21, 23, 26 (D.C. Cir. 1984) (legislators had standing to seek injunction requiring executive-branch officials to "deliver and publish" bill "as law"), *vacated as moot sub nom. Burke v. Barnes*, 479 U.S. 361 (1987); *Kennedy v. Sampson*, 511 F.2d

430, 432-33 (D.C. Cir. 1974) (same).[4]  It has done so notwithstanding that a bill becomes law not when it is published, but after the signature of the President or the successful override of his or her veto.  See U.S. Const. art. I, § 7, cl. 2; *Marshall Field & Co. v. Clark*, 143 U.S. 649, 668 (1892). To Plaintiff-States' knowledge, the Court has never questioned whether the plaintiffs in these cases might lack standing because a statute's publication has no formal legal effect.  That is presumably because formal recognition carries practical consequences whose deprivation qualifies as an injury under Article III, even setting aside its legal import.

Indeed, as Plaintiff-States explained, Opening Br. 31-32, no less an authority than *Marbury v. Madison*, 5 U.S. 137 (1803), establishes that standing does not turn on whether the Archivist's inaction has legal effect.  There, the judicial commission was "not necessary to the validity of" Marbury's appointment; rather, it served as "evidence" of that appointment.  *Id.* at 138 (emphasis omitted).  But the Court nonetheless

---

[4] To be sure, aspects of the Court's opinions in *Kennedy* and *Barnes* were overruled by *Raines*, which held that individual legislators generally lack standing to defend the validity of duly passed legislation. See *Chenoweth v. Clinton*, 181 F.3d 112, 113-17 (D.C. Cir. 1999).  But nothing in *Raines* undermines this Court's apparent view that the plaintiffs in those cases had chosen the appropriate defendants.

entertained Marbury's suit.  The same principle applies here.  Although the publication and certification of the Equal Rights Amendment do not affect its validity, Plaintiff-States have standing to seek "evidence" of its adoption, *id.*, in the form of publication and certification.  The Archivist tries to distinguish *Marbury* on the ground that Marbury had a "'vested legal right' in his commission," Archivist Br. 35 (quoting 5 U.S. at 162), whereas Plaintiff-States have no such right.   But that argument presumes that Plaintiff-States' claims fail on the merits, contrary to this Court's direction that, for standing, one "assume[s] that on the merits the plaintiffs would be successful in their claims."  *New Jersey v. EPA*, 989 F.3d 1038, 1045 (D.C. Cir. 2021).  Plaintiff-States are in a position identical to Marbury's:  They have a legal entitlement that the Archivist is refusing to recognize, and they are injured by his refusal to provide that recognition.

## B.    The Archivist's remaining arguments fail

The Archivist advances a range of additional arguments in defense of the district court's decision, but these, too, lack merit.

1.    To start, the Archivist argues for the first time on appeal that Plaintiff-States have forfeited any arguments stemming from the injury

he has caused to their sovereign interests.  Archivist Br. 25.  Not so:
Plaintiff-States alleged that they had "fulfilled their assigned
[constitutional] role by ratifying an amendment . . . proposed by
Congress," and that the Archivist's failure to publish and certify that
amendment "thwart[ed] the will of the people" by effectively nullifying
those ratifications.  JA 91-92.  Notably, the Archivist made no forfeiture
argument below, instead addressing Plaintiff-States' standing theory on
the merits.  Doc. 101 at 2-3.  And the district court had no trouble
understanding that Plaintiff-States had pled an "injury" that it described
as "interference with their constitutional authority to amend the Federal
Constitution."  JA 323 (cleaned up); see also JA 322 (explaining that
Plaintiff-States' standing argument "rests on an injury to one of their
sovereign interests").

Plaintiff-States thus adequately alleged a sovereignty-based injury
in their complaint.  But even if the Court were to conclude otherwise—
i.e., that the Archivist's failure to publish and certify the Amendment
injures the States as sovereigns, but that Plaintiff-States did not
adequately allege such an injury in the complaint—the proper course
would be to permit Plaintiff-States to amend to make such allegations,

either on remand, *see Keep Chi. Livable v. City of Chi.*, 913 F.3d 618, 624 (7th Cir. 2019), or before this Court under 28 U.S.C. § 1653, *see Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). Although a plaintiff must generally seek leave to amend below in order to obtain a remand for that purpose, *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 515 (D.C. Cir. 2016), that rule should not apply where a forfeiture argument is first raised on appeal. Had the district court held that Plaintiff-States had failed to allege an injury to their sovereignty, they could have amended the complaint to address any perceived deficiency. The Court should thus not affirm the dismissal of the action on curable grounds.

2.    Next, although Plaintiff-States explained why the district court erred in engrafting a "legal effects" test onto the standing analysis, Opening Br. 30-36, the Archivist attempts to defend that decision, suggesting that the court's discussion of "legal effects" reflects its view that Plaintiff-States must identify injuries that are redressable by a court, Archivist Br. 34. But Plaintiff-States also explained why an order compelling the Archivist to publish and certify the Equal Rights Amendment would redress their injuries:  Publication and certification

13

yield a wide range of practical consequences that together constitute the culmination of the ratification process.  Supra pp. 7-9.  Because Plaintiff-States' injuries stem from the deprivation of those practical consequences, an order directing the Archivist to publish and certify the Amendment would redress those injuries.

3.    The Archivist also defends the district court's reliance on *United States ex rel. Widenmann v. Colby*, 265 F. 998 (D.C. Cir. 1920).  Archivist Br. 35-36.  But *Colby* is inapposite.  For one, the plaintiff in *Colby* sought mainly to negate the validity of the Eighteenth Amendment, a result this Court observed would not follow even from an order "cancel[ing]" its publication, given that publication does not affect an amendment's legal validity.  *Id.* at 1000; see supra p. 7.  For another, the *Colby* plaintiff was a private individual with no "concrete" stake in the dispute.  *Akins*, 524 U.S. at 24.  Plaintiff-States, by contrast, are not disinterested bystanders but the separate sovereigns that ratified the Amendment.  Moreover, they do not seek a ruling to give the Amendment legal force, but rather to secure the practical consequences that flow from formal recognition.  Supra pp. 7-9.

The Archivist disputes all this, cherry-picking passages from the complaint to analogize Plaintiff-States to the *Colby* plaintiff, Archivist Br. 36, but that effort fails.  Plaintiff-States seek an order directing the Archivist to certify the Equal Rights Amendment as a "valid . . . part of the [U.S.] Constitution," because that is the language used by the statute setting out his duties.  *Compare* JA 92 (cleaned up) *with* 1 U.S.C. § 106b. And Plaintiff-States addressed arguments regarding the Amendment's validity in their complaint because they predicted—correctly—that those questions would be put before the Court, notwithstanding that the Archivist's role is ministerial.  See Archivist Br. 45-54 (raising these arguments); Intervenors' Br. 27-47 (same).  These passages do not undermine the differences between this case and *Colby*.

4.    Finally, Plaintiff-States explained why the district court's standing analysis cannot be reconciled with its view that Intervenors had standing.  Opening Br. 35-36.  The Archivist appears to agree, but only because, in his view, Intervenors would lack standing in a case brought to challenge his certification or publication of an amendment.  Archivist Br. 36-37 (reading district court's opinion to suggest that *all* "States do not have standing").  Intervenors, for their part, suggest that they were

15

not required to show standing, because they were intervening "as defendants in an existing case." Intervenors' Br. 17 (emphasis omitted). This Court has held otherwise. See *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 316 (D.C. Cir. 2015) ("[W]here a party tries to intervene as another defendant, we have required it to demonstrate Article III standing."). And even if there might be some cases in which an intervenor-defendant might not need to demonstrate standing, this is not one, given that Intervenors seek judgment on grounds not advanced by the Archivist. See *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017) ("For all relief sought, there must be a litigant with standing.").

The Archivist and Intervenors also suggest that Intervenors are differently positioned because Intervenors would have to "change their laws against their will" if the Equal Rights Amendment were adopted. Archivist Br. 37; Intervenors' Br. 17-18. But the starting point of the district court's analysis was its view that Intervenors had "a constitutionally-assigned role in the amendment process," JA 102, not the fact that Intervenors' laws would be overridden by the Amendment. Moreover, this fallback argument is irreconcilable with the Archivist's

16

view that publication and certification "does not, as a matter of law, have any effect on the amendment process," Archivist Br. 26; if publication and certification lacked consequences, a State whose laws would be overridden by the Amendment would not have standing to sue the Archivist. In any event, distinguishing Plaintiff-States and Intervenors for standing purposes would create perverse incentives, permitting ratification opponents to challenge publication and certification, but barring ratifying States from seeking judicial review. That cannot be correct.

For these reasons, the district court erred in holding that Plaintiff-States lacked standing to challenge the Archivist's refusal to publish and certify the Equal Rights Amendment.

## II. The district court had jurisdiction to order the Archivist to publish and certify the Equal Rights Amendment

The district court's alternative holding that it lacked jurisdiction under the Mandamus Act, 28 U.S.C. § 1361, was also erroneous. All three jurisdictional requirements for mandamus relief were met. Plaintiff-States have a "clear and indisputable right to relief," the Archivist is "violating a clear duty" to publish and certify the Equal Rights

17

Amendment, and "no adequate alternative remedy exists." *American Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).

The Archivist's and Intervenors' defense of the district court's decision, which held that the first two requirements were unmet, is unpersuasive.  Their understanding of the Archivist's authority to evaluate State ratifications is inconsistent with Section 106b, and their understanding of Congress's authority to set deadlines is inconsistent with Article V.

Intervenors go beyond the district court's decision and ask this court to decide whether (1) the Constitution requires ratification within a "reasonable" time and (2) several States validly rescinded their ratifications of the Amendment.  This Court should remand these issues for the district court to address in the first instance, but, if it reaches these arguments, it should reject them.

### A.    The Archivist was required to publish and certify the Equal Rights Amendment notwithstanding Congress's ratification deadline

The first two elements of mandamus jurisdiction are met where a defendant has a "ministerial," "peremptory," and "clearly defined" duty to discharge.  *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760

(D.C. Cir. 1980) (internal quotation marks omitted).[5]   It is undisputed

that the Archivist has a "clear non-discretionary duty" to publish and

certify constitutional amendments.  *Monmouth Med. Ctr. v. Thompson*,

257 F.3d 807, 813 (D.C. Cir. 2001).  The question is whether the Archivist

could refuse to discharge this duty because Plaintiff-States' ratifications

of the Equal Rights Amendment occurred after a congressional deadline.

He could not.  Section 106b does not authorize the Archivist to assess

State compliance with congressional deadlines, and even if it did, he

improperly disregarded Plaintiff-States' ratifications because the

deadline here was not binding.

> 1.   **Section 106b required the Archivist to publish and certify the Amendment without assessing Plaintiff-States' compliance with Congress's deadline**

There is no dispute that Section 106b "impose[s] a 'ministerial,

record-keeping duty'" on the Archivist to publish and certify

---

[5] The Archivist misunderstands Plaintiff-States as asking this Court to decide only one element or the other, Archivist Br. 45 n.11, when, in reality, Plaintiff-States are permissibly approaching both elements "'concurrently,'" JA 335 (quoting *Lovitky v. Trump*, 949 F.3d 759, 760 (D.C. Cir. 2020)); Opening Br. 50 n.22.

constitutional amendments.  Archivist Br. 40 (quoting *Congressional Pay Amendment*, 16 Op. O.L.C. 85, 98 (Nov. 2, 1992)); see Intervenors' Br. 15. The statute's plain text makes this clear, directing that the Archivist "shall" publish and certify an amendment "[w]henever official notice is received . . . that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution."  1 U.S.C. § 106b; see *SAS Inst. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) (use of "shall" renders statutory directive mandatory).

The dispute, instead, concerns the nature of the Archivist's duty to ensure that an amendment has been ratified "according to the provisions of the Constitution."  1 U.S.C. § 106b.  In Plaintiff-States' view, this task is straightforward and ministerial.  See *National Treasury Emps. Union v. Nixon*, 492 F.2d 587, 608 (D.C. Cir. 1974) (ministerial task is a "simple, definite duty").  The Archivist is authorized to ensure that the textually enumerated provisions of Article V—ratification by three-fourths of the States and by legislature or convention as designated by Congress—are met before publishing and certifying an amendment of which he receives "official notice" of ratification.  Opening Br. 43.

20

The Archivist and Intervenors, however, contend that the Archivist's responsibility to ensure that an amendment was ratified "according to the provisions to the Constitution" is, at least here, a discretionary duty that cannot be compelled by mandamus. Archivist Br. 41-42; Intervenors' Br. 15-16. They argue that the Archivist must go beyond assessing compliance with Article V's textually enumerated conditions and also decide whether the States met any "'properly imposed'" congressional deadlines. Archivist Br. 43 (quoting JA 338); see Intervenors' Br. 16. Their understanding is flawed in multiple respects.

1.      The Archivist and Intervenors overlook Section 106b's directive that the Archivist must publish and certify amendments that have been ratified "according to the *provisions* of the Constitution." 1 U.S.C. § 106b (emphasis added). A "provision" is a "clause in a . . . legal instrument." Provision, Black's Law Dictionary (11th ed. 2019). Article V contains no "clause" or "provision" requiring ratification by a deadline—regardless of whether it permits Congress to impose a deadline, see infra Section II.A.2—and thus Section 106b's plain text does not authorize the Archivist to assess compliance with a deadline. To arrive at a contrary conclusion, the district court relied on authority

21

"implied" by the statute.  JA 337.  But neither the court, nor the Archivist and Intervenors, provided a reason to depart from Section 106b's plain language.  See *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) ("plain and unambiguous" statute must be given effect as written).

2.    The Archivist and Intervenors' contention that the Archivist has discretionary authority conflicts with this Court's determination that the duty contained in Section 106b's substantively identical predecessor statute was "purely ministerial."  *Colby*, 265 F. at 999.  The Archivist argues that *Colby* is distinguishable because there, unlike here, the petitioner asked the court to "'look behind'" facially valid notices into the State proceedings that had generated them.  Archivist Br. 43-44 (quoting *Colby*, 265 F. at 1000).  But this distinction does not render *Colby* inapposite.

To start, this case, too, will require the Archivist to "look behind" the notices if his understanding of his authority is accepted.  The Archivist will need to first assess whether Congress's deadline was binding before deciding whether Plaintiff-States met it.  Opening Br. 44-45.  The Archivist appears to recognize the need to make this

22

determination and its complexity. He states that he may assess compliance with "'any *properly imposed* ratification deadline,'" Archivist Br. 43 (quoting JA 338) (emphasis added), showing that he understands that he cannot accept all deadlines at face value, and he claims that the effect of the deadline at issue on the Amendment is "uncertain," *id.* at 42. The Archivist's inability to define his authority in a way that does not require him to "look behind" facially valid notices demonstrates why this Court should not imply such authority.

In any case, although the specific deficiency alleged in *Colby* was different, *Colby* still controls here. This Court's conclusion that the executive-branch official's duty was "purely ministerial" stemmed from the statute's language, under which "[n]o discretion was lodged in him" to "investigate" notices of ratification issued in "due form." *Id.* at 999; see *id.* at 1000 (Acting Secretary "performed a duty enjoined upon him by statute in issuing the proclamation in question"). Likewise, Section 106b lodged "no discretion" in the Archivist to question whether Plaintiff-States' official notices of ratifications "stated the truth" that the Equal Rights Amendment had been ratified notwithstanding a congressional deadline.

3.     Contrary to the Archivist's argument, Archivist Br. 41, the publication and certification of the Sixteenth Amendment confirms that his role is ministerial.  The Secretary of State concluded that three-fourths of the States had ratified the Sixteenth Amendment notwithstanding "errors of diction, capitalization, punctuation, and spelling" in the version of the amendment contained in several State notices of ratification.  *United States v. Thomas*, 788 F.2d 1250, 1253 (7th Cir. 1986).  That is, the Secretary assessed compliance with Article V's explicit requirement that the amendment proposed by Congress (as opposed to variations on that amendment) was officially ratified by three-fourths of the States, as the Archivist is also empowered to do.

To be sure, as the Archivist notes, Archivist Br. 42 n.10, *Thomas*'s reasoning should not be adopted wholesale.  *Thomas* determined that the Secretary's certification of the Sixteenth Amendment was beyond judicial review based on its understanding that *Leser v. Garnett*, 258 U.S. 130 (1922), "treat[ed]" the certification "as conclusive" upon courts, 788 F.2d at 1253.  This conclusion misreads *Leser*, which, in fact, treated States'

"official," "duly authenticated" notices of ratification as "conclusive" upon the Secretary and the courts.  258 U.S. at 218.[6]

4.    The Archivist and Intervenors' argument that the Archivist has discretion under Section 106b also creates constitutional concerns. The framers designed the amendment process to prevent the federal government from abusing its power, *The Federalist* No. 85 (Alexander Hamilton), and excluded the executive branch from that process.[7] Against this backdrop, the Archivist concedes that Section 106b "does not, and cannot, give the Archivist any role in the amendment process," but also contends that he can assess the validity of congressional ratification conditions and their impact on State ratifications.  Archivist Br. 44.  But this assumed authority goes beyond merely "publishing and

---

[6] There is no contention that Plaintiff-States' notices of ratification were not "official" or "duly authenticated."  See JA 148-52 (Nevada's notice); JA 154-66 (Illinois's notice).

[7] Thus, the President's constitutional duty to "take Care" that the laws are faithfully executed, Intervenors' Br. 16 (internal quotation marks omitted), does not permit him or his associates to play a substantive role in the amendment process, see *Hollingsworth v. Virginia*, 3 U.S. 378, 381 n.2 (1798) ("[The president] has nothing to do with the proposition, or adoption, of amendments to the Constitution.").

certifying the adoption of constitutional amendments," *id.*, and therefore upsets the balance of power struck by the framers.

5. Finally, the Archivist suggests that his statutory duty was unclear here. Archivist Br. 42. This Court, however, must "interpret the underlying statute" to decide if mandamus relief is available. *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005). That is, because "mandamus jurisdiction under § 1361 merges with the merits," this Court cannot "rule[ ] out" a mandamus action because the merits present difficult or complex questions. *Id.*; see Intervenors' Br. 25-26. As explained, properly interpreted, Section 106b imposed a clear, non-discretionary duty on the Archivist to publish and certify the Equal Rights Amendment without assessing State compliance with Congress's deadline.

## 2.    Congress's deadline for ratifying the Equal Rights Amendment was not binding

Even if the Archivist could assess whether State ratification complied with Congress's deadline, he nevertheless had a "clear non-discretionary" duty to publish and certify the Equal Rights Amendment because that deadline—which Congress placed in the introduction to, and separate from the text of, the proposed amendment—was not binding. *Monmouth Med. Ctr.*, 257 F.3d at 813.

26

Article V is "clear in statement and in meaning," *United States v. Sprague*, 282 U.S. 716, 730 (1931), and says nothing about Congress's authority to set deadlines. This "constitutional silence" should be read as "equivalent to an express prohibition" on Congress setting deadlines for State ratification. *Clinton v. City of N.Y.*, 524 U.S. 417, 439 (1998). Due to concerns that Congress would "encroach[ ]" on the States during the amendment process, *The Federalist* No. 85 (Alexander Hamilton), the framers assigned Congress and the States specific roles. That they did not list the power to set deadlines as one of Congress's roles is "persuasive evidence" that no such power was "intended"; if it had been, "nothing would have been simpler" than to say so. *Sprague*, 282 U.S. at 732; see *Hawke v. Smith*, 253 U.S. 221, 227 (1920) (Article V is "plain" and "[i]t is not the function of courts or legislative bodies . . . to alter the method which the Constitution has fixed.").[8]

At minimum, however, Congress cannot impose the type of deadline used here—one in a prefatory clause outside the text of the proposed amendment. Prefatory deadlines raise constitutional concerns that are

---

[8] Plaintiff-States raised this argument below, Doc. 37 at 20; JA 88-89, and thus did not "waive[ ]" it, Intervenors' Br. 28.

arguably not posed by deadlines contained within an amendment's text. When Congress drafts an amendment to be inoperative if it is not ratified within a certain period, the States can still choose to ratify that amendment, even if it is potentially inoperative once ratified. This practice better respects the coordinate roles assigned to Congress and the States: Congress may "propose" the content of amendments without intruding on the States' constitutional prerogative to "ratif[y]" them. U.S. Const. art. V.

The Archivist and Intervenors ask this Court to ignore these constitutionally-assigned roles because allowing States to ratify potentially legally inoperative amendments would serve no "salutary purpose." Archivist Br. 52 n.14; see Intervenors' Br. 32. But that a ratified amendment could be legally inoperative is a reason why States may choose not to ratify it. It is not a reason to allow Congress to curtail the States' role in the amendment process.

The Archivist and Intervenors' various other counter-arguments similarly lack merit.

1. *Dillon*'s discussion of Congress's authority to set ratification deadlines is dictum. The Supreme Court determined that the Eighteenth

28

Amendment was not invalid merely because its text included a deadline. *Dillon*, 256 U.S. at 371, 376. But the Archivist and Intervenors do not dispute that the deadline in *Dillon* had no impact on States' ratification authority because the amendment was ratified before the deadline elapsed. *See id.* Thus, the Court's discussion of Congress's authority to set a deadline that would bind the States was not "'necessary'" to its decision. Archivist Br. 51 (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996)).[9]

Even if *Dillon* could be read as holding that Congress can set deadlines for ratification, it is distinguishable because the deadline was in the proposed amendment's text, see U.S. Const. amend. XVIII, § 3, which, as explained, is meaningfully different from prefatory deadlines, see supra pp. 27-28. The Archivist and Intervenors note that *Dillon*'s reasoning did not turn on the deadline's location, Archivist Br. 51; Intervenors' Br. 33, but that is because the Court had no occasion to consider the constitutional concerns posed by prefatory deadlines—

---

[9] That the Supreme Court later characterized this reasoning as a holding is not dispositive, see Archivist Br. 50 (citing *Coleman*, 307 U.S. at 452), because the Court also stated that this reasoning was not "in the strict sense necessary to a decision," *Sprague*, 282 U.S. at 732.

showing, again, why the question here was not concretely presented in *Dillon*.

The Archivist adds that *Dillon* determined that Congress's power to set deadlines stemmed from its power to designate a mode of ratification, and argues that because Congress has consistently done the latter via proposing clauses without invalidation, its use of prefatory deadlines should be no different. Archivist Br. 51-52. This assumes that this Court should adopt *Dillon*'s dictum that Congress's authority to set deadlines stems from its power to determine the mode of ratification. But, as explained, Opening Br. 57, that reasoning is unpersuasive. The plain meaning of "mode" is the "particular form or variety of something,"[10] so the fact that Congress can determine the *form* of ratification (legislature or convention) does not mean that it can also control *when* ratification occurs.

2.    The Archivist and Intervenors overstate Congress's "substantial historical practice" of setting prefatory deadlines, Archivist Br. 53; see Intervenors' Br. 29, 31-32, which Congress did not begin until

---

[10] "Mode," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/mode.

1960—nearly two centuries after the Bill of Rights was proposed.[11]

Moreover, aside from the Equal Rights Amendment, Congress has imposed a prefatory deadline for only four ratified amendments, which were proposed over the course of 11 years and hardly represent a "traditional way[ ] of conducting government." Archivist Br. 50 (internal quotation marks omitted).[12] At any rate, the validity of prefatory deadlines has never been tested before this amendment, so congressional practice is not dispositive. And Congress's belief that it could impose such deadlines—which was not universal, contrary to the Archivist's and Intervenors' suggestion, Archivist Br. 52; Intervenors' Br. 32[13]—does not permit it "to expand or extend its constitutional authority," *United States v. Chambers*, 291 U.S. 217, 224 (1934).[14]

---

[11] 74 Stat. 1057 (1960).

[12] *Id.* (proposing Twenty-Third Amendment); 76 Stat. 1259 (1962) (Twenty-Fourth); 79 Stat. 1327 (1965) (Twenty-Fifth); 85 Stat. 825 (1971) (Twenty-Sixth).

[13] See 75 Cong. Rec. 3856 (1932) (representative arguing that placing ratification deadline in "proposal clause" "would be of no avail"); *id.* (another representative proposing that deadline should be added to amendment's text to "play [it] safe").

[14] Intervenors speculate that Congress would not have proposed the Equal Rights Amendment without a deadline. Intervenors' Br. 29. Any votes gained because of the deadline were not necessarily critical because the Amendment passed by a wide margin. See ERA Coalition Br. 12

3.    The Archivist and Intervenors also overread the other "clues" identified by the district court.  JA 341-42.  *Coleman* observed that the Child Labor Amendment contained no deadline in the proposed amendment "'or in the resolution of submission,'" Archivist Br. 48 (quoting *Coleman*, 307 U.S. at 452), when explaining that Congress had set no deadline at all but did not opine on a prefatory deadline's validity, *Coleman*, 307 U.S. at 452.

Further, the Supreme Court's vacatur of the district court's decision in *Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1981), did not explain why that case was moot.  *National Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982) ("consider[ing]" parties' submissions but not adopting any particular argument).  At any rate, this "most telling" clue, Archivist Br. 48, is a summary decision without "legal significance," *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 221 (1992).

## B.    Intervenors' remaining arguments are unpersuasive

As the Archivist explains, Archivist Br. 54-55, a remand is warranted to resolve Intervenors' arguments that the Equal Rights

_____

(Amendment passed House by a 354-24 margin and passed Senate by 84-8 margin).

Amendment was not properly ratified because Plaintiff-States did not meet a reasonable time requirement and several States rescinded their ratifications. This Court may remand legal issues that were not addressed by the district court and were not fully briefed on appeal. *LaRoque v. Holder*, 650 F.3d 777, 795 (D.C. Cir. 2011). Given the "tricky questions" presented here, this Court "would be greatly aided by the considered judgment of the district court, which has yet to weigh in." *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. App'x 442, 456 (D.C. Cir. 2018); see JA 346 (declining to reach these issues). Additionally, the Archivist has not provided his position on these questions. See Archivist Br. 55; Doc. 101 at 24 n.10. A remand would "thereby facilitate the proper disposition" of these issues. *CC Distribs., Inc. v. United States*, 883 F.2d 146, 156 (D.C. Cir. 1989).

A remand will not cause unnecessary delay and waste judicial resources, as Intervenors caution. Intervenors' Br. 27. This Court will need to remand this matter anyway so the district court can answer the "difficult," non-jurisdictional question of whether the equities warrant mandamus. See *American Hosp. Ass'n*, 812 F.3d at 192 (equities "rest[ ] in the first instance with the district court"). Remanding the issues of a

reasonable time requirement and State rescission "to the district court for an initial evaluation" will thus not consume additional judicial resources and would be "efficient and prudent." *International Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 783 F.2d 237, 251 (D.C. Cir. 1986).

If, however, this Court reaches the merits of Intervenors' arguments, it should reject them.

### 1. The Equal Rights Amendment is not barred by a "reasonable time" requirement

Any "reasonable time" requirement for ratification does not defeat mandamus here. The Equal Rights Amendment was ratified within a reasonable time, and, in any case, Article V imposes no such requirement.

1. This Court need not resolve whether Article V requires ratification to occur within a reasonable time because the States met any such requirement here. Congress took nearly five decades to propose the Equal Rights Amendment; the States took a nearly identical amount of time to ratify it. ERA Coalition Br. 11-12. Intervenors suggest this period of deliberation was unreasonable because shifts in the political and social landscape rendered the Amendment unnecessary, Intervenors' Br. 42, but the Amendment is as necessary today as when it was

proposed. Sex-based discrimination remains pervasive in our society, as evidenced by unequal pay and educational opportunities and scores of sex-based incidents of violence and harassment. See, e.g., ERA Coalition Br. 22-31; Generation Ratify Br. 16-33; Conference of Mayors Br. 16-18, 21; Business and Corporate Entities Br. 16-28. The Amendment is a critical tool in fighting and preventing this inequality.

In particular, the Equal Rights Amendment provides a basis for Congress to enact robust statutes combatting sex-based discrimination that it may otherwise lack the authority to establish. See, e.g., *United States v. Morrison*, 529 U.S. 598, 627 (2000) (Congress lacked authority to enact civil remedy in Violence Against Women Act); *United States v. Nagarwala*, 350 F. Supp. 3d 613, 630 (E.D. Mich. 2018) (Congress lacked authority to enact statute criminalizing female genital mutilation). It also provides a federal constitutional basis for claims by individuals facing sex-based violence and inequality. See *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) (domestic violence victim lacked due process right to seek enforcement of restraining order against abuser); *Geduldig v. Aiello*, 417 U.S. 484, 496-97 (1974) (State disability insurance

program that excluded pregnancy-related disabilities was constitutional).

The Amendment also supplements State efforts to combat sex inequality. It protects individuals across State lines and within the 24 States that do not have constitutional counterparts to the federal amendment. NY Br. 1; ERA Coalition Br. 16. Additionally, unlike many State counterparts, the Amendment requires strict scrutiny, which could prove fatal for sex-based discrimination (such as unequal pay) that otherwise survives review. Conference of Mayors Br. 8-9, 20, 24-25 (collecting cases); Equality Now Br. 32-33. The Amendment thus serves the important—and ongoing—need for sex equality.

2.    At any rate, the Amendment was properly ratified because Article V imposes no reasonable time requirement. Intervenors acknowledge that Article V "contains no express provision limiting the time for ratification." Intervenors' Br. 35 (internal quotation marks omitted). That omission was deliberate. When the Constitution was drafted, six State constitutions imposed timelines on the amendment process, with three limiting the time between an amendment's proposal

and ratification.[15]  Choosing not to follow these models, the framers drafted Article V without temporal limitations on the amendment process.  This Court should reject Intervenors' invitation to rewrite Article V's "clear" text by reading in a reasonable time requirement. *Sprague*, 282 U.S. at 730.

3.     Intervenors rely primarily on *Dillon*, which concluded that a reasonable time requirement is "'implied'" in Article V.  Intervenors' Br. 35-37 (quoting *Dillon*, 256 U.S. at 373).  *Dillon*'s reasoning on this point was dictum.  Again, the question there was whether the Eighteenth Amendment was invalid because its text included a deadline.  *Dillon*, 256 U.S. at 370-71; see Intervenors' Br. 36 (reasonable time requirement was not "precise question" before Court).  Although the Court addressed whether the Constitution requires ratification within a reasonable time, it ultimately decided (via dictum, see supra pp. 28-29), that Congress's power to set the deadline stemmed from its Article V authority to designate a mode of ratification.  *Dillon*, 256 U.S. at 376.  Thus, the discussion of whether the Constitution requires ratification within a

---

[15] Penn. Const. of 1776, § 47; Vt. Const. of 1786, ch. 2, § XL; Md. Const. of 1776, § LIX; see NY Br. 8-10.

reasonable time was "unnecessary." *Congressional Pay Amendment*, 16 Op. O.L.C. at 93 (internal quotation marks omitted).

This dictum is not binding and should not be followed because it is unpersuasive. See *Bauer v. Marmara*, 774 F.3d 1026, 1035 (D.C. Cir. 2014) (declining to follow Supreme Court's dicta). The Court stated that "proposal and ratification" are "succeeding steps in a single endeavor" and thus should not be "widely separated in time," *Dillon*, 256 U.S. at 374-75, "assum[ing] its conclusion" that "the process is to be short rather than lengthy," *Congressional Pay Amendment*, 16 Op. O.L.C. at 94. Next, the Court determined that amendments are to be proposed when there is a "necessity," *Dillon*, 256 U.S. at 375, but a necessity can persist for a long period of time—indeed, if an amendment's necessity appears temporary, that counsels against altering the Constitution. Finally, the Court concluded that the "fair implication" of requiring ratification by three-fourths of the States is that ratification must be "contemporaneous." *Id.* But consensus does not necessarily demand contemporaneity; Congress needed almost five decades to build the consensus required to propose the Equal Rights Amendment. ERA Coalition Br. 11-12.

4.    The Twenty-Seventh Amendment confirms that Article V contains no reasonable time requirement. *Dillon* thought it "untenable" that this amendment was still pending, 256 U.S. at 375, but it was nevertheless ratified 203 years after its proposal and then published and certified by the Archivist, JA 90.  Intervenors claim the amendment "means nothing" because it has never been approved in court, Intervenors' Br. 40, but neither have the prefatory deadlines upon which they rely.  They and their amici also submit that concluding that Article V imposes a reasonable time requirement would not undermine the Twenty-Seventh Amendment because Congress imposed no deadline there, Intervenors' Br. 40; Moral Law Br. 14; Eagle Forum Br. 14-15, but presumably, this constitutional requirement would apply regardless of whether Congress imposed a deadline.  This Court should not adopt a view of Article V that would call the Twenty-Seventh Amendment into question.  See *Leser*, 258 U.S. at 136 (declining to interpret Nineteenth Amendment in manner that would invalidate Fifteenth Amendment).

5.    Finally, Intervenors contend that it would be "impossible" for courts to interpret an amendment's "original meaning" if that amendment were ratified over several decades.  Intervenors' Br. 39

(internal quotation marks omitted).[16]     But courts conduct a similar analysis in the Second Amendment context by looking to public understanding over many decades—from Colonial America to the Fourteenth Amendment's ratification—when discerning the scope of the right to keep and bear arms.  See, e.g., *District of Columbia v. Heller*, 554 U.S. 570, 598, 605 (2008); *McDonald v. City of Chi.*, 561 U.S. 742, 769 (2010).  Intervenors' concern is also overblown given that in 2020 the Supreme Court had no difficulty discerning the "ordinary public meaning" of "strikingly similar" language in Title VII (there, "because of sex" instead of "account of sex"), which, as the Court noted, was enacted

---

[16]  Intervenors also warn that, absent a reasonable time requirement, the proposed Corwin Amendment—which prohibits any constitutional amendment giving "Congress the power to abolish or interfere" with any State's institution of slavery, Moral Law Br. 2—is pending.  Intervenors' Br. 39.  But that proposal has been impliedly repealed, or at minimum been rendered meaningless, by the Thirteenth Amendment, which prohibits slavery.  U.S. Const. amend. XIII, § 1; see *The Federalist* No. 78 (Alexander Hamilton) (where two "contradictory laws" cannot be "reconciled," later-in-time law prevails); *EC Term of Years Tr. v. United States*, 550 U.S. 429, 435 (2007) (same); Michael Stokes Paulsen, *A General Theory of Article V:  The Constitutional Lessons of the Twenty-seventh Amendment*, 103 Yale L.J. 677, 703 (1993) (Thirteenth Amendment served "impliedly to repeal" Corwin Amendment) (cited in Intervenors' Br. 43-45).

only a few years before Congress proposed the Equal Rights Amendment. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738, 1751 (2020).

In fact, it is Intervenors' understanding of Article V that would upset our constitutional design. The framers established an amendment process that "guards equally against that extreme facility, which would render the Constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults." *The Federalist* No. 43 (James Madison). Inserting a reasonable time requirement into Article V would upend this balance by making this already demanding process more difficult.

### 2.    States cannot rescind their ratifications of constitutional amendments

Intervenors Nebraska, South Dakota, and Tennessee, as well as Idaho and Kentucky, purported to rescind their ratifications of the Equal Rights Amendment before Plaintiff-States ratified the Amendment, and North Dakota purported to rescind its ratification last year. Intervenors' Br. 46; NY Br. 28 n.4. Relying on these actions, Intervenors submit that the Amendment is "[a]t least five" votes short of the requisite 38 votes. Intervenors' Br. 43. Should this Court reach the argument, it should reject it: there is nothing in the record to support finding any of the

41

rescissions effective under State law, and, more broadly, States cannot rescind their ratifications under federal law.

1. To start, although Intervenors ask this Court to find the rescissions effective, Intervenors' Br. 43, they provided no evidence showing that the rescissions were valid under the rescinding States' laws, including any procedures for acting on proposed constitutional amendments. And there were reasons to think the rescissions were invalid. Doc. 99 at 4-6, 24-26. For instance, in Kentucky, the Lieutenant Governor vetoed the rescission in part because the legislature had not followed State procedures required of even routine legislation. Marie Abrams Br. 17-28. And, in South Dakota, the legislature adopted a resolution stating its ratification would be withdrawn if 38 States did not ratify the Amendment by Congress's seven-year deadline, notwithstanding the State Attorney General's official opinion stating it was "without authority" to do so.[17] These and other issues would need to be resolved before a court could consider any of the rescissions valid.

---

[17] S.D. Atty. Gen. Op. No. 75-33 (Feb. 21, 1975), https://bit.ly/3jYUL2S; S.J. Res. 2, 54th Leg. (S.D. 1979).

2.    Even if these issues did not exist, Intervenors' argument would fail because States lack the authority to rescind their ratifications. Article V empowers the States to "ratif[y]" amendments but says nothing about rescinding those ratifications.    U.S. Const. art. V.    Although Intervenors insist that rescission authority is "implied," Intervenors' Br. 43 (internal quotation marks omitted), Article V "contains no ambiguity" and "calls for no resort to rules of construction," *Sprague*, 282 U.S. at 730. This Court, therefore, cannot "alter the method which the Constitution has fixed." *Hawke*, 253 U.S. at 227.

Historical understanding of the Constitution confirms this plain text reading.    The framers viewed State authority to ratify the Constitution as irrevocable.  For example, when New York contemplated conditionally ratifying the Constitution, James Madison advised that the Constitution "requires an adoption *in toto* and *for ever*" and thus "any *condition* whatever must vi[t]iate the ratification."[18]    Others at the framing agreed.[19]  There is no evidence that the framers held a different

---

[18] Letter from James Madison to Alexander Hamilton (July 20, 1788) in *Founders Online*, Nat'l Archives, https://bit.ly/3MjAz7Z.

[19] 23 *The Documentary History of the Ratification of the Constitution* 2290-91 (Jensen & Kaminski eds.), https://bit.ly/3JShHvs.

understanding of ratification authority with respect to amendments, and, over the following decades, scholars agreed that State ratification of an amendment was final and could not be rescinded. See NY Br. 30 (collecting sources).

Consistent with this historical understanding, and contrary to Intervenors' representation, Intervenors' Br. 45-46, the federal government has never accepted a State rescission of a proposed amendment. For instance, when Ohio and New Jersey purported to rescind their ratifications of the Fourteenth Amendment, Congress passed a joint resolution listing both States as having ratified the amendment and directing the Secretary of State to publish and certify the amendment, which he did. *Coleman*, 307 U.S. at 449. Likewise, the Secretary listed New York as having certified the Fifteenth Amendment even though the State had purported to rescind its ratification. 16 Stat. 1131 (1870); CAC Br. 12-13. For both amendments, the Supreme Court approved of the decision to treat the rescissions as invalid. See *Coleman*, 307 U.S. at 450; *Leser*, 258 U.S. at 136.

Indeed, allowing States to rescind their ratifications would inject uncertainty into the amendment process. Permitting State rescissions

44

could create "great confusion in determining when an amendment has in fact been adopted." Charles Burdick, *The Law of the American Constitution* 43-44 (1922). Additionally, the "mere possibility of rescission" destabilizes the amendment process: legislators and advocates would no longer be able to rely on the fact that other States have ratified an amendment when deciding to invest time and resources into advocating for their State to do the same. State Advocates Br. 26-27.

Ignoring these consequences, Intervenors submit that rescinding ratification of an amendment is no different than changing one's vote for legislation, and that allowing rescission ensures that an amendment reflects the will of the people. Intervenors' Br. 43-44. But unlike an act of legislation, an amendment becomes a permanent part of our nation's foundational document. States must thus approach the decision of whether to ratify an amendment with serious "deliberation and consideration," *Hawke*, 253 U.S. at 226, which is why the framers viewed ratification authority as a "special power" that "[w]hen exercised" ceases to exist, John Jameson, *A Treatise on Constitutional Conventions* 628 (4th ed., 1887). Moreover, if the will of the people does fundamentally

45

change, there is a process for reflecting as much: as with the Eighteenth Amendment, another amendment can be passed.

## C.    No alternative remedy exists

The district court did not reach the third jurisdictional element for mandamus, but Plaintiff-States have explained that this element was met because they have no adequate alternative remedy.  Opening Br. 63-64.  Indeed, this Court has previously recognized that the refusal to publish and certify constitutional amendments "should be coerced by mandamus." *Colby*, 265 F. at 360.

Neither the Archivist nor Intervenors contend that this jurisdictional element is unsatisfied, but Intervenors suggest that Plaintiff-States should have instead brought a claim for injunctive and declaratory relief or sought to challenge agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Intervenors' Br. 26.  To the extent this Court agrees, it should treat this action as being brought under the proper cause of action or remand this case to the district court with instructions that Plaintiff-States be permitted to amend their complaint.  See *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 231 n.4 (1986) (construing mandamus action as suit to

46

compel agency action under APA); see Intervenors' Br. 26-27 (dismissing case for failure to plead correct cause of action "would serve little purpose").[20]

\* \* \*

Thirty-Eight States have exercised their sovereign prerogative to make our nation's foundational document "more perfect." Those ratifications should be respected, and the recognition that all residents of our nation are equal—regardless of their sex—should be enshrined in the official text of our Constitution.

---

[20] The possibility that Plaintiff-States could seek relief under the APA does not provide a meaningfully distinct remedy that precludes mandamus relief. See *Vietnam Veterans of Am. & Veterans of Modern Warfare v. Shinseki*, 599 F.3d 654, 559 n.6 (D.C. Cir. 2010) ("standards for obtaining" mandamus and relief under APA "are essentially the same"); *Haneke v. Sec'y of Health, Educ. & Welfare*, 535 F.2d 1291, 1296 & n.16 (D.C. Cir. 1976) (concluding that Court had mandamus jurisdiction while also recognizing plaintiffs could proceed under APA).

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

STATES OF ILLINOIS and NEVADA

KWAME RAOUL
Attorney General of Illinois

AARON D. FORD
Attorney General of Nevada

By: */s/ Jane Elinor Notz*
JANE ELINOR NOTZ
*Solicitor General*
ALEX HEMMER
PRIYANKA GUPTA
KATHRYN HUNT MUSE
ELIZABETH ROBERSON-
YOUNG
Office of the Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3312 – Telephone
(312) 814-5024 – Facsimile
Jane.Notz@ilag.gov

*Attorneys for Appellant
State of Illinois*

By: */s/ Heidi Parry Stern*
HEIDI PARRY STERN
*Solicitor General*
CRAIG A. NEWBY
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 – Telephone
(775) 684-1108 – Facsimile
HStern@ag.nv.gov
CNewby@ag.nv.gov

*Attorneys for Appellant
State of Nevada*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century, a proportionally spaced font, and that it complies with the type-volume limitation provided by this Court's September 14, 2021 order, see D.C. Cir. R. 28(e), because it contains 8,993 words, excluding the parts exempted by Fed. R. App. 32(f), according to the count of Microsoft Word.

By: */s/ Jane Elinor Notz*
Jane Elinor Notz

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2022, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

By: */s/ Jane Elinor Notz*
Jane Elinor Notz